1

**CALLAHAN & BLAINE, APLC**
Daniel J. Callahan (Bar No. 91490)
    dcallahan@callahan-law.com
Richard T. Collins (Bar No. 166577)
    rcollins@callahan-law.com
Damon D. Eisenbrey (Bar No. 215927)
    deisenbrey@callahan-law.com
Adrian L. Canzoneri (Bar No. 265168)
    acanzoneri@callahan-law.com
3 Hutton Centre Drive, Ninth Floor
Santa Ana, California 92707
Telephone: (714) 241-4444
Facsimile:  (714) 241-4445

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| TML RECOVERY, LLC, a California limited liability company;<br>MMR SERVICES, LLC, a California limited liability company;<br>SOUTHERN CALIFORNIA RECOVERY CENTERS OCEANSIDE, LLC, a California limited liability company;<br>ADDICTION HEALTH ALLIANCE, LLC, a California limited liability company;<br>DR RECOVERY ENCINITAS, LLC, a California limited liability company;<br>SOUTHERN CALIFORNIA ADDICTION CENTER, INC., a California corporation;<br>12 SOUTH, LLC, a California limited liability company;<br>WOMAN'S RECOVERY CENTER, LLC, a California limited liability company; and<br>PACIFIC PALMS RECOVERY, LLC, a California limited liability company,<br><br>Plaintiffs,<br><br>v.<br><br>CIGNA CORPORATION, a Delaware corporation;<br>CIGNA HEALTH AND LIFE INSURANCE COMPANY, a Connecticut corporation;<br>CONNECTICUT GENERAL LIFE | Case No.: 8:20-cv-0269-DOC-JDE<br><br>*Assigned to Hon. Judge David O. Carter*<br><br>Consolidated with:<br>8:20-cv-0271       8:20-cv-0272<br>8:20-cv-0273       8:20-cv-0274<br>8:20-cv-0787       8:20-cv-0788<br><br>**CONSOLIDATED SECOND AMENDED COMPLAINT FOR:**<br><br>1. **CLAIMS FOR PLAN BENEFITS UNDER ERISA, 29 U.S.C. §1132(a)(1)(B)**<br>2. **BREACH OF WRITTEN CONTRACT**<br>3. **BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**<br>4. **BREACH OF IMPLIED CONTRACT**<br>5. **BREACH OF ORAL CONTRACT**<br>6. **PROMISSORY ESTOPPEL**<br>7. **UNFAIR COMPETITION**<br><br>**DEMAND FOR JURY TRIAL**<br><br>This Document relates to:<br>        **"ALL ACTIONS"** |

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

1 | INSURANCE COMPANY, a Connecticut corporation;
2 | CIGNA BEHAVIORAL HEALTH, INC., a Minnesota corporation;
3 | CIGNA BEHAVIORAL HEALTH OF CALIFORNIA, INC., a California corporation;
4 | 
5 | CIGNA HEALTH MANAGEMENT, INC., a Delaware corporation; CIGNA HEALTHCARE OF CALIFORNIA, INC., a California corporation;
6 | 
7 | VIANT, INC., a Nevada corporation; and MULTIPLAN, INC., a New York corporation,
8 | 
9 | Defendants.

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

Plaintiffs TML Recovery, LLC, MMR Services, LLC, Southern California Recovery Centers Oceanside, LLC, Addiction Health Alliance, LLC, DR Recovery Encinitas, LLC, Southern California Addiction Center, Inc., 12 South, LLC, Woman's Recovery Center, LLC and Pacific Palms Recovery, LLC (collectively "Plaintiffs") hereby allege against Defendants Cigna Corporation, Cigna Health and Life Insurance Company, Connecticut General Life Insurance Company, Cigna Behavioral Health, Inc., Cigna Behavioral Health of California, Inc., Cigna Health Management, Inc., Cigna Healthcare of California, Inc., Viant, Inc., MultiPlan, Inc., and Does 1 through 25, inclusive, (collectively "Defendants") as follows:

## THE PARTIES

1.      Plaintiff TML Recovery, LLC ("TML Recovery") (TIN 46-2916076) is, and at all relevant times herein mentioned was, a California limited liability company qualified to do business in the State of California.  TML Recovery is a substance use disorder treatment provider and clinical laboratory.  TML Recovery is in the profession of helping individuals recover from alcoholism and addiction and return to their families and communities as productive and contributing members of society.  TML Recovery is, and at all relevant times herein was, certified by the California Department of Health Care Services ("DHCS") to operate a substance use

1   disorder treatment program.  TML Recovery is, and at all relevant times herein was,

2   accredited by The Joint Commission, Behavioral Health Care Accreditation

3   Program ("JCAHO"), and The Commission on Accreditation of Rehabilitation

4   Facilities International ("CARF"), and has a Centers for Medicare and Medicaid

5   Services ("CMS"), Clinical Laboratory Improvements Amendments ("CLIA"),

6   certificate of waiver.  At times relevant herein, TML Recovery was licensed by the

7   California Department of Public Health ("DPH") and accredited by the CMS and

8   Commission on Office Laboratory Accreditation ("COLA") for the examination of

9   materials derived from the human body for the purpose of providing information for

10  the diagnosis, prevention, and treatment of human disease or impairment, and to

11  determine, measure, or otherwise describe the presence or absence of various

12  substances or organisms in the body.

13          2.      Plaintiff MMR Services, LLC ("MMR Services") (TIN 47-3018602) is,

14  and at all relevant times herein mentioned was, a California limited liability

15  company qualified to do business in the State of California.  MMR Services is a

16  clinical laboratory.  MMR Services provides laboratory services to those in the

17  process of recovering from mental health and substance use disorders.  MMR

18  Services is, and at all relevant times herein was, licensed by the DPH and accredited

19  by the CMS and COLA for the examination of materials derived from the human

20  body for the purpose of providing information for the diagnosis, prevention, and

21  treatment of human disease or impairment, and to determine, measure, or otherwise

22  describe the presence or absence of various substances or organisms in the body.

23  MMR Services is a full service, CLIA compliant, high complexity reference

24  specialty laboratory that combines state of the art laboratory testing processes,

25  methodologies and cutting-edge technology for its specialization in urine toxicology

26  drug confirmation testing which is designed to provide accurate results that help

27  physicians and clinicians create a scientifically designed drug monitoring strategy

28  for optimal treatment outcomes, which includes core lab and PGx testing for

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

1   accurate prescription therapy.

2       3.      Plaintiff Southern California Recovery Centers Oceanside, LLC (TIN

3   47-4573182) ("SCRCO") is, and at all relevant times herein mentioned was, a

4   California limited liability company qualified to do business in the State of

5   California.  SCRCO is, and at all relevant times herein was, a substance use disorder

6   treatment provider and clinical laboratory.  SCRCO is in the profession of helping

7   individuals recover from alcoholism and addiction and return to their families and

8   communities as productive and contributing members of society.  SCRCO is, and at

9   all relevant times herein was, certified by the DHCS to operate a substance use

10  disorder treatment program.  SCRCO at all relevant times herein has had a CMS,

11  CLIA, certificate of waiver, and at times relevant herein, SCRCO was licensed by

12  the DPH and accredited by the CMS and COLA for the examination of materials

13  derived from the human body for the purpose of providing information for the

14  diagnosis, prevention, and treatment of human disease or impairment, and to

15  determine, measure, or otherwise describe the presence or absence of various

16  substances or organisms in the body.

17      4.      Plaintiff Addiction Health Alliance, LLC ("AHA") (TIN 46-5515765)

18  is, and at all relevant times herein mentioned was, a California limited liability

19  company qualified to do business in the State of California.  AHA is a substance use

20  disorder treatment provider and clinical laboratory.  AHA is in the profession of

21  helping individuals recover from alcoholism and addiction and return to their

22  families and communities as productive and contributing members of society.  AHA

23  is, and at all relevant times herein was, licensed by the DHCS to operate a substance

24  use disorder residential facility and accredited by JCAHO.  AHA is also licensed by

25  the DPH and accredited by the CMS and COLA for the examination of materials

26  derived from the human body for the purpose of providing information for the

27  diagnosis, prevention, and treatment of human disease or impairment, and to

28  determine, measure, or otherwise describe the presence or absence of various

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

- 3 -

1   substances or organisms in the body.

2       5.    Plaintiff DR Recovery, LLC ("DR Recovery") (TIN 47-1361036) is,

3   and at all relevant times herein mentioned was, a California limited liability

4   company qualified to do business in the State of California.  DR Recovery is a

5   substance use disorder treatment provider and clinical laboratory.  DR Recovery is

6   in the profession of helping individuals recover from alcoholism and addiction and

7   return to their families and communities as productive and contributing members of

8   society.  DR Recovery is, and at all relevant times herein was, certified by the

9   DHCS to operate a substance use disorder treatment program.  DR Recovery has,

10   and at all relevant times herein had, a CMS, CLIA, certificate of waiver, and at

11   times relevant herein, was licensed by the DPH and accredited by the CMS and

12   COLA for the examination of materials derived from the human body for the

13   purpose of providing information for the diagnosis, prevention, and treatment of

14   human disease or impairment, and to determine, measure, or otherwise describe the

15   presence or absence of various substances or organisms in the body.

16       6.    Plaintiff Southern California Addiction Center, Inc. ("SCAC") (TIN

17   47-5231947) is, and at all relevant times herein mentioned was, a California

18   corporation qualified to do business in the State of California.  At all times relevant

19   herein, SCAC was a substance use disorder treatment provider in the profession of

20   helping individuals recover from alcoholism and addiction and return to their

21   families and communities as productive and contributing members of society.

22   SCAC was, at all relevant times herein, licensed and certified by the DHCS to

23   operate a substance use disorder residential facility and treatment program,

24   accredited by JCAHO, and holder of a CMS, CLIA, certificate of waiver.

25       7.    Plaintiff 12 South, LLC ("12 South") (TIN 47-5125464) is, and at all

26   relevant times herein mentioned was, a California limited liability company

27   qualified to do business in the State of California.  12 South is a mental health and

28   substance use disorder treatment provider.  12 South is in the profession of helping

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

- 4 -

individuals recover from alcoholism and addiction and return to their families and communities as productive and contributing members of society.  12 South is, and at all relevant times herein was, certified by the DHCS to operate a substance use disorder treatment program and accredited by JCAHO, and has a CMS, CLIA, certificate of waiver.

8.     Plaintiff Woman's Recovery Center, LLC ("Woman's Recovery") (TIN 81-5361991) is, and at all relevant times herein mentioned was, a California limited liability company qualified to do business in the State of California. Woman's Recovery is a substance use disorder treatment provider.  Woman's Recovery is in the profession of helping individuals recover from alcoholism and addiction and return to their families and communities as productive and contributing members of society.  Woman's Recovery is, and at all relevant times herein was, certified by the DHCS to operate a substance use disorder treatment program and holds a CMS, CLIA, certificate of waiver.

9.     Plaintiff Pacific Palms Recovery, LLC ("Pacific Palms") (TIN 80-0651115) is, and at all relevant times herein mentioned was, a California limited liability company qualified to do business in the State of California.  Pacific Palms is a substance use disorder treatment provider.  Pacific Palms is in the profession of helping individuals recover from alcoholism and addiction and return to their families and communities as productive and contributing members of society. Pacific Palms is, and at all relevant times herein was, certified by the DHCS to operate a substance use disorder treatment program.  Pacific Palms is, and at all relevant times herein was, accredited by JCAHO and CARF, and has a CMS, CLIA, certificate of waiver.

10.     On information and belief, Defendant Cigna Corporation ("Cigna") is a Delaware corporation that conducts insurance operations throughout California, representing to consumers that Cigna, together with its subsidiaries is a global health service organization.  Cigna has license to use the federally registered service mark

- 5 -

CONSOLIDATED SECOND AMENDED COMPLAINT

"Cigna," markets and issues health insurance and insures, issues, administers and makes coverage and benefit determinations, and develops and applies substance use disorder and mental health treatment and laboratory services guidelines in making coverage and benefit determinations related to the health care policies nationally through its various wholly-owned and controlled subsidiaries, controlled agents and undisclosed principals and agents, including, but not limited to, Defendants Cigna Health and Life Insurance Company, Connecticut General Life Insurance Company, Cigna Behavioral Health, Inc., Cigna Behavioral Health of California, Inc., Cigna Health Management, Inc., Cigna Healthcare of California, Inc., Viant, Inc., MultiPlan, Inc., and Does 1 through 25, inclusive, under the name "Cigna."  Cigna is licensed and regulated by the California Department of Insurance ("CDI") and the California Department of Managed Health Care ("CDMHC") to transact the business of insurance in the State of California, is in fact transacting the business of insurance in the State of California, and is thereby subject to the laws and regulations of the State of California.

11.    On information and belief, Defendant Cigna Health and Life Insurance Company ("Cigna Health and Life") is a Connecticut corporation that conducts insurance operations throughout California.  Cigna Health and Life markets and issues health insurance and insures, administers and makes coverage and benefit determinations, develops and applies substance use disorder and mental health treatment and laboratory services guidelines and criteria in making coverage and benefit determinations related to the plans at issue in this action, and participates in the claims administration process related to plans insured, managed and/or administered by Cigna and its subsidiaries and affiliates.  Cigna Health and Life is licensed and regulated by the CDI and the CDMHC to transact the business of insurance in the State of California, is in fact transacting the business of insurance in the State of California, and is thereby subject to the laws and regulations of the State of California.

CONSOLIDATED SECOND AMENDED COMPLAINT

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

12.     On information and belief, Defendant Connecticut General Life Insurance Company ("Connecticut General") is a Connecticut corporation that conducts insurance operations throughout California.  Connecticut General markets and issues health insurance and insures, administers and makes coverage and benefit determinations, develops and applies substance use disorder and mental health treatment and laboratory services guidelines and criteria in making coverage and benefit determinations related to the plans at issue in this action, and participates in the claims administration process related to plans insured, managed and/or administered by Cigna and its subsidiaries and affiliates.  Connecticut General is licensed and regulated by the CDI and the CDMHC to transact the business of insurance in the State of California, is in fact transacting the business of insurance in the State of California, and is thereby subject to the laws and regulations of the State of California.

13.     On information and belief, Defendant Cigna Behavioral Health, Inc. ("Cigna Behavioral Health") is a Minnesota corporation that conducts insurance operations throughout California.  Cigna Behavioral Health markets and issues health insurance and insures, administers and makes coverage and benefit determinations, develops and applies substance use disorder and mental health treatment and laboratory services guidelines and criteria in making coverage and benefit determinations related to the plans at issue in this action, and participates in the claims administration process related to plans insured, managed and/or administered by Cigna and its subsidiaries and affiliates.  Cigna Behavioral Health is licensed and regulated by the CDI and the CDMHC to transact the business of insurance in the State of California, is in fact transacting the business of insurance in the State of California, and is thereby subject to the laws and regulations of the State of California.

14.     On information and belief, Defendant Cigna Behavioral Health of California, Inc. ("Cigna Behavioral Health CA") is a California corporation that

conducts insurance operations throughout California.  Cigna Behavioral Health CA markets and issues health insurance and insures, administers and makes coverage and benefit determinations, develops and applies substance use disorder and mental health treatment and laboratory services guidelines and criteria in making coverage and benefit determinations related to the plans at issue in this action, and participates in the claims administration process related to plans insured, managed and/or administered by Cigna and its subsidiaries and affiliates.  Cigna Behavioral Health CA is licensed and regulated by the CDI and the CDMHC to transact the business of insurance in the State of California, is in fact transacting the business of insurance in the State of California, and is thereby subject to the laws and regulations of the State of California.

15.    On information and belief, Defendant Cigna Health Management, Inc. ("Cigna Health Management") is a Delaware corporation that conducts insurance operations throughout California.  Cigna Health Management markets and issues health insurance and insures, administers and makes coverage and benefit determinations, develops and applies substance use disorder and mental health treatment and laboratory services guidelines and criteria in making coverage and benefit determinations related to the plans at issue in this action, and participates in the claims administration process related to plans insured, managed and/or administered by Cigna and its subsidiaries and affiliates.  Cigna Health Management is licensed and regulated by the CDI and the CDMHC to transact the business of insurance in the State of California, is in fact transacting the business of insurance in the State of California, and is thereby subject to the laws and regulations of the State of California.

16.    On information and belief, Defendant Cigna Healthcare of California, Inc. ("Cigna Healthcare CA") is a Delaware corporation that conducts insurance operations throughout California.  Cigna Healthcare CA markets and issues health insurance and insures, administers and makes coverage and benefit determinations,

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

CONSOLIDATED SECOND AMENDED COMPLAINT

develops and applies substance use disorder and mental health treatment and laboratory services guidelines and criteria in making coverage and benefit determinations related to the plans at issue in this action, and participates in the claims administration process related to plans insured, managed and/or administered by Cigna and its subsidiaries and affiliates.  Cigna Healthcare CA is licensed and regulated by the CDI and the CDMHC to transact the business of insurance in the State of California, is in fact transacting the business of insurance in the State of California, and is thereby subject to the laws and regulations of the State of California.

17.    On information and belief, Defendant Viant, Inc. ("Viant") is a Nevada corporation which conducts insurance operations throughout California.  Viant provides health care payment solutions and offers auditing and reimbursement of behavioral health and substance use disorder claims and costs, as well as prepayment services such as treatment facility bill review and professional negotiation, on plans insured, managed and/or administered by Cigna and its subsidiaries and affiliates.  Plaintiffs are informed and believe, and based thereon allege, that Viant is licensed and/or regulated by the CDI and/or the CDMHC to transact the business of insurance in the State of California, is in fact transacting the business of insurance in the State of California, and is thereby subject to the laws and regulations of the State of California.

18.    On information and belief, Defendant MultiPlan, Inc. ("MPI") is a New York corporation which conducts insurance operations throughout California.  MPI is a provider of healthcare cost management solutions, specializing in providing claim cost management solutions for controlling the financial risks associated with health care bills on plans insured, managed and/or administered by Cigna and its subsidiaries and affiliates.  MPI also offers preferred provider organization network solutions for accessing hospitals, ancillary care facilities, treatment facilities, and health care professionals for the benefit and at the control and direction of Cigna and

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

its subsidiaries and affiliates.  Plaintiffs are informed and believe, and based thereon allege, that MPI is licensed and/or regulated by the CDI and/or the CDMHC to transact the business of insurance in the State of California, is in fact transacting the business of insurance in the State of California, and is thereby subject to the laws and regulations of the State of California.

19.     Plaintiffs are informed and believe that, at all relevant times, each of the Defendants was and is the agent, servant, representative, undisclosed principal and/or alter ego of each of the other Defendants, and in doing the things herein alleged, each of the Defendants was acting in the scope of its authority as such agent, servant, representative, undisclosed principal and/or alter ego, and with the permission and consent of each of the other Defendants.

20.     Plaintiffs are informed and believe that, at all relevant times, Defendants are the alter egos of the other Defendants, have comingled assets, have comingled business operations, have undercapitalized operations, have ignored corporate formalities, and have exercised such dominion and control over the operations of the other Defendants that it would be unjust to permit such Defendants to avoid individual liability.  Plaintiffs are further informed and believe, that a unity of interest and ownership exists between Defendants, that any individuality and separateness between Defendants have ceased, and that Defendants are the alter egos of one another.  On information and belief, Plaintiffs understand and believe that Defendants share the same common ownership, places of business, managements, and operate as a single enterprise.

21.     Plaintiffs are informed and believe that, at all relevant times, each of the Defendants formed and operated a conspiracy with each of the other Defendants to perform the acts alleged herein, in furtherance of a common design to place profits over patients and damage substance use disorder treatment providers, including Plaintiffs, and with knowledge that the conduct alleged herein of each of the Defendants constituted violations of law and provided substantial assistance or

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

CONSOLIDATED SECOND AMENDED COMPLAINT

encouragement to each other to so act against insured patients and substance use disorder treatment providers, including Plaintiffs.

## **BRIEF STATEMENT OF THE CONSOLIDATED LITIGATION**

22.     Plaintiffs are out-of-network substance use disorder treatment providers and clinical laboratories.  Plaintiffs are in the profession of helping individuals recover from alcoholism and addiction and return to their families and communities as productive and contributing members of society.  Plaintiffs provided medically necessary, verified, preauthorized and covered substance use disorder treatment and laboratory services to 508 individuals with health insurance that was sold, insured, managed and/or administered by Defendants.  The treatment and services provided by Plaintiffs include residential detoxification and residential treatment ("RTC"), partial hospitalization/day treatment ("PHP"), intensive outpatient ("IOP"), outpatient ("OP"), treatment planning, counseling and behavioral therapies, individual, family and group therapy, medication management, case management services, and laboratory services to, among other things, determine, measure, or otherwise describe the presence or absence of various substances in the body.  The treatments and services were provided by or under the direction of properly qualified behavioral health providers and/or medical and clinical professionals.

23.     Defendants' health insurance plans, for each of the 508 insureds at issue, provide coverage for out-of-network substance use disorder treatment and laboratory services.  In this regard, the plans, and each of them, provide that out-of-network substance use disorder benefits include the following levels of care: RTC, PHP, IOP, and OP.  The plans also provide that out-of-network covered substance use disorder services include: diagnostic evaluations, assessment and treatment planning, treatment and/or procedures, medication management and other associated treatment, psychological testing, referral services, individual, family and group therapy, provider-based case management services, and crisis intervention.  The plans further provide coverage for out-of-network laboratory benefits, which include

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

the facility charge and the charge for supplies and equipment, physician services for pathologists, and presumptive drug tests and definitive drug tests.

24.     Defendants' health insurance plans, for each of the 508 insureds at issue, pay benefits for out-of-network substance use disorder treatment and laboratory services, including, but not limited to, RTC, PHP, IOP, OP, diagnostic evaluations, assessment and treatment planning, treatment and/or procedures, medication management and other associated treatment, psychological testing, referral services, individual, family and group therapy, provider-based case management services, crisis intervention, and laboratory services, at varying percentages of covered charges (between 50% to 80% of covered charges, with the majority of plans paying out-of-network benefits at 70% of covered charges (minus any outstanding insured cost-sharing amounts, which Defendants deduct from payments to Plaintiffs)) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%.  Plaintiffs are informed and believe, and based thereon allege, that each of the 508 insureds had already met their annual out-of-pocket maximum at the time they first received treatment or services from Plaintiffs, or shortly thereafter.  The plans also pay 100% of covered charges in the event of a "network inadequacy" or "network gap" for the services received. Plaintiffs are informed and believe, and based thereon allege, that at all times relevant herein Defendants had an inadequate network of substance use disorder treatment providers and clinical laboratories.  The exclusions, conditions and limitations in the plans do not apply to the treatments and services provided by Plaintiffs.

25.     Each of Defendants' insureds orally assigned benefits and payments by their insurance company or health plan to Plaintiffs and Plaintiffs obtained written assignments of benefits from each of the insureds at issue, by which Defendants' insureds intended to, and did, assign to Plaintiffs not only rights to payment of claims but to assert all rights and causes of action against Defendants in connection

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

1    with such claims.

2        26.    Each of the Plaintiffs at all relevant times utilized an electronic medical

3    record ("EMR") system provided by Kipu, a company that specifically serves the

4    addiction treatment industry, which includes various forms utilized by treatment

5    providers like Plaintiffs.  Each of the Plaintiffs, with the exception of clinical

6    laboratory MMR Services, at all relevant times utilized the Kipu assignment forms

7    and tailored them to their facility, and obtained from each of the insureds at issue a

8    written assignment of benefits that states the following material terms, *inter alia*:

> [Patient-insured] hereby authorize and request that
> payment of benefits by [Cigna] be made directly to
> [Plaintiff]…for services furnished to me or my dependent.
>
> …
>
> [Plaintiff] has been appointed by me to act as my
> representative and on my behalf in any proceeding that
> may be necessary to seek payment from [Cigna]. …

14        27.    Plaintiff MMR Services is a clinical laboratory that at all relevant times

15    utilized a Drug Testing Requisition Form in its Kipu EMR that includes an

16    assignment, and obtained from each of the insureds at issue a written assignment of

17    benefits that states the following material terms, *inter alia*:

> [Patient-insured] authorize payments to be made to
> [Plaintiff]…for services ordered by my practitioner. I
> authorize my physician and practice staff, as well as my
> insurance company … to release information needed to
> determine benefits for laboratory services. …

21        28.    In reliance on the assignments of benefits, Plaintiffs, and each of them,

22    rendered the subject treatment and services to Defendants' insureds/members.

23    Moreover, Defendants confirmed, represented, promised and warranted to Plaintiffs

24    through the required verification of benefits and the preauthorization process, that

25    each of the insureds and their respective out-of-network treatments and services

26    were covered by health insurance plans issued, managed and/or administered by

27    Defendants, the premiums were paid and the plans were effective, and that Plaintiffs

28    would be paid for treating Defendants' insureds.  In reliance on Defendants'

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

CONSOLIDATED SECOND AMENDED COMPLAINT

coverage representations and payment promises, Plaintiffs, and each of them, rendered the subject treatment and services to Defendants' insureds/members.  At all times relevant herein, Defendants knew that Plaintiffs were treating and providing services, and would continue to treat and provide services, to their insureds, and Defendants were, at all times, advised and fully aware of Plaintiffs' charges for the treatment and services rendered, at each level of care.  .

29.     After providing covered treatment and services to the 508 insureds at issue, Plaintiffs submitted their claims to Defendants for payment.  Defendants were obligated – under the law and the plans – to pay Plaintiffs the applicable plan percentage of their covered charges (between 50% to 80% of covered charges, with the majority of plans paying out-of-network benefits at 70% of covered charges (minus any outstanding insured cost-sharing amounts)) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%. Defendants also advised, confirmed and promised to Plaintiffs during the verification and benefits and preauthorization process for each of the 508 insureds, that the out-of-network benefits paid by Defendants to out-of-network providers, like Plaintiffs, for all levels of substance use disorder treatment and laboratory services, is a percentage of their covered charges (between 50% to 80% of covered charges, with the majority of claims promised by Defendants to be paid at 70% of covered charges) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%.

30.     Instead of paying Plaintiffs in accordance with the plan documents and the law, and in accordance with Defendants' agreements, representations and promises to Plaintiffs, Defendants engaged in unfair, unreasonable, illegal, incomplete, fraudulent and systematic polices, practices and decisions – with an emphasis on profits over patients – and paid Plaintiffs, as a group, an average of 16.23% of their covered charges.  It was only after Plaintiffs rendered the treatment and services at issue that Defendants refused to properly compensate Plaintiffs for

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

the covered treatment and services rendered to Defendants' insureds.

31.     During the claim submission and payment process, Defendants put Plaintiffs on various pre-payment review and program integrity audits, and through their various departments, Defendants repeatedly requested the same documents and information from Plaintiffs, over and over again.  This was all an attempt by Defendants, and each of them, to avoid processing and paying the claims.  Plaintiffs complied with Defendants' repetitive requests and despite being promised payment pursuant to, *inter alia*, the plans and/or repricing agreements, Defendants refused to properly reimburse Plaintiffs for the covered treatment and services provided to Defendants' insureds.  Defendants likewise failed and refused to provide Plaintiffs and the insureds with adequate notice and/or explanation for the denial of benefits, payments or reimbursement of claims, and failed and refused to provide Plaintiffs and the insureds with a reasonable opportunity to engage in a meaningful claims process and procedure which was full and fair.  Defendants' audits, bogus TIN flags and pending of claims, inadequate notices and explanations, denial of full and fair claims processes and procedures, repetitive document and information requests and promises of payment were false and fraudulent and were implemented by Defendants, and each of them, as a pretext to illegally delay and deny Plaintiffs (and hundreds of other substance use disorder treatment providers and clinical laboratories) payment in accordance with Defendants' representations and promises, and the law and plans.

32.     Defendants never informed or advised Plaintiffs during the claim submission and payment process or post-claims process, and never denied Plaintiffs payment on the grounds of any anti-assignment provisions in the health plans at issue.  As a result and by operation of law and principles of equity, Defendants have waived and are estopped from asserting any such anti-assignment provisions in any

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

of the health plans at issue in this action.[1]

33.     As a result of the conduct of Defendants', and each of them, Plaintiffs have suffered and continue to suffer general and incidental damages according to proof, including the benefits owed under the plans and the law in the millions, amounts owed in accordance with Defendants' payment promises to Plaintiffs, the interruption in Plaintiffs' businesses, lost business opportunities, lost profits and other consequences, and moreover, Plaintiffs are entitled to injunctive relief and statutory and prejudgment interest and attorney's fees against Defendants, and each of them.[2]

## AMERICA'S SUBSTANCE USE DISORDER EPIDEMIC

34.     Now, as never before, there is a critical need for access to treatment for substance use disorders.  The Substance Abuse and Mental Health Services Administration ("SAMHSA") estimates that in 2014, 20.2 million adult Americans, or 8.4 percent of the adult population suffered from a substance use disorder within

---

[1] *See, California Spine and Neurosurgery Institute v. Blue Cross of California*, 2020 WL 3536496 at *1 (9th Cir. June 30, 2020) ("district court erred in determining waiver was inapplicable[;]" and "district court also erred in concluding that [Plaintiff] failed to satisfy three equitable estoppel factors" when insurer asserted for the first time in litigation an anti-assignment provision to avoid coverage.); *Spinedex Physical Therapy USA, Inc. v. United Healthcare of Ariz., Inc.*, 770 F.3d 1282, 1296 (9th Cir. 2014) (considering an anti-assignment provision and explaining that "an administrator may not hold in reserve a known or reasonably knowable reason for denying a claim, and give that reason for the first time when the claimant challenges a benefits denial in court."); *Harlick v. Blue Shield of Cal.*, 686 F.3d 699, 720 (9th Cir. 2012) ("ERISA and its implementing regulations are undermined where plan administrators have available sufficient information to assert a basis for denial of benefits, but choose to hold that basis in reserve rather than communicate it to the beneficiary.").

[2] The treatment and claim documents concerning each of the subject 508 patient insureds treated by Plaintiffs contain personal health and treatment information protected by law from public disclosure pursuant to, *inter alia*, the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). A Protective Order has been entered, and Plaintiffs produced their claims reports to Defendants on May 21, 2020.  The reports set forth the subject patient's initials and member identification number, the service start and end dates, the amounts billed and paid, and the outstanding balance.  With Plaintiffs' company names and TINs, Defendants can access a trove of information on each of Plaintiffs' patients, including, but not limited to, the patient's name, date of birth, residence address, gender, family relationships, name and type of insurance plan/policy and state of issuance, dates of coverage, dates of service, types and levels of care provided, claim numbers, billed amounts, explanations of benefits paid or denied, and appeals and grievances regarding claims denied.  The information available to Defendants through Plaintiffs' company names and TINs is sufficient enough to apprise Defendants of the substance of Plaintiffs' claims.

---

- 16 -

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

the past year.[3]  According to the President's Commission on Combatting Drug Addiction and the Opioid Crisis (November 2017), heroin overdose deaths increased four-fold from 2010 to 2015, while overdose deaths due to prescription opioids consistently outpaced even the disturbingly high heroin overdose rates.[4]  Drug overdoses now cause more deaths than either car accidents or guns, and those suffering from substance use disorders are at the highest risk.

35.  On average, 130 Americans die every day from an opioid overdose. The opioid crisis has and continues to destroy lives and devastate families and communities.[5]  It is the deadliest drug crisis in United States history and it is only getting worse.[6]  In 2017 alone, California lost 2,196 lives to the opioid epidemic. Timely access to life-sustaining and life-saving treatment and continuing care for substance use and mental health disorders is critical to preventing these deaths and allowing people to achieve long-term recovery and to return to their families, friends and communities as healthy, productive and contributing members of society.[7]

---

[3]  *See* Rachel N. Lipari & Struther L. Van Horn, Trends in Substance Use Disorders in Adults 18 and Older (June 29, 2017), retrieved on May 23, 2019 from https://www.samhsa.gov/data/sites/default/files/report_2790/ShortReport-2790.html.

[4]  *See* President's Commission on Combatting Drug Addiction and the Opioid Crisis, Final Report, at p. 32, retrieved on May 23, 2019 from https://www.whitehouse.gov/sites/whitehouse.gov/files/images/Final_Report_Draft_11-15-2017.pdf.

[5]  *See* Centers for Disease Control and Prevention, Understanding the Epidemic, retrieved on May 28, 2019 from https://www.cdc.gov/drugoverdose/epidemic/index.html.

[6]  *See* California Department of Public Health, Patterns of Opioid-Related Overdose Deaths in California, 2011-2017 (March 2019), retrieved on June 12, 2019 from https://www.cdph.ca.gov/Programs/CCDPHP/DCDIC/SACB/CDPH%20Document%20Library/Prescription%20Drug%20Overdose%20Program/Injury%20Data%20Brief%20Opioid%20Overdose%20Deaths%202011-2017_ADA.pdf.

[7]  The human impact of the opioid epidemic – from babies born dependent, the emotional toll on individuals with a substance use disorder, and that of their families and communities, to the tens of thousands of lives cut short each year – has been tremendous.  Now, reports show that the economic impact has been just as shocking, with the drug crisis costing the U.S. economy $1 trillion since 2001 and likely to cost the economy an additional $500 billion by 2020 if the current rates of addiction and overdose remain steady.  See Altarum, Solutions to Advance Health: Economic Toll of Opioid Crisis in U.S. Exceeded $1 Trillion Since 2001 (February 13, 2018), retrieved on June 5, 2019 from https://altarum.org/news/economic-toll-opioid-crisis-us-exceeded-1-trillion-2001.

36.     Addiction is recognized as a chronic, relapsing brain disorder characterized by compulsive drug seeking, continued use despite harmful consequences, and long-lasting changes in the brain.  Addiction is considered both a complex brain disorder and a mental illness.  The brain changes can be long lasting and can lead to many harmful, often self-destructive, behaviors.  Addiction is the most severe form of a full spectrum of substance use disorders, and is a medical illness caused by repeated misuse of a substance or substances.[8]  Without treatment and engagement in recovery activities, addiction is progressive and can result in unemployment, homelessness, disability and premature death.

37.     Substance use disorder treatment is difficult and the challenges of recovery from addiction are many, which can involve cycles of recurrence and remission before long-term recovery is realized.  Timely access to treatment and continuing care, including RTC, PHP, IOP and OP treatment, medication management, psychological testing, counseling and behavioral therapies, social support and supportive sober living environments, are critical for people to recover from addiction and reclaim active and meaningful lives.  Clinical laboratory services are recognized as an appropriate and important diagnostic procedure in substance use disorder and mental health treatment as such services promote prevention, diversion, early detection, and lifelong recovery from addiction.  Such testing is designed to provide accurate results that help physicians and treatment clinicians create a scientifically designed drug monitoring strategy for optimal treatment outcomes, which includes testing for accurate prescription therapy and medication

---

[8]  *See* National Institute of Drug Addiction, The Science of Drug Use and Addiction: The Basics, retrieved on May 29, 2019 from https://www.drugabuse.gov/publications/media-guide/science-drug-use-addiction-basics; *see also*, American Society of Addiction Medicine, Public Policy Statement: Definition of Addiction, retrieved on June 13, 2019 from https://www.asam.org/docs/default-source/public-policy-statements/1definition_of_addiction_long_4-11.pdf?sfvrsn=a8f64512_4.

CONSOLIDATED SECOND AMENDED COMPLAINT

assisted treatment.[9]

38.     Families and individuals purchase health insurance to help cover the costs of health care, including the costs of substance use disorder and mental health treatment.  Health insurance is supposed to provide people with peace of mind and security, and provide them with access and options for life-sustaining and life-saving health care while preventing families and individuals from experiencing financial crises, such as bankruptcy or home foreclosure, or being forced to choose between paying for rent, utilities and food or paying for necessary health care costs.

39.     Traditionally, insurers and employers have covered treatment for mental health conditions, including substance use disorders, less favorably than treatment for physical health conditions, including higher cost-sharing obligations for patients, more restrictive limits on the number of inpatient days and outpatient visits, and more onerous prior authorization requirements.  To address this unequal treatment, Congress first passed a mental health parity law in 1996, and many states followed suit in the following decade by passing laws of their own.  Among other limitations, however, the 1996 act did not address the treatment of substance use disorders.  Congress addressed this gap in passing the historic Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), 42 U.S.C. § 300gg-26, which, among other things, prohibits most plans governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 et seq., from imposing different treatment limits, cost-sharing and in-network and out-of-network coverage on mental health and substance use disorder treatment than are imposed on other medical and surgical

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

---

[9] *See* American Society of Addiction Medicine, Public Policy Statement on Drug Testing as a Component of Addiction Treatment and Monitoring Programs and in other Clinical Settings, retrieved on May 29, 2019 from https://www.asam.org/docs/default-source/public-policy-statements/1drug-testing---clinical-10-10.pdf.

services.[10]  Furthermore, ERISA requires fiduciaries to act solely in the interests of plan participants and beneficiaries, and to decide claims for health care benefits in accordance with plan documents and under a full and fair procedure.

40.     The Patient Protection and Affordable Care Act of 2010 ("PPACA"), 42 U.S.C. §§ 18001, *et seq.*, also known as the Affordable Care Act or Obamacare, requires a range of health plans, both inside and outside of the exchanges, to provide a core package of essential health benefits including mental health and substance use disorder services and laboratory services.  42 U.S.C. § 18022.  The PPACA extends the impact of the MHPAEA so that many health plans must offer coverage for mental health and substance use disorder services and laboratory services with at least an equal level of benefits as the plans offer for the treatment of medical and surgical benefits.  However, as President Donald J. Trump's commission on the opioid crisis wrote in its November 2017 report, "health insurers are not following the federal law requiring parity in the reimbursement for mental health and addiction [;] [t]hey must be held responsible."[11]

## DEFENDANTS' SCHEME TO DENY ACCESS AND COVERAGE FOR CRITICALLY-NEEDED SUBSTANCE USE DISORDER TREATMENT

41.     Despite the above statutory requirements, and the obvious individual and public health interests in timely access to and coverage for substance use disorder and mental health treatment and laboratory services, Defendants, and each

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

---

[10]  California has its own Mental Health Parity Act ("MHPA"), codified in Insurance Code section 10144.5 and Health and Safety Code section 1374.72, which, like the MHPAEA, requires mental health care coverage to be provided "under the same terms and conditions applied to other medical conditions."  California law also requires health care plans to "provide all covered mental health and substance use disorder benefits in compliance with the [MHPAEA] and all rules, regulations, and guidance issued" pursuant to federal laws.  Cal. Ins. Code §§ 10144.4, 10112.27; Cal. Health & Safety Code § 1374.76.

[11]  *See* President's Commission on Combatting Drug Addiction and the Opioid Crisis, Final Report, at pp. 9 and 122, retrieved on May 23, 2019 from https://www.whitehouse.gov/sites/whitehouse.gov/files/images/Final_Report_Draft_11-15-2017.pdf.  Roster of Commissioners include Governor Chris Christie, Chairman, Governor Charlie Baker, Governor Roy Cooper, Congressman Patrick J. Kennedy, Professor Bertha Madras, Ph.D., Florida Attorney General Pam Bondi.

of them and their controlled agents and/or undisclosed principals, are engaged in unfair, unreasonable, incomplete, fraudulent and systematic policies, practices and decisions that have and continue to result in the unlawful and fraudulent denial, underpayment, delay and/or flat-out refusal to authorize and decide access, coverage and claims for mental health and substance use disorder treatment and laboratory services for patients whose plans promise, and the law requires, access to and coverage for such treatment, services and benefits.  Defendants' systematic practices have and continue to result in restrictive prior authorization requirements and restrictive limits on the number of substance use disorder and mental health treatment days and tests.  Defendants' access, coverage and claims-handling policies, practices and decisions are imposing unlawful barriers between patients and life-saving substance use disorder and mental health treatment they desperately need.  And Defendants are doing this in the middle of an opioid and addiction epidemic!  Defendants' impermissible barriers to substance use disorder and mental health treatment and laboratory services must be removed and Defendants must be held responsible for placing profits over patients in a life and death situation.

42.     Defendants' substance use disorder and mental health treatment and laboratory access, coverage and claims-handling policies, practices and decisions as a whole violate the law and the plan documents.  For instance, Plaintiffs are informed and believe, and based thereon allege, that Defendants refuse to authorize access and coverage for RTC treatment because a facility does not have an *optional* state incidental medical license.[12]  Plaintiffs are also informed and believe, and based thereon allege, that Defendants unreasonably limit the number of RTC treatment days, and impermissibly and unreasonably require preauthorization for

---

[12]  Cal. Health & Safety Code § 11834.026(a).  Moreover, California law provides that health insurers may not "in any manner … direct, participate in, or control the selection of the hospital or health facility … from who the insured secures services … except that an insurer may negotiate and enter into contracts for alternative rates of payment with institutional providers, and offer the benefit of these alternative rates to insures who select these providers."  Cal. Ins. Code § 10133.

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

PHP and IOP treatment and then limits the number of treatment days at each level of care.[13]  Plaintiffs are also informed and believe, and based thereon allege, that Defendants reimburse RTC, PHP and IOP levels of care at nominal percentages of covered charges, if at all.  Additionally, Plaintiffs are informed and believe, and based thereon allege, that Defendants refuse to reimburse OP claims and refuse to reimburse claims for breathalyzer tests, counseling services and services of treatment case managers, and that Defendants improperly and unlawfully unbundle treatment and services claims in an effort to game the system at the expense of providers, including Plaintiffs.  Moreover, Plaintiffs are informed and believe, and based thereon allege, that Defendants utilize illegal and overly restrictive medical necessity criteria and guidelines in order to deny claims and profit over the health and safety of their insureds, and utilize improper single bundled rates on claims for covered individuals in substance use disorder treatment.  Further, Plaintiffs are informed and believe, and based thereon allege, that Defendants refuse to pay for clinical laboratory claims as either beyond the numerical limitation and/or simply not covered or reimbursable.  Plaintiffs are also informed and believe, and based thereon allege, that Defendants make payments on claims based on inapplicable Medicare rates and demand refunds on other claims they assert should have been

---

[13]  Under California law, once a health insurer authorizes a specific type of treatment covered under a plan and the provider has provided that treatment in good faith and pursuant to the authorization, the insurer cannot rescind or modify that authorization for any reason.  Cal. Ins. Code § 796.04; Cal. Health & Safety Code § 1371.8. Moreover, California law requires that where health insurers cannot provide their insureds/members access to needed healthcare providers on an "in-network" basis, the insurers shall pay any "out-of-network" provider the amounts necessary to limit the out-of-pocket cost to the patient as if an in-networker provider had provided the same treatment and services.  In effect, this makes an out-of-network provider eligible to receive almost 100 percent of its billed charges.  Cal. Ins. Code § 10133.5; Cal. Code Regs. tit. 10, § 2240.1. Further, health insurers are required to reimburse health care providers at almost 100 percent of the billed charges for emergency services.  Cal. Ins. Code § 10112.7; Cal. Health & Safety Code § 1317; Cal. Code Regs., tit. 28, § 1300.67.  In addition, California law provides that health insurers may not "in any manner … direct, participate in, or control the selection of the hospital or health facility … from who the insured secures services … except that an insurer may negotiate and enter into contracts for alternative rates of payment with institutional providers, and offer the benefit of these alternative rates to insures who select these providers."  Cal. Ins. Code § 10133.

1    paid at inapplicable Medicare rates.[14]

2         43.    Plaintiffs are informed and believe, and based thereon allege, that

3    Defendants' objective is to deny their insureds/members access to and coverage for

4    critically-needed substance use disorder RTC treatment, limit the number of

5    authorized RTC, PHP and IOP substance use disorder treatment days, rush their

6    insureds into an OP substance use disorder treatment level of care, refuse to

7    reimburse OP claims, deny and/or underpay all other substance use disorder

8    treatment and laboratory claims, and then demand refunds on paid claims and

9    subject the remaining claims to inapplicable Medicare rates, all in violation of the

10   law and the plan documents and to the detriment of Defendants' insureds in need of

11   life-saving substance use disorder and mental health treatment, and to the detriment

12   of substance use disorder treatment providers and clinical laboratories, like

13   Plaintiffs.

## DEFENDANTS' SCHEME SPECIFIC TO PLAINTIFFS

14   ### TML Recovery

15

16        44.    TML Recovery is an out-of-network substance use disorder treatment

17   provider and clinical laboratory.  TML Recovery provides treatment and services to

18   individuals in the process of recovering from substance use disorders.  TML

19   Recovery provided medically necessary, verified, preauthorized and covered

20   substance use disorder treatment and laboratory services to 131 individuals with

21   health insurance that was sold, insured, managed and/or administered by

22   Defendants.  The treatment and services provided by TML Recovery include PHP,

23   IOP, OP, treatment planning, counseling and behavioral therapies, case management

24   services, and laboratory services.

25   _____

26   [14]  The California Department of Insurance found and concluded in its July 23, 2018 Order to
     Show Cause *In the Matter of the Certificate of Authority of Health Net Life Insurance Company*
27   (CDI File No. UPA-2016-00005), that Medicare does not provide a rate for inpatient or outpatient
     substance use disorder treatment provider charges and that substituting a bundled per diem
28   Medicare rate for such treatment charges violates state and federal parity laws.

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

CONSOLIDATED SECOND AMENDED COMPLAINT

45.     Defendants' health insurance plans, for each of the 131 insureds at issue, provide coverage for out-of-network substance use disorder treatment and laboratory services.  In this regard, the plans, and each of them, provide that out-of-network substance use disorder benefits include the following levels of care: RTC, PHP, IOP, and OP.  The plans also provide that covered out-of-network substance use disorder services include: diagnostic evaluations, assessment and treatment planning, treatment and/or procedures, medication management and other associated treatment, psychological testing, referral services, individual, family and group therapy, provider-based case management services, and crisis intervention.  The plans further provide coverage for out-of-network laboratory benefits, which include the facility charge and the charge for supplies and equipment, physician services for pathologists, and presumptive drug tests and definitive drug tests.

46.     Defendants' health insurance plans, for each of the 131 insureds at issue, pay benefits for out-of-network substance use disorder treatment and laboratory services, including, but not limited to, RTC, PHP, IOP, OP, treatment planning, counseling and behavioral therapies, case management services, and laboratory services, at varying percentages of covered charges (between 50% to 80% of covered charges, with the majority of plans paying out-of-network benefits at 70% of covered charges (minus any outstanding insured cost-sharing amounts, which Defendants deduct from payments to providers)) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%.  TML Recovery is informed and believes, and based thereon alleges, that each of the 131 insureds had already met their annual out-of-pocket maximum at the time of admission into TML Recovery's program, or shortly thereafter.  The plans also pay 100% of covered charges in the event of a "network inadequacy" or "network gap" for the services received.  TML Recovery is informed and believes, and based thereon alleges, that at all times relevant herein Defendants had an inadequate network of substance use disorder treatment providers and clinical laboratories.

CONSOLIDATED SECOND AMENDED COMPLAINT

47.     TML Recovery obtained an oral and written assignment of benefits from each of the 131 insureds at issue, by which Defendants' insureds intended to, and did, assign to TML Recovery not only rights to payment of claims but to assert all rights and causes of action against Defendants in connection with such claims. In reliance on the assignments of benefits, TML Recovery rendered the subject treatment and services to Defendants' insureds/members.  Moreover, Defendants confirmed, represented, promised and warranted to TML Recovery through the required verification of benefits and the preauthorization process, that each of the insureds and their respective out-of-network treatments and services were covered by health insurance plans issued, managed and/or administered by Defendants and that TML Recovery would be paid for treating Defendants' insureds/members.  In reliance on Defendants' coverage representations and payment promises, TML Recovery rendered the subject treatment and services to Defendants' insureds/members.  At all times relevant herein, Defendants knew that TML Recovery was treating and providing services, and would continue to treat and provide services, to their insureds, and Defendants were, at all times, advised and fully aware of TML Recovery's charges for the treatment and services rendered, at each level of care.

48.     After providing covered treatment and services to the 131 insureds at issue, TML Recovery submitted its claims to Defendants for payment.  Defendants were obligated – under the law and the policies – to pay TML Recovery the applicable plan percentage of its covered charges (between 50% to 80% of covered charges, with the majority of plans paying out-of-network benefits at 70% of covered charges (minus any outstanding insured cost-sharing amounts)) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%.  Defendants also advised, confirmed and promised to TML Recovery during the verification and benefits and preauthorization process for each of the 131 insureds, that the out-of-network benefits paid by Defendants to out-of-network

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

CONSOLIDATED SECOND AMENDED COMPLAINT

providers, like TML Recovery, for all levels of substance use disorder treatment and laboratory services, is a percentage of its covered charges (between 50% to 80% of covered charges, with the majority of claims promised by Defendants to be paid at 70% of covered charges) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%. Instead of paying TML Recovery per the plan documents and the law, and in accordance with Defendants' agreements, representations and promises to TML Recovery, Defendants engaged in unfair, unreasonable, illegal, incomplete, fraudulent and systematic polices, practices and decisions – with an emphasis on profits over patients – and paid TML Recovery a mere 27.61% of its covered charges. It was only after TML Recovery rendered the treatment and services at issue that Defendants refused to properly compensate TML Recovery for the covered treatment and services rendered to Defendants' insureds.

49. During the claim submission and payment process, Defendants put TML Recovery on various pre-payment review and program integrity audits, and through their various departments, Defendants repeatedly requested the same documents and information from TML Recovery, over and over again. This was all an attempt by Defendants, and each of them, to avoid processing and paying the claims. TML Recovery complied with Defendants' repetitive requests and despite being promised payment pursuant to, *inter alia*, the plans and/or repricing agreements, Defendants refused to properly reimburse TML Recovery for the covered treatment and services provided to Defendants' insureds. Defendants likewise failed and refused to provide TML Recovery and the insureds with adequate notice and/or explanation for the denial of benefits, payments or reimbursement of claims, and failed and refused to provide TML Recovery and the insureds with a reasonable opportunity to engage in a meaningful claims process and procedure which was full and fair. Defendants' audits, bogus TIN flag and pending of claims, inadequate notices and explanations, denial of full and fair claims processes and procedures, repetitive document and information requests and

CONSOLIDATED SECOND AMENDED COMPLAINT

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

1  promises of payment were false and fraudulent and were implemented by

2  Defendants, and each of them, as a pretext to illegally delay and deny TML

3  Recovery (and hundreds of other substance use disorder treatment providers and

4  clinical laboratories) payment in accordance with Defendants' representations and

5  promises, and the law and plans.

6      50.   As a result, TML Recovery has suffered and continues to suffer general

7  and incidental damages according to proof, including the benefits owed under the

8  plans and the law in the millions, amounts owed in accordance with Defendants'

9  payment promises to TML Recovery, the interruption in TML Recovery's business,

10 lost business opportunities, lost profits and other consequences, and moreover, TML

11 Recovery is entitled to injunctive relief and statutory and prejudgment interest and

12 attorney's fees against Defendants, and each of them.

13     **MMR Services**

14     51.   MMR Services is an out-of-network clinical laboratory.  MMR

15 Services provides laboratory services to individuals in the process of recovering

16 from substance use disorders.  MMR Services provided medically necessary,

17 verified, preauthorized and covered laboratory services to 143 individuals with

18 health insurance that was sold, insured, managed and/or administered by

19 Defendants.  The services provided by MMR Services include presumptive and

20 definitive drug tests.

21     52.   Defendants' health insurance plans, for each of the 143 insureds at

22 issue, provide coverage for out-of-network substance use disorder treatment and

23 laboratory services.  In this regard, the plans, and each of them, provide that out-of-

24 network substance use disorder benefits include the following levels of care: RTC,

25 PHP, IOP, and OP.  The plans also provide that covered out-of-network substance

26 use disorder services include: diagnostic evaluations, assessment and treatment

27 planning, treatment and/or procedures, medication management and other associated

28 treatment, psychological testing, referral services, individual, family and group

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

- 27 -

therapy, provider-based case management services, and crisis intervention.  The plans further provide coverage for out-of-network laboratory benefits, which include the facility charge and the charge for supplies and equipment, physician services for pathologists, and presumptive drug tests and definitive drug tests.

53.     Defendants' health insurance plans, for each of the 143 insureds at issue, pay benefits for out-of-network laboratory services at varying percentages of covered charges (between 50% to 80% of covered charges, with the majority of plans paying out-of-network benefits at 70% of covered charges (minus any outstanding insured cost-sharing amounts, which Defendants deduct from payments to providers)) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%.  MMR Services is informed and believes, and based thereon alleges, that each of the 143 insureds had already met their annual out-of-pocket maximum at the time they first received services from MMR Services, or shortly thereafter.  The plans also pay 100% of covered charges in the event of a "network inadequacy" or "network gap" for the services received.  MMR Services is informed and believes, and based thereon alleges, that at all times relevant herein Defendants had an inadequate network of clinical laboratories.

54.     MMR Services obtained an oral and written assignment of benefits from each of the 143 insureds at issue, by which Defendants' insureds intended to, and did, assign to MMR Services not only rights to payment of claims but to assert all rights and causes of action against Defendants in connection with such claims.  In reliance on the assignments of benefits, MMR Services rendered the subject services to Defendants' insureds/members.  Moreover, Defendants confirmed, represented, promised and warranted to MMR Services through the required verification of benefits and the preauthorization process, that each of the insureds and their respective out-of-network treatments and services were covered by health insurance plans issued, managed and/or administered by Defendants and that MMR Services would be paid for treating and providing services to Defendants'

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

insureds/members.  In reliance on Defendants' coverage representations and payment promises, MMR Services rendered the subject services to Defendants' insureds/members.  At all times relevant herein, Defendants knew that MMR Services was treating and providing services, and would continue to treat and provide services, to their insureds, and Defendants were, at all times, advised and fully aware of MMR Services' charges for the treatment and services rendered, at each level of care.

55.     After providing covered treatment and services to the 143 insureds at issue, MMR Services submitted its claims to Defendants for payment.  Defendants were obligated – under the law and the policies – to pay MMR Services the applicable plan percentage of its covered charges (between 50% to 80% of covered charges, with the majority of plans paying out-of-network benefits at 70% of covered charges (minus any outstanding insured cost-sharing amounts)) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%.  Defendants also advised, confirmed and promised to MMR Services during the verification and benefits and preauthorization process for each of the 143 insureds, that the out-of-network benefits paid by Defendants to out-of-network providers, like MMR Services, for all levels of substance use disorder treatment and laboratory services, is a percentage of its covered charges (between 50% to 80% of covered charges, with the majority of claims promised by Defendants to be paid at 70% of covered charges) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%.  Instead of paying MMR Services per the plan documents and the law, and in accordance with Defendants' agreements, representations and promises to MMR Services, Defendants engaged in unfair, unreasonable, illegal, incomplete, fraudulent and systematic polices, practices and decisions – with an emphasis on profits over patients – and paid MMR Services a mere 18.97% of its covered charges.  It was only after MMR Services rendered the treatment and services at issue that Defendants refused to properly compensate

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

CONSOLIDATED SECOND AMENDED COMPLAINT

MMR Services for the covered treatment and services rendered to Defendants'
insureds.

56.     During the claim submission and payment process, Defendants put
MMR Services on various pre-payment review and program integrity audits, and
through their various departments, Defendants repeatedly requested the same
documents and information from MMR Services, over and over again.  This was all
an attempt by Defendants, and each of them, to avoid processing and paying the
claims.  MMR Services complied with Defendants' repetitive requests and despite
being promised payment pursuant to, *inter alia*, the plans and/or repricing
agreements, Defendants refused to properly reimburse MMR Services for the
covered treatment and services provided to Defendants' insureds.  Defendants
likewise failed and refused to provide MMR Services and the insureds with
adequate notice and/or explanation for the denial of benefits, payments or
reimbursement of claims, and failed and refused to provide MMR Services and the
insureds with a reasonable opportunity to engage in a meaningful claims process and
procedure which was full and fair.  Defendants' audits, bogus TIN flag and pending
of claims, inadequate notices and explanations, denial of full and fair claims
processes and procedures, repetitive document and information requests and
promises of payment were false and fraudulent and were implemented by
Defendants, and each of them, as a pretext to illegally delay and deny MMR
Services (and hundreds of other substance use disorder treatment providers and
clinical laboratories) payment in accordance with Defendants' representations and
promises, and the law and plans.

57.     As a result, MMR Services has suffered and continues to suffer general
and incidental damages according to proof, including the benefits owed under the
plans and the law in the millions, amounts owed in accordance with Defendants'
payment promises to MMR Services, the interruption in MMR Services' business,
lost business opportunities, lost profits and other consequences, and moreover,

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

MMR Services is entitled to injunctive relief and statutory and prejudgment interest and attorney's fees against Defendants, and each of them.

**SCRCO**

58.    SCRCO is an out-of-network substance use disorder treatment provider and clinical laboratory.  SCRCO provides treatment and services to individuals in the process of recovering from substance use disorders.  SCRCO provided medically necessary, verified, preauthorized and covered substance use disorder treatment and laboratory services to 13 individuals with health insurance that was sold, insured, managed and/or administered by Defendants.  The treatment and services provided by SCRCO include PHP, IOP, OP, treatment planning, counseling and behavioral therapies, case management services, and laboratory services.

59.    Defendants' health insurance plans, for each of the 13 insureds at issue, provide coverage for out-of-network substance use disorder treatment and laboratory services.  In this regard, the plans, and each of them, provide that out-of-network substance use disorder benefits include the following levels of care: RTC, PHP, IOP, and OP.  The plans also provide that covered out-of-network substance use disorder services include: diagnostic evaluations, assessment and treatment planning, treatment and/or procedures, medication management and other associated treatment, psychological testing, referral services, individual, family and group therapy, provider-based case management services, and crisis intervention.  The plans further provide coverage for out-of-network laboratory benefits, which include the facility charge and the charge for supplies and equipment, physician services for pathologists, and presumptive drug tests and definitive drug tests.

60.    Defendants' health insurance plans, for each of the 13 insureds at issue, pay benefits for out-of-network substance use disorder treatment and laboratory services, including, but not limited to, RTC, PHP, IOP, OP, treatment planning, counseling and behavioral therapies, case management services, and laboratory services, at varying percentages of covered charges (between 50% to 80% of

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

1    covered charges, with the majority of plans paying out-of-network benefits at 70%

2    of covered charges (minus any outstanding insured cost-sharing amounts, which

3    Defendants deduct from payments to providers)) until the insured's nominal annual

4    out-of-pocket maximum is met at which time Defendants pay 100%.  SCRCO is

5    informed and believes, and based thereon alleges, that each of the 13 insureds had

6    already met their annual out-of-pocket maximum at the time of admission into

7    SCRCO's program, or shortly thereafter.  The plans also pay 100% of covered

8    charges in the event of a "network inadequacy" or "network gap" for the services

9    received.  SCRCO is informed and believes, and based thereon alleges, that at all

10   times relevant herein Defendants had an inadequate network of substance use

11   disorder treatment providers and clinical laboratories.

12        61.   SCRCO obtained an oral and written assignment of benefits from each

13   of the 13 insureds at issue, by which Defendants' insureds intended to, and did,

14   assign to SCRCO not only rights to payment of claims but to assert all rights and

15   causes of action against Defendants in connection with such claims.  In reliance on

16   the assignments of benefits, SCRCO rendered the subject treatment and services to

17   Defendants' insureds/members.  Moreover, Defendants confirmed, represented,

18   promised and warranted to SCRCO through the required verification of benefits and

19   the preauthorization process, that each of the insureds and their respective out-of-

20   network treatments and services were covered by health insurance plans issued,

21   managed and/or administered by Defendants and that SCRCO would be paid for

22   treating Defendants' insureds/members.  In reliance on Defendants' coverage

23   representations and payment promises, SCRCO rendered the subject treatment and

24   services to Defendants' insureds/members.  At all times relevant herein, Defendants

25   knew that SCRCO was treating and providing services, and would continue to treat

26   and provide services, to their insureds, and Defendants were, at all times, advised

27   and fully aware of SCRCO's charges for the treatment and services rendered, at

28   each level of care.

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

62.     After providing covered treatment and services to the 13 insureds at issue, SCRCO submitted its claims to Defendants for payment.  Defendants were obligated – under the law and the policies – to pay SCRCO the applicable plan percentage of its covered charges (between 50% to 80% of covered charges, with the majority of plans paying out-of-network benefits at 70% of covered charges (minus any outstanding insured cost-sharing amounts)) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%. Defendants also advised, confirmed and promised to SCRCO during the verification and benefits and preauthorization process for each of the 13 insureds, that the out-of-network benefits paid by Defendants to out-of-network providers, like SCRCO, for all levels of substance use disorder treatment and laboratory services, is a percentage of its covered charges (between 50% to 80% of covered charges, with the majority of claims promised by Defendants to be paid at 70% of covered charges) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%.  Instead of paying SCRCO per the plan documents and the law, and in accordance with Defendants' agreements, representations and promises to SCRCO, Defendants engaged in unfair, unreasonable, illegal, incomplete, fraudulent and systematic polices, practices and decisions – with an emphasis on profits over patients – and paid SCRCO a mere 7.07% of its covered charges.  It was only after SCRCO rendered the treatment and services at issue that Defendants refused to properly compensate SCRCO for the covered treatment and services rendered to Defendants' insureds.

63.     During the claim submission and payment process, Defendants put SCRCO on various pre-payment review and program integrity audits, and through their various departments, Defendants repeatedly requested the same documents and information from SCRCO, over and over again.  This was all an attempt by Defendants, and each of them, to avoid processing and paying the claims.  SCRCO complied with Defendants' repetitive requests and despite being promised payment

pursuant to, *inter alia*, the plans and/or repricing agreements, Defendants refused to properly reimburse SCRCO for the covered treatment and services provided to Defendants' insureds.  Defendants likewise failed and refused to provide SCRCO and the insureds with adequate notice and/or explanation for the denial of benefits, payments or reimbursement of claims, and failed and refused to provide SCRCO and the insureds with a reasonable opportunity to engage in a meaningful claims process and procedure which was full and fair.  Defendants' audits, bogus TIN flag and pending of claims, inadequate notices and explanations, denial of full and fair claims processes and procedures, repetitive document and information requests and promises of payment were false and fraudulent and were implemented by Defendants, and each of them, as a pretext to illegally delay and deny SCRCO (and hundreds of other substance use disorder treatment providers and clinical laboratories) payment in accordance with Defendants' representations and promises, and the law and plans.

64.    As a result, SCRCO has suffered and continues to suffer general and incidental damages according to proof, including the benefits owed under the plans and the law in the hundreds of thousands of dollars, amounts owed in accordance with Defendants' payment promises to SCRCO, the interruption in SCRCO's business, lost business opportunities, lost profits and other consequences, and moreover, SCRCO is entitled to injunctive relief and statutory and prejudgment interest and attorney's fees against Defendants, and each of them.

**AHA**

65.    AHA is an out-of-network substance use disorder treatment provider and clinical laboratory.  AHA provides treatment and services to individuals in the process of recovering from substance use disorders.  AHA provided medically necessary, verified, preauthorized and covered substance use disorder treatment and laboratory services to 41 individuals with health insurance that was sold, insured, managed and/or administered by Defendants.  The treatment and services provided

CONSOLIDATED SECOND AMENDED COMPLAINT

by AHA include RTC and laboratory services.

66.     Defendants' health insurance plans, for each of the 41 insureds at issue, provide coverage for out-of-network substance use disorder treatment and laboratory services.  In this regard, the plans, and each of them, provide that out-of-network substance use disorder benefits include the following levels of care: RTC, PHP, IOP, and OP.  The plans also provide that covered out-of-network substance use disorder services include: diagnostic evaluations, assessment and treatment planning, treatment and/or procedures, medication management and other associated treatment, psychological testing, referral services, individual, family and group therapy, provider-based case management services, and crisis intervention.  The plans further provide coverage for out-of-network laboratory benefits, which include the facility charge and the charge for supplies and equipment, physician services for pathologists, and presumptive drug tests and definitive drug tests.

67.     Defendants' health insurance plans, for each of the 41 insureds at issue, pay benefits for out-of-network substance use disorder treatment and laboratory services, including, but not limited to, RTC, PHP, IOP, OP, treatment planning, counseling and behavioral therapies, case management services, and laboratory services, at varying percentages of covered charges (between 50% to 80% of covered charges, with the majority of plans paying out-of-network benefits at 70% of covered charges (minus any outstanding insured cost-sharing amounts, which Defendants deduct from payments to providers)) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%.  AHA is informed and believes, and based thereon alleges, that each of the 41 insureds had already met their annual out-of-pocket maximum at the time of admission into AHA's program, or shortly thereafter.  The plans also pay 100% of covered charges in the event of a "network inadequacy" or "network gap" for the services received. AHA is informed and believes, and based thereon alleges, that at all times relevant herein Defendants had an inadequate network of substance use disorder treatment

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

providers and clinical laboratories.

68.     AHA obtained an oral and written assignment of benefits from each of the 41 insureds at issue, by which Defendants' insureds intended to, and did, assign to AHA not only rights to payment of claims but to assert all rights and causes of action against Defendants in connection with such claims.  In reliance on the assignments of benefits, AHA rendered the subject treatment and services to Defendants' insureds/members.  Moreover, Defendants confirmed, represented, promised and warranted to AHA through the required verification of benefits and the preauthorization process, that each of the insureds and their respective out-of-network treatments and services were covered by health insurance plans issued, managed and/or administered by Defendants and that AHA would be paid for treating Defendants' insureds/members.  In reliance on Defendants' coverage representations and payment promises, AHA rendered the subject treatment and services to Defendants' insureds/members.  At all times relevant herein, Defendants knew that AHA was treating and providing services, and would continue to treat and provide services, to their insureds, and Defendants were, at all times, advised and fully aware of AHA's charges for the treatment and services rendered, at each level of care.

69.     After providing covered treatment and services to the 41 insureds at issue, AHA submitted its claims to Defendants for payment.  Defendants were obligated – under the law and the policies – to pay AHA the applicable plan percentage of its covered charges (between 50% to 80% of covered charges, with the majority of plans paying out-of-network benefits at 70% of covered charges (minus any outstanding insured cost-sharing amounts)) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%. Defendants also advised, confirmed and promised to AHA during the verification and benefits and preauthorization process for each of the 41 insureds, that the out-of-network benefits paid by Defendants to out-of-network providers, like AHA, for

CONSOLIDATED SECOND AMENDED COMPLAINT

all levels of substance use disorder treatment and laboratory services, is a percentage of its covered charges (between 50% to 80% of covered charges, with the majority of claims promised by Defendants to be paid at 70% of covered charges) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%. Instead of paying AHA per the plan documents and the law, and in accordance with Defendants' agreements, representations and promises to AHA, Defendants engaged in unfair, unreasonable, illegal, incomplete, fraudulent and systematic polices, practices and decisions – with an emphasis on profits over patients – and paid AHA a mere 3.52% of its covered charges. It was only after AHA rendered the treatment and services at issue that Defendants refused to properly compensate AHA for the covered treatment and services rendered to Defendants' insureds.

70.     During the claim submission and payment process, Defendants put AHA on various pre-payment review and program integrity audits, and through their various departments, Defendants repeatedly requested the same documents and information from AHA, over and over again. This was all an attempt by Defendants, and each of them, to avoid processing and paying the claims. AHA complied with Defendants' repetitive requests and despite being promised payment pursuant to, *inter alia*, the plans and/or repricing agreements, Defendants refused to properly reimburse AHA for the covered treatment and services provided to Defendants' insureds. Defendants likewise failed and refused to provide AHA and the insureds with adequate notice and/or explanation for the denial of benefits, payments or reimbursement of claims, and failed and refused to provide AHA and the insureds with a reasonable opportunity to engage in a meaningful claims process and procedure which was full and fair. Defendants' audits, bogus TIN flag and pending of claims, inadequate notices and explanations, denial of full and fair claims processes and procedures, repetitive document and information requests and promises of payment were false and fraudulent and were implemented by

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

CONSOLIDATED SECOND AMENDED COMPLAINT

Defendants, and each of them, as a pretext to illegally delay and deny AHA (and hundreds of other substance use disorder treatment providers and clinical laboratories) payment in accordance with Defendants' representations and promises, and the law and plans.

71.     As a result, AHA has suffered and continues to suffer general and incidental damages according to proof, including the benefits owed under the plans and the law in the millions, amounts owed in accordance with Defendants' payment promises to AHA, the interruption in its business, lost business opportunities, lost profits and other consequences, and moreover, AHA is entitled to injunctive relief and statutory and prejudgment interest and attorney's fees against Defendants, and each of them.

**DR Recovery**

72.     DR Recovery is an out-of-network substance use disorder treatment provider and clinical laboratory.  DR Recovery provides treatment and services to individuals in the process of recovering from substance use disorders.  DR Recovery provided medically necessary, verified, preauthorized and covered substance use disorder treatment and laboratory services to 31 individuals with health insurance that was sold, insured, managed and/or administered by Defendants.  The treatment and services provided by DR Recovery include PHP, IOP, OP, treatment planning, counseling and behavioral therapies, case management services, and laboratory services.

73.     Defendants' health insurance plans, for each of the 31 insureds at issue, provide coverage for out-of-network substance use disorder treatment and laboratory services.  In this regard, the plans, and each of them, provide that out-of-network substance use disorder benefits include the following levels of care: RTC, PHP, IOP, and OP.  The plans also provide that covered out-of-network substance use disorder services include: diagnostic evaluations, assessment and treatment planning, treatment and/or procedures, medication management and other associated

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

CONSOLIDATED SECOND AMENDED COMPLAINT

treatment, psychological testing, referral services, individual, family and group therapy, provider-based case management services, and crisis intervention. The plans further provide coverage for out-of-network laboratory benefits, which include the facility charge and the charge for supplies and equipment, physician services for pathologists, and presumptive drug tests and definitive drug tests.

74. Defendants' health insurance plans, for each of the 31 insureds at issue, pay benefits for out-of-network substance use disorder treatment and laboratory services, including, but not limited to, RTC, PHP, IOP, OP, counseling and behavioral therapies, case management services, and laboratory services, at varying percentages of covered charges (between 50% to 80% of covered charges, with the majority of plans paying out-of-network benefits at 70% of covered charges (minus any outstanding insured cost-sharing amounts, which Defendants deduct from providers)) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%. DR Recovery is informed and believes, and based thereon alleges, that each of the 31 insureds had already met their annual out-of-pocket maximum at the time of admission into DR Recovery's program, or shortly thereafter. The plans also pay 100% of covered charges in the event of a "network inadequacy" or "network gap" for the services received. DR Recovery is informed and believes, and based thereon alleges, that at all times relevant herein Defendants had an inadequate network of substance use disorder treatment providers and clinical laboratories.

75. DR Recovery obtained an oral and written assignment of benefits from each of the 31 insureds at issue, by which Defendants' insureds intended to, and did, assign to DR Recovery not only rights to payment of claims but to assert all rights and causes of action against Defendants in connection with such claims. In reliance on the assignments of benefits, DR Recovery rendered the subject treatment and services to Defendants' insureds/members. Moreover, Defendants confirmed, represented, promised and warranted to DR Recovery through the required

CONSOLIDATED SECOND AMENDED COMPLAINT

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

verification of benefits and the preauthorization process, that each of the insureds and their respective out-of-network treatments and services were covered by health insurance plans issued, managed and/or administered by Defendants and that DR Recovery would be paid for treating Defendants' insureds/members.  In reliance on Defendants' coverage representations and payment promises, DR Recovery rendered the subject treatment and services to Defendants' insureds/members.  At all times relevant herein, Defendants knew that DR Recovery was treating, and would continue to treat, their insureds, and Defendants were, at all times, advised and fully aware of DR Recovery's charges for the treatment and services rendered, at each level of care.

76.     After providing covered treatment and services to the 31 insureds at issue, DR Recovery submitted its claims to Defendants for payment.  Defendants were obligated – under the law and the policies – to pay DR Recovery the applicable plan percentage of its covered charges (between 50% to 80% of covered charges, with the majority of plans paying out-of-network benefits at 70% of covered charges (minus any outstanding insured cost-sharing amounts)) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%. Defendants also advised, confirmed and promised to DR Recovery during the verification and benefits and preauthorization process for each of the 31 insureds, that the out-of-network benefits paid by Defendants to out-of-network providers, like DR Recovery, for all levels of substance use disorder treatment and laboratory services, is a percentage of its covered charges (between 50% to 80% of covered charges, with the majority of claims promised by Defendants to be paid at 70% of covered charges) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%.  Instead of paying DR Recovery per the plan documents and the law, and in accordance with Defendants' agreements, representations and promises to DR Recovery, Defendants engaged in unfair, unreasonable, illegal, incomplete, fraudulent and systematic polices, practices and

CONSOLIDATED SECOND AMENDED COMPLAINT

decisions – with an emphasis on profits over patients – and paid DR Recovery a mere 20.28% of its covered charges.  It was only after DR Recovery rendered the treatment and services at issue that Defendants refused to properly compensate DR Recovery for the covered treatment and services rendered to Defendants' insureds.

77.   During the claim submission and payment process, Defendants put DR Recovery on various pre-payment review and program integrity audits, and through their various departments, Defendants repeatedly requested the same documents and information from DR Recovery, over and over again.  This was all an attempt by Defendants, and each of them, to avoid processing and paying the claims.  DR Recovery complied with Defendants' repetitive requests and despite being promised payment pursuant to, *inter alia*, the plans and/or repricing agreements, Defendants refused to properly reimburse DR Recovery for the covered treatment and services provided to Defendants' insureds.  Defendants likewise failed and refused to provide DR Recovery and the insureds with adequate notice and/or explanation for the denial of benefits, payments or reimbursement of claims, and failed and refused to provide DR Recovery and the insureds with a reasonable opportunity to engage in a meaningful claims process and procedure which was full and fair.  Defendants' audits, bogus TIN flag and pending of claims, inadequate notices and explanations, denial of full and fair claims processes and procedures, repetitive document and information requests and promises of payment were false and fraudulent and were implemented by Defendants, and each of them, as a pretext to illegally delay and deny DR Recovery (and hundreds of other substance use disorder treatment providers and clinical laboratories) payment in accordance with Defendants' representations and promises, and the law and plans.

78.   As a result, DR Recovery has suffered and continues to suffer general and incidental damages according to proof, including the benefits owed under the plans and the law in the millions, amounts owed in accordance with Defendants' payment promises to DR Recovery, the interruption in DR Recovery's business, lost

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

CONSOLIDATED SECOND AMENDED COMPLAINT

business opportunities, lost profits and other consequences, and moreover, DR
Recovery is entitled to injunctive relief and statutory and prejudgment interest and
attorney's fees against Defendants, and each of them.

**SCAC**

79.     SCAC is an out-of-network substance use disorder treatment provider.
SCAC provides treatment and services to individuals in the process of recovering
from substance use disorders.  SCAC provided medically necessary, verified,
preauthorized and covered substance use disorder treatment and services to 34
individuals with health insurance that was sold, insured, managed and/or
administered by Defendants.  The treatment and services provided by SCAC include
RTC, PHP, IOP, OP, treatment planning, counseling and behavioral therapies, and
case management services.

80.     Defendants' health insurance plans, for each of the 34 insureds at issue,
provide coverage for out-of-network substance use disorder treatment and
laboratory services.  In this regard, the plans, and each of them, provide that out-of-
network substance use disorder benefits include the following levels of care: RTC,
PHP, IOP, and OP.  The plans also provide that covered out-of-network substance
use disorder services include: diagnostic evaluations, assessment and treatment
planning, treatment and/or procedures, medication management and other associated
treatment, psychological testing, referral services, individual, family and group
therapy, provider-based case management services, crisis intervention, and
laboratory services.

81.     Defendants' health insurance plans, for each of the 34 insureds at issue,
pay benefits for out-of-network substance use disorder treatment, including, but not
limited to, RTC, PHP, IOP, OP, treatment planning, counseling and behavioral
therapies, and case management services, at varying percentages of covered charges
(between 50% to 80% of covered charges, with the majority of plans paying out-of-
network benefits at 70% of covered charges (minus and outstanding insured cost-

sharing amounts, which Defendants deduct from payments to providers)) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%. SCAC is informed and believes, and based thereon alleges, that each of the 34 insureds had already met their annual out-of-pocket maximum at the time of admission into its program, or shortly thereafter. The plans also pay 100% of covered charges in the event of a "network inadequacy" or "network gap" for the services received. SCAC is informed and believes, and based thereon alleges, that at all times relevant herein Defendants had an inadequate network of substance use disorder treatment providers.

82. SCAC obtained an oral and written assignment of benefits from each of the 34 insureds at issue, by which Defendants' insureds intended to, and did, assign to SCAC not only rights to payment of claims but to assert all rights and causes of action against Defendants in connection with such claims. In reliance on the assignments of benefits, SCAC rendered the subject treatment and services to Defendants' insureds/members. Moreover, Defendants confirmed, represented, promised and warranted to SCAC through the required verification of benefits and the preauthorization process, that each of the insureds and their respective out-of-network treatments and services were covered by health insurance plans issued, managed and/or administered by Defendants and that SCAC would be paid for treating Defendants' insureds/members. In reliance on Defendants' coverage representations and payment promises, SCAC rendered the subject treatment and services to Defendants' insureds/members. At all times relevant herein, Defendants knew that SCAC was treating and providing services, and would continue to treat and provide services, to their insureds, and Defendants were, at all times, advised and fully aware of SCAC's charges for the treatment and services rendered, at each level of care.

83. After providing covered treatment and services to the 34 insureds at issue, SCAC submitted its claims to Defendants for payment. Defendants were

CONSOLIDATED SECOND AMENDED COMPLAINT

obligated – under the law and the policies – to pay SCAC the applicable plan percentage of its covered charges (between 50% to 80% of covered charges, with the majority of plans paying out-of-network benefits at 70% of covered charges (minus any outstanding insured cost-sharing amounts)) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%. Defendants also advised, confirmed and promised to SCAC during the verification and benefits and preauthorization process for each of the 34 insureds, that the out-of-network benefits paid by Defendants to out-of-network providers, like SCAC, for all levels of substance use disorder treatment, is a percentage of its covered charges (between 50% to 80% of covered charges, with the majority of claims promised by Defendants to be paid at 70% of covered charges) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%. Instead of paying SCAC per the plan documents and the law, and in accordance with Defendants' agreements, representations and promises to SCAC, Defendants engaged in unfair, unreasonable, illegal, incomplete, fraudulent and systematic polices, practices and decisions – with an emphasis on profits over patients – and paid SCAC a mere 22.84% of its covered charges. It was only after SCAC rendered the treatment and services at issue that Defendants refused to properly compensate SCAC for the covered treatment and services rendered to Defendants' insureds.

84. During the claim submission and payment process, Defendants put SCAC on various pre-payment review and program integrity audits, and through their various departments, Defendants repeatedly requested the same documents and information from SCAC, over and over again. This was all an attempt by Defendants, and each of them, to avoid processing and paying the claims. SCAC complied with Defendants' repetitive requests and despite being promised payment pursuant to, *inter alia*, the plans and/or repricing agreements, Defendants refused to properly reimburse SCAC for the covered treatment and services provided to Defendants' insureds. Defendants likewise failed and refused to provide SCAC and

the insureds with adequate notice and/or explanation for the denial of benefits, payments or reimbursement of claims, and failed and refused to provide SCAC and the insureds with a reasonable opportunity to engage in a meaningful claims process and procedure which was full and fair.  Defendants' audits, bogus TIN flag and pending of claims, inadequate notices and explanations, denial of full and fair claims processes and procedures, repetitive document and information requests and promises of payment were false and fraudulent and were implemented by Defendants, and each of them, as a pretext to illegally delay and deny SCAC (and hundreds of other substance use disorder treatment providers and clinical laboratories) payment in accordance with Defendants' representations and promises, and the law and plans.

85.    As a result, SCAC has suffered and continues to suffer general and incidental damages according to proof, including the benefits owed under the plans and the law in the millions, amounts owed in accordance with Defendants' payment promises to SCAC, the interruption in its business, lost business opportunities, lost profits and other consequences, and moreover, SCAC is entitled to injunctive relief and statutory and prejudgment interest and attorney's fees against Defendants, and each of them.

**12 South**

86.    12 South is an out-of-network mental health and substance use disorder treatment provider.  12 South provides treatment and services to individuals in the process of recovering from mental health and substance use disorders.  At all times relevant herein, 12 South provided medically necessary, verified, preauthorized and covered mental health and substance use disorder treatment and services to 5 individuals with health insurance that was sold, insured, managed and/or administered by Defendants.  The treatment and services provided by 12 South include PHP, IOP, OP, treatment planning, counseling and behavioral therapies, and case management services.

CONSOLIDATED SECOND AMENDED COMPLAINT

87.     Defendants' health insurance plans, for each of the 5 insureds at issue, provide coverage for out-of-network mental health and substance use disorder treatment and laboratory services.  In this regard, the plans, and each of them, provide that out-of-network mental health and substance use disorder benefits include the following levels of care: RTC, PHP, IOP, and OP.  The plans also provide that covered out-of-network mental health and substance use disorder services include: diagnostic evaluations, assessment and treatment planning, treatment and/or procedures, medication management and other associated treatment, psychological testing, referral services, individual, family and group therapy, provider-based case management services, crisis intervention, and laboratory services.

88.     Defendants' health insurance plans, for each of the 5 insureds at issue, pay benefits for out-of-network mental health and substance use disorder treatment, including, but not limited to, RTC, PHP, IOP, OP, treatment planning, counseling and behavioral therapies, and case management services, at varying percentages of covered charges (between 50% to 80% of covered charges, with the majority of plans paying out-of-network benefits at 70% of covered charges (minus any outstanding insured cost-sharing amounts, which Defendants deduct from payments to providers)) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%.  12 South is informed and believes, and based thereon alleges, that each of the 5 insureds had already met their annual out-of-pocket maximum at the time of admission into its program, or shortly thereafter. The plans also pay 100% of covered charges in the event of a "network inadequacy" or "network gap" for the services received.  12 South is informed and believes, and based thereon alleges, that at all times relevant herein Defendants had an inadequate network of mental health and substance use disorder treatment providers.

89.     12 South obtained an oral and written assignment of benefits from each of the 5 insureds at issue, by which Defendants' insureds intended to, and did,

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

assign to 12 South not only rights to payment of claims but to assert all rights and causes of action against Defendants in connection with such claims.  In reliance on the assignments of benefits, 12 South rendered the subject treatment and services to Defendants' insureds/members.  Moreover, Defendants confirmed, represented, promised and warranted to 12 South through the required verification of benefits and the preauthorization process that each of the insureds and their respective out-of-network treatments and services were covered by health insurance plans issued, managed and/or administered by Defendants and that 12 South would be paid for treating Defendants' insureds/members.  In reliance on Defendants' coverage representations and payment promises, 12 South rendered the subject treatment and services to Defendants' insureds/members.  At all times relevant herein, Defendants knew that 12 South was treating and providing services, and would continue to treat and provide services, to their insureds, and Defendants were, at all times, advised and fully aware of 12 South's charges for the treatment and services rendered, at each level of care.

90.     After providing covered treatment and services to the 5 insureds at issue, 12 South submitted its claims to Defendants for payment.  Defendants were obligated – under the law and the policies – to pay 12 South the applicable plan percentage of its covered charges (between 50% to 80% of covered charges, with the majority of plans paying out-of-network benefits at 70% of covered charges (minus any outstanding insured cost-sharing amounts)) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%. Defendants also advised, confirmed and promised to 12 South during the verification and benefits and preauthorization process for each of the 5 insureds, that the out-of-network benefits paid by Defendants to out-of-network providers, like 12 South, for all levels of mental health and substance use disorder treatment, is a percentage of its covered charges (between 50% to 80% of covered charges, with the majority of claims promised by Defendants to be paid at 70% of covered

charges) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%.  Instead of paying 12 South per the plan documents and the law, and in accordance with Defendants' agreements, representations and promises to 12 South, Defendants engaged in unfair, unreasonable, illegal, incomplete, fraudulent and systematic polices, practices and decisions – with an emphasis on profits over patients – and paid 12 South a mere 8.96% of its covered charges.  It was only after 12 South rendered the treatment and services at issue that Defendants refused to properly compensate 12 South for the covered treatment and services rendered to Defendants' insureds.

91.     During the claim submission and payment process, Defendants put 12 South on various pre-payment review and program integrity audits, and through their various departments, Defendants repeatedly requested the same documents and information from 12 South, over and over again.  This was all an attempt by Defendants, and each of them, to avoid processing and paying the claims.  12 South complied with Defendants' repetitive requests and despite being promised payment pursuant to, *inter alia*, the plans and/or repricing agreements, Defendants refused to properly reimburse 12 South for the covered treatment and services provided to Defendants' insureds.  Defendants likewise failed and refused to provide 12 South and the insureds with adequate notice and/or explanation for the denial of benefits, payments or reimbursement of claims, and failed and refused to provide 12 South and the insureds with a reasonable opportunity to engage in a meaningful claims process and procedure which was full and fair.  Defendants' audits, bogus TIN flag and pending of claims, inadequate notices and explanations, denial of full and fair claims processes and procedures, repetitive document and information requests and promises of payment were false and fraudulent and were implemented by Defendants, and each of them, as a pretext to illegally delay and deny 12 South (and hundreds of other substance use disorder treatment providers and clinical laboratories) payment in accordance with Defendants' representations and promises,

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

- 48 -

and the law and plans.

92.     As a result, 12 South has suffered and continues to suffer general and incidental damages according to proof, including the benefits owed under the plans and the law in the hundreds of thousands of dollars, amounts owed in accordance with Defendants' payment promises to 12 South, the interruption in its business, lost business opportunities, lost profits and other consequences, and moreover, 12 South is entitled to injunctive relief and statutory and prejudgment interest and attorney's fees against Defendants, and each of them.

**Woman's Recovery**

93.     Woman's Recovery is an out-of-network substance use disorder treatment provider.  Woman's Recovery provides treatment and services to individuals in the process of recovering from substance use disorders.  Woman's Recovery provided medically necessary, verified, preauthorized and covered substance use disorder treatment and services to 21 individuals with health insurance that was sold, insured, managed and/or administered by Defendants.  The treatment and services provided by Woman's Recovery include PHP, IOP, OP, treatment planning, counseling and behavioral therapies, and case management services.

94.     Defendants' health insurance plans, for each of the 21 insureds at issue, provide coverage for out-of-network substance use disorder treatment and services. In this regard, the plans, and each of them, provide that out-of-network substance use disorder benefits include the following levels of care: RTC, PHP, IOP, and OP. The plans also provide that covered out-of-network substance use disorder services include: diagnostic evaluations, assessment and treatment planning, treatment and/or procedures, medication management and other associated treatment, psychological testing, referral services, individual, family and group therapy, provider-based case management services, and crisis intervention.  The plans further provide coverage for out-of-network laboratory benefits, which include the facility charge and the

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

- 49 -

charge for supplies and equipment, physician services for pathologists, and presumptive drug tests and definitive drug tests.

95.     Defendants' health insurance plans, for each of the 21 insureds at issue, pay benefits for out-of-network substance use disorder treatment and services, including, but not limited to, RTC, PHP, IOP, OP, treatment planning, counseling and behavioral therapies, and case management services, at varying percentages of covered charges (between 50% to 80% of covered charges, with the majority of plans paying out-of-network benefits at 70% of covered charges (minus any outstanding insured cost-sharing amounts, which Defendants deduct from payments to providers)) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%.  Woman's Recovery is informed and believes, and based thereon alleges, that each of the 21 insureds had already met their annual out-of-pocket maximum at the time of admission into Woman's Recovery 's program, or shortly thereafter.  The plans also pay 100% of covered charges in the event of a "network inadequacy" or "network gap" for the services received. Woman's Recovery is informed and believes, and based thereon alleges, that at all times relevant herein Defendants had an inadequate network of substance use disorder treatment providers.

96.     Woman's Recovery obtained an oral and written assignment of benefits from each of the 21 insureds at issue, by which Defendants' insureds intended to, and did, assign to Woman's Recovery not only rights to payment of claims but to assert all rights and causes of action against Defendants in connection with such claims.  In reliance on the assignments of benefits, Woman's Recovery rendered the subject treatment and services to Defendants' insureds/members.  Moreover, Defendants confirmed, represented, promised and warranted to Woman's Recovery through the required verification of benefits and the preauthorization process, that each of the insureds and their respective out-of-network treatments and services were covered by health insurance plans issued, managed and/or administered by

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

Defendants and that Woman's Recovery would be paid for treating Defendants' insureds/members.  In reliance on Defendants' coverage representations and payment promises, Woman's Recovery rendered the subject treatment and services to Defendants' insureds/members.  At all times relevant herein, Defendants knew that Woman's Recovery was treating and providing services, and would continue to treat and provide services, to their insureds, and Defendants were, at all times, advised and fully aware of Woman's Recovery 's charges for the treatment and services rendered, at each level of care.

97.    After providing covered treatment and services to the 21 insureds at issue, Woman's Recovery submitted its claims to Defendants for payment. Defendants were obligated – under the law and the policies – to pay Woman's Recovery the applicable plan percentage of its covered charges (between 50% to 80% of covered charges, with the majority of plans paying out-of-network benefits at 70% of covered charges (minus any outstanding insured cost-sharing amounts)) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%.  Defendants also advised, confirmed and promised to Woman's Recovery  during the verification and benefits and preauthorization process for each of the 21 insureds, that the out-of-network benefits paid by Defendants to out-of-network providers, like Woman's Recovery , for all levels of substance use disorder treatment, is a percentage of its covered charges (between 50% to 80% of covered charges, with the majority of claims promised by Defendants to be paid at 70% of covered charges) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%.  Instead of paying Woman's Recovery per the plan documents and the law, and in accordance with Defendants' agreements, representations and promises to Woman's Recovery, Defendants engaged in unfair, unreasonable, illegal, incomplete, fraudulent and systematic polices, practices and decisions – with an emphasis on profits over patients – and paid Woman's Recovery a mere 22.17% of its covered charges.  It

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

was only after Woman's Recovery rendered the treatment and services at issue that Defendants refused to properly compensate Woman's Recovery for the covered treatment and services rendered to Defendants' insureds.

98.     During the claim submission and payment process, Defendants put Woman's Recovery on various pre-payment review and program integrity audits, and through their various departments, Defendants repeatedly requested the same documents and information from Woman's Recovery, over and over again.  This was all an attempt by Defendants, and each of them, to avoid processing and paying the claims.  Woman's Recovery complied with Defendants' repetitive requests and despite being promised payment pursuant to, *inter alia*, the plans and/or repricing agreements, Defendants refused to properly reimburse Woman's Recovery for the covered treatment and services provided to Defendants' insureds.  Defendants likewise failed and refused to provide Woman's Recovery and the insureds with adequate notice and/or explanation for the denial of benefits, payments or reimbursement of claims, and failed and refused to provide Woman's Recovery and the insureds with a reasonable opportunity to engage in a meaningful claims process and procedure which was full and fair.  Defendants' audits, bogus TIN flag and pending of claims, inadequate notices and explanations, denial of full and fair claims processes and procedures, repetitive document and information requests and promises of payment were false and fraudulent and were implemented by Defendants, and each of them, as a pretext to illegally delay and deny Woman's Recovery (and hundreds of other substance use disorder treatment providers and clinical laboratories) payment in accordance with Defendants' representations and promises, and the law and plans.

99.     As a result, Woman's Recovery has suffered and continues to suffer general and incidental damages according to proof, including the benefits owed under the plans and the law in the millions, amounts owed in accordance with Defendants' payment promises to Woman's Recovery, the interruption in Woman's

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

Recovery 's business, lost business opportunities, lost profits and other consequences, and moreover, Woman's Recovery is entitled to injunctive relief and statutory and prejudgment interest and attorney's fees against Defendants, and each of them.

**Pacific Palms**

100.   Pacific Palms is an out-of-network substance use disorder treatment provider.  Pacific Palms provides treatment and services to individuals in the process of recovering from substance use disorders.  Pacific Palms provided medically necessary, verified, preauthorized and covered substance use disorder treatment and services to 89 individuals with health insurance that was sold, insured, managed and/or administered by Defendants.  The treatment and services provided by Pacific Palms include PHP, IOP, OP, treatment planning, counseling and behavioral therapies, and case management services.

101.   Defendants' health insurance plans, for each of the 89 insureds at issue, provide coverage for out-of-network substance use disorder treatment and services.  In this regard, the plans, and each of them, provide that out-of-network substance use disorder benefits include the following levels of care: RTC, PHP, IOP, and OP.  The plans also provide that covered out-of-network substance use disorder services include: diagnostic evaluations, assessment and treatment planning, treatment and/or procedures, medication management and other associated treatment, psychological testing, referral services, individual, family and group therapy, provider-based case management services, and crisis intervention.  The plans further provide coverage for out-of-network laboratory benefits, which include the facility charge and the charge for supplies and equipment, physician services for pathologists, and presumptive drug tests and definitive drug tests.

102.   Defendants' health insurance plans, for each of the 89 insureds at issue, pay benefits for out-of-network substance use disorder treatment and services, including, but not limited to, RTC, PHP, IOP, OP, treatment planning, counseling

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

CONSOLIDATED SECOND AMENDED COMPLAINT

and behavioral therapies, and case management services, at varying percentages of covered charges (between 50% to 80% of covered charges, with the majority of plans paying out-of-network benefits at 70% of covered charges (minus any outstanding insured cost-sharing amounts, which Defendants deduct from payments to providers)) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%.  Pacific Palms is informed and believes, and based thereon alleges, that each of the 89 insureds had already met their annual out-of-pocket maximum at the time of admission into Pacific Palms 's program, or shortly thereafter.  The plans also pay 100% of covered charges in the event of a "network inadequacy" or "network gap" for the services received.  Pacific Palms is informed and believes, and based thereon alleges, that at all times relevant herein Defendants had an inadequate network of substance use disorder treatment providers.

103.   Pacific Palms obtained an oral and written assignment of benefits from each of the 89 insureds at issue, by which Defendants' insureds intended to, and did, assign to Pacific Palms not only rights to payment of claims but to assert all rights and causes of action against Defendants in connection with such claims.  In reliance on the assignments of benefits, Pacific Palms rendered the subject treatment and services to Defendants' insureds/members.  Moreover, Defendants confirmed, represented, promised and warranted to Pacific Palms through the required verification of benefits and the preauthorization process, that each of the insureds and their respective out-of-network treatments and services were covered by health insurance plans issued, managed and/or administered by Defendants and that Pacific Palms would be paid for treating Defendants' insureds/members.  In reliance on Defendants' coverage representations and payment promises, Pacific Palms rendered the subject treatment and services to Defendants' insureds/members.  At all times relevant herein, Defendants knew that Pacific Palms was treating and providing services, and would continue to treat and provide services, to their

insureds, and Defendants were, at all times, advised and fully aware of Pacific Palms 's charges for the treatment and services rendered, at each level of care.

104.    After providing covered treatment and services to the 89 insureds at issue, Pacific Palms submitted its claims to Defendants for payment.  Defendants were obligated – under the law and the policies – to pay Pacific Palms the applicable plan percentage of its covered charges (between 50% to 80% of covered charges, with the majority of plans paying out-of-network benefits at 70% of covered charges (minus any outstanding insured cost-sharing amounts)) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%. Defendants also advised, confirmed and promised to Pacific Palms  during the verification and benefits and preauthorization process for each of the 89 insureds, that the out-of-network benefits paid by Defendants to out-of-network providers, like Pacific Palms , for all levels of substance use disorder treatment, is a percentage of its covered charges (between 50% to 80% of covered charges, with the majority of claims promised by Defendants to be paid at 70% of covered charges) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%.  Instead of paying Pacific Palms per the plan documents and the law, and in accordance with Defendants' agreements, representations and promises to Pacific Palms, Defendants engaged in unfair, unreasonable, illegal, incomplete, fraudulent and systematic polices, practices and decisions – with an emphasis on profits over patients – and paid Pacific Palms a mere 14.65% of its covered charges.  It was only after Pacific Palms rendered the treatment and services at issue that Defendants refused to properly compensate Pacific Palms for the covered treatment and services rendered to Defendants' insureds.

105.    During the claim submission and payment process, Defendants put Pacific Palms on various pre-payment review and program integrity audits, and through their various departments, Defendants repeatedly requested the same documents and information from Pacific Palms, over and over again.  This was all

an attempt by Defendants, and each of them, to avoid processing and paying the claims.  Pacific Palms complied with Defendants' repetitive requests and despite being promised payment pursuant to, *inter alia*, the plans and/or repricing agreements, Defendants refused to properly reimburse Pacific Palms for the covered treatment and services provided to Defendants' insureds.  Defendants likewise failed and refused to provide Pacific Palms and the insureds with adequate notice and/or explanation for the denial of benefits, payments or reimbursement of claims, and failed and refused to provide Pacific Palms and the insureds with a reasonable opportunity to engage in a meaningful claims process and procedure which was full and fair.  Defendants' audits, bogus TIN flag and pending of claims, inadequate notices and explanations, denial of full and fair claims processes and procedures, repetitive document and information requests and promises of payment were false and fraudulent and were implemented by Defendants, and each of them, as a pretext to illegally delay and deny Pacific Palms (and hundreds of other substance use disorder treatment providers and clinical laboratories) payment in accordance with Defendants' representations and promises, and the law and plans.

106.   As a result, Pacific Palms has suffered and continues to suffer general and incidental damages according to proof, including the benefits owed under the plans and the law in the millions, amounts owed in accordance with Defendants' payment promises to Pacific Palms, the interruption in Pacific Palms 's business, lost business opportunities, lost profits and other consequences, and moreover, Pacific Palms is entitled to injunctive relief and statutory and prejudgment interest and attorney's fees against Defendants, and each of them.

## LEGAL EFFECT AND CONSEQUENCES OF DEFENDANTS' SCHEME

107.   Defendants' conduct at issue herein has had a severe and adverse effect on not only Plaintiffs, but also Defendants' insureds and the substance use disorder treatment profession as a whole.  Defendants' conduct has placed the lives of their insureds that are struggling with addiction in jeopardy, exposing the insureds and

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

CONSOLIDATED SECOND AMENDED COMPLAINT

their families to significant financial and health risk, while simultaneously destroying or significantly damaging Plaintiffs and all similarly situated substance use disorder treatment providers and clinical laboratories.

108.   Defendants' conduct breached agreements with Plaintiffs which arose when Plaintiffs' patients assigned benefits to Plaintiffs in writing, and when Defendants confirmed out-of-network coverage for the treatment and services at issue herein and promised to pay Plaintiffs for said treatment and services provided to Defendants' insureds on the same terms as provided for in the plans between Defendants and their insureds, and when necessary, Defendants gave prior approval and authorization for the substance use disorder treatment and services that Plaintiffs provided to Defendants' insureds/members.  Defendants' violated the implied covenant of good faith and fair dealing in said insurance contracts, rendering their actions in bad faith.

109.   Upon information and belief, Plaintiffs allege that Defendants' conduct was wanton and willful, and undertaken to improve their balance sheets by placing profits over patients in a life and death situation.  In this regard, Defendants' substance use disorder treatment and clinical laboratory guidelines, reimbursement policies and claims handlings processes and procedures were, and are, fraudulently flawed and tainted by Defendants' financial interests.

110.   Defendants' practices were also unfair, fraudulent and unlawful under California's Unfair Competition Law ("UCL") in that, as a part of their scheme to not pay or underpay Plaintiffs, and to prevent Plaintiffs from learning of Defendants' scheme for as long as possible, Defendants violated their claims handling and processing obligations under ERISA and California law by providing either no, baseless, false, or dilatory reasons for not paying or underpaying Plaintiffs; thereby entitling Plaintiffs to injunctive relief and restitution against Defendants, and each of them, under the UCL.

111.   Defendants' practices were similarly unfair, fraudulent and unlawful

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

CONSOLIDATED SECOND AMENDED COMPLAINT

under state and federal law in that they violate the MHPAEA, while simultaneously constituting common law bad faith. The MHPAEA is an antidiscrimination statute intended to ensure that coverage of mental health and substance use disorder treatment (such as Plaintiffs provide) is in "parity" with coverage of medical and surgical care. Defendants, and each of them, have systematically treated substance use disorder treatment providers differently than medical and surgical providers in California, and likely across the nation.

112.   Defendants' practices were likewise unfair, fraudulent and unlawful under state and federal law in that they violate the PPACA, which requires, among other things, insurers to provide benefits for essential mental health and substance use disorder treatment and laboratory services, with no pre-existing condition exclusions and no annual or lifetime dollar amount limits on coverage of such treatment services.

113.   Defendants' actions were further unfair, fraudulent and unlawful in that they violated other well established public policies, including those set forth in the California Unfair Insurance Practices Act ("UIPA"), as set forth in California Insurance Code sections 790, *et seq*.

114.   Defendants' insureds/members were also unlawfully, unfairly and fraudulently misled into believing that their health plans would provide coverage for care supplied by out-of-network substance use disorder treatment providers and clinical laboratories, such as Plaintiffs.

115.   Defendants, and each of them, never intended to provide the coverage mandated by the plans at issue and instead intended to not pay or to underpay substance use disorder treatment providers and laboratories throughout California, including Plaintiffs. Defendants, and each of them, have ignored Plaintiffs' efforts to recover payment for the treatment and services provided, placing Plaintiffs in the untenable position of being forced to file this lawsuit in order to recover payments due under the law and plans, and in accordance with Defendants' out-of-network

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

CONSOLIDATED SECOND AMENDED COMPLAINT

coverage representations and payment promises to Plaintiffs.

116. Plaintiffs seek relief under their direct rights, written assigned rights from patients cheated out of their insurance benefits by Defendants, and as third-party beneficiaries of their patients' health insurance plans issued, managed and/or administered by Defendants.

117. Defendants have also tortiously breached the implied covenant of good faith and fair dealing in the underlying health insurance plans issued, managed and/or administered by Defendants, which rights have been assigned to Plaintiffs.

118. The treatment and services at issue were provided by Plaintiffs to patients who at all relevant times had health insurance for the substance use disorder treatment and services that Plaintiffs provided and the health insurance plans were issued, managed and/or administered by Defendants, and each of them, or at the direction and under the control of Defendants.

119. Defendants, and each of them, caused the events complained of herein to occur in the County of Orange and throughout the State of California, and likely across the nation.

120. Plaintiffs provide substance use disorder treatment and laboratory services to individuals in the process of recovering from alcoholism and substance use disorders. Plaintiffs' treatment includes a range of services, including, but not limited to, RTC, PHP, IOP, OP, diagnostic evaluations, assessment and treatment planning, treatment and/or procedures, medication management and other associated treatment, psychological testing, referral services, individual, family and group therapy, provider-based case management services, crisis intervention, and laboratory services.

121. Defendants, and each of them, developed and marketed the subject health insurance plans to include coverage for substance use disorder treatment and laboratory services provided to their insureds by in-network providers ("INP") and out-of-network providers ("ONP") like Plaintiffs.

122.   The health insurance plans issued, managed and/or administered by Defendants, and each of them, are industry standard indemnity health insurance contracts that provide richer benefits (less out-of-pocket expense for insureds) for treatment and services that are obtained from INPs.  Such providers contract with Defendants to become part of their "network" and generally agree to accept a set reduced rate of reimbursement in exchange for Defendants' steerage of patients to their practices or facilities and payment within specified contractual timeframes.

123.   The health insurance plans issued, managed and/or administered by Defendants, and each of them, provide for a reimbursement rate for ONP services at a lesser percentage of the overall billed charges than the 100% reimbursement rate for INP services, less the insured's copayment, coinsurance and deductible, generally resulting in greater out-of-pocket expenses for Defendants' insureds.

124.   California law requires that the policy forms, such as those utilized in the health insurance plans issued, managed and/or administered by Defendants, and each of them, be filed with and approved by the CDI, and are generally not to be withdrawn from the insurance marketplace without an insurer meeting specific conditions.

125.   The health insurance plans issued, managed and/or administered by Defendants, and each of them, provide coverage for, but not limited to, the following ONP substance use disorder treatment and services: RTC, PHP, IOP, OP, diagnostic evaluations, assessment and treatment planning, treatment and/or procedures, medication management and other associated treatment, psychological testing, referral services, individual, family and group therapy, provider-based case management services, crisis intervention, and laboratory services.

126.   The health insurance plans issued, managed and/or administered by Defendants, and each of them, provide for the payment of services with an INP at 100% of the provider's billed charges set by contract, less the insured's copayment, coinsurance and deductible.  Services with an ONP are reimbursed at a lesser

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

percentage of the provider's billed charges.

127.   The health insurance plans issued, managed and/or administered by Defendants, and each of them, provide that Defendants are required to remit claim payments directly to providers when the insured assigns his or her benefits to the provider in writing, and Defendants warranted, represented and promised Plaintiffs that payments would be made directly to Plaintiffs.

128.   When required by the health insurance plans issued, managed and/or administered by Defendants, and each of them, Plaintiffs' standard operating procedure was to obtain prior authorizations from Defendants for the substance use disorder treatment and services to be rendered.  Plaintiffs' standard operating procedure also included obtaining a verification of benefits from Defendants to ensure the patient is covered by the insurer and that the treatment and services at each level of care are covered benefits under the plan.  Defendants' members/insureds were not admitted for treatment and services with Plaintiffs, and each of them, until the verification of benefits, prior authorizations, when needed, and payment promises were confirmed and acknowledged by Defendants.

129.   In communication with Plaintiffs, including telephone calls requesting verification of benefits and preauthorization, Defendants, and each of them, represented to Plaintiffs that the services provided to Defendants' insureds were covered and that the out-of-network benefits paid by Defendants to out-of-network providers, like Plaintiffs, for all levels of substance use disorder treatment and laboratory services, is a percentage of its covered charges (between 50% to 80% of covered charges, with the majority of claims promised by Defendants to be paid at 70% of covered charges) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%.

130.   Specifically, for each of the 508 patients whose treatments and services are at issue, Plaintiffs contacted Defendants by phone and/or in writing before beginning such treatments and services.  Defendants confirmed with Plaintiffs that

CONSOLIDATED SECOND AMENDED COMPLAINT

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

the patients, and each of them, were validly covered by plans issued, managed and/or administered by Defendants, and Plaintiffs advised Defendants of the planned out-of-network treatments and services for Defendants' insureds, including the specific types of treatment and services to be provided, the treatment duration, billing codes and rates for the same.  Defendants' represented, warranted and promised to Plaintiffs that the out-of-network benefits paid by Defendants to out-of-network providers, like Plaintiffs, for all levels of substance use disorder treatment and laboratory services, is a percentage of the covered charges (between 50% to 80% of covered charges, with the majority of claims promised by Defendants to be paid at 70% of covered charges) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%.  Thereafter, Plaintiffs treated and provided the subject treatment and services to Defendants' insureds/members.

131.   Based upon the language of the health insurance plans issued, managed and/or administered by Defendants, and each of them, and upon obtaining verifications of benefits, prior authorizations and payment promises from Defendants, and valid written assignments from the patients, Plaintiffs and their patients insureds by Defendants, all 508 of them, reasonably expected that Plaintiffs' claims would be paid promptly and consistent with the law and the terms of the plans and/or the herein payment representations and promises that Defendants, and each of them, made to Plaintiffs.

132.   Notwithstanding the verifications of benefits, prior authorizations, coverage representations by Defendants, payment promises by Defendants, and valid written assignments, Plaintiffs' claims for the majority of the substance use disorder treatment and laboratory services provided to Defendants' insureds/members have not been paid properly and require substantial interest payments for violation of the applicable health plans, ERISA and California insurance laws and regulations providing for the prompt payment of claims.

133.   Plaintiffs are entitled to payment for the substance use disorder

CONSOLIDATED SECOND AMENDED COMPLAINT

1   treatment and services provided to Defendants' insureds/members at the proper

2   reimbursement rates, pursuant to the plan documents, valid written assignments

3   from their patients and pursuant to Defendants' coverage representations and

4   payment promises to Plaintiffs.

5       134.   While the breaches alleged herein involved health insurance plans

6   issued, managed and/or administered by one or more of the Defendants and

7   Defendants' coverage representations and payment promises to Plaintiffs, each

8   Defendant, upon information and belief, conceived, directed, approved, or aided and

9   abetted the others in this bad faith scheme.

10      135.   In California, a health insurer must provide or arrange for the provision

11  of access to health care services in a timely manner.  Most health insurers, including

12  Defendants, and each of them, seek to satisfy this duty by providing an adequate

13  network of INPs for their insureds to choose from so they may receive the necessary

14  treatment at the lowest expense to the insurer and the insured.

15      136.   A "network gap" or "network insufficiency" exists in a health insurer's

16  network when either the health insurer, or the patient, is unable to secure the

17  services of an INP for necessary treatment.  If a network gap exists, California law

18  requires the insurer to secure the services of an ONP so the insurer can meet its legal

19  and contractual obligations to provide or arrange for the provision of access to

20  health care services in a timely manner.  In addition, emergency services, and

21  sometimes urgently needed services, must be covered by an insurer with an ONP if

22  the insurer has no network provider to provide the needed services.

23      137.   California law does not give a health insurer the right or ability to

24  unilaterally set the price it will pay an ONP that provides services to one of the

25  insurer's insureds in order to fill a network gap.

26      138.   Upon information and belief, Defendants had a network gap with

27  respect to substance use disorder treatment providers and laboratories in California,

28  and across the nation, to serve the tremendous number of insured patients in need of

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

CONSOLIDATED SECOND AMENDED COMPLAINT

such treatment and services, due in large part to the opioid and addiction epidemic in California, and across the nation.

139.   Upon information and belief, Defendants had a network gap with respect to substance use disorder treatment providers and laboratories required to treat and meet the needs of their insureds/members, which caused some of Defendants' insureds to obtain their needed treatment and services with ONPs, like Plaintiffs.

140.   In the health care industry, a "verification" of an insured's coverage for the contemplated treatment, or an "authorization" for such treatment, is understood by both the insurers and providers (and the law) to be an agreement by the insurers to pay for such treatment.  For INPs, it is an agreement by the insurers to pay those providers based on previously negotiated rates between the insurer and those providers.  For ONPs, it is an agreement by the insurers to pay those providers at their fully billed charges.

141.   Plaintiffs, as ONPs, after obtaining verifications of benefits and prior authorizations from Defendants, provided life-saving and medically necessary substance use disorder treatment and services to Defendants' insureds/members due to a network gap, and therefore, Plaintiffs are entitled to recover payment for their treatment and services at their fully billed charges.

142.   While Plaintiffs have repeatedly demanded payment in full for the treatment and services provided to Defendants' insureds, Defendants, and each of them, have denied, delayed and incorrectly issued payment for Plaintiffs' claims even after requested records were copied, sent and received by Defendants.

143.   Defendants, and each of them, would respond to Plaintiffs' inquiries about the delay or errors in payment with false promises that payment would be made and/or a multitude of excuses.  Regardless of the excuses made by Defendants, and each of them, Plaintiffs did not receive proper claim payments for the covered substance use disorder treatment and services provided to Defendants'

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

insureds/members.

144.   Upon information and belief, Defendants, and each of them, realized an immediate positive financial impact as a result of their misconduct alleged herein, cessation of substance use disorder treatment and laboratory claims payments, and forcing treatment providers, like Plaintiffs, through an expensive, administratively burdensome and indiscriminate audit, and not paying claims that are due and owed.

145.   Upon information and belief, Defendants, and each of them, undertook the actions alleged herein with the intent and designed purpose of not paying claims that are due and owed under the law and the plans, and in accordance with Defendants' coverage representations and payment promised to Plaintiffs, as part of a pattern and practice by Defendants, and each of them, that is unlawful, unfair and fraudulent, and thus violates, *inter alia*, California's UCL, state and federal regulations and ERISA, MHPAEA and PPACA.

146.   Upon information and belief, Defendants, and each of them, undertook the actions alleged herein, in violation of numerous provisions of California's UIPA, without limitation, numerous subsections of California Insurance Code section 790.03, including misrepresentations to patients and providers, failing to acknowledge and act reasonably and promptly in response to communications, failing to adopt and implement reasonable standards for investigations, not attempting in good faith to effectuate prompt, fair and equitable settlement of claims, and compelling providers, like Plaintiffs, to institute litigation to recover amounts due and owed.

147.   Upon information and belief, Defendants, and each of them, developed a mechanism through their superior economic might to oppress substance use disorder treatment providers and laboratories, including Plaintiffs, and force Plaintiffs and other treatment providers into a position where they can no longer afford to accept patients insured by Defendants, or with health plans managed and/or administered by Defendants.  Defendants' misconduct as alleged herein has

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

resulted in significant and undue hardship to Plaintiffs (and the patient-insureds) and interference with Plaintiffs' contractual relationships with their patients and their prospective economic advantage, in addition to interfering with Plaintiffs' ability to provide life-saving substance use disorder treatment and services to individuals in desperate need of help.  And Defendants, and each of them, are doing this in the middle of an opioid and addiction epidemic!

## FIRST CAUSE OF ACTION

### Claims for Plan Benefits Under ERISA, 29 U.S.C. §1132(a)(1)(B)

### Against All Defendants

148.   Plaintiffs incorporate by reference all allegations set forth in each of the paragraphs above as if fully set forth herein.

149.   Plaintiffs are out-of-network substance use disorder treatment providers and clinical laboratories.  Plaintiffs are in the profession of helping individuals recover from alcoholism and addiction and return to their families and communities as productive and contributing members of society.  Plaintiffs provided medically necessary, verified, preauthorized and covered substance use disorder treatment and laboratory services to 508 individuals with health insurance that was sold, insured, managed and/or administered by Defendants.  The treatment and services provided by Plaintiffs include RTC, PHP, IOP, OP, treatment planning, counseling and behavioral therapies, individual, family and group therapy, medication management, case management services, and laboratory services to, among other things, determine, measure, or otherwise describe the presence or absence of various substances in the body.

150.   Defendants' health insurance plans, for each of the 508 insureds at issue who had ERISA plans, provide coverage for out-of-network substance use disorder treatment and laboratory services.  In this regard, the ERISA plans, and each of them, provide that out-of-network substance use disorder benefits include the following levels of care: RTC, PHP, IOP, and OP.  The plans also provide that

out-of-network covered substance use disorder services include: diagnostic evaluations, assessment and treatment planning, treatment and/or procedures, medication management and other associated treatment, psychological testing, referral services, individual, family and group therapy, provider-based case management services, and crisis intervention.  The plans further provide coverage for out-of-network laboratory benefits, which include the facility charge and the charge for supplies and equipment, physician services for pathologists, and presumptive drug tests and definitive drug tests.

151.   Plaintiffs allege this claim for relief in connection with their claims for substance use disorder treatment and laboratory services rendered to the 508 insureds with a health benefits plan governed by ERISA.  This claim seeks to recover benefits, enforce rights and clarify rights to benefits under 29 U.S.C. § 1132(a)(1)(B).  Plaintiffs have standing to pursue these claims as assignees of the insureds' benefits under the ERISA plans.  Defendants' insureds orally assigned benefits by their insurance company or health plan to Plaintiffs and Plaintiffs obtained written assignments of benefits from the insureds at issue, by which Defendants' insureds intended to, and did, assign to Plaintiffs not only rights to payment of claims but to assert all rights and causes of action against Defendants in connection with such claims (*see* paras. 25-27, *supra*).  As the assignees of benefits under the ERISA plans, Plaintiffs are beneficiaries entitled to collect benefits under the terms of the ERISA plans, and claimants for purposes of ERISA.

152.   Defendants' health plans governed by ERISA pay benefits for out-of-network substance use disorder treatment and laboratory services, including, but not limited to, RTC, PHP, IOP, OP, diagnostic evaluations, assessment and treatment planning, treatment and/or procedures, medication management and other associated treatment, psychological testing, referral services, individual, family and group therapy, provider-based case management services, crisis intervention and laboratory services at varying percentages of covered charges (between 50% to 80%

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

of covered charges, with the majority of plans paying out-of-network benefits at 70% of covered charges (minus any outstanding insured cost-sharing amounts, which Defendants deduct from payments to Plaintiffs)) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%. Plaintiffs are informed and believe, and based thereon allege, that each of the 508 insureds at issue with an ERISA plan had already met their annual out-of-pocket maximum at the time they first received services from Plaintiffs, or shortly thereafter.  The ERISA plans also pay 100% of covered charges in the event of a "network inadequacy" or "network gap" for the services received.  Plaintiffs are informed and believe, and based thereon allege, that at all times relevant herein Defendants had an inadequate network of substance use disorder treatment providers and clinical laboratories.

153.   The intended benefits set forth in Defendants' ERISA health plans are the same in all material respects as to the claims at issue for those of Defendants' 508 insureds with a health benefits plan governed by ERISA, and provide the following material terms with respect to coverage for the services at issue:

**Substance Use Disorder**

**Inpatient Facility**

Includes Acute Inpatient Detoxification, Acute Inpatient Rehabilitation and Residential Treatment …[.]

**Outpatient – Office Visits**

Includes Individual, Family and Group Psychotherapy; Medication Management, etc. …

**Outpatient – All Other Services**

Includes Partial Hospitalization, Intensive Outpatient Services, etc.

…

**Mental Health and Substance Use Disorder Services**

…

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

**Substance Use Disorder** is defined as the psychological or physical dependence on alcohol or other mind-altering drugs that requires diagnosis, care, and treatment. …

**Inpatient Substance Use Disorder Rehabilitation Services**

Services provided for rehabilitation, while you or your Dependent is Confined in a Hospital, when required for the diagnosis and treatment of abuse or addiction to alcohol and/or drugs. Inpatient Substance Use Disorder Services include Residential Treatment services.

**Substance Use Disorder Residential Treatment Services** are services provided by a Hospital for the evaluation and treatment of the psychological and social functional disturbances that are a result of subacute Substance Use Disorder conditions.

**Substance Use Disorder Residential Treatment Center** means an institution which specializes in the treatment of psychological and social disturbances that are the result of Substance Use Disorder; provides a subacute, structured, psychotherapeutic treatment program, under the supervision of Physicians; provides 24-hour care, in which a person lives in an open setting; and is licensed in accordance with the laws of the appropriate legally authorized agency as a residential treatment center.

…

**Outpatient Substance Use Disorder Rehabilitation Services**

Services provided for the diagnosis and treatment of abuse or addiction to alcohol and/or drugs, while you or your Dependent is not Confined in a Hospital, including outpatient rehabilitation in an individual, a group, or a Substance Use Disorder Partial Hospitalization or Intensive Outpatient Therapy Program. …

**Substance Use Disorder Detoxification Services**

Detoxification and related medical ancillary services are provided when required for the diagnosis and treatment of addiction to alcohol and/or drugs. Cigna will decide, based on the Medical Necessity of each situation, whether such services will be provided in an inpatient or outpatient setting.

154. With regard to calculating reimbursement for out-of-network substance use disorder treatment, the plans utilize any of the following three methodologies to

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

CONSOLIDATED SECOND AMENDED COMPLAINT

calculate what Cigna defines as the "Maximum Reimbursable Charge" ("MRC")[15].

    a.    MRC I:

Under this option, a data base compiled by FAIR Health, Inc. (an independent non-profit company) is used to determine the billed charges made by health care professionals or facilities in the same geographic area for the same procedure codes using data. The maximum reimbursable amount is then determined by applying a percentile (typically the 70th or 80th percentile) of billed charges, based upon the FAIR Health, Inc. data. For example, if the plan sponsor has selected the 80th percentile, then any portion of a charge that is in excess of the 80th percentile of charges billed for the particular service in the same relative geographic area (as determined using the FAIR Health, Inc. data) will not be considered in determining reimbursement and the patient will be fully responsible for such excess.

    b.    MRC II:

This option uses a schedule of charges established using a methodology similar to that used by Medicare to determine allowable fees for services within a geographic market or at a particular facility. The schedule amount is then multiplied by a percentage (110%, 150% or 200%) selected by the plan sponsor to produce the MRC.

In the limited situations where a Medicare-based amount is not available (e.g., a certain type of health care professional or procedure is not covered by Medicare or charges relate to covered services for which Medicare has not established a reimbursement rate), the MRC is determined based on the lesser of:

1. the health care professional or facility's normal charge for a similar service or supply; or

2. the MRC Option I methodology based on the 80th percentile of billed charges.

    c.    Average Contracted Rate ("ACR"):

Under this option, the MRC is determined based on the lesser of:

1. the health care professional or facility's normal charge for a similar service or supply; or

---

[15] *See*,

https://static.cigna.com/assets/chcp/resourceLibrary/clinicalReimbursementPayment/medicalClinicalReimburseOutOfNetwork.html

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

2. the Average Contracted Rate - i.e., the average percentage discount applied to all claims in a geographic area paid by Cigna during a recent 6 month period for the same or similar service/supply provided by health care professionals or facilities participating in the Cigna network. The ACR is updated by Cigna on a semiannual basis. The geographic area used by Cigna is either a Metropolitan Statistical Areas (MSA) or an area within governmental boundaries (e.g. state, county, zip code).

In some cases, the ACR amount will not be used and the MRC is determined based on the lesser of:

1. the health care professional or facilities' normal charge for a similar service or supply; or

2. the MRC I methodology based on the 80th percentile of billed charges."

155.   Defendants promised they would reimburse Plaintiffs pursuant to one of these three reimbursement methodologies under the terms of the plans.  However, Defendants did not use these purported methodologies to calculate the reimbursement rates for any of the underlying claims at issue in this action.

156.   Defendants, and each of them, insure, sponsor, fund, serve as the designated plan administrator and/or serve as the named plan administrator's designee for the various ERISA health plans at issue.

157.   The ERISA health plans at issue expressly state that Cigna acts as plan fiduciary and administrator, with discretionary authority and discretionary control respecting management of the plan benefits, sole discretionary authority and responsibility to interpret and construe the provisions of the plans and to determine all factual and legal questions under the plans, and the right to delegate such discretionary authority.

158.   With respect to a percentage of the ERISA claims at issue, Cigna delegated to MultiPlan its discretionary authority to determine the amount of benefits owed for medically necessary covered services, pursuant to a service agreement that incentivized MultiPlan to reduce the amount of benefits paid to Plaintiffs, using MultiPlan's pricing database of healthcare claims data that is

CONSOLIDATED SECOND AMENDED COMPLAINT

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

wholly unrepresentative of amounts actually charged by or paid to similar medical providers in Plaintiffs' surrounding area, generating unreasonably low payment amounts relative to the reimbursement amounts that would have been generated if Cigna and MultiPlan instead had relied on the reimbursement methodologies set forth in the plans.

159.   Once MultiPlan's database and pricing tool generated a rate with respect to a particular claim at issue, MultiPlan returned the rate information to Cigna, who then issued the under-payment of benefits to Plaintiffs.

160.   After Cigna under-reimbursed Plaintiffs' claims that were priced by MultiPlan, Plaintiffs received explanations of benefits ("EOB") from Cigna that are misleading because the EOBs do not explain that Cigna's reimbursements had been based on a methodology inconsistent with the plans' requirements, and omitted information from these EOBs about the reimbursement methodology it used.  But what the EOBs did make clear was MultiPlan's role as a plan fiduciary in determining the amount of benefits Cigna would pay under the plans.

161.   The various ERISA health plans at issue fall into two categories – fully-funded and self-funded – but are administered the same.

162.   With respect to each ERISA plan at issue in this litigation that is a fully-funded plan, Defendants, and each of them are responsible for both administering and paying the claims from their own bank accounts, and are the plan administrators and ERISA fiduciaries for these plans.

163.   With respect to each ERISA plan at issue in this litigation that is a self-funded plan, Defendants, and each of them, administer these plans pursuant to an administrative service agreement, by which the self-funded ERISA plan sponsors delegated to Defendants, and each of them, the authority and responsibility for all administrative responsibilities, including *inter alia,* providing plan members with plan documents, interpreting and applying the plan terms, making coverage and benefits decisions, handling appeals of coverage and benefits decisions, and

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

providing for payment from their own bank accounts in the form of claim reimbursements, and as such are the plan administrators and ERISA fiduciaries for these plans.

164.    With respect to each ERISA plan at issue in this litigation that is a self-funded plan, but which does not specifically designate a plan administrator, Defendants, and each of them, functioned as the *de facto* plan administrators and were specifically designated by the ERISA plan sponsors as the claims administrator, with the same fiduciary duties as expressly designated plan administrators, and as such are the plan administrators and ERISA fiduciaries for these plans.

165.    With respect to each ERISA plan at issue in this litigation that is a self-funded plan, Defendants, and each of them, make all benefit determinations and authorize benefit checks to be issued out of their own bank accounts.  Periodically, Defendants, and each of them, will notify the ERISA self-funded plan sponsors of the need to replenish their accounts so that benefits can be paid.  Defendants, and each of them, control these accounts and are fully responsible for processing the insurance claims and making the determination whether to issue a benefits payment check from these accounts.

166.    As alleged herein, Defendants, and each of them, acted as agents for each other with regard to processing the claims under the ERISA plans at issue. With respect to the ERISA plans, whether fully-funded or self-funded, Defendants, and each of them, are the proper parties for Plaintiffs to sue because Defendants, and each of them, not the underlying plan sponsor or employer, made and continue to make all the relevant decisions whether to honor or deny claims under the ERISA plans, and exercised and continue to exercise the authority to issue benefit payment checks under the ERISA plans form their own bank accounts.

167.    After providing covered treatment and services to the 508 insureds at issue with ERISA plans, Plaintiffs submitted their claims to Defendants for payment

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

CONSOLIDATED SECOND AMENDED COMPLAINT

in accordance with the procedures for receiving benefits under the terms of the ERISA plans, with the claim forms notifying Defendants that Plaintiffs were submitting the claims as the insureds' assignee.  Defendants were obligated – under the law and the ERISA plans – to pay Plaintiffs the applicable plan percentage of their covered charges (between 50% to 80% of covered charges, with the majority of plans paying out-of-network benefits at 70% of covered charges (minus any outstanding insured cost-sharing amounts)) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%.

168.   Instead of paying Plaintiffs per the ERISA plan documents and the law, Defendants engaged in unfair, unreasonable, illegal, incomplete, fraudulent and systematic polices, practices and decisions – with an emphasis on profits over patients – and paid Plaintiffs, as a group, an average of 16.23% of their covered charges.  It was only after Plaintiffs rendered the treatment and services at issue that Defendants refused to properly compensate Plaintiffs for the covered treatment and services rendered to Defendants' insureds.

169.   Defendants never informed or advised Plaintiffs during the claims or post-claims process of any anti-assignment ERISA plan terms, and Defendants have thereby waived and are estopped from asserting any anti-assignment plan terms in this action.  See fn. 1, *supra.*  Likewise, Defendants never provided Plaintiffs with the ERISA plan documents, and Defendants, and each of them, made benefit determinations that were not based on individual plan terms.  Similarly, Defendants never provided Plaintiffs with notice of any administrative remedy provisions, limitation of action provisions or any other conditions to coverage under the terms of the plans.

170.   During the claim submission and payment process, Defendants put Plaintiffs on various pre-payment review and program integrity audits, and through their various departments, Defendants repeatedly requested the same documents and information from Plaintiffs, over and over again.  This was all an attempt by

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

Defendants, and each of them, to avoid processing and paying the claims. Plaintiffs complied with Defendants' repetitive requests and despite being promised payment pursuant to, *inter alia*, the ERISA plans and/or repricing agreements, Defendants refused to properly reimburse Plaintiffs for the covered treatment and services provided to Defendants' insureds. Defendants likewise failed and refused to provide Plaintiffs and the insureds with adequate notice and/or explanation for the denial of benefits, payments or reimbursement of claims, and failed and refused to provide Plaintiffs and the insureds with a reasonable opportunity to engage in a meaningful claims process and procedure which was full and fair. Defendants' audits, bogus TIN flags and pending of claims, inadequate notices and explanations, denial of full and fair claims processes and procedures, repetitive document and information requests and promises of payment were false and fraudulent and were implemented by Defendants, and each of them, as a pretext to illegally delay and deny Plaintiffs (and hundreds of other substance use disorder treatment providers and clinical laboratories) payment in accordance with the law and the ERISA plans.

171.   Plaintiffs have made all reasonable efforts to have Defendants adjudicate their claims, and have provided Defendants with thousands of pages of treatment records, none of which Defendants even consider for determining coverage. Plaintiffs have exhausted or by law are deemed to have exhausted their administrative remedies under the ERISA plans at issue, and moreover, Defendants' herein explained pattern of misconduct and misbehavior rendered all potential and further administrative remedies futile.

172.   Not all of the ERISA plans at issue require the exhaustion of administrative remedies as a condition precedent to Plaintiffs taking legal action, and those having such conditions couch the material terms of the appeal and grievance process as an optional procedure, stating that if a claim for plan benefits is denied, the insured member or an authorized representative, such as the provider, *may* participate in Defendants' appeals and grievance process.

CONSOLIDATED SECOND AMENDED COMPLAINT

173.   Out of network providers who have been assigned their patients' rights to reimbursement, such as Plaintiffs, have standing to pursue ERISA claims against Defendants, and their assigned right to reimbursement includes the ability to seek judicial enforcement of that right in this action.

174.   ERISA notice and appeal rights belong to the party with the legal right to payment,[16] and the Department of Labor ("DOL") maintains that providers who have been assigned their patients' rights to reimbursement, such as Plaintiffs, are entitled to insist upon their assigned right to challenge the allegedly wrongful decision to deny benefits through a process that complies with the ERISA Claims Regulation.[17]

175.   Defendants failed to provide Plaintiffs with proper notice of their appeal rights pursuant to ERISA Claims Regulation (29 C.F.R. § 2560.503-1), which is consistent with Defendants' custom and practice of only giving notice of ERISA appeal rights—if they give notice at all—to parties least likely to exercise them (patients who have assigned their right to payment to providers), and deny those rights to parties most likely to exercise them (providers who have been assigned the right to payment).  Defendants' failure to provide Plaintiffs with proper notice of their appeal rights pursuant to ERISA Claims Regulation is a systematic

---

[16] *See Premier Health Ctr. v. UnitedHealth Grp.*, 292 F.R.D. 204, 221 (D.N.J. 2013) (Out of network providers who have been assigned their patients' rights to reimbursement have standing to pursue ERISA claims against the plan sponsor/administrator, and that "assignment of the right to reimbursement 'must logically include the ability to seek judicial enforcement of that right.'" *Id.*, citation omitted.

[17] *See Tri3 Enters., LLC v. Aetna, Inc.,* 2012 WL 6113799, at *29 (3d Cir. Nov. 30, 2012) (DOL Amicus Brief) (Out of network providers who have been assigned their patients' rights to reimbursement are "entitled to insist upon [their] assigned right to challenge the allegedly wrongful decision to deny benefits through a process that complies with the [ERISA] claims regulation."

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

1  violation of ERISA, deeming the administrative remedies exhausted,[18] constituting a

2  waiver of any condition requiring exhaustion of administrative remedies under the

3  ERISA plans at issue, and estopping Defendants from asserting administrative

4  exhaustion as a defense.

5       176.   Even when these similarly situated Plaintiffs sought to enforce their

6  assigned appeal rights in response to Defendants' wrongful denials and

7  underpayment of plan benefits for similarly situated patients, by giving notice in

8  accordance with the ERISA plans offering an appeal and grievance procedure, and

9  supplying the requisite information and documents, Plaintiffs exhausted the

10 administrative remedies to no avail.  Defendants repeatedly requested more and

11 more records (even duplicate requests), conducted sham peer to peer reviews and

12 ultimately upheld their denials and underpayments, representing to Plaintiffs that

13 Defendants' decision was final and "no further steps needed to be taken," and not

14 advising Plaintiffs of any further conditions on Plaintiffs' rights to litigate the

15 ERISA claims at issue.  All of these facts and circumstances, along with

16 Defendants' insistence that it owes not a penny of the more than $70 million in

17 benefits at issue in this consolidated action, render it reasonable for Plaintiffs to

18 conclude that the pursuit of an administrative appeal to Defendants would be

19 futile.[19]

20 _____

21 [18] 29 C.F.R. § 2560.503–1(*l*); *see Barboza v. California Ass'n of Professional Firefighters* (9th
   Cir. 2011) 651 F.3d 1073, 1076 ("when an employee benefits plan fails to establish or follow
22 'reasonable claims procedures' consistent with the requirements of ERISA, a claimant need not
   exhaust because his claims will be deemed exhausted"); *see also Downey Surgical Clinic, Inc. v.*
23 *Ingenix, Inc.* (C.D. Cal., May 30, 2014, No. CV 09-5457 PSG (CTX)) 2014 WL 12558848, at *5–
   6.

24 [19] *See In re WellPoint, Inc. Out-of-Network UCR Rates Litigation,* 865 F.Supp.2d 1002, 1041–
   1042 (C.D. Cal. 2011) (providers demonstrated futility by pointing to similarly situated plaintiffs
25 who exhausted administrative remedies to no avail; *see also Perkins v. Prudential Insurance*
   *Company of America,* 417 F.Supp.2d 1149, 1153 (C.D. Cal. 2006) (plaintiff's showing
26 of futility sufficient where the long history of claims and lawsuits between the plaintiff and the
   insurer showed that the insurer "consistently refused to pay [the plaintiff's] benefits until
27 sued."); *see also Melczer v. Unum Life Ins. Co. Am.,* 2009 WL 792502 (D. Ariz. March 24, 2009)
   (futility adequately shown where there was evidence regarding the lack of reviews done by the
28 insurer in initial determination of claim such that appeal would be futile).

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

- 77 -

177. Defendants, and each of them, have failed to process Plaintiffs' claims in a manner consistent with ERISA, by, among other acts and omissions:

a. Delaying the processing, adjustment and/or payment of claims for periods of time greater than 45 days after submission of the claims in violation of 29 C.F.R. §2560.503-1(f)(2)(iii)(B);

b. Failing and refusing to provide any notice and/or explanation for the denial of benefits, payments or reimbursement of the claims of each of the insureds, in violation of 29 U.S.C. §1133(1);

c. Failing and refusing to provide an adequate notice and/or explanation for the denial of benefits, payments or reimbursement of claims of each of the insureds, in violation of 29 U.S.C. § 1133(1);

d. Failing and refusing to provide an explanation for the denial of benefits, payments or reimbursements of claims of each of the insureds, and by failing and refusing to set forth the specific reasons for such denials, all in violation of 29 U.S.C. §1133(1);

e. Failing and refusing to provide an explanation for the denial of benefits, payments or reimbursements of claims of each of the insureds, written in a manner calculated to be understood by the participant, in violation of 29 U.S.C. § 1133(1);

f. Failing to afford Plaintiffs and/or their patient insureds with a reasonable opportunity to engage in an appeals process, in violation of 29 U.S.C. §1133(2);

g. Failing to afford Plaintiffs and/or their patient insureds with a reasonable opportunity to engage in meaningful appeal process which was full and fair, in violation of 29 U.S.C. §1133(2);

h. Failing and refusing to provide Plaintiffs and/or their patient insureds with information pertaining to their rights to appeal,

CONSOLIDATED SECOND AMENDED COMPLAINT

including not limited to those deadlines for filing appeals and/or the requirements that an appeal be filed, in violation of 29 U.S.C. §1133(1);

i.   Violating the minimum requirements for employee benefit plans pertaining to claims and benefits by participants and beneficiaries, in violation of 29 C.F.R. § 2560.503-1(a), *et seq.*;

j.   Failing and refusing to establish and maintain reasonable claims procedures in violation of 29 C.F.R. § 2560.503-1(b);

k.   Establishing, maintaining and enforcing claims procedures which unduly inhibit the initiation and processing of claims for benefits, in violation of 29 C.F.R. §2560.503.1(b)(3);

l.   Precluding and prohibiting Plaintiffs from acting as authorized representatives of the patient insureds in pursuing a benefit claim or appeal of an adverse benefit determination, in violation of 29 C.F.R. §2560.503-1(b)(4);

m.   Failing and refusing to design, administer and enforce their processes, procedures and claims administration to ensure that their governing plan documents and provisions have been applied consistently with respect to similarly situated participants, beneficiaries and claimants, in violation of 29 C.F.R. §2560.503-1(b)(5);

n.   Failing and refusing to pay benefits for services rendered by Plaintiffs which Defendants authorized, as well as rescinding the same, in violation of California Health & Safety Code §1371.8 and California Insurance Code §796.04;

o.   Failing to offer coverage for mental health and substance use disorder treatment and laboratory services in parity with the medical and surgical benefits afforded by the same plans, as

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

required by 26 U.S.C. §9812(3), as well as other mandates set forth at 26 U.S.C. §9812, *et seq.*; and

p.   Failing and refusing to pay Plaintiffs for the substance use disorder treatments and laboratory services provided to the patient insureds in violation of 26 U.S.C. § 9812(3).

178.   Defendants' failure and refusal to provide coverage, reimbursement, payment and/or benefits for the substance use disorder treatment and laboratory services that Plaintiffs rendered to Defendants' insureds/members, and Defendants' denial of health insurance benefits coverage, constitute breaches of the ERISA plans at issue.  Plaintiffs seek reimbursement and compensation for any and all payments which they would have received and to which they are entitled to receive as a result of Defendants' breaches and failure to pay benefits and cover the treatments and services rendered by Plaintiffs to Defendants' insureds/members, in amounts according to proof at trial.

179.   Defendants have arbitrarily and capriciously breached the obligations set forth in the ERISA plans at issue, and as regulated by ERISA and implementing regulations incorporated into the plans, and Defendants have arbitrarily and capriciously breached their obligations under the ERISA plans to provide Plaintiffs and the patient insureds with health benefits.

180.   To remedy Defendants' wrongful conduct, Plaintiffs seek an order awarding them an amount equal to the amount of benefits Plaintiffs should have received and to which the patient insureds would have been entitled had Defendants paid the proper amounts, in amounts according to proof at trial, as direct and proximate result of the denial of plan benefits and other wrongful conduct by Defendants, and each of them, as alleged herein.

181.   Plaintiffs are entitled to an award of reasonable attorney's fees pursuant to 29 U.S.C. § 1132(g)(1).  As a result of the actions and failings of Defendants, and each of them, Plaintiffs have retained the services of legal counsel and have

CONSOLIDATED SECOND AMENDED COMPLAINT

1  necessarily incurred attorney's fees and costs in prosecuting this litigation.

2  Furthermore, Plaintiffs anticipate incurring additional attorney's fees and costs

3  hereafter pursing this litigation and recovery of amounts due and owed by

4  Defendants.

### SECOND CAUSE OF ACTION

**Breach of Written Contract**

**(Non-ERISA Plans)**

**Against All Defendants**

9  182.   Plaintiffs incorporate by reference all allegations set forth in each of the

10  paragraphs above as if fully set forth herein.

11  183.   Plaintiffs allege this cause of action in connection with their claims for

12  substance use disorder treatment and laboratory services rendered to those of

13  Defendants' 508 insureds with health insurance plans *not governed by ERISA*.

14  Plaintiffs bring this cause of action as assignees and third party beneficiaries of the

15  non-ERISA health insurance plans at issue.

16  **Assignees**

17  184.   Plaintiffs are out-of-network substance use disorder treatment providers

18  and clinical laboratories.  Plaintiffs are in the profession of helping individuals

19  recover from alcoholism and addiction and return to their families and communities

20  as productive and contributing members of society.  Plaintiffs provided medically

21  necessary, verified, preauthorized and covered substance use disorder treatment and

22  laboratory services to 508 individuals with health insurance that was sold, insured,

23  managed and/or administered by Defendants, including the non-ERISA health plans.

24  The treatment and services provided by Plaintiffs include RTC, PHP, IOP, OP,

25  treatment planning, counseling and behavioral therapies, individual, family and

26  group therapy, medication management, case management services, and laboratory

27  services to, among other things, determine, measure, or otherwise describe the

28  presence or absence of various substances in the body.

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

185.   Defendants' health insurance plans, for each of the 508 insureds at issue, including the non-ERISA health plans, provide coverage for out-of-network substance use disorder treatment and laboratory services.  In this regard, the plans, and each of them, provide that out-of-network substance use disorder benefits include the following levels of care: RTC, PHP, IOP, and OP.  The plans also provide that out-of-network covered substance use disorder services include: diagnostic evaluations, assessment and treatment planning, treatment and/or procedures, medication management and other associated treatment, psychological testing, referral services, individual, family and group therapy, provider-based case management services, and crisis intervention.  The plans further provide coverage for out-of-network laboratory benefits, which include the facility charge and the charge for supplies and equipment, physician services for pathologists, and presumptive drug tests and definitive drug tests.

186.   Defendants' health insurance plans, for each of the 508 insureds at issue, including the non-ERISA health plans, pay benefits for out-of-network substance use disorder treatment and laboratory services, including, but not limited to, RTC, PHP, IOP, OP, diagnostic evaluations, assessment and treatment planning, treatment and/or procedures, medication management and other associated treatment, psychological testing, referral services, individual, family and group therapy, provider-based case management services, crisis intervention, and laboratory services, at varying percentages of covered charges (between 50% to 80% of covered charges, with the majority of plans paying out-of-network benefits at 70% of covered charges (minus any outstanding insured cost-sharing amounts, which Defendants deduct from payments to Plaintiffs)) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%. Plaintiffs are informed and believe, and based thereon allege, that each of the 508 insureds had already met their annual out-of-pocket maximum at the time they first received treatment or services from Plaintiffs, or shortly thereafter.  The plans also

pay 100% of covered charges in the event of a "network inadequacy" or "network gap" for the services received.  Plaintiffs are informed and believe, and based thereon allege, that at all times relevant herein Defendants had an inadequate network of substance use disorder treatment providers and clinical laboratories.  The exclusions, conditions and limitations in the plans do not apply to the treatments and services provided by Plaintiffs.

187.   The intended benefits set forth in Defendants' non-ERISA health plans are the same in all material respects as to the claims at issue for those of Defendants' 508 insureds with a health benefits plan not governed by ERISA, and provide the following material terms:

**Substance Use Disorder**

**Inpatient Facility**

Includes Acute Inpatient Detoxification, Acute Inpatient Rehabilitation and Residential Treatment …[.]

**Outpatient – Office Visits**

Includes Individual, Family and Group Psychotherapy; Medication Management, etc. …

**Outpatient – All Other Services**

Includes Partial Hospitalization, Intensive Outpatient Services, etc.

…

**Mental Health and Substance Use Disorder Services**

…

**Substance Use Disorder** is defined as the psychological or physical dependence on alcohol or other mind-altering drugs that requires diagnosis, care, and treatment. …

**Inpatient Substance Use Disorder Rehabilitation Services**

Services provided for rehabilitation, while you or your Dependent is Confined in a Hospital, when required for the diagnosis and treatment of abuse or addiction to alcohol and/or drugs. Inpatient Substance Use Disorder Services include Residential Treatment services.

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

**Substance Use Disorder Residential Treatment Services** are services provided by a Hospital for the evaluation and treatment of the psychological and social functional disturbances that are a result of subacute Substance Use Disorder conditions.

**Substance Use Disorder Residential Treatment Center** means an institution which specializes in the treatment of psychological and social disturbances that are the result of Substance Use Disorder; provides a subacute, structured, psychotherapeutic treatment program, under the supervision of Physicians; provides 24-hour care, in which a person lives in an open setting; and is licensed in accordance with the laws of the appropriate legally authorized agency as a residential treatment center.

…

**Outpatient Substance Use Disorder Rehabilitation Services**

Services provided for the diagnosis and treatment of abuse or addiction to alcohol and/or drugs, while you or your Dependent is not Confined in a Hospital, including outpatient rehabilitation in an individual, a group, or a Substance Use Disorder Partial Hospitalization or Intensive Outpatient Therapy Program. …

**Substance Use Disorder Detoxification Services**

Detoxification and related medical ancillary services are provided when required for the diagnosis and treatment of addiction to alcohol and/or drugs. Cigna will decide, based on the Medical Necessity of each situation, whether such services will be provided in an inpatient or outpatient setting.

188. With regard to calculating reimbursement for out-of-network substance use disorder treatment, the plans utilize any of the following three methodologies to calculate what Cigna defines as the "Maximum Reimbursable Charge" ("MRC")[20].

a. MRC I:

Under this option, a data base compiled by FAIR Health, Inc. (an independent non-profit company) is used to determine the billed charges made by health care professionals or facilities in the same geographic area for the same procedure codes using data. The maximum reimbursable amount is then determined by applying a percentile (typically the 70th or 80th percentile) of billed

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

---

[20] *See*, fn. 16, *supra*.

charges, based upon the FAIR Health, Inc. data. For example, if the plan sponsor has selected the 80th percentile, then any portion of a charge that is in excess of the 80th percentile of charges billed for the particular service in the same relative geographic area (as determined using the FAIR Health, Inc. data) will not be considered in determining reimbursement and the patient will be fully responsible for such excess.

b.      MRC II:

This option uses a schedule of charges established using a methodology similar to that used by Medicare to determine allowable fees for services within a geographic market or at a particular facility. The schedule amount is then multiplied by a percentage (110%, 150% or 200%) selected by the plan sponsor to produce the MRC.

In the limited situations where a Medicare-based amount is not available (e.g., a certain type of health care professional or procedure is not covered by Medicare or charges relate to covered services for which Medicare has not established a reimbursement rate), the MRC is determined based on the lesser of:

1. the health care professional or facility's normal charge for a similar service or supply; or

2. the MRC Option I methodology based on the 80th percentile of billed charges.

c.      Average Contracted Rate ("ACR"):

Under this option, the MRC is determined based on the lesser of:

1. the health care professional or facility's normal charge for a similar service or supply; or

2. the Average Contracted Rate - i.e., the average percentage discount applied to all claims in a geographic area paid by Cigna during a recent 6 month period for the same or similar service/supply provided by health care professionals or facilities participating in the Cigna network. The ACR is updated by Cigna on a semiannual basis. The geographic area used by Cigna is either a Metropolitan Statistical Areas (MSA) or an area within governmental boundaries (e.g. state, county, zip code).

In some cases, the ACR amount will not be used and the MRC is determined based on the lesser of:

1. the health care professional or facilities' normal charge for a similar service or supply; or

CONSOLIDATED SECOND AMENDED COMPLAINT

2. the MRC I methodology based on the 80th percentile of billed charges."

189.   Defendants promised they would reimburse Plaintiffs pursuant to these terms of the plans.  However, Defendants did not use these purported methodologies to calculate the reimbursement rates for any of the underlying claims at issue in this action.

190.   Plaintiffs obtained oral and written assignments of benefits from each of the 508 insureds at issue, by which Defendants' insureds intended to, and did, assign to Plaintiffs not only rights to payment of claims but to assert all rights and causes of action against Defendants in connection with such claims (*see* paras. 25-27, *supra*).

191.   Moreover, Defendants confirmed, represented, promised and warranted to Plaintiffs through the required verification of benefits and the preauthorization process, that each of the insureds and their respective out-of-network treatments and services were covered by health insurance plans issued, managed and/or administered by Defendants and that Plaintiffs would be paid for treating Defendants' insureds.  At all times relevant herein, Defendants knew that Plaintiffs were treating and providing services, and would continue to treat and provide services, to their insureds, and Defendants were, at all times, advised and fully aware of Plaintiffs' charges for the treatment and services rendered, at each level of care.

192.   After providing covered treatment and services to the 508 insureds at issue, Plaintiffs submitted their claims to Defendants for payment.  Defendants were obligated – under the law and the plans – to pay Plaintiffs the applicable plan percentage of their covered charges (between 50% to 80% of covered charges, with the majority of plans paying out-of-network benefits at 70% of covered charges (minus any outstanding insured cost-sharing amounts)) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%.  Instead

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

CONSOLIDATED SECOND AMENDED COMPLAINT

of paying Plaintiffs per the plan documents and the law, Defendants engaged in unfair, unreasonable, illegal, incomplete, fraudulent and systematic polices, practices and decisions – with an emphasis on profits over patients – and paid Plaintiffs, as a group, an average of 16.23% of their covered charges.

193.    Plaintiffs have performed all, or substantially all, of the significant things required of them under the health insurance plans, except as excused by Defendants' material breaches.

194.    Defendants, and each of them, breached the health insurance plans by the conduct alleged herein, including without limitation withholding of proper claim payments from Plaintiffs, making unreasonable demands on Plaintiffs, not engaging in a prompt, full and complete investigation of Plaintiffs' claims, and interpreting the plans in an unduly restrictive manner so as to deny coverage and benefits when, in fact, coverage exists and benefits are owed to Plaintiffs.

195.     As a direct and proximate result Defendants' breaches, Plaintiffs have suffered and will continue to suffer in the future, economic loss, including the benefits owed under the health insurance plans and the law in the millions, the interruption in Plaintiffs' businesses, lost business opportunities, lost profits, and other general, incidental and consequential damages, in amounts according to proof at trial.  Plaintiffs are also entitled to recover statutory and prejudgment interest against Defendants, and each of them.

**Third Party Beneficiaries**

196.    Plaintiffs are also express and intended third-party beneficiaries of the health insurance plans between Defendants and the 508 insured patients treated by Plaintiffs, and are entitled to recover on that basis.

197.    Defendants and their insureds intended that Plaintiffs directly benefit from the health insurance plans and the plans indicate the intent to benefit Plaintiffs by providing for payment to Plaintiffs for the treatment and services provided to Defendants' insureds.

198.   The health insurance plans issued, managed and/or administered by Defendants provide their insureds with the option of seeking treatment with Defendants' INPs or choosing their own ONPs, like Plaintiffs.  The plans also provide for the payment of benefits for ONPs, like Plaintiffs, who provide medically necessary services to the insureds.  Although the plans issued, managed and/or administered by Defendants may incentivize their insureds to seek treatment with INPs, the plans explicitly express Defendants' intent to benefit ONPs, like Plaintiffs.

199.   The health insurance plans issued, managed and/or administered by Defendants further express Defendants' intent to benefit ONPs, like Plaintiffs, insofar as the plans expressly incorporate by reference regulations requiring insurers, like Defendants, to provide an adequate network of INPs and, in the event of a "network inadequacy" or "network gap," requiring insurers, like Defendants, to pay for the required care with available and accessible ONPs, like Plaintiffs, with the insureds responsible for paying only cost-sharing in an amount equal to the cost-sharing they would have paid for provision of that or a similar service by an INP.

200.   Defendants' intent to benefit ONPs, like Plaintiffs, by the terms of the health insurance plans at issue is further evidenced by the conduct of the Defendants, who issued payments to ONPs, including Plaintiffs, for the medically necessary treatment and services rendered to their insureds, in accordance with the terms of the plans, until in or around 2015, when the Defendants, as part of their scheme to decrease their costs on mental health and substance use disorder treatment claims, conspired, concocted and implemented their plans to significantly decrease, and in some cases completely ceased reimbursing, ONPs providing substance use disorder treatment and related services, including Plaintiffs.

201.   As set forth hereinabove, Plaintiffs provided covered, verified, preauthorized and medically necessary substance use disorder treatment and laboratory services to Defendants' insureds, all 508 of them, at great expense to Plaintiffs.  After providing the services, Plaintiffs submitted their claims to

1   Defendants for payment, requesting compensation for the treatment and services

2   provided to the insureds.

3       202.   Plaintiffs have performed all, or substantially all, of the significant

4   things required of them under the health insurance plans, except as excused by

5   Defendants' material breaches.

6       203.   Defendants were obligated – under the law and the plans – to pay

7   Plaintiffs the applicable plan percentage of their covered charges (between 50% to

8   80% of covered charges, with the majority of plans paying out-of-network benefits

9   at 70% of covered charges (minus any outstanding insured cost-sharing amounts))

10  until the insured's nominal annual out-of-pocket maximum is met at which time

11  Defendants pay 100%.  Instead of paying Plaintiffs per the plan documents and the

12  law, Defendants engaged in unfair, unreasonable, illegal, incomplete, fraudulent and

13  systematic polices, practices and decisions – with an emphasis on profits over

14  patients – and paid Plaintiffs, as a group, an average of 16.23% of their covered

15  charges.

16      204.   Defendants, and each of them, breached the health insurance plans by

17  the conduct alleged herein, including without limitation withholding of proper claim

18  payments from Plaintiffs, making unreasonable demands on Plaintiffs, not engaging

19  in a prompt, full and complete investigation of Plaintiffs' claims, and interpreting

20  the plans in an unduly restrictive manner so as to deny coverage and benefits when,

21  in fact, coverage exists and benefits are owed to Plaintiffs.

22      205.   As a direct and proximate result of Defendants' breaches, Plaintiffs

23  have suffered and will continue to suffer in the future, economic losses, including

24  the benefits owed under the health insurance plans in the millions, the interruption in

25  Plaintiffs' businesses, lost business opportunities, lost profits, and other general,

26  incidental and consequential damages, in amounts according to proof at trial.

27  Plaintiffs are also entitled to recover statutory and prejudgment interest against

28  Defendants, and each of them.

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

CONSOLIDATED SECOND AMENDED COMPLAINT

## THIRD CAUSE OF ACTION

**Breach of Implied Covenant of Good Faith and Fair Dealing**

**Against All Defendants**

206.   Plaintiffs incorporate by reference all allegations set forth in each of the paragraphs above as if fully set forth herein.

207.   Plaintiffs allege this cause of action in connection with their claims for substance use disorder treatment and laboratory services rendered to the 508 insureds with health insurance plans not governed by ERISA.

208.   As alleged herein, Plaintiffs are assignees and intended beneficiaries of their patients' health insurance plans issued, managed and/or administered by Defendants and the rights conferred thereunder.

209.   Each health insurance plan contains an implied covenant of good faith and fair dealing that obligates each party to do nothing to injure the right of the other party to receive the benefits of the agreement.

210.   As set forth hereinabove, Plaintiffs provided covered, verified, preauthorized and medically necessary substance use disorder treatment and laboratory services to Defendants' insureds with the understanding and expectation that Defendants would act in good faith and deal fairly with Plaintiffs pursuant to the plans. Defendants and each of them, however, tortiously breached the plans and the implied covenant of good faith and fair dealing, and committed unfair and deceptive acts and practices in direct violation of California's Unfair Insurance Practices Act (Cal. Ins. Code § 790 *et seq.*) and Fair Claims Settlement Practices Regulations (Cal. Code Regs. tit. 10, § 2695.1, *et seq.*) in the following ways, among others:

a.   Misrepresenting to Plaintiffs pertinent facts and insurance policy provisions relating to the coverages at issue (Cal. Ins. Code § 790.03(h)(1));

b.   Failing and refusing to acknowledge and act reasonably promptly

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

upon Plaintiffs' communications with respect to the claims at issue (Cal. Ins. Code § 790.03(h)(2));

c.  Failing and refusing to adopt and implement reasonable standards for the prompt investigation and processing of the claims at issue (Cal. Ins. Code § 790.03(h)(3));

d.  Failing and refusing to affirm or deny coverage of the claims at issue within a reasonable time after proof of Plaintiffs' entitlement to benefits had been established (Cal. Ins. Code § 790.03(h)(4));

e.  Not attempting in good faith to effectuate prompt, fair, and equitable settlements of the claims at issue despite proof of Plaintiffs' entitlement to benefits having been established (Cal. Ins. Code § 790.03(h)(5));

f.  Compelling Plaintiffs to institute litigation to recover amounts due on the claims at issue by offering substantially less than the amounts owed (Cal. Ins. Code § 790.03(h)(6));

g.  Delaying the investigation and payment of the claims at issue by requiring Plaintiffs to submit multiple reports and documents that contain substantially the same information (Cal. Ins. Code § 790.03(h)(11));

h.  Failing to and refusing promptly settle the claims at issue despite proof of Plaintiffs' entitlement to benefits having been established under one portion of the insurance policy's coverage in order to influence settlements under other portions of the insurance policy's coverage (Cal. Ins. Code § 790.03(h)(12));

i.  Failing to and refusing promptly provide a reasonable explanation of the basis relied on in the insurance policy, in relation to the facts or applicable law, for the denial of the claims at issue or for the offer of a compromised amount on the benefits owed (Cal. Ins.

Code § 790.03(h)(13));

j. Discriminating in its claims settlement practices based upon the physical disabilities of Plaintiffs' patients/Defendants' insureds (Cal. Code Regs. tit. 10, § 2695.7(a));

k. Failing and refusing to conduct and diligently pursue a thorough, fair and objective investigation and persisting in seeking information not reasonably required for or material to the resolution of the claims at issue (Cal. Code Regs. tit. 10, § 2695.7(d));

l. Unjustifiably seeking reimbursement of an overpayment and withholding benefits payable as a result of a claim on the basis that the sum withheld or reimbursement sought is an adjustment or correction for an overpayment (Cal. Code Regs. tit. 10, § 2695.11(a));

m. Failing and refusing to provide Plaintiffs with an explanation of benefits that includes a clear explanation of the computation of benefits (Cal. Code Regs. tit. 10, § 2695.11(b));

n. Failing and refusing to affirm or deny contested claims within 30 calendar days from the original notification that the claims at issue were being contested (Cal. Code Regs. tit. 10, § 2695.11(d));

o. Adopting unreasonable medical necessity standards that indiscriminately reduce the amount of authorized substance use disorder treatment available to their insureds;

p. Bullying Plaintiffs into adopting these unreasonable standards by threatening to withhold righteous claim payments;

q. Interpreting the plans in an unduly restrictive manner so as to deny coverage and benefits when, in fact, coverage exists and benefits are owed to Plaintiffs;

r. Making unreasonable demands on Plaintiffs;

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

s.  Not engaging in a prompt, full and complete investigation of Plaintiffs' claims;

t.  Fraudulently representing to Plaintiffs that Defendants would pay the claims in accordance with the plans and the Viant and Multiplan contracts;

u.  Forcing Plaintiffs to file appeals and requests for external peer reviews to obtain authorization for medically necessary treatment, and to obtain proper medically necessity determinations for post-service claim reimbursements;

v.  Failing and refusing to pay benefits for services rendered by Plaintiffs that Defendants authorized, as well as rescinding the same (Cal. Health & Safety Code §1371.8; Cal. Ins. Code §796.04);

w.  Failing and refusing to offer coverage for mental health and substance use disorder treatment and related laboratory services in parity with the medical and surgical benefits afforded by the same plans (26 U.S.C. §9812, *et seq.*); and

x.  Failing to abide by the rules and regulations promulgated by the CDI and the DMHC as alleged herein, and by other acts and omissions of which Plaintiffs are presently unaware and which will be shown according to proof at the time of trial.

211.  In committing these unfair and deceptive acts and practices in direct violation of California's Unfair Insurance Practices Act and Fair Claims Settlement Practices Regulations, Defendants and each of them not only breached their express contractual covenants to properly reimburse medically necessary covered claims, but also tortiously breached the implied covenant of good faith and fair dealing, frustrating the purpose of the insurance contracts by denying and underpaying benefits without any justification, unreasonably delaying adjudication of Plaintiffs'

CONSOLIDATED SECOND AMENDED COMPLAINT

claims in an oppressive effort to force Plaintiffs to accept less than what they are owed under the plans, and leaving Plaintiffs without any notice of a right to appeal Defendants' adverse benefit determinations and forcing Plaintiffs to incur the unreasonable expense of attorney fees and litigation costs to pursue the wrongfully denied and withheld benefits, which fees and costs are not recoverable under the insurance contract but which were proximately caused by Defendants' tortious conduct.

212.   Upon information and belief, the conduct of Defendants, and each of them, as alleged herein constitutes part of an institutional illegal pattern and practice of bad faith and unlawful insurance practices.

213.   Defendants' conduct constitutes a continuing tort that is causing Plaintiffs continued damages.

214.   Defendants' conduct as alleged herein was undertaken by Defendants' officers, directors and/or managing agents who were responsible for the supervision, operation, reports, communications and decisions at issue in this action.  The conduct of said officers, directors and managing agents, and of other employees, representatives and agents, was undertaken on behalf of Defendants, which had advance knowledge of the action and conduct of said individuals whose conduct and actions were authorized, ratified and approved by officers, directors or managing agents of Defendants.

215.   As a direct and proximate result of Defendants' breaches, Plaintiffs have suffered and will continue to suffer in the future, economic losses, including the benefits owed under the health insurance plans in the millions, the interruption in Plaintiffs' businesses, lost business opportunities, lost profits, and other general, incidental and consequential damages, in amounts according to proof at trial. Plaintiffs are also entitled to recover statutory and prejudgment interest against Defendants, and each of them.

216.   As a direct and proximate result of Defendants' breaches, Plaintiffs

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

CONSOLIDATED SECOND AMENDED COMPLAINT

have incurred attorney's fees and costs as a result of efforts to secure the insurance benefits owed, in an amount according to proof. Plaintiffs are also entitled to recover statutory and prejudgment interest against Defendants, and each of them.

## FOURTH CAUSE OF ACTION

### Breach of Implied Contract

### Against All Defendants

217. Plaintiffs incorporate by reference all allegations set forth in each of the paragraphs above as if fully set forth herein.

218. Plaintiffs, as ONPs, provided medically necessary and covered substance use disorder treatment and laboratory services to 508 patients who were insured under health insurance plans issued, managed and/or administered by Defendants, and each of them, preceded by prior authorizations and verifications of benefits by Defendants, and accompanied by promises by Defendants to pay Plaintiffs for the treatment and services provided to Defendants' insureds on the same terms as provided for in the plans between Defendants and their insureds.

219. Consistent with the trade custom and usage associated with prior authorizations and verifications of benefits by Defendants, Plaintiffs provided the subject treatment and services with the expectation, which was fully and clearly understood by Defendants and promised by Defendants, and each of them, that Plaintiffs would be compensated for such services at varying percentages of covered charges (between 50% to 80% of covered charges, with the majority of plans paying out-of-network benefits at 70% of covered charges (minus any outstanding insured cost-sharing amounts, which Defendants deduct from payments to Plaintiffs)) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%.

220. Plaintiffs, as ONPs, must often decide on short notice whether and to what extent they can treat a patient. Requiring such providers to, in effect, make an on-the-spot legal analysis whether the representations, statements and promises

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

made by health insurers (like Defendants) to authorize treatment, verify benefits and promise payment constitute binding contract "acceptance" versus supposedly non-binding "authorization" would jeopardize the safety of patients, and impose an unfair risk on healthcare providers that they would not get paid for providing treatments that are medically necessary.  For this reason, the California Legislature enacted Insurance Code section 796.04, which states (*see also* Cal. Health & Safety Code § 1371.8 (same):

> A health insurer that provides coverage for hospital, medical, or surgical expenses that authorizes a specific type of treatment for services covered under a policyholder's contract or plan by a provider **shall not rescind or modify this authorization after the provider renders the health care service in good faith and pursuant to the authorization for any reason**, including, but not limited to, the insurer's subsequent rescission, cancellation, or modification of the insured's or policyholder's contract or the insurer's subsequent determination that it did not make an accurate determination of the insured's eligibility. (emphasis added)

221.   Wholly unrelated to Defendants' obligations under the health plans at issue, and in addition to Plaintiffs' reliance upon the trade custom and usage associated with prior authorizations and verifications of benefits by Defendants, Plaintiffs provided the subject treatment and services with the expectation that Plaintiffs would be compensated for such services based upon Defendants' prior course of conduct and Defendants' promises to pay Plaintiffs for the treatment and services provided to Defendants' insureds on the same terms as provided for in the plans between Defendants and their insureds. Defendants confirmed this with Plaintiffs during the verification of benefits and authorization process for each of the insureds at issue herein.

222.   Defendants, and each of them, were advised and fully aware of the dollar amounts charged by Plaintiffs for the subject treatment and services rendered to the subject insureds, at each level of care, and had previously authorized, verified and confirmed the benefits payable to Plaintiffs for such treatment and services

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

CONSOLIDATED SECOND AMENDED COMPLAINT

rendered to the insureds, at each level of care. Defendants, and each of them, were also aware that Plaintiffs did not provide the subject treatment and services for free, and that Plaintiffs would submit their claims to Defendants for payment, which claims Defendants promised to pay. Defendants, and each of them, also knew Plaintiffs were not contracted in-network providers who had agreed to accept any pre-negotiated contract rates. With such knowledge, Defendants, and each of them, issued payments for the subject treatment and services to ONPs, including Plaintiffs.

223. Whereas payments by Defendants, and each of them, was sporadic and often inadequate, in or around 2015, and as part of their scheme to decrease their costs of substance use disorder and mental health treatment and laboratory claims, Defendants, and each of them, conspired, concocted and implemented their plans to significantly decrease, and in some cases completely ceased reimbursing, ONPs providing substance use disorder treatment and laboratory services, including Plaintiffs.

224. Accordingly, by virtue of Defendants, and each of them, authorizing, verifying and confirming the benefits for the subject treatment and services provided by Plaintiffs; by the trade custom and usage associated with prior authorizations and verifications of benefits; by Defendants' promises to pay Plaintiffs; and by Defendants' prior course of conduct and confirmations, the parties thus created an implied contract, through words and conduct, that Defendants, and each of them, would pay Plaintiffs for the substance use disorder treatment and laboratory services rendered to Defendants' insureds.

225. Defendants are also liable to pay Plaintiffs for treating the 508 patients and the claims at issue herein due to a contract implied in law based on Defendants' network gaps as discussed hereinabove. California law requires that where health insurers (like Defendants) cannot provide their insureds access to the needed healthcare providers on an "in-network" basis, the insurers shall pay any "out-of-network" provider (like Plaintiffs) the amounts necessary to limit the out-of-pocket

cost to the insured as if an in-networker provider had provided the same treatment and services. In effect, this makes an out-of-network provider eligible to receive almost 100 percent of its covered charges (since the insureds would be responsible for only their relatively nominal copayments), or in any case substantially more than the contracted rates agreed to by an in-network provider. *See*, *e.g.*, Cal. Ins. Code §10133.5; Cal. Code Regs., tit. 10, §2240.1

226.   As explained hereinabove, the health insurance plans at issue pay 100% of covered charges in the event of a "network inadequacy" or "network gap" for the services received. Plaintiffs are informed and believe, and based thereon allege, that at all times relevant herein Defendants had an inadequate network of substance use disorder treatment providers and clinical laboratories. Simply put, Defendants failed to arrange for in-network providers in the insureds' localities who were willing and able to provide the substance use disorder treatment and related services required by those insureds. Indeed, if Defendants objected to their insureds obtaining treatment from ONPs such as Plaintiffs, why did they refuse or otherwise fail to refer those insureds to an INP? The only reasonable inference is that there were no such INP's who were in the position to treat the insureds at issue. As a result, those insureds had no choice but to seek the treatments and services rendered by Plaintiffs, who did so in good faith and in reliance on Defendants' expected compliance with the plans and applicable California health care law as it pertains to a "network gap."

227.   Plaintiffs have performed all, or substantially all, of the significant things required of them under the implied contracts, except as excused by Defendants' material breaches.

228.   Defendants, and each of them, breached the implied contracts by the conduct alleged herein, including without limitation withholding of proper claim payments, making unreasonable demands on Plaintiffs, not engaging in a prompt, full and complete investigation of Plaintiffs' claims, and interpreting the plans in an unduly restrictive manner so as to deny coverage and benefits when, in fact,

1   coverage exists and benefits are owed.

2   229.   As a direct and proximate result Defendants' breaches of the implied

3   contracts, Plaintiffs have suffered and will continue to suffer in the future, economic

4   losses, including the benefits owed under the law and health insurance plans in the

5   millions, the interruption in Plaintiffs' businesses, lost business opportunities, lost

6   profits, and other general, incidental and consequential damages, in amounts

7   according to proof at trial.  Plaintiffs are also entitled to recover statutory and

8   prejudgment interest against Defendants, and each of them.

### FIFTH CAUSE OF ACTION

**Breach of Oral Contract**

**Against All Defendants**

12   230.   Plaintiffs incorporate by reference all allegations set forth in each of the

13   paragraphs above as if fully set forth herein.

14   231.   Wholly unrelated to Defendants' obligations under the health plans at

15   issue, and as part of verifying benefits and authorizing treatment when necessary,

16   and in multiple communications following admissions and the submission of claims,

17   Defendants, and each of them, orally promised to pay Plaintiffs for the treatment

18   and services provided to Defendants' insureds, all 508 of them, an amount equal to a

19   percentage of their billed charges (between 50% to 80% of billed charges, with the

20   majority of claims promised by Defendants to be paid at 70% of billed charges).

21   232.   The persons answering calls and corresponding on behalf of

22   Defendants, and each of them, were upon information and belief the agents and

23   employees of Defendants, and each of them, and in doing the things herein alleged

24   were acting within the course and scope of such agency and employment and with

25   the permission and consent of Defendants, and each of them.

26   233.   Plaintiffs have performed all duties required of them under the oral

27   contracts, except as excused by Defendants' material breaches.

28   234.   Defendants and each of them, however, breached the oral contracts by

CONSOLIDATED SECOND AMENDED COMPLAINT

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

the conduct alleged herein, including without limitation the withholding of proper claim payments.

235.   As a direct and proximate result of Defendants' breaches, Plaintiffs have suffered general and incidental damages according to proof, and are entitled to statutory and prejudgment interest and attorney's fees against Defendants.  Under this cause of action, Plaintiffs seek to recover the benefits orally promised, which are equal to a percentage of their billed charges (between 50% to 80% of billed charges, with the majority of claims promised by Defendants to be paid at 70% of billed charges).

236.   As a direct and proximate result of Defendants' breaches, Plaintiffs have incurred and continue to incur economic loss, including the benefits owed in the millions, the interruption in Plaintiffs' businesses, lost business opportunities, lost profits and other consequences, all according to proof.

## SIXTH CAUSE OF ACTION

### Promissory Estoppel

### Against All Defendants

237.   Plaintiffs incorporate by reference all allegations set forth in each of the paragraphs above as if fully set forth herein.

238.   Wholly unrelated to Defendants' obligations under the health plans at issue, and as part of verifying benefits and authorizing treatment when necessary, and in multiple communications following admissions and the submission of claims, Defendants expressed a clear promise to pay Plaintiffs for the treatment and services provided to Defendants' insureds, all 508 of them, an amount equal to a percentage of their billed charges (between 50% to 80% of billed charges, with the majority of claims promised by Defendants to be paid at 70% of billed charges).

239.   The persons answering calls and corresponding on behalf of Defendants, and each of them, were upon information and belief the agents and employees of Defendants, and each of them, and in doing the things herein alleged

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

CONSOLIDATED SECOND AMENDED COMPLAINT

were acting within the course and scope of such agency and employment and with the permission and consent of Defendants, and each of them.

240.   Plaintiffs relied on Defendants' promises in providing the subject treatment and services to Defendants' insureds, and Defendants, and each of them, should reasonably have expected this to induce Plaintiffs' action in providing said treatment and services to Defendants' insureds.

241.   Plaintiffs have suffered substantial detriment in reliance upon Defendants' promises in providing treatment and services to Defendants' insureds, including without limitation the benefits owed in the millions, the interruption in Plaintiffs' businesses, lost business opportunities, lost profits and other consequences, all according to proof at trial.

242.   As a direct and proximate result of Defendants' breach of their promises, Plaintiffs are also entitled to statutory and prejudgment interest and attorney's fees against Defendants, and each of them.

## SEVENTH CAUSE OF ACTION

### Unfair Competition

### Against All Defendants

243.   Plaintiffs incorporate by reference all allegations set forth in each of the paragraphs above as if fully set forth herein.

244.   The conduct of Defendants, and each of them, as alleged herein not only constitutes common law bad faith, but also violates state and federal law, regulations and policies, and thus constitutes unlawful, unfair, and fraudulent business practices in violation of the UCL (Bus. & Prof. Code §§ 17200 *et seq*.).

245.   Plaintiffs have suffered injury in fact and have lost money as a result of the unlawful conduct of Defendants, and each of them, as alleged herein, including but not limited to Defendants' wrongful denials and underpayment of claims, inconsistent with oral promises, history of dealings and other conduct, and wholly unrelated to Defendants' obligations under the health plans at issue; refusal to honor

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

CONSOLIDATED SECOND AMENDED COMPLAINT

the patients' valid assignments of rights for Plaintiffs to pursue their legal right to the health plan benefits; delaying interminably the adjudication of claims with pretext audits and demands for documents, information and sham peer to peer reviews; and refusing to pay even those claims determined to be covered and owing because of offsetting for alleged overpayment of prior claims.  All of this conduct was unlawful and designed specifically to deprive Plaintiffs and all other similarly situated out of network substance use disorder providers of their legal entitlement to reimbursement for medically necessary covered services rendered to Defendants' insureds.

246.   The wrongful conduct of Defendants and each of them has proximately caused direct injury to Plaintiffs and all other similarly situated out of network substance use disorder providers in the form of lost revenue necessary to keep their businesses in operation.  Defendants maintain an institutional pattern and practice of denying and underpaying out of network substance use disorder through the course of unlawful conduct alleged herein, with the intent of reducing the amount of benefits paid for such essential health care services that the PPACA mandates they cover.

247.   As courts have held that a patient who has assigned his rights to his provider has no standing to challenge Defendants' practice of impermissibly requiring prior authorization for certain levels of care in order to wrongfully deny coverage; to challenge Defendants impermissible refusal to pay for covered and medically necessary claims for benefits; to challenge Defendants' practice of unlawfully demanding refunds or refusing to cover and pay for covered claims for individuals under one plan based on purported overpayments to other individuals covered by other plans; to challenge Defendants' refusal to cover and pay for covered counseling and behavioral therapy, case and treatment management services, pharmacologic management services, and breathalyzer testing; to challenge Defendants' refusal to cover and pay for covered clinical laboratory claims based

CONSOLIDATED SECOND AMENDED COMPLAINT

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

upon arbitrary numerical limitations; or to challenge Defendants' systematic and willful underpayment of claims, including the substitution of an improper Medicare rate payment methodology for substance use disorder treatment claims, notwithstanding the increased out of pocket expense that results for the insured patient,[21] Plaintiffs and all other similarly situated out of network substance use disorder providers are the aggrieved parties who must hold Defendants accountable for their unfair and unlawful conduct.

248.   Plaintiffs are entitled to injunctive relief under the UCL and, as such, Plaintiffs seek a temporary restraining order, a preliminary injunction, and a permanent injunction, all enjoining Defendants, and each of them, from unjustifiably withholding proper payment of claims.

249.   Plaintiffs are further entitled to an order appointing a receiver over Defendants, and each of them, and restoring to Plaintiffs any money or property that was acquired through the foregoing acts of unfair competition (Cal. Bus. & Prof. Code § 17203).

## **PRAYER**

WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, and that the Court award the following relief:

1.      For compensatory, general and special damages in amounts to be proven at trial;

2.      For statutory and prejudgment interest;

3.      For costs incurred in connection with this lawsuit;

4.      For attorney's fees;

5.      For injunctive and equitable relief; and

6.      For all other relief the Court deems just and proper.

---

[21] *See Ryan S. v. UnitedHealth Grp., Inc., et al.,* 2020 WL 8028609, at *4–6 (C.D. Cal. Dec. 3, 2020); see also .

CONSOLIDATED SECOND AMENDED COMPLAINT

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

1

## **DEMAND FOR JURY TRIAL**

2    Plaintiffs hereby request a trial by jury for all claims triable by jury.

3

4    Dated:  April 28, 2021              **CALLAHAN & BLAINE, APLC**

5

6                                        By:   /s/ *Richard T. Collins*

7                                              Richard T. Collins
                                               Attorneys for Plaintiffs

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

CONSOLIDATED SECOND AMENDED COMPLAINT