# EXHIBIT E-1

REDACTED VERSION OF DOCUMENT PROPOSED TO BE

FILED UNDER SEAL L.R. 79-5.2.2(c)

**Kelly J. Clark, MD, MBA**

**Expert Report in Rebuttal to Report of Dr. Andrea G. Barthwell**

**TML RECOVERY, LCC, et al. v. Cigna Corporation, et al.**

**Case No.: 8:20-cv-0269-DOC-JDE**

**June 26, 2023**

## I.  ENGAGEMENT

I have been retained by Cooley LLP on behalf of its clients Cigna Corporation, Cigna Health and Life Insurance Company, Connecticut General Life Insurance Company, Cigna Behavioral Health, Inc., Cigna Behavioral Health of California, Inc., Cigna Health Management, Inc., and Cigna Healthcare of California, Inc. (together "Cigna") to provide independent analysis and expert testimony and rebuttal of portions of the expert report filed by Dr. Andrea Barthwell on March 30, 2023, in the above-referenced matter.

I have been engaged to render an opinion on the nature of the billings for services, including those related to inpatient and outpatient levels of care and lab drug testing, by the Plaintiffs[1] in this action (the "Billed Claims").  Because my review and report rebut certain of Dr. Barthwell's opinions, I also speak to issues that she raises regarding Cigna's processing of the Billed Claims.

My opinions are based on my education, training, and experience, and my review of the documents and information available in this matter and/or relied upon by Dr. Barthwell, as well as Dr. Barthwell's report.  Due to the highly technical nature of many concepts, I will at times generalize for clarity.

My opinions are described in detail in this report. I reserve the right to supplement or amend this report and/or my opinions based upon any additional evidence provided by the parties in this case, as well as any other information that may become available, or any other analysis counsel may request. I further reserve the right to offer opinions within my area of expertise to additional opinions and/or subjects addressed by other experts.

## II.  DOCUMENTS & INFORMATION REVIEWED

I performed high-level analysis of the records identified by Dr. Barthwell.  In addition, I relied upon documentation and information provided to me by Counsel and publicly available sources, as well as my extensive experience, detailed in Section III.  For a list of documents and information I considered in formulating my opinions included in this report, see Appendix A.

## III.  QUALIFICATIONS AND RELEVANT EXPERIENCE

I received my Doctor of Medicine degree from the University of Wisconsin School of Medicine and my Master of Business Administration with an Additional Certificate in Health Sector Management from the Fuqua School of Business at Duke University. I am a physician board certified in both Psychiatry and Addiction Medicine. It should be noted that, under the American Board of Medical Specialties, Addiction Medicine is a subspecialty of Preventive Medicine and not related to Psychiatry.  I have provided direct patient care to many patients as well as oversight of care providers in multiple settings. A copy of my most recent CV is attached as Appendix B.

In my career I have performed thousands of reviews of care provisions around the country for medical necessity on behalf of health plans, worker's compensation and disability insurance providers, and continue to do so as a consultant reviewer. I have also engaged in utilization review processes as a treating provider. I was employed as the Medical Director for Behavioral Health at a non-profit community health plan, Capital District Physicians Health Plan ("CDPHP") in Albany, New York – a position which requires the addiction physician specialist to also be board certified

---

[1] "Plaintiffs" refers to TML Recovery, LLC, MMR Services, LLC, Southern California Recovery Centers Oceanside, LLC, Addiction Health Alliance, LLC, DR Recovery Encinitas, LLC, Southern California Addiction Center, Inc., Woman's Recovery Center, LLC, and Pacific Palms Recovery, LLC.  For simplicity in this report, I will use the term "Plaintiffs" to refer to all listed Plaintiffs unless specified otherwise.

in psychiatry.  I continue to work as a consulting medical director for PHP as needed to cover when their employed psychiatrists are unavailable.  As CDPHP's Medical Director, I worked with the Special Investigation Unit ("SIU") on issues of Fraud, Waste, and Abuse by analyzing claims data abnormalities.

As a Medical Director with CVS Caremark, I also assisted their SIU on issues of Fraud, Waste and Abuse as identified via aberrant claims data.  I am familiar with the protocols of numerous other health plans for clinical reviews and SIU reviews of aberrant providers/claims through my forensic work in both civil cases involving billing disputes as well as criminal health care fraud cases.

I was elected by my peers as the president of my medical specialty society, the American Society of Addiction Medicine ("ASAM"), consisting of, at the time, about 4,000 physicians involved in this specialty. I have worked with groups of experts throughout the fields of addiction medicine and psychiatry to publish a number of practice and policy guidelines, including such documents as the ASAM "National Practice Guideline for the Treatment of Opioid Use Disorder" (2015), the ASAM "Appropriate Use of Drug Testing in Clinical Addiction Medicine" (2017), and the United States Health and Human Services' Substance Use and Mental Health Services Administration (SAMHSA) as a paid consultant on "TIP 63: Medications for Opioid Use Disorder" (2018).

I have worked as a litigation consultant and expert witness in federal criminal fraud cases related to providers' billing codes for medical services which were without evidence of legitimate service delivery by appropriately licensed individuals, without required documentation to support the codes billed, gross overcharging for medical services focusing on out of network commercial plan members, and medically unnecessary services including laboratory testing.  I have been qualified in federal court as an expert on issues including medical billing and drug testing. A list of my experience as a testifying expert in the last 4 years is attached as Appendix C.

I have published numerous articles on topics related to addiction medicine, including the use of drug testing, treatment of opioid addiction, management of alcohol withdrawal, systems of care including and policy and payment for behavioral health including addiction services. A list of my publications for the last ten years is attached as Appendix D.

This report reflects my experience and understanding of billing protocols and requirements as well as rate structures in providing estimates of the typical fees a provider might reasonably expect to be paid for these lab services.

I am being compensated for my time on this matter at a rate of $1,250 per hour.

**IV.**     **SUMMARY OF OPINIONS REBUTTING DR. BARTHWELL'S REPORT**

  **A.**     **Opinion 1:** my examination of the records[2] and Dr. Barthwell's report reflects that there is nothing about Cigna's methodology that is inconsistent with industry standards regarding utilization review, limits for drug tests, and medical review of issues of medical necessity

  **B.**     **Opinion 2:** Cigna's methodology as described by Dr. Barthwell—including Cigna's use of Medicare codes to anchor its reimbursement rates—is appropriate and there is no basis to conclude that Cigna "used biased data systems, administrative burdens, and deceptive practices."

  **C.**     **Opinion 3:** Dr. Barthwell provides no support or citations for many of her opinions, which makes it impossible to determine how she has reached many of her conclusions. However, following my analysis of the records identified by Dr. Barthwell, it is clear that the evidence contradicts numerous of her opinions presented as fact.  In this section I address a few of the most critical deficiencies in her report.

**V.**     **BACKGROUND**

  **A.**     **Addiction treatment in the US, including of individual professional services, different Levels of Care (LOC) and the use of drug testing.**

---

[2] I have reviewed the same records identified by Dr. Barthwell in her report and which were sent to Cigna's counsel by Plaintiffs.  This applies to each reference herein to the records I have reviewed in support of this opinion, unless stated otherwise.

CONFIDENTIAL

The majority Dr. Barthwell's report focuses on policy and treatment issues, as well as information well known to addiction medicine physicians, but these issues do not apply to this case. And while she does provide the current definition of addiction of American Society of Addiction Medicine ("ASAM") and the Dimensions to be assessed when making a treatment plan and choosing the appropriate Level of Care (at times referred to as "LOC"), Dr. Barthwell provides no information as to whether the Plaintiffs used the relevant ASAM criteria in determining the appropriate LOC for their patients.  Dr. Barthwell also fails to acknowledge that Cigna has licensed the use of the ASAM criteria for their review processes.

Dr. Barthwell only lists the ASAM LOC but does not describe them.  Accordingly, I provide further description of the LOC's involved in the provision and billing of specific medical services as well as the payment by a health insurance plan of those specific medical services, because it is necessary to understand the nature of these issues and how they relate to this case.

1.     Individual Professional Services & Levels of Care

There is a wide range of individuals who provide services within our health care systems, such as licensed professionals (e.g., physicians and psychologists), credentialed providers (e.g., nursing assistants and phlebotomists), and support staff who require no formal training or licensing.  All of these people have a "scope of practice" – or some delineation of what they are allowed to do.  For example, it is within the scope of practice for a physician to perform an appendectomy, but it would be outside the scope of practice for a pharmacist or physical therapist to do the same.

The scope of practice and licensing of individual clinicians reside at the state level.  However, there are general national guidelines that designate which types of clinicians may bill for which types of service delivery, as defined by national billing codes.  For example, general medical evaluation and management codes can be billed by physicians and other qualified health care providers but cannot be billed by pharmacists or psychologists. In other words, certain codes can only be legitimately billed by professionals with certain credentials.

Each of these treatment environments exists along the Levels of Care.  Many treatment programs or facilities that make up Levels of Care are licensed and bill independently of independent rendering clinicians.

2.     Levels of Care for Substance Use Disorder Treatment

There are a variety of Levels of Care which can be used to treat people with SUDs. In addition to state licensure and payer requirements, ASAM has developed criteria which defines specific levels of care and the type of treatment that is most appropriate for a specific patient at a specific time. The current edition published in 2013 defines outpatient treatment levels from 1 to 2.5, and inpatient levels from 3.1 to 4.

As with psychiatric levels of care, "outpatient treatment" refers to programs where the patient does not reside or sleep in that facility, while "inpatient treatment" refers to one of several levels of care where the patients sleep at the facility. The inpatient levels of care, such as a hospital, nursing home, or other rehabilitation facility, provides 24-hour clinical staffing and basic needs (like food). The outpatient levels of care provides clinical services while the patient lives in the community, so services like food and housing are not provided. In fact, providers may not provide housing, food, and other goods or services of value (such as transportation to a geographically distant treatment location) to patients engaging in outpatient levels of care because such items are considered inappropriate inducements to engage in treatment.

ASAM Level 1 (general outpatient):

ASAM Level 1 treatment is traditional outpatient care.  The patient goes to their doctor's office for an appointment as needed or sees a psychotherapist for their weekly/monthly individual or group psychotherapy sessions. Level 1 treatment services are performed by independently licensed medical clinicians, including psychotherapists with a doctorate or master's degree level of training.

When these clinicians bill for their services, the range of a physician's evaluation and management (E&M) codes used to describe those medical appointments are, at their core, the same for psychiatrists, addictionists, and family medicine physicians. Psychiatrists may add additional billing codes if they also engage in the delivery of psychotherapy during the visit in addition to typical patient counselling, which is typically considered to be a part of the general physician-patient encounter.

CONFIDENTIAL

ASAM Level 2 (formal outpatient treatment programs):

ASAM Level 2 treatment consists of two different levels of care in an outpatient environment where the patient sleeps at home or another location: (1) an Intensive Outpatient Program (Level 2.1) and (2) a Partial Hospital Program (Level 2.5). These programs do not offer 24-hour care.  Accordingly, during treatment hours, it is possible for Intensive Outpatient Programs or Partial Hospital Programs to have counselling staff but not medical or nursing staff. They are expected to have some coordination of care between providers in the program and to provide individual and family sessions as well as psychoeducational groups as part of their programming. Those sessions may not be billed independently and are part of the day rate (per diem) of the program.  However, in some instances additional medical and psychiatric treatment by licensed clinicians, as well as other specific medical services such as drug testing, may also be needed and would be generally billed in addition to the programmatic services.

Programs providing Intensive Outpatient Program and Partial Hospital Program services, such as the Plaintiffs which provided those services, typically bill their services as program codes. Often these services are not provided by licensed independent clinicians. The program services typically focus less on group psychotherapy (which requires a strong therapeutic focus for all individuals in the group, run by a licensed master or doctorate level licensed psychotherapist[3,4,5]), and more on educating patients on their disease, skill development for relapse prevention, supporting and normalizing their experiences, and so on.  These are often called "psychosocial interventions" or as "psychoeducational groups" as opposed to formal "psychotherapy".

-       ASAM Level 2.1 (Intensive Outpatient Program) requires that the patient have between 9 and 20 hours of programming per week.  It is often billed on a daily rate for the (at least) three days of treatment.

-       ASAM Level 2.5 (Partial Hospital Program) requires a minimum of 20 hours of programming per week, and these are traditionally done as 4 hours of care, 5 days per week.  That schedule is often required for billing purposes by payers, with 1 unit of care equating to one day of at least 4 hours of care within a week, totaling at least 20 hours.

The same definition is used for psychiatric care. In other words, Psychiatric Intensive Outpatient Program is generally 9-20 hours of programming per week: 3 hours a day, 3 days a week; while Psychiatric Partial Hospital Program is at least 20 hours of programming per week: 5 days, 4 hours per day.

Both Intensive Outpatient Program and Partial Hospital Program, whether psychiatric, SUDs, or dual diagnosis focused, typically bill per diem for each date that the patient meets criteria for the specific intensity of care.

ASAM Level 3 ("Residential"):

ASAM Level 3 care is typically referred to as "residential" care. Patients at this inpatient Level of Care should receive 24-hour care from trained clinical staff.  These programs are also considered "facilities" and, like Intensive Outpatient Program and Partial Hospital Program programs, also bill at per diem rates.

---

[3] Government Health Administrators, (2023) *Documentation Guidance for a Successful Review of Group Psychotherapy* {wpsgha.com} (lists information in documentation needed to support the billing of group psychotherapy, code 90853).

[4] "Group therapy, since it involves psychotherapy, must be led by a person who is authorized by state statute to perform this service. This will usually mean a physician, clinical psychologist, clinical social worker, physician assistant, certified nurse practitioners, clinical nurse specialist, or other person authorized by the state to perform this service." (Psychiatry and Psychology Services (LCD #L34616). Centers for Medicare & Medicaid Services. {https://www.cms.gov/medicare-coverage-database/view/lcd.aspx?lcdId=34616&ver=40}).

[5] "90853 - Group Psychotherapy (Other Than of a Multiple-Family Group) - This code relies on the use of interactions of group members to examine the pathology of each individual within the group. In addition, the dynamics of the entire group are noted and used to modify behaviors and attitudes of the patient members. The size of the group may vary depending on the therapeutic goals of the group and/or the type of therapeutic interactions used by the therapist. The code is used to report per-session services for each group member.  Most insurance plans cover this procedure." (Claim Submission Cover Sheet: CPT code 90853. Palmetto GBA. (July 2016) {https://www.palmettogba.com/Palmetto/Providers.Nsf/files/RR_Group_Psychotherapy_Checklist.pdf/$File/RR_Group_Psychotherapy_Checklist.pdf}).

CONFIDENTIAL

There is a range of intensity of care within the general Level 3, from Clinically Managed Low-Intensity Residential Services (Level 3.1) to High-Intensity Residential Services (Level 3.7).  It is important to understand that these are not housing services – these are inpatient levels of care. The patient resides within the treatment program because 24-hour clinical care is required but their condition is not so severe that full hospital level of care is required. Some programs claiming to provide these levels of care, particularly at lower "residential/rehab" levels, may not have any physician involvement as part of the actual treatment being delivered.

At the highest level, ASAM Level 3.7 is often used for Medically Monitored or Medically Supervised withdrawal management services (called "Detox" by laypeople).  Such care is appropriate only when the patient requires 24-hour on-site nursing as well as daily physician (or appropriate Advanced Practice Clinician (APC), such as a Nurse Practitioner) monitoring.  This level of care may be required, for example, if a person has significant physical dependence on substances like alcohol but their withdrawal symptoms are not so serious as to require a Hospital Level of Care.  In comparison, when a patient exhibits severe withdrawal, they would meet criteria for ASAM Level 4 or Hospital Level of Care.

The vast majority of people who are physically dependent on any substance, whether or not they have a SUD, have their withdrawal managed in the general outpatient level of care.

Dr. Barthwell discusses the opioid crisis, increases in synthetic opioid use including fentanyl, and overdoses, but while she states that "Cigna should have been implementing initiatives and strategies to increase coverage and access to SUD treatment", the evidence-based treatment used to treat opioid addiction occurs in outpatient levels of care at Opioid Treatment Programs ("methadone clinics"), Office Based Opioid Treatment ("Suboxone clinics"), and Telemedicine Based Opioid Treatment programs ("telehealth Suboxone clinics"). I understand that the Plaintiffs were not providing those services to the Cigna members at issue in this litigation.

ASAM Level 4 (Hospital):

ASAM inpatient Level 4 care is for persons who are medically ill enough to require that both physicians and nurses be on-site 24/7 for their treatment. This Level of Care is provided in a general hospital setting, with medications dispensed by nurses or pharmacists. Someone who is withdrawing from alcohol and has an uncontrolled seizure disorder, for example, may require this Level of Care, often in an Intensive Care Unit.

In addition, psychiatric patients who are acutely dangerous to themselves or others, often due to acute psychosis, are generally treated at this level of care in psychiatric units in hospital settings. Such treatment requires nurses and physicians to be on-site 24/7, often requires locked doors, and a physical plant that is built for safety (i.e. break-away clothes hooks and shower curtain rods to prevent hanging, psychiatric physician specialists in charge of the patient's daily treatment plan, among other requirements).

When a patient is admitted to an inpatient hospital Level of Care, the hospital will bill for the programmatic care it delivers.  The rates paid to hospitals are higher than the rates paid to other LOC facilities/programs due to the higher level of overhead they carry (the physical plant, the nurses, nursing aids, pharmacists, technicians, licensing and administrative burdens, etc.).  Individual professional services, such as physician fees, may be additionally provided and billed at this LOC as well. Hospitals often have affiliated outpatient programs, such as pulmonary rehabilitation, or Partial Hospital Program/Intensive Outpatient Program for SUDs or mental health.  These programs are generally paid at higher rates when they are part of the hospitals as compared to when they are independent programs.

Though Dr. Barthwell lists the various levels of care, she omits any discussion regarding the distinction between the services provided at each Level of Care.  Such differences are critical to understanding the Plaintiffs' Billed Charges.

**B.      Overview of the Use of Laboratory Testing**

 General health testing is part of the expertise of any physician, but drug testing specifically is part of treating people who are prescribed controlled substances as well as the treatment of those with substance use disorder or the disease of addiction.

In order to explain the patterns of deviation from legitimate and acceptable billing for laboratory work identified in Plaintiffs' Billed Charges, it is necessary to first discuss the appropriate use of these technologies and the related appropriate billing.

CONFIDENTIAL

1.   <u>Use of lab testing in the practice of medicine and addiction medicine</u>

Insurance companies and managed care systems typically provide coverage for clinical diagnostics and treatments, including different levels of care and lab testing.  But to be covered the service must be, among other things, medically necessary for the care of patients generally, and specifically related to the medical needs and treatment of the particular patient at that particular time.

In treating addiction, the clinician obtains information in order to make a diagnosis, works with the patient on a treatment plan, and then gathers additional information to monitor how well the treatment plan is working.  One important source of information is the results of lab testing, including drug testing.  Clinicians should choose only the specific tests and testing frequency that is appropriate for support and ongoing assessment.  It may be appropriate to screen a patient population for a specified and medically indicated panel of drugs of abuse, but it is not medically appropriate, nor is it medically necessary, to "over-test" a patient – performing, causing to perform, or billing for testing which is not indicated for the treatment of a patient's condition.

The primary utility of drug testing in the treatment of addiction is as a therapeutic tool to provide objective checkpoints for patients' self-reports and allow ongoing treatment planning updates between clinician and patient.  Drug testing should be used to determine if the treatment plan is working well or if changes are needed.  Importantly, the purpose of drug testing is not to try to "catch the patient" when they use a substance.  People with any chronic disease are not expected to perfectly adhere to their treatment plan. Rather, the medical purpose of drug testing submitted for medical billing is primarily therapeutic and is not to be used as a punitive surveillance technique.  For all of these reasons, it is rarely, if ever, clinically necessary to monitor the actual quantitative level of a substance in a patient's urine. Definitive tests are generally considered "Present/Absent" in clinical usage.  Furthermore, it is simply not possible to test for every drug which could possibly be misused, and it is not appropriate to waste resources testing for substances when there is no reasonable expectation that the test results will alter a patient's treatment plan.

The medical necessity of any test is in its utilization for treatment planning – failure to use the information from a test means that the test had no medical purpose.  In other words, if information to be gained from a test is not needed to care for a specific patient, then the test is not medically necessary.

2.   <u>Types of Drug Testing and Choice of Tests</u>

There is a range of technological complexity in the different types of urine drug tests. Again, this is highly technical material, so I have generalized for clarity.

**Presumptive Tests.**  These are most familiar as Point of Care ("POC") on-site screening test tests, which are the most rapid and least expensive tests.  They are similar to home pregnancy tests where the change in color on a chemical strip gives a positive or negative result.  More expensive, but less prone to error, presumptive tests can also employ a mechanized approach using optical scanning and similar immunoassay technologies. These are considered "presumptive" tests because of the rates of errors and inability to test for certain substances.

**Definitive tests.**  This type of testing is performed by larger laboratory machines not found in physician offices. They provide much lower error rates and are hence "definitive." They also allow for more complex analysis on a wider range of substances. However, these tests take longer for the information to become available to the clinician and are more expensive.

If a simple POC screening is done on-site, information may be then obtained from the patient regarding whether these results are anticipated or not as expected.  If a physician is available at that time, a decision regarding whether to do additional testing can be made and the order given. If the patient is in an Intensive Outpatient Program or Partial Hospital Program or residential or inpatient LOC, information regarding presumptive testing can be discussed with the patient fairly quickly, even if the presumptive testing is done off-site. In other words, it would be inappropriate to see large batteries of definitive testing done several times per week for extended periods, because those levels of care indicate that the treating clinician is in close contact with the patient - and therefore information could be gathered regarding the presumptive test results to guide the need for further testing.[6]

_____

[6] "Reflex testing for IA presumptive positives may only be performed by laboratories other than physician office labs (POL). Physicians in POL are expected to determine the medical necessity for definitive testing for a presumptive

CONFIDENTIAL

The guidelines for methadone treatment programs (TIP 47) state that these programs should test for a relatively few classes of drug at least 8 times per year, but the battery of screening tests may expand where there is a demonstrated need.[7] A range of national guidelines indicate that the choice of specific tests should be chosen in order to provide the information needed for the medical care of a specific patient, and that costs of testing should be considered.[8], [9] Expansive and therefore expensive drug testing, either presumptive or definitive, has generally neither been required nor appropriate to add to the basic drug test screening. Rather, what is important to add to basic screenings should be determined by the clinician based on "analyzing community drug-use patterns and individual medical indications."[10]

It is currently standard for large volume definitive drug testing laboratories to run an expansive panel of tests – regardless of the tests actually ordered – on each specimen.  This is because it is now prohibitively expensive to change the scope of the panel of tests run on a specimen-by-specimen basis as opposed to the cost of running a large, standardized panel. But the routine billing of expansive and expensive panels of tests – the "test for everything" approach – is not consistent with the standard of care or legitimate practice of medicine.  Such testing is not medically necessary and cannot be legitimately billed.

   3.  <u>Frequency of Drug Testing</u>

The primary purpose of drug testing after initial assessment is to monitor how well the treatment plan is working. However, there is no medical reason to regularly submit urine specimens to a laboratory and bill insurance for every individual patient at a treatment facility for drug testing several times per week.  Moreover, there is no medical reason for routinely ordering and billing expansive and expensive definitive testing on every individual patient's urine several times per week.

It cannot be stated often enough: if the results of a test are not needed to care for the patient, then the test is not medically necessary.

   C.  **Billing and Payment for Medical Services**

Although the industry term is "reimbursement", this implies that a provider is reimbursed for their expenses in providing that service.  This is not the case.  Payers actually remunerate some amount to the provider to cover both their expenses and their profit for delivering the medical goods or services.  When CMS sets Medicare rates, used as benchmarking anchors throughout the health insurance industry, they do attend to higher expenses for some services.  For example, they pay higher rates for services delivered through a hospital than an individual provider office, due to the much higher overhead expenses to deliver care in the hospital setting.

It is the responsibility of those performing and billing a code for any medical service to understand how that code is defined at the time of service and to ensure the service delivered meets the criteria to legitimately and accurately bill that code.  Commercial and other health plans also may provide guidance on what they will and will not consider appropriate billing.  It is incumbent upon those submitting codes for their provided services to be aware of how the

---

positive result and document the necessity in the medical record because they have specific patient information and may not need definitive testing." (Billing and Coding: Lab: Controlled Substance Monitoring and Drugs of Abuse Testing (A54799) {https://www.cms.gov/medicare-coverage-database/view/article.aspx?articleId=54799&ver=41}).

[7] In 2013, a consensus panel which drew up Substance Abuse and Mental Health Services Administration Center for Substance Abuse Treatment's ("SAMHSA") Treatment Improvement Protocol ("TIP") 47 for Intensive Outpatient Care recommended that in early treatment urine drug testing should occur between every 4-7 days, with decreased frequency as the person stabilizes such that during Intensive Outpatient Care "monthly testing is standard in most programs." (Substance Abuse: Clinical Issues in Intensive Outpatient Treatment, A Treatment Improvement Protocol 47, at 262.  U.S. Department of Health and Human Services, Substance Abuse and Mental Health Services Administration Center for Substance Abuse Treatment. {https://store.samhsa.gov/sites/default/files/SAMHSA_Digital_Download/sma13-4182.pdf}).

[8] Federal Guidelines for Opioid Treatment Programs.  SAMHSA. (January 2015) {https://store.samhsa.gov/sites/default/files/d7/priv/pep15-fedguideotp.pdf}.

[9] *Appropriate Use of Drug Testing in Clinical Addiction Medicine.* American Society of Addiction Medicine. (2017).

[10] Fed. Guidelines for Opioid Treatment Prgms.  SAMHSA.

CONFIDENTIAL

payer is determining the requirements for legitimately billing those codes, which includes keeping up with the changes in coding requirements and definitions.

**D.    Medical Necessity**

In general, commercial, Medicaid, and managed Medicare[11] health plans all utilize the concept of medical necessity including the following concepts:

• necessary for and appropriate to the diagnosis, treatment, cure, or relief of a health condition, illness, injury, disease or its symptoms;

• within the generally accepted standards of medical care in the community;

• not solely for the convenience of the insured, the insured's family or the provider; and

• not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that patient's illness, injury or disease.

Cigna's Medical Necessity Definitions – which are used as a basis for examining all services – are consistent with the industry standard.  For example:

*Medical Necessity - In considering coverage for any level of care, all elements of Medical Necessity must be met as specifically outlined in the individual's benefit plan documents. Although benefit plan definitions of Medical Necessity/Medically Necessary vary to some degree, they commonly require the service or supply to be:*

-    *In accordance with the generally accepted standards of medical practice,*

-    *Clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for the patient's illness, injury or disease; and,*

*Not primarily for the convenience of the patient or Physician, and not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that patient's illness, injury or disease.[12]*

The overall concept is that health plans pay for what is needed for the medical care of their members. They do not pay for whatever a doctor orders, a member requests, or a product or service which "may" be helpful. Accordingly, a patient's medical records should provide the information necessary to reflect the medical need of a particular service and thus support the billing of that service.  These same concepts apply to the ordering of lab tests.

1.    Fraud, Waste and Abuse in Addiction Medicine and Drug Testing, and Response of Payers

There are differences between the definitions of "Fraud," "Waste," and "Abuse."  The U.S. Department of Health and Human Services provides the following definition (as related to federally funded programs):

***What is Fraud, Waste, and Abuse?***

***Fraud** is an intentional or deliberate act to deprive another of property or money by deception or other unfair means.  The ways in which fraud occurs are as unique as the individual perpetrators, their motives, and the situations they exploit.  For the purposes of this training, fraud is intentionally submitting false information to the*

---

[11] One unusual definition of medical necessity is that of straight, Fee-For-Service Medicare is not a health plan, but rather runs like an unmanaged insurance company and has its own definition unchanged since at least 2006: "Services or supplies that: are proper and needed for the diagnosis or treatment of your medical condition, are provided for the diagnosis, direct care, and treatment of your medical condition, meet the standards of good medical practice in the local area, and aren't mainly for the convenience of you or your doctor". Fee-for-Service Medicare is also unique in that it is structure to provide a fully transparent fixed fee schedule, to not negotiate with providers, and to not offer out of network benefits. (Medically Necessary, CMS Glossary *What Does 'Medically Necessary' Mean?*  Medicare.org. {https://www.medicare.org/articles/what-does- medically-necessary-mean/}).
What is Medically Necessary' Mean?, Medicare.org Centers for Medicare & Medicaid Services, Glossary: "MEDICALLY NECESSARY." {https://www.cms.gov/apps/glossary/search.asp?Term=medically+necessary}.
[12] Cigna_ TML00065404

CONFIDENTIAL

*Government (including situations in which you should have known the information was false) to get money or a benefit.*

***Waste*** *includes practices that, directly or indirectly, result in unnecessary costs to federally funded programs, such as overusing services.  Waste is generally not considered to be caused by criminally negligent actions but rather by the misuse of resources.*

***Abuse*** *includes actions that may, directly or indirectly, result in unnecessary costs to federally funded programs.  Abuse involves paying for items or services when there is no legal entitlement to that payment.* [13]

Examples given by the OIG include "providing medically unnecessary care" (referenced above).  Other examples were provided by the OIG as issued in 1991 and repeated in 1994 in a special "Fraud Alert: Routine Waiver of Copayments or Deductibles".[14]   While the OIG is focused on medical care directly funded by the federal government through Medicare programs, Medicare is the general industry benchmark upon which other health insurance programs base their protocols.

The addiction treatment system in the U.S was formed outside of the practice of other medical care, which has allowed for care that was not evidence based to multiply, such as 28-day rehabilitation stays of the "Minnesota model"[15] based upon what would be paid for by insurance.  Over the past 1-2 decades, as addiction treatment providers began to bill health plans for their services, the Fraud, Waste, and Abuse in the field of addiction treatment, including drug testing, has been wide-ranging.

For example, particular issues have been identified regarding "The Florida Shuffle":

- Unscrupulous "treatment programs" and "sober homes" take advantage of patients, typical relocating them from other states order to bill out-of-network rates to their insurance company.

- Often young adults were recruited because the providers would bill the patient's parents' insurance, under which they could remain covered until age 26 through the Patient Protection and Affordable Care Act of 2010 (ACA).

- These unemployed 18 to 26 year olds would have no reasonable possibility of paying their required portion of the charges the programs billed, and often there was little or no attempt to collect those monies because the focus is on the OON plan payments.

- Providers will bill exorbitant charges for services in an attempt to be paid a percentage of billed charges, and thereby receive outrageously high payments.

- There are billings for services not actually delivered by qualified professionals

- The amounts that could be received for unnecessary and overbilled urine drug testing led to urine being called "Liquid Gold"

- The revenue from these billings was so extreme that these sober homes/treatment programs would pay millions of dollars in kickbacks to patient brokers (who were paid to recruit people from across the country, often providing illegal inducements like air fare, housing, and drugs of abuse).[16]

By December 2021, Assistant US Attorney Benjamin Barron noted that the active prosecutions in South Florida drove the growth of those practices in California.  The US DOJ is focusing on this fraud via a Sober Home Task Force focused

---

[13] Fraud, Waste, and Abuse for Health Care Providers Course: Chapter 2, *What is Fraud, Waste, and Abuse?* Office of Inspector General, HHS.  {https://oig.hhs.gov/reports-and-publications/featured topics/ihs/training/fraud-waste-and-abuse-for-health-care providers/content/#/lessons/Q_LqlRct1c1EKs6p7TnS8VmuIdHlizi6}.
[14] Publication of OID Special Fraud Alerts.  Office of Inspector General, HHS. (December 19, 1994) {https://oig.hhs.gov/documents/special-fraud-alerts/876/121994.html}.
[15]Allen, Ben, *Rehab for Addiction Usually Lasts 28 Days.  But why?* KFF Health News (October 7, 2016) {https://kffhealthnews.org/news/rehab-for-addiction-usually-lasts-28-days-but-why/}.
[16] Segal, David, *In Pursuit of Liquid Gold*, New York Times (2018) {https://www.nytimes.com/interactive/2017/12/27/business/urine-test-cost.html}.

CONFIDENTIAL

around South Florida, and another focused around California.[17]  These issues are clearly reflected in documents produced by Cigna in this action. (Cigna_TML00171620; Cigna_TML00171630; Cigna_TML00171781).

While there has been national press and criminal convictions for this type of behavior relating to treatment programs, the field of addiction medicine and other stakeholder groups are also particularly aware of issues involving drug testing.[18]  This includes problems with over-testing and overbilling for drug tests and the harms caused by fraudulent billing.  In 2017, ASAM published the "Appropriate Use of Drug Testing in Clinical Addiction Medicine," which was endorsed by the American College of Medical Toxicology.[19]

The document is clear on these issues, and identifies them as one reason these clinical guidelines were developed:

> *The inappropriate use of drug testing can have extraordinary costs to third-party payers, taxpayers, and at times the patients who are receiving care. Though non-monetary, this has also cost the addiction treatment field because of loss of credibility. Examples of inappropriate and often-costly drug-testing practices are (1) the routine use of large, arbitrary test panels, (2) unnecessarily frequent drug testing without consideration for the drug's window of detection, and (3) the confirmation and quantification of all presumptive positive and negative test results.*

> *It is ASAM's position that these and other inappropriate drug- testing practices are harmful not only because they waste valuable resources but because they do not fit the standards of appropriate clinical care. Providers have an obligation to ensure the highest possible quality of treatment for all patients, which includes the appropriate use of clinical drug testing. One of the purposes of this document is to clarify appropriate clinical use of drug testing and, in so doing, shine a light on drug-testing practices that are clearly outside of these boundaries. The delineation of appropriate treatment practices will confer multiple benefits; most importantly, it will improve patient care. At the same time, it will reduce waste and fraud.[20]*

By 2016 it was clear to the national organization of physicians specializing in addiction medicine that the use of drug testing was a focus of Fraud, Waste and Abuse in the country and was harming not only those who pay for these inappropriate and medically unnecessary tests but was also harming the patients and the field itself. The issue was of such importance that it was a significant reason for the building of the clinical guidelines.

The emerging understanding of the huge scope of the Fraud, Waste, and Abuse in drug testing was also noted by multiple other stakeholder groups around that time.[21]  When these stakeholders were queried regarding their areas of greatest concern regarding Fraud, Waste and Abuse in the clinical laboratory area, their focus was strongly on urine

---

[17] *CA: Dept. of Justice: Orange County is now nation's center for addiction fraud*.  National Association of Drug Diversion Investigators. {https://www.naddi.org/ca-dept-of-justice-orange-county-is-now-nations-center-for-addiction-fraud/}.

[18] Examples of national press: Wooten, Colton.  *My Years in the Florida Shuffle of Drug Addiction.* The New Yorker. (October 10, 2019); Lurie, Julia. *A disturbing new phase of the opioid crisis: How rehab recruiters are luring recovering addicts into a deadly cycle.* Mother Jones. (March 2019); Kelly, Megyn, *Florida's Billion-Dollar Drug Treatment Industry is Plagued by Overdoses, Fraud.* (June 25, 2017) {https://www.nbcnews.com/feature/megyn-kelly/florida-s-billion-dollar-drug-treatment-industry-plagued-overdoses-fraud-n773376}; *Unethical Drug Rehab 'Body Brokering' Leads to Tragic Death*. CBS News Bay Area.  (November 8, 2018) {https://www.cbsnews.com/sanfrancisco/news/unethical-drug-rehab-body-brokering-leads-to-tragic-death/}*;* and Nelson, Harry, *How Urine Drug Testing Fraud and Abuse is Impacting the Treatment* Community.  Bloomberg Law (February 16, 2015) {https://news.bloomberglaw.com/health-law-and-business/how-urine-drug-testing-fraud-and-abuse-is-impacting-the-treatment-community}.

[19] *Appropriate Use of Drug Testing in Clinical Addiction Medicine.* American Society of Addiction Medicine. (2017).  Dr. Barthwell is well aware of these issues and, specifically, this publication as she was an external reviewer for this article.  (Appendix A at 7).

[20] *Id.* (pages 3-4)

[21] The Healthcare Fraud Prevention Partnership (HFPP) in May 2018 produced a White Paper entitled, "Examining Clinical Laboratory Services". (Examining Clinical Laboratory Services: A Review by the Healthcare Fraud Prevention Partnership. Healthcare Fraud Prevention Partnership (May 2018) {https://www.cms.gov/files/document/download-clinical-laboratory-services-white-paper.pdf}).  In this report, under "Major Fraud & Abuse Schemes", pages 9-12 focus on medically unnecessary testing, which they define thus: "Medically unnecessary testing refers to the excessive or improper use of clinical laboratory services for reasons not related to the medical needs of a patient."

CONFIDENTIAL

drug testing, and the amount of the money referenced was significant.  The areas of specific concern included: use of excessively large panels, standing orders for laboratory tests, and excessive or improper urine drug testing.[22]  This has also been identified as an area of concern by the US OIG, which noted in a Review of Medicare Part B Drug Testing services an extraordinarily high amount of overpaying.[23]

The changes in payer approach to improper billings for addiction treatment and drug testing services occurred around 2015, with CMS providing significant updating in what drug testing would be allowed and how it would be remunerated.[24]  For example, CMS instituted limits on the number of drug test codes for which it would pay per day (this would be done via claims edits) and on the number of drug tests for which it would pay per week/month.  It also attempted to account for different clinical needs by providing different limits depending upon how well a person was doing in treatment; and it differentiated the use of drug testing for monitoring patients on long term medication therapy (i.e., long term opioid use for pain) from the use of drug testing in addiction treatment.

From the standpoint of an ethical physician, treatment should be individualized from a baseline standard of care position.[25]  However, it is reasonable for payors to institute caps on the number of drug tests they will cover given the extensive Fraud, Waste, and Abuse in this area.  The approach taken for Medicare beneficiaries covered under FFS Medicare placed a limit on the number of drug tests which would be paid per calendar year.  This has been and continues to be a source of contention among payers and providers, with different health plans (such as Cigna) often using more generous limitations.  And when a health plan is managed, there are opportunities for prospective requests for medical necessity exceptions and for post-denial appeals.

## VI.    RESPONSE AND REBUTTAL TO DR. BARTHWELL'S OPINIONS[26]

A.     **Opinion 1** my examination of the records reflects that there is nothing about Cigna's methodology which is inconsistent with industry standards regarding utilization review, limits for drug tests, and medical review of issues of medical necessity

Dr. Barthwell opines that:

*"Cigna implemented policies and systematic practices that emphasized profits over patients and resulted in the under-reimbursement of Plaintiffs' claims, with Cigna instead* ▇▇▇▇ *Plaintiffs an arbitrary, nominal percentage of the charges, far below a reasonable and customary rate."*

and

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

---

[22] *Id.*

[23] "The 2018 Medicare fee-for-service improper payment data showed that laboratory testing, including UDT, had an improper payment rate of almost 30 percent, and that the overpayment rate for definitive drug testing for 22 or more drug classes was 71.7 percent. We will review UDT services for Medicare beneficiaries with SUD-related diagnoses to determine whether those services were allowable in accordance with Medicare requirements." (Review of Medicare Part B Urine Drug Testing Services.  Office of Inspector General, U.S. Department of Health and Human Services {https://oig.hhs.gov/reports-and-publications/workplan/summary/wp-summary-0000404.asp}).

[24] Note, there were minimal issues with coding and billing for drug tests in CMS guidance in 2014.  (Billing and Coding Guidelines for Drug Testing.  Center for Medicare Services. {https://downloads.cms.gov/medicare-coverage-database/lcd_attachments/34645_8/L34645_PATH035_BCG.pdf}), but substantial new language regarding non-covered testing services occurred in 2015. (Controlled Substance Monitoring and Drugs of Abuse Testing (L35006) {https://www.cms.gov/medicare-coverage-database/view/lcd.aspx?LCDId=35006}).

[25] Again, FFS Medicare is not a managed plan, so when plan limits are put into place, there is not a process of making medical necessity exceptions.  Unlike Cigna, which does provide for medical necessity exceptions.

[26] I am able to opine, relying upon my decades of experience in utilization management as well as work as a health plan medical director, about the actual meaning of plan language within the industry.  As an addiction medicine specialist and a psychiatrist, I performed over 2,000 utilizations reviews on specific cases, initial and appeal, prior to being employed as a medical director for two health plans. I continue to function as a consulting behavioral health medical director for a health plan and am quite familiar with many of the issues Dr. Barthwell mentions in her report.

CONFIDENTIAL



Dr. Barthwell here made extremely broad statements, with very little reference to what information she relied upon to develop this opinion.  The statements are indeed so broad and without sufficient references that I will focus my response on a few specific issues.

Dr. Barthwell does not address the clinical services provided by the Plaintiffs or their Billed Claims, but rather opines on Cigna's process of adjudicating those claims.  And she draws incorrect conclusions regarding Cigna's adjudication process.

The deposition testimony of Dr. Nemecek reviewed in this action reflects that Cigna had identified significant issues of Fraud, Waste, and Abuse in providers' billing practices, and had taken steps to address them, ███████████████ ███████████████████████████████████████████████████████ [28]  This is a rational response to the rise of the unscrupulous and harmful "Florida Shuffle" models of Fraud, Waste, and Abuse with OON SUD providers of "treatment" and drug testing which has become rampant in California.[29]

Payers like Cigna have responded to the large-scale Fraud, Waste, and Abuse seen in the addiction treatment/drug testing area by, for example:



What is described in the documents reviewed by Dr. Barthwell, in my opinion, is the rational response of Cigna to look closely at and then appropriately deal with disallowed charges.[30]  Importantly, I understand from the deposition testimony of Dr. Nemecek that █████████████████████████████████████████████ ███████████████████████████████████████████████████████████████

---

[27] Deposition of Dr. Nemecek at 158-160.
[28] Deposition of Dr. Nemecek at 171 ███████████████████████████████████████ ███████████████████████████████████████████████

[29] *Supra* Section V.D.
[30] Cigna_TML00171632 ████████████████████████████████████ ███████████████████████████████████████████

CONFIDENTIAL / HIGHLIGHTED INFORMATION DESIGNATED CONFIDENTIAL - ATTORNEYS' EYES ONLY

████████████████████████ were consistent with the generally accepted standard practices in the industry.

The exemplar data, documents, and information identified by Dr. Barthwell further show that each of the Plaintiffs engaged in inappropriate billing practices, including but not limited to billing for: (1) claims for services which did not meet the requirements for the legitimate billing of those codes and (2) medically unnecessary services, as described in greater detail in Opinion 3.

There are legal requirements for individual medical necessity determinations, and only a physician can make an adverse medical necessity determination.  For some plans, a medical director's signature (requiring their approval) might be required for specific types of administrative denials, but that does not mean a medical necessity determination was made.  Cigna is not a physician to whom the standards of medical care apply.  It is a payer and must follow the rules for payers.  As a health plan physician, it is my opinion that there is no information to indicate that Cigna failed to adhere to these standards.  The deposition testimony of Dr. Nemecek indicates that physicians were involved with actual medical necessity denials, as is an industry requirement. Further, in my examination of the exemplar documents provided, I did not see any claims which were wrongfully denied due to lack of medical necessity.

There is a difference between administrative denials and those for medical necessity.  Administrative denials are made for a range of reasons, including the provider's failure to provide required information (such as the date the service was provided), the patient not having health care coverage during the date of service, a clear disconnect in information provided (e.g., where a psychiatrist submits a claim for providing an appendectomy), the provider engaging in fee forgiveness, or a claim for a service that is not covered by the health plan.  It is a normal industry practice to request information to support that the provision of treatment and/or services are indeed covered services.  If there is no clinical information provided, Cigna cannot conduct a full "clinical review," but rather denies the claim due to lack of documentation.  Accordingly, administrative denials in many cases do not require a medical director's involvement.  Dr. Barthwell does not distinguish between these two different types of denials.

Dr. Barthwell also states, without support, that "it has been well-documented that Cigna's medical directors have a custom and practice of denying claims without ever reviewing medical records."  As explained above, in some instances medical directors will sign administrative denials, but such denials do not always require review of medical records.  Each of the claims Plaintiffs bill must be medically necessary and the provider for whom the bill is submitted must have documentation—in some cases before or at the time of billing, in others submitted later as part of the appeal process—that supports their contention that the service was medically necessary and billed appropriately.  If such documentation is not provided, and only a master billing sheet is sent, in some situations this will lead to a denial for lack of medical necessity.  There is nothing nefarious about medical directors denying claims without reviewing medical records in the scenario where no medical records are provided for review.  This is customary practice for certain services.  And for most payer denials, no medical director input is necessary.

**SUD Services**.

Dr. Barthwell states, "There were some claim denials for lack of medical necessity where the claim was reviewed by a medical director. However, the medical director's opinion conflicted with the records in the patient's chart" (p. 28). She also opines that Cigna "unjustifiably denied SUD claims without any clinical review[.]"  She provides no citation to any document produced in this case, so it is impossible to assess these statements based upon the materials reviewed.[31]  However, I have seen no evidence that Cigna's ████████████████████████████
████████████████████████████████████████████████████████

Contrary to Dr. Barthwell's assertion, it is not accurate to say that Cigna denied these claims based on lack of medical necessity.  Rather, my examination of the records identified by Dr. Barthwell reflects that Plaintiffs regularly billed for services which did not meet the requirements for the legitimate billing of those codes.  Cigna denied the claims

---

[31] I will briefly note that in her concluding paragraph Dr Barthwell states incorrectly that presumptive drug testing does not identify fentanyl.

CONFIDENTIAL

because the providers did not provide information and documentation evidencing that they actually provided the services or that services had been appropriately provided.  Cigna_TML00094763, Cigna_TML00094767, and Cigna_TML00094768 also reflect that Cigna gave the providers an opportunity to supply the requisite records.[32]

For example, programmatic Intensive Outpatient Program is typically three hours of programming per day provided by an unlicensed practitioner, three times per week.  These groups can be art or recreational groups, or psychoeducational in nature, watching then discussing a movie, or discussing specific relapse prevention skills. As previously explained, in contrast, psychotherapy is a procedure which can only be provided by a masters or doctorate level licensed professional who documents the provision of psychotherapy.  Psychotherapy is a billable procedure by licensed clinician, while the other types of group experiences are not billable as medical codes, unless they are subsumed into a day rate of Intensive Outpatient Program/ Partial Hospital Program /Residential Treatment Programs.

Yet, DRR billed for two hours (units) of group psychotherapy for WP on June 3, 2019, but only provided records which state "counsellor [Thurman Hines, CATC[33]] facilitated a psycho-educational group" lasting 90 minutes.  (DR_CIGNA00012046).  In addition, the notation regarding Mr. Hines's credentials indicates that he holds a "CATC", which is not a certificate that allows him to bill for providing group psychotherapy.  (DR_CIGNA00012046).  And on June 14, 2019, DRR billed for a psychotherapy session run by Attila Hadnagy, but the notes do not provide Ms. Hadnagy's credentials, although they reflect that the session "consisted of a recovery-based movie" regarding drug related deaths of musicians and the recovery of the drummer from Hole, (DR_CIGNA00012049), and one note of a group experience facilitated by Mike Ross, with no credential noted, for a 90 minute group which is described as "educational" and "about relapse prevention strategies", where "they were told that means by (sic) doing a few simple things,meetings,groups,stepwork,prayer,etc. they have a better short (sic) at a happy life, and long term sobriety." (DR_CIGNA00012050).  In my experience, these are examples of psychoeducational and other group programming, but not group psychotherapy, and these notes do not meet the required documentation elements to support the billed code.  I noted almost identical issues with SCRCO's claims as reflected in the documents identified by Dr. Barthwell.  Likewise, PPR billed Cigna for three sessions of group psychotherapy reportedly completed on September 4, 2019, for patient LM.  (Cigna_TML00030544).  However, the only group note for September 4, 2019, refers to an

---

[32] "OUR RECORDS DO NOT REFLECT AN AUTHORIZATION ON FILE AND ADDITIONAL INFORMATION FROM THE HEALTH CAREPROVIDER IS NEEDED TO REVIEW THE CLAIM FOR MEDICAL NECESSITY. PLEASE SUBMIT FACILITY RECORDS, OFFICE NOTES, AND HISTORY, PHYSICAL & DIAGNOSTIC REPORTS TO: CIGNA HEALTHSOLUTIONS, PO BOX 188064, CHATTANOOGA, TN 37422. IF WE DON'T RECEIVE THE INFORMATION WE'LL HAVE TO CLOSE THE CLAIM.

PROVIDER: WE NEED MORE INFORMATION TO PROCESS THIS CLAIM. PLEASE FAX A COPY OF THIS EXPLANATION OF PAYMENT WITH THE PATIENT'S COMPLETE MEDICAL RECORD TO 1.859.410.2422. IF WE DON'T RECEIVE THE INFORMATION WE'LL HAVE TO CLOSE THE CLAIM.

BASED UPON THE INFORMATION REPORTED OR CONTAINED IN THE FILE, SERVICES WERE NOT RENDERED AS BILLED. THE PATIENT IS NOT RESPONSIBLE FOR THIS AMOUNT.

WE HAVEN'T RECEIVED THE INFORMATION WE REQUESTED ABOUT THIS CLAIM. WE'LL CLOSE IT UNTIL WE GET THE INFORMATION WE NEED." Cigna_TML00094767 (DRR Encinitas).

[33] CATC certificates have the following, formal education requirements: (1) CATC requires 30 semester hours of alcohol and other drug (AOD) coursework, (2) CATC II requires an associate's degree, and (3) CATC III requires a bachelor's degree.  These certifications do not allow for the individual holding them to perform psychotherapy.  In contrast, California deems "licensed professionals" who provide addiction services to include, for example, physicians, psychologists, clinical social workers, marriage and family therapists. (Cal. Code Regs. Tit. 9 § 13030 – Requirements for Counselors Certified or Licensed in Other States or y Other Certifying Organizations; Simple Steps to Becoming a Certified Addiction Treatment Counselor (CATC).  Addiction Counselor Certification Board of California. {https://www.accbc.org/catc/}).

CONFIDENTIAL / HIGHLIGHTED INFORMATION DESIGNATED CONFIDENTIAL - ATTORNEYS' EYES ONLY

"Educational Group".[34]  This group experience does not meet the requirements for psychotherapy group sessions.[35]

Put into context, PPR billed Cigna for a morning group on September 6th which had 18 attendees (PPR_CIGNA00006581) and another on September 9th with 24 attendees (PPR_CIGNA00006587).  PPR billed for each of these three days $1,674.40 for a per diem drug treatment program (H2036) as well as $1,674.40 for group psychotherapy (90853).  If PPR billed $1,674.40 for *each* member of the "group psychotherapy" groups, they would have billed over $28K, $30K, and $40K for 90 minutes of an unlicensed PPR staff member's time on 9/4/19, 9/6/19, and 9/9/19 respectively.

PPR, SCRCO, and DRR were not the only Plaintiffs which billed for group psychotherapy at over $1,400 per day without meeting the requirements for legitimate billing of that code.  For example, on May 24, 2018, SCAC billed for psychotherapy sessions for patient BG but the records identified by Dr. Barthwell reflect that he actually attended Yoga Group, mindfulness group, community integration/documentary movie discussion group, and an art expression group—none of which had documentation to support the provision of a group psychotherapy session. (SCAC_CIGNA00005838 through SCAC_CIGNA00005841).  Yet, SCAC Billed for two group psychotherapy sessions that day at $1,900 each. (Cigna_TML00030545).

These are not isolated examples.  For Patient WP, the records identified by Dr. Barthwell show that DRR began billing $1,709 for their alcohol and drug treatment program (H0015) on March 1, 2019, then changed to billing the same amount for two group psychotherapy sessions per day (90853) beginning April 17, 2019.  However, there is no documentation in the records identified by Dr. Barthwell that would support billing for any group sessions— psychotherapy or otherwise—until June 3, 2019, which is the first date there are any group therapy notes, and even then, the post June 3 records do not support the billing of group psychotherapy sessions as the records do not show that the sessions were led by a master's or doctorate level licensed professional and/or instead reflect that they were actually psycho-education group sessions. (DR_Cigna00012014-15).

The exemplar medical records identified by Dr. Barthwell do not show documentation to support the legitimate billing of group psychotherapy sessions.  Instead, the records reflect that certain Plaintiffs provided psychoeducational, yoga, and other groups run by individuals without the necessary clinical credentials to provide the billed psychotherapeutic services.  In other words, the records identified by Dr. Barthwell show that Plaintiffs simply billed for services that they were not providing, but she somehow opines these claims were medically necessary and underpaid by Cigna.  My examination of these records reflect that Cigna did pay a portion of some of these claims for group psychotherapy sessions (90852) billed by DDR for patient WP (over $700 per claimed group psychotherapy session), before appropriately denying further claims for failure to provide medical documentation evidencing that these services were legitimately provided by an appropriately licensed clinician. (Cigna_TML00094767).

**Laboratory Testing.**

Dr. Barthwell states that "Cigna denied definitive drug testing claims pursuant to its Medical Coverage Policy for Drug Testing, which provides for presumptive drug testing not to exceed one test per date of service up to 32 tests per year, and definitive drug testing not to exceed one test per date of service up to 16 tests per year, subject to limiting

---

[34] "GOAL: The purpose of this group is for the clients to realize that drugs and alcohol, used as a coping mechanism has become maladaptive. Clients will learn, or review healthier alternatives to cope with people, places, and things. INTERVENTION: Clients will read the Coping Skills for addictions worksheet and discuss techniques. Clients will then write out how using drugs and alcohol worked for them as a coping skill. Clients will also write out what they do to cope in sobriety, and what new coping skills they can implement into their daily routine. Group leader will offer feedback."  The group note was signed only by "Michael Coyne, CATC II."  (PPR_CIGNA00006570).

[35] I will also note that in the group of September 4, 2019, LM patient stated he was going home to Indiana within the week, but he failed his drug test by falsifying the specimen allegedly collected during the group session, as well as the previous drug test taken a few days earlier (PPR_CIGNA00006566).  However, his treatment plan of the following day reports he was 162 days sober. (PPR_CIGNA00006571 through PPR_CIGNA00006580).

CONFIDENTIAL / HIGHLIGHTED INFORMATION DESIGNATED CONFIDENTIAL - ATTORNEYS' EYES ONLY

factors".[36]  Again, she provides no citation to evidentiary support for this contention, however I interpret her to imply that this internal coverage policy for urine drug tests was inconsistent with generally accepted standards of care.  Such comparison is equivalent to comparing apples and oranges.  From the standpoint of an ethical addiction physician specialist, it is difficult to put a blanket limit on the number of drug tests that could be considered medically necessary for every patient we may see.  Nonetheless, it is reasonable for Cigna to institute caps on the number of drug tests it will cover given the extensive Fraud, Waste, and Abuse in this area, particularly because ████████████████████████ ████████████████████████████████████████████████████  Cigna's policy capping the number of drug tests it will cover is consistent with industry standards and provides more generous limits than other payors, like Medicare, allow.

Dr. Barthwell further states that she reviewed claims with the allowed amounts of $0 and cross referenced these to that patients' charts to determine that Cigna denied these claims due to its medical Coverage Policy for Drug Tests.  She also states that "a group of denials were for services Cigna deemed not medically necessary. However, the vast majority of these claims were "administrative" denials for alleged lack of documentation of medical necessity, without any clinical review of the claim".  Because Dr. Barthwell did not cite to specific documents that she reviewed, I have no knowledge of the data she used to determine the reason for Cigna's adjudications outside of her broad statement that she relied on certain patient records. But the vast majority of the exemplar claims I reviewed were in no way related to medical necessity denials.  (Cigna_TML00094768; Cigna_TML00094767; Cigna_TML00094763).  I have also seen no evidence in the materials identified by Dr. Barthwell of instances where, after Cigna denied Plaintiffs' claims for failure to provide documentation of medical necessity, the Plaintiffs then provided the records necessary to support billing for the denied claims.

While there is a range of appropriate frequency and intensity of testing, there are also patterns of testing which are aberrant and cannot possibly be considered medically necessary.  My examination of the records identified by Dr. Barthwell reflects that Plaintiffs billed for medically unnecessary laboratory services.[37]  For example, AHA, MMR, and TML billed for multiple types of drug tests at a frequency that is excessive by any standard – in numerous instances billing for testing every two days.  For example, AHA billed for drug tests performed every two days over a period of approximately six months for numerous patients (e.g., JJ, SK, and HS).  (Cigna_TML00030541).  The same pattern of unnecessary frequency of testing is also reflected in the records submitted by MMR.  For example, MMR billed for testing approximately every two days for patients AF, BF, and MH.  (Cigna_TML00030543).  It is simply not possible to credibly argue that testing at this frequency is medically necessary.

Nor was the testing accurate.  For example, multiple AHA lab results for patient JJ showed what would be considered a failure of the lab to provide appropriate results.  (AHA_CIGNA00002575 - AHA_CIGNA00002584). Multiple specimens showed a negative numerical result for oxidants.  One way people attempt to "cheat" on their drug test is to add adulterant substances ("Oxidants") to their urine specimen to mask the presence of some drugs of abuse.  We expect a test for oxidants to be "negative" (no significant adulterants present, with a test result of the amount of oxidants present being 0 to a cut off level) rather than "positive" (the amount of oxidants present being above that specific cut

---

[36] Dr. Barthwell incorrectly describes the Cigna Drug Testing policy, as it does not provide for "one test per date of service" for presumptive and definitive tests, but rather for one CODE for drug testing for presumptive and definitive tests per date of service.  The billing codes include those for multiple tests per day - which is the protocol Medicare also adopted.

[37] While I have not been asked to opine as to the amount charged by the Plaintiffs for laboratory tests, in my experience Plaintiffs billed grossly excessive charges for routine drug testing.  For example, AHA billed $4,830 per urine drug test day (Cigna_TML00030541), MMR billed as much as $1,946 for a panel of definitive drug tests (Cigna_TML00030543), DRR (Cigna_TML00195703) and MMR (Cigna_TML00030543) billed $1,785 for a presumptive panel, and SCAC billed $300 per breathalyzer test (Cigna_TML00195704).  These amounts are grossly outside of what appropriate billing should be.  In my experience, tests such as the 90307 presumptive panel may be expected to be paid somewhere around $60-100, with the definitive panel of G0483 (the highest code, with 22+ substances tested), could be expected to pay around $270.  Plaintiffs' overcharges, combined with their excessive frequency of testing, results in extraordinary total bills.

CONFIDENTIAL / HIGHLIGHTED INFORMATION DESIGNATED CONFIDENTIAL - ATTORNEYS' EYES ONLY

off level, indicating oxidants are present).  A negative numeric result for oxidants is wrong ("there are negative 14 oxidants present" is like "there are negative 14 apples in the barrel").  This reflects a technical problem of the lab and indicates that the machinery needs to be checked.  These test results, however, are simply electronically signed with no analysis of results available for review.  This further indicates that the drug tests were not medically necessary because if the results were not being actively analyzed, then they were not being used to inform or direct the course of treatment.

Despite providing a blanket opinion that the services billed were medically necessary, Dr. Barthwell only references one claim where two days of IOP services were billed for a single patient, JJ.  (Barthwell page 26).  As with her other assertions, Dr. Barthwell provides no information to support her opinion that this or any other specific claim was a covered service, why it would meet medical necessity criteria, or the amount of remuneration she believes would be appropriate.  However, the exemplar files did include documents sufficient to evaluate that many of the claims for urine drug testing were not covered services, including being not medically necessary.

One example is illustrative.  AHA_CIGNA00012180 through AHA_CIGNA00012183 includes a service order for PS that is a blanket order for "Presumptive Full Panel" and "Definitive Full Panel".  The presumptive POC tests were entirely negative.  There is no physician signature on the drug testing order, and the space where the patient allegedly signed has a computerized non-signature instead. (AHA_CIGNA00012180 through AHA_CIGNA00012183).  At a minimum, a valid order for diagnostic tests being billed must be signed by a physician (or someone else with the appropriate scope of practice, such as an APC) – and the services must have been delivered.  The information identified by Dr. Barthwell also does not reflect that the definitive full panel tests were even performed.  It is upon her purported review of these documents that Dr. Barthwell states that the billings of the Plaintiffs were medically necessary, and from which she criticizes the amount Cigna paid the Plaintiffs as unfairly low. The records she identified simply do not support this conclusion.

Even where Plaintiffs purportedly reviewed drug test results, the records identified by Dr. Barthwell reflect that the drug tests often were not reviewed by a clinician.  Drug test results must be interpreted by a physician or APC so that they may be used in the care of the patient, including altering the treatment plan if necessary.  But in many instances these records reflect that Plaintiffs' unlicensed employees reviewed the results.  For example, TML employee "Nathaniel Izzo, Office Administrator" signed "doctor review" notes in multiple instances.  (TML_CIGNA00003571; TML_CIGNA00014539- 14552).

In sum, the information identified by Dr. Barthwell indicates that each of the Plaintiffs engaged in inappropriate billing practices consistent with Fraud, Waste, and Abuse. Cigna, like other payers, instituted increased oversight and protocols to counter the substantial Fraud, Waste, and Abuse noted in the addiction treatment and drug testing industries beginning in the mid-2010s.

   **B.**       **Opinion 2:** Cigna's methodology as described by Dr. Barthwell—including Cigna's use of Medicare codes to anchor its reimbursement rates—is appropriate and there is no basis to conclude that Cigna "used biased data systems, administrative burdens, and deceptive practices."

Dr. Barthwell opines that:

   *"There is no Medicare rate for inpatient or outpatient SUD services billed by residential treatment facilities such as Plaintiffs, and* ███████████████████████████████████████
███████████████████████████████████████████████
██████████████

---

[38] It is a mischaracterization that the Plaintiffs were Residential Treatment Facilities. Several of the Plaintiffs billed entirely or almost entirely as laboratories, and the rest billed primarily not as Residential Treatment Facilities (ASAM Level 3), but for the provision of services at outpatient (ASAM Levels 1 and 2) Levels of Care. This incorrect statement about the nature of the services billed ignores the fact that the majority of billed services in the spreadsheets identified by Dr. Barthwell (Cigna_TML00030540- Cigna_TML00030548; Cigna_TML00195700- Cigna_TML00195708) appear to be for services which had Medicare rates.

CONFIDENTIAL

It is factually false that Cigna paid an arbitrary percentage of billed charges, as the protocol described was to determine an allowable charge for a service and then to pay based upon the allowable amount. There is no evidence—indeed, Dr. Barthwell cites none—of an effort to arbitrarily pay some percentage of billed charges.

The process as it is described in Dr. Barthwell's report regarding the MRC II review indicates the methodology for paying OON claims (p. 23-24):

> "70% of the Maximum Reimbursable Charge [MRC]… [MRC] is determined based on the lesser of the provider's normal charge for a similar service or supply; or… [110%] of a schedule that [Cigna] developed based upon a methodology similar to a methodology utilized by Medicare for similar service in geographic market; In some cases, a Medicare based schedule will not be used and the [MRC] for covered services is determined based on the lesser of:

> - the provider's normal charge for a similar service or supply; or
>   the 80th percentile of charges made by providers of such service or supply in the geographic area as compiled in database selected by [Cigna]."

I understand that during the relevant period, Medicare did not pay for certain substance use disorder treatments. Accordingly, in order to approximate the amount Medicare would pay for such services, ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ [39] While I have not been asked to opine on the specific and detailed protocols used by Cigna and/or its vendors, based upon the process stated in Dr. Barthwell's report, in my opinion, the clinical aspects of the protocol – e.g., ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ – was appropriate.  If anything, it gave an advantage to the billing providers because it ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

Health plans look at charges from OON providers and typically assess a value to that coded service, which is tied to Medicare payment rates.  This is typically done for all types of claims – medical, psychiatric, or addiction in nature - and is considered a normal industry practice.  While it is true that there were no Medicare rates for some SUD treatment program services such as billed by certain of the Plaintiffs during the dates in question, the process Dr. Barthwell outlines regarding ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ was appropriate, thoughtful, and reasonable – although it would provide higher remuneration to the Plaintiffs.

Dr. Barthwell indicates that Cigna ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ whereas "most of the claims at issue were for outpatient services." This is somewhat disingenuous, as the majority of the claims reflected in the spreadsheets identified by Dr. Barthwell are actually for services which have Medicare rates. I also understand that Cigna does not actually ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Nonetheless, Dr. Barthwell is wrong that this ▮▮▮▮▮▮ somehow disadvantages Plaintiffs and/or that Plaintiffs provide a more intensive level of care.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ is not less complex, less involved with managing patient and community risk, or less intensely or professionally staffed when compared to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. It is just not true that people in an outpatient SUD Level of Care are more dangerous to themselves or others than those in ▮▮▮▮▮▮▮▮▮ as that is the basic requirement for ▮▮▮▮▮▮▮▮▮▮▮ Hospital Level of Care is paid out at a higher rate than ▮▮▮▮▮▮▮▮▮▮▮▮ because it has, as with any hospital, a much higher cost to deliver care, higher levels of professional involvement, higher risks, and higher levels of difficulty in treating the sick patients. Similarly, ▮▮▮▮▮

---

[39] I understand that another expert witness, Kevin O'Brien, will opine as to Cigna's reimbursement methodology.

CONFIDENTIAL

████████████████████████████████████████████ provide food and housing to patients, as well as other significant administrative overhead. This is a much higher LOC than Intensive Outpatient Program LOC billed by some of the Plaintiffs.  An Intensive Outpatient Program per diem rate is for 3 hours per day of outpatient programming, generally without any medical or nursing care provision, and the majority of services are provided by non-licensed personnel. A ████████████████ is a much higher LOC than Intensive Outpatient Program and pays out at a higher rate than Intensive Outpatient Program.

By ████████████████████████████████████████████, from a clinical perspective, Cigna would be engaging in rate setting in a way that is not "arbitrary" or "unjust" or "unreliable" but rather stands directly upon Medicare rates, which are clearly based upon Medicare (CMS) methodology for rate setting.  By ██████████ to demonstrably higher LOC which pay more, Cigna was not disadvantaging the billing providers, but chose █████████ that was to the provider's advantage.  This can in no way be considered "unjust" to the OON SUD Intensive Outpatient Program provider ████████████████████████████.

In addition, Dr. Barthwell states in error that outpatient codes were ████████████████████████████ This is not true.  "Behavioral health counselling" is not a billable code.  Coded claims for physician E&M codes, or individual or group psychotherapy codes, or any of the other codes used by a wide range of clinicians for a wide range of conditions could all be simply paid based on the listed Medicare rates. Dr. Nemecek stated this in his deposition ("General outpatient SUD services are typically provided by physicians or providers in an office visit setting and they use standard codes which would be reimbursable by – by CMS. So – there's – I'm not, off the top of my head, aware of any ████████████████████████ (p 98)).   Further, as my examination of the records identified by Dr. Barthwell show, there are multiple instances where some of the Plaintiffs billed for "psychotherapy" which was not delivered, although in some cases an unlicensed "substance abuse counsellor" or "care manager" "facilitated" a group experience.

Dr. Barthwell's repeated focus on the billed charges of the Plaintiffs seems to imply that some relatively high percentage of these OON charges should be paid by Cigna.  But this assumes that the plan terms require payment of some relatively high percentage of Billed Charges.  If Cigna receives a bill for $5,000 for a urine pregnancy test, it is not required to pay billed charges or any particular percentage of billed charges. While I have not been engaged to offer a formal opinion as to the excessiveness of Plaintiffs charges, in my extensive experience reviewing claims and allowable charges in a variety of settings, charges such as Plaintiffs' billing $300 for a breathalyzer test, $1,500 for each participant in an hour group psychotherapy session, $1,700 for each person in a 3-hour group watching a movie and discussing it, or $4,000 for a urine drug test, are, in my opinion, excessive.

In sum, although Dr. Barthwell repeatedly opines that the allowed amounts determined for these OON SUD claims were arbitrary, it is clear the process she describes for determining those rates was instead quite thoughtful from a clinical perspective and based upon objectively identifiable rate information.

> **D.**    **Opinion 3:** Dr. Barthwell provides no support or citations for many of her opinions, which makes it impossible to determine how she has reached many of her conclusions. However, following my analysis of the documents reviewed by Dr. Barthwell, it is clear that the evidence contradicts many of her opinions, which she presents as facts.

I address only a few of the most critical deficiencies below not otherwise addressed in my opinions above.

- Dr. Barthwell states that "Plaintiffs are in the profession of helping individuals recover from substance use disorders and return to their families and communities as healthy and productive members of society." (p20). This is factually incorrect. Individuals may be engaged the practice of their respective professions, but companies are not "in the profession" of anything (although it may be said that many people in the company may be practicing business administration). Plaintiffs exist to make profits by billing for medical service delivery. This is not an ignoble goal, but Dr. Barthwell's characterization that these companies are "in the profession of helping" is a mischaracterization.

- Dr. Barthwell states that "Plaintiffs provided medically necessary, preauthorized, and covered SUD

CONFIDENTIAL / HIGHLIGHTED INFORMATION DESIGNATED CONFIDENTIAL - ATTORNEYS' EYES ONLY

treatment and laboratory services to 508 of Cigna's insured members" but it is my understanding that she has only reviewed the patient records for a small subset of the patients at issue in this case (62 of 508 patients) (p20). And with respect to the small subset of patient records that she did identify, upon my examination of those documents, it is my opinion that each of the Plaintiffs engaged in the billing for services which were uncovered due to some combination of issues, including but not limited to including lack of medically necessity and/or billing for services which were not documented as actually delivered. The records she reviewed do not support her conclusions.

- Dr. Barthwell opines that "Cigna confirmed, represented, promised, and warranted Plaintiffs through the required verification of benefits process that each of the insureds and their respective OON SUD treatments and services were covered by health insurance plans issued, managed, or administered by Cigna and MultiPlan. *Id.* ¶ 28. In reliance on these assignments of benefits and Cigna representations, Plaintiffs rendered treatment to the patients." (p 20). I am not an attorney and cannot speak to the legal conclusions contained in this statement, but in my industry experience, the process of verifying benefits is just that: verification that certain information regarding a member's coverage is correct. It is well known within the industry that neither this nor prior authorization, concurrent authorization, or retrospective authorization is considered a "promise to pay". A plan will, and indeed must, pay claims only when those claims are legitimately filed for covered services at appropriate amounts. I have seen a plethora of issues which rendered bills for treatment which was "prior authorized" into disallowed claims – including many which are also reflected in the documents identified by Dr. Barthwell– including incorrect billing codes, lack of documentation the service was delivered, member's coverage having been terminated, and a range of Fraud, Waste, and Abuse issues.

- Dr. Barthwell also states that "Cigna knew that Plaintiffs were treating and providing services and were advised and fully aware of Plaintiffs' charges for the treatment and services rendered[]"(p 20), but I see no evidence in the records identified by Dr. Barthwell that Cigna knew the Plaintiffs' charges at the time of Verification of Benefits ("VOB").  The materials reflect that the VOB process was, in some cases, outsourced to third party vendors who themselves may not have known the charges Plaintiffs would make.  Dr. Barthwell does not cite to any evidence that Cigna "knew" the amount of Plaintiffs' "rack rate" charges during the VOB or at any other time pre-treatment.

- Dr. Barthwell opines that ███████████████████████████████████████████████ ██████████████████████████████ This is a specious argument. First, when an organization provides value by stopping an over-payment, they should rightly be entitled to share in the value created. But more fundamentally and very bluntly, the Plaintiffs' financial motives here are to obtain as much payment as they possibly can, while the Defendants are to not pay more than they must.  Again, there is nothing ignoble about normal business practice, but there are restrictions under which these companies pursue their goals.

## VII.    SUMMARY

The above represents my opinions in response to those put forth by Dr. Barthwell.



_____

Kelly J. Clark, MD, MBA

CONFIDENTIAL

**APPENDIX A – Documents & Information Reviewed**

1. Documents and materials reviewed by Dr. Barthwell and those listed in Section III and cited throughout her report dated March 30, 2023.

2. Federal Guidelines for Opioid Treatment Programs.  SAMHSA. (January 2015) {https://store.samhsa.gov/sites/default/files/d7/priv/pep15-fedguideotp.pdf}.

3. Cal. Code Regs. Tit. 9 § 13030 – Requirements for Counselors Certified or Licensed in Other States or y Other Certifying Organizations.

4. Allen, Ben, *Rehab for Addiction Usually Lasts 28 Days.  But why?*  KFF Health News (October 7, 2016) {https://kffhealthnews.org/news/rehab-for-addiction-usually-lasts-28-days-but-why/}.

5. Giadrino, Angelo, et al. *Utilization Management*.   National Library of Medicine (July 11, 2022) {https://www.ncbi.nlm.nih.gov/books/NBK560806/}.

6. Kelly, Megyn, *Florida's Billion-Dollar Drug Treatment Industry is Plagued by Overdoses, Fraud.*  (June 25, 2017) {https://www.nbcnews.com/feature/megyn-kelly/florida-s-billion-dollar-drug-treatment-industry-plagued-overdoses-fraud-n773376}.

7. Lurie, Julia. *A disturbing new phase of the opioid crisis: How rehab recruiters are luring recovering addicts into a deadly cycle.* Mother Jones. (March 2019).

8. Nelson, Harry, *How Urine Drug Testing Fraud and Abuse is Impacting the Treatment* Community.  Bloomberg Law (February 16, 2015) {https://news.bloomberglaw.com/health-law-and-business/how-urine-drug-testing-fraud-and-abuse-is-impacting-the-treatment-community}.

9. Segal, David, *In Pursuit of Liquid Gold*, New York Times (2018) {https://www.nytimes.com/interactive/2017/12/27/business/urine-test-cost.html}.

10. Wooten, Colton.  *My Years in the Florida Shuffle of Drug Addiction.* The New Yorker. (October 10, 2019).

11. *Appropriate Use of Drug Testing in Clinical Addiction Medicine.* American Society of Addiction Medicine. (2017).

12. Billing   and   Coding   Guidelines   for   Drug   Testing.    Center   for   Medicare   Services. {https://downloads.cms.gov/medicare-coverage-database/lcd_attachments/34645_8/L34645_PATH035_BCG.pdf}.

13. Billing and Coding: Lab: Controlled Substance Monitoring and Drugs of Abuse Testing (A54799) {https://www.cms.gov/medicare-coverage-database/view/article.aspx?articleId=54799&ver=41}.

14. *CA: Dept. of Justice: Orange County is now nation's center for addiction fraud*.  National Association of Drug Diversion Investigators. {https://www.naddi.org/ca-dept-of-justice-orange-county-is-now-nations-center-for-addiction-fraud/}.

15. Centers for Medicare & Medicaid Services, Glossary: "MEDICALLY NECESSARY." {https://www.cms.gov/apps/glossary/search.asp?Term=medically+necessary}.

16. Claim Submission Cover Sheet: CPT code 90853.  Palmetto GBA. (July 2016) {https://www.palmettogba.com/Palmetto/Providers.Nsf/files/RR_Group_Psychotherapy_Checklist.pdf/$File/RR_Group_Psychotherapy_Checklist.pdf}.

17. Controlled Substance Monitoring and Drugs of Abuse Testing (L35006) {https://www.cms.gov/medicare-coverage-database/view/lcd.aspx?LCDId=35006}.

18. Examining Clinical Laboratory Services: A Review by the Healthcare Fraud Prevention Partnership. Healthcare Fraud Prevention Partnership (May 2018) {https://www.cms.gov/files/document/download-clinical-laboratory-services-white-paper.pdf}.

19. Fraud, Waste, and Abuse for Health Care Providers Course: Chapter 2, *What is Fraud, Waste, and Abuse?* Office of Inspector General, HHS.  {https://oig.hhs.gov/reports-and-publications/featured

topics/ihs/training/fraud-waste-and-abuse-for-health-care providers/content/#/lessons/Q_LqlRct1c1EKs6p7TnS8VmuIdHlizi6}

20. Government Health Administrators, *Documentation Guidance for a Successful Review of Group Psychotherapy* (2023) {wpsgha.com}.

21. Psychiatry and Psychology Services (L34616). Centers for Medicare & Medicaid Services. {https://www.cms.gov/medicare-coverage-database/view/lcd.aspx?lcdId=34616&ver=40}.

22. Publication of OID Special Fraud Alerts.   Office of Inspector General, HHS.  (December 19, 1994) {https://oig.hhs.gov/documents/special-fraud-alerts/876/121994.html}.

23. Review of Medicare Part B Urine Drug Testing Services.  Office of Inspector General, U.S. Department of Health and Human Services {https://oig.hhs.gov/reports-and-publications/workplan/summary/wp-summary-0000404.asp}.

24. Simple Steps to Becoming a Certified Addiction Treatment Counselor (CATC).  Addiction Counselor Certification Board of California. {https://www.accbc.org/catc/}.

25. Substance Abuse: Clinical Issues in Intensive Outpatient Treatment (TIP 47).  U.S. Department of Health and Human Services, Substance Abuse and Mental Health Services Administration Center for Substance Abuse Treatment. {https://store.samhsa.gov/sites/default/files/SAMHSA_Digital_Download/sma13-4182.pdf}.

26. *Unethical Drug Rehab 'Body Brokering' Leads to Tragic Death*.  CBS News Bay Area.  (November 8, 2018) {https://www.cbsnews.com/sanfrancisco/news/unethical-drug-rehab-body-brokering-leads-to-tragic-death/}.

27. *What Does 'Medically Necessary' Mean?*   Medicare.org.  {https://www.medicare.org/articles/what-does-medically-necessary-mean/}.

28. Excerpts from the Deposition of Doug Nemecek (dated February 24, 2023)

29. AHA_CIGNA00002575-84

30. AHA_CIGNA00012180-83

31. Cigna_ TML00065404

32. Cigna_TML00030541

33. Cigna_TML00030543

34. Cigna_TML00195703

35. Cigna_TML00030543

36. Cigna_TML00195704

37. Cigna_TML00030540-48

38. Cigna_TML00195700-8

39. Cigna_TML00171632

40. Cigna_TML00171620

41. Cigna_TML00171630

42. Cigna_TML00171781

43. Cigna_TML00094763

44. Cigna_TML00094767

45. Cigna_TML00094768

46. Cigna_ TML00065404

47. Cigna_TML00094767

48. Cigna_TML00094768

49. Cigna_TML00094763

50. DR_CIGNA00012046

51. DR_CIGNA00012050

52. DR_CIGNA00012049

53. DR_Cigna00012014-15

54. PPR_CIGNA00006570

55. PPR_CIGNA00006566

56. PPR_CIGNA00006571-80

57. PPR_CIGNA00006581

58. PPR_CIGNA00006587

59. SCAC_CIGNA00005838-41

60. TML_CIGNA00003571

61. TML_CIGNA00014539-52

# KELLY J. CLARK, MD, MBA

**FOUNDER AND PRESIDENT, ADDICTION CRISIS SOLUTIONS**
**PAST PRESIDENT, ASAM American Society of Addiction Medicine**

502-767-6388 |
kellyjclarkmd@gmail.com
Louisville, KY 40207

## EXECUTIVE SUMMARY

Board certified in both addiction medicine and psychiatry, Kelly J. Clark, MD, MBA, DFAPA, DFASAM is a practicing physician, business leader and recognized expert on issues related to substance misuse involving opioids as well as other illicit and prescription substances. Known for building consensus across diverse stakeholder groups, Dr. Clark works actively across the medical, scientific, criminal justice, and business communities to transform addiction care into evidence-based, cost-effective practice.

An author of *Guide for Future Directions for the Addiction and OUD Treatment System,* from Prevention Treatment and Recovery Group of the National Academy of Medicine's Action Collaborative in Countering the US Opioid Epidemic, Clark also serves as a member of the Steering Committee, a Co-Chair of the Research Data and Metrics Workgroup, and a Co-Chair of the Telemedicine Group. Member of the Milken Institute Public Health Advisory Board and National Rx and Heroin Abuse Summit Advisory Board, Clark also continues as a contributer to the Association of Managed Care Pharmacy's Substance Use Disorder Working Group and ASAM's delegation to the American Medical Association.

Her work to improve access to quality mental health and addiction care is matched by her efforts to decrease the provision of Fraud, Waste and Abuse in behavioral health care, especially in addictions care.  Having supported the Special Investigations Units of 2 payers (Capital District Physicians Health Plan and CVS Caremark), and with expertise in utilization management, utilization review, and quality of care standards, she has testified in federal criminal court for both prosecution and defense of charges such as conspiracy to commit health care fraud and prescribing outside of legitimate medical practice / distributing controlled substances.

Considered one of the nation's leading experts on substance use disorder and addiction care, she is frequently invited to testify about the disease of addiction and needed systems of treatment before Congress and to federal organizations and other drug policy stakeholders, including the United States Presidential Opioid Commission, Bipartisan Heroin and Opioid Task Force, the Food and Drug Administration (FDA), the Substance Abuse and Mental Health Services Administration (SAMHSA), the Office of Comptroller General, the National Association of Attorneys General, the National Association for the Advancement of Science, Pew Trusts, National Safety Council, National Business Group on Health, American Psychiatric Association Foundation's Judges and Psychiatrists Initiative, and the Council of State Governments' Justice and Mental Health Collaboration Program.

.

## LEADERSHIP | POLICY EXPERIENCE

**Addiction Crisis Solutions,** Cedar Falls, IA                                                    2018-Present
**Founder and President**
Founded by Clark, Addiction Crisis Solutions (ACS) is a company focused on preventing addiction and transforming addiction care into evidence-based and cost-effective practice.

Consulting clients of ACS teams led by Dr. Clark have included both national and international organizations. Addiction Learning Resources (ALR) is a wholly owned subsidiary focusing on educating all stakeholder groups around addiction issues.

**American Society of Addiction Medicine**, Rockville, MD

2

**KELLY J. CLARK, MD, MBA**

**President-Elect, President, Immediate Past President**                                         2015-2021
**Member ASAM delegation to the American Medical Association**                         2017-present

Presided over world's largest group of physicians and allied health professionals specializing in the treatment of addictive diseases; 5,500+ physicians and 700+ associated professionals.  Previously served as Chair of Public Policy Council, Legislative Advocacy Committee, and Finance Committee, as well as President of the Kentucky Society of Addiction Medicine.

- Led high-profile task force that raised $1.3M funds; oversaw development of national reports on effectiveness and costs of medication-assisted treatment for opioid addiction and issues with insurance coverage of public and private payers nationally.
- Developed national opioid addiction treatment guidelines, including need for diversion control protocol.
- Built bipartisan and multi-stakeholder coalitions to help pass new legislation/policies, including CARA, CURES, SUPPORT, and update HHS guidelines to allow expanded evidence-based treatment access.
- Expanded access to payment for quality addiction services; advocated for, established, and led startup of Payer Relations Committee
- Vice-Chair of ASAM's Covid TaskForce which developed and published over a dozen expert guidance documents from March to May 2020 for ensuring safe access to treatment and alterations to normal treatment protocols during the beginning of the Covid-19 Pandemic.  Coordinated with state and national regulatory, scientific, eduational and payment partners to address needs for Covid-related changes in each area; listened, integrated, and presented in bi-weekly state ASAM Chapter meetings focused on needs and responses to Covid; expanded and updated acute guidance through end of Task Force work.

**DisposeRX,** Sanford, NC                                                                                              2018-Present
**Board Member**

DisposeRX is the leading site-of-use drug disposal company providing a solution to eradicate the misuse of unused medications. The Company is spearheading programs to educate communities about practical, convenient, inexpensive and safe medication disposal solutions, preventing drug addictions, overdoses and deaths.

- Provides medical and business development input as a member of the Advisory Board to further the Mission of DisposeRX to decrease medication misuse and diversion

**CleanSlate Centers**, Northampton, MA                                                                     2014–2018
**Chief Medical Officer**

Provided clinical policy and payment subject matter expertise in opioid addiction to drive strategic planning, clinical program development, and quality improvements leading science- and medicine-based addiction treatment as company expanded from 2000 patients in 1 state to 10,000 patients in 8 states across US. Worked collaboratively with regulatory agencies to support compliance and oversee government relations function. Established and maintained relationships with external stakeholder groups at local, state and national levels.

- Led negotiations and establishment of value-based, bundled payment contracts.
- Employed knowledge of data and costs to support contracts and highlighted metrics, scale, and reach in market to achieve partnerships with Medicaid, Medicare, and commercial payers.
- Drove expansion into PA and IN markets with business, treatment, and network expertise; identified value proposition, built formal business development functions, developed strategies and marketing materials, set up meetings, and presented.

**CVS Caremark**, Northbrook, IL                                                                                 2014–2015
**Medical Director**

KELLY J. CLARK, MD, MBA

Expanded leadership teams' awareness by contributing medical acumen regarding overextending members and unusual practice patterns of providers, retail pharmacies, and dual-eligible Medicare/Medicaid initiatives.

- Utilized expertise in opioid therapies and addiction to collaborate across enterprise regarding over-utilization of controlled substances, fraud, waste, and abuse.

**Behavioral Health Group (BHG)**, Dallas, Texas                                    2012 –2014
**Chief Medical Officer | Medical Affairs Officer**

Served as liaison to federal, state, community, and association stakeholders to inform, educate, and collaborate on patient-centered treatments utilizing medication-assistance to help patients restore, maintain, and enhance well-being and achieve optimal level of functioning.

- Oversaw and led 37 opioid treatment program facilities in 8 states: Colorado, Kansas, Kentucky, Louisiana, Missouri, Oklahoma, Tennessee and Texas.

**Publicis Touchpoint Solutions**, Yardley, PA                                      2013–2014
**Medical Science Liaison**

Provided comprehensive managed-care clinical presentations, clinical support, and medical information to internal and external customers.

- Facilitated the exchange of unbiased scientific information between medical community and Orexo during launch of Zubsolv, a buprenorphine product.

**Capital District Physician's Health Plan**, Albany, NY                             2009–2012
**Medical Director for Behavioral Health**

Provided clinical leadership to Behavioral Health team and clinical expertise to medical management staff.  Developed appropriate policies and procedures for the management of behavioral health benefits, in-sourced plans, and integrated with medical management. Chaired Behavioral Health Committee and represented Behavioral Health management at Quality Management, Credentialing, and Pharmacy/Therapeutics committee meetings.

- Saved $2.3M in 2 years; proposed and directed psychotropic medication strategy.
- Recuperated costs in 6 months and exceeded startup project goals.
-  Instituted hub-and-spoke buprenorphine model; engaged clinical community in medical-necessity determinations and redirected treatment to outpatient.
- Implemented the embedding of behavioral health case management into patient-centered medical homes; piloting at federally-qualified health center, academic medical center faculty, resident practice, and traditional private practice.

# CURRENT PROFESSIONAL WORK

**Dr. Kelly Clark, PLLC**, Louisville, KY                                          1995–Present
**Addiction and Psychiatric Physician | Consultant**

Specialize in addiction and mental health treatment, policy and payment reform, quality care; provide evidence-based treatment in public and private settings.  Offer direct care, including emergency, acute, sub-acute, and chronic

4

KELLY J. CLARK, MD, MBA

institutions; community, county, state, federal sites; tax-paying and nonprofit organizations; voluntary, involuntary and criminal justice settings.

- ▪ Contributed across various settings and gained national recognition as expert on policy, bio-psycho-social outcome goals, evidence-informed care, identifying ineffective care, diversion control, quality metrics, and decreasing costs of care.  Clients have included Braeburn, Sandoz, National Safety Council, MedPower.
- ▪ Forensic psychiatry and addiction medicine services. Expert review, reports and trial testimony. Engaged on behalf of plaintiffs and defendants for criminal and civil matters, including wrongful death, criminal fraud, competency, disability, assignment of relatedness, as other issues. Most work has been as independent, court appointed third party expert.

**Bicycle Health,** Boston, MA                                                        2020-present
**Chief Clinical Advisor**
Bicycle is an early stage company expanding access to evidence-based addiction treatment by providing telehealth treatment now in 27 states.

**Path CCM,** Los Angeles, CA                                                    2019-present
**Clinical Advisor**

Path is an early stage company committed to improving access to evidence based and cost-effective treatment for substance use by working with employer purchasers of care and building a network of quality providers.

**Journey Colab,** San Francisco, CA                                            2021- present
**Clinical Advisor**
Journey Colab is an early stage company developing a portfolio of psychedelic therapies to treat addiction.

**Resilient Lifescience**, Pittsburgh, PA                                        2022-present
Advisor

**Within Health Group,** Miami, FL                                              2023-present
Advisor
Within Health Group combines clinically-based treatment methods for people with eating disorders with a personalized digital platform so users can receive care in their own home.

## MEDICO-LEGAL EXPERIENCE

**Court Recognized Medical Expert:**
- ▪ Federal District Courts including Southern Florida, Eastern KY, Southern West Virginia regarding issues including substance abuse treatment and related billing.
- ▪ State Courts in Kentucky, Massachusetts, New Hampshire, Rhode Island, Wisconsin
- ▪ Social Security Disability Court

**EXPERT WITNESS COURT APPEARANCES:**

Commonwealth of Kentucky v. Lauren Baker                                        2022
Case No. 21-CR-491
Qualified as Expert via Daubert on issues of Opioid Use Disorder, its treatment, and related stigma
Convicted of murder at trial
Expert Witness for the Defense

KELLY J. CLARK, MD, MBA

United States v. Jonathan Markovitch e.t al.                                                      2021
Case NO. 20-CR-60020 (Dimitrouleas)
Jonathan and Daniel Markovich found guilty at trial fraudulent health care billing
Expert Witness for the Prosecution


United States vs. Kesari                                                                          2021
District Court, Southern Distrist of West Virginia
Found not guilty at trial on 12 of 13 counts
Prescribing controlled substances outside legitimate medical practice
Sentenced to probation
Expert Witness for the Defense


United States v. Bixler (5:18-CR-00068)                                                           2020
District Court, Eastern District of Kentucky
Convicted at trial of sex and drug trafficking
Expert Witness for the Prosecution


United States v. Ali Ahmed                                                                        2020
Case No. 19-60200-CR-Moreno (Cohn)
District Court, Southern District of Florida
Convicted at trial of health care fraud, conspiracy to commit health care fraud, money laundering
Expert Witness for the Prosecution


United States v. Eric Snyder (9:18-CR-80111)                                                      2019
District Court, Southern District of Florida
Qualified as expert witness by Daubert Hearing
Accused then pled guilty of conspiracy to commit health care fraud
Expert Witness for the Prosecution


United States v. Arman Abovyan, et.al. (18-80122- CR- MIddlebrooks)                               2018
District Court, Southern District of Florida
Convicted at trial conspiracy to commit health care fraud; conspiracy to possess,
distribute, and dispense controlled substances; unlawfully dispensing controlled substances.
Conviction upheld on appeal 2021
Expert Witness for the Prosecution


**ADDITIONAL RETAINED EXPERT EXPERIENCE**


United States v. Wallace Steven Anderson et al (5:21-cr-00008)                                    2022
Southern District of Georgia
Pled guilty to conspiracy to unlawfully distribute controlled substances
Expert Witness for Prosecution


United States v. Agresti (18-80124-CR-Ruiz)                                                       2022
District Court, Southern District of Florida
Convicted at trial of health care fraud and conspiracy to commit health care fraud
Litigative Consultant and Expert Witness Services for the Prosecution


United States v. Jose Santeiro

6

KELLY J. CLARK, MD, MBA

 (0:21-cr-60020 ( (Dimitrouleas))                                                      2022
District Court, Southern District of Florida
Convicted at trial of health care fraud and conspiracy to commit health care fraud
Litigative Consultant and Expert Witness Services for the Prosecution

United States c. Beetle (9:19-CR-80234)                                                2022
District Court, Southern District of Florida
Convicted at trial of conspiracy to commit health care fraud
Litigative Consultant and Expert Witness Services for the Prosecution

Estate of Stephen Michael Frankino et al v. Charlene Lewis, St. Pater's Health         2022
Montana First Judicial District Court, Lewis and Clark County
Cause No DDV-2019-782
Plaintiffs voluntarily dismissed case
Deposed Expert Witness for the Defense

United States v. Michael Ligotti (9:20-MJ-08265-BER)                                    2022
District Court, Southern District of Florida
Pled guilty to conspiracy to commit health care fraid
Litigative Consultant and Expert Witness for the Prosecution

United States v. Perez et al (Rural Hospital) (3:20-cr-86)                              2021
District Court, Middle District of Florida
Expert Witness Services for the Prosecution

Marek Furtek and Barbara Baran v. McDermott Center, Inc d/b/a Haymarket Center         2022
Case No. 19 L 002103
Circuit Court of Cook County, IL County Department, Law Division
Deposed 2021
Settled 2022
Expert Witness for the Plaintiff

Cigna v. Biohealth Laboratories et al                                                  active
Case No. 19-1324
District Court, District of Connecticut
Expert for the Plaintiff

**DISABILITY AND WORKER"S COMPENSATION EXPERT WORK**

Commonwealth of Kentucky, District Disability Court, Louisville, KY                   2005–2013
Independent Disability and Guardianship Evaluations

- Provided court 300+ independent expert opinions as physician member of multi-disciplinary
  court-appointed team; presented on issues of multiple areas of disability, need for substituted
  decision-maker and respondents residing in levels of care include acute, sub-acute and chronic
  hospital and rehabilitation facilities; skilled nursing facilities; assisted living facilities; group home
  facilities; and home care facilities.

Commonwealth of Rhode Island, Worker's Compensation Court, Providence, RI             2003–2004

KELLY J. CLARK, MD, MBA

Independent Health Care Reviewer
- Supplied court-appointed, independent-expert written opinions on issues of disability, casual relationship with injuries, diagnosis/prognosis, attainment of maximum medical improvement, and quality of care.

Social Security Administration, Milford, MA                                      2003–2004
Physician Examiner
- Court-appointed to provide written expert opinions to Social Security Administrative Law Judge regarding issues of psychiatric disability.

## COVID-19 RELATED WORK

**ASAM Caring for Patients During COVID-19 Task Force**                   March 2020-Present
**Vice Chair**
Led the engagement with subject matter experts around the country to rapidly provide written guidance to patients, providers, programs, and policymakers to support the emergency need for altered addiction treatment guidance at the outbreak of COVID-19. These resources are promoted by many organizations and have been accessed by over 100,000 unique viewers.  Rapidly developed and uploaded COVID-19 specific guidance in such areas as telemedicine; promoting support group attendance; treating justice involved persons; treating unhoused people with addiction; ongoing management of the continuum of addiction care; accessing care in opioid treatment programs; access to buprenorphine in office-based settings; Infection risk mitigation in both inpatient and outpatient programs; adjusting drug testing protocols; clinician well-being; and other topics. Original guidances issued March, full updates completed September, 2020.

**ASAM: "Caring for Patients During the Covid-19 Pandemic"**                 March 2020
Webinar speaker, March 27, 2020

**National Academy of Medicine and**                                          May 2020
**American Society of Addiction Medicine**
Supporting People with Addiction During Covid-19: A Three-Part Webinar Series
May 7, May 22, and June 6, 2020
https://nam.edu/programs/action-collaborative-on-countering-the-u-s-opioid-epidemic/treatment-webinar-series/

**Kentuckiana Health Collaboration, Moderator:** "Challenges and Adaptations as the
COVID-19 and Opioid Crises Merge"                                            July 2020
https://www.khcollaborative.org/initiatives/covid19/

## POLICY AND STANDARDS EXPERIENCE

**Buprenorphine and Pharmacy Policy**  Qato DM, Watanabe JH, Clark KJ. "Federal and State Pharmacy Regulations and Dispensing Barriers to Buprenorphine Access at Retail Pharmacies in the US". *JAMA Health Forum.* 2022;3(8):e222839. doi:10.1001/jamahealthforum.2022.283

**ASAM** "National Practice Guideline for the Treatment of Opioid Use Disorder - 2020 Focused Update"
https://www.asam.org/Quality-Science/quality/2020-national-practice-guideline

**Duke Margolis Center for Health Policy**                                    Dec 2020
Expert Roundtable
"Next Steps in Responding to the Opioid Crisis: Priorities and Considerations for a Federal Response"

8

KELLY J. CLARK, MD, MBA

**ASAM** "Clinical Practice Guideline on Alcohol Withdrawal Management". 2020
https://www.asam.org/Quality-Science/quality/guideline-on-alcohol-withdrawal-management

**NAM** "Medications for Opioid Use Disorder Save Lives" 2019
https://www.nap.edu/catalog/25310/medications-for-opioid-use-disorder-save-lives

**Kentuckiana Health Collaborative** "Opioids and the Workplace: An Employer Toolkit for Supporting Prevention, Treatment, and Recovery". 2019.
https://www.khcollaborative.org/wp-content/uploads/2020/04/2.0-Opioids-and-the-Workplace-FINAL-4.21.2020-1.pdf

**SAMHSA** "TIP 63: Medications for Opioid Use Disorder" 2018.
https://store.samhsa.gov/product/TIP-63-Medications-for-Opioid-Use-Disorder-Full-Document/PEP20-02-01-006

**ASAM** "Appropriate Use of Drug Testing in Clinical Addiction Medicine", 2017
https://www.asam.org/Quality-Science/quality/drug-testing

**Kentucky's Regulations 201 KAR 9:270: "**Professional Standards for Prescribing or Dispensing Buprenorphine-Mono-Product or Buprenorphine-Combined-With Naloxone"

**Operation UNITE:** Provided subject matter expertise to Operation UNITE, which is supported by Representative Hal Rogers. Founding Member of Advisory Board for National RX Drug Abuse Summit.  Provided taped presentation, which met Kentucky's prescriber requirement for opioid education.

**Johns Hopkins Bloomberg School of Public Health: "**The Prescription Drug Epidemic: An Evidence Based Approach"
http://www.jhsph.edu/research/centers-and-institutes/center-for-drug-safety-and-effectiveness/opioid-epidemic-town-hall-2015/2015-prescription-opioid-epidemic-report.pdf

**Association of Managed Care Pharmacy Addiction Treatment Advisory Group: "**Role of Managed Care Pharmacy in Providing Access to Naloxone" and "Findings and Considerations for the Evidence-Based Use of Medications Used in the Treatment of Substance Use Disorders" http://www.amcp.org/Newsletter.aspx?id=21664

**Substance Abuse and Mental Health Services Administration:** Buprenorphine Summit
https://www.samhsa.gov/sites/default/files/proceedings_of_2014_buprenorphine_summit_030915_508.pdf

**American Society of Addiction Medicine**: "Guidelines for the Use of Medications in the Treatment of Addiction Involving Opioid Use" http://www.asam.org/docs/default-source/practice-support/guidelines-and-consensus-docs/asam-national-practice-guideline-supplement.pdf

**"Standards of Care for the Addiction Specialist Physician"** http://www.asam.org/docs/default-source/practice-support/quality-improvement/standards-of-care-final-design-document.pdf?sfvrsn=0

**"Drug Testing: a White Paper of the American Society of Addiction Medicine"**
https://www.cmm.com.au/files/uploads/resources/20170817102442drug-testing-a-white-paper-by-asam.pdf

**American Society of Addiction Medicine (ASAM): President and Chair of Legislative Advocacy Committee**; worked with Congress, the White House, and Department of Health and Human Services on legislative changes to improve access to clinical and cost-effective care. Instrumental in legislative, federal policy, and insurance payer changes. www.asam.org

## EDUCATION

University of Wisconsin, Madison, WI                                                                                   1989

**KELLY J. CLARK, MD, MBA**

Doctor of Medicine (MD)

| | |
|---|---|
| The Fuqua School of Business, Duke University, Durham, NC | 2007 |
| Master of Business Administration (MBA) and Certificate in Health Sector Management | |

| | |
|---|---|
| Coe College, Cedar Rapids, IA | 1983 |
| Bachelor of Arts (BA) in Psychology, Honors: *cum laude*, Honor Society: Phi Beta Kappa | |

## MEDICAL RESIDENCY

| | |
|---|---|
| Medical College of Wisconsin, Milwaukee, WI | 1992–1994 |
| Psychiatric Residency Program, Years III-IV | |

| | |
|---|---|
| University of Wisconsin, Milwaukee Campus | 1990–1992 |
| Psychiatric Residency Program, Years I-II | |

## ACADEMIC AFFILIATIONS

| | |
|---|---|
| Virginia Tech Carilion School of Medicine | 2010–2016 |
| Founding Faculty, Adjunct Assistant Professor | |
| Department of Interprofessionalism | |

| | |
|---|---|
| University of Massachusetts | 1996–2004 |
| Assistant Professor of Psychiatry | |

## CERTIFICATIONS

| | |
|---|---|
| Certification in Addiction Medicine | 2019 |
| International Society of Addiction Medicine | |
| New Delhi, India | |

| | |
|---|---|
| Re-Certification in Psychiatry | 2016–2026 |
| Re-Certification in Psychiatry | 2006–2016 |
| Board Certified in Psychiatry | 1997–2007 |
| American Board of Neurology and Psychiatry | |

| | |
|---|---|
| Certification in Addiction Medicine | 2018-2027 |
| American Board of Preventative Medicine | |

| | |
|---|---|
| Re-Certification in Addiction Medicine | 2014–2024 |
| Board Certified in Addiction Medicine | 2004–2014 |
| American Society of Addiction Medicine, American Board of Addiction Medicine | |

## ACTIVE MEDICAL LICENSURE

- Florida (FL), Indiana (IN), Kentucky (KY), Massachusetts (MA), Maryland (MD), New Hampshire (NH)
- New York (NY), Pennsylvania (PA), Virginia (VA), Wisconsin (WI)

## PRESENTATIONS/INTERVIEWS/TALKS

10

KELLY J. CLARK, MD, MBA

**Speaker:** "The Substance Use Treatment Landscape –                              May 2022
Treatment Types, Monitoring, and Enforcement "
NGTRI Predatory and Unethical Practices in Substance Use Treatment Conference
National Association of Attorneys General

**Guest Lecturer**                                                                Feb 2022
Addiction Treatment in the US
Masters of Science in Addiction Policy and Practice Program
Georgetown University

**Fellowship Didactic Instructor**                                               Jan 2022
"Addiction as a Chronic Brain Disease"
Addiction Medicine Fellowship
Howard University College of Medicine

**Speaker:** "The Substance Use Treatment Landscape –                              Nov 2021
Treatment Types, Monitoring, and Enforcement "
NGTRI Predatory and Unethical Practices in Substance Use Treatment Conference
National Association of Attorneys General

**Speaker:**                                                                     Oct 2021
"Guide for Future Directions for the Addiction And OUD Treatment Ecosystem
Oregon Council for Behavioral Health

**Grand Rounds Speaker**                                                         Sept 2021
"Addiction as a Chronic Brain Disease: Implications for Treatment and Systems"
Department of Psychiatry
University of Louisville School of Medicine

**Speaker and Panelist**                                                         July 2021
US Food and Drug Administration / Duke Margolis Center for Health Policy
Public Workshop: Safe Use of Benzodiazepines: Clinical, Regulatory, and Public Health Perspectives
https://healthpolicy.duke.edu/events/safe-use-benzodiazepines-clinical-regulatory-and-public-health-perspectives

**Speaker: "**Maintaining Access to Substance Use Disorder Treatment              April 2021
And Pain Management During a Pandemic Response"
National Rx Drug Abuse and Heroin Summit

**Moderator:** "Organized Medicine's Role in Strengthening a Public Health        April 2021
Approach to Overdose Morbidity and Mortality"
National Rx Drug Abuse and Heroin Summit

**Moderator:** "CDC's Overdose Data to Action: Drug Overdose Surveillance and Innovations"   April 2021
National Rx Drug Abuse and Heroin Summit

**Fellowship Didactic Instructor**                                               November 2020
Addiction as a Chronic Brain Disease
Addiction Medicine Fellowship
Howard University College of Medicine

KELLY J. CLARK, MD, MBA

**Fellowship Didactic Instructor**                                                November 2020
"An  Overview of Ethics, Legal and,Liability Issues
related to the practice of ADM: what every doctor should know"
Addiction Medicine Fellowship
Howard University College of Medicine

**National Academy of Medicine**                                                   May 2020
Symposium of the Action Collaborative on Countering the US Opioid Epidemic (Webinar)
**Moderator:** Addressing the Stigma Surrounding Opioid Use Disorder
**Panelist:** Building a Health System that is Equipped to Prevent, Treat, and Manage OUD

**Grand Rounds Presenter**: "Substance Use Disorder as Integral Part of the Health Care System"     October 2019
Department of Family Medicine
Meriter Health System, Madison, WI

**Panelist:** Opioid Addiction: A Crisis Fueled by Stigma                          October 2019
Milken Institute Future of Medicine Summit
https://livestream.com/milkeninstitute/Opioid-Addiction-A-Crisis-Fueled-by-Stigma
Washington, DC

**Speaker and Participant:** Opioid Response in the Workplace                      October 2019
The Role of Corporations in addressing the Crisis
Milken Institute Future of Medicine Summit
Washington, DC

**Speaker**: "If Addiction is a Chronic Disease, What Does That Mean for Recovery?"     September 2019
Building Communities of Recovery National Conference
Marietta, GA

**Speaker::**Understanding Opioids and the Workplace"                              August 2019
Kentucky SHRM State Conference
Louisvlle, KY

**Speaker:**                                                                      August 2019
"Substance Use Disorder in Your Medical Practice: Treatment and Referral Updates"
University of Kentucky CE Central
CME presentation accredited toward KY HB1 requirements
https://www.cecentral.com/activity/17298

**Speaker and Moderator:** Big Ideas Plenary                                       April 2019
50th Annual Conference, American Society of Addiction Medicine, Orlando, FL

**Speaker:** Quality of Care Showcase                                             April 2019
National Rx Drug Abuse and Heroin Summit, Atlanta, GA

**Speaker:** Employers Respond: Kentuckiana Health Collaborative's Evidence-Based Approach     April 2019
National Rx Drug Abuse and Heroin Summit, Atlanta, GA

**Moderator:** Opioid Prescribing and Treatment in a Rural Community              April 2019
National Rx Drug Abuse and Heroin Summit, Atlanta, GA

KELLY J. CLARK, MD, MBA

---

**Moderator:**  Capitalizing on Integrated Medical, Pharmacy Data: Working Upstream and Downstream to Identify Misuse, Abuse
National Rx Drug Abuse and Heroin Summit, Atlanta, GA

April 2019

**Speaker:** "Opioids and the Workplace: An Employer Toolkit for Supporting Prevention, Treatment, and Recovery
Employer Roundtable and Webinar speaker, Louisville, KY

April 2019

**Speaker:** The US Opioid Epidemic
International Society of Addiction Medicine 20th Annual Meeting
Busan, Republic of Korea

November 2018

**Speaker:** Opioid Addiction
Orange County, FL

May 2018

**Speaker and Moderator**: Opening Scientific Plenary
49th Annual Conference, American Society of Addiction Medicine, San Diego, CA

April 2018

**Speaker:** Knowledge and Agility**:** Pivoting in Response to Federal and State Health Policy Changes
National Rx Drug Abuse and Heroin Summit, Atlanta, GA

April 2018

**Speaker:** Implementing SAMHSA TIP 63**:** Accessing Pharmacotherapy Across the Care Continuum
National Rx Drug Abuse and Heroin Summit, Atlanta, GA

April 2018

**Moderator:** Safe Alprazolam Prescribing and Benzodiazepine Monitoring Program
National Rx Drug Abuse and Heroin Summit, Atlanta, GA

April 2018

**Moderator**: Increasing the Specialty Workforce: How City and State Governments Can Leverage Providers to Treat
National Rx Drug Abuse and Heroin Summit, Atlanta, GA

April 2018

**Speaker and Moderator**: The Opioid Epidemic
Sustainable Business & Social Impact Conference
Fuqua School of Business, Durham, NC

February 2018

**Speaker:** Provider and Health System Approaches to Manage Opioid Access and Improve Patient Safety; Strategies for Promoting the Safe and Appropriate Prescribing of Prescription Opioids
Duke Margolis Center for Health Policy; Washington, DC

February 2018

**Speaker:** Addiction as a Chronic Brain Disease- Implications for Business Leaders
National Business Group on Health

February 2018

**Speaker:** We Aren't Doing What We Know Works:
How Long Can U.S. Social Policy Ignore the Science
National Association for the Advancement of Science, Austin, TX

February 2018

**Kentucky Health, Season 13 Episode 8. Treating Drug Addiction.**
Interview of Dr. Clark by Dr. Wayne Tuckson
https://www.ket.org/program/kentucky-health/treating-drug-addiction/

October 2017

**KELLY J. CLARK, MD, MBA**

| | |
|---|---|
| **Speaker:** "Case Study and Outcomes Presentation: Office-Based, ASAM-Consistent Opioid Treatment" National Rx Drug Abuse and Heroin Summit, Atlanta, GA | April 2017 |
| **Moderator:** The Role of Treatment in Response to the Opioid Epidemic National Rx Drug Abuse and Heroin Summit, Atlanta, GA | April 2017 |
| **Speaker, Panelist:** "Federal Changes Impacting the Delivery of Treatment for Opioid Addiction" National Rx Drug Abuse and Heroin Summit, Atlanta, GA | April 2017 |
| **Moderator:** Buprenorphine among Substance Use Disorder Treatment Clients and in Abstinence-Based Treatment.  Rx Drug Abuse and Heroin Summit, Atlanta, GA | April 2017 |
| **Moderator:** Opening Scientific Plenary & Distinguished Scientist Lecture 48th Annual ASAM Meeting, New Orleans, LA | April 2017 |
| **Moderator:** Policy Plenary: Addiction Policy Outlook in the New Administration 48th Annual ASAM Meeting, New Orleans, LA | April 2017 |
| **Opening Session Speaker:** "State of the Science: Treatment and Delivery Systems for Addiction" National Association of Psychiatric Health Systems Annual Meeting, Washington, DC | March 2017 |
| **Speaker, Panelist**: "Optimizing Customer Experience with Effective Addiction Treatment" Open Minds Institute**,** Clearwater, FL | February 2017 |
| **Speaker: Tackling the Opioid Epidemic** "Recovery: Past, Present, and Future – Reducing Stigma" University of Kentucky CE Central Lexington, KY | October 2016 |
| **Speaker:** "Treating Addiction and Saving Lives: The Use of Medical Assisted Treatment & Naloxone," Challenge of Tarrant County Opiate Symposium, Fort Worth, TX | September 2016 |
| **Speaker, Panelist:** Substance Abuse and Recovery Task Force, United States Conference of Mayors Annual Meeting Indianapolis, IN | June 2016 |
| **Speaker, Panelist:** "Treatment System Evolution and Synthesis: Program Integration in 2016" National Association of Addiction Treatment Providers Annual Conference, Jacksonville, FL | May 2016 |
| **Partnership to End Addiction** "Improving Buprenorphine Access While Reducing Diversion" https://drugfree.org/drug-and-alcohol-news/improving-buprenorphine-access-reducing-diversion-qa-asam-president/?utm_source=Stay+Informed+-+latest+tips%2C+resources+and+news&utm_campaign=bd0e323165-JT_Weekly_News_Health_Experts_Ask_for_Ch4_21_2016&utm_medium=email&utm_term=0_34168a2307-bd0e323165-224282125 | April 2016 |
| **Speaker:** "But How Do I Get Paid: Valuing Psychiatric Services in the New World Order" 2016 Regional Integrated Mental Health Conference, West Baden, IN | April 2016 |
| **Speaker, Panelist:** "Opioid Addiction Treatment- Current State and Future Opportunities" Staying on Course with Legislative and Regulatory Issues, Academy of Managed Care Pharmacy Annual Meeting, San Francisco, CA | April 2016 |

KELLY J. CLARK, MD, MBA

| | |
|---|---|
| **Speaker, Panelist:** "Policy Plenary- Parity and the ACA: Implementation Update and Issues on the Horizon for Addiction Medicine" American Society of Addiction Medicine Annual Conference, Baltimore, MD | April 2016 |
| **Speaker, Panelist:** "Payment for Addiction Medicine Services" American Society of Addiction Medicine Annual Conference, Baltimore, MD | April 2016 |
| **Panelist:** The Tennessee Pain, Opioids, Problems and Solutions Forum, Nashville, TN | April 2016 |
| **Speaker, Panelist:** "Buprenorphine: Knocking Out Pill Mills and Minimizing Diversion" National Rx Drug Abuse and Heroin Summit, Atlanta, GA | March 2016 |
| **Moderator:** Co-Prescribing Opioids and Benzodiazepines: Risks and Recommendations, National Rx Drug Abuse and Heroin Summit, Atlanta, GA | March 2016 |
| **Moderator:** Community Responses to Heroin: North Carolina and Northern Kentucky, National Rx Drug Abuse and Heroin Summit, Atlanta, GA | March 2016 |
| **Moderator:** Pre-Summit Workshop: Medication Assisted Therapy, National Rx Drug Abuse and Heroin Summit, Atlanta, GA | March 2016 |
| **Speaker:** "Attacking the Opioid Epidemic: ASAM's Proposal and Implications for Kentucky" Kentucky Society of Addiction Medicine, Louisville, KY | August 2015 |
| **Speaker, Panelist:** "Dietz Wolfe Lecture:  The Heroin Epidemic" Louisville, KY | August 2015 |
| **Speaker, Panelist:** "Get Involved in Policy Changes: Make Big Differences Using a Little Savvy" American Society of Addiction Medicine Annual Conference, Austin, TX | April 2015 |
| **Moderator:** "FDA on Decreasing Opioid Risks and VA on Exploring Non-Opioid Options" National RX Drug Abuse Summit, Atlanta, GA | April 2015 |
| **Speaker, Panelist:** "Trends in Drugs of Choice" National RX Drug Abuse Summit, Atlanta, GA | April 2015 |
| **Moderator:** "The Evidence Base for Opioid Addiction Treatment and the ASAM Criteria" National RX Drug Abuse Summit, Atlanta, GA | April 2015 |
| **Speaker:** "Strategies to Address Substance Abuse and reporting Requirements – Diagnosis and Treatment of Prescription Drug Abuse" Kentucky Medical Association, Louisville, KY | November 2014 |
| **Moderator:** "Clinical ER/LA Opioid REMS – Achieving Safe Use While Improving Patient Care" National RX Drug Abuse Summit, Atlanta, GA | April 2014 |
| **Speaker, Panelist:** "Barriers to Access to care: American Society of Addiction Medicine's Advancing Access to Addiction Medications Initiative" National RX Drug Abuse Summit, Atlanta, GA | April 2014 |
| **Speaker, Panelist:** "Influencing Health Policy: ASAM Advocacy in 2014" | April 2014 |

KELLY J. CLARK, MD, MBA

American Society of Addiction Medicine Annual Conference, Orlando, FL

**Speaker:** "Substance Abuse Treatment as an Integral Part of the Health Care System"          August 2013
The Good, the Bad, and the Ugly of Addiction, Lexington, KY

**Speaker, Panelist:** "The Good, the Bad, and the Ugly- Practical Issues in Addressing          May 2013
the Epidemic of Prescription Drug Abuse" American Psychiatric Association, San Francisco, CA

**Panelist:** "Patient Access to Medication Assisted Treatment: Responding to State Access Limitations"          April 2013
American Society of Addiction Medicine, Chicago, IL

**Panelist:** Policy Plenary; "US Drug Crisis – The Addiction Treatment Gap"          April 2013
American Society of Addiction Medicine, Chicago, IL

**Speake**r: "Influencing Health Policy: ASAM Advocacy in 2013"          April 2013
American Society of Addiction Medicine, Chicago, IL

**Moderator:** "Access to Treatment Challenges"          April 2013
National Rx Drug Abuse Summit, Orlando, FL

**Moderator:** "Prescribing Practices"          April 2013
National Rx Drug Abuse Summit, Orlando, FL

**Speaker, Panelist:** "Opioid Dependence: Health Plan Problems and Strategies"          April 2012
National Rx Drug Abuse Summit, Orlando, FL

**Moderator:** "A Paradigm Shift of Payer Strategy"          April 2012
National Rx Drug Abuse Summit, Orlando, FL

**Moderator:** "Treatment and Recovery in America"          April 2012
National Rx Drug Abuse Summit, Orlando, FL

**Speaker, Panelist:** "Chronic Pain and Addiction"          April 2012
National Rx Drug Abuse Summit, Orlando, FL

**Plenary Panel Member:** "Addressing Prescription Drug Abuse: Role of the Physician in          April 2012
Counteracting Diversion, Misuse & Addiction" American Society of Addiction Medicine, Atlanta, GA

**Speaker:** "Prescription Drug Abuse and Treatment in KY: Costs and Consequences"          September 2012
Kentucky Society of Addiction Medicine, Kentucky Medical Association Annual Meeting, Louisville, KY

**Speaker: "Issues Related to ER Prescriptions in New York State"**
**Panelist:** Prescription Drug Misuse Public Health Policy Forum          February 2012
New York Society of Addiction Medicine, New York, NY

**Speaker, Panelist:** "Successful Integration of Behavioral Health into Primary Care:          October 2011
Fiscal and Policy Initiatives," Family Medicine Education Consortium, Danvers, MA

**Speaker:** "The Role of US Health Plans in Opioid Management."          September 2011
International Society of Addiction Medicine Annual Meeting, Oslo, Norway

KELLY J. CLARK, MD, MBA

**Speaker, Panelist:** "Health Care Reform and Opportunities for Addiction Medicine"          April 2011
American Society of Addiction Medicine, Washington, DC.

**Speaker:** "Health Care Reform and Opportunities for Psychiatry"          March 2011
Capital District Branch, New York State Psychiatric Association, Albany, NY

**Speaker, Panelist:** "Health Care Reform and Psychiatric Opportunities"          March 2011
Louisiana Psychiatric Medical Association, New Orleans, LA

**Speaker, Panelist:** "Healthcare Reform and Opportunities for Addiction Medicine"          February 2011
New York Society of Addiction Medicine, New York, NY

**Speaker, Panelist:** "Health Care Reform and Behavioral Health"          February 2011
New York State Psychological Association

**Speaker:** Annual NYSPA Business of Practice Workshop,          November 2010
Psychologists' Continuing Education Units, New York, NY

**Speaker:** "Asking the Critical Questions about Data Analysis"          March 2004
Continuing Medical Education Faculty: Westwood Lodge Hospital, Westwood, MA

**Roundtable Facilitator:** "Market Research on Namenda and Lexapro with Clinical Data"          2003–2005
Led groups of 20-30 physicians in multiple locations in Western US.
Advisory Board Faculty: Forest Laboratories

**National Consultant Speaker:** Forest Laboratories          2002–2007
Presented 200+ physician advocate programs to groups of physicians.
Led roundtable discussions across US on behalf of Forest Laboratories'
products Namenda, Celexa, Lexapro.

**Corporate Business Consultant and Speaker for Corporate Clients**          2002–2007
Provided education and sales support for promotion of Ability, Aricept, Effexor, Provigil,
Suboxone, Wellbutrin, and Zoloft by speaking throughout regional Bristol-Myers Squibb,
Cephalon, GlaxoSmithKline, Pfizer, Reckitt Benckiser, and Wyeth.

## INDEPENDENT REVIEW EXPERIENCE

Capital District Physician's Health Plan, Albany, NY          2012–Present
- ▪ Perform initial and appeal utilization reviews for all levels of care; conducted pharmacy
  reviews July 2012–March 2014.

Bluegrass Health Network, Louisville, KY          2005– Present
- ▪ Execute expert reviews for utilization, disability, worker's compensation, pharmacy
  benefit management.

MES Solutions, Boston, MA          2003– 2014
- ▪ Complete expert reviews for utilization, disability, pharmacy benefit management, prior
  authorization, concurrent and retrospective reviews, and Independent Medical Examinations.

MCMC, Formerly CORE, Boston, MA          1999–2014
- ▪ Handle expert reviews for utilization, disability, worker's compensation, pharmacy

KELLY J. CLARK, MD, MBA
_____

benefit management; prior authorization, concurrent and retrospective.
- Synthesize data from medical records, legal contracts, and attending physicians to assess medical necessity of proposed treatments.
- Produce written consultative reports, function as Acting Medical Director during absences of Permanent Medical Director, and perform Independent Medical Examinations.

Behavioral Medical Interventions, Eden Prairie, MN                              2011–2014
- Performed expert reviews of worker's compensation claims for relatedness and medical necessity.

Reliable Review Services, Formerly Reed Review Services, Boca Raton, FL         2003–2013
- Completed expert reviews for utilization, disability, and worker's compensation.
- Mentored new physician consultants.

Alicare Medical Management, New York, NY                                        2005–2009
- Reviewed disability benefits and performed expert reviews for utilization, worker's compensation, pharmacy benefit management; prior authorization, concurrent and retrospective reviews.

SHPS, Louisville, KY                                                            2005–2009
- Performed expert reviews for utilization, as prior authorization, concurrent and retrospective reviews.

## PROFESSIONAL AFFILIATIONS

**American Society of Addiction Medicine**                                      2005–Present
Distinguished Fellow (DFASAM)
Immediate Past President                                                        2019-2021
President                                                                      2017-2019
President-Elect                                                                2015– 2017
Director                                                                       2011–2021
Vice Chair of COVID-19 Task Force                                              2020-2021
Chair of Finance Committee                                                     2011–2015
Chair of Legislative Action Committee                                          2011–2015
Chair of Public Policy Council                                                 2015-2017
Legislative Advocacy Committee                                                 2009-Present
Finance Committee                                                              2010–2021
Membership Committee Member                                                    2011–2016
Patient Advocacy Task Force                                                    2012–2015
Chapters Committee                                                             2011–2012
Parity Committees                                                              2010–2011
Pain and Addiction Committee                                                   2009
Pharmacological Issues Workgroup                                               2009
Utilization Review Accreditation Liaison                                       2005

**Kentucky Society of Addiction Medicine**                                     2011–Present
Chair of Public Policy Committee                                               2011–2018
Immediate Past President                                                       2012–2014
President                                                                      2011–2012

KELLY J. CLARK, MD, MBA

| | |
|---|---|
| **American Psychiatric Association** | 1988–Present |
| Distinguished Fellow (DFAPA) | 2011–Present |
| Member Integration Work Group | 2012-2017 |
| | |
| **American Medical Association** | 2004-Present |
| Member ASAM Delegation to AMA | 2016-Present |
| | |
| **Kentucky Medical Association** | 2015–Present |
| Delegate from Greater Louisville Medical Society | 2015–Present |
| Member Annual Meeting Reference Committee | 2016 |
| | |
| **International Society of Addiction Medicine** | 2011–Present |
| | |
| **Kentuckiana Health Collaborative** | 2018-Present |
| Contributing member and Consultant on Opioid Toolkit | |
| Member, Finance Committee | |
| Member of Addiction in the Workplace Group | |
| | |
| **American Association for Physician Leadership /** | |
| **American College of Physician Executives** | 2006–Present |
| | |
| **American Academy of Addiction Psychiatry** | 2012–2014 |
| Member Public Policy Committee | |
| | |
| **New York State Psychiatric Association Capital District Branch** | 2009–2012 |
| President-Elect | 2012 |
| Secretary | 2011–2012 |
| Executive Committee Liaison for Payment Strategies | 2009–2011 |

## TASK FORCES | EXPERT PANELS | WRITING GROUPS

| | |
|---|---|
| **National Academy of Medicine** | 2018-Present |
| Action Collaborative on Countering the U.S. Opioid Epidemic | |
| Steering Committee Member | |
| Research, Data, and Metrics Working Group Co-Lead | |
| Prevention, Treatment, and Recovery Working Group Member | |
| | |
| **American Board of Preventive Medicine** | 2023 |
| Addiction Medicine Item Writing Subcommittee for Longitudinal Assessment | |
| | |
| **World Health Organization** | 2019 |
| Sixth Meeting on the Public Health Implications of Addictive Behavior | |
| Official Observer, Abu Dhabi, UAS | |
| | |
| **World Health Organization** | 2019 |
| Regional Capacity Building Workshop | |
| for Management and Care of | |
| Substance Use Disorders: Eastern Mediterranean Region | |
| Temporary Expert Status | |

**Kelly J. Clark, MD, MBA**

Abu Dhabi, UAE

| | |
|---|---|
| **Milken Institute**<br>Public Health Advisory Committee Member | 2019-Present |
| **National Rx Drug Abuse Summit**<br>Advisory Board Member | 2012–Present |
| **Association of Managed Care Pharmacies**<br>Member of Addiction Treatment Action Group | 2015–Present |
| **The Council of State Governments Justice Center**<br>Judges' and Psychiatrists' Leadership Initiative, New York, NY<br>Convening on Behavioral Health Systems of Care and Conditions of Release | 2017-Present |
| **National Safety Council**: Prescription Drug Overdose Initiative, Arlington, VA<br>Prescription Drug Expert Panel | 2016 |
| **Comptroller General's Forum**: Preventing the use of Illicit Drugs and Abuse of Prescription Drugs<br> Participant. Washington, DC | 2016 |
| **Johns Hopkins Bloomberg School of Public Health**<br>"The Prescriptions Opioid Epidemic: An Evidence-Based Approach"<br>Member, Treatment Section Writing Committee | 2015 |
| **United States Department of Health and Human Services**, Rockville, MD<br>Substance Abuse and Mental Health Services Administration Buprenorphine Summit<br>Moderator and participant of work group "Addressing Health Systems and Reimbursement." | 2014 |
| **Collaborative Care Research Network, American Academy of Family Practice**<br>Steering Committee Member | 2011–2014 |
| **New York State Office of Alcohol and Substance Abuse Services Medical Advisory Panel**<br>Panel Member | 2012 |
| **Patient Centered Primary Care Collaborative**<br>Behavioral Health Task Force Member | 2010–2012 |
| **Alliance of Community Health Plan Behavioral Health Medical Directors Network** | 2009–2012 |

## Clinic Affiliations

| | |
|---|---|
| Louisville Behavioral Health, Louisville, KY,<br>    ▪ Provide services to general adult, geriatric psychiatry, and Independent Medical Examinations. | 2004–2016 |
| Behavioral Health Group, Paintsville, Pikeville, Lexington, and Hazard, KY<br>    ▪ Provided program physician services to opioid treatment program using both methadone and<br>       buprenorphine in medication-assisted treatment. | 2013–2014 |
| Paducah Professional Associates, Paducah, KY | 2005–2009 |

KELLY J. CLARK, MD, MBA

- Served as Medical Director; managed and oversaw clinical care, aligned and supervised clinical staff, and ensured compliance with applicable federal and state clinical treatment regulations.
- Grew clinic population size18.6% and increased revenue by introducing innovative clinical techniques.

Lexington Professional Associates, Lexington, KY                                   2007–2008
- Led interdisciplinary team in provision of outpatient treatment of substance abuse disorders As Interim Medical Director and Staff Psychiatrist.

Bowling Green Professional Associates, Bowling Green, KY                           2005–2006
- Oversaw clinical care and led interdisciplinary teams in provision of outpatient treatment of substance abuse disorders as Medical Director.

Tri-County Psychiatric Associates, Milford, MA                                     1999–2004
- Provided ongoing direct treatment for over 200 adult and geriatric patients in the community, including consultation services to physicians and surgeons at Tri-County Medical Associates.
- Taught medical student and resident physicians of University of Massachusetts.

Brockton Multi-Service Center, Brockton, MA                                        1995–1998
- Provided outpatient treatment for indigent and chronically mentally ill patients in a community mental health center setting.
- Taught Harvard Medical School resident physicians.

Brockton Multi-Service Center, Plymouth Clinical Center, Plymouth, MA              1995–1996
- Successfully positioned clinic for full accreditation as Site Medical Director, accountable for clinical turn-around in preparation for JCAHO accreditation site evaluation.

Advanced Healthcare Systems, Former Division of MSPCC, Boston, MA                  1996–1997
- Consulted to primary care physicians on assessment and treatment of patients in skilled nursing home and group home residences.

Lakes Region Mental Health Clinic, Laconia, NH                                     1994–1995
- Led multidisciplinary team in the diagnosis and treatment of adult and geriatric patients in an outpatient community mental health center setting.

## HOSPITAL EXPERIENCE & AFFILIATIONS

Madison State Hospital, Madison, IN                                                2008–2009
- Provided on-site covering physician for general adult, geriatric, and mentally retarded/developmentally disabled inpatients.

Central State Hospital, Louisville, KY                                       2004–2005; 2009
- Brought in for Locum tenens position and expanded to include additional contracts; led a multidisciplinary team in diagnosis and treatment of geriatric and medically fragile patients in both acute and sub-acute state hospital settings.
- Performed legal assessments and testimony.

Ten Broeck Hospitals, KMI and Dupont Campuses, Louisville, KY                      2005–2006
- Handled services for private practice of adult and geriatric inpatient psychiatry.

KELLY J. CLARK, MD, MBA

Tewksbury State Hospital, Tewksbury, MA                                      2000–2004
- Provided on-site covering physician for general adult, geriatric, child and adolescent units.

Milford Regional Medical Center, Milford, MA                               1999–2004
- Brought in to provide consultation-liaison services to physicians and surgeons

Marlborough Hospital, Marlborough, MA                                       1996–2004
- Provided acute inpatient care for patients with mental illnesses and/or addiction disorders.
- Supervised resident physicians and medical students during required substance abuse And clinical psychiatry rotations; provided consultation-liaison services.

Corrigan Mental Health Center, Fall River, MA                                    1999
- Led multidisciplinary treatment team in diagnosis and treatment of acutely ill adult and geriatric patients in an inpatient setting in Locum tenens position.

Portland Providence Hospital, Portland, OR                                  1998-1999
- Psychiatric Emergency Room Physician

Oregon State Hospital, Salem, OR                                            1998–1999
- Led interdisciplinary team in diagnosis and treatment if patients in a chronic state hospital setting and performed legal assessments and testimony, as needed.

Mercy Hospital d/b/a Providence Hospital, Springfield MA                    1997–1998
- On-site covering physician for adult, geriatric, child and adolescents.

Charles River Hospital West, Chicopee, MA                                   1996–1997
- On-site covering physician for general adult, geriatric, child and adolescent units.

Beverly Hospital d/b/a Bay Ridge Hospital, Lynn, MA                              1996
- Served as Locum tenens adult and geriatric inpatient physician, subsequently hired as emergency evaluation, partial hospital and intensive outpatient physician.

Lakes Region Medical Center, Laconia, NH                                    1994–1995
- Supervised emergency room evaluations, consulted to physicians and surgeons at Lakes Region General Hospital, and provided attending physician inpatient services.

Mendota Mental Health Institute, Madison, WI                                1992–1994
- On-site covering physician for maximum security penal wards, geriatric, general adult, child and adolescent units.

Milwaukee Country Mental Health Center, Milwaukee, WI                       1992–1994
- Psychiatric emergency room and on-site covering physician

## RESEARCH EXPERIENCE

University of Massachusetts – Assistant Professor of Psychiatry                2000–2004
- Participated in Phase IV multiple studies.

**KELLY J. CLARK, MD, MBA**

Woods Veteran's Medical Center – Psychopharmacology                                    1993
- Served as research assistant for initiation of Phase III trials of atypical antipsychotic agent (sertindole).

University of Wisconsin – Psychiatry/Pharmacovigilance                                  1986
- Evaluated pre-marketing and post-marketing adverse events associated with various Lithium preparations as reported to worldwide Lithium Information Center.
- Clark KJ, Jefferson JW.  Lithium Allergy. *J Clin Psychopharmacol.* 1987 Aug; 7(4):287-9.

Marquette University – Neuroscience                                                     1983
- Served as research assistant for animal studies of neural pain pathways. Performed stereotaxic cannula implants, ran noxious stimulation trials, prepared histological brain specimens, and examined for accurate anatomic placement.

Columbia University – Psychiatric Epidemiology                                          1983
- Interned for large epidemiological study of incidence and prevalence of DSM-diagnosable disorders. Performed data coding and data cleaning.

Coe College – Behavioral Psychopharmacology                                            1982
- Conducted research as Research Assistant for animal studies of learning paradigms; partnered in research design, computer programming, running animal trials, collecting and analyzing data.

**Kelly J. Clark, MD**

**May 31, 2023**

### APPENDIX C - EXPERT WITNESS DEPOSITION, HEARING, AND TRIAL APPEARANCES

<u>Commonwealth of Kentucky v. Lauren Baker</u>        2023

Case No. 21-CR-491

Expert Witness for Defense at Trial

Qualified as Expert Witness for the Defense via Daubert Hearing


<u>United States v. Jonathan Markovitch e.t al.</u>        2021

Case NO. 20-CR-60020 (Dimitrouleas)

Expert Witness for the Prosecution at Trial


<u>United States vs. Kesari</u>

District Court, Southern Distrist of West Virginia        2021

Expert Witness for the Defense at Trial


<u>United States v. Bixler (5:18-CR-00068)</u>         2020

District Court, Eastern District of Kentucky

Expert Witness for the Prosecution at Trial


<u>United States v. Ali Ahmed</u>         2020

Case No. 19-60200-CR-Moreno (Cohn)

District Court, Southern District of Florida

Expert Witness for the Prosecution at Trial


<u>United States v. Eric Snyder (9:18-CR-80111)</u>        2019

District Court, Southern District of Florida

Qualified as Expert Witness for Prosecution by Daubert Hearing


<u>United States v. Arman Abovyan, et.al.</u> (18-80122- CR- MIddlebrooks)          2018

District Court, Southern District of Florida

Expert Witness for the Prosecution at Trial


<u>Estate of Stephen Michael Frankino et al v. Charlene Lewis, St. Pater's Health</u>          2022

Montana First Judicial District Court, Lewis and Clark County

Cause No DDV-2019-782

Deposed Expert Witness for the Defense


<u>Marek Furtek and Barbara Baran v. McDermott Center, Inc d/b/a Haymarket Center</u>          2023

Case No. 19 L 002103

Circuit Court of Cook County, IL County Department, Law Division

Deposed Expert Witness for the Plaintiff

Case settled prior to trial

Kelly J. Clark, MD

February 20, 2023

**APPENDIX D - PUBLICATIONS**

Listed as cited author:

- **Buprenorphine and Pharmacy Policy.** Qato DM, Watanabe JH, Clark KJ. "Federal and State Pharmacy Regulations and Dispensing Barriers to Buprenorphine Access at Retail Pharmacies in the US". *JAMA Health Forum.* 2022;3(8):e222839. doi:10.1001/jamahealthforum.2022.283

- Waller, R. C., K. J. Clark, A. Woodruff, J. Glossa, and A. Ostrovsky. 2021. Guide for Future Directions for the Addiction and OUD Treatment Ecosystem. *NAM Perspectives.* Discussion Paper, National Academy of Medicine, Washington, DC. https://doi.org/10.31478/202104b

Examples of publications as indicated in my CV where I served as a member of writing committees, invited reviewer, or a paid consultant working on impactful meeting proceedings and documents through organizations.:

- **ASAM** "National Practice Guideline for the Treatment of Opioid Use Disorder - 2020 Focused Update" https://www.asam.org/Quality-Science/quality/2020-national-practice-guideline

- **ASAM** "Clinical Practice Guideline on Alcohol Withdrawal Management". 2020 https://www.asam.org/Quality-Science/quality/guideline-on-alcohol-withdrawal-management

- **NAM** "Medications for Opioid Use Disorder Save Lives" 2019 https://www.nap.edu/catalog/25310/medications-for-opioid-use-disorder-save-lives

- **Kentuckiana Health Collaborative** "Opioids and the Workplace: An Employer Toolkit for Supporting Prevention, Treatment, and Recovery". 2019. https://www.khcollaborative.org/wp-content/uploads/2020/04/2.0-Opioids-and-the-Workplace-FINAL-4.21.2020-1.pdf

- **SAMHSA** "TIP 63: Medications for Opioid Use Disorder" 2018. https://store.samhsa.gov/product/TIP-63-Medications-for-Opioid-Use-Disorder-Full-Document/PEP20-02-01-006

- **ASAM** "Appropriate Use of Drug Testing in Clinical Addiction Medicine", 2017 https://www.asam.org/Quality-Science/quality/drug-testing

- **Johns Hopkins Bloomberg School of Public Health: "**The Prescription Drug Epidemic: An Evidence Based Approach" http://www.jhsph.edu/research/centers-and-institutes/center-for-drug-safety-and-effectiveness/opioid-epidemic-town-hall-2015/2015-prescription-opioid-epidemic-report.pdf

- **Association of Managed Care Pharmacy Addiction Treatment Advisory Group: "**Role of Managed Care Pharmacy in Providing Access to Naloxone" and "Findings and Considerations for the Evidence-Based Use of Medications Used in the Treatment of Substance Use Disorders" http://www.amcp.org/Newsletter.aspx?id=21664

- **Substance Abuse and Mental Health Services Administration:** Buprenorphine Summit https://www.samhsa.gov/sites/default/files/proceedings_of_2014_buprenorphine_summit_030915_508.pdf

- **American Society of Addiction Medicine**: "Guidelines for the Use of Medications in the Treatment of Addiction Involving Opioid Use" http://www.asam.org/docs/default-source/practice-support/guidelines-and-consensus-docs/asam-national-practice-guideline-supplement.pdf

- **"Standards of Care for the Addiction Specialist Physician"** http://www.asam.org/docs/default-source/practice-support/quality-improvement/standards-of-care-final-design-document.pdf?sfvrsn=0

- **"Drug Testing: a White Paper of the American Society of Addiction Medicine"** https://www.cmm.com.au/files/uploads/resources/20170817102442drug-testing-a-white-paper-by-asam.pdf

# EXHIBIT E-2

REDACTED VERSION OF DOCUMENT PROPOSED TO BE

FILED UNDER SEAL L.R. 79-5.2.2(c)



**Berkeley Research Group**

# EXPERT REPORT OF
# KEVIN L. O'BRIEN, CFE, CICA, CVA, MAFF

### Prepared in the Matter of:

*TML Recovery, LLC; MMR Services, LLC; Southern California Recovery Centers Oceanside, LLC; Addiction Health Alliance, LLC; DR Recovery, Encinitas, LLC; Southern California Addiction Center, Inc.; Woman's Recovery Center, LLC; and Pacific Palms Recovery, LLC, Plaintiffs,*

*vs.*

*Cigna Corporation; Cigna Health and Life Insurance Company; Connecticut General Life Insurance Company; Cigna Behavioral Health, Inc.; Cigna Behavioral Health of California, Inc.; Cigna Health Management, Inc.; Cigna Healthcare of California, Inc.; Viant, Inc.; and MultiPlan, Inc., Defendants.*

*Case# 8:20-cv-0269-DOC-JDE*

### June 21, 2023

*Confidential*

**Berkeley Research Group, LLC.**

*TML Recovery, LLC et. al., Plaintiffs vs. Cigna Corporation et. al., Defendants*

I.      INTRODUCTION ................................................................................................................3
        *Retention* .................................................................................................................................3
        *Scope* .....................................................................................................................................3

II.     RELIANCE .......................................................................................................................4

III.    EXPERT QUALIFICATION ...........................................................................................4

IV.     COMPENSATION ...........................................................................................................7

V.      BACKGROUND ...............................................................................................................7
        *Nature of the Case* ..................................................................................................................7
        *In-Network v. OON* ...............................................................................................................8

VI.     OPINIONS AND ANALYSES .........................................................................................9

        OPINION 1: DR. BARTHWELL PROVIDES NO EVIDENCE THAT THE RATES PAID BY CIGNA FOR SUD SERVICES ARE UNREASONABLE. .................................................................................................................9

        OPINION 2: DR. BARTHWELL PROVIDES NO EVIDENCE THAT CIGNA'S BEHAVIORAL HEALTH NETWORK WAS INADEQUATE. ....................................................................................................................12

        OPINION 3: THE METHODOLOGIES CIGNA USED FOR DETERMINING THE MRC FOR OON SUD PROVIDERS APPEAR CONSERVATIVE. ...................................................................................................................13
                *Maximum Reimbursable Charge I (MRC I)* ...............................................................14
                        Outpatient Facility Claims ..........................................................................14
                        Inpatient Facility Claims .............................................................................16
                        Professional Claims ....................................................................................16
                *Maximum Reimbursable Charge II (MRC II)* .............................................................16
                        Outpatient Facility Claims ..........................................................................16
                        Inpatient Facility Claims .............................................................................18
                        Professional Claims ....................................................................................19
                *Dr. Barthwell's Assessment of MRC Methodologies* ...................................................19
        OPINION 4: THE METHODOLOGIES CIGNA USED FOR REIMBURSING OON SUD PROVIDERS ARE CONSISTENT WITH THE LANGUAGE INCLUDED IN PLAN DOCUMENTS. .......................................................................22

VII.    RESERVATION OF RIGHTS .......................................................................................23

VIII.   CONCLUSION ..............................................................................................................23

Berkeley Research Group, LLC.

*TML Recovery, LLC et. al., Plaintiffs vs. Cigna Corporation et. al., Defendants*

## I.    **INTRODUCTION**

### Retention

(1)    I, Kevin L. O'Brien, am an Executive Director with Berkeley Research Group, LLC ("BRG"). I was retained on or about May 17, 2023 by Cooley LLP ("Counsel") on behalf of Defendants Cigna Corporation, Cigna Health and Life Insurance Company, Connecticut General Life Insurance Company, Cigna Behavioral Health, Inc., Cigna Behavioral Health of California, Inc., Cigna Health Management, Inc., and Cigna Healthcare of California, Inc. (together, "Cigna Defendants") in the matter of TML Recovery, LLC; MMR Services, LLC; Southern California Recovery Centers Oceanside , LLC; Addiction Health Alliance, LLC; DR Recovery, Encinitas, LLC; Southern California Addiction Center, Inc.; Woman's Recovery Center, LLC; and Pacific Palms Recovery, LLC, Plaintiffs, vs. Cigna Corporation; Cigna Health and Life Insurance Company; Connecticut General Life Insurance Company; Cigna Behavioral Health, Inc.; Cigna Behavioral Health of California, Inc.; Cigna Health Management, Inc.; Cigna Healthcare of California, Inc., Viant, Inc.; and MultiPlan, Inc., Defendants. Throughout this report, the Plaintiffs will be referred to as "Plaintiffs" and the Cigna Defendants will be referred to as "Defendants" or "Cigna."

### Scope

(2)    I was asked to provide expert opinions related to the expert report submitted by Andrea Barthwell, MD, DFASAM ("Barthwell Report") on March 30, 2023. Based on my review of documentation and data provided in conjunction with this matter, publicly available sources, and over 35 years of healthcare, health insurance and valuation experience, I intend to render the following opinions:

- Opinion 1: Dr. Barthwell provides no evidence that the rates paid by Cigna for SUD services are unreasonable.

Berkeley Research Group, LLC.

*TML Recovery, LLC et. al., Plaintiffs vs. Cigna Corporation et. al., Defendants*

- Opinion 2: Dr. Barthwell provides no evidence that Cigna's behavioral health network was inadequate.

- Opinion 3: The methodologies Cigna used for determining the Maximum Reimbursable Charge ("MRC") for OON SUD providers appear conservative.

- Opinion 4: The methodologies Cigna used for reimbursing OON SUD providers are consistent with the language included in plan documents.

## II.      RELIANCE

(3)     In performing my analyses, I, with the assistance of BRG personnel, relied upon documentation and information provided to me by Counsel and publicly available sources. Additionally, I relied upon my over 35 years of healthcare, health insurance and valuation experience. For a detailed list of documents and information I considered in formulating my opinions included in this expert report, see **Exhibit 1**. No statement included in this expert report should be considered the rendering or offering of any legal opinion.

## III.      EXPERT QUALIFICATION

(4)     I am an Executive Director with BRG. I have over thirty-five years of experience providing complex consultative, valuation and expert services to clients and counsel in the healthcare, health insurance and pharmaceutical industries. Prior to joining BRG, I was a Managing Director with LECG, LLC; a Partner with Resolution Economics, LLC; a Managing Director with Navigant Consulting; a Senior Consultant with Ernst & Young; a Controller for Allied International Holdings Corporation; and a First Lieutenant in the United States Marine Corps.

(5)     I have extensive experience in performing financial, operational, regulatory, and valuation services for health service organizations such as hospitals, health systems, physician practices, ambulatory surgical centers, clinical laboratories, and skilled nursing facilities, among others. I have analyzed the reasonableness of projected and pro forma revenues and the underlying cost structure required to support future sales. I have determined the overall

**Berkeley Research Group, LLC.**

*TML Recovery, LLC et. al., Plaintiffs vs. Cigna Corporation et. al., Defendants*

financial health of businesses via analyzing historical financial trends and identifying major competitors.

(6)     I have extensive experience with healthcare claims reimbursement (both commercial and government sponsored programs). In my career, I have reviewed provider billing and payer claims adjudication policies, procedures, and practices. I have assessed claims data for trends related to, among other things, coding and billing patterns, utilization, and time and resource requirements.

(7)     I have been retained on numerous occasions to assist in the assessment of the reasonable value of services rendered by healthcare providers. These engagements have specifically included assessing and providing expert testimony with regards to the reasonable value of both professional and facility out-of-network ("OON") services.

(8)     I have extensive experience in conducting fair market value and commercial reasonableness assessments of various types of health service organizations, including both hospitals and physician practices. I have valued physician compensation agreements, medical directorship agreements, consulting agreements, physician practices and joint venture agreements, among others. These valuations are typically performed in conjunction with Stark and anti-kickback assessments.

(9)     I have been appointed by the Tennessee Department of Commerce and Insurance ("TDCI") on several occasions to review the operations and financial condition of managed care organizations participating in the TennCare program, Tennessee's Medicaid Managed Care program. Additionally, I was appointed to the TennCare Claims Processing Panel for the purpose of assisting providers and payers in resolving claims payment disputes and to develop and recommend policies and procedures to streamline claims submission and payment practices.

(10)     In addition to the Tennessee Medicaid Managed Care program, I have provided consultative or expert services for numerous other state Medicaid programs. Much of my

**Berkeley Research Group, LLC.**

*TML Recovery, LLC et. al., Plaintiffs vs. Cigna Corporation et. al., Defendants*

work in this regard revolved around the development and assessment of Medicaid reimbursement rates.

(11)  I have been retained on numerous occasions to review the operational, financial and regulatory systems and environments for contractors and payers associated with government sponsored programs. These programs include, among others, Medicare Fee-For-Service, Medicare Advantage, TriCare, and the Federal Employee Program.

(12)  Specific to behavioral health and substance use disorder matters, I have analyzed and reviewed the adequacy of community mental health services provided in conjunction with state Medicaid programs. I have assessed the cost benefits of providing mental health and substance use disorder services in community-based settings versus institutional settings. Additionally, I have provided expert testimony related to matters raised by realtors in conjunction with the delivery and payment of mental health and substance use disorder services. Furthermore, I have reviewed corporate compliance programs of providers of mental health and substance use disorder services for consistency with OIG guidance.

(13)  My clients have included, among others, health insurance companies, health systems, large physician groups, mental health and substance abuse providers, suppliers, pharmaceutical wholesalers, manufacturers and PBMs. Additionally, I have provided consultative services to federal and state regulatory bodies with respect to the healthcare industry. For example, I have conducted claim audits and investigations for Medicare and Medicaid fiscal agents. I have advised various state Medicaid programs on reimbursement matters and I have consulted on the establishment of risk corridors and fraud and abuse protocol for the Medicare Part D program.

(14)  I have a Master in Health Services Administration, a Master of Science in Systems Management and a Bachelor of Arts in Accounting. I am a Certified Valuation Analyst ("CVA"), Certified Fraud Examiner ("CFE"), Certified Internal Controls Auditor, ("CICA") and a Master Analyst in Financial Forensics ("MAFF"). I am a member of the National Association of Certified Valuation Analysts, American Health Lawyers Association, American College of Healthcare Executives, Healthcare Financial

*Confidential*

Berkeley Research Group, LLC.

*TML Recovery, LLC et. al., Plaintiffs vs. Cigna Corporation et. al., Defendants*

Management Association, Association of Certified Fraud Examiners, American Bar Association – Health Law Section, The Institute for Internal Controls, Health Care Compliance Association, and Medical Group Management Association, among other organizations.

(15)  I have been qualified as a healthcare financial, operational, and regulatory expert in federal and state courts. Additionally, I have provided expert testimony in conjunction with arbitrations and public hearings. A copy of my full Curriculum Vitae containing the information required by Federal Rule 26(a)(2)(B)(iv) and (v) is attached as ***Exhibit 2.***

## IV.   <u>COMPENSATION</u>

(16)  BRG is being compensated for the actual hours I incur at my hourly rate. My current hourly rate is $850. In addition to my time, BRG is also billing for the actual time that other members of BRG's staff spend on this matter at hourly rates ranging from $250 to $725. Additionally, BRG is being reimbursed for external project-related expenses (e.g., datasets, reports, copy services, travel, meals, services of outside vendors) incurred in connection with this matter. The reimbursement of the fees and expenses associated with my retention are not contingent on the outcome of this matter.

## V.   <u>BACKGROUND</u>

### Nature of the Case

(17)  This case relates to the provision and reimbursement of substance use disorder ("SUD") and laboratory ("Lab") services by the Plaintiffs, who do not participate in Cigna's networks, to members of plans administered or insured by Cigna entities. These providers are referred to as out-of-network ("OON") providers. Specifically, Plaintiffs provided SUD treatment including residential detoxification and residential treatment ("RTC"), partial hospitalization ("PHP"), intensive outpatient ("IOP"), and other outpatient ("OP") services including treatment planning, counseling and behavioral therapies, therapy, medication management, case management services, and laboratory services to members of Cigna

**Berkeley Research Group, LLC.**

*TML Recovery, LLC et. al., Plaintiffs vs. Cigna Corporation et. al., Defendants*

---

plans.[1] I understand from Counsel that the following of Plaintiffs' claims remain at issue in this action:

- Claims for Plan Benefits Under ERISA, 29 U.S.C. §1132(a)(1)(B);

- Breach of Written Contract (Non-ERISA Plans); and

- Promissory Estoppel.[2]

**In-Network v. OON**

(18)   As previously stated, Plaintiffs in this matter were non-participating or OON providers with Cigna. Generally, Plaintiffs did not have a contract with Cigna defining the rate of reimbursement Cigna would allow for services rendered by Plaintiffs to Cigna members for the claims at issue here.[3, 4]

(19)   Differences exist between in-network and OON providers. In-network providers are generally reimbursed for covered services as described in plan documents based on the financial terms outlined in Participating Provider Agreements ("PPA"). Negotiated rates usually reimburse the providers at significantly less than the providers' billed charges. Conversely, OON providers, like the Plaintiffs, are often reimbursed amounts determined by the payer after the application of each member's out of network plan benefits.

---

[1] It is my understanding the vast majority of claims at issue in this matter are outpatient.

[2] Consolidated Second Amended Complaint.

[3] Consolidated Second Amended Complaint, ¶22.

[4] It is my understanding certain claims at issue in this matter were reimbursed subject to the terms of single case rate agreements.

Berkeley Research Group, LLC.

*TML Recovery, LLC et. al., Plaintiffs vs. Cigna Corporation et. al., Defendants*

## VI.   <u>OPINIONS AND ANALYSES</u>

***Opinion 1: Dr. Barthwell provides no evidence that the rates paid by Cigna for SUD services are unreasonable.***

(20)   Based on my review of Dr. Barthwell's Report, I have determined that she dedicates the majority of her report to providing an overview of how addiction and SUD are treated and funded in the US. She focuses on the clinical aspects of addiction and the impact of public policy on treatment. Specifically, she defines addiction and the principles of addiction treatment; she discusses how treatment may be delivered in inpatient, outpatient, and residential settings; she refers to the American Society of Addiction Medicine (ASAM) guidelines and criteria for the placement, continued stay, transfer, or discharge of patients with addiction and co-occurring conditions; and she addresses how recovery is best achieved. Additionally, she provides comments on access to care and funding, the SUD and drug poisoning crisis, as well as SUD reform efforts.

(21)   While clinical and policy issues related to addiction are important, they provide limited insight into the reasonableness of the OON rates paid. Throughout her report, Dr. Barthwell makes several references to Cigna's OON reimbursement amounts and methods used by Cigna in deriving those amounts. Based on my review of her report, Dr. Barthwell's understanding of Cigna's OON methodologies appears, in part, to be based on information included on Cigna's website as opposed to language included in plan documents.[5] She specifically opines as follows:

- Opinion 1: "Cigna implemented policies and systematic practices that emphasized profits over patients and resulted in the under-reimbursement of Plaintiffs' claims, with Cigna instead paying Plaintiffs an arbitrary, nominal percentage of the charges, far below a reasonable and customary rate."[6]
- Opinion 2: "There is no Medicare rate for inpatient or outpatient SUD services billed by residential treatment facilities such as Plaintiffs, and Cigna and MultiPlan's ███████████████████████

---

[5] Barthwell Report, p. 21.
[6] Barthwell Report, p. 25.

**Berkeley Research Group, LLC.**

*TML Recovery, LLC et. al., Plaintiffs vs. Cigna Corporation et. al., Defendants*

████████████████████████████████████████████ is arbitrary and unreasonable."[7]

- Opinion 3: "Despite Cigna's payment obligations under the sample patients' SPDs, Cigna and MultiPlan used biased data systems, administrative burdens, and deceptive practices to avoid paying, or to pay unreasonably low reimbursement rates for Plaintiffs' OON SUD services."[8]

- Opinion 4: 

(22)   Additional comments regarding Cigna OON reimbursement amounts can be found on page 21 of her report where she states that "Cigna paid Plaintiffs a nominal percentage of the charges for the claims that are at issue."[10] She states that "Cigna and MultiPlan's repricing methodologies are premised upon Medicare charge and reimbursement data, skewing the reimbursement rates lower."[11] Furthermore, on page 25 of her report, she states:[12]

> Cigna and MultiPlan's repricing methodologies and reimbursement rates are premised upon Medicare data purchased by Cigna and MultiPlan that they use to produce arbitrary, unreliable and unjust reimbursement rates for Plaintiffs' SUD services that are a nominal percentage of the charges and far from Plaintiffs' usual, reasonable and customary charges.

(23)   I have seen no reference to an analysis conducted by Dr. Barthwell that would support her allegation that the rates paid by Cigna to the Plaintiffs were unreasonable. She inappropriately discusses the "arbitrary, nominal percentage of the charges" because she does not put the concept of provider charges in perspective.

---

[7] Barthwell Report, p. 26.
[8] Barthwell Report, p. 27.
[9] Barthwell Report, p. 28.
[10] Barthwell Report, p. 21.
[11] Barthwell Report, p. 21.
[12] Barthwell Report, p. 25.

Berkeley Research Group, LLC.

*TML Recovery, LLC et. al., Plaintiffs vs. Cigna Corporation et. al., Defendants*

(24)     Gross charges are the non-discounted fees charged for all services provided before any contractual, charitable, courtesy, bad debt, or other adjustments. "Charges (or list prices) face little constraint from market forces and tend to be extremely high relative to objectively reasonable prices."[13] As such, these unregulated list prices are often arbitrary and can vary significantly across providers, even for the same exact service. Gross charges are typically significantly higher than what the provider accepts as reimbursement for their services and therefore are relatively meaningless in the context of revenue generation. Based on my experience, the methods used to establish charges are unregulated and charges are unilaterally determined by the provider.

(25)     Depicted below is a table of frequently billed Healthcare Common Procedure Coding System (HCPCS)[14] codes on Plaintiffs' claims in this matter. Significant variation exists amongst the Plaintiffs' charges. For example, for CPT 82075, the provider with the highest charge of $300 charges three times more than the provider with the lowest charge of $100. Based on my experience, it is unlikely that the cost of this service for the higher charging provider is three times greater than the cost associated with the lower charging provider. The top three HCPCS codes included below represent approximately 70% of the records included in Cigna's Claim Report.[15]

| Service Code | Description | Records | Minimum Charge | Maximum Charge |
|---|---|---|---|---|
| 82075 | Alcohol (ethanol); breath | 2,418 | $ 102 | $ 300 |
| H0015 | Alcohol and/or drug services; intensive outpatient | 1,405 | $ 1,709 | $ 2,875 |
| 90853 | Group psychotherapy | 754 | $ 850 | $ 1,709 |

---

[13] https://www.brookings.edu/wp-content/uploads/2019/02/Adler_et-al_State-Approaches-to-Mitigating-Surprise-Billing-2019.pdf

[14] "HCPCS is divided into two subsystems, Level I and Level II. Level I is comprised of Current Procedural Terminology® codes (HCPT). HCPT codes consist of five numeric digits. […] Level II HCPCS codes identify products, supplies, and services not included in CPT. Level II codes consist of a letter followed by four numeric digits. Current Dental Terminology codes are included in the Level II codes as HCDT." (https://www.nlm.nih.gov/research/umls/sourcereleasedocs/current/HCPCS/index.html#)

[15] Cigna_TML00195700 – 195708.

**Berkeley Research Group, LLC.**

*TML Recovery, LLC et. al., Plaintiffs vs. Cigna Corporation et. al., Defendants*

---

(26)     Dr. Barthwell appears to be suggesting a provider who receives an allowed amount that is a smaller percentage of their billed charge is being treated less reasonably than a provider whose allowed amount as a percent of their billed charge is higher. Without analyzing both the numerator (allowed amount) and denominator (charge) used to calculate the percent of billed charge, one cannot draw this conclusion. For example, if two providers bill $1,000 and $2,000 for the same service and Cigna pays each $500, one is getting 50% of billed charges and the other 25% of billed charge, even though Cigna allowed the same amount for the same service. Therefore, I see no basis for her opinion.

***Opinion 2: Dr. Barthwell provides no evidence that Cigna's behavioral health network was inadequate.***

(27)     Dr. Barthwell appears to be suggesting, without citation to any evidence, that Cigna's behavioral healthcare network of providers was inadequate.[16] Similar to the discussion above regarding Cigna's reimbursement of OON SUD services, Dr. Barthwell provides no analysis to support this allegation. I have reviewed several Cigna behavioral health geo-availability reports for the years 2014 through 2020.[17] Nothing in these reports would suggest Cigna's behavioral healthcare network was materially inadequate. Per the geo-availability reports, the vast number of Cigna's behavioral health network goals had been consistently achieved. This finding appears consistent with the testimony of Lauren Neu, Network Compliance and Reporting Manager at Cigna. For example, Ms. Neu testifies as follows:[18]

> Q. Okay. And what do these reports show in terms of -- well, strike that. Other than distance requirements, are there other standards reflected in these reports?
> A. For the state of California, there are also time requirements, and those are reflected.
> Q. What do those reports tell you?

---

[16] Barthwell Report, p. 3.

[17] Cigna_TML00198370 - Cigna_TML00198371, Cigna_TML00198372 - Cigna_TML00198373, Cigna_TML00198415 - Cigna_TML00198430, Cigna_TML00198374 - Cigna_TML00198388, Cigna_TML00198431 - Cigna_TML00198452.

[18] Deposition Testimony of Lauren Neu dated March 15, 2023, p. 14:16-25.

Berkeley Research Group, LLC.

*TML Recovery, LLC et. al., Plaintiffs vs. Cigna Corporation et. al., Defendants*

A. Those reports tell me that in the state of California, we did not have any network adequacy issues for the time period being reviewed.

Additionally, she testified as follows:[19]

Q. Has anyone complained to you about the inadequacy of network providers of substance use disorder treatment?
A. No.

I have seen no evidence in the record and Dr. Barthwell provides no evidence that would suggest that Cigna's network was materially deficient. Therefore, I see no basis for her opinion.

***Opinion 3: The methodologies Cigna used for determining the MRC for OON SUD providers appear conservative.***

(28)   Cigna employs specific reimbursement methodologies and a cost containment program that it has developed to establish and/or negotiate reimbursement rates with OON providers that can result in reduced member out-of-pocket costs by reducing member cost share and by eliminating balance billing.[20] Unlike Dr. Barthwell's use of information included on Cigna's website to obtain an understanding of Cigna's reimbursement methodologies, I obtained my understanding of the MRC methodologies based on my review of exemplar plan documents provided in this matter as well as an interview with Wendy Gompper on May 25, 2023. Based on my over 35 years of experience, payers such as Cigna should reimburse providers for services rendered consistent with the language included in the plan documents and participating provider agreements, if applicable.

(29)   It is my understanding that two reimbursement methodologies are at issue in this case: Maximum Reimbursable Charge I ("MRC I") and Maximum Reimbursable Charge II ("MRC II"). The existence of one of these reimbursement methodologies in a member's

---

[19] Deposition Testimony of Lauren Neu dated March 15, 2023, p. 30:3-6.

[20] Balance billing is the process by which a provider bills a patient for the difference between the provider's billed charge and the plan's allowed amount.

**Berkeley Research Group, LLC.**

*TML Recovery, LLC et. al., Plaintiffs vs. Cigna Corporation et. al., Defendants*

plan benefits is identified by language in the plan that describes the MRC program elected by the plans.

(30)   Under the MRC I methodology, the reimbursement rate is calculated based on a percentile of charges made by providers of such service in the geographic area where the service is received. The percentile used is defined by the plan sponsor. As previously discussed, provider gross charges are typically higher than amounts providers accept from payers and often have no relationship to cost. As such, reimbursement amounts based on charges are likely conservative, resulting in higher reimbursement amounts to Plaintiffs.

(31)   The MRC II methodology establishes the MRC based on a methodology similar to a methodology utilized by Medicare to determine the allowable fee for similar services within the geographic market. Under this approach, a specific multiple, chosen by the plan sponsor, is applied to the appropriate Medicare rate to obtain the MRC. As will be discussed below, it is my understanding that when the application of this methodology requires the identification of a Medicare-like service, ████████████████████ ████████████████████ The specific processes that are followed and reimbursement calculations for each type of OON claim under MRC I and MRC II are described below.

**Maximum Reimbursable Charge I (MRC I)**

<u>**Outpatient Facility Claims**</u>

(32)   Outpatient facility claims include IOP, PHP as well as other outpatient services such as individual and group therapy. Outpatient claims are submitted by institutional healthcare providers such as hospitals and RTCs and do not include an overnight stay or room and board. Providers submit claims to Cigna and ████████████████████████ ████████████████████████████████████████.[21]

---

[21] MultiPlan provides support services to healthcare payers, including claims repricing, network access and analytics services (https://www.multiplan.us/company/#).

**Berkeley Research Group, LLC.**

*TML Recovery, LLC et. al., Plaintiffs vs. Cigna Corporation et. al., Defendants*

(33)   As stated above, each plan sponsor who chooses the MRC I reimbursement methodology under its benefit plan(s) must choose a percentile (such as the 50th, 80th or another percentile level), which is used to establish the MRC amount. If a plan sponsor elects not to participate in Cigna's cost containment programs, the claim is reimbursed at the MRC amount. █████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

(34)   When MultiPlan or another one of Cigna's third-party OON claims processing vendors[23] receives an outpatient claim from Cigna, it initiates the processes for establishing ██

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████ Claims may also be subject to offer-and-settlement negotiations whereby a vendor determines the offer amount and returns the claim to Cigna for processing.[25]

---

[22] It is my understanding from Counsel, for most of the relevant time period, the proprietary database used is the Viant OPR database.

[23] Deposition Transcript of 30(b)(6) Terri Cothron dated March 31, 2023, pp. 19:22-25.

[24] ████████████████████████████████████████████████████

████████████████████████████████████████████

[25] Deposition Transcript of 30(b)(6) Terri Cothron dated March 31, 2023, pp. 28:10 – 29:4.

*Confidential*

**Berkeley Research Group, LLC.**

*TML Recovery, LLC et. al., Plaintiffs vs. Cigna Corporation et. al., Defendants*

### Inpatient Facility Claims

(35)   For plans that include cost containment provisions, the process for reimbursement of
inpatient claims is similar to outpatient claims. The primary difference between processing
inpatient and outpatient OON claims is that ██████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████

### Professional Claims

(36)   Cigna uses FAIR Health's charge database to establish the "target price" for OON
professional claims. FAIR Health collects and aggregates data from health plans across the
U.S. For those plans that elected to participate in the cost containment program, claims are
then routed to MultiPlan. If cost containment efforts are unsuccessful or if a plan does not
participate in cost containment, the claims are paid at the MRC which is calculated by
identifying the plan-specific percentile of the FAIR Health billed charges for the same
service (identified by billing code) for the same geographic area.

**Maximum Reimbursable Charge II (MRC II)[26]**

### Outpatient Facility Claims

(37)   For plans where the plan sponsor has chosen to participate in Cigna's cost containment
programs, outpatient facility claims are submitted by providers and routed ultimately to
MultiPlan as described previously. In addition, ████████████████████████

---

[26] It is my understanding that Cigna commenced using MRC II in 2008.

**Berkeley Research Group, LLC.**

*TML Recovery, LLC et. al., Plaintiffs vs. Cigna Corporation et. al., Defendants*

(38) ███████████████████████████████████

In 2015, Cigna implemented a process regarding OON reimbursement of certain outpatient SUD services. ███████████████████████████

███████████████████████████████ While the Medicare program covers many of the individual services provided in an IOP, such as individual and group therapy, there is currently no per diem rate within the Medicare fee schedules designated for IOP.[27]

[28]

---

[27] Medicare will begin covering IOP services in 2024 (https://www.kff.org/medicare/issue-brief/faqs-on-mental-health-and-substance-use-disorder-coverage-in-medicare/).

[28] I understand that Dr. Kelly Clark will opine as to the clinical aspects of this "cross-walk" method of calculating reimbursement rates. However, I note that the individual services provided within PHP and IOP programs are the same, but PHP is considered a higher level of care because the services are provided for a greater number of hours during a week or month compared to IOP (https://www.kff.org/medicare/issue-brief/faqs-on-mental-health-and-substance-use-disorder-coverage-in-medicare/).

*Highlighted Information Designated* **Confidential - Attorneys' Eyes Only**

**Berkeley Research Group, LLC.**

*TML Recovery, LLC et. al., Plaintiffs vs. Cigna Corporation et. al., Defendants*

| Billed Code | Description | ▮ | ▮ | ▮ |
|---|---|---|---|---|
| **H0015** | Alcohol and/or drug services; intensive outpatient (treatment program that operates at least 3 hours/day and at least 3 days/week and is based on an individualized treatment plan), including assessment, counseling; crisis intervention, and activity therapies or education | | | |
| **H0018** | Behavioral health; short term residential (non-hospital residential treatment program), without room and board, per diem | | | |
| **H0035** | Mental health partial hospitalization, treatment, less than 24 hour | | | |
| **H2036** | Alcohol and/or other drug treatment program, per diem | | | |
| **S0201** | Partial hospitalization services, less than 24 hours, per diem | | | |

### Inpatient Facility Claims

(39)   Inpatient facility claims are reimbursed using the same general process as described above for outpatient facility claims. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

(40)   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

*Highlighted Information Designated* **Confidential - Attorneys' Eyes Only**

**Berkeley Research Group, LLC.**

*TML Recovery, LLC et. al., Plaintiffs vs. Cigna Corporation et. al., Defendants*



### **Professional Claims**

(41)   Professional claims are reimbursed using the same process described above. Medicare reimburses for professional services using the Medicare Physician Fee Schedule ("MPFS"). Under the MPFS, services identified by CPT codes, including SUD services, are assigned a fee based on the resources required to provide the service, including physician work time, practice expense and malpractice expense. These fees are also adjusted for differences in labor costs across geographic areas. When Cigna receives a professional claim, ███████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████

### **Dr. Barthwell's Assessment of MRC Methodologies**

(42)   Dr. Barthwell appears to take issue with the use of Medicare in assessing the Maximum Reimbursable Charges (MRC). For example, on page 25 of Dr. Barthwell's report, she states "Plaintiffs are not Medicare providers and there is no Medicare rate for SUD treatment facilities such as Plaintiffs'; ████████████████████████████████████ ██████████████████████████████████,"[30, 31, 32] Based on my experience, the use of Medicare as a benchmark in analyzing commercial reimbursement rates is common.

---

[29] Cigna licenses Medicare data from Optum.

[30] Barthwell Report, p. 25.

[31] Contrary to Dr. Barthwell's opinion that PHP provided at a psychiatric hospital is unrelated to services provided at Plaintiff facilities, TRICARE covers services similar to those provided by the Plaintiffs in this case such as freestanding PHP, IOP, and RTC. To reimburse for non-hospital-based PHP or IOP services, TRICARE reimburses based on "prospectively determined, all-inclusive per diem rates." The per diem amount is based on a percentage of the psychiatric hospital inpatient per diem amount (https://manuals.health.mil/pages/DisplayManualHtmlFile/2022-12-05/AsOf/TRT5/C7S2.html). "TRICARE is the uniformed services health care program for active duty service members (ADSMs), active duty family members (ADFMs), National Guard and Reserve members and their family members, retirees and retiree family members, survivors, and certain former spouses worldwide." (https://www.tricare.mil/Plans/New).

[32] Based on information provided by Wendy Gompper, it is my understanding ████████████████████ ████████████████████████████████████

Berkeley Research Group, LLC.

*TML Recovery, LLC et. al., Plaintiffs vs. Cigna Corporation et. al., Defendants*

(43)  Medicare is one of the largest payers of health care services in the United States. In establishing the rates used by Medicare to compensate providers, the rates paid by Medicare are intended to cover the costs associated with the economic and efficient delivery of health care services. MedPAC outlines the goals of tying compensation to estimates of cost, explaining that "[r]ates set to cover the costs of relatively efficient providers help create fiscal pressure on all providers to control their costs."[33] Consequently, Medicare rates are reflective of, in addition to the clinical nature of the service, the resources required to provide the service and therefore often used as a proxy for cost for benchmarking purposes.

(44)  Medicare rates are also used for benchmarking because robust data related to amounts reimbursed by Medicare is easily accessible. For example, numerous files are publicly available that would allow interested parties the ability to calculate Medicare allowed amounts as well as files containing historical provider claims information.[34] Furthermore, based on my experience, providers and payers frequently have system capabilities to calculate estimates of Medicare allowed amounts for comparability and benchmarking purposes.

(45)  The use of a multiple or percentage of Medicare for benchmarking purposes can reduce the impact of unilaterally set charges by a provider when assessing rates. As discussed previously, it is well known throughout the industry and apparent from my over 35 years of health care experience that provider charges are meaningless and often have no relationship to cost. Additionally, researchers routinely use Medicare in conducting their

---

[33] MedPAC Report to the Congress: Medicare Payment Policy, March 2019 (https://www.medpac.gov/wp-content/uploads/import_data/scrape_files/docs/default-source/reports/mar19_medpac_entirereport_sec_rev.pdf) at p. 52.

[34] *See*, for example, CMS IPPS rate calculation files (https://www.cms.gov/medicare/acute-inpatient-pps/fy-2021-ipps-final-rule-home-page), CMS IPPS Web Pricer (https://www.cms.gov/ipps-webpricer), CMS OPPS rate calculation files (https://www.cms.gov/medicaremedicare-fee-service-paymenthospitaloutpatientppsannual-policy-files/2021), CMS OPPS Pricer Code (https://www.cms.gov/OPPS-PricerCode), and CMS Standard Analytical Files (Medicare claims) (https://www.cms.gov/Research-Statistics-Data-and-Systems/Files-for-Order/LimitedDataSets/StandardAnalyticalFiles), CMS Physician Fee Schedule (https://www.cms.gov/medicare/medicare-fee-for-service-payment/physicianfeesched), and CMS Physician Fee Schedule Look-up Tool (https://www.cms.gov/medicare/medicare-fee-for-service-payment/pfslookup).

*Confidential*

**Berkeley Research Group, LLC.**

*TML Recovery, LLC et. al., Plaintiffs vs. Cigna Corporation et. al., Defendants*

studies;[35] state and federal programs, policies, and plans often reference Medicare;[36] and commercial rates, to include rates associated with SUD services,[37] are frequently determined as a multiple or percent of Medicare.[38]

(46)   Dr. Barthwell also appears to dispute the similarity of the services used by Cigna in deriving the MRC in conjunction with the adjudication of the Plaintiffs' claims. It is my understanding Counsel has retained Dr. Kelly Clark who will opine that when it is necessary for ████████████████████████████████████████████████ ████████████████████████████████████████ This is consistent with testimony provided in this matter. Dr. Doug Nemecek (Medical Managing Director at Cigna) testified as follows:[39, 40]

> Q: When -- when Cigna ██████████████ that are actually billed by the healthcare provider to -- to find a █████████████████████████████████ ████████████████████████████████████████████████ ███████████████

---

[35] *See*, for example, How Much More Than Medicare Do Private Insurers Pay? A Review of the Literature (https://www.kff.org/medicare/issue-brief/how-much-more-than-medicare-do-private-insurers-pay-a-review-of-the-literature/), The Prices That Commercial Health Insurers and Medicare Pay for Hospitals' and Physicians' Services (https://www.cbo.gov/system/files/2022-01/57422-medical-prices.pdf), and Addiction and mental health vs. physical health: Widening disparities in network use and provider reimbursement (https://www.milliman.com/en/insight/addiction-and-mental-health-vs-physical-health-widening-disparities-in-network-use-and-p).

[36] See, for example, 45 CFR § 147.138 - Patient protections (https://www.law.cornell.edu/cfr/text/45/147.138), NASHP How Oregon is Limiting Hospital Payments and Cost Growth For State Employee Health Plans (https://www.nashp.org/how-oregon-is-limiting-hospital-payments-and-cost-growth-for-state-employee-health-plans/), NASHP Independent Analysis: Estimating the Impact of Reference-Based Hospital Pricing on the Montana State Employee Plan (https://nashp.org/independent-analysis-estimating-the-impact-of-reference-based-hospital-pricing-on-the-montana-state-employee-plan/), and HealthAffairs: Cascade Select: Insights From Washington's Public Option (https://www.healthaffairs.org/do/10.1377/forefront.20210819.347789/)

[37] https://www.bipc.com/assets/PDFs/Presentations/Presentation-Healthcare_Symposium-P2-Addiction_Treatment_Providers-20190116.pdf.

[38] Researchers have found evidence that payers often use contracts tied to Medicare rates in negotiating contracts with providers. See Cooper et al. "The Price Ain't Right? Hospital Prices and Health Spending on the Privately Insured, pp. 22-23 and p. 25 (https://www.nber.org/system/files/working_papers/w21815/w21815.pdf).

[39] Deposition Transcript of 30(b)(6) Doug Nemecek dated February 24, 2023, pp. 98:19 – 99:4.

[40] Deposition Transcript of 30(b)(6) Doug Nemecek dated February 24, 2023, p. 254:4-16.

**Berkeley Research Group, LLC.**

*TML Recovery, LLC et. al., Plaintiffs vs. Cigna Corporation et. al., Defendants*

Q: Right. And there's one for IOP. So why would you want to bill it at a PHP or a residential treatment code to avoid paying the billed charge?
A: ███████████████████████████████████████████████████████
████████████████████████████████████████████████

Furthermore, Wendy Gompper (Provider Contracting Director at Cigna) testified as follows:[41]



(47)    In addition to the above, in Opinion 3 of the Barthwell Report, she appears to be alleging that the datasets used by Cigna and Multiplan are biased. Similar to the allegations Dr. Barthwell raises with regard to unreasonable reimbursement rates and inadequate provider networks, she again provides no evidence or support that she actually analyzed these datasets. Therefore, I see no basis for her opinion.

***Opinion 4: The methodologies Cigna used for reimbursing OON SUD providers are consistent with the language included in plan documents.***

(48)    I have reviewed plan documents related to 12 patients who were treated by one of the Plaintiffs in this matter. These SPDs address the methodologies used by Cigna in determining the MRC associated with OON services. Generally, the methodologies are as follows: [42]

---

[41] Deposition Transcript of 30(b)(6) Wendy Gompper dated March 28, 2023, p. 114:11 - 115:1.

[42] *See*, for example, CignaTML00004370.

*Highlighted Information Designated* **Confidential - Attorneys' Eyes Only**

Berkeley Research Group, LLC.

*TML Recovery, LLC et. al., Plaintiffs vs. Cigna Corporation et. al., Defendants*

- "A percentage of a schedule that [Cigna has] developed that is based upon a methodology similar to a methodology utilized by Medicare to determine the allowable fee for similar services within the geographic market[,]"

- "the provider's normal charge for a similar service or supply[,]" or

- A certain "percentile of charges made by providers of such service or supply in the geographic area where it is received as compiled in a database selected by the Insurance Company."

Based on my review of the MRC language included above referenced plan documents, it is my opinion that the language is consistent with my understanding of the methodologies used by Cigna in determining MRCs. For a detailed summary of my review of the SPDs, see ***Exhibit 3***.

## VII.   <u>RESERVATION OF RIGHTS</u>

(49)   I reserve the right to modify this report if I receive additional information from Counsel, through testimony of other experts, or any other source not available as of the date of this report.

## VIII.   <u>CONCLUSION</u>

(50)   Based on the review of documents and analyses described throughout this report and on my over 35 years of healthcare and health insurance experience, I have formed the following conclusions to a reasonable degree of professional certainty:

- Opinion 1: Dr. Barthwell provides no evidence that the rates paid by Cigna for SUD services are unreasonable.

- Opinion 2: Dr. Barthwell provides no evidence that Cigna's behavioral health network was inadequate.

**Berkeley Research Group, LLC.**

*TML Recovery, LLC et. al., Plaintiffs vs. Cigna Corporation et. al., Defendants*

- Opinion 3: The methodologies Cigna used for determining the MRC for OON SUD providers appear conservative.

- Opinion 4: The methodologies Cigna used for reimbursing OON SUD providers are consistent with the language included in plan documents.

Respectfully Submitted by:

Kevin L. O'Brien
Executive Director

*Confidential*

# Exhibit 1



**TML Recovery, et. al v. Cigna**

Exhibit 1 - Materials Considered

| File Name / Bates |
| --- |
| Consolidated Second Amended Complaint |
| Report of Andrea G. Barthwell, MD, DFASAM dated March 30, 2023 |
| Cigna's Memorandum of Points and Authorities in Support of Motion for Summary Judgment on Plaintiffs' Claims and Partial Summary Judgment on Cigna's Counterclaims |
| Deposition Transcript of 30(b)(6) Wendy Gompper dated March 28, 2023 |
| Deposition Transcript of 30(b)(6) Lauren Neu dated March 15, 2023 |
| Deposition Transcript of 30(b)(6) Doug Nemecek dated February 24, 2023, pp. 94-101,147-148, 151-155, 253-255 |
| Deposition Transcript of 30(b)(6) Mike Callahan dated March 1, 2023, pp. 16-33, 38-61, 64-69, 70, 73, 77-79, 80-81, 85-87, 120-132, 135-145, 148-153, 160-161, 175-178 |
| Deposition Transcript of 30(b)(6) Terri Cothron dated March 31, 2023, pp. 18-21, 27-33 |
| Interview with Wendy Gompper on May 25, 2023 |
| Cigna_TML00000159-Cigna_TML00000239 |
| Cigna_TML00000243-Cigna_TML00000324 |
| Cigna_TML00001256-Cigna_TML00001268 |
| Cigna_TML00004358-Cigna_TML00004414 |
| Cigna_TML00004621-Cigna_TML00004677 |
| Cigna_TML00009917-Cigna_TML00009993 |
| Cigna_TML00009994-Cigna_TML00009996 |
| Cigna_TML00010220-Cigna_TML00010299 |
| Cigna_TML00010703-Cigna_TML00010766 |
| Cigna_TML00013513-Cigna_TML00013515 |
| Cigna_TML00013516-Cigna_TML00013576 |
| Cigna_TML00013587-Cigna_TML00013594 |
| Cigna_TML00014354-Cigna_TML00014430 |
| Cigna_TML00014431-Cigna_TML00014433 |
| Cigna_TML00020399-Cigna_TML00020468 |
| Cigna_TML00023160-Cigna_TML00023228 |
| Cigna_TML00026671-Cigna_TML00026678 |
| Cigna_TML00026679-Cinga_TML00026727 |
| Cigna_TML00030998-Cigna_TML00031453 |
| Cigna_TML00039223-Cigna_TML00039358 |
| Cigna_TML00044644-Cigna_TML00044683 |
| Cigna_TML00070765-Cigna_TML00070806 |
| Cigna_TML00071384-Cigna_TML00071450 |
| Cigna_TML00073410-Cigna_TML00073451 |
| Cigna_TML00073655-Cigna_TML00073657 |
| Cigna_TML00073658-Cigna_TML00074005 |
| Cigna_TML00077739-Cigna_TML00077742 |
| Cigna_TML00077743-Cigna_TML00077746 |
| Cigna_TML00077747-Cigna_TML00077750 |
| Cigna_TML00077751-Cigna_TML00077754 |
| Cigna_TML00077755-Cigna_TML00077758 |
| Cigna_TML00077759_Cigna_TML00077762 |
| Cigna_TML00077763-Cigna_TML00077766 |
| Cigna_TML00077767-Cigna_TML00077770 |
| Cigna_TML00077771-Cigna_TML00077774 |
| Cigna_TML00077775-Cigna_TML00077778 |
| Cigna_TML00077779-Cigna_TML00077782 |
| Cigna_TML00077783-Cigna_TML00077786 |
| Cigna_TML00077787-Cigna_TML00077790 |

*Confidential*



**TML Recovery, et. al v. Cigna**

Exhibit 1 - Materials Considered

| File Name / Bates |
|---|
| Cigna_TML00077791-Cigna_TML00077794 |
| Cigna_TML00077795-Cigna_TML00077798 |
| Cigna_TML00077799-Cigna_TML00077802 |
| Cigna_TML00077803-Cigna_TML00077806 |
| Cigna_TML00078035-Cigna_TML00078038 |
| Cigna_TML00078039-Cigna_TML00078042 |
| Cigna_TML00078043-Cigna_TML00078046 |
| Cigna_TML00078047-Cigna_TML00078050 |
| Cigna_TML00078051-Cigna_TML00078054 |
| Cigna_TML00078055-Cigna_TML00078058 |
| Cigna_TML00078059-Cigna_TML00078062 |
| Cigna_TML00078063-Cigna_TML00078066 |
| Cigna_TML00078067-Cigna_TML00078070 |
| Cigna_TML00078071-Cigna_TML00078086 |
| Cigna_TML00078087-Cigna_TML00078090 |
| Cigna_TML00078091-Cigna_TML00078094 |
| Cigna_TML00078095-Cigna_TML00078098 |
| Cigna_TML00078099-Cigna_TML00078102 |
| Cigna_TML00078103-Cigna_TML00078106 |
| Cigna_TML00078107-Cigna_TML00078110 |
| Cigna_TML00078111-Cigna_TML00078114 |
| Cigna_TML00078115-Cigna_TML00078118 |
| Cigna_TML00078119-Cigna_TML00078122 |
| Cigna_TML00078123-Cigna_TML00078126 |
| Cigna_TML00089403-Cigna_TML00090240 |
| Cigna_TML00096274-Cigna_TML00096357 |
| Cigna_TML00096474-Cigna_TML00096589 |
| Cigna_TML00114815-Cigna_TML00114916 |
| Cigna_TML00114931-Cigna_TML00115762 |
| Cigna_TML00116020-Cigna_TML00116033 |
| Cigna_TML00120755-Cigna_TML00120776 |
| Cigna_TML00120777-Cigna_TML00120815 |
| Cigna_TML00124157-Cigna_TML00124174 |
| Cigna_TML00124213-Cigna_TML00124229 |
| Cigna_TML00124308-Cigna_TML00124330 |
| Cigna_TML00125770-Cigna_TML00125972 |
| Cigna_TML00128437-Cigna_TML00128764 |
| Cigna_TML00154054-Cigna_TML00154057 |
| Cigna_TML00161659-Cigna_TML00161662 |
| Cigna_TML00162865-Cigna_TML00162868 |
| Cigna_TML00171620-Cigna_TML00171787 |
| Cigna_TML00172045-Cigna_TML00172065 |
| Cigna_TML00182905-Cigna_TML00182908 |
| Cigna_TML00183400-Cigna_TML00183403 |
| Cigna_TML00195700-Cigna_TML00195708 |
| Cigna_TML00196499-Cigna_TML00196646 |
| Cigna_TML00198370-Cigna_TML00198371 |
| Cigna_TML00198372-Cigna_TML00198373 |
| Cigna_TML00198374-Cigna_TML00198388 |
| Cigna_TML00198389-Cigna_TML00198389 |
| Cigna_TML00198390-Cigna_TML00198414 |



**TML Recovery, et. al v. Cigna**

Exhibit 1 - Materials Considered

| File Name / Bates |
| --- |
| Cigna_TML00198415-Cigna_TML00198430 |
| Cigna_TML00198431-Cigna_TML00198452 |
| Cigna_TML00198453-Cigna_TML00198453 |
| Cigna_TML00198454-Cigna_TML00198465 |
| MPI_Cigna0004157 |
| https://manuals.health.mil/pages/DisplayManualHtmlFile/2022-12-05/AsOf/TRT5/C7S2.html |
| https://www.ama-assn.org/sites/ama-assn.org/files/corp/media-browser/public/about-ama/councils/Council%20Reports/council-on-medical-service/a09-cms-hospital-charges.pdf |
| https://www.bipc.com/assets/PDFs/Presentations/Presentation-Healthcare_Symposium-P2-Addiction_Treatment_Providers-20190116.pdf |
| https://www.brookings.edu/wp-content/uploads/2019/02/Adler_et-al_State-Approaches-to-Mitigating-Surprise-Billing-2019.pdf |
| https://www.cbo.gov/system/files/2022-01/57422-medical-prices.pdf |
| https://www.cms.gov/ipps-webpricer |
| https://www.cms.gov/medicare/acute-inpatient-pps/fy-2021-ipps-final-rule-home-page |
| https://www.cms.gov/medicare/medicare-fee-for-service-payment/pfslookup |
| https://www.cms.gov/medicare/medicare-fee-for-service-payment/physicianfeesched |
| https://www.cms.gov/medicaremedicare-fee-service-paymenthospitaloutpatientppsannual-policy-files/2021 |
| https://www.cms.gov/OPPS-PricerCode |
| https://www.cms.gov/outreach-and-education/medicare-learning-network-mln/mlnmattersarticles/downloads/se1604.pdf |
| https://www.cms.gov/Research-Statistics-Data-and-Systems/Files-for-Order/LimitedDataSets/StandardAnalyticalFiles |
| https://www.health.mil/Military-Health-Topics/Access-Cost-Quality-and-Safety/TRICARE-Health-Plan/Rates-and-Reimbursement/MHSUD-Facility-Rates |
| https://www.healthaffairs.org/do/10.1377/forefront.20210819.347789/ |
| https://www.kff.org/medicare/issue-brief/faqs-on-mental-health-and-substance-use-disorder-coverage-in-medicare/ |
| https://www.kff.org/medicare/issue-brief/how-much-more-than-medicare-do-private-insurers-pay-a-review-of-the-literature/ |
| https://www.law.cornell.edu/cfr/text/45/147.138 |
| https://www.medpac.gov/wp-content/uploads/2021/11/MedPAC_Payment_Basics_22_psych_FINAL_SEC.pdf |
| https://www.medpac.gov/wp-content/uploads/import_data/scrape_files/docs/default-source/reports/mar19_medpac_entirereport_sec_rev.pdf |
| https://www.milliman.com/en/insight/addiction-and-mental-health-vs-physical-health-widening-disparities-in-network-use-and-p |
| https://www.multiplan.us/company/# |
| https://www.nashp.org/how-oregon-is-limiting-hospital-payments-and-cost-growth-for-state-employee-health-plans/ |
| https://www.nashp.org/new-analysis-finds-montana-has-saved-millions-by-moving-hospital-rate-negotiations-to-reference-based-pricing/ |
| https://www.nber.org/system/files/working_papers/w21815/w21815.pdf |
| https://www.nlm.nih.gov/research/umls/sourcereleasedocs/current/HCPCS/index.html# |
| https://www.tricare.mil/Plans/New |

*Confidential*

# Exhibit 2

**Curriculum Vitae**



**KEVIN L. O'BRIEN**

BERKELEY RESEARCH GROUP, LLC

70 West Madison, Suite 5000 | Chicago, IL 60602

Direct: 312.429.7901

Mobile: 615.300.4790

kobrien@thinkbrg.com

## SUMMARY

Mr. O'Brien is an executive director and co-founder of Berkeley Research Group, LLC (BRG) specializing in accounting, financial, economic, operational and regulatory consulting services to a variety of industries including healthcare, health insurance and pharmaceuticals. Prior to joining BRG, Mr. O'Brien was a managing director with LECG, LLC, a partner with Resolution Economics, LLC, and a managing director with Navigant Consulting, Inc. He was also a Senior Consultant at Ernst & Whinney, a Controller at Allied International Holdings Corporation and a First Lieutenant in the United States Marine Corps.

Mr. O'Brien has extensive experience with healthcare reimbursement methodologies and processes including, among others, Medicare, Medicaid, Tricare, commercial and private pay insurance products. He has assisted providers and payors with the financial and operational aspects of contracting. For example, he has developed detailed financial models related to contract terms and conditions and has advised payors and providers of the potential impact of the contract on organizational profitability. Additionally, he has assessed contract terms in conjunction with operational and compliance requirements.

Mr. O'Brien's engagements have included assisting with the development of the Medicaid reimbursement manual for the State of Pennsylvania, defining economic and efficient payors and providers of healthcare services, as well as assessing the reasonableness and accuracy of the Medicaid budgets and the reimbursement methodologies for numerous states. He was appointed by the Tennessee Department of Commerce and Insurance ("TDCI") on several occasions to review the operations and financial condition of managed care organizations participating in the TennCare program, Tennessee's Medicaid Managed Care program. Additionally, he was appointed to the TennCare Claims Processing Panel for the purpose of assisting providers and payors in resolving claims payment disputes and to develop and recommend policies and procedures to streamline claims submission and payment practices. He has provided consultative or expert services for numerous other State Medicaid programs. Much of his work in this regard revolved around the development and assessment of Medicaid reimbursement rates and allowable costs.

Mr. O'Brien has been engaged in numerous matters involving behavioral health providers. These engagements have included, among others, assessing compliance with the provision of care outlined in the individualized plans of care. He has assisted clients and counsel in analyzing Condition of Participation and Condition of Payment requirements relative to government sponsored programs. Further, he has performed statistically valid claim audits and has conducted financial analyses in conjunction with behavioral health contracting. Additionally, Mr. O'Brien has analyzed and reviewed the adequacy of community mental health services provided in conjunction with state Medicaid programs. Mr. O'Brien has assessed the cost benefits of providing mental health and substance use disorder services in community-based settings versus institutional settings. Additionally, he has provided expert testimony related to matters raised by realtors in conjunction with the delivery and payment of mental health and substance use disorder services. Furthermore, he has reviewed corporate compliance programs of providers of mental health and substance use disorder services for consistency with OIG guidance.



Mr. O'Brien's engagements have included a review of the financial condition and operational aspects of numerous payors (i.e., Government, Commercial, Workers Compensation and Self-Insured Plans) and other Health Service Organizations (HSOs). These HSOs have included hospitals, skilled nursing facilities, assisted living facilities, continuing care retirement centers, physician practices, durable medical equipment companies, pharmacy benefit management companies and many others. If applicable, these engagements involved the comprehensive review of each HSO's contracting, claims/billing processing, finance, medical review and utilization review, provider relations, customer service, contracting and member services departments, among others. These engagements included numerous interviews with regulators, HSO personnel and other constituencies. The completion of these projects resulted in the development of corrective action plans and other forms of written reports and Expert testimony.

Mr. O'Brien has extensive experience in analyzing the solvency of numerous organizations including those involved in the healthcare industry. He has reviewed the financial condition of companies in determining the organization's ability to continue as a "going concern." He has assessed the company's capability to pay its current obligations as they become due. This analysis includes, among others, determining the organization's debt and equity structure, calculating current ratios, quick ratios, asset turnover ratios, inventory turnover ratios, days in accounts payable, days in accounts receivable, days' cash on hand, etc. Mr. O'Brien has advised on issues relating to restatement of the assets and liabilities of various entities to represent their fair values. These analyses were performed in conjunction with determining whether the entity's liabilities exceed its assets. Additionally, he has quantified the value of certain assets assuming a liquidation sale. Much of this work has been performed in conjunction with reviewing various debtors' plans of reorganization. In this regard, Mr. O'Brien has provided Expert testimony in Federal Bankruptcy court.

Mr. O'Brien has performed patient origin studies and competitive analyses. He has performed market share analyses, demand studies and has defined the primary service area and secondary service area for multiple healthcare clients. Additionally, Mr. O'Brien has calculated and analyzed multiple claims for lost profits and business interruption resulting from casualty losses. He has analyzed the reasonableness of projected and pro forma revenues and the underlying cost structure required to support future sales. Mr. O'Brien has determined the overall financial health of businesses. His experience includes the valuation of numerous businesses utilizing the asset, market, and income approaches. He is familiar with the pertinent differences between the markets for closely held and publicly traded companies. He has estimated the market-required rate of return on equity, the beta for closely held stocks and discount rates for overall capital.

Mr. O'Brien is experienced in conducting fair market value and commercial reasonableness assessments of financial relationships between physicians and health service organizations including physician compensation agreements across numerous specialties. He has performed fair market value and commercial reasonableness assessments for numerous healthcare clients and has assessed, among others, medical directorship agreements, physician on-call coverage arrangements, key opinion leader speaker agreements, and joint venture agreements. These valuations are often performed in conjunction with Stark and anti-kickback assessments.

Mr. O'Brien has provided cost management advice to the healthcare and pharmaceutical industries in such areas as strategic planning and resizing. He has prepared financial feasibility and debt capacity studies for the construction and renovation of acute care multi-facility systems, psychiatric hospitals, skilled nursing facilities, intermediate care facilities, continuing care retirement centers, adult congregate living facilities, outpatient diagnostic centers and emergency room facilities. He has performed valuations in conjunction with physician joint ventures, mergers, acquisitions, leveraged buyouts and pharmaceutical products and failed product launches.

In the area of managed care, Mr. O'Brien has developed and monitored financial and operational budgets for health maintenance organizations (HMOs), hospitals, independent practice associations (IPAs), pharmacy benefit management (PBM) and pharmaceutical organizations, among others. He has performed systems reviews and implementations and has recommended changes in internal control resulting in improved

2



operational efficiencies and safeguards over plan and program assets.  He has also performed contract reviews, rate setting, profit improvement, and operations studies to identify the reasons for lack of profit and determine means of improving profits or eliminating losses.

Mr. O'Brien is experienced in matters involving healthcare related claims (both insurance, such as Blue Cross/Blue Shield and government paid programs), benefit determinations, rate setting and operational efficiencies.  These engagements have included both contract compliance, operational reviews, financial reviews and special investigations and have involved issues related to claims and correspondence processing and cost charging.

Analyses of claims and benefit processing activities have considered such issues as the accuracy and timeliness of claims processing, payment edits and audits, coordination of benefits (e.g., Medicare Secondary Payor), refunds, discounts, duplicate payments, etc.  Additionally, Mr. O'Brien has extensive knowledge of the Chief Financial Officers' Act and the Federal Managers' Financial Integrity Act, as well as the General Accounting Office's "Standards for Internal Control in the Federal Government."  He has performed reviews related to operations efficiency, accounting for financial transactions, management reporting, cash management reconciliations and controls over Trust Funds.  He is familiar with the procedures used to identify instances of beneficiary and provider fraud.  In addition, he has analyzed contractor performance and transaction processing in the context of that agency's performance measurement standards, as well as evaluated the results of those performance measurements in the context of his findings on internal controls and procedures.

Several of Mr. O'Brien's claims and health benefit engagements have required a detailed understanding of the Employee Retirement Income Security Act of 1974 (ERISA).  For example, he has reviewed employee benefit structures, assessed the responsibilities and duties of plan sponsors and plan administrators and reviewed summary plan descriptions (SPD), summary of material modifications (SMM) and Form 5500s, among others.  Additionally, Mr. O'Brien has assisted with issues related to adverse benefit determinations and has ascertained the characteristics of fully-insured products versus self-funded plans.  He has testified on damages matters arising as a result of alleged ERISA violations.

Mr. O'Brien has lectured to Medicare contractors, insurance companies and large health systems on the topics of internal control compliance reviews, fraud and abuse and the claims adjudication process.  He has led teams which created large claim databases from files downloaded from the intermediaries'/carriers' claims and client computer systems.  These databases were then used to perform both substantive testing and as the source for statistically developed samples which were used to perform compliance testing.  Sampling plans were developed, populations were analyzed to determine how they should be stratified, statistically valid samples were drawn, detailed transactions within the sample tested and results of testing summarized and evaluated to determine extrapolation to the underlying population.  He has also analyzed the cost of program administration for reasonableness, contractual allowability and allocability.  He has provided recommendations resulting in improved effectiveness and efficiency.  Mr. O'Brien and his staff have also assisted management in the development of corrective action plans and the monitoring and measuring of performance against those plans.  Mr. O'Brien has also assisted clients and counsel through formal and written presentation of the team's findings to government investigators and other personnel.

Mr. O'Brien has extensive experience in healthcare corporate compliance. He has been retained on numerous occasions to design, review, implement, and test the effectiveness of corporate compliance programs. He has performed these services in conjunction with hospitals and health systems, large physician groups, and entities responsible for administering the government sponsored programs. Mr. O'Brien has worked in the capacity of an Independent Review Organization ("IRO") on several occasions and has worked closely with clients and regulatory bodies on matters involving alleged health care fraud, waste, and abuse.

In the area of pharmaceuticals, Mr. O'Brien has provided consulting and expert services to manufacturers, distributors, re-packagers, wholesalers, retailers, pharmacy benefit management (PBM) companies and various regulatory bodies.   He has assessed various pricing strategies, rebate formulae and inventory tracking

3



methodologies. Specifically, Mr. O'Brien has analyzed pharmaceutical product markets, valued pharmaceutical products in conjunction with co-promotion agreements and performed compliance, internal control, and operational reviews of numerous pharmaceutical clients.

Mr. O'Brien has experience with the Medicare Part D drug program enacted as part of the Medicare Prescription Drug, Improvement and Modernization Act (MMA) of 2003. He has worked with contractors to the Centers for Medicare and Medicaid Services (CMS) in developing "risk corridors" for Part D plans and has drafted portions of the Part D fraud and abuse manual.

Mr. O'Brien's experience in product pricing includes an understanding of several pricing methods, such as AWP, AMP, ASP, WAC, MAC, Best Price, FAMP, and FSS. He has experience with the Medicaid Drug Rebate Program.

Mr. O'Brien has provided litigation support services and Expert testimony in conjunction with numerous healthcare, health insurance and pharmaceutical class action matters. Specifically, he has analyzed data in conjunction with class certification motions. These analyses have assessed Rule 23(a) requirements and the plaintiff's ability to demonstrate numerosity, commonality and typicality. Also, he has prepared and reviewed class action damage calculations.

Mr. O'Brien has advised counsel and clients in the areas of investigative accounting, reconstruction of events, damages modeling of business transactions, business fact-finding relative to the issues in dispute and transaction tracing. In the area of special purpose investigations, Mr. O'Brien has addressed the impact of mismanagement, as well as personal use and/or loss of corporate assets via fraud or criminal activities. The results of this work have led to expedited settlement of disputed issues and claims against directors and officers.

Mr. O'Brien has prepared sensitivity analyses and alternative damage calculations by identifying critical assumptions included in the damage calculation. These analyses have address liability issues and have addressed issues relating to the reasonableness of alleged damages.

Mr. O'Brien has substantial systems experience. Specifically, Mr. O'Brien was responsible for financial statement preparation, general ledger accounting and system design and implementation while assistant controller for a property and casualty insurance company. Mr. O'Brien has performed detailed needs analysis, identified feasible hardware and software alternatives, developed evaluation criteria, selected system requirements, performed system implementations and provided post implementation monitoring. These implementations have included insurance premium quotation systems, loss-reserving modules, automated claims processing, general ledger packages and accounts receivable and accounts payable subsidiary ledgers. Additionally, Mr. O'Brien has performed internal controls and compliance reviews and has recommended changes resulting in improved effectiveness and efficiency.

**EDUCATION**

MHSA (Health Service Administration)          Saint Joseph's College of Maine, 2001

MS (Systems Management)                       University of Southern California, 1986

BS (Accounting)                               Michigan State University, 1982

**CERTIFICATIONS**

Certified Fraud Examiner

Certified Internal Controls Auditor



Certified Valuation Analyst

Master Analyst in Financial Forensics


**EMPLOYMENT HISTORY**

Berkeley Research Group, LLC

    Executive Director & Co-Founder, 2018-Present

    Ex-Officio Member Board of Directors, 2018-Present

    Board of Directors, 2014-2017

    Managing Director & Co-Founder, 2010-2017


LECG, LLC; Economics and Finance

    Managing Director, 2009-2010


Resolution Economics, LLC

    Partner, 2008–2009


LECG, LLC; Economics and Finance

    Managing Director, 2002-2008


Peterson Consulting, a unit of Navigant Consulting, Inc.

    Partner, 1989-2002


Ernst & Whinney

    Senior Consultant, 1987-1989


Allied International Holdings Corporation

    Controller, 1986-1987


United States Marine Corps

    Disbursing Officer, Agent to the United States Treasury, 1983-1986



## OVERSIGHT POSITIONS

### Court Appointed Consultant to the Creditors Committee – Granada Hills Community Hospital Los Angeles

Provided oversight responsibility related to activities conducted by the Debtor and Debtor Consultants. Responsibilities included cash controls, contracting, accounts receivable, accounts payable, fixed assets, etc.  Guidance as to the plan of reorganization was provided to the committee members.

### Supervisor Xantus Healthplan of Tennessee, Inc.

Appointed by the Tennessee Department of Commerce and Insurance (TDCI) to provide operational and financial oversight of a 160,000 Medicaid Managed Care Organization and assisted the rehabilitator in developing strategies, controls and plans related to a voluntary rehabilitation.

### Lead Examiner – Access MedPlus

Appointed by the Tennessee Department of Commerce and Insurance to lead and conduct financial and operational reviews of a 300,000+ member managed care organization.

### TennCare Claims Processing Panel

Appointed as a participant to the TennCare Claims processing panel by the Deputy Chief of TDCI to assist in resolving disputes between payors and providers of healthcare services.

### Independent Review Organization – Alpha Respiratory, Inc.

Appointed to oversee compliance with the terms and conditions of certain aspects of the Corporate Integrity Agreement.

### Independent Review Organization – Lincare Holdings, Inc.

Appointed to oversee compliance with the terms and conditions of certain aspects of the Corporate Integrity Agreement.

### Independent Review Organization – Orlando Regional Healthcare Systems, Inc.

Appointed to oversee compliance with the terms and conditions of certain aspects of the Corporate Integrity Agreement.

6

**BRG**
Berkeley Research Group

## RECENT TESTIMONY EXPERIENCE

**Private Confidential Arbitration**

Hospital System, Claimant vs. Insurance Company, Respondent.

Deposition Testimony

January 13, 2023

Hearing Testimony

January 26, 2023

**Case No. 1:17-cv-00419-RGA**

United States of America and the State of Delaware ex rel. Ronald Sherman, Plaintiffs v. Christiana Care Health Services, Inc., Christiana Care Health System, Christiana Hospital, and Wilmington Hospital, Defendants.

Deposition Testimony

December 20, 2022

**Consolidated Case Nos. 01-18-0003-7424, 01-18-0001-5134, and 01-18-0001-6915**

In the Matter of and Among, UnitedHealthcare Insurance Company, Envision Healthcare Corporation and Sheridan Healthcorp, Inc.

Deposition Testimony

August 30, 2022

Hearing Testimony

October 4, 2022

February 22, 2023

**Case No. 1:19-cv-01031-MSN-TCB**

Plymouth County Retirement System and Oklahoma Police Pension and Retirement System, Individually and On Behalf of All Others Similarly Situated, Plaintiffs, v. Evolent Health, Inc., Frank Williams, Nicholas McGrane, and Seth Blackley, Defendants.

Deposition Testimony

June 22, 2022

**Case No. 5:17-CV-00600-J**

Emergency Services of Oklahoma, PC, Oklahoma Emergency Services, PC, Emergency Services of Mid-America, PC, and South Central Emergency Services, PC, Plaintiffs, v. Aetna Health Inc., Aetna Health Insurance Company, and Aetna Life Insurance Company, Defendants.

Deposition Testimony

October 22, 2021

7



**Civil Action No. 2:12-cv-00145**

United States of America, ex rel. J. William Bookwalter, III, M.D., Robert J. Sclabassi, M.D., and Anna Mitina v. UPMC; UPP, Inc. d/b/a UPP Department of Neurosurgery.

Deposition Testimony

September 15, 2021

**Case No. 01-19-0000-5262**

St. Elizabeth's Hospital of the Hospital Sisters of the Third Order of St. Francis and Harmony Health Plan, Inc.

Deposition Testimony

September 3, 2020

**Case No. 4:17-CV-492-KGB**

Southeastern Emergency Physicians, LLC v. Arkansas Health & Wellness Health Plan, Inc.; Celtic Insurance Company d/b/a Arkansas Health & Wellness Insurance Company; Novasys Health, Inc.; and Centene Corporation

Deposition Testimony

May 13, 2020

August 3, 2020

**In Re Opioid Litigation, 400000/2017**

Relating to Case Nos. County of Suffolk, 400001/2017; County of Nassau, 400008/2017; and New York State, 400016/2018

Deposition Testimony

March 5, 2020

**Case No. 25CI1:17-cv-00465-WLK**

Southeastern Emergency Physicians LLC, and ACS Emergency Services of Mississippi, Professional Association v. Ambetter of Magnolia, Inc.

Deposition Testimony

February 28, 2020

**Case No. 18cv1456**

MSP Recovery Claims, Series LLC et al v. AIX Specialty Insurance Company

Deposition Testimony

December 9, 2019

**BRG**
Berkeley Research Group

Civil Action No. 3:16-CV-622-CWR-FKB

United States of America v. The State of Mississippi

Deposition Testimony

December 18, 2018

Trial Testimony

June 14, 2019

## PRESENTATIONS AND PUBLICATIONS

"Best Practices for Lawyers and Experts in Health Care Fraud Investigations, Self-Reporting, and Lawsuits." American Health Lawyers Association. September 2018.

"Three Day Rule for Outpatient Services" (with Russell T. Manns), Atlantic Information Services, Inc. Washington, D.C. Copyright 1999

"What a Compliance Officer Should Know about the New HIPAA Regulations" (with Tri MacDonald), Today's Corporate Compliance for the Health Care Professional, an HCCA Publication. Volume two Number five; May 2000

"Tackling the New HIPAA Regulations" Back to Basics, June 2000

"Acquiring an HSO: A Guide to Determining the Value of Health Care Entities" (with Cherie M. Fieri), Managed Care Law Strategist, Law Journal Newsletters. October 2001

"The Valuation of Healthcare Entities: A Three Step Process" Expert Insight Inc. Magazine. October 2001

## PROFESSIONAL AFFILIATIONS

American Bar Association – Health Law Section

American College of Healthcare Executives

American Health Lawyers Association

America's Health Insurance Plans

American Institute of Healthcare Compliance

Association of Certified Fraud Examiners

Health Care Compliance Association

Health Care Financial Management Association

Hillsborough County Bar Association

The Institute for Internal Controls

Medical Group Management Association

National Association of Certified Valuation Analysts

Radiology Business Management Association

Exhibit 3

**Exhibit 3 - Summary of Relevant Plan Language for Exemplar Patients**

| Member | Provider | MRC Methodology | Out-of-Network Reimbursement Methodology Language | Provisions Regarding Cost Sharing | Document Name / Bates |
|---|---|---|---|---|---|
| C.C. | SCAC | MRC II<br><br>Medicare based | **Maximum Reimbursable Charge (p. 13)**<br><br>Maximum Reimbursable Charge is determined based on the lesser of the provider's normal charge for a similar service or supply; or<br>A percentage of a schedule that we have developed that is based upon a methodology similar to a methodology utilized by Medicare to determine the allowable fee for similar services within the geographic market. In some cases, a Medicare based schedule will not be used and the Maximum Reimbursable Charge for covered services is determined based on the lesser of:<br>• the provider's normal charge for a similar service or supply; or<br>• the 80th percentile of charges made by providers of such service or supply in the geographic area where it is received as compiled in a database selected by the Insurance Company.<br><br>**Maximum Reimbursable Charge – Medical (p. 54)**<br>The Maximum Reimbursable Charge for covered services is determined based on the lesser of:<br>• the provider's normal charge for a similar service or supply; or<br>• a policyholder-selected percentage of a schedule developed by Cigna that is based upon a methodology similar to a methodology utilized by Medicare to determine the allowable fee for the same or similar service within the geographic market.<br>The percentage used to determine the Maximum Reimbursable Charge is listed in The Schedule.<br>In some cases, a Medicare based schedule will not be used and the Maximum Reimbursable Charge for covered services is determined based on the lesser of:<br>• the provider's normal charge for a similar service or supply; or | The provider may bill you for the difference between the provider's normal charge and the Maximum Reimbursable Charge in addition to applicable deductibles and coinsurance. **(p. 13)**<br><br>Some providers forgive or waive the cost share obligation (e.g. your deductible and/or coinsurance) that this plan requires you to pay. Waiver of your required cost share obligation can jeopardize your coverage under this plan. For more details, see the Exclusions Section. **(p.13)**<br><br>**Exclusions and Expenses Not Covered (p.32)**<br>"…charges which you are not obligated to pay or for which you are not billed or for which you would not have been billed except that they were covered under this plan. For example, if Cigna determines that a provider is or has waived, reduced, or forgiven any portion of its charges and/or any portion of copayment, deductible, and/or coinsurance amount(s) you are required to pay for a Covered Service (as shown on the Schedule) without Cigna's express consent, then Cigna in its sole discretion shall have the right to deny the payment of benefits in connection with the Covered Service, or reduce the benefits in proportion to the amount of the copayment, deductible, and/or coinsurance amounts waived, forgiven or reduced, regardless of whether the provider represents that you remain responsible for any amounts that your plan does not cover. In the exercise of that discretion, Cigna shall have the right to require you to provide proof sufficient to Cigna that you have made your required cost share payment(s) prior to the payment of any benefits by Cigna. This exclusion includes, but is not limited to, charges of a Non-Participating Provider who has agreed to charge you or charged you at an in-network benefits level or | SPD 2017-05.pdf<br><br>Cigna_TML00004358-Cigna_TML00004414 |

1

**Exhibit 3 - Summary of Relevant Plan Language for Exemplar Patients**

| Member | Provider | MRC Methodology | Out-of-Network Reimbursement Methodology Language | Provisions Regarding Cost Sharing | Document Name / Bates |
|---|---|---|---|---|---|
| | | | • the 80th percentile of charges made by providers of such service or supply in the geographic area where it is received as compiled in a database selected by Cigna.<br><br>The Maximum Reimbursable Charge is subject to all other benefit limitations and applicable coding and payment methodologies determined by Cigna. Additional information about how Cigna determines the Maximum Reimbursable Charge is available upon request.<br><br>**Policyholder selected percentage: 110% (p. 13)** | some other benefits level not otherwise applicable to the services received. | |
| C.S. | DRR | MRC I<br><br>Percentile of charge database | **Maximum Reimbursable Charge (p.16)**<br>Maximum Reimbursable Charge is determined based on the lesser of the provider's normal charge for a similar service or supply; or<br><br>A percentile of charges made by providers of such service or supply in the geographic area where the service is received. These charges are compiled in a database Cigna has selected. If sufficient charge data is unavailable in the database for that geographic area to determine the Maximum Reimbursable Charge, then state, regional or national charge data may be used. If sufficient charge data is unavailable in the database for that geographic area to determine the Maximum Reimbursable Charge, then data in the database for similar services may be used.<br><br>**Maximum Reimbursable Charge – Medical (p. 69)**<br>The Maximum Reimbursable Charge for covered services is determined based on the lesser of:<br><br>• the provider's normal charge for a similar service or supply; or<br>• a policyholder-selected percentile of charges made by providers of such service or supply in the | The provider may bill you for the difference between the provider's normal charge and the Maximum Reimbursable Charge, in addition to applicable deductibles and coinsurance. **(p. 16)**<br><br>Some providers forgive or waive the cost share obligation (e.g. your deductible and/or coinsurance) that this plan requires you to pay. Waiver of your required cost share obligation can jeopardize your coverage under this plan. For more details, see the Exclusions Section. **(p.16)** | 2019 SPD-3337318 – Children's Medical Center of Dallas.pdf<br><br>Cigna_TML00014354-Cigna_TML00014430 |

2

**Exhibit 3 - Summary of Relevant Plan Language for Exemplar Patients**

| Member | Provider | MRC Methodology | Out-of-Network Reimbursement Methodology Language | Provisions Regarding Cost Sharing | Document Name / Bates |
|---|---|---|---|---|---|
| | | | geographic area where it is received as compiled in a database selected by Cigna. If sufficient charge data is unavailable in the database for that geographic area to determine the Maximum Reimbursable Charge, then state, regional or national charge data may be used. If sufficient charge data is unavailable in the database for that geographic area to determine the Maximum Reimbursable Charge, then data in the database for similar services may be used.<br><br>The percentile used to determine the Maximum Reimbursable Charge is listed in The Schedule.<br><br>The Maximum Reimbursable Charge is subject to all other benefit limitations and applicable coding and payment methodologies determined by Cigna. Additional information about how Cigna determines the Maximum Reimbursable Charge is available upon request.<br><br>**Policyholder-selected percentile: 80th percentile (p.16)** | | |
| D.M. | TML | MRC II<br><br>Medicare based | Reimbursement for non-emergency charges by an out-of-network provider is limited to the Plan's Maximum Reimbursable Charge and is subject to an additional out-of-network deductible, coinsurance and out-of-pocket maximum as outlined in the Appendix. **(p.8)**<br><br>**Maximum Reimbursable Charge (p.8)**<br>The Plan bases reimbursement for benefits and deductible and out-of-pocket maximum accumulations on the maximum reimbursable charge for any covered out-of-network services or supplies you receive. The maximum reimbursable charge is determined by Cigna, the Plan's claims administrator. | The provider may bill you the difference between the provider's normal charge and the maximum reimbursable charge as determined by the benefit plan, in addition to applicable deductible and coinsurance. **(p. 8)** | SPD. Pdf<br><br>Cigna_TML00026679-Cigna_TML00026727 |

3

**Exhibit 3 - Summary of Relevant Plan Language for Exemplar Patients**

| Member | Provider | MRC Methodology | Out-of-Network Reimbursement Methodology Language | Provisions Regarding Cost Sharing | Document Name / Bates |
|---|---|---|---|---|---|
| | | | The maximum reimbursable charge is based on the lesser of:<br>• The provider's normal charge for a similar service or supply; or<br>• A percentage (150%) of a fee schedule developed by Cigna that is based on a methodology similar to one used by Medicare to determine the allowable fee for the same or similar service in a geographic area.<br><br>If the above fee schedule is not used, the maximum reimbursable charge for covered services is determined based on the lesser of:<br>• The provider's normal charge for a similar service or supply; or<br>• A percentile of charges made by providers for the same service or supply in the geographic area where the service in question was received. Cigna compiles the information needed to make this determination. | | |
| Mic. C. | TML | MRC I<br><br>Percentile of charge database | **Maximum Reimbursable Charge (p.13)**<br>Maximum Reimbursable Charge is determined based on the lesser of the provider's normal charge for a similar service or supply; or<br>A percentile of charges made by providers of such service or supply in the geographic area where the service is received. These charges are compiled in a database we have selected.<br><br>**Maximum Reimbursable Charge – Medical (p.54)**<br>The Maximum Reimbursable Charge for covered services is determined based on the lesser of:<br>• the provider's normal charge for a similar service or supply; or<br>• a policyholder-selected percentile of charges made by providers of such service or supply in the geographic area where it is received as compiled in a database selected by Cigna. | The provider may bill you for the difference between the provider's normal charge and the Maximum Reimbursable Charge, in addition to applicable deductibles, copayments and coinsurance. **(p.13)**<br><br>Some providers forgive or waive the cost share obligation (e.g. your copayment, deductible and/or coinsurance) that this plan requires you to pay. Waiver of your required cost share obligation can jeopardize your coverage under this plan. For more details, see the Exclusions Section. **(p.13)**<br><br>**Exclusions and Expenses Not Covered (p.31)**<br>Additional coverage limitations determined by plan or provider type are shown in the Schedule. Payment for the following is specifically excluded from this plan:<br>• charges which you are not obligated to pay or for which you are not billed or for which you would | SPD 2016-04.pdf<br><br>Cigna_TML00004621-Cigna_TML00004677 |

CONFIDENTIAL

**Exhibit 3 - Summary of Relevant Plan Language for Exemplar Patients**

| Member | Provider | MRC Methodology | Out-of-Network Reimbursement Methodology Language | Provisions Regarding Cost Sharing | Document Name / Bates |
|---|---|---|---|---|---|
| | | | The percentile used to determine the Maximum Reimbursable Charge is listed in The Schedule.<br><br>The Maximum Reimbursable Charge is subject to all other benefit limitations and applicable coding and payment methodologies determined by Cigna. Additional information about how Cigna determines the Maximum Reimbursable Charge is available upon request.<br><br>**Policyholder-selected percentile of charges: 80th (p.13)** | not have been billed except that they were covered under this plan. For example, if Cigna determines that a provider is or has waived, reduced, or forgiven any portion of its charges and/or any portion of copayment, deductible, and/or coinsurance amount(s) you are required to pay for a Covered Service (as shown on the Schedule) without Cigna's express consent, then Cigna in its sole discretion shall have the right to deny the payment of benefits in connection with the Covered Service, or reduce the benefits in proportion to the amount of the copayment, deductible, and/or coinsurance amounts waived, forgiven or reduced, regardless of whether the provider represents that you remain responsible for any amounts that your plan does not cover. In the exercise of that discretion, Cigna shall have the right to require you to provide proof sufficient to Cigna that you have made your required cost share payment(s) prior to the payment of any benefits by Cigna. This exclusion includes, but is not limited to, charges of a Non-Participating Provider who has agreed to charge you or charged you at an in-network benefits level or some other benefits level not otherwise applicable to the services received. | |
| Mit. C. | TML | MRC II<br><br>Medicare based | Out-of-network claims are subject to the maximum reimbursable charge. **(p.B-9)**<br><br>**Maximum Reimbursable Charge (B-24)**<br>Maximum reimbursable charges (sometimes called the reasonable and customary amount) are charges that are within the normal range of fees as determined by Cigna below. They are used when there is no negotiated discounted rate available. Reimbursement for expenses incurred when you don't use a network provider is based on the maximum reimbursable charge for the treatment or service you receive. | If your provider charges more than the maximum reimbursable charge as determined by Cigna, you will be responsible for paying the additional amount. These additional amounts will not count toward your deductible or your out-of-pocket limit. You may want to discuss charges that are above the maximum reimbursable charge with your doctor or hospital to be certain that the bill is correct and complete**. (p.B-24-25)** | SPD 2015.pdf<br><br>Cigna_TML00020399-Cigna_TML00020468 |

CONFIDENTIAL

**Exhibit 3 - Summary of Relevant Plan Language for Exemplar Patients**

| Member | Provider | MRC Methodology | Out-of-Network Reimbursement Methodology Language | Provisions Regarding Cost Sharing | Document Name / Bates |
|---|---|---|---|---|---|
| | | | Maximum reimbursable charge limits do not apply to network charges since network providers have agreed to already reduced fees for their services. You pay a share of these pre-negotiated fees.<br><br>The maximum reimbursable charge is determined based on the lesser of:<br>• The provider's normal charge for a similar service or supply; or<br>• **200% of a fee schedule developed by CIGNA** that is based upon a methodology similar to the methodology utilized by Medicare to determine the allowable fee for the same or similar service within the geographic market.<br>Note: In some cases, a Medicare based fee schedule will not be used and the maximum reimbursable charge for covered services is determined based on the lesser of:<br>    • The provider's normal charge for a similar service or supply; or<br>    • The charges made by 80% of the providers of such service or supply in the geographic area where it is received as compiled in a database selected by CIGNA. | | |
| N. A-G. | PPR | MRC II<br><br>Medicare based | **Maximum Reimbursable Charge (p.17)**<br>Maximum Reimbursable Charge is determined based on the lesser of the provider's normal charge for a similar service or supply; or<br>A percentage of a schedule that we have developed that is based upon a methodology similar to a methodology utilized by Medicare to determine the allowable fee for similar services within the geographic market. In some cases, a Medicare based schedule will not be used and the Maximum Reimbursable Charge for covered services is determined based on the lesser of: | The provider may bill you for the difference between the provider's normal charge and the Maximum Reimbursable Charge, in addition to applicable deductibles and coinsurance. **(p.17)**<br><br>Some providers forgive or waive the cost share obligation (e.g. your deductible and/or coinsurance) that this plan requires you to pay. Waiver of your required cost share obligation can jeopardize your coverage under this plan. For more details, see the Exclusions Section. **(p.17)** | SPD 2018.pdf<br><br>Cigna_TML00000159-Cigna_TML00000239 |

CONFIDENTIAL

**Exhibit 3 - Summary of Relevant Plan Language for Exemplar Patients**

| Member | Provider | MRC Methodology | Out-of-Network Reimbursement Methodology Language | Provisions Regarding Cost Sharing | Document Name / Bates |
|---|---|---|---|---|---|
| | | | <ul><li>the provider's normal charge for a similar service or supply; or</li><li>the 80th percentile of charges made by providers of such service or supply in the geographic area where it is received as compiled in a database selected by the Insurance Company.</li></ul>**Maximum Reimbursable Charge – Medical (p.68)**<br>The Maximum Reimbursable Charge for covered services is determined based on the lesser of:<ul><li>the provider's normal charge for a similar service or supply; or</li><li>a policyholder-selected percentage of a schedule developed by Cigna that is based upon a methodology similar to a methodology utilized by Medicare to determine the allowable fee for the same or similar service within the geographic market.</li></ul>The percentage used to determine the Maximum Reimbursable Charge is listed in The Schedule.<br>In some cases, a Medicare based schedule will not be used and the Maximum Reimbursable Charge for covered services is determined based on the lesser of:<ul><li>the provider's normal charge for a similar service or supply; or</li><li>the 80th percentile of charges made by providers of such service or supply in the geographic area where it is received as compiled in a database selected by Cigna.</li></ul>The Maximum Reimbursable Charge is subject to all other benefit limitations and applicable coding and payment methodologies determined by Cigna. Additional information about how Cigna determines the Maximum Reimbursable Charge is available upon request. | **Exclusions and Expenses Not Covered (p.45)**<br>Additional coverage limitations determined by plan or provider type are shown in The Schedule. Payment for the following is specifically excluded from this plan:<ul><li>charges which you are not obligated to pay or for which you are not billed or for which you would not have been billed except that they were covered under this plan. For example, if Cigna determines that a provider or pharmacy is or has waived, reduced, or forgiven any portion of its charges and/or any portion of copayment, deductible, and/or coinsurance amount(s) you are required to pay for a Covered Expense (as shown on The Schedule) without Cigna's express consent, then Cigna in its sole discretion shall have the right to deny the payment of benefits in connection with the Covered Expense, or reduce the benefits in proportion to the amount of the copayment, deductible, and/or coinsurance amounts waived, forgiven or reduced, regardless of whether the provider or pharmacy represents that you remain responsible for any amounts that your plan does not cover. In the exercise of that discretion, Cigna shall have the right to require you to provide proof sufficient to Cigna that you have made your required cost share payment(s) prior to the payment of any benefits by Cigna. This exclusion includes, but is not limited to, charges of a non-Participating Provider who has agreed to charge you or charged you at an in-network benefits level or some other benefits level not otherwise applicable to the services received. Provided further, if you use a coupon provided by a pharmaceutical manufacturer or other third party that discounts the cost of a prescription medication or other product, Cigna</li></ul> | |

CONFIDENTIAL

**Exhibit 3 - Summary of Relevant Plan Language for Exemplar Patients**

| Member | Provider | MRC Methodology | Out-of-Network Reimbursement Methodology Language | Provisions Regarding Cost Sharing | Document Name / Bates |
|---|---|---|---|---|---|
| | | | **Policyholder selected percentage: 110% (p. 17)** | may, in its sole discretion, reduce the benefits provided under the plan in proportion to the amount of the Copayment, Deductible, and/or Coinsurance amounts to which the value of the coupon has been applied by the Pharmacy or other third party, and/or exclude from accumulation toward any plan Deductible or Out-of-Pocket Maximum the value of any coupon applied to any Copayment, Deductible and/or Coinsurance you are required to pay. | |
| N.A.-G. | PPR | MRC II<br><br>Medicare based | **Maximum Reimbursable Charge (p.19)**<br>Maximum Reimbursable Charge is determined based on the lesser of the provider's normal charge for a similar service or supply; or<br>A percentage of a schedule that Cigna has developed that is based upon a methodology similar to a methodology utilized by Medicare to determine the allowable fee for similar services within the geographic market. In some cases, a Medicare based schedule will not be used and the Maximum Reimbursable Charge for covered services is determined based on the lesser of:<br>• the provider's normal charge for a similar service or supply; or<br>• the 80th percentile of charges made by providers of such service or supply in the geographic area where it is received as compiled in a database selected by Cigna. If sufficient charge data is unavailable in the database for that geographic area to determine the Maximum Reimbursable Charge, then data in the database for similar services may be used.<br><br>**Maximum Reimbursable Charge – Medical (p.69)**<br>The Maximum Reimbursable Charge for covered services is determined based on the lesser of:<br>• the provider's normal charge for a similar service or supply; or | The provider may bill you for the difference between the provider's normal charge and the Maximum Reimbursable Charge, in addition to applicable deductibles, copayments and coinsurance. **(p.19)**<br><br>Some providers forgive or waive the cost share obligation (e.g. your copayment, deductible and/or coinsurance) that this Plan requires you to pay. Waiver of your required cost share obligation can jeopardize your coverage under this Plan. For more details, see the Exclusions Section. **(p.19)**<br><br>**Exclusions and Expenses Not Covered (p.45)**<br>Additional coverage limitations are shown in The Schedule. Payment for the following is specifically excluded from this Plan:<br><br>• charges which you are not obligated to pay or for which you are not billed or for which you would not have been billed except that they were covered under this Plan. For example, if Cigna determines that a provider or Pharmacy is or has waived, reduced, or forgiven any portion of its charges and/or any portion of Copayment, Deductible, and/or Coinsurance amount(s) you are required to pay for a Covered Expense (as shown on The Schedule) without Cigna's express consent, then Cigna in its sole discretion shall | SPD 2019.pdf<br><br>Cigna_TML00000243-Cigna_TML00000324 |

CONFIDENTIAL

**Exhibit 3 - Summary of Relevant Plan Language for Exemplar Patients**

| Member | Provider | MRC Methodology | Out-of-Network Reimbursement Methodology Language | Provisions Regarding Cost Sharing | Document Name / Bates |
|---|---|---|---|---|---|
| | | | • a policyholder-selected percentage of a schedule that Cigna has developed that is based upon a methodology similar to a methodology utilized by Medicare to determine the allowable fee for the same or similar service within the geographic market.<br><br>The percentage used to determine the Maximum Reimbursable Charge is listed in The Schedule.<br>In some cases, a Medicare based schedule will not be used and the Maximum Reimbursable Charge for covered services is determined based on the lesser of:<br>• the provider's normal charge for a similar service or supply; or<br>• the 80th percentile of charges made by providers of such service or supply in the geographic area where it is received as compiled in a database selected by Cigna. If sufficient charge data is unavailable in the database for that geographic area to determine the Maximum Reimbursable Charge, then data in the database for similar services may be used.<br><br>The Maximum Reimbursable Charge is subject to all other benefit limitations and applicable coding and payment methodologies determined by Cigna. Additional information about how Cigna determines the Maximum Reimbursable Charge is available upon request.<br><br>**Policyholder selected percentage: 110% (p. 19)** | have the right to deny the payment of benefits in connection with the Covered Expense, or reduce the benefits in proportion to the amount of the Copayment, Deductible, and/or Coinsurance amounts waived, forgiven or reduced, regardless of whether the provider or Pharmacy represents that you remain responsible for any amounts that the Plan does not cover. In the exercise of that discretion, Cigna shall have the right to require you to provide proof sufficient to Cigna that you have made your required cost share payment(s) prior to the payment of any benefits by the Plan. This exclusion includes, but is not limited to, charges of a non-Participating Provider who has agreed to charge you or charged you at an in-network benefits level or some other benefits level not otherwise applicable to the services received. | |
| M.B. | MMR | N/A | Services for Out-of-Network providers are not covered except for initial care to treat and stabilize an Emergency Medical Condition, an unforeseen illness, injury or condition requiring immediate care. For additional details see the "How The Plan Works" section of Your Policy. **(p.1)** | This exclusive provider benefit plan does not cover services You receive from Out-of-Network Providers, except services for treatment of an Emergency Medical condition, or Medically Necessary care that is not available through an In-Network Provider. You are responsible for paying any charges from Out-of-Network providers that this plan does not cover. **(p.1)** | Baker – SPD.pdf<br><br>Cigna_TML00001256 - Cigna_TML00001268 |

CONFIDENTIAL

Exhibit 3 - Summary of Relevant Plan Language for Exemplar Patients

| Member | Provider | MRC Methodology | Out-of-Network Reimbursement Methodology Language | Provisions Regarding Cost Sharing | Document Name / Bates |
|--------|----------|-----------------|-----------------|-----------------|-----------------|
| J.G. | AHA | MRC II<br><br>Medicare based | **Maximum Reimbursable Charge (p.15)**<br> Maximum Reimbursable Charge is determined based on the lesser of the provider's normal charge for a similar service or supply; or<br>A percentage of a schedule that we have developed that is based upon a methodology similar to a methodology utilized by Medicare to determine the allowable fee for similar services within the geographic market. In some cases, a Medicare based schedule will not be used and the Maximum Reimbursable Charge for covered services is determined based on the lesser of:<br>• the provider's normal charge for a similar service or supply; or<br>• the 80th percentile of charges made by providers of such service or supply in the geographic area where it is received as compiled in a database selected by the Insurance Company.<br><br>**Maximum Reimbursable Charge – Medical (p.61)**<br>The Maximum Reimbursable Charge for covered services is determined based on the lesser of:<br>• the provider's normal charge for a similar service or supply; or<br>• a policyholder-selected percentage of a schedule developed by Cigna that is based upon a methodology similar to a methodology utilized by Medicare to determine the allowable fee for the same or similar service within the geographic market.<br>The percentage used to determine the Maximum Reimbursable Charge is listed in The Schedule.<br>In some cases, a Medicare based schedule will not be used and the Maximum Reimbursable Charge for covered services is determined based on the lesser of:<br>• the provider's normal charge for a similar service or supply; or | The provider may bill you for the difference between the provider's normal charge and the Maximum Reimbursable Charge, in addition to applicable deductibles and coinsurance. **(p.15)**<br><br>Some providers forgive or waive the cost share obligation (e.g. your deductible and/or coinsurance) that this plan requires you to pay. Waiver of your required cost share obligation can jeopardize your coverage under this plan. For more details, see the Exclusions Section. **(p.15)**<br><br>**Exclusions and Expenses Not Covered (p.41)**<br>Additional coverage limitations determined by plan or provider type are shown in The Schedule. Payment for the following is specifically excluded from this plan:<br><br>• charges which you are not obligated to pay or for which you are not billed or for which you would not have been billed except that they were covered under this plan. For example, if Cigna determines that a provider is or has waived, reduced, or forgiven any portion of its charges and/or any portion of copayment, deductible, and/or coinsurance amount(s) you are required to pay for a Covered Service (as shown on The Schedule) without Cigna's express consent, then Cigna in its sole discretion shall have the right to deny the payment of benefits in connection with the Covered Service, or reduce the benefits in proportion to the amount of the copayment, deductible, and/or coinsurance amounts waived, forgiven or reduced, regardless of whether the provider represents that you remain responsible for any amounts that your plan does not cover. In the exercise of that discretion, Cigna shall have the right to require you to provide proof sufficient to Cigna that you have made your required cost | 2017 SPD-3209876.pdf<br><br>Cigna_TML00023160-Cigna_TML00023228 |

10

**Exhibit 3 - Summary of Relevant Plan Language for Exemplar Patients**

| Member | Provider | MRC Methodology | Out-of-Network Reimbursement Methodology Language | Provisions Regarding Cost Sharing | Document Name / Bates |
|--------|----------|-----------------|--------------------------------------------------|-----------------------------------|----------------------|
| | | | • the 80th percentile of charges made by providers of such service or supply in the geographic area where it is received as compiled in a database selected by Cigna.<br>The Maximum Reimbursable Charge is subject to all other benefit limitations and applicable coding and payment methodologies determined by Cigna. Additional information about how Cigna determines the Maximum Reimbursable Charge is available upon request.<br><br>**Policyholder selected percentage: 150% (p. 15)** | share payment(s) prior to the payment of any benefits by Cigna. This exclusion includes, but is not limited to, charges of a non-Participating Provider who has agreed to charge you or charged you at an in-network benefits level or some other benefits level not otherwise applicable to the services received. | |
| J.J. | SCRCO | MRC II<br><br>Medicare based | **Maximum Reimbursable Charge (p.15)**<br>Maximum Reimbursable Charge is determined based on the lesser of the provider's normal charge for a similar service or supply; or<br>A percentage of a schedule that we have developed that is based upon a methodology similar to a methodology utilized by Medicare to determine the allowable fee for similar services within the geographic market. In some cases, a Medicare based schedule will not be used and the Maximum Reimbursable Charge for covered services is determined based on the lesser of:<br>• the provider's normal charge for a similar service or supply; or<br>• the 80th percentile of charges made by providers of such service or supply in the geographic area where it is received as compiled in a database selected by the Insurance Company.<br><br>**Maximum Reimbursable Charge – Medical (p.68)**<br>The Maximum Reimbursable Charge for covered services is determined based on the lesser of:<br>• the provider's normal charge for a similar service or supply; or<br>• a policyholder-selected percentage of a schedule developed by Cigna that is based upon a | The provider may bill you for the difference between the provider's normal charge and the Maximum Reimbursable Charge, in addition to applicable deductibles and coinsurance. **(p.15)**<br><br>Some providers forgive or waive the cost share obligation (e.g. your deductible and/or coinsurance) that this plan requires you to pay. Waiver of your required cost share obligation can jeopardize your coverage under this plan. For more details, see the Exclusions Section. **(p.15)**<br><br>**Exclusions and Expenses Not Covered (p.45)**<br>Additional coverage limitations determined by plan or provider type are shown in The Schedule. Payment for the following is specifically excluded from this plan:<br><br>• charges which you are not obligated to pay or for which you are not billed or for which you would not have been billed except that they were covered under this plan. For example, if Cigna determines that a provider or pharmacy is or has waived, reduced, or forgiven any portion of its charges and/or any portion of copayment, deductible, and/or coinsurance amount(s) you are required to pay for a Covered Expense (as shown | Jones-SPD 2018.pdf<br><br>Cigna_TML00009917-<br>Cigna_TML00009993 |

11

CONFIDENTIAL

Exhibit 3 - Summary of Relevant Plan Language for Exemplar Patients

| Member | Provider | MRC Methodology | Out-of-Network Reimbursement Methodology Language | Provisions Regarding Cost Sharing | Document Name / Bates |
|---|---|---|---|---|---|
| | | | methodology similar to a methodology utilized by Medicare to determine the allowable fee for the same or similar service within the geographic market.<br>The percentage used to determine the Maximum Reimbursable Charge is listed in The Schedule.<br>In some cases, a Medicare based schedule will not be used and the Maximum Reimbursable Charge for covered services is determined based on the lesser of:<br>• the provider's normal charge for a similar service or supply; or<br>• the 80th percentile of charges made by providers of such service or supply in the geographic area where it is received as compiled in a database selected by Cigna.<br><br>The Maximum Reimbursable Charge is subject to all other benefit limitations and applicable coding and payment methodologies determined by Cigna. Additional information about how Cigna determines the Maximum Reimbursable Charge is available upon request.<br><br>**Policyholder selected percentage: 110% (p. 15)** | on The Schedule) without Cigna's express consent, then Cigna in its sole discretion shall have the right to deny the payment of benefits in connection with the Covered Expense, or reduce the benefits in proportion to the amount of the copayment, deductible, and/or coinsurance amounts waived, forgiven or reduced, regardless of whether the provider or pharmacy represents that you remain responsible for any amounts that your plan does not cover. In the exercise of that discretion, Cigna shall have the right to require you to provide proof sufficient to Cigna that you have made your required cost share payment(s) prior to the payment of any benefits by Cigna. This exclusion includes, but is not limited to, charges of a non-Participating Provider who has agreed to charge you or charged you at an in-network benefits level or some other benefits level not otherwise applicable to the services received. Provided further, if you use a coupon provided by a pharmaceutical manufacturer or other third party that discounts the cost of a prescription medication or other product, Cigna may, in its sole discretion, reduce the benefits provided under the plan in proportion to the amount of the Copayment, Deductible, and/or Coinsurance amounts to which the value of the coupon has been applied by the Pharmacy or other third party, and/or exclude from accumulation toward any plan Deductible or Out-of-Pocket Maximum the value of any coupon applied to any Copayment, Deductible and/or Coinsurance you are required to pay. | |
| A.K. | SCAC | MRC II | **Maximum Reimbursable Charge (p.19)** | The provider may bill you for the difference between the provider's normal charge and the Maximum | Kishor-SPD 2018.pdf |

CONFIDENTIAL

**Exhibit 3 - Summary of Relevant Plan Language for Exemplar Patients**

| Member | Provider | MRC Methodology | Out-of-Network Reimbursement Methodology Language | Provisions Regarding Cost Sharing | Document Name / Bates |
|---|---|---|---|---|---|
| | | Medicare based | Maximum Reimbursable Charge is determined based on the lesser of the provider's normal charge for a similar service or supply; or<br>A percentage of a schedule that we have developed that is based upon a methodology similar to a methodology utilized by Medicare to determine the allowable fee for similar services within the geographic market. In some cases, a Medicare based schedule will not be used and the Maximum Reimbursable Charge for covered services is determined based on the lesser of:<br>• the provider's normal charge for a similar service or supply; or<br>• the 80th percentile of charges made by providers of such service or supply in the geographic area where it is received as compiled in a database selected by the Insurance Company.<br><br>**Maximum Reimbursable Charge – Medical (p.76)**<br>The Maximum Reimbursable Charge for covered services is determined based on the lesser of:<br>• the provider's normal charge for a similar service or supply; or<br>• a policyholder-selected percentage of a schedule developed by Cigna that is based upon a methodology similar to a methodology utilized by Medicare to determine the allowable fee for the same or similar service within the geographic market.<br>The percentage used to determine the Maximum Reimbursable Charge is listed in The Schedule.<br>In some cases, a Medicare based schedule will not be used and the Maximum Reimbursable Charge for covered services is determined based on the lesser of:<br>• the provider's normal charge for a similar service or supply; or | Reimbursable Charge, in addition to applicable deductibles, copayments and coinsurance. **(p.19)** | Cigna_TML00010220-Cigna_TML00010299 |

13

CONFIDENTIAL

**Exhibit 3 - Summary of Relevant Plan Language for Exemplar Patients**

| Member | Provider | MRC Methodology | Out-of-Network Reimbursement Methodology Language | Provisions Regarding Cost Sharing | Document Name / Bates |
|---|---|---|---|---|---|
| | | | • the 80th percentile of charges made by providers of such service or supply in the geographic area where it is received as compiled in a database selected by Cigna.<br><br>The Maximum Reimbursable Charge is subject to all other benefit limitations and applicable coding and payment methodologies determined by Cigna. Additional information about how Cigna determines the Maximum Reimbursable Charge is available upon request.<br><br>**Policyholder selected percentage: 110% (p. 19)** | | |
| M.L. | WRC | MRC II<br><br>Medicare based | **Maximum Reimbursable Charge (p.14)**<br>Maximum Reimbursable Charge is determined based on the lesser of the provider's normal charge for a similar service or supply; or<br>A percentage of a schedule that we have developed that is based upon a methodology similar to a methodology utilized by Medicare to determine the allowable fee for similar services within the geographic market. In some cases, a Medicare based schedule will not be used and the Maximum Reimbursable Charge for covered services is determined based on the lesser of:<br>• the provider's normal charge for a similar service or supply; or<br>• the 80th percentile of charges made by providers of such service or supply in the geographic area where it is received as compiled in a database selected by the Insurance Company.<br><br>**Maximum Reimbursable Charge – Medical (p.60)**<br>The Maximum Reimbursable Charge for covered services is determined based on the lesser of: | The provider may bill you for the difference between the provider's normal charge and the Maximum Reimbursable Charge, in addition to applicable deductibles, and coinsurance. **(p.14)**<br><br>Some providers forgive or waive the cost share obligation (e.g. your deductible and/or coinsurance) that this plan requires you to pay. Waiver of your required cost share obligation can jeopardize your coverage under this plan. For more details, see the Exclusions Section. **(p.14)**<br><br>**Exclusions and Expenses Not Covered (p.36)**<br>Additional coverage limitations determined by plan or provider type are shown in The Schedule. Payment for the following is specifically excluded from this plan:<br><br>• charges which you are not obligated to pay or for which you are not billed or for which you would not have been billed except that they were covered under this plan. For example, if Cigna determines that a provider or pharmacy is or has waived, reduced, or forgiven any portion of its | 01.01.18 - Pinnacle West Capital Corporation - 3341058 - SPD.pdf.pdf<br><br>Cigna_TML00010703-Cigna_TML00010766 |

CONFIDENTIAL

**Exhibit 3 - Summary of Relevant Plan Language for Exemplar Patients**

| Member | Provider | MRC Methodology | Out-of-Network Reimbursement Methodology Language | Provisions Regarding Cost Sharing | Document Name / Bates |
|--------|----------|-----------------|---------------------------------------------------|-----------------------------------|-----------------------|
| | | | • the provider's normal charge for a similar service or supply; or<br>• a policyholder-selected percentage of a schedule developed by Cigna that is based upon a methodology similar to a methodology utilized by Medicare to determine the allowable fee for the same or similar service within the geographic market.<br>The percentage used to determine the Maximum Reimbursable Charge is listed in The Schedule.<br>In some cases, a Medicare based schedule will not be used and the Maximum Reimbursable Charge for covered services is determined based on the lesser of:<br>• the provider's normal charge for a similar service or supply; or<br>• the 80th percentile of charges made by providers of such service or supply in the geographic area where it is received as compiled in a database selected by Cigna.<br><br>The Maximum Reimbursable Charge is subject to all other benefit limitations and applicable coding and payment methodologies determined by Cigna. Additional information about how Cigna determines the Maximum Reimbursable Charge is available upon request.<br><br>**Policyholder selected percentage: 125% (p. 14)** | charges and/or any portion of copayment, deductible, and/or coinsurance amount(s) you are required to pay for a Covered Expense (as shown on The Schedule) without Cigna's express consent, then Cigna in its sole discretion shall have the right to deny the payment of benefits in connection with the Covered Expense, or reduce the benefits in proportion to the amount of the copayment, deductible, and/or coinsurance amounts waived, forgiven or reduced, regardless of whether the provider or pharmacy represents that you remain responsible for any amounts that your plan does not cover. In the exercise of that discretion, Cigna shall have the right to require you to provide proof sufficient to Cigna that you have made your required cost share payment(s) prior to the payment of any benefits by Cigna. This exclusion includes, but is not limited to, charges of a non-Participating Provider who has agreed to charge you or charged you at an in-network benefits level or some other benefits level not otherwise applicable to the services received. Provided further, if you use a coupon provided by a pharmaceutical manufacturer or other third party that discounts the cost of a prescription medication or other product, Cigna may, in its sole discretion, reduce the benefits provided under the plan in proportion to the amount of the Copayment, Deductible, and/or Coinsurance amounts to which the value of the coupon has been applied by the Pharmacy or other third party, and/or exclude from accumulation toward any plan Deductible or Out-of-Pocket Maximum the value of any coupon applied to any Copayment, Deductible and/or Coinsurance you are required to pay. | |

15

CONFIDENTIAL

**Exhibit 3 - Summary of Relevant Plan Language for Exemplar Patients**

| Member | Provider | MRC Methodology | Out-of-Network Reimbursement Methodology Language | Provisions Regarding Cost Sharing | Document Name / Bates |
|---|---|---|---|---|---|
| W.P. | DRR | MRC I<br><br>Percentile of charge database | **Maximum Reimbursable Charge (p.13)**<br>Maximum Reimbursable Charge is determined based on the lesser of the provider's normal charge for a similar service or supply; or<br>A percentile of charges made by providers of such service or supply in the geographic area where the service is received. These charges are compiled in a database we have selected.<br><br>**Maximum Reimbursable Charge – Medical (p.57)**<br>The Maximum Reimbursable Charge for covered services is determined based on the lesser of:<br>• the provider's normal charge for a similar service or supply; or<br>• a policyholder-selected percentile of charges made by providers of such service or supply in the geographic area where it is received as compiled in a database selected by Cigna.<br>The percentile used to determine the Maximum Reimbursable Charge is listed in The Schedule.<br><br>The Maximum Reimbursable Charge is subject to all other benefit limitations and applicable coding and payment methodologies determined by Cigna. Additional information about how Cigna determines the Maximum Reimbursable Charge is available upon request.<br><br>**Policyholder-selected percentile of charges: 90th (p.13)** | The provider may bill you for the difference between the provider's normal charge and the Maximum Reimbursable Charge, in addition to applicable deductibles and coinsurance. **(p.13)**<br><br>Some providers forgive or waive the cost share obligation (e.g. your deductible and/or coinsurance) that this plan requires you to pay. Waiver of your required cost share obligation can jeopardize your coverage under this plan. For more details, see the Exclusions Section. **(p.13)**<br><br>**Exclusions and Expenses Not Covered (p.33)**<br>Additional coverage limitations determined by plan or provider type are shown in The Schedule. Payment for the following is specifically excluded from this plan:<br><br>• charges which you are not obligated to pay or for which you are not billed or for which you would not have been billed except that they were covered under this plan. For example, if Cigna determines that a provider or pharmacy is or has waived, reduced, or forgiven any portion of its charges and/or any portion of copayment, deductible, and/or coinsurance amount(s) you are required to pay for a Covered Expense (as shown on The Schedule) without Cigna's express consent, then Cigna in its sole discretion shall have the right to deny the payment of benefits in connection with the Covered Expense, or reduce the benefits in proportion to the amount of the copayment, deductible, and/or coinsurance amounts waived, forgiven or reduced, regardless of whether the provider or pharmacy represents that you remain responsible for any amounts that your plan does not cover. In the exercise of that discretion, Cigna shall have the right to require you to provide proof sufficient to Cigna that you | 2018 SPD-3210608.pdf<br><br>Cigna_TML00013516-Cigna_TML00013576 |

16

**Exhibit 3 - Summary of Relevant Plan Language for Exemplar Patients**

| Member | Provider | MRC Methodology | Out-of-Network Reimbursement Methodology Language | Provisions Regarding Cost Sharing | Document Name / Bates |
|---|---|---|---|---|---|
| | | | | have made your required cost share payment(s) prior to the payment of any benefits by Cigna. This exclusion includes, but is not limited to, charges of a non-Participating Provider who has agreed to charge you or charged you at an in-network benefits level or some other benefits level not otherwise applicable to the services received. Provided further, if you use a coupon provided by a pharmaceutical manufacturer or other third party that discounts the cost of a prescription medication or other product, Cigna may, in its sole discretion, reduce the benefits provided under the plan in proportion to the amount of the Copayment, Deductible, and/or Coinsurance amounts to which the value of the coupon has been applied by the Pharmacy or other third party, and/or exclude from accumulation toward any plan Deductible or Out-of-Pocket Maximum the value of any coupon applied to any Copayment, Deductible and/or Coinsurance you are required to pay. | |

CONFIDENTIAL

# EXHIBIT E-3

REDACTED VERSION OF DOCUMENT PROPOSED TO BE

FILED UNDER SEAL L.R. 79-5.2.2(c)

<u>Report of Andrea G. Barthwell, MD, DFASAM</u>

Submitted March 30, 2023
in the case of
*TML RECOVERY, LCC, et al. v. Cigna Corporation, et al.*
Case No.: 8:20-cv-0269-DOC-JDE
in the
United States District Court for the Central District of California

## I.        Introduction

Upon the request of Richard T. Collins, Esq., of Arnall Golden Gregory LLP, counsel for the Plaintiffs,[1] I have provided in this report a broad description of the substance use disorder (SUD), commonly referred to as addiction, treatment delivery systems in the United States. Additionally, I have reviewed numerous documents pertinent to the civil action described above and provided my opinion on the clinical and related practices the Plaintiffs follow in providing SUD treatment services.

## II.        Qualifications

I have practiced Addiction Medicine since 1985, am certified by the American Board of Addiction Medicine, and am a Distinguished Fellow in the American Society of Addiction Medicine (ASAM). I have employed and overseen many forms of care used to treat alcoholism and other addictions. I have conducted research on the treatment of individuals in the office-based setting and on aggressive case management and its effect on treatment retention and outcomes.

I am a co-author of a chapter on the different modalities of SUD treatment in *Principles of Addiction Medicine*, ASAM's textbook. I was a reviewer of the first edition of *Principles of Effective Treatment*, the research-based guide on addiction treatment by the National Institute on Drug Abuse (NIDA). I have served on the  Department of Health and Human Services' National Institute of Health (NIH) National Advisory Committees of the National Institute on Alcoholism and Alcohol Abuse (NIAAA), NIDA, and the Substance Abuse and Mental Health Administration (SAMHSA) Center for Substance Abuse Treatment (CSAT).

In Illinois, I was the Medical Director of an organization contracting with the State of Illinois during the shift from grant-in-aid funding to fee-for-service funding using the adoption of ASAM's Patient Placement Criteria (PPC)[2] as the impetus for the shift.  In that position I helped develop a number of services our organization developed and sold to third party payers in publicly-funded centers that were created and funded by CSAT's then forerunner, "the Office of

---

[1] By "Plaintiffs," I refer to those in Band 1 who I understand include:   12 South, LLC, Addiction Health Alliance, LLC, DR Recovery Encinitas, LLC, MMR Services, LLC, TML Recovery, LLC, Woman's Recovery Center, LLC, Pacific Palms Recovery, LLC, Southern California Recovery Centers Oceanside, LCC, and Southern California Addiction Center, Inc.

[2] The PPC is a system that provides separate placement criteria for adolescents and adults to create comprehensive and individualized treatment plans.

Treatment Improvement (OTI), a non-regulatory agency of the Federal Government intended to improve the quality of drug addiction treatment[3] Substance Abuse Prevention and Treatment Block Grant (SABG).  The SABG program provides funds to all 50 states, the District of Columbia, Puerto Rico, the U.S. Virgin Islands, 6 Pacific jurisdictions, and 1 tribal entity to prevent and treat substance abuse.

The demand for space in programs that was intended to provide SUD services and care to the indigent rose sharply during the early 1980s, along with a proliferation of programs in hospitals and free-standing residential centers developed by not-for-profit, compassionate organizations, such as the Betty Ford Center, as the recognition of SUD and its treatment grew in the public eye.  The publicly-funded and subsidized system of care across the country has long been recognized as a safety net for all individuals, even those with employee provided insurance benefits.  The services developed for third-party payers within the "indigent and entitlement public sector" were highly sought after by insured individuals for a number of reasons.  The third-party payer practice of denying coverage or requiring failure at a lower level of care than prescribed (step-coverage) encouraged individuals who might seek care at a private philanthropic, not-for-profit free-standing program or hospital intended for the insured to seek the assistance of the public programs.  Deductibles and co-pays at the more expensive private facilities left individuals to make the choice to deny themselves the burden of future indebtedness against their own interests.  Failure to ensure adequate numbers and types of providers and services accessible in the private sector forced individuals into the public sector for care, lest they face long waits, costly travel to "so-called" nationally recognized centers, or no access and potential loss of life due to the long waiting lists and delays in ability to start treatment. In the early 1980s, waiting lists of up to 15% of those actively seeking treatment were common.

While the U.S. government doubled funding for the SABG programs, private payers induced public programs to develop time-limited services for the insured rather than develop more private services to meet the increasing demand for treatment as individuals responded to public encouragement to stop drinking and the fear of AIDS to stop using drugs.  These pressures expanded due to increased awareness driven by the proliferation of programs such as Mothers Against Drunk Driving (MADD); Students Against Drunk driving (SADD); the National Youth Anti-Drug Campaign and its frying pan commercials; private advertising campaigns supported by programs such as the hospital based "Care Centers;" high profile celebrity open acknowledgments of treatment, recovery, and relapse- including the travails of a First Lady of the United States who went on to open a private facility, the Betty Ford Center; and even a monthly themed show on "Oprah," on which I appeared.  treatment   Additionally, as a consultant I trained state employees to use ASAM's PPC in annual compliance visits and post-treatment reviews.

From 2002 to 2004, I served as the Deputy Director of Demand Reduction in the White House Office of National Drug Control Policy (ONDCP). In this U.S. Senate-confirmed position, I traveled extensively, visiting programs in almost every state. I reviewed and certified the budget of the Center for Substance Abuse Treatment (CSAT), a federal agency within the Substance Abuse and Mental Health Service Administration (SAMHSA).  In addition to the SABG

---

[3] https://www.tandfonline.com/doi/abs/10.1080/02791072.1991.10472229?journalCode=ujpd20

program, I gained knowledge of a number of state financing models. At ONDCP, I also wrote the plan for President George W. Bush's national expansion of addiction treatment, known as, *Access to Recovery*. This initiative sought to provide an additional $1.5 billion of treatment support to states through the SABG program.  The rationale for this expansion was to close the "treatment gap," consisting of those individuals who recognized that they had an SUD and sought treatment but were unable to access it. The Bush Administration also proposed doubling the number of Drug Courts, a program that helped individuals access treatment under the supervision of a Judge and a treatment team in the Administrative Offices of the Court, using funds provided by the Department of Justice, and foregoing treatment covered by their individual or family insurance plan.

In addition to providing assistance to individuals who work for self-insured employers access treatment for all chronic and severe mental health problems, including SUD, I serve as an expert and consultant for the Department of Labor (DOL) and help their employees understand and identify variance between behavioral health and medical/surgical care that violates  the Mental Health Parity and Addiction Equity Act (MHPAEA).  The MHPAEA's purpose is to promote equal access to Mental Health(MH)/ SUD treatment by prohibiting disparate coverage limitations and practices that deny coverage for or access to these services. In the DOL's 2022 Mental Health Parity and Addiction Equity Act (MHPAEA) Report to Congress,[4]  the DOL emphasized that its enforcement efforts will focus on two issues that are essential to this case: (1) prior authorization requirements for in-network and out-of-network inpatient services; and (2) out-of-network reimbursement rates (plan methods for determining usual, customary, and reasonable charges).[5] The report highlights instances when insurers failed to comply with MHPAEA's requirements by reimbursing SUD claims at a disproportionately low rate.[6] President Biden, the DOL, and the Department of Health and Human Services continue to make MHPAEA enforcement a top priority because of widespread noncompliance and to protect individuals seeking SUD treatment, as need is at an all-time high.[7]

The Senate Finance Committee's report[8] pointed to another issue relevant to this case – network inadequacy. Finding behavioral healthcare providers who are in-network (INN) with commercial insurers is a challenge and often a barrier for those trying to access care.[9] Studies of individual market plans and Medicare Advantage have found that networks cover a smaller proportion of behavioral health providers than of primary care providers, making it more likely patients will go out-of-network (OON) for behavioral health services.[10] Numerous commenters point to low

---

[4] Dep't of Labor, 2022 MHPAEA Report to Congress, (2022) https://www.dol.gov/sites/dolgov/files/EBSA/laws-and-regulations/laws/mental-health-parity/report-to-congress-2022-realizing-parity-reducing-stigma-and-raising-awareness.pdf.
[5] *Id.* at 50.
[6] *Id.* at 38.
[7] *Id.* at 3.
[8] See, U.S. Senate Finance Committee Report on Mental Health care in the United States: The Case for Federal Action, (2022) https://www.finance.senate.gov/imo/media/doc/SFC%20Mental%20Health%20Report%20March%202022.pdf.
[9] *Id.* at 22.
[10] U.S. Department of Health and Human Services, Office of the Assistant Secretary for Planning and Evaluation, New HHS Study Shows 63-Fold Increase in Medicare Telehealth Utilization During the Pandemic, December 2021

commercial health plan reimbursement rates as one reason for limited network participation.[11]

Today, I continue to practice addiction medicine and provide consultative services to an array of treatment programs located in Illinois, Washington, Alaska, California, Pennsylvania, and New York.  My full *curriculum vitae* is attached to this report.

## III.    Materials Reviewed

In preparing this report, I reviewed and analyzed the following items, which I use regularly in the practice of medicine, some of which I co-authored:

- A.G. Barthwell & L.S. Brown, The Treatment of Drug Addiction: An Overview Ch. 24, Principles of Addiction Medicine
- American Psychiatric Association, DSM IVR and DSM V
- The American Society of Addiction Medicine, Definition of Addiction [12]
- The American Society of Addiction Medicine, Patient Placement Criteria for the Treatment of Substance-Related Disorder, Second Edition- Revised (ASAM PPC-2R), Mee-Lee D, ed. Chevy Chase, MD: American Society of Addiction Medicine, 2001. Adult Placement Criteria Levels I- IV (pp. 25-127) and Dimensional Criteria for Adult Detoxification (pp 145-176)
- American Society of Addiction Medicine, ASAM Public Policy Statement on the Relationship between Treatment and Self Help: A Joint Statement of the American Society of Addiction Medicine, the American Academy of Addiction Psychiatry, and the American Psychiatric Association
- A.T. McLellan et al., Drug Dependence, a Chronic Medical Illness: Implications for Treatment, Insurance, and Outcomes Evaluation
- Center for Behavioral Health Statistics and Quality, Results from the 2010 National Survey on Drug Use and Health: Summary of National Findings
- Harold Pollack, 4.8 Million People Uninsured with Drug or Alcohol Problems
- L. Siqueland L & P. Crits-Christoph, Current Developments in Psychosocial Treatments of Alcohol and Substance Abuse
- Nady el-Guebaly, The Meanings of Recovery from Addiction, Evolution and Promises, Addiction Medicine
- National Institute on Drug Abuse, The Principles of Drug Addiction Treatment: A Research-Based Guide
- Scott J. Rein, Executive Brief: Dispelling the Myths of Out-of-Network Billing
- Substance Abuse and Mental Health Services Administration, The ADSS Cost Study: Costs of Substance Abuse Treatment in the Specialty Sector

---

[11] https://www.hhs.gov/about/news/2021/12/03/new-hhs-study-shows-63-fold-increase-in-medicare-telehealthutilization-during-pandemic.html; Mehrotra A et al., The Impact of COVID-19 on Outpatient Visits in 2020: Visits Remained Stable, Despite a Late Surge in Cases, Commonwealth Fund, Feb. 2021 https://doi.org/10.26099/bvhf-e411. Au-Yeung CM, Blewett LA, Winkelman TN, Increasing Access to Medications for Opioid Use Disorder: Policy Strategies During and After COVID-19 Pandemic, October 2021 https://www.milbank.org/wpcontent/uploads/2021/10/Au-Yeung_Brief_5.pdf.
[12] The American Society of Addiction Medicine. "What Is the Definition of Addiction?" https://www.asam.org/quality-care/definition-of-addiction. (Accessed: January 26, 2023).

- Substance Abuse and Mental Health Service Administration, Medication-Assisted Treatment for Opioid Addiction in Opioid Treatment Programs, TIP 43
- Substance Abuse and Mental Health Services Administration, National Expenditures for Mental Health Services & Substance Abuse Treatment 1986-2009
- Substance Abuse and Mental Health Services Administration, National Household Survey on Drug Use and Health (NSDUH)
- Substance Abuse and Mental Health Services Administration, Analyses of Substance Abuse and Treatment Need Issues
- Substance Abuse and Mental Health Services Administration, The Need for and Receipt of Specialty Treatment
- Substance Abuse and Mental Health Services Administration, Predictors of Substance Abuse Treatment Completion or Transfer to Further Treatment by Service Type, The TEDS Report
- Suzanne Gelber Rinaldo & David W. Rinaldo, Availability Without Accessibility? State Medicaid Coverage and Authorization Requirements for Opioid Dependence Medications
- Thomas J. Force, How to Obtain Increased Reimbursement on Your Out-of-Network Claims
- Websites of the following treatment providers: Betty Ford Center, Caron, Hazelden, Passages Malibu, and Promises
- W.M. Burdon, et al., Differential Effectiveness of Residential Versus Outpatient Aftercare for Parolees from Prison-based Therapeutic Community Treatment Programs
- U.S. Department of Labor's 2022 Mental Parity and Addiction Equity Act Report to Congress
- U.S. Senate Finance Committee Report on Mental Health care in the United States: The Case for Federal Action, (2022)
- U.S. Department of Health and Human Services, Office of the Assistant Secretary for Planning and Evaluation, New HHS Study Shows 63-Fold Increase in Medicare Telehealth Utilization During the Pandemic, December 2021
- Mehrotra A et al., The Impact of COVID-19 on Outpatient Visits in 2020: Visits Remained Stable, Despite a Late Surge in Cases, Commonwealth Fund, Feb. 2021
- Au-Yeung CM, Blewett LA, Winkelman TN, Increasing Access to Medications for Opioid Use Disorder: Policy Strategies During and After COVID-19 Pandemic, October 2021

In addition to the general resource material listed above used in preparation of this report, I reviewed and/or analyzed the following items provided by Arnall Golden Gregory LLP:

### *TML Recovery, LLC v. Cigna Corporation et al*., United States District Court, Central District of California, Case No. 8:20-cv-00269-DOC-JDE

- Stipulated Protective Order, ECF No. 19
- Consolidated Second Amended Complaint, ECF No. 79

- myCigna - Legal Disclaimer (September 29, 2020)
- Cigna AEO Documents, Cigna_TML00171620, Cigna_TML00171630, Cigna_TML00171649, Cigna_TML00171650, Cigna_TML00171717, Cigna_TML00171719, Cigna_TML00171752, Cigna_TML00171753, Cigna_TML00171756, Cigna_TML00171757, Cigna_TML00171773, Cigna_TML00171774, Cigna_TML00171781, Cigna_TML00171782, Cigna_TML00171784, Cigna_TML00171786, Cigna_TML00172045, Cigna_TML00172046
- Cigna's Claim Report, Volume 12, Cigna_TML00195700-8
- 2015-2016 Standards and Guidelines - Medical Necessity Criteria, Cigna_TML00065727
- 2017-01 Standards and Guidelines - Medical Necessity Criteria, Cigna_TML00065470
- 2018-01 Standards and Guidelines - Medical Necessity Criteria, Cigna_TML00065347
- 2019-01 Standards and Guidelines - Medical Necessity Criteria, Cigna_TML00065848
- 2020-01 Standards and Guidelines - Medical Necessity Criteria, Cigna_TML00065604
- 2020-04 Standards and Guidelines - Medical Necessity Criteria, Cigna_TML00065261
- Intro to ASAM Criteria for Patients and Families, Cigna_TML00065718

- Synopses of patient treatment records and claims administration documents, including Summary Plan Documents, Administrative Service Agreements, Global Agreements, Verification of benefits, claims reports, Patient, Plan and Claims Spreadsheets, Explanation of Benefits, Assignment of Benefits, and other patient specific documents and summaries for the following providers and patients:

  - Addiction Health Alliance patients JJ, SK, HS, PS, CC, JG, JG, MS
  - DR Recovery Encinitas patients CB, SK, CL, YP, CC, JJ, WP, CS
  - MMR Services patients MB, BF, MH, SW, CC, IE, AF, CG
  - Pacific Palms Recovery patients NAG, AF, LM, MS, CC, MH, ML, GSB
  - Southern California Addiction Center patients BG, AK, RM, MY, TB, CC, MC, RM
  - Southern California Recovery Center Oceanside patients JG, JJ, JL, PK, JP, PS, BD
  - TML Recovery patients BB, MC, ML, DM, KA, MC, AF, AM
  - Woman's Recovery Center patients DH, ET, MT, LA, AB, LE, ML

- myCigna - Legal Disclaimer (February 21, 2023)
- Skilled Nursing Facility Glossary
- Index of FAIR Health benchmark rates
- Insurance Companies Make Commitment To Address Opioid Crisis, November 9, 2017

- Skilled Nursing Facility Glossary

***RJ v. Cigna Behavioral Health, Inc., et al.***, **United States District Court, Northern District of California, Case No. 20-cv-02255-NC**

- Stipulated Protective Order, ECF No. 22
- First Amended Complaint, ECF No. 63
- Plaintiff's Motion for Class Certification and Memorandum in Support of Motion, ECF No. 148
- Deposition transcript and exhibits for Cigna witness JoAnne Forrest, dated October 14, 2022
- Deposition transcript and exhibits for MultiPlan witness Sean Crandell, dated October 20, 2022
- Deposition transcript and exhibits for Cigna witness Michael Battistoni, dated October 25, 2022
- Deposition transcript and exhibits for Cigna witness Mario N. Vangeli, dated November 4, 2022
- Deposition transcript and exhibits for Cigna witness Terri Cothron, dated November 8, 2022
- Deposition transcript and exhibits for Cigna witness Jo-Ann Lebel, dated November 29, 2022
- Plaintiffs' Motion for Partial Summary Judgment regarding United's Counterclaim, Addiction Health's Declaration, ECF 145
- Plaintiffs' Motion for Partial Summary Judgment regarding United's Counterclaim, MMR Declaration, ECF 145-4
- Plaintiffs' Motion for Partial Summary Judgment regarding United's Counterclaim, Pacific Palm Recovery's Declaration, ECF 145-5
- Plaintiffs' Motion for Partial Summary Judgment regarding United's Counterclaim, Southern California Addiction Center's Declaration, ECF 145-6
- Plaintiffs' Motion for Partial Summary Judgment regarding United's Counterclaim, TML Recovery's Declaration, ECF 145-7
- Plaintiffs' Motion for Partial Summary Judgment regarding United's Counterclaim, Woman's Recovery Declaration, ECF 145-8
- Plaintiffs' Motion for Partial Summary Judgment regarding United's Counterclaim, DR Recovery's Declaration, ECF 147

***In the Matter of the Certificate of Authority of: Health Net Life Insurance Company***, **Insurance Commissioner of the State of California, CDI File No. UPA-2016-00005**

- Order to Show Cause, CDI
- Order to Show Cause Health Net, State of California Insurance Commission

***In the Matter of UnitedHealth Group Incorporated***, **State New York Office of the Attorney General, Investigation No. 2008-161**

- Assurance of Discontinuance Under Executive Law § 63(15)

**Articles**

- *"What Is the Definition of Addiction?"* The American Society of Addiction Medicine
- Availability Without Accessibility? State Medicaid Coverage and Authorization Requirements for Opioid Dependence Medications, Suzanne Gelber Rinaldo & David W. Rinaldo, American Society of Addiction Medicine (2013)
- "Drug overdoses are costing the U.S. economy $1 trillion a year, government report estimates," CNBC, February 8, 2022
- Michael C. Barnes, et al., Potential Impact of Texas et al v United States on Persons with Substance Use Disorder, ABA Health eSource (Oct. 2018)

**Congressional Reports and Studies**

- Department of Labor, 2022 MHPAEA Report to Congress, (2022)
- U.S. Senate Finance Committee Report on Mental Health Care in the United States: The Case for Federal Action, March 2022
- U.S. Department of Health and Human Services, Office of the Assistant Secretary for Planning and Evaluation, New HHS Study Shows 63-Fold Increase in Medicare Telehealth Utilization During the Pandemic, December 2021
- Increasing Access to Medications for Opioid Use Disorder: Policy Strategies During and After COVID-19 Pandemic, Au-Yeung CM, Blewett LA, Winkelman TN, October 2021
- H.R.-7780-SAP
- Overview of SUD Care Clinical Guidelines, A Resource for States Developing SUD Delivery System Reforms, medicaid.gov
- Medicare Coverage of Substance Abuse Services, CMS MLN Matters SE1604, April 28, 2016 (links in article updated on May 10, 2019)

**Research and Survey Materials**

- The Principles of Drug Addiction Treatment: A Research-Based Guide, National Institute on Drug Abuse
- Results from the 2010 National Survey on Drug Use and Health: Summary of National Findings, Center for Behavioral Health Statistics and Quality
- Status of Federal Funding for Addiction Services, National Association of State Alcohol and Drug Abuse Directors, March 3, 2014
- National Expenditures for Mental Health Services & Substance Abuse Treatment 1986-2009, Substance Abuse and Mental Health Services Administration
- 2020 NSDUH Detailed Tables, Substance Abuse and Mental Health Services Administration
- Principles of Drug Addiction Treatment: A Research-Based Guide 13-14, National Institute on Drug Abuse (3rd ed. 2012)
- "Status of State Medicaid Expansion Decisions: Interactive Map," KFF, published Jan. 31, 2022

## IV.    Background

The following facts support the findings in my opinion.

### A.    Addiction Defined

Addiction is a treatable, chronic medical disease involving complex interactions among brain circuits, genetics, the environment, and an individual's life experiences. People with addiction use substances or engage in behaviors that become compulsive and often continue despite harmful consequences.[13] This is reflected in an individual's pathological pursuit of reward[14] or relief through substance use and other behaviors. Addiction is characterized by:

- Inability to consistently abstain;
- Impairment in behavioral control;
- Craving, or increased "hunger" for drugs or rewarding experiences;
- Diminished recognition of significant problems with one's behaviors and interpersonal relationships; and
- A dysfunctional emotional response.[15]

### B.    Principles of Addiction Treatment

Like other chronic diseases, addiction often involves cycles of relapse and remission, meaning periods of relapse may interrupt spans of remission.[16] Without treatment or engagement in recovery activities, addiction is progressive and can result in disability or premature death.

Extensive data shows that addiction treatment is as effective as most well-accepted treatments for other chronic medical conditions.[17] Three decades of scientific research and clinical practice have yielded a variety of approaches to addiction treatment; the most effective approaches pair the patient's needs with scientifically researched services anticipated to have the highest impact. Treatment programs typically incorporate many components of care, each aimed to address a particular aspect of the illness and its consequences. For instance, specific pharmacologic and psychosocial treatments are frequently combined, which often leads to better treatment retention

---

[13] The American Society of Addiction Medicine. "What Is the Definition of Addiction?"
https://www.asam.org/quality-care/definition-of-addiction. (Accessed: January 26, 2023).

[14] Pathologically pursuing reward has multiple components. It is not necessarily the amount of exposure to the reward (e.g., the dosage of a drug) or the frequency or duration of the exposure that is pathological. In the disease of addiction, pursuit of rewards persists, despite life problems that accumulate due to addictive behaviors, even when engagement in the behaviors ceases to be pleasurable. Similarly, in earlier stages of addiction, or even before the outward manifestations of addiction have become apparent, substance use or engagement in addictive behaviors can be an attempt to pursue relief from dysphoria; while in later stages of the disease, engagement in addictive behaviors can persist even though the behavior no longer provides relief.

[15] These five features are not intended to be used as "diagnostic criteria" for determining if addiction is present or not. Although these characteristic features are widely present in most cases of addiction, regardless of the pharmacology of the substance use seen in addiction or the reward that is pathologically pursued, each feature may not be equally prominent in every case. The diagnosis of addiction requires a comprehensive biological, psychological, social and spiritual assessment by a trained and certified professional.

[16] It is also important to recognize that return to drug use or pathological pursuit of rewards is not inevitable.

[17] A.T. McLellan et al., *Drug Dependence, a Chronic Medical Illness: Implications for Treatment, Insurance, and Outcomes Evaluation*, 284 J. OF AM. MED. ASS'N.1689–1695 (2000).

and outcomes.[18]

Below are summaries of some of NIDA's Principles of Effective Treatment:[19]

- Addiction is a complex but treatable disease that affects brain function and behavior.
- No single treatment is appropriate for everyone. Matching treatment settings to an individual's particular problems and needs is critical to his or her ultimate success in returning to productive functioning.
- Treatment must be readily available.
- Effective treatment attends to multiple needs of the individual, not just his or her substance use.
- Remaining in treatment for an adequate period of time is critical. The appropriate duration for an individual depends on the type and degree of the patient's problems and needs. Research indicates that most addicted individuals need at least **three months**[20] in treatment to significantly reduce or stop their drug use and that the best outcomes occur with longer durations of treatment.
- Programs should include strategies to engage and keep patients in treatment because individuals often leave treatment prematurely.
- An individual's treatment and service plan must be assessed continually and modified as necessary to ensure that it meets the individual's changing needs.
- Recovery from drug addiction is a long-term process and frequently requires multiple episodes of treatment. As with other chronic illnesses, relapses to drug abuse can occur and should signal a need for treatment to be reinstated or adjusted.

Treatment works best when it is driven by assessment, buttressed with case management, and completed with follow up care in the community. The treatment plan should address how the patient will achieve and maintain abstinence and improve his or her ability to function physically, socially, and psychologically.[21]

## C.    Treatment Setting

Treatment for substance use and addiction is delivered in many different settings using a variety of behavioral and pharmacological approaches. For instance, treatment may be delivered in outpatient, inpatient, and residential settings. It is important to have outpatient services in every community, intensive outpatient services serving geographic clusters, and geographically dispersed regional and national residential services. Options in various locations are important because people with the severity of problems that require residential treatment may have a

---

[18] L. Siqueland L & P. Crits-Christoph, *Current Developments in Psychosocial Treatments of Alcohol and Substance Abuse*, 1 CURRENT PSYCHIATRY REP. 179–184 (1999).

[19] *The Principles of Drug Addiction Treatment: A Research-Based Guide*, NATIONAL INSTITUTE ON DRUG ABUSE, *available at* http://www.drugabuse.gov/publications/principles-drug-addiction-treatment-research-based-guide-third-edition/drug-addiction-treatment-in-united-states.

[20] Emphasis added.

[21] A.G. Barthwell & L.S. Brown, *The Treatment of Drug Addiction: An Overview* ch. 24, PRINCIPLES OF ADDICTION MEDICINE (Richard K Ries et al. eds., 4th Ed. 2009).

greater tendency to seek treatment away from the complex psychosocial environment in which their problems first developed. Benefits of residential treatment can include a greater sense of safety and security, all-day programming and uninterrupted focus on recovery, fewer hassles of daily living, fewer environmental temptations or triggers to relapse, and the opportunity to build supportive relationships with other people in treatment.

Treatment centers using a 28-day model of care increased during the late 1970s and early 1980s in response to increasing demand, public recognition of treatment's usefulness, and a model of reimbursement for care that supported the growth. Programs with national reputations developed in the late 1990s in response to a need to provide specialty care and a full continuum of care as defined by ASAM. These programs with national reputations attract patients from all over the country, partially because they provide detoxification on-site and have the capacity to manage all patients who arrive for care. Many of these programs have added other regional facilities to their stable of programs[22] to provide alternatives to their flagship programs to meet the needs of geographic regions where many of their patients and former patients reside.

Nationally recognized programs rely on their reputations, referrals from former patients, referrals from interventionists who are familiar with their services, and marketing efforts from national outreach staff. Many target areas that are not served by regional residential centers.

Currently, in the United States, more than 14,500 specialized drug treatment facilities provide counseling, behavioral therapy, medication, case management, and other types of services to persons with SUDs. Some national programs provide niche markets with specific, highly developed services around a master clinician or school of thought. Niche markets include women's services (*e.g.*, Operation PAR in Florida), trauma (*e.g.*, The Refuge in Florida), eating disorders comorbid with SUDs (*e.g.*, Timberline Knolls in Illinois), professionals (*e.g.*, Talbott Recovery in Georgia), hospital extensions (*e.g.*, Pine Grove in Alabama), pain and addictions (*e.g.,* Las Vegas Recovery Center) and luxury programs (*e.g.*, Promises in California). Although specific treatment approaches often are associated with particular treatment settings, a variety of therapeutic interventions or services can be included in any given setting.

Drug abuse and addiction are also treated in physicians' offices and mental health clinics. Regardless of the setting, a variety of professionals, including counselors, physicians, psychiatrists, psychologists, nurses, and social workers, can contribute to effective addiction treatment.

### D.    The ASAM Criteria

*The ASAM Criteria* is the most widely used and comprehensive set of guidelines for placement, continued stay, transfer, or discharge of patients with addiction and co-occurring conditions. Formerly known as the ASAM patient placement criteria, *The ASAM Criteria* is the result of a collaboration that began in the 1980s to define one national set of criteria for providing outcome-oriented and results-based care in the treatment of addiction, originally called the Patient Placement Criteria (PPC).

---

[22] Examples include Caron with programs in Pennsylvania, Texas and Florida; Hazelden with a full continuum of care in Minnesota; and Springbrook in the Northwest.

In 1996, the second edition of the PPC was published (PPC-2). The PPC-2 defined six areas or dimensions of assessment.  In 2001, ASAM further revised and again published the criteria as the PPC-2R. Among other things, the PPC-2R provides guidance on specific services (*e.g.*, drug screening, medication compliance, punctuality training, motivational interviewing, etc.), treatment plan reviews, and assessing the patient's response to treatment. It defines the criteria necessary for admission and continued stay in a certain level of care, including the acceptable sources of data (direct interviews and collateral interviews with family, employers, etc.).

Today, many states across the country are using *The ASAM Criteria* as the foundation of their efforts to improve the addiction treatment system. Adolescent and adult treatment plans are developed through a multidimensional patient assessment over five broad levels of treatment that are based on the degree of direct medical management provided, the structure, safety and security provided, and the intensity of treatment services provided.  Some payers have looked to the ASAM Criteria and revised them, without the peer review provided the original Criteria and the multiple revisions, to support denial of services or limitation of services.  Providers may apply a rule that a patient fail at a certain level of care before being matched to one where success may be achieved at the intensity and for the time needed to bring about substantive change in the patient's life to support recovery.  Given the risk attendant to the use of illicit substances and the drug poisoning crisis, commonly referred to as the opioid epidemic, the practice of failure at a too low level of care is all too often, sadly, associated with death or permanent disability.

The current ASAM Criteria assess:

- **Dimension 1** - Acute Intoxication and/or Withdrawal Potential: Exploring an individual's past and current experiences of substance use and withdrawal.  It helps to predict the need for medication to manage withdrawal and conditions under which medical care is provided.
- **Dimension 2** - Biomedical Conditions and Complications: Exploring and individual's health history and current physical health needs.  It helps predict the need for admission into medical-surgical beds prior to or concurrent with the onset of addiction care. Additionally, it suggests the level of difficulty in managing medical care while engaged in addiction care.
- **Dimension 3** - Emotional, Behavioral, or Cognitive Conditions and Complications: Exploring an individual's mental health history and current cognitive and mental health needs.  It helps to predict the need for locked psychiatric units if there is imminent threat to self or others. If a psychiatric unit is not required, it addresses co-occurring emotional and behavior disorders that can complicate an individual's ability to engage in addiction care (*e.g.*, anxiety disorders making group participation difficult, depressive states that interfere with motivation to travel to treatment, etc.).
- **Dimension 4** - Readiness to Change: Exploring and individual's readiness for and interest in changing and reviews patient insight and compliance with directions.
- **Dimension 5** - Relapse, Continued Use, or Continued Problem Potential: Exploring and individual's unique needs that influence their risk for relapse or continued use.  It reviews skills acquisition and symptomology that interferes with intentions.

- **Dimension 6** – Recovering/ Living Environment: Exploring and individual's recovery or living situation, and the people and places that can support or hinder their recovery.  It reviews the structure or safety available to the individual to support the intention to resist use.

The ASAM Criteria also introduced more specific detail in the levels of care. The major levels of care are as follows:

- Level 0.5, Early Intervention
- Level 1, Outpatient Services
- Level 2.1, Intensive Outpatient Services
- Level 2.5, Partial Hospitalization
- Level 3.1 Clinical Managed Low-Intensity Residential Services
- Level 3.3, Clinically Managed Population-Specific High-Intensity Residential Services
- Level 3.5, Clinically Managed High-Intensity Residential Services
- Level 3.7, Medically Monitored Intensive Inpatient Services
- Level 4, Medically Managed Intensive Inpatient Services.

These Levels are similar when discussing adolescent care.

### E. Recovery

Addiction professionals and persons in recovery find hope in recovery. Recovery is available even to persons who may not at first be able to perceive this hope. Recovery is recognized when the individual with SUD acknowledges the disease, commits to recovery in a heart-felt way, and reduces or eliminates inducements to use.  Some individuals, during and after an episode of treatment, my remain abstinent to convince others around them of their commitment to recover, while never actually making the commitment.  When use resumes following this self-imposed, or sometimes coerced, period of abstinence, it is continued use and NOT a relapse.

As in other health conditions, recovery from addiction is best achieved through a combination of self-management, mutual support, and professional care provided by trained and certified professionals. Peer support, such as that found in various "self-help" activities, is beneficial in optimizing health status and functional outcomes in recovery.[23]

Participation in alumni programs can encourage support and connection to prevent post-treatment substance use. Most national programs have such programs and facilitate connection with others who have had a similar treatment experience. The professionals who develop such programs are often seen as a part of a provider's marketing efforts in that they seek to have satisfied consumers remember them for referrals of family members and friends.

---

[23] *See ASAM Public Policy Statement on the Relationship between Treatment and Self Help: A Joint Statement of the American Society of Addiction Medicine, the American Academy of Addiction Psychiatry, and the American Psychiatric Association*, AMERICAN SOCIETY OF ADDICTION MEDICINE, *available at* http://www.asam.org/docs/publicy-policy-statements/1treatment-and-self-help---joint-12-971.pdf.

## F.        Access to Care/Funding

Drug abuse and addiction are major public health problems, and it has long been recognized that the public system needs to act as a safety net for addiction treatment services. A large portion of drug treatment is funded by local, state, and federal governmental entities, though these public addiction treatment services remain significantly underfunded and can have long waiting lists which vary by state and geographic region. To use these services, patients also must qualify for this assistance on a means test.

As indicated by the passage of the MHPAEA, health insurance is an essential element in accessing addiction treatment services for most individuals in need. In some states, the public sector programs serve individuals under first-, second-, or third-party pay arrangements, and the state sees itself as the payer of last resort. While the state may be the payer of last resort, individuals with third-party insurance coverage who present themselves to programs in the public sector are often prioritized over the truly indigent, as the reimbursement helps the public program diversify its sources of revenue and often, though meager, may receive more for the hour/slot/bed that the insured individual with an SUD occupies.  Because these services are subsidized by the public funding, the cost to the third-party is generally lower than in the private sector, resulting  in a perverse incentive to drive the insured into the already strained public sector.   Persons suffering from addiction often face significant financial hardship as a result of their disease, which greatly impacts the ability to pay for treatment. These hardships are due to loss of employment or failure to secure employment due to positive pre-employment drug screens, estrangement from family who may have resources or coverage, and loss of financial stability due to large expenditures on drugs or legal defense services due to arrests from substance caused or related crimes (*e.g.,* drug sales, home invasions, public inebriation, issuing and uttering, etc.)

A large population of individuals neither qualifies for government assistance nor has access to insurance benefits. For instance, in 2010, an estimated 4.8 million individuals with SUDs lacked insurance, and among persons who received substance use treatment at a specialty facility, 41.5 percent reported using their "own savings or earnings" as a source of payment for such treatment.[24] Moreover, research has shown that many individuals who have SUDs have low income, and even among those who are employed or have substantial income, as the addiction progresses, those incomes may decrease, and subsequently, once-covered or wealthy patients may have to rely on public funding in order to access addiction treatment.[25] In some cases, family members are forced to refer their loved ones to the criminal justice system to ensure that they can get treatment. Alternatively, access to insurance can allow individuals to obtain the treatment that they need.

---

[24] *Results from the 2010 National Survey on Drug Use and Health: Summary of National Findings*, CENTER FOR BEHAVIORAL HEALTH STATISTICS AND QUALITY, *available at* http://www.samhsa.gov/data/nsduh/2k10nsduh/2k10results htm; Harold Pollack, *4.8 Million People Uninsured with Drug or Alcohol Problems*, THE INCIDENTAL ECONOMIST, Aug. 17, 2013, *available at* http://theincidentaleconomist.com/wordpress/4-8-million-people-uninsured-with-drug-or-alcohol-problems/.
[25] Suzanne Gelber Rinaldo & David W. Rinaldo, *Availability Without Accessibility? State Medicaid Coverage and Authorization Requirements for Opioid Dependence Medications*, AMERICAN SOCIETY OF ADDICTION MEDICINE (2013).

Although private and employer-subsidized health plans may provide coverage for treatment of addiction and its medical consequences, private insurers as payers for addiction benefits have steadily declined since 1986. Between 1986 and 2009, the share of substance abuse spending increased for Medicaid (from 9 percent to 21 percent) and for other state and local governments (from 27 percent to 31 percent) and decreased for private insurance (from 32 percent to 16 percent).[26]

From 1986 to 2009, nominal substance abuse spending growth (4.4 percent annually, on average) was slower than the growth for all-health (7.5 percent) and mental health (6.8 percent).[27]

Unfortunately, managed care also has resulted in shorter average stays, while a historical lack of or insufficient coverage for substance abuse treatment has curtailed the number of operational programs. The National Survey on Drug Use and Health (NSDUH)[28] illustrates this point.

The NSDUH provides national and state-level data on the use of tobacco, alcohol, and illicit drugs (including non-medical use of prescription drugs) in the United States. The survey includes a series of questions to assess the prevalence of substance use, including alcohol and illicit drugs, over the past 12 months. Questions are structured to classify persons as dependent on or abusing specific substances based on criteria specified in the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV and DSM-5).

In addition to questions about substance use employed to classify respondents' need for treatment, NSDUH includes questions about respondents' perceived need for treatment (*i.e.*, whether they felt they needed treatment or counseling for alcohol or illicit drug use). The survey found that in 2020, 41.1 million persons aged 12 or older needed treatment for substance use (14.9 percent of persons aged 12 or older). Some and 2.7 million persons (1.0 percent of persons aged 12 or older and 6.5 percent of those who needed treatment) received treatment at a specialty facility.

Among persons who received treatment at a specialty facility, 31.6 percent reported using their "own savings or earnings" as a source of payment, 48.1 percent reported using private health insurance, 30.0 percent reported using public assistance other than Medicaid, 48.8 percent reported using Medicaid, 20.0 percent reported using funds from family members, and 40.0 percent reported using Medicare.

Of the 27.6 million who were classified as needing but not receiving treatment, 559,000 persons (2.0 percent) reported that they perceived a need for treatment for their alcohol or illicit drug use problem. Of these 559,000 persons who felt they needed treatment but did not receive it in 2020, 115,000 (20.6 percent) reported that they made an effort to get treatment, and 444,000 (79.4 percent) reported making no effort to get treatment.

[26] *Status of Federal Funding for Addiction Services,* NAT'L ASS'N OF STATE ALCOHOL AND DRUG ABUSE DIRECTORS, March 3, 2014, *available at* https://www.naadac.org/assets/2416/2014aina_morrison_rob_nasadad.pdf.
[27] *National Expenditures for Mental Health Services & Substance Abuse Treatment 1986-2009*, SUBSTANCE ABUSE AND MENTAL HEALTH SERVICES ADMINISTRATION, *available at* http://store.samhsa.gov/shin/content//SMA13-4740/SMA13-4740.pdf.
[28] *2020 NSDUH Detailed Tables*, SUBSTANCE ABUSE AND MENTAL HEALTH SERVICES ADMINISTRATION, *available at* https://www.samhsa.gov/data/report/2020-nsduh-detailed-tables

Among those who needed and perceived the need for treatment yet made no effort to receive treatment, the reasons for not seeking treatment included:

- No health coverage and could not afford cost (19.1 percent),
- Did not find program that offered type of treatment that was wanted (14.4 percent)
- Concern that receiving treatment might cause neighbors/community to have a negative opinion (11.9 percent),
- Could handle the problem without treatment (9.0 percent),
- Did not want others to find out (6.5 percent),
- Did not have time (5.2 percent), and
- No openings in a program (1.7 percent).

Among people aged 12 or older in 2020 who needed substance use treatment but did not receive it, 97.5 percent did not feel that they needed treatment. These statistics highlight the need to provide greater consumer access to quality, affordable health care that includes routine screenings for substance use, therapeutic interventions, evidence-based treatment, and recovery support.

It is important to have addiction treatment providers willing to take health insurance to provide access to care that would be otherwise unavailable. Addiction treatment providers, recognizing the need to allow patients to use their health insurance benefits, will typically accept insurance; however, these providers often prefer to work outside of commercial insurer networks. Not only is the amount of reimbursement often set lower than the cost of care within network, but treatment planning, including length of stay, is no longer clinically driven when an insurance company limits services without regard for the patient's medical needs. Other than the unrealistically low reimbursement, the most frustrating aspect of negotiated care within network is when inappropriate limits are applied or length-of-stay decisions are determined by an individual not working clinically with the patient (and often without clinical experience).

People with SUDs often face greater financial hardships than other patients, despite the availability of insurance, due to the nature of the disease and its consequences. Patients with SUDs may be insured by a working relative but underemployed or unemployed themselves due to their disorder. It is sometimes difficult to get family members to use their policy for treatment. The family member may not want his or her employer to know about the covered relative having a problem, or the family member may be skeptical of treatment. A lack of family support may exist before and after treatment, so individuals with SUDs may be homeless or may not have housing options after treatment. The lack of family support, housing, and employment often make post-treatment collection of fees virtually impossible.

Addiction treatment providers recognize financial difficulties facing patients – even those with health insurance that covers treatment for SUDs. Addiction treatment providers also have significant experience in dealing with the problems associated with the collection of fees. Many providers use a model of insurance, advance out-of-pocket payments, and financial aid to enable patients to access treatment. Some providers use promissory notes. Attempts to collect the portion of the medical bill for which the patient is responsible must account for the impacts that financial stress and aggressive collection tactics can have on a person's fragile recovery.

Addiction treatment providers accepting insurance incur additional costs and have entire departments dedicated to working with insurance companies to meet their requirements and attempt to collect payment. The Hazelden program is one example.

A small number of providers who service a limited group of individuals who are very wealthy can and do require full payment in advance; sometimes these individuals want to use their insurance benefits. To help the patient access insurance benefits, the provider will either manage the insurance policy with pre-certification and utilization review while in treatment or provide a comprehensive bill at the conclusion of care (which usually is not eligible for reimbursement without concurrent reviews).

Providers often must use an estimate of benefits for patients with insurance as the patient's clinical needs and length of stay are not known at the beginning of treatment. Providers also are affected by the insurer's limitations on care, as described above, which are often applied after treatment has concluded and the bill has been submitted. These treatment programs face the risk of receiving payments from insurers lower than those used in calculating the patient's up-front payment obligation.

Insurers' denials of care create a difficult dilemma for the treatment professional, whose last note in the chart documents the patient's clinical need and who knows, if she discharges the patient and the patient experiences an untoward event, the provider could be deemed liable for damages. Very few, if any, providers terminate care when insurance companies' interference becomes financially problematic. In fact, the provider's clinical relationship with the patient is at stake, and a sense of rejection could exacerbate the already grave risks associated with early termination of treatment Ethical SUD treatment providers are aware of the fragility of recovery and are generally reticent to terminate treatment before it is clinically appropriate to do so.

### G.    Substance Use Disorder and Drug Poisoning Crisis

On February 8, 2022, the U.S. Commission on Combating Synthetic Opioid Trafficking published its final report. The Commission cited statistics indicating that drug poisonings have been responsible for more than 1 million deaths in the U.S. since 1999. The Commission estimated that drug poisonings are now costing the U.S. around $1 trillion every year.[29]

More than 101,750 people died of drug poisonings in the 12 months ending in October 2022.[30] More than 76,900 of these deaths involved prescription or illicit opioids, such as illegal fentanyl and fentanyl analogs.[31] In fact, roughly 68 percent of all drug poisoning deaths and 86 percent of opioid poisoning deaths involved synthetic opioids (other than methadone), predominantly illicit fentanyl and its analogs.

---

[29] CNBC, "Drug overdoses are costing the U.S. economy $1 trillion a year, government report estimates," February 8, 2022, *available at* https://www.cnbc.com/2022/02/08/drug-overdoses-cost-the-us-around-1-trillion-a-year-report-says.html.

[30] https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data htm

[31] https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data htm

Millennium Health, a national drug testing laboratory, published a report in February 2023 entitled, "Fentanyl in Focus: Perspectives on Polysubstance Use in 2022."[32]

A key finding from the Millennium report was the increasing detection of fentanyl alongside cocaine, methamphetamine, heroin, and prescription opioids. Nationally, fentanyl is the most-detected drug, but the Western United States has seen the most significant rate of growth.

The Millennium data revealed that over 60 percent of fentanyl-positive specimens were also positive for one or more fentanyl analogs. This finding could indicate that the use of multiple fentanyl analogs may be a form of intentional polysubstance use. Geographical analysis also showed regional differences in the prevalence of certain fentanyl analogs.

Furthermore, the Millennium data indicated that individuals with fentanyl-positive specimens were more likely to engage in polysubstance use in comparison with those who had fentanyl-negative specimens. Researchers also found that, given the regional differences, state and local data might be more significant to health care providers than national data alone. An understanding of local trends is essential for the development of effective SUD treatment plans.[33]

Treatment for SUD has shown to be effective in reducing the impact of the disease as well as the public health burden. Appropriate treatment can reduce the number of poisonings and deaths and can increase productivity. Every dollar invested in SUD treatment programs yields a return of between $4 and $7 in increased earnings and decreased drug-related crime, criminal justice costs, and theft.[34] Providing coverage of SUD treatment can not only save lives but also generate significant cost savings.

### H.     Steps Toward Reform

Prior to the enactment of the Patient Protection and Affordable Care Act of 2010 (ACA), health insurers in both public and private plans routinely denied coverage to individuals with SUDs. Health plans discriminated against individuals with SUDs on the basis of preexisting condition by either excluding them from coverage or limiting access to treatment through the use of higher copayments, annual visit limits, and burdensome prior authorization requirements.[35]

The ACA and its implementing regulations significantly expanded insurance coverage and access for individuals with SUDs. For example, the law requires small group plans, individual plans, and Medicaid alternative benefit packages (ABPs) to cover SUD services as one of ten essential health benefits. The ACA also requires health insurers to accept people who apply for coverage regardless of preexisting conditions. The ACA prohibits insurers from charging higher premiums based on health condition, meaning insurers may not exclude individuals with SUDs from coverage or charge them more based on their conditions. The ACA also caps annual out-of-pocket costs for health plan enrollees and prohibits individual plans, small group plans, and

---

[32] http://resource millenniumhealth.com/signalsreportvol5

[33] http://resource millenniumhealth.com/signalsreportvol5

[34] Nat'l Inst. On Drug Abuse, Principles of Drug Addiction Treatment: A Research-Based Guide 13-14 (3rd ed. 2012), *available at* https://d14rmgtrwzf5a.cloudfront net/sites/default/files/675-principles-of-drug-addiction-treatment-a-research-based-guide-third-edition.pdf.

[35] Michael C. Barnes, et al., *Potential Impact of Texas et al v United States on Persons with Substance Use Disorder*, ABA Health eSource (Oct. 2018).

ABPs from putting yearly or lifetime dollar limits on the coverage of SUD services.[36] The ACA additionally allows states to expand Medicaid coverage to all uninsured adults under the age of 65 with incomes up to 138 percent of the federal poverty level. As of January 2022, 39 states (including Washington, DC) have expanded Medicaid in line with the ACA, and 12 states have not.[37]

Finally, the ACA and its implementing regulations expanded federal parity protections. In 2008, Congress passed the MHPAEA, which mandated parity in insurance coverage between mental health/substance use disorder and medical/surgical services, including both treatment limitations and financial requirements. The MHPAEA only applied to privately insured large group plans that voluntarily offered coverage of MH/SUD benefits. The ACA expanded the MH/SUD parity protections in the MHPAEA to individual and small group plans. In 2016, the Centers for Medicare & Medicaid Services expanded parity protections to Medicaid managed care organizations, Medicaid ABPs, and the Children's Health Insurance Program.[38]

Just as the SUD and drug poisoning crisis was increasing the demand for SUD treatment, federal regulations requiring most health insurance plans to provide coverage of SUD treatment took effect. As of 2014, many Americans had access to SUD treatment for the first time. Naturally, the number of health insurance claims for SUD treatment services increased.

The expansion of the MHPAEA required that many more health insurers' treatment limitations and financial requirements for people being treated for SUD be in parity with those applied to people receiving medical or surgical care. As a result, the dollar value of insurance claims for SUD treatment services also increased.

Congressional efforts to reduce SUD and drug poisonings by providing accessible and affordable treatment remain ongoing. In September of 2022, the House passed H.R. 7780, the Mental Health Matters Act, which will expand access to mental health and SUD services by preventing Americans from being improperly denied mental health and substance use benefits, ensuring a fair standard of review by the courts and banning forced arbitration agreements.[39]

As demonstrated by the Department of Labor's report,[40] health insurance companies are recalcitrant in adjusting to and complying with the requirements of the ACA and MHPAEA that are rapidly evolving to provide access and coverage for SUD treatment.

---

[36] Michael C. Barnes, et al., Potential Impact of Texas et al v United States on Persons with Substance Use Disorder, ABA Health eSource (Oct. 2018).

[37] KFF, "Status of State Medicaid Expansion Decisions: Interactive Map," published Jan. 31, 2022, *available at https://www.kff.org/medicaid/issue-brief/status-of-state-medicaid-expansion-decisions-interactive-map/.*

[38] Michael C. Barnes, et al., Potential Impact of Texas et al v United States on Persons with Substance Use Disorder, ABA Health eSource (Oct. 2018).

[39] https://www.whitehouse.gov/wp-content/uploads/2022/09/H.R.-7780-SAP.pdf

[40] DEP'T OF LABOR, 2022 MHPAEA REPORT TO CONGRESS, (2022)
https://www.dol.gov/sites/dolgov/files/EBSA/laws-and-regulations/laws/mental-health-parity/report-to-congress-2022-realizing-parity-reducing-stigma-and-raising-awareness.pdf.

## V.      Factual Summary

Plaintiffs' counsel had not supplied me with any depositions taken in this action as of the time I prepared this report, though I have had access to deposition transcripts taken in the related action – *RJ, et al. v. Cigna Behavioral Health et al.* (*RJ*) – for which I have also been retained as a consultant. I expect to receive transcripts of depositions taken in this action as they are completed, and I intend to supplement this report with any relevant testimony.

The following facts are drawn from Plaintiffs' Consolidated Second Amended Complaint (SAC) [ECF No. 79]. Plaintiffs are OON SUD treatment providers and clinical laboratories. SAC ¶ 23. Plaintiffs are in the profession of helping individuals recover from substance use disorders and return to their families and communities as healthy and productive members of society. *Id.* Plaintiffs are certified to provide these services by the California Department of Health Care Services. *Id.* ¶ 1.

Cigna[41] is an insurance company licensed to do business in the state of California as providers of health insurance benefits. *Id.* ¶¶ 10-16. MultiPlan[42] is a provider of healthcare cost management solutions, specializing in providing claim cost management solutions, health care payment solutions, auditing and reimbursement of behavioral health and substance use disorder claims and costs, as well as prepayment services such as treatment facility and professional bill review and negotiations for controlling the financial risks associated with health care bills on plans insured, managed, or administered by Cigna and its subsidiaries and affiliates. *Id.* ¶¶ 17-18.

Plaintiffs provided medically necessary, preauthorized, and covered SUD treatment and laboratory services to 508 of Cigna's insured members (the patients), including residential withdrawal management and residential treatment (RTC), partial hospitalization/day treatment (PHP), intensive outpatient (IOP), outpatient (OP), treatment planning, counseling and behavioral therapies, family and group therapy, medication management, case management services, and laboratory services to, among other things, determine, measure, or otherwise describe the presence or absence of various substances in the body. *Id.* ¶ 22. The health insurance plans provide coverage for OON SUD treatment and laboratory services. *Id.* ¶ 23.

Before rendering treatment to the patients, Plaintiffs obtained written assignments of benefits from each of the patients. *Id.* ¶ 25. Cigna confirmed, represented, promised, and warranted Plaintiffs through the required verification of benefits process that each of the insureds and their respective OON SUD treatments and services were covered by health insurance plans issued, managed, or administered by Cigna and MultiPlan. *Id.* ¶ 28. In reliance on these assignments of benefits and Cigna representations, Plaintiffs rendered treatment to the patients. *Id.* Cigna knew that Plaintiffs were treating and providing services and were advised and fully aware of Plaintiffs' charges for the treatment and services rendered. *Id.* After providing treatment and services to the patients, Plaintiffs submitted their claims to Cigna for payment. *Id.* ¶ 29.

I have been advised that Plaintiffs and Defendants selected a sample set of the patients for

---

[41] By "Cigna," I refer to Cigna Corporation, Cigna Health and Life Insurance Company, Connecticut General Life Insurance Company, Cigna Behavioral Health, Inc., Cigna Behavioral Health of California, Inc., Cigna Health Management, Inc., and Cigna Healthcare of California, Inc.
[42] By "MultiPlan," I refer to MultiPlan, Inc. and Viant, Inc.

purposes of discovery. I have reviewed the claims charts and synopses of patient admission and treatment records, including Verification of Benefits (VOB), Assignment of Benefits (AOB), Explanation of Benefits (EOB) and Explanation of Payments (EOP), and other patient specific documents and summaries for the sample patients. I also reviewed documents produced by Defendants in this action, including internal document and communications, and claims administration documents, including Summary Plan Descriptions (SPDs), Administrative Services Only Agreements (ASOs), Cigna's Standards and Guidelines, SIU investigation files, emails, memoranda, spreadsheets, and slide decks. The following facts are drawn from these documents and the Defendants' witness testimony in the *RJ* action.

After Plaintiffs submitted their claims to Cigna for payment, Cigna paid Plaintiffs a nominal percentage of the charges for the claims that are at issue. Cigna accomplished this by, among other things, reimbursing the claims with an artificial "reasonable and customary" (R&C) rate,[43] and funneling claims to MultiPlan through its ███████████

██ █████

he Plaintiffs are not Medicare providers, and there is no Medicare rate for SUD treatment facilities such as Plaintiffs';

██████████. Cigna and MultiPlan's repricing methodologies are premised upon Medicare charge and reimbursement data, skewing the reimbursement rates lower.

According to Cigna's website, when calculating reimbursement for OON claims, the plans utilize any of the following three methodologies to calculate what Cigna defines as the "Maximum Reimbursable Charge" ("MRC").[45]

    a.    MRC I:

    Under this option, a data base compiled by FAIR Health, Inc. (an independent non-profit company) is used to determine the charges billed by health care professionals or facilities in the same geographic area for the same procedure codes using data. The maximum reimbursable amount is then determined by applying a percentile (typically the 70th or 80th percentile) of billed charges, based upon the FAIR Health, Inc. data. For example, if the plan sponsor has selected the 80th percentile, then any portion of a

---

[43] Also known as "Usual and Customary" (U&C).

[44] Order to Show Cause *In the Matter of the Certificate of Authority of Health Net Life Insurance Company* (CDI File No. UPA-2016-00005).

[45] myCigna - Legal Disclaimer; https://my.cigna.com/public/legal_disclaimer.html; https://static.cigna.com/assets/chcp/resourceLibrary/clinicalReimbursementPayment/medicalClinicalReimburseOutOfNetwork.html.

charge that is in excess of the 80th percentile of charges billed for the particular service in the same relative geographic area (as determined using the FAIR Health, Inc. data) will not be covered and reimbursed, and the patient will be fully responsible for such excess.

b.      MRC II:

This option uses a schedule of charges established using a methodology similar to that used by Medicare to determine allowable fees for services within a geographic market or at a particular facility. The schedule amount is then multiplied by a percentage (110%, 150% or 200%) selected by the plan sponsor to produce the MRC.

In the limited situations where a Medicare-based amount is not available (e.g., a certain type of health care professional or procedure is not covered by Medicare or charges relate to covered services for which Medicare has not established a reimbursement rate), the MRC is determined based on the lesser of:

> 1. the health care professional or facility's normal charge for a similar service or supply; or

> 2. the MRC Option I methodology based on the 80th percentile of billed charges.

c.      Average Contracted Rate ("ACR"):

Under this option, the MRC is determined based on the lesser of:

> 1. the health care professional or facility's normal charge for a similar service or supply; or

> 2. the Average Contracted Rate - i.e., the average percentage discount applied to all claims in a geographic area paid by Cigna during a recent 6-month period for the same or similar service provided by health care professionals or facilities participating in the Cigna network. The ACR is updated by Cigna on a semiannual basis. The geographic area used by Cigna is either a Metropolitan Statistical Area (MSA) or an area within governmental boundaries (e.g., state, county, zip code).

In some cases, the ACR amount will not be used and the MRC is determined based on the lesser of:

> 1. the health care professional or facilities' normal charge for a similar service or supply; or
>
> 2. the MRC I methodology based on the 80th percentile of billed charges."

The sample patients' SPDs that I reviewed contained either an MRC I reimbursement methodology that obligated Cigna to reimburse Plaintiffs' claims with an R&C rate such as those determined by using FAIR Health, or an MRC II reimbursement methodology that obligated Cigna to reimburse Plaintiffs' claims at either Plaintiffs' "normal charge for a similar service or supply; or the MRC Option I methodology [i.e., R&C] based on the 80th percentile of billed charges," for "situations [like here] where a Medicare-based amount is not available (e.g., a certain type of health care professional or procedure is not covered by Medicare or charges relate to covered services for which Medicare has not established a reimbursement rate)."[46]

The Centers for Medicare and Medicaid Services ("CMS") defines R&C as, "[t]he amount paid for a medical service in a geographic area based on what providers in the area usually charge for the same or similar medical service." As evidenced by the plan language below, this verbiage is commonly used by insurers and referred to as R&C and U&C. For example, one of the MRC I SPDs I reviewed states:[47]

> Maximum Reimbursable Charge is determined based on the lesser of the providers normal charge for a similar service or supply; or
>
> A percentile of charges made by providers of such service or supply in the geographic area where the service is received. These charges are compiled in a database we have selected [e.g., FAIR Health].

An MRC II SPD I reviewed states that the reimbursement methodology for OON claims is:[48]

> 70% of the Maximum Reimbursable Charge [MRC]… [MRC] is determined based on the lesser of the provider's normal charge for a similar service or supply; or… [110%] of a schedule that [Cigna] developed based upon a methodology similar to a methodology utilized by Medicare for similar service in geographic market; In some cases, a Medicare based schedule will not be used and the [MRC] for covered services is determined based on the lesser of:
>
> - the provider's normal charge for a similar service or supply; or

---

[46] *Id.*
[47] Cigna_TML00019837.
[48] Cigna_TML00025225–6.

- the 80th percentile of charges made by providers of such
  service or supply in the geographic area as compiled in
  database selected by [Cigna].



Cigna derives revenue in two ways under the ASOs when providing claims administrative
services for self-insured employers that sponsor health benefit plans for their employees that are
relevant to this action:

## VI.    Opinions

1.      Cigna implemented policies and systematic practices that emphasized profits over patients and resulted in the under-reimbursement of Plaintiffs' claims, with Cigna instead paying Plaintiffs an arbitrary, nominal percentage of the charges, far below a reasonable and customary rate.

Plaintiffs are not Medicare providers and there is no Medicare rate for SUD treatment facilities such as Plaintiffs';



Cigna disregarded the language it drafted into the SPDs that obligated Cigna to reimburse Plaintiffs' OON SUD claims with an R&C rate or the Plaintiffs' normal billed charges under either the MRC I or MRC II methodology given the absence of a Medicare rate, which is how Cigna historically had been reimbursing OON SUD claims prior to the 2015 changes to its reimbursement policies. Instead, Cigna

The MRC I methodology makes no mention that Cigna would use a                              ear no relationship to an R&C rate or the FAIR Health benchmark rate for SUD services, or to Plaintiffs' "normal charge for a similar service or supply" as represented in the MRC I SPDs and in Cigna's online legal disclaimer.

The MRC II methodology allows for the use of a Medicare-based reimbursement rate, but only when a Medicare rate is available and only if Cigna bases that rate "upon a methodology similar to a methodology utilized by Medicare for a similar service in the geographic market" as represented in the MRC II SPDs and in Cigna's online legal disclaimer. There is no Medicare rate for SUD treatment facilities, and I saw no evidence that Cigna's methodology is similar to Medicare's methodology.

Cigna and MultiPlan's repricing methodologies and reimbursement rates are premised upon Medicare data purchased by Cigna and MultiPlan that they use to produce arbitrary, unreliable and unjust reimbursement rates for Plaintiffs' SUD services that are a nominal percentage of the charges and far from Plaintiffs' usual, reasonable and customary charges. These rates were arbitrary in that there is no evidence to indicate Cigna and MultiPlan arrived at these purported R&C reimbursement rates by analyzing data of billed charges made by healthcare professionals or facilities in the same geographic area for the same procedure codes. In fact, the evidence demonstrates that Cigna and MultiPlan arrived at these rates by analyzing claims data for different providers of different services in different geographic areas. It appears more likely than not that Cigna and MultiPlan arrived at these reimbursement rates not in an effort to fairly determine the R&C rates, but rather to increase their own profits.

███████████████████████████████████████████████████████████ The claims data for the
sample patients in this action demonstrates that ███████████████████████████

██████████████████████████████ For example, Cigna's claims data indicates that for one of the sample
patient's claims, the provider billed $3,418.00 for its services.[50] The sum paid to the provider
was only $369.04.[51] ████████████████████████████████████████████████
██████████████████████ The provider in this instance received ~10% of the
amount billed, while █████████████████████████████

██████████████████████████████████████ spending on SUD treatment at a time when a
million Americans have died from a drug poisoning. Cigna should have been implementing
initiatives and strategies to increase coverage and access to SUD treatment.

2.      There is no Medicare rate for inpatient or outpatient SUD services billed by residential
treatment facilities such as Plaintiffs, and ███████████████████████████
████████████████████████████████████████████

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

████████████████████████████████████████████████ SUD providers are tasked with the responsibility of treating
someone who can leave the treatment facility and gain access to alcohol, prescription drugs, and
illegal substances, such as fentanyl analogs. We are responsible not only to the patients but feel
an obligation to the public at large. Many people with SUDs are not only a danger to themselves
but to others. For example, people with SUDs may commit crimes, such as drug dealing, as a
consequence of their SUD. SUDs entail a plethora of risks that are less common at inpatient
psychiatric hospitals and typically not encountered at SNFs.

With increased risks, come increased duties and associated costs, which are reflected in amounts
SUD treatment facilities bill. SUD treatment facilities may provide inpatient services, which
entail less patient exposure to the outside community, or outpatient services, which entail greater
patient exposure to the outside community and related risks to the patient's SUD recovery. By
definition, ██████████████████████ services are not outpatient services and do not entail as
much exposure to the outside community and associated risks to recovery. SUD treatment
facilities provide varying levels of services not provided by ██████████████████████ and
medically specialized services not provided by ██████.

---

[49] Cigna_TML00195707
[50] Cigna's Claim Report Vol. 12 for DR Recovery Patient Jacob Jones Cigna_TML00195703, column DJ.
[51] *Id.*, also known as the allowed amount, column DL.
[52] *Id.*, columns DM and DO.



If a patient with an SUD is not successful in an outpatient setting, SUD treatment providers may decide that another treatment setting or level of care is more appropriate, whether inpatient, residential, partial hospitalization, or maybe a more intensive outpatient. Each level of care requires a different type of service, investment of time, and resources.[54] Beyond levels of care, each patient at an SUD treatment facility often requires different specialized services, many of which are not provided at ███████████████. For example, a marital or family issue may be at the center of someone's substance use. In this scenario, I would connect the patient with a family therapist to assess this issue and to work with the treating physician to develop a treatment plan. These types of specialized services are not available at many ██████. Similarly, many ███████ may employ physical therapists, which are rarely needed or present in SUD treatment facilities.

Cigna and MultiPlan's ████████████████████████████ is arbitrary and unreasonable considering the significant differences in treatment, care, risks, resources, and staffing. The services are not the same, and the Medicare rates for these differing facilities do not reflect what SUD providers in the same geographic area usually charge for SUD treatment. Indeed, Cigna and MultiPlan's █████████ of Plaintiffs' billing codes to Medicare rates resulted in reimbursement amounts that were generally between seven and 20 percent of Plaintiffs' billed charges. These Medicare-based rates are not SUD R&C rates, such as those generated by FAIR Health.

3.    Despite Cigna's payment obligations under the sample patients' SPDs, Cigna and MultiPlan used biased data systems, administrative burdens, and deceptive practices to avoid paying, or to pay unreasonably low reimbursement rates for Plaintiffs' OON SUD services.

As discussed above, MultiPlan's Master Services Agreement with Cigna provides for ████████

---

[53] https://www.cms.gov/glossary?term=skilled+nursing+facility&items_per_page=10&viewmode=grid#:~:text=A%20facility%20(which%20meets%20specific,treatment%20available%20in%20a%20hospital.

[54] For details in the details of the various levels of care see, https://www.medicaid.gov/state-resource-center/innovation-accelerator-program/iap-downloads/reducing-substance-use-disorders/asam-resource-guide.pdf

MultiPlan may bestow upon a provider the perception of in-network status with its network agreements, but MultiPlan will not guarantee reimbursement at the negotiated network rate, and ███████████████████████████████████████████ In negotiating single-claim agreements, MultiPlan employed questionable coercive tactics, offering Plaintiffs negotiated rates far below the R&C rate and a fraction of the billed charges with an indication that if not accepted, Plaintiffs could expect an even lower Medicare-based rate. As part of this negotiation process, MultiPlan conditions payment on the OON provider's agreement to waive the balance bill.

There are additional examples of Cigna and MultiPlan's use of flawed methodologies, biased data systems, burdensome requirements, and deceptive practices to avoid paying, or pay unreasonably low reimbursement rates for, OON SUD services.

4. 

The claim charts I reviewed reflect a number of claims where Cigna determined the allowed amount to be $0. When cross-referencing those patients' line item claims to the patients' charts, it is apparent that Cigna denied definitive drug testing claims pursuant to its Medical Coverage Policy for Drug Testing, which provides for presumptive drug testing not to exceed one test per date of service up to 32 tests per year, and definitive drug testing not to exceed one test per date of service up to 16 tests per year, subject to limiting factors.

Another group of claim denials were for services Cigna deemed not medically necessary. However, the vast majority of these claims were "administrative" denials for an alleged lack of documentation of the medical necessity, without any clinical review of the claim. The patient charts reflect the providers' compliance with Cigna's repeated requests for records, yet no acknowledgment by Cigna that it had received the requested records. There were some claim denials for lack of medical necessity where the claim was reviewed by a medical director. However, the medical director's opinion conflicted with the records in the patient's chart. Furthermore, it has been well-documented that Cigna's medical directors have a custom and practice of denying claims without ever reviewing the medical records.

According to investigative reporting conducted by the independent, not-for-profit ProPublica news publication and published on March 25, 2023, Cigna "has built a system that allows its doctors to instantly reject a claim on medical grounds without opening the patient file, leaving people with unexpected bills, according to corporate documents and interviews with former Cigna officials. Over a period of two months last year, Cigna doctors denied over 300,000 requests for payments using this method, spending an average of 1.2 seconds on each case"

The denials in this case are consistent with the initiatives described in the ██████████████ ████████████████████████████████████████████████████████



One such email message read,

Cigna_TML00171620. The new one-size-fits all rule denying coverage of quantitative (definitive) testing after a negative qualitative (presumptive) test is inconsistent with medical standards. Presumptive drug testing does not identify many substances, including fentanyl. At a time when more than 101,750 Americans are dying of drug poisonings, and more than 68 percent of those poisonings involve synthetic opioids like illegal fentanyl analogs, it is often medically necessary to conduct frequent definitive drug testing for many patients in the active treatment phase of SUD management.

## VII.   Compensation

I am being compensated at $1,250.00 per hour for my review of materials and preparation of this report.

## VIII.   Exhibits
- Curriculum Vitae
- List of cases in which expert testimony was provided

Dated:  March 30, 2023

By:   *Andrea G. Barthwell*

Andrea G. Barthwell, MD, DFASAM

# EXHIBIT E-4

REDACTED VERSION OF DOCUMENT PROPOSED TO BE

FILED UNDER SEAL L.R. 79-5.2.2(c)

Supplemental Report of Andrea G. Barthwell, MD, DFASAM

Submitted July 9, 2023
in the case of
*TML RECOVERY, LCC, et al. v. Cigna Corporation, et al.*
Case No.: 8:20-cv-0269-DOC-JDE
in the
United States District Court for the Central District of California

## I.        Introduction

Upon the request of Richard T. Collins, Esq., of Arnall Golden Gregory LLP, counsel for the Plaintiffs,[1] I have provided in this report a broad description of the substance use disorder (SUD), commonly referred to as addiction, treatment delivery systems in the United States. Additionally, I have reviewed numerous documents pertinent to the civil action described above and provided my opinion on the clinical and related practices the Plaintiffs follow in providing SUD treatment services and Defendants reimbursement of the resulting claims.

## II.        Qualifications

I have practiced Addiction Medicine since 1985, am certified by the American Board of Addiction Medicine, and am a Distinguished Fellow in the American Society of Addiction Medicine (ASAM). I have employed and overseen many forms of care used to treat alcoholism and other addictions. I have conducted research on the treatment of individuals in the office-based setting and on aggressive case management and its effect on treatment retention and outcomes.

I am a co-author of a chapter on the different modalities of SUD treatment in *Principles of Addiction Medicine*, ASAM's textbook. I was a reviewer of the first edition of *Principles of Effective Treatment*, the research-based guide on addiction treatment by the National Institute on Drug Abuse (NIDA). I have served on the  Department of Health and Human Services' National Institute of Health (NIH) National Advisory Committees of the National Institute on Alcoholism and Alcohol Abuse (NIAAA), NIDA, and the Substance Abuse and Mental Health Administration (SAMHSA) Center for Substance Abuse Treatment (CSAT). Additionally, as a consultant I trained state employees to use ASAM's PPC in annual compliance visits and post-treatment reviews.

In Illinois, I was the Medical Director of an organization contracting with the State of Illinois during the shift from grant-in-aid funding to fee-for-service funding using the adoption of ASAM's Patient Placement Criteria (PPC)[2] as the impetus for the shift.  In that position I helped develop a number of services our organization sold to third party payers in publicly-funded centers that were created and funded by CSAT's then forerunner, "the Office of Treatment Improvement (OTI), a

---

[1] By "Plaintiffs," I refer to those in Band 1 who I understand include:   12 South, LLC, Addiction Health Alliance, LLC, DR Recovery Encinitas, LLC, MMR Services, LLC, TML Recovery, LLC, Woman's Recovery Center, LLC, Pacific Palms Recovery, LLC, Southern California Recovery Centers Oceanside, LCC, and Southern California Addiction Center, Inc.

[2] The PPC is a system that provides separate placement criteria for adolescents and adults to create comprehensive and individualized treatment plans.

non-regulatory agency of the Federal Government intended to improve the quality of drug addiction treatment[3] Substance Abuse Prevention and Treatment Block Grant (SABG).  The SABG program provides funds to all 50 states, the District of Columbia, Puerto Rico, the U.S. Virgin Islands, 6 Pacific jurisdictions, and 1 tribal entity to prevent and treat substance abuse.

The demand for space in programs that was intended to provide SUD services and care to the indigent rose sharply during the early 1980s, along with a proliferation of programs in hospitals and free-standing residential centers developed by not-for-profit, compassionate organizations, such as the Betty Ford Center, as the recognition of SUD and its treatment grew in the public eye. The publicly-funded and subsidized system of care across the country has long been recognized as a safety net for all individuals, even those with employee provided insurance benefits. The services developed for third-party payers within the "indigent and entitlement public sector" were highly sought after by insured individuals for a number of reasons.  The third-party payer practice of denying coverage or requiring failure at a lower level of care than prescribed (step-coverage) encouraged individuals who might seek care at a private philanthropic, not-for-profit free-standing program or hospital intended for the insured to seek the assistance of the public programs. Deductibles and co-pays at the more expensive private facilities left individuals to make the choice to deny themselves the burden of future indebtedness against their own interests.  Failure to ensure adequate numbers and types of providers and services accessible in the private sector forced individuals into the public sector for care, lest they face long waits, costly travel to "so-called" nationally recognized centers, or no access and potential loss of life due to the long waiting lists and delays in ability to start treatment. In the early 1980s, waiting  lists of up to 15% of those actively seeking treatment were common.

While the U.S. government doubled funding for the SABG programs, private payers induced public programs to develop time-limited services for the insured rather than develop more private services to meet the increasing demand for treatment as individuals responded to public encouragement to stop drinking and the fear of AIDS to stop using drugs.  These pressures expanded due to increased awareness driven by the proliferation of programs such as Mothers Against Drunk Driving (MADD); Students Against Drunk driving (SADD); the National Youth Anti-Drug Campaign and its frying pan commercials; private advertising campaigns supported by programs such as the hospital based "Care Centers;" high profile celebrity open acknowledgments of treatment, recovery, and relapse- including the travails of a First Lady of the United States who went on to open a private facility, the Betty Ford Center; and even a monthly themed show on "Oprah," on which I appeared.

From 2002 to 2004, I served as the Deputy Director of Demand Reduction in the White House Office of National Drug Control Policy (ONDCP). In this U.S. Senate-confirmed position, I traveled extensively, visiting programs in almost every state. I reviewed and certified the budget of the Center for Substance Abuse Treatment (CSAT), a federal agency within the Substance Abuse and Mental Health Service Administration (SAMHSA).  In addition to the SABG program, I gained knowledge of a number of state financing models. At ONDCP, I also wrote the plan for President George W. Bush's national expansion of addiction treatment, known as, *Access to Recovery*. This initiative sought to provide an additional $1.5 billion of treatment support to states through the SABG program.  The rationale for this expansion was to close the "treatment gap,"

---

[3] https://www.tandfonline.com/doi/abs/10.1080/02791072.1991.10472229?journalCode=ujpd20.

consisting of those individuals who recognized that they had an SUD and sought treatment but were unable to access it. The Bush Administration also proposed doubling the number of Drug Courts, a program that helped individuals access treatment under the supervision of a Judge and a treatment team in the Administrative Offices of the Court, using funds provided by the Department of Justice, and foregoing treatment covered by their individual or family insurance plan.

In addition to providing assistance to individuals who work for self-insured employers access treatment for all chronic and severe mental health problems, including SUD, I serve as an expert and consultant for the Department of Labor (DOL) and help their employees understand and identify variance between behavioral health and medical/surgical care that violates  the Mental Health Parity and Addiction Equity Act (MHPAEA).  The MHPAEA's purpose is to promote equal access to Mental Health(MH)/ SUD treatment by prohibiting disparate coverage limitations and practices that deny coverage for or access to these services. In the DOL's 2022 Mental Health Parity and Addiction Equity Act (MHPAEA) Report to Congress,[4]  the DOL emphasized that its enforcement efforts will focus on two issues that are essential to this case: (1) prior authorization requirements for in-network and out-of-network inpatient services; and (2) out-of-network reimbursement rates (plan methods for determining usual, customary, and reasonable charges).[5] The report highlights instances when insurers failed to comply with MHPAEA's requirements by reimbursing SUD claims at a disproportionately low rate.[6] President Biden, the DOL, and the Department of Health and Human Services continue to make MHPAEA enforcement a top priority because of widespread noncompliance and to protect individuals seeking SUD treatment, as need is at an all-time high.[7]

The Senate Finance Committee's report[8] pointed to another issue relevant to this case – network inadequacy. Finding behavioral healthcare providers who are in-network (INN) with commercial insurers is a challenge and often a barrier for those trying to access care.[9] Studies of individual market plans and Medicare Advantage have found that networks cover a smaller proportion of behavioral health providers than of primary care providers, making it more likely patients will go out-of-network (OON) for behavioral health services.[10] Numerous commenters point to low commercial health plan reimbursement rates as one reason for limited network participation.[11]

---

[4] Dep't of Labor, 2022 MHPAEA Report to Congress, (2022)
https://www.dol.gov/sites/dolgov/files/EBSA/laws-and-regulations/laws/mental-health-parity/report-to-congress-2022-realizing-parity-reducing-stigma-and-raising-awareness.pdf.
[5] *Id.* at 50.
[6] *Id.* at 38.
[7] *Id.* at 3.
[8] See, U.S. Senate Finance Committee Report on Mental Health care in the United States: The Case for Federal Action, (2022)
https://www.finance.senate.gov/imo/media/doc/SFC%20Mental%20Health%20Report%20March%202022.pdf.
[9] *Id.* at 22.
[10] U.S. Department of Health and Human Services, Office of the Assistant Secretary for Planning and Evaluation, New HHS Study Shows 63-Fold Increase in Medicare Telehealth Utilization During the Pandemic, December 2021 https://www.hhs.gov/about/news/2021/12/03/new-hhs-study-shows-63-fold-increase-in-medicare-telehealthutilization-during-pandemic.html; Mehrotra A et al., The Impact of COVID-19 on Outpatient Visits in 2020: Visits Remained Stable, Despite a Late Surge in Cases, Commonwealth Fund, Feb. 2021 https://doi.org/10.26099/bvhf-e411.
[11] Au-Yeung CM, Blewett LA, Winkelman TN, Increasing Access to Medications for Opioid Use Disorder: Policy Strategies During and After COVID-19 Pandemic, October 2021 https://www.milbank.org/wpcontent/uploads/2021/10/Au-Yeung_Brief_5.pdf.

Today, I continue to practice addiction medicine and provide consultative services to an array of treatment programs located in Illinois, Washington, Alaska, California, Pennsylvania, and New York.  My full *curriculum vitae* is attached to this report.

## III.  Materials Reviewed

In preparing this report, I reviewed and analyzed the following items, which I use regularly in the practice of medicine, some of which I co-authored:

- A.G. Barthwell & L.S. Brown, The Treatment of Drug Addiction: An Overview Ch. 24, Principles of Addiction Medicine
- American Psychiatric Association, DSM IVR and DSM V
- The American Society of Addiction Medicine, Definition of Addiction [12]
- The American Society of Addiction Medicine, Patient Placement Criteria for the Treatment of Substance-Related Disorder, Second Edition- Revised (ASAM PPC-2R), Mee-Lee D, ed. Chevy Chase, MD: American Society of Addiction Medicine, 2001. Adult Placement Criteria Levels I- IV (pp. 25-127) and Dimensional Criteria for Adult Detoxification (pp 145-176)
- American Society of Addiction Medicine, ASAM Public Policy Statement on the Relationship between Treatment and Self Help: A Joint Statement of the American Society of Addiction Medicine, the American Academy of Addiction Psychiatry, and the American Psychiatric Association
- A.T. McLellan et al., Drug Dependence, a Chronic Medical Illness: Implications for Treatment, Insurance, and Outcomes Evaluation
- Center for Behavioral Health Statistics and Quality, Results from the 2010 National Survey on Drug Use and Health: Summary of National Findings
- Harold Pollack, 4.8 Million People Uninsured with Drug or Alcohol Problems
- L. Siqueland L & P. Crits-Christoph, Current Developments in Psychosocial Treatments of Alcohol and Substance Abuse
- Nady el-Guebaly, The Meanings of Recovery from Addiction, Evolution and Promises, Addiction Medicine
- National Institute on Drug Abuse, The Principles of Drug Addiction Treatment: A Research-Based Guide
- Scott J. Rein, Executive Brief: Dispelling the Myths of Out-of-Network Billing
- Substance Abuse and Mental Health Services Administration, The ADSS Cost Study: Costs of Substance Abuse Treatment in the Specialty Sector
- Substance Abuse and Mental Health Service Administration, Medication-Assisted Treatment for Opioid Addiction in Opioid Treatment Programs, TIP 43
- Substance Abuse and Mental Health Service Administration, Medications for Opioid Use Disorder, TIP 63
- Substance Abuse and Mental Health Services Administration, National Expenditures for Mental Health Services & Substance Abuse Treatment 1986-2009

---

[12] The American Society of Addiction Medicine. "What Is the Definition of Addiction?" https://www.asam.org/quality-care/definition-of-addiction. (Accessed: January 26, 2023).

- Substance Abuse and Mental Health Services Administration, National Household Survey on Drug Use and Health (NSDUH)
- Substance Abuse and Mental Health Services Administration, Analyses of Substance Abuse and Treatment Need Issues
- Substance Abuse and Mental Health Services Administration, The Need for and Receipt of Specialty Treatment
- Substance Abuse and Mental Health Services Administration, Predictors of Substance Abuse Treatment Completion or Transfer to Further Treatment by Service Type, The TEDS Report
- Suzanne Gelber Rinaldo & David W. Rinaldo, Availability Without Accessibility? State Medicaid Coverage and Authorization Requirements for Opioid Dependence Medications
- Thomas J. Force, How to Obtain Increased Reimbursement on Your Out-of-Network Claims
- Websites of the following treatment providers: Betty Ford Center, Caron, Hazelden, Passages Malibu, and Promises
- W.M. Burdon, et al., Differential Effectiveness of Residential Versus Outpatient Aftercare for Parolees from Prison-based Therapeutic Community Treatment Programs
- U.S. Department of Labor's 2022 Mental Parity and Addiction Equity Act Report to Congress
- U.S. Senate Finance Committee Report on Mental Health care in the United States: The Case for Federal Action, (2022)
- U.S. Department of Health and Human Services, Office of the Assistant Secretary for Planning and Evaluation, New HHS Study Shows 63-Fold Increase in Medicare Telehealth Utilization During the Pandemic, December 2021
- Mehrotra A et al., The Impact of COVID-19 on Outpatient Visits in 2020: Visits Remained Stable, Despite a Late Surge in Cases, Commonwealth Fund, Feb. 2021
- Au-Yeung CM, Blewett LA, Winkelman TN, Increasing Access to Medications for Opioid Use Disorder: Policy Strategies During and After COVID-19 Pandemic, October 2021

In addition to the general resource material listed above used in preparation of this report, I reviewed and/or analyzed the following items provided by Arnall Golden Gregory LLP:

### *TML Recovery, LLC v. Cigna Corporation et al.*, United States District Court, Central District of California, Case No. 8:20-cv-00269-DOC-JDE

- Stipulated Protective Order, ECF No. 19
- Consolidated Second Amended Complaint, ECF No. 79
- myCigna - Legal Disclaimer (September 29, 2020)
- Cigna AEO Documents, Cigna_TML00171620, Cigna_TML00171630, Cigna_TML00171649, Cigna_TML00171650, Cigna_TML00171717, Cigna_TML00171719, Cigna_TML00171752, Cigna_TML00171753, Cigna_TML00171756, Cigna_TML00171757, Cigna_TML00171773, Cigna_TML00171774, Cigna_TML00171781, Cigna_TML00171782,

Cigna_TML00171784, Cigna_TML00171786, Cigna_TML00172045, Cigna_TML00172046

- Cigna's Claim Report, Volume 12, Cigna_TML00195700-8
- 2015-2016 Standards and Guidelines - Medical Necessity Criteria, Cigna_TML00065727
- 2017-01 Standards and Guidelines - Medical Necessity Criteria, Cigna_TML00065470
- 2018-01 Standards and Guidelines - Medical Necessity Criteria, Cigna_TML00065347
- 2019-01 Standards and Guidelines - Medical Necessity Criteria, Cigna_TML00065848
- 2020-01 Standards and Guidelines - Medical Necessity Criteria, Cigna_TML00065604
- 2020-04 Standards and Guidelines - Medical Necessity Criteria, Cigna_TML00065261
- Intro to ASAM Criteria for Patients and Families, Cigna_TML00065718

- Synopses of patient treatment records and claims administration documents, including Summary Plan Documents, Administrative Service Agreements, Global Agreements, Verification of benefits, claims reports, Patient, Plan and Claims Spreadsheets, Explanation of Benefits, Assignment of Benefits, and other patient specific documents and summaries for the following providers and patients:

  - Addiction Health Alliance patients JJ, SK, HS, PS, CC, JG, JG, MS
  - DR Recovery Encinitas patients CB, SK, CL, YP, CC, JJ, WP, CS
  - MMR Services patients MB, BF, MH, SW, CC, IE, AF, CG
  - Pacific Palms Recovery patients NAG, AF, LM, MS, CC, MH, ML, GSB
  - Southern California Addiction Center patients BG, AK, RM, MY, TB, CC, MC, RM
  - Southern California Recovery Center Oceanside patients JG, JJ, JL, PK, JP, PS, BD
  - TML Recovery patients BB, MC, ML, DM, KA, MC, AF, AM
  - Woman's Recovery Center patients DH, ET, MT, LA, AB, LE, ML

- myCigna - Legal Disclaimer (February 21, 2023)
- Skilled Nursing Facility Glossary
- Index of FAIR Health benchmark rates
- Insurance Companies Make Commitment To Address Opioid Crisis, November 9, 2017
- Cigna_TML00171630; Cigna_TML00094763; Cigna_TML00094767.
- Expert Reports of Dr. Kelly Clark and Mr. Kevin O'Brien.

## **Deposition Materials**

- Deposition Transcript for Plaintiffs Witness Addiction Health Alliance, Nathaniel Izzo, Dated March 23, 2023

6

- Deposition Transcript for Plaintiffs Witness DR Recovery, Nathaniel Izzo, Dated March 20, 2023
- Deposition Transcript for Plaintiffs Witness MMR Services, Nathaniel Izzo, Dated March 15, 2023
- Deposition Transcript for Plaintiffs Witness Pacific Palms Recovery, Ryan Schrier, Dated March 16, 2023
- Deposition Transcript for Plaintiffs Witness Southern California Addiction Center, Aaron Brower, Dated March 13, 2023
- Deposition Transcript for Plaintiffs Witness Southern California Recovery Centers Oceanside, Nathaniel Izzo, Dated March 9, 2023
- Deposition Transcript for Plaintiffs Witness TML Recovery, Nathaniel Izzo, Dated March 7, 2023
- Deposition Transcript for Plaintiffs Witness Woman's Recovery Center, Ryan Schrier, Dated March 8, 2023
- Deposition Transcript for MultiPlan Witness Monica Armstrong, Dated March 9, 2023
- Deposition Transcript for Cigna Witness Michael Callahan, Dated March 1, 2023
- Deposition Transcript for Cigna Witness Terri Cothron, Dated March 31, 2023
- Deposition Transcript for MultiPlan Witness Sean Crandell, Dated March 22, 2023
- Deposition Transcript for Cigna Witness Wendy Gompper, Dated March 28, 2023
- Deposition Transcript for Cigna Witness Dr. Doug Nemecek, Dated February 24, 2023
- Deposition Transcript for Cigna Witness Lauren Neu, Dated March 15, 2023
- Deposition Transcript for MultiPlan Witness Kathy Praxmarer, Dated March 14, 2023
- Deposition Transcript for Cigna Witness Emily Russell, Dated February 16, 2023
- Deposition Transcript for Cigna Witness Sean Petree, Dated March 30, 2023
- Deposition Transcript for Cigna Witness Mario Vangeli, Dated March 10, 2023

***RJ v. Cigna Behavioral Health, Inc., et al.*, United States District Court, Northern District of California, Case No. 20-cv-02255-NC**

- Stipulated Protective Order, ECF No. 22
- First Amended Complaint, ECF No. 63
- Plaintiff's Motion for Class Certification and Memorandum in Support of Motion, ECF No. 148
- Deposition transcript and exhibits for Cigna witness JoAnne Forrest, dated October 14, 2022
- Deposition transcript and exhibits for MultiPlan witness Sean Crandell, dated October 20, 2022
- Deposition transcript and exhibits for Cigna witness Michael Battistoni, dated October 25, 2022

- Deposition transcript and exhibits for Cigna witness Mario N. Vangeli, dated November 4, 2022
- Deposition transcript and exhibits for Cigna witness Terri Cothron, dated November 8, 2022
- Deposition transcript and exhibits for Cigna witness Jo-Ann Lebel, dated November 29, 2022
- Plaintiffs' Motion for Partial Summary Judgment regarding United's Counterclaim, Addiction Health's Declaration, ECF 145
- Plaintiffs' Motion for Partial Summary Judgment regarding United's Counterclaim, MMR Declaration, ECF 145-4
- Plaintiffs' Motion for Partial Summary Judgment regarding United's Counterclaim, Pacific Palm Recovery's Declaration, ECF 145-5
- Plaintiffs' Motion for Partial Summary Judgment regarding United's Counterclaim, Southern California Addiction Center's Declaration, ECF 145-6
- Plaintiffs' Motion for Partial Summary Judgment regarding United's Counterclaim, TML Recovery's Declaration, ECF 145-7
- Plaintiffs' Motion for Partial Summary Judgment regarding United's Counterclaim, Woman's Recovery Declaration, ECF 145-8
- Plaintiffs' Motion for Partial Summary Judgment regarding United's Counterclaim, DR Recovery's Declaration, ECF 147

***In the Matter of the Certificate of Authority of: Health Net Life Insurance Company***, **Insurance Commissioner of the State of California, CDI File No. UPA-2016-00005**

- Order to Show Cause, CDI
- Order to Show Cause Health Net, State of California Insurance Commission

***In the Matter of UnitedHealth Group Incorporated***, **State New York Office of the Attorney General, Investigation No. 2008-161**

- Assurance of Discontinuance Under Executive Law § 63(15)

**Articles**

- *"What Is the Definition of Addiction?"* The American Society of Addiction Medicine
- Availability Without Accessibility? State Medicaid Coverage and Authorization Requirements for Opioid Dependence Medications, Suzanne Gelber Rinaldo & David W. Rinaldo, American Society of Addiction Medicine (2013)
- "Drug overdoses are costing the U.S. economy $1 trillion a year, government report estimates," CNBC, February 8, 2022
- Michael C. Barnes, et al., Potential Impact of Texas et al v United States on Persons with Substance Use Disorder, ABA Health eSource (Oct. 2018)

**Congressional Reports and Studies**

- Department of Labor, 2022 MHPAEA Report to Congress, (2022)
- U.S. Senate Finance Committee Report on Mental Health Care in the United States: The Case for Federal Action, March 2022
- U.S. Department of Health and Human Services, Office of the Assistant Secretary for Planning and Evaluation, New HHS Study Shows 63-Fold Increase in Medicare Telehealth Utilization During the Pandemic, December 2021
- Increasing Access to Medications for Opioid Use Disorder: Policy Strategies During and After COVID-19 Pandemic, Au-Yeung CM, Blewett LA, Winkelman TN, October 2021
- H.R.-7780-SAP
- Overview of SUD Care Clinical Guidelines, A Resource for States Developing SUD Delivery System Reforms, medicaid.gov
- Medicare Coverage of Substance Abuse Services, CMS MLN Matters SE1604, April 28, 2016 (links in article updated on May 10, 2019)

**Research and Survey Materials**

- The Principles of Drug Addiction Treatment: A Research-Based Guide, National Institute on Drug Abuse
- Results from the 2010 National Survey on Drug Use and Health: Summary of National Findings, Center for Behavioral Health Statistics and Quality
- Status of Federal Funding for Addiction Services, National Association of State Alcohol and Drug Abuse Directors, March 3, 2014
- National Expenditures for Mental Health Services & Substance Abuse Treatment 1986-2009, Substance Abuse and Mental Health Services Administration
- 2020 NSDUH Detailed Tables, Substance Abuse and Mental Health Services Administration
- Principles of Drug Addiction Treatment: A Research-Based Guide 13-14, National Institute on Drug Abuse (3rd ed. 2012)
- "Status of State Medicaid Expansion Decisions: Interactive Map," KFF, published Jan. 31, 2022

**Other Materials Utilized in Supplemental Report**

- Bertha Coombs, *As Obamacare twists in political winds, top insurers made $6 billion (not that there is anything wrong with that)*, CNBC, Published, August 5, 2017, Updated, August 6, 2017.
- Joseph Burns, *The pandemic One Year In: Despite Large Profits in 2020, Health Insurers See Volatility Ahead*, MHE Publication, MHE March 11, 2021, Volume 31, Issue 3.
- Paige Minemyer, *UnitedHealth was 2021's most profitable payer. Here's a look at what its competitors earned*, Payers, February 11, 2022
- *Big payers ranked by 2022 profit*, Viewed July 6, 2023, https://www.beckerspayer.com/payer/big-payers-ranked-by-2022-profit.html
- Paige Minemyer, *Health insurers' profits topped $35B last year. Medicare Advantage is the common thread*, Payers, February 24, 2020

- Eric Lopez, Tricia Neuman, Gretchen Jacobson, and Larry Levitt, *How Much More Than Medicare Do Private Insurers Pay? A Review of the Literature*, KFF, April 15, 2020
- *Cigna Reports 2016 Results, Expects Attractive Earnings Growth in 2017,* Business Wire, February 2, 2017
- Cigna Annual Report, 2015
- Cigna Annual Report, 2016
- Cigna Annual Report, 2017
- Cigna Annual Report, 2018
- Cigna Annual Report, 2019
- Cigna Annual Report, 2020
- Cigna Annual Report, 2021
- Cigna Corporation, Schedule 14A, United States Securities And Exchange Commission, Fiscal Year 2022
- Amy Marschall, PsyD, Reviewed by David Susman, PhD, *How Psychoeducation Is Used In Therapy*, Verywell Mind, Updated May 22, 2023
- *The Global 2000*, Forbes, Andrea Murphy and Hank Tucker, Editors, June 8, 2023
- *Cal. Code Regs. Tit. 9, § 13005 - Definitions*, Cornell Law School, Legal Information Institute
- *Cal. Code Regs. Tit. 9, § 13010 - Requirement for Certification*, Cornell Law School, Legal Information Institute
- *Cal. Code Regs. Tit. 9, § 13015 - Requirements for Certification of Licensed Professionals*, Cornell Law School, Legal Information Institute
- *Cal. Code Regs. Tit. 9, § 13035 - Certifying Organizations*, Cornell Law School, Legal Information Institute
- *Alcohol and/or Other Drug Program Certification Standards*, Department of Health Care Services, Health and Human Services Agency, State of California, February 2020
- *Counselor Certification*, Department of Health Care Services, State of California, Last Modified, March 23, 2021

## IV.   Background

The following facts support the findings in my opinion.

### A.   Addiction Defined

Addiction is a treatable, chronic medical disease involving complex interactions among brain circuits, genetics, the environment, and an individual's life experiences. People with addiction use substances or engage in behaviors that become compulsive and often continue despite harmful consequences.[13] This is reflected in an individual's pathological pursuit of reward[14] or relief

---

[13] The American Society of Addiction Medicine. "What Is the Definition of Addiction?" https://www.asam.org/quality-care/definition-of-addiction. (Accessed: January 26, 2023).

[14] Pathologically pursuing reward has multiple components. It is not necessarily the amount of exposure to the reward (e.g., the dosage of a drug) or the frequency or duration of the exposure that is pathological. In the disease of addiction, pursuit of rewards persists, despite life problems that accumulate due to addictive behaviors, even when

through substance use and other behaviors. Addiction is characterized by:

- Inability to consistently abstain;
- Impairment in behavioral control;
- Craving, or increased "hunger" for drugs or rewarding experiences;
- Diminished recognition of significant problems with one's behaviors and interpersonal relationships; and
- A dysfunctional emotional response.[15]

### B.     Principles of Addiction Treatment

Like other chronic diseases, addiction often involves cycles of relapse and remission, meaning periods of relapse may interrupt spans of remission.[16] Without treatment or engagement in recovery activities, addiction is progressive and can result in disability or premature death.

Extensive data shows that addiction treatment is as effective as most well-accepted treatments for other chronic medical conditions.[17] Three decades of scientific research and clinical practice have yielded a variety of approaches to addiction treatment; the most effective approaches pair the patient's needs with scientifically researched services anticipated to have the highest impact. Treatment programs typically incorporate many components of care, each aimed to address a particular aspect of the illness and its consequences. For instance, specific pharmacologic and psychosocial treatments are frequently combined, which often leads to better treatment retention and outcomes.[18]

Below are summaries of some of NIDA's Principles of Effective Treatment:[19]

- Addiction is a complex but treatable disease that affects brain function and behavior.
- No single treatment is appropriate for everyone. Matching treatment settings to an individual's particular problems and needs is critical to his or her ultimate success in returning to productive functioning.
- Treatment must be readily available.

---

engagement in the behaviors ceases to be pleasurable. Similarly, in earlier stages of addiction, or even before the outward manifestations of addiction have become apparent, substance use or engagement in addictive behaviors can be an attempt to pursue relief from dysphoria; while in later stages of the disease, engagement in addictive behaviors can persist even though the behavior no longer provides relief.

[15] These five features are not intended to be used as "diagnostic criteria" for determining if addiction is present or not. Although these characteristic features are widely present in most cases of addiction, regardless of the pharmacology of the substance use seen in addiction or the reward that is pathologically pursued, each feature may not be equally prominent in every case. The diagnosis of addiction requires a comprehensive biological, psychological, social and spiritual assessment by a trained and certified professional.

[16] It is also important to recognize that return to drug use or pathological pursuit of rewards is not inevitable.

[17] A.T. McLellan et al., *Drug Dependence, a Chronic Medical Illness: Implications for Treatment, Insurance, and Outcomes Evaluation*, 284 J. OF AM. MED. ASS'N.1689–1695 (2000).

[18] L. Siqueland L & P. Crits-Christoph, *Current Developments in Psychosocial Treatments of Alcohol and Substance Abuse*, 1 CURRENT PSYCHIATRY REP. 179–184 (1999).

[19] *The Principles of Drug Addiction Treatment: A Research-Based Guide*, NATIONAL INSTITUTE ON DRUG ABUSE, *available at* http://www.drugabuse.gov/publications/principles-drug-addiction-treatment-research-based-guide-third-edition/drug-addiction-treatment-in-united-states.

- Effective treatment attends to multiple needs of the individual, not just his or her substance use.
- Remaining in treatment for an adequate period of time is critical. The appropriate duration for an individual depends on the type and degree of the patient's problems and needs. Research indicates that most addicted individuals need at least **three months**[20] in treatment to significantly reduce or stop their drug use and that the best outcomes occur with longer durations of treatment.
- Programs should include strategies to engage and keep patients in treatment because individuals often leave treatment prematurely.
- An individual's treatment and service plan must be assessed continually and modified as necessary to ensure that it meets the individual's changing needs.
- Recovery from drug addiction is a long-term process and frequently requires multiple episodes of treatment. As with other chronic illnesses, relapses to drug abuse can occur and should signal a need for treatment to be reinstated or adjusted.

Treatment works best when it is driven by assessment, buttressed with case management, and completed with follow up care in the community. The treatment plan should address how the patient will achieve and maintain abstinence and improve his or her ability to function physically, socially, and psychologically.[21]

## C.    Treatment Setting

Treatment for substance use and addiction is delivered in many different settings using a variety of behavioral and pharmacological approaches. For instance, treatment may be delivered in outpatient, inpatient, and residential settings. It is important to have outpatient services in every community, intensive outpatient services serving geographic clusters, and geographically dispersed regional and national residential services. Options in various locations are important because people with the severity of problems that require residential treatment may have a greater tendency to seek treatment away from the complex psychosocial environment in which their problems first developed. Benefits of residential treatment can include a greater sense of safety and security, all-day programming and uninterrupted focus on recovery, fewer hassles of daily living, fewer environmental temptations or triggers to relapse, and the opportunity to build supportive relationships with other people in treatment.

Treatment centers using a 28-day model of care increased during the late 1970s and early 1980s in response to increasing demand, public recognition of treatment's usefulness, and a model of reimbursement for care that supported the growth. Programs with national reputations developed in the late 1990s in response to a need to provide specialty care and a full continuum of care as defined by ASAM. These programs with national reputations attract patients from all over the country, partially because they provide detoxification on-site and have the capacity to manage all patients who arrive for care. Many of these programs have added other regional facilities to their stable of programs[22] to provide alternatives to their flagship programs to meet the needs of

---

[20] Emphasis added.

[21] A.G. Barthwell & L.S. Brown, *The Treatment of Drug Addiction: An Overview* ch. 24, PRINCIPLES OF ADDICTION MEDICINE (Richard K Ries et al. eds., 4th Ed. 2009).

[22] Examples include Caron with programs in Pennsylvania, Texas and Florida; Hazelden with a full continuum of care in Minnesota; and Springbrook in the Northwest.

geographic regions where many of their patients and former patients reside.

Nationally recognized programs rely on their reputations, referrals from former patients, referrals from interventionists who are familiar with their services, and marketing efforts from national outreach staff. Many target areas that are not served by regional residential centers.

Currently, in the United States, more than 14,500 specialized drug treatment facilities provide counseling, behavioral therapy, medication, case management, and other types of services to persons with SUDs. Some national programs provide niche markets with specific, highly developed services around a master clinician or school of thought. Niche markets include women's services (*e.g.*, Operation PAR in Florida), trauma (*e.g.*, The Refuge in Florida), eating disorders comorbid with SUDs (*e.g.*, Timberline Knolls in Illinois), professionals (*e.g.*, Talbott Recovery in Georgia), hospital extensions (*e.g.*, Pine Grove in Alabama), pain and addictions (*e.g.,* Las Vegas Recovery Center) and luxury programs (*e.g.*, Promises in California). Although specific treatment approaches often are associated with particular treatment settings, a variety of therapeutic interventions or services can be included in any given setting.

Drug abuse and addiction are also treated in physicians' offices and mental health clinics. Regardless of the setting, a variety of professionals, including counselors, physicians, psychiatrists, psychologists, nurses, and social workers, can contribute to effective addiction treatment.

### D.    The ASAM Criteria

*The ASAM Criteria* is the most widely used and comprehensive set of guidelines for placement, continued stay, transfer, or discharge of patients with addiction and co-occurring conditions. Formerly known as the ASAM patient placement criteria, *The ASAM Criteria* is the result of a collaboration that began in the 1980s to define one national set of criteria for providing outcome-oriented and results-based care in the treatment of addiction, originally called the Patient Placement Criteria (PPC).

In 1996, the second edition of the PPC was published (PPC-2). The PPC-2 defined six areas or dimensions of assessment. In 2001, ASAM further revised and again published the criteria as the PPC-2R. Among other things, the PPC-2R provides guidance on specific services (*e.g.*, drug screening, medication compliance, punctuality training, motivational interviewing, etc.), treatment plan reviews, and assessing the patient's response to treatment. It defines the criteria necessary for admission and continued stay in a certain level of care, including the acceptable sources of data (direct interviews and collateral interviews with family, employers, etc.).

Today, many states across the country are using *The ASAM Criteria* as the foundation of their efforts to improve the addiction treatment system. Adolescent and adult treatment plans are developed through a multidimensional patient assessment over five broad levels of treatment that are based on the degree of direct medical management provided, the structure, safety and security provided, and the intensity of treatment services provided. Some payers have looked to *The ASAM Criteria* and revised them, without the peer review provided the original Criteria and the multiple revisions, to support denial of services or limitation of services. █████████

13



| Cigna 2015-2016 Residential SUD[29] | ASAM Level 3.1 Residential[30] |
|---|---|
| ███████████████ | Allied health professionals (e.g., counselor aides, group living workers) who are available on-site 24 hours per day |
| ███████████████ | Physicians, NPs, and PAs are not involved in direct service provision as staff; a physician should review admission decisions |
| ███████████████ | Support systems include telephone or in-person consultation with a physician; appropriately trained and credentialed medical, addiction, and mental health professionals |
| ███████████████ | |

---

[23] Despite the fact that *The ASAM Criteria* were first published in 1991.
[24] ████████████████████████████████████
[25] Nemecek Dep. at 66–68.
[26] Report of Dr. Clark at 13.
[27] Original Complaint Filed December 31, 2019.
[28] Nemecek Dep. at 66–68; Cigna Standards and Guidelines/Medical Necessity Criteria For Treatment of Mental Health and Substance Use Disorders, Revised 2015–2016, CignaTML00065727–65847.
[29] Cigna Standards and Guidelines/Medical Necessity Criteria for Treatment of Behavioral Health and Substance Use Disorders Revised Edition: 2015-2016. Beginning Cigna_TML0065827.
[30] *ASAM Criteria*, pgs. 224-225.

Providers may apply a rule that a patient fail at a certain level of care before being matched to one where success may be achieved at the intensity and for the time needed to bring about substantive change in the patient's life to support recovery.  Given the risk attendant to the use of illicit substances and the drug poisoning crisis, commonly referred to as the opioid epidemic, the practice of failure at a too low level of care is all too often, sadly, associated with death or permanent disability. In this situation, providers will request payer authorization to move the patient to a higher level of care.

The current *ASAM Criteria* assess:

- **Dimension 1** - Acute Intoxication and/or Withdrawal Potential: Exploring an individual's past and current experiences of substance use and withdrawal.  It helps to predict the need for medication to manage withdrawal and conditions under which medical care is provided.
- **Dimension 2** - Biomedical Conditions and Complications: Exploring and individual's health history and current physical health needs.  It helps predict the need for admission into medical-surgical beds prior to or concurrent with the onset of addiction care. Additionally, it suggests the level of difficulty in managing medical care while engaged in addiction care.
- **Dimension 3** - Emotional, Behavioral, or Cognitive Conditions and Complications: Exploring an individual's mental health history and current cognitive and mental health needs.  It helps to predict the need for locked psychiatric units if there is imminent threat to self or others. If a psychiatric unit is not required, it addresses co-occurring emotional and behavior disorders that can complicate an individual's ability to engage in addiction care (*e.g.*, anxiety disorders making group participation difficult, depressive states that interfere with motivation to travel to treatment, etc.).
- **Dimension 4** - Readiness to Change: Exploring an individual's readiness for and interest in changing and reviews patient insight and compliance with directions.
- **Dimension 5** - Relapse, Continued Use, or Continued Problem Potential: Exploring and individual's unique needs that influence their risk for relapse or continued use. It reviews skills acquisition and symptomology that interferes with intentions.
- **Dimension 6** – Recovering/Living Environment: Exploring an individual's recovery or living situation, and the people and places that can support or hinder their recovery.  It reviews the structure or safety available to the individual to support the intention to resist use.

*The ASAM Criteria* also defines the elements necessary for admission and continued stay in a certain level of care. Adolescent and adult treatment plans are developed using the multidimensional patient assessment over several broad levels of care that are based on the degree of direct medical management provided; the structure, safety and security provided; and the intensity of treatment services provided. The levels of care include:

- Level 0.5, Early Intervention
- Level 1, Outpatient Services
- Level 2.1, Intensive Outpatient Services

15

- Level 2.5, Partial Hospitalization
- Level 3.1 Clinical Managed Low-Intensity Residential Services
- Level 3.3, Clinically Managed Population-Specific High-Intensity Residential Services
- Level 3.5, Clinically Managed High-Intensity Residential Services
- Level 3.7, Medically Monitored Intensive Inpatient Services
- Level 4, Medically Managed Intensive Inpatient Services.

*The ASAM Criteria* uses precise terminology to convey discrete concepts relating to physician assessments and medical decision making. The term "managed" entails the physician seeing the patient every 24 hours, and changes to the treatment plan may be made only upon the direction of the physician. The term "monitored" entails physician decision making upon assessments that may be conducted by other personnel, such as nurses. The term "supervised" means that the physician leads the treatment staff, approves patient admissions, and might not see patients more than once weekly; other members of the treatment team, such as licensed therapists, may adjust the treatment plan and report back to the physician.

A summary of services and staffing described by *The ASAM Criteria* for Level 1 outpatient services, Level 2 intensive outpatient/partial hospitalization services, Level 3 residential/inpatient services, Level 4 medically managed intensive inpatient services, Level 3.2-WM clinically managed residential WM, Level 3.7-WM medically monitored inpatient WM, and Level 4-WM medically managed intensive inpatient WM, is provided below.

### 1.   Level 1 Outpatient and Level 2 IOP/PHP Services

Level 1 covers organized outpatient services that are provided in regularly scheduled sessions that typically total fewer than nine contact hours per week for adults. Such services can be delivered in a wide variety of settings, are tailored to each patient's clinical needs, and are designed to help patients achieve changes in drug use or addictive behaviors.[31]

Level 2 has two variations: Level 2.1 IOP and Level 2.5 PHP services. Such services can be delivered in a variety of settings and can provide SUD education and treatment while allowing patients to apply new skills in real world environments. At Level 2.1, a minimum of nine hours of programming is provided per week for adults. At Level 2.5, a minimum of 20 hours of programming is provided per week for adults. For patients who do not need 24-hour supervision at Level 3.3 or greater, outpatient clinical services can be combined with Level 3.1, clinically managed low-intensity residential treatment.[32]

*The ASAM Criteria* describes several different characteristics of these levels, including examples of service delivery, staff, and support systems. The chart below highlights some of this information. Greater detail is available in the source document.

---

[31] *The ASAM Criteria*: Treatment Criteria for Addictive, Substance-Related, and Co-Occurring Conditions, Third Edition (2013). American Society of Addiction Medicine, Pg. 184.
[32] *The ASAM Criteria*, pgs. 196-197.

| Level | Examples of Service Delivery (Adult Programs) | Staff and Support Systems (Adult Programs) |
|-------|-----------------------------------------------|---------------------------------------------|
| 1 | Office practices, health clinics, school-based clinics, primary care, MH/SUD clinics, child and adolescent behavioral clinics | Appropriately credentialed/licensed treatment professionals (e.g., addiction-credentialed physicians, counselors, psychologists, social workers). Staff able to obtain and interpret information about biopsychosocial needs and are knowledgeable about the biopsychosocial dimensions of SUDs. Certified/licensed addiction counselors offer much of the counseling services. Physicians and appropriately licensed advanced registered nurse practitioners (NPs) and physician assistants (PAs) provide medication management services. Generalists may be involved in providing general medical evaluations. Support services include emergency services available by phone 24/7 and medical, psychiatric, psychological, laboratory, and toxicology service either on-site or through consultation/referral. Medical/psychiatric consultation available by phone within 24 hours.[33] |
| 2.1 | After school, day or evening, weekend IOP programs | Interdisciplinary teams of appropriately credentialed addiction treatment professionals (e.g., addiction-credentialed physicians, counselors, psychologists, social workers). Physicians at this level should have specialty training or experience in addiction medicine/psychiatry. Staff able to obtain and interpret information about the patient's biopsychosocial needs. Generalists may be involved in providing general medical evaluations. Support services include emergency services available by phone 24/7 and medical, psychiatric, psychological, laboratory, and toxicology services, either on-site or through consultation/referral. Medical/psychiatric consultation available by phone within 24 hours and in person within 72 hours.[34] |
| 2.5 | Day treatment or partial hospital programs | Interdisciplinary teams of appropriately credentialed addiction treatment professionals (e.g., addiction-credentialed physicians, counselors, psychologists, social workers). Physicians at this level should have specialty training or experience in addiction medicine/psychiatry. Staff able to obtain and interpret information about the |

---

[33] *ASAM Criteria*, pgs. 187-188.
[34] *ASAM Criteria*, pgs. 198-199.

| | | patient's biopsychosocial needs. Generalists may be involved in providing general medical evaluations.<br><br>Support services include emergency services available by phone 24/7 and medical, psychiatric, psychological, laboratory, and toxicology services, either on-site or through consultation/referral. Medical/psychiatric consultation available by phone within 8 hours and in person within 48 hours.[35] |

### 2.      Level 3 Residential/Inpatient Services

Level 3 is characterized by "a planned and structured regimen of care in a 24-hour residential setting . . . All Level 3 programs serve individuals who, because of specific functional limitations, need safe and stable living environments . . ."[36] Level 3's four sublevels exist on a continuum ranging from the least to the most intensive services. They are briefly described below[37]:

- *3.1 Clinically Managed Low-Intensity Residential Services*
  - o  24-hour structure with available trained personnel; at least five hours per week of low-intensity clinical services.
- *3.3 Clinically Managed Population-Specific High-Intensity Residential Services*
  - o  24-hour care with trained counselors to stabilize multidimensional imminent danger. Services are provided to meet patients' functional limitations to support recovery from substance use disorders (SUDs).
- *3.5 Clinically Managed High-Intensity Residential Services*
  - o  24-hour care with trained counselors to stabilize multidimensional imminent danger and prepare for outpatient treatment. Patients' multidimensional needs are severe enough that they cannot be safely treated at a less intense level.
- *3.7 Medically Monitored Intensive Inpatient Services*
  - o  24-hour nursing care and daily physician availability for significant problems in dimension 1 (acute intoxication/withdrawal potential), 2 (biomedical conditions and complications), or 3 (emotional, behavioral, or cognitive conditions and complications). Counselors are available 16 hours per day. Patients at this level typically have subacute problems in dimensions 2 or 3 that are severe enough for inpatient treatment, but not severe enough to warrant the resources of an acute general hospital or medically managed inpatient treatment program.

*The ASAM Criteria* defines "clinically managed services" as services that:

. . . are directed by non-physician addiction specialists rather than medical and nursing personnel. They are appropriate for individuals who primary problems involve emotional, behavioral, or cognitive concerns, readiness to change, relapse,

---

[35] *ASAM Criteria*, pgs. 208-209.
[36] *ASAM Criteria*, pg. 219.
[37] *ASAM Criteria*, pg. 106.

or recovery environment, and whose problems in [Dimension 1 and Dimension 2], if any, are minimal or can be managed through separate arrangements for medical services.[38]

"Medically monitored treatment" is defined as:

> Services that are provided by an interdisciplinary staff of nurses, counselors, social workers, addiction specialists, and other health care professionals and technical personnel, under the direction of a licensed physician. Medical monitoring is provided through an appropriate mix of direct patient contact, review of records, team meetings, 24-hour coverage by a physician, and quality assurance programs.[39]

*The ASAM Criteria* describes several different characteristics of each sublevel, including examples of service delivery, staff, and support systems. The chart below highlights some of this information.

| Level | Examples of Service Delivery (Adult Programs) | Staff and Support Systems (Adult Programs) |
|---|---|---|
| 3.1 | Recovery residences, group homes, and other supportive living environments with 24-hour staff and close integration with clinical services | Allied health professionals (e.g., counselor aides, group living workers) who are available on-site 24 hours per day (or as required by state licensing requirements).<br><br>Clinical staff who are knowledgeable about biological and psychosocial dimensions of SUDs and their treatment, and able to identify the signs and symptoms of acute psychiatric conditions.<br><br>Appropriately trained and credentialed medical, addiction, and mental health professionals.<br><br>Physicians, NPs, and PAs are not involved in direct service provision as staff. A physician should review admission decisions.<br><br>Support systems include telephone or in-person consultation with a physician; and emergency services available 24/7.[40] |
| 3.3 | Therapeutic rehabilitation facility | Allied health professionals who are available on-site 24 hours per day (or as required by state licensing requirements). |

---

[38] *ASAM Criteria*, pg. 415.
[39] *ASAM Criteria*, pg. 422.
[40] *ASAM Criteria*, pgs. 224-225.

| | | At least one clinician with competence in the treatment of SUDs is available on-site or by telephone 24 hours per day.<br><br>Clinical staff who are knowledgeable about biological and psychosocial dimensions of SUDs and their treatment, and able to identify the signs and symptoms of acute psychiatric conditions. Staff have specialized training in behavior management techniques.<br><br>Support systems include telephone or in-person consultation with a physician, or a PA or NP in states where licensed as physician extenders (i.e., authorized to perform certain duties designated for a physician); and emergency services available 24/7.[41] |
| 3.5 | Therapeutic community of variable length of stay with appropriately clinically trained staff; or a residential treatment center | Licensed or credentialed clinical staff (e.g., addiction counselors, social workers, licensed professional counselors) who work with allied professional staff in an interdisciplinary team approach.<br><br>Allied health professionals who are available on-site 24 hours per day (or as required by state licensing requirements).<br><br>At least one clinician with competence in the treatment of SUDs is available on-site or by telephone 24 hours per day.<br><br>Clinical staff who are knowledgeable about biological and psychosocial dimensions of SUDs and their treatment, and able to identify the signs and symptoms of acute psychiatric conditions. Staff have specialized training in behavior management techniques.<br><br>Support systems include telephone or in-person consultation with a physician, or a PA or NP in states where licensed as physician extenders; and emergency services available 24/7.[42] |
| 3.7 | Inpatient treatment center within the context of an acute care hospital or acute psychiatric unit, or a | Interdisciplinary staff (physicians, nurses, addiction counselors, behavioral health specialists). |

---

[41] *ASAM Criteria*, pg. 236.
[42] *ASAM Criteria*, pgs. 249-251.

| | separate, more intensive unit of a freestanding Level 3.5 residential facility | Clinical staff who are knowledgeable about biological and psychosocial dimensions of addiction and other behavioral health disorders, and with specialized training in behavior management techniques and evidence-based practices.<br><br>A licensed physician to oversee the treatment process and assure the quality of care.<br><br>Support systems include available physician monitoring, nursing care, and observation. A physician is available to assess the patient in person within 24 hours of admission and thereafter as medically necessary. A nurse is responsible for monitoring patients' progress and medication administration.[43] |
|---|---|---|

Health insurers often refuse to approve medically necessary residential SUD treatment services. If they do authorize such services, the authorization is typically for a duration of services significantly less than what is medically necessary. Health insurers' denials of residential SUD treatment and, more specifically, Level 3.1 (supportive living environments with 24-hour staff and close integration with clinical services), is inconsistent with the trend in policy and practice to ensure that patients' needs for housing safety and stability are satisfied as an essential element of the SUD treatment plan. The Centers for Medicare and Medicaid Services has approved Medicaid programs that address participants' housing stability needs in Arkansas, Arizona, California, Massachusetts, and Oregon.

Domiciliary supportive services in medical/surgical areas are recognized and often covered by health insurance. Examples include in-home aid, nursing homes, skilled nursing facilities, and 23-hour hospital observation units (which can eliminate the necessity to admit a patient to the hospital).

### 3.    Level 4 Medically Managed Intensive Inpatient Services

*The ASAM Criteria* defines "medically managed" as:

> Services that involve daily medical care, where diagnostic and treatment services are directly provided and/or managed by an appropriately trained and licensed physician. Such services are provided in an acute care hospital or psychiatric hospital or treatment unit.[44]

Level 4 services are delivered 24-hours per day in acute care settings with inpatient beds for patients whose acute biomedical, emotional, behavioral, and cognitive problems are severe enough to require primary medical and nursing care. These programs are staffed by interdisciplinary teams

---

[43] *ASAM Criteria*, pgs. 266-268.
[44] *ASAM Criteria*, pg. 422.

of credentialed clinical staff (e.g., addiction-credentialed physicians, NPs, PAs, nurses, counselors, psychologists, and social workers) who are knowledgeable about the biopsychosocial dimensions of addiction as well as biomedical, emotional, behavioral, and cognitive disorders. These care teams provide primary nursing care and observation 24 hours per day, medical management by physicians 24 hours per day, and professional counseling services 16 hours per day.[45]

### E.    Recovery

Addiction professionals and persons in recovery find hope in recovery. Recovery is available even to persons who may not at first be able to perceive this hope. Recovery is recognized when the individual with SUD acknowledges the disease, commits to recovery in a heart-felt way, and reduces or eliminates inducements to use.  Some individuals, during and after an episode of treatment, my remain abstinent to convince others around them of their commitment to recover, while never actually making the commitment.  When use resumes following this self-imposed, or sometimes coerced, period of abstinence, it is continued use and NOT a relapse.

As in other health conditions, recovery from addiction is best achieved through a combination of self-management, mutual support, and professional care provided by trained and certified professionals. Peer support, such as that found in various "self-help" activities, is beneficial in optimizing health status and functional outcomes in recovery.[46]

Participation in alumni programs can encourage support and connection to prevent post-treatment substance use. Most national programs have such programs and facilitate connection with others who have had a similar treatment experience. The professionals who develop such programs are often seen as a part of a provider's marketing efforts in that they seek to have satisfied consumers remember them for referrals of family members and friends.

### F.    Access to Care/Funding

Drug abuse and addiction are major public health problems, and it has long been recognized that the public system needs to act as a safety net for addiction treatment services. A large portion of drug treatment is funded by local, state, and federal governmental entities, though these public addiction treatment services remain significantly underfunded and can have long waiting lists which vary by state and geographic region. To use these services, patients also must qualify for this assistance on a means test.

As indicated by the passage of the MHPAEA, health insurance is an essential element in accessing addiction treatment services for most individuals in need. In some states, the public sector programs serve individuals under first-, second-, or third-party pay arrangements, and the state sees itself as the payer of last resort. While the state may be the payer of last resort, individuals with third-party insurance coverage who present themselves to programs in the public sector are often prioritized over the truly indigent, as the reimbursement helps the public program diversify

---

[45] *ASAM Criteria*, pg. 282.
[46] *See ASAM Public Policy Statement on the Relationship between Treatment and Self Help: A Joint Statement of the American Society of Addiction Medicine, the American Academy of Addiction Psychiatry, and the American Psychiatric Association*, AMERICAN SOCIETY OF ADDICTION MEDICINE, *available at* http://www.asam.org/docs/publicly-policy-statements/1treatment-and-self-help---joint-12-971.pdf.

its sources of revenue and often, though meager, may receive more for the hour/slot/bed that the insured individual with an SUD occupies.  Because these services are subsidized by the public funding, the cost to the third-party is generally lower than in the private sector, resulting  in a perverse incentive to drive the insured into the already strained public sector.   Persons suffering from addiction often face significant financial hardship as a result of their disease, which greatly impacts the ability to pay for treatment. These hardships are due to loss of employment or failure to secure employment due to positive pre-employment drug screens, estrangement from family who may have resources or coverage, and loss of financial stability due to large expenditures on drugs or legal defense services due to arrests from substance caused or related crimes (*e.g.,* drug sales, home invasions, public inebriation, issuing and uttering, etc.)

A large population of individuals neither qualifies for government assistance nor has access to insurance benefits. For instance, in 2010, an estimated 4.8 million individuals with SUDs lacked insurance, and among persons who received substance use treatment at a specialty facility, 41.5 percent reported using their "own savings or earnings" as a source of payment for such treatment.[47] Moreover, research has shown that many individuals who have SUDs have low income, and even among those who are employed or have substantial income, as the addiction progresses, those incomes may decrease, and subsequently, once-covered or wealthy patients may have to rely on public funding in order to access addiction treatment.[48] In some cases, family members are forced to refer their loved ones to the criminal justice system to ensure that they can get treatment. Alternatively, access to insurance can allow individuals to obtain the treatment that they need.

Although private and employer-subsidized health plans may provide coverage for treatment of addiction and its medical consequences, private insurers as payers for addiction benefits have steadily declined since 1986. Between 1986 and 2009, the share of substance abuse spending increased for Medicaid (from 9 percent to 21 percent) and for other state and local governments (from 27 percent to 31 percent) and decreased for private insurance (from 32 percent to 16 percent).[49]

From 1986 to 2009, nominal substance abuse spending growth (4.4 percent annually, on average) was slower than the growth for all-health (7.5 percent) and mental health (6.8 percent).[50]

Unfortunately, managed care also has resulted in shorter average stays, while a historical lack of or insufficient coverage for substance abuse treatment has curtailed the number of operational

---

[47] *Results from the 2010 National Survey on Drug Use and Health: Summary of National Findings*, CENTER FOR BEHAVIORAL HEALTH STATISTICS AND QUALITY, *available at*
http://www.samhsa.gov/data/nsduh/2k10nsduh/2k10results htm; Harold Pollack, *4.8 Million People Uninsured with Drug or Alcohol Problems*, THE INCIDENTAL ECONOMIST, Aug. 17, 2013, *available at*
http://theincidentaleconomist.com/wordpress/4-8-million-people-uninsured-with-drug-or-alcohol-problems/.
[48] Suzanne Gelber Rinaldo & David W. Rinaldo, *Availability Without Accessibility? State Medicaid Coverage and Authorization Requirements for Opioid Dependence Medications*, AMERICAN SOCIETY OF ADDICTION MEDICINE (2013).
[49] *Status of Federal Funding for Addiction Services,* NAT'L ASS'N OF STATE ALCOHOL AND DRUG ABUSE DIRECTORS, March 3, 2014, *available at* https://www naadac.org/assets/2416/2014aina_morrison_rob_nasadad.pdf.
[50] *National Expenditures for Mental Health Services & Substance Abuse Treatment 1986-2009*, SUBSTANCE ABUSE AND MENTAL HEALTH SERVICES ADMINISTRATION, *available at*
http://store.samhsa.gov/shin/content//SMA13-4740/SMA13-4740.pdf.

programs. The National Survey on Drug Use and Health (NSDUH)[51] illustrates this point.

The NSDUH provides national and state-level data on the use of tobacco, alcohol, and illicit drugs (including non-medical use of prescription drugs) in the United States. The survey includes a series of questions to assess the prevalence of substance use, including alcohol and illicit drugs, over the past 12 months. Questions are structured to classify persons as dependent on or abusing specific substances based on criteria specified in the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV and DSM-5).

In addition to questions about substance use employed to classify respondents' need for treatment, NSDUH includes questions about respondents' perceived need for treatment (*i.e.*, whether they felt they needed treatment or counseling for alcohol or illicit drug use). The survey found that in 2020, 41.1 million persons aged 12 or older needed treatment for substance use (14.9 percent of persons aged 12 or older). Some and 2.7 million persons (1.0 percent of persons aged 12 or older and 6.5 percent of those who needed treatment) received treatment at a specialty facility.

Among persons who received treatment at a specialty facility, 31.6 percent reported using their "own savings or earnings" as a source of payment, 48.1 percent reported using private health insurance, 30.0 percent reported using public assistance other than Medicaid, 48.8 percent reported using Medicaid, 20.0 percent reported using funds from family members, and 40.0 percent reported using Medicare.

Of the 27.6 million who were classified as needing but not receiving treatment, 559,000 persons (2.0 percent) reported that they perceived a need for treatment for their alcohol or illicit drug use problem. Of these 559,000 persons who felt they needed treatment but did not receive it in 2020, 115,000 (20.6 percent) reported that they made an effort to get treatment, and 444,000 (79.4 percent) reported making no effort to get treatment.

Among those who needed and perceived the need for treatment yet made no effort to receive treatment, the reasons for not seeking treatment included:

- No health coverage and could not afford cost (19.1 percent),
- Did not find program that offered type of treatment that was wanted (14.4 percent)
- Concern that receiving treatment might cause neighbors/community to have a negative opinion (11.9 percent),
- Could handle the problem without treatment (9.0 percent),
- Did not want others to find out (6.5 percent),
- Did not have time (5.2 percent), and
- No openings in a program (1.7 percent).

Among people aged 12 or older in 2020 who needed substance use treatment but did not receive it, 97.5 percent did not feel that they needed treatment.  These statistics highlight the need to provide greater consumer access to quality, affordable health care that includes routine screenings for substance use, therapeutic interventions, evidence-based treatment, and recovery support.

---

[51] *2020 NSDUH Detailed Tables*, SUBSTANCE ABUSE AND MENTAL HEALTH SERVICES ADMINISTRATION, *available at https://www.samhsa.gov/data/report/2020-nsduh-detailed-tables*

It is important to have addiction treatment providers willing to take health insurance to provide access to care that would be otherwise unavailable. Addiction treatment providers, recognizing the need to allow patients to use their health insurance benefits, will typically accept insurance; however, these providers often prefer to work outside of commercial insurer networks. Not only is the amount of reimbursement often set lower than the cost of care within network, but treatment planning, including length of stay, is no longer clinically driven when an insurance company limits services without regard for the patient's medical needs. Other than the unrealistically low reimbursement, the most frustrating aspect of negotiated care within network is when inappropriate limits are applied or length-of-stay decisions are determined by an individual not working clinically with the patient (and often without clinical experience).

People with SUDs often face greater financial hardships than other patients, despite the availability of insurance, due to the nature of the disease and its consequences. Patients with SUDs may be insured by a working relative but underemployed or unemployed themselves due to their disorder. It is sometimes difficult to get family members to use their policy for treatment. The family member may not want his or her employer to know about the covered relative having a problem, or the family member may be skeptical of treatment. A lack of family support may exist before and after treatment, so individuals with SUDs may be homeless or may not have housing options after treatment. The lack of family support, housing, and employment often make post-treatment collection of fees virtually impossible.

Addiction treatment providers recognize financial difficulties facing patients – even those with health insurance that covers treatment for SUDs. Addiction treatment providers also have significant experience in dealing with the problems associated with the collection of fees. Many providers use a model of insurance, advance out-of-pocket payments, and financial aid to enable patients to access treatment. Some providers use promissory notes. Attempts to collect the portion of the medical bill for which the patient is responsible must account for the impacts that financial stress and aggressive collection tactics can have on a person's fragile recovery.

Addiction treatment providers accepting insurance incur additional costs and have entire departments dedicated to working with insurance companies to meet their requirements and attempt to collect payment. The Hazelden program is one example.

A small number of providers who service a limited group of individuals who are very wealthy can and do require full payment in advance; sometimes these individuals want to use their insurance benefits. To help the patient access insurance benefits, the provider will either manage the insurance policy with pre-certification and utilization review while in treatment or provide a comprehensive bill at the conclusion of care (which usually is not eligible for reimbursement because it lacks concurrent reviews).

Providers often must use an estimate of benefits for patients with insurance as the patient's clinical needs and length of stay are not known at the beginning of treatment. Providers also are affected by the insurer's limitations on care, as described above, which are often applied after treatment has concluded and the bill has been submitted. These treatment programs face the risk of receiving payments from insurers lower than those used in calculating the patient's up-front payment obligation.

Insurers' denials of care create a difficult dilemma for the treatment professional, whose last note in the chart documents the patient's clinical need and who knows, if she discharges the patient and the patient experiences an untoward event, the provider could be deemed liable for damages. Very few, if any, providers terminate care when insurance companies' interference becomes financially problematic. In fact, the provider's clinical relationship with the patient is at stake, and a sense of rejection could exacerbate the already grave risks associated with early termination of treatment ethical SUD treatment providers are aware of the fragility of recovery and are generally reticent to terminate treatment before it is clinically appropriate to do so.

### G.      Substance Use Disorder and Drug Poisoning Crisis

On February 8, 2022, the U.S. Commission on Combating Synthetic Opioid Trafficking published its final report. The Commission cited statistics indicating that drug poisonings have been responsible for more than 1 million deaths in the U.S. since 1999. The Commission estimated that drug poisonings are now costing the U.S. around $1 trillion every year.[52]

More than 101,750 people died of drug poisonings in the 12 months ending in October 2022.[53] More than 76,900 of these deaths involved prescription or illicit opioids, such as illegal fentanyl and fentanyl analogs.[54] In fact, roughly 68 percent of all drug poisoning deaths and 86 percent of opioid poisoning deaths involved synthetic opioids (other than methadone), predominantly illicit fentanyl and its analogs.

Millennium Health, a national drug testing laboratory, published a report in February 2023 entitled, "Fentanyl in Focus: Perspectives on Polysubstance Use in 2022."[55]

A key finding from the Millennium report was the increasing detection of fentanyl alongside cocaine, methamphetamine, heroin, and prescription opioids. Nationally, fentanyl is the most-detected drug, but the Western United States has seen the most significant rate of growth.

The Millennium data revealed that over 60 percent of fentanyl-positive specimens were also positive for one or more fentanyl analogs. This finding could indicate that the use of multiple fentanyl analogs may be a form of intentional polysubstance use. Geographical analysis also showed regional differences in the prevalence of certain fentanyl analogs.

Furthermore, the Millennium data indicated that individuals with fentanyl-positive specimens were more likely to engage in polysubstance use in comparison with those who had fentanyl-negative specimens. Researchers also found that, given the regional differences, state and local data might be more significant to health care providers than national data alone. An understanding of local trends is essential for the development of effective SUD treatment plans.[56]

Treatment for SUD has shown to be effective in reducing the impact of the disease as well as the

---

[52] CNBC, "Drug overdoses are costing the U.S. economy $1 trillion a year, government report estimates," February 8, 2022, *available at* https://www.cnbc.com/2022/02/08/drug-overdoses-cost-the-us-around-1-trillion-a-year-report-says.html.
[53] https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data htm
[54] https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data htm
[55] http://resource millenniumhealth.com/signalsreportvol5
[56] http://resource millenniumhealth.com/signalsreportvol5

public health burden. Appropriate treatment can reduce the number of poisonings and deaths and can increase productivity. Every dollar invested in SUD treatment programs yields a return of between $4 and $7 in increased earnings and decreased drug-related crime, criminal justice costs, and theft.[57] Providing coverage of SUD treatment can not only save lives but also generate significant cost savings.

### H.   Steps Toward Reform

Prior to the enactment of the Patient Protection and Affordable Care Act of 2010 (ACA), health insurers in both public and private plans routinely denied coverage to individuals with SUDs. Health plans discriminated against individuals with SUDs on the basis of preexisting condition by either excluding them from coverage or limiting access to treatment through the use of higher copayments, annual visit limits, and burdensome prior authorization requirements.[58]

The ACA and its implementing regulations significantly expanded insurance coverage and access for individuals with SUDs. For example, the law requires small group plans, individual plans, and Medicaid alternative benefit packages (ABPs) to cover SUD services as one of ten essential health benefits. The ACA also requires health insurers to accept people who apply for coverage regardless of preexisting conditions. The ACA prohibits insurers from charging higher premiums based on health condition, meaning insurers may not exclude individuals with SUDs from coverage or charge them more based on their conditions. The ACA also caps annual out-of-pocket costs for health plan enrollees and prohibits individual plans, small group plans, and ABPs from putting yearly or lifetime dollar limits on the coverage of SUD services.[59] The ACA additionally allows states to expand Medicaid coverage to all uninsured adults under the age of 65 with incomes up to 138 percent of the federal poverty level. As of January 2022, 39 states (including Washington, DC) have expanded Medicaid in line with the ACA, and 12 states have not.[60]

Finally, the ACA and its implementing regulations expanded federal parity protections. In 2008, Congress passed the MHPAEA, which mandated parity in insurance coverage between mental health/substance use disorder and medical/surgical services, including both treatment limitations and financial requirements. The MHPAEA only applied to privately insured large group plans that voluntarily offered coverage of MH/SUD benefits. The ACA expanded the MH/SUD parity protections in the MHPAEA to individual and small group plans. In 2016, the Centers for Medicare & Medicaid Services expanded parity protections to Medicaid managed care organizations, Medicaid ABPs, and the Children's Health Insurance Program.[61]

Just as the SUD and drug poisoning crisis was increasing the demand for SUD treatment, federal

---

[57] Nat'l Inst. On Drug Abuse, Principles of Drug Addiction Treatment: A Research-Based Guide 13-14 (3rd ed. 2012), *available at* https://d14rmgtrwzf5a.cloudfront net/sites/default/files/675-principles-of-drug-addiction-treatment-a-research-based-guide-third-edition.pdf.

[58] Michael C. Barnes, et al., Potential Impact of Texas et al v United States on Persons with Substance Use Disorder, ABA Health eSource (Oct. 2018).

[59] Michael C. Barnes, et al., Potential Impact of Texas et al v United States on Persons with Substance Use Disorder, ABA Health eSource (Oct. 2018).

[60] KFF, "Status of State Medicaid Expansion Decisions: Interactive Map," published Jan. 31, 2022, *available at https://www.kff.org/medicaid/issue-brief/status-of-state-medicaid-expansion-decisions-interactive-map/.*

[61] Michael C. Barnes, et al., Potential Impact of Texas et al v United States on Persons with Substance Use Disorder, ABA Health eSource (Oct. 2018).

regulations requiring most health insurance plans to provide coverage of SUD treatment took effect. As of 2014, many Americans had access to SUD treatment for the first time. Naturally, the number of health insurance claims for SUD treatment services increased.

The expansion of the MHPAEA required that many more health insurers' treatment limitations and financial requirements for people being treated for SUD be in parity with those applied to people receiving medical or surgical care. As a result, the dollar value of insurance claims for SUD treatment services also increased.

Congressional efforts to reduce SUD and drug poisonings by providing accessible and affordable treatment remain ongoing. In September of 2022, the House passed H.R. 7780, the Mental Health Matters Act, which will expand access to mental health and SUD services by preventing Americans from being improperly denied mental health and substance use benefits, ensuring a fair standard of review by the courts and banning forced arbitration agreements.[62]

As demonstrated by the Department of Labor's report,[63] health insurance companies are recalcitrant in adjusting to and complying with the requirements of the ACA and MHPAEA that are rapidly evolving to provide access and coverage for SUD treatment.

## I.     The Cigna Alarm

The year 2014 entailed a great deal of flux for consumers, providers, and insurers alike given the implementation of the ACA and its implementing regulations, which deemed behavioral health care an essential benefit and expanded mental health and SUD parity to new insurance markets. This change gave rise to some confusion and chaos, as is demonstrated by Cigna's ignorance in 2015 of the changes in the insurance industry surrounding billing and payment for testing for substance use.

Fortunately, many consumers were finally able to access insurance-covered SUD treatment. A lot of these people chose to obtain services from OON providers offering quality, convenience, or other value beyond that offered by lower-cost INN providers. This consumer preference for OON providers surely contributed to the fact that ████████████████████████████████████
████████████████████████████████ [64]

Cigna administrators became aware of the changes in selection of their product, use of the benefit, and attendant increase in costs. ████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

- ████████████████████████████████

---



- ██████████████████████████████████████
████████████████████████████████████████
███████████████████████████████ ,, 66

████████████████████████████████████████ The emails state:

- ██████████████████████████████ (**only 5 responses from providers**)." Emphasis added.

- ████████████████████████████████████████

- ████████████████████████████████████████

████████████████████████████████████████

- ████████████████████████ Ingenix was a subsidiary of UnitedHealth that created reimbursement schedules for UnitedHealth. The New York Attorney General found that Ingenix had a conflict of interest in creating reimbursement schedules used by UnitedHealth.[67]

- ████████████████████████████████████████

████████████████████████████████████████

- ████████████████████████████████████████

---

[66] Cigna_TML0017624.
[67] UnitedHealth Group, NY State Invest - Assurance of Discontinuance Under Executive Law § 63(15).
[68] *See generally,* Nemecek Deposition Exhibits.
[69] Report of Dr. Clark, p. 17



I have been provided no evidence to suggest that Cigna took a collaborative approach to informing
OON SUD providers of Cigna's expectations for prior or future SUD-related service provision and
billing.

### J.    Onerous Documentation Requests

I reviewed a documentation request Cigna sent to Plaintiff Addiction Health Alliance.[70] Cigna
requested that the Plaintiff send the following information for 21 patients within 30 days:

- Complete medical and laboratory records
- Copies of patient billing and collection ledgers
- A copy of your billing and collection practices
- Signed Assignment of Benefit form for each patient
- List of all licensed employees, including credentials
- Proof of licensure and Clinical Laboratory Improvement Amendment certification or
  waiver
- The name of the manufacturer for the equipment and type of tests used for the urine drug
  testing performed at your facility
- Client handbook

In some instances, Cigna asked that responses be transmitted by fax, a mode of electronic
communication that became largely obsolete some 25 years ago, or costly and slow physical
mail.[71]

Nevertheless, I saw evidence that Plaintiff TML Recovery attempted in good faith to satisfy
Cigna's requests of this nature and provided substantially all of the information Cigna requested.[72]

Cigna SIU Investigator Sharon Dennis stated in an email discussing Plaintiff TML, "I just deny
everything for medical records and they do not respond."[73]

### K.    Cigna's Practices Drive Profit

These measures were so effective, that Cigna experienced dramatic increase in profits between
2015–2022. Dr. Nemecek stated in his deposition that Cigna's "goal is to provide an overall, most

---

[70] CignaTML00061826.
[71] Cigna_TML00061847.
[72] February 15, 2018 - TML's submission of requested medical records to Cigna for patient MC, 320 pgs.,
Cigna_TML00057128-57447; February 15, 2018 - TML's submission of requested medical records to Cigna for
patient BB, 355 pgs., Cigna_TML00056773-57127; February 15, 2018 - TML's submission of requested medical
records to Cigna for patient ML, 580 pgs., Cigna_TML00058780-59359; February 15, 2018 - TML's submission of
requested medical records to Cigna for patient DM, 84 pgs., Cigna_TML00059360-59443.
[73] Cigna_TML00095850.

affordable health plan" to meet the needs of its members, customers, and clients.[74] The "smoking gun" emails among Cigna's employees expose the company's primary emphasis on profitability, not consumer affordability. [75] This extreme focus on profits is reflected in the company's shareholders' net profits from 2015 through 2022:

- 2015: $2.1 billion[76]
- 2016: $1.9 billion[77]
- 2017: $2.2 billion[78]
- 2018: $2.6 billion[79]
- 2019: $5.1 billion[80]
- 2020: $8.5 billion[81]
- 2021: $5.4 billion[82]
- 2022: $6.7 billion[83]

Cigna is among the top 100 (#68) on the "Forbes Global 2000" ranking based on sales, profits, assets, and market value.[84] A company that is focused on providing a "most affordable health plan" would pass some of these impressive profits along to its members, customers, and clients in the form of premium reductions. I am not aware of any evidence that Cigna reduced its premiums and enhanced consumer affordability in any significant way during this time period.

Despite Cigna's efforts to reduce its costs and increase profitability, some claims were paid. If a claim was not paid at all it would trigger an adverse benefit determination,[85] so I observed that claims were gutted rather than zero-paid through the use of these new processes.

Cigna's expert stated:

> [I] only reference[d] one claim where two days of IOP services were billed [and grossly underpaid] for a single patient, JJ. (Barthwell page 26). As with her other assertions, Dr. Barthwell provides no information to support her opinion that this or any other specific claim was a covered service, why it would meet medical necessity criteria, or the amount of remuneration she believes would be appropriate.

---

[74] Nemecek Dep. at 131.
[75] Cigna_TML00171630.
[76] https://www.annualreports.com/HostedData/AnnualReportArchive/c/NYSE_CI_2015.pdf, pg. 5.
[77] https://www.annualreports.com/HostedData/AnnualReportArchive/c/NYSE_CI_2016.pdf, pg. 6.
[78] https://www.annualreports.com/HostedData/AnnualReportArchive/c/NYSE_CI_2017.pdf, pg. 40.
[79] https://www.annualreports.com/HostedData/AnnualReportArchive/c/NYSE_CI_2018.pdf, pg. 29.
[80] https://www.annualreports.com/HostedData/AnnualReportArchive/c/NYSE_CI_2019.pdf, pg. 81.
[81] https://www.annualreports.com/HostedData/AnnualReportArchive/c/NYSE_CI_2020.pdf, pg. 72.
[82] https://www.annualreports.com/HostedData/AnnualReportArchive/c/NYSE_CI_2021.pdf, pg. 183.
[83] https://www.sec.gov/Archives/edgar/data/1739940/000114036122010160/ny20002777x1_def14a.htm, at schedule I.
[84] https://www.forbes.com/lists/global2000/?sh=327568135ac0
[85] Callahan Dep. at 87–90.

My findings support that ██████████████████████████████████████
████████████████████████████[86] Despite the extreme scrutiny that the Plaintiffs underwent, many of their claims were paid (albeit often grossly underpaid). Each of these payments was a tacit Cigna *concession* that the Plaintiffs documented and proved the following:

- The patient's diagnosis;
- The service was covered;
- The service was appropriate;
- The provider was qualified;
- The service was provided.

The fact that Plaintiffs' claims were negotiated demonstrates that Cigna recognized, acknowledged, and accepted the amount of the claim since a negotiation is only required after the initial billed amount is accepted.

### L.   Cigna's Expert's Errors

#### 1.   Counseling Services in California

Cigna's expert contends that "psychotherapy is a procedure which can only be provided by a masters or doctorate level licensed professional who documents the provision of psychotherapy."[87] This contention is inconsistent with California regulations. Specifically, California regulations provide:

"Counseling services" means any of the following activities:
(A) Evaluating participants', patients', or residents' AOD [Alcohol/Other Drug] treatment or recovery needs, including screening prior to admission, intake, and assessment of need for services at the time of admission;
(B) Developing and updating of a treatment or recovery plan;
(C) Implementing the treatment or recovery plan;
(D) Continuing assessment and treatment planning;
(E) Conducting individual counseling sessions, group counseling sessions, face-to-face interviews, or counseling for families, couples, and other individuals significant in the life of the participants, patients, or residents; and
(F) Documenting counseling activities, assessment, treatment and recovery planning, clinical reports related to treatment provided, progress notes, discharge summaries, and all other client related data.[88]

Counseling services may only be provided by the following individuals: [89]

---

[86] Cigna_TML00171630; Cigna_TML00094763.
[87] Report of Dr. Clark, p. 14.
[88] https://www.law.cornell.edu/regulations/california/9-CCR-13005
[89] https://www.dhcs.ca.gov/Documents/DHCS-AOD-Certification-Standards-2.7.2020.pdf

1. Licensed professionals acting within their scope of practice, i.e., "a physician licensed by the Medical Board of California; or a psychologist licensed by the Board of Psychology; or a clinical social worker or marriage and family therapist licensed by the California Board of Behavioral Sciences, or an intern registered with the California Board of Psychology or the California Board of Behavioral Sciences;[90] or

2. Individuals registered or certified pursuant to California Code of Regulations, Title 9, Division 4, Chapter 8.[91]

To obtain certification, non-licensed or non-certified individuals providing counseling services in a California SUD treatment program must register with a state-approved certifying organization within six months of hire.[92] From the date of registry, counselors have five years to become certified. If a counselor fails to become certified after being registered for five years, the counselor will not be permitted to provide counseling services to clients.[93]

Finally, California regulations state as follows:

[A]t least thirty percent (30%) of staff providing counseling services in all AOD programs shall be licensed or certified pursuant to the requirements of this Chapter. All other counseling staff shall be registered pursuant to Section 13035(f).[94]

In other words, in California SUD treatment programs, counseling staff must be apportioned as follows:

- 70 percent or less:
  - New hires within their first six months (in general, these individuals are often persons in recovery who wish to share their experiences with peers), or
  - A person who is registered with a certifying organization but is not yet certified;
- 30 percent or more:
  - California-licensed physicians, psychologists, clinical social workers, marriage and family therapists, and interns registered with the California Board of Psychology or Board of Behavioral Sciences; or
  - Certified AOD counselors.

Cigna's expert also states that "Psychotherapy is a billable procedure by licensed clinician, while the other types of group experiences are not billable as medical codes, unless they are subsumed into a day rate of Intensive Outpatient Program/Partial Hospital Program/Residential Treatment Programs." This statement is inconsistent with California regulations.

As explained above, the definition of "counseling services" includes "implementing the treatment or recovery plan."[95] Individuals who understand their health condition and treatment methodology are often better equipped to cope and motivated to succeed in treatment and recovery. Therefore,

---

[90] https://www.law.cornell.edu/regulations/california/9-CCR-13015
[91] https://www.dhcs.ca.gov/Documents/DHCS-AOD-Certification-Standards-2.7.2020.pdf
[92] https://www.law.cornell.edu/regulations/california/9-CCR-13035
[93] https://www.dhcs.ca.gov/provgovpart/Pgs.CounselorCertification.aspx
[94] https://www.law.cornell.edu/regulations/california/9-CCR-13010
[95] https://www.law.cornell.edu/regulations/california/9-CCR-13005

SUD treatment plans often include informing the patient about his or her disorder, symptoms, and treatment methods.[96] These informational activities are the foundation "psychoeducation."[97] Given that counseling services include implementing the treatment plan, and the treatment plan often incorporates psychoeducation, psychoeducation is a counseling service. It is billable as such, and it may be provided by any of the individuals authorized by California regulation.

As a result of Cigna's expert's misunderstanding of how counseling services are conducted and billed in California, the expert's analyses and conclusions regarding the Plaintiffs' counseling services and billing are flawed and erroneous.

Cigna's expert also appears to have misinterpreted the charge and payment spreadsheets in the case record. For example, Cigna's expert reported, "My examination of these records reflect that Cigna did pay a portion of some of these claims for group psychotherapy sessions (90852) billed by DRR for patient WP (over $700 per claimed group psychotherapy session)…." Assuming the expert intended to refer to services for WP coded 90853, my reading of the relevant spreadsheet is that the maximum amount paid for services for WP coded 90853 was $183.[98] This amount was barely 10 percent of the billed amount of $1,709.

Neither Cigna nor its expert has provided a comprehensible explanation of how the rate reductions Cigna and its contractors applied to the Plaintiffs' claims were justified and calculated. I maintain that Cigna's approach to the computation of payment of the Plaintiffs' claims is irrational and haphazard, and intended to retain assets of Cigna despite claims that Cigna concedes are valid and payable.

### 2.    Evidence-Based Treatment

Cigna's expert asserts that "the evidence-based treatment used to treat opioid addiction occurs in outpatient levels of care at Opioid Treatment Programs ("methadone clinics"), Office Based Opioid Treatment ("Suboxone clinics"), and Telemedicine Based Opioid Treatment programs ("telehealth Suboxone clinics")."[99] This assertion suggests that treatment without medication for opioid use disorder (OUD) is not evidence-based and does not occur in residential, PHP, IOP, and other settings.

SAMHSA's TIP 63 (which the Cigna's expert includes on her resume under "Policy and Standards Experience") states as follows:

> The science demonstrating the effectiveness of medication for OUD is strong … This doesn't mean that remission and recovery occur only through medication. Some people achieve remission without OUD medication, just as some people can manage type 2 diabetes with exercise and diet alone....

---

[96] Amy Marshall, Psy.D. "How Psychoeducation Is Used in Therapy." https://www.verywellmind.com/what-is-psychoeducation-5323831#citation-1
[97] Amy Marshall, Psy.D. "How Psychoeducation Is Used in Therapy." https://www.verywellmind.com/what-is-psychoeducation-5323831#citation-1
[98] Cigna_TML00094767.
[99] Report of Dr. Clark, p. 5.

> Medication for OUD should be successfully integrated with
> outpatient and residential treatment. Some patients may benefit from
> different levels of care during the course of their lives. These
> different levels include outpatient counseling, intensive outpatient
> treatment, inpatient treatment, or long-term therapeutic
> communities….[100]

Furthermore, Cigna's expert declares that SUD treatment premised upon the Minnesota Model is not evidence-based. The Minnesota Model has a sturdy base of evidence documented in credible literature and has provided a foundation for SUD treatment in the U.S. for roughly 50 years. This model has evolved to incorporate all levels of care recognized by *The ASAM Criteria*, requires that the duration of treatment be individualized, and includes individual and group therapies, family engagement, mutual aid, and peer recovery support. There are no FDA-approved medications to treat SUDs other than OUD, alcohol use disorder, and nicotine use disorder. As such, multimodal treatment methods drawing upon the Minnesota Model are standard for patients with SUDs for which there are no medications.

### 3. In-Network vs. Out-of-Network Providers

Health insurers maintain a network of providers to better predict and control costs. Providers who agree to go INN are marketed by the insurer and obtain access to a pool of insured individuals in exchange for less control over treatment decisions and lower fees that are established by the insurer. OON providers typically elect not to go INN due to the level of insurer control and lower compensation rates.

Deductibles, copays, and annual limits on out-of-pocket costs are typically lower for services provided by INN providers than the deductibles, copays, and annual limits applied to services provided by OON providers. Insured consumers who obtain health care services from INN providers typically pay less out of pocket than those consumers who obtain services from OON providers. Insured consumers who obtain services from OON providers are often willing and prepared to pay more out of pocket than consumers who obtain services from INN providers in exchange for the quality, convenience, or other distinctive value OON providers offer.

### 4. False Negative Urine Drug Testing Results

In Dr. Nemecek's deposition, he explained his belief that the criteria in which a definitive drug test is medically necessary is when a presumptive test result is inconsistent or not available for the analyte being tested.[101] This position disregards the risks of false negative results associated with the less reliable presumptive methodology. A false negative result may give a treatment provider inappropriate confidence that substance use is not occurring. A false negative may cause the provider to miss a patient's return to use, lead to misdiagnosis or diagnostic delay, misinform the treatment plan, and reinforce extremely risky drug-related patient behaviors. This risk is especially grave when polysubstance use is common, fentanyl is frequently present in counterfeit medications

---

[100] SAMHSA TIP 63. https://store.samhsa.gov/sites/default/files/pep21-02-01-002.pdf
[101] Nemecek Dep. at 112–113.

and illicit substances, and some 90 percent of drug poisonings involve synthetic opioids like fentanyl.

### M.  Cigna's Reactions to Increased Costs and Coverage

Cigna and its experts seem to point to fraud as its reasons for changing the way it covered SUD treatment. For example, Cigna's experts seem to suggest that young adults seeking treatment is a perverse way for providers to bill their relatives' insurance.[102] However, Cigna's experts do not reference a single piece of evidence that the Plaintiffs in this action recruited dependents for this reason, nor does my review of the records indicate this.

As it relates to Cigna's coverage guidelines, I see no evidence that  were offset by above-market-rate or supplemental compensation.[103] Rather, Cigna's requirements created complications and expenses that likely impeded SUD treatment providers' ability and willingness to serve Cigna-insured patients.

## V.  Factual Summary

Since completing my initial report Plaintiffs' counsel has supplied me with the depositions taken in this action which I rely upon to supplement my report. Although I have had access to deposition transcripts taken in the related action – *RJ, et al. v. Cigna Behavioral Health et al.* (*RJ*) – for which I have also been retained as a consultant, I did not rely on any materials from the *RJ* matter to form my initial report or supplemental report.

The following facts are drawn from Plaintiffs' Consolidated Second Amended Complaint (SAC) [ECF No. 79]. Plaintiffs are OON SUD treatment providers and clinical laboratories.[104] Plaintiffs are in the profession of helping individuals recover from substance use disorders and return to their families and communities as healthy and productive members of society.[105] Plaintiffs are certified to provide these services by the California Department of Health Care Services.[106]

Cigna[107] is an insurance company licensed to do business in the state of California as providers of health insurance benefits.[108] MultiPlan[109] is a provider of healthcare cost management solutions, specializing in providing claim cost management solutions, health care payment solutions, auditing and reimbursement of behavioral health and substance use disorder claims and costs, as well as prepayment services such as treatment facility and professional bill review and negotiations for controlling the financial risks associated with health care bills on plans insured, managed, or

---

[102] Dr. Kelly Clark Report at 9.
[103] Cigna Standards and Guidelines/Medical Necessity Criteria for Treatment of Behavioral Health and Substance Use Disorders Revised Edition: 2015-2016. Beginning Cigna_TML0065827.
[104] SAC ¶ 23.
[105] *Id.*
[106] *Id.* at ¶ 1.
[107] By "Cigna," I refer to Cigna Corporation, Cigna Health and Life Insurance Company, Connecticut General Life Insurance Company, Cigna Behavioral Health, Inc., Cigna Behavioral Health of California, Inc., Cigna Health Management, Inc., and Cigna Healthcare of California, Inc.
[108] SAC at ¶¶ 10–16.
[109] By "MultiPlan," I refer to MultiPlan, Inc. and Viant, Inc.

administered by Cigna and its subsidiaries and affiliates.[110]

Plaintiffs provided medically necessary, preauthorized, and covered SUD treatment and laboratory services to 508 of Cigna's insured members (the patients), including residential withdrawal management and residential treatment (RTC), partial hospitalization/day treatment (PHP), intensive outpatient (IOP), outpatient (OP), treatment planning, counseling and behavioral therapies, family and group therapy, medication management, case management services, and laboratory services to, among other things, determine, measure, or otherwise describe the presence or absence of various substances in the body.[111] The health insurance plans provide coverage for OON SUD treatment and laboratory services.[112]

Before rendering treatment to the patients, Plaintiffs obtained written assignments of benefits from each of the patients.[113] Cigna confirmed, represented, promised, and warranted Plaintiffs through the required verification of benefits process that each of the insureds and their respective OON SUD treatments and services were covered by health insurance plans issued, managed, or administered by Cigna and MultiPlan.[114] In reliance on these assignments of benefits and Cigna representations, Plaintiffs rendered treatment to the patients.[115] Cigna knew that Plaintiffs were treating and providing services and were advised and fully aware of Plaintiffs' charges for the treatment and services rendered.[116] After providing treatment and services to the patients, Plaintiffs submitted their claims to Cigna for payment.[117]

I have been advised that Plaintiffs and Defendants selected a sample set of the patients for purposes of discovery. I have reviewed the claims charts and synopses of patient admission and treatment records, including Verification of Benefits (VOB), Assignment of Benefits (AOB), Explanation of Benefits (EOB) and Explanation of Payments (EOP), and other patient specific documents and summaries for the sample patients. I also reviewed documents produced by Defendants in this action, including internal document and communications, and claims administration documents, including Summary Plan Descriptions (SPDs), Administrative Services Only Agreements (ASOs), Cigna's Standards and Guidelines, SIU investigation files, emails, memoranda, spreadsheets, and slide decks. The following facts are drawn from these documents and the Defendants' witness testimony in this action.

After Plaintiffs submitted their claims to Cigna for payment, Cigna paid Plaintiffs a nominal percentage of the charges for the claims that are at issue. Cigna accomplished this by, among other things, reimbursing the claims with an artificial "reasonable and customary" (R&C) rate,[118] and funneling claims to MultiPlan through its ██████████████████████████████████ [119]

---

[110] *Id.* at ¶¶ 17–18.
[111] *Id.* at ¶ 22.
[112] *Id.* at ¶ 23.
[113] *Id.* at ¶ 25.
[114] *Id.* at ¶ 28.
[115] *Id.*
[116] *Id.*
[117] *Id.* at ¶ 29.
[118] Also known as "Usual and Customary" (U&C).
[119] Gompper Dep. at 117–118. Order to Show Cause *In the Matter of the Certificate of Authority of Health Net Life Insurance Company* (CDI File No. UPA-2016-00005).

██████████████████████████████████████████████████

The Plaintiffs are not Medicare providers, and there is no Medicare rate for SUD treatment facilities such as Plaintiffs';

██████████████████████████████████████████████████

[120] Cigna and MultiPlan's repricing methodologies are premised upon Medicare charge and reimbursement data, skewing the reimbursement rates lower.

According to Cigna's website, when calculating reimbursement for OON claims, the plans utilize any of the following three methodologies to calculate what Cigna defines as the "Maximum Reimbursable Charge" ("MRC").[121]

a.    MRC I:

Under this option, a data base compiled by FAIR Health, Inc. (an independent non-profit company) is used to determine the charges billed by health care professionals or facilities in the same geographic area for the same procedure codes using data. The maximum reimbursable amount is then determined by applying a percentile (typically the 70th or 80th percentile) of billed charges, based upon the FAIR Health, Inc. data. For example, if the plan sponsor has selected the 80th percentile, then any portion of a charge that is in excess of the 80th percentile of charges billed for the particular service in the same relative geographic area (as determined using the FAIR Health, Inc. data) will not be covered and reimbursed, and the patient will be fully responsible for such excess.

b.    MRC II:

This option uses a schedule of charges established using a methodology claimed to be similar to that used by Medicare to determine allowable fees for services within a geographic market or at a particular facility. The schedule amount is then multiplied by a percentage (110%, 150% or 200%) selected by the plan sponsor to produce the MRC.

In the limited situations where a Medicare-based amount is not available (e.g., a certain type of health care professional or

---

[120] Cothron Dep. at 103. Cigna receives as much as 29% of the 'savings' and MultiPlan receives 7–11% of the savings

[121] myCigna - Legal Disclaimer; https://my.cigna.com/public/legal_disclaimer.html; https://static.cigna.com/assets/chcp/resourceLibrary/clinicalReimbursementPayment/medicalClinicalReimburseOutOfNetwork.html.

procedure is not covered by Medicare or charges relate to covered services for which Medicare has not established a reimbursement rate), the MRC is determined based on the lesser of:

> 1. the health care professional or facility's normal charge for a similar service or supply; or
>
> 2. the MRC Option I methodology based on the 80th percentile of billed charges.

c.       Average Contracted Rate ("ACR"):

Under this option, the MRC is determined based on the lesser of:

> 1. the health care professional or facility's normal charge for a similar service or supply; or
>
> 2. the Average Contracted Rate - i.e., the average percentage discount applied to all claims in a geographic area paid by Cigna during a recent 6-month period for the same or similar service provided by health care professionals or facilities participating in the Cigna network. The ACR is updated by Cigna on a semiannual basis. The geographic area used by Cigna is either a Metropolitan Statistical Area (MSA) or an area within governmental boundaries (e.g., state, county, zip code).

In some cases, the ACR amount will not be used and the MRC is determined based on the lesser of:

> 1. the health care professional or facilities' normal charge for a similar service or supply; or
>
> 2. the MRC I methodology based on the 80th percentile of billed charges."

The sample patients' SPDs that I reviewed contained either an MRC I reimbursement methodology that obligated Cigna to reimburse Plaintiffs' claims with an R&C rate such as those determined by using FAIR Health, or an MRC II reimbursement methodology that obligated Cigna to reimburse Plaintiffs' claims at either Plaintiffs' "normal charge for a similar service or supply; or the MRC Option I methodology [i.e., R&C] based on the 80th percentile of billed charges," for "situations [like here] where a Medicare-based amount is not available (e.g., a certain type of health care professional or procedure is not covered by Medicare or charges relate to covered services for which Medicare has not established a reimbursement rate)."[122] The Centers for Medicare and Medicaid Services ("CMS") defines R&C as, "[t]he amount paid for a medical service in a geographic area based on what providers in the area usually charge for the same or similar medical

---

[122] *Id.*

service." As evidenced by the plan language below, this verbiage is commonly used by insurers and referred to as R&C and U&C. For example, one of the MRC I SPDs I reviewed states:[123]

> Maximum Reimbursable Charge is determined based on the lesser of the providers normal charge for a similar service or supply; or
>
> A percentile of charges made by providers of such service or supply in the geographic area where the service is received. These charges are compiled in a database we have selected [e.g., FAIR Health].

An MRC II SPD I reviewed states that the reimbursement methodology for OON claims is:[124]

> 70% of the Maximum Reimbursable Charge [MRC]… [MRC] is determined based on the lesser of the provider's normal charge for a similar service or supply; or… [110%] of a schedule that [Cigna] developed based upon a methodology similar to a methodology utilized by Medicare for similar service in geographic market; In some cases, a Medicare based schedule will not be used and the [MRC] for covered services is determined based on the lesser of:
>
> - the provider's normal charge for a similar service or supply; or
>
> - the 80th percentile of charges made by providers of such service or supply in the geographic area as compiled in database selected by [Cigna].

Cigna's experts seem to be critical of my reliance of Cigna's plan language on its website as opposed to the sample SPDs. As evidenced by the language above, that distinction is immaterial, as the language in the sample SPDs is nearly identical to the language online and leads to the same conclusion, and furthermore, my initial report did, in fact, include references to sample SPDs.

Ms. Gompper testified that, ███████████████████████████████████████
████████████████████████████████████████
████████████████████████[125] The crux of this case is whether the methodologies were permissible pursuant to the plans. Ms. Gompper testified that MRC I professional claims are priced using FAIR Health.[126] However, for MRC I outpatient facility claims, Cigna does not use FAIR Health and instead uses MultiPlan/ Viant OPR, which is populated with Medicare Charge Data at a national level.[127] The plans provide that, under MRC I and II, the reimbursement must be calculated based on data relevant to the geographic area where the service is received.[128] ████
████████████████████████████

---

[123] Cigna_TML00019837.
[124] Cigna_TML00025225–6.
[125] Gompper Dep. at 43–45.
[126] Gompper Dep. *Id.* at 52.
[127] Gompper Dep. at 54, 75, 80.
[128] Cigna_TML00019837; Cigna_TML00025225–6.

[29] Using FAIR Health, on the other hand, would have allowed Cigna to price claims based on Geozips and in accordance with the plan language.[130]

As Cigna internal emails indicate and Ms. Gompper admits, Cigna and MultiPlan

[141]

---

[129] Gompper Dep. at 80–82.
[130] Gompper Dep. at 71.
[131] Gompper Dep. at 43–52.
[132] Cigna_TML00171624.
[133] Cigna_TML00171631.
[134] Id.
[135] Cigna_TML00171786.
[136] Cigna_TML00171752.
[137] Cigna_TML00171774.
[138] Cigna_TML00171756.
[139] Crandell Dep. at 85.
[140] Cothron Dep. at 81–82.
[141] Gompper Dep. at 54, 75, 80.



Cigna derives revenue in two ways under the ASOs when providing claims administrative services for self-insured employers that sponsor health benefit plans for their employees that are relevant to this action:



47

## VI.    Opinions

> 1.    **Cigna implemented policies and systematic practices that emphasized profits over patients and resulted in the under-reimbursement of Plaintiffs' claims, with Cigna instead paying Plaintiffs an arbitrary, nominal percentage of the charges, far below a reasonable and customary rate.**

Plaintiffs are not Medicare providers and there is no Medicare rate for SUD treatment facilities such as Plaintiffs';                                                                                                    Cigna disregarded the language it drafted into the SPDs that obligated Cigna to reimburse Plaintiffs' OON SUD claims with an R&C rate or the Plaintiffs' normal billed charges under either the MRC I or MRC II methodology given the absence of a Medicare rate, which is how Cigna historically had been reimbursing OON SUD claims prior to the 2015 changes to its reimbursement policies. Instead,

---

[142] Example ASO Cigna_TML0073412.
[143] Example ASO Cigna_TML00073419–00073420.
[144] Cothron Dep. at 103.
[145] Example ASO Cigna_TML00073419¬–00073420.
[146] Vangeli Dep. at 59–61; Cothron Dep. at 109.
[147] Cigna's Vol. 18 Claims Charts: Cigna_TML00198466–72.

███████████████████████████████

The plans require that Cigna reimburse Plaintiffs claims based on "[a]percentile of charges made by providers of such service or supply in the geographic area where the service is received" for MRC I or for MRC II "the provider's normal charge for a similar service or supply; or the 80th percentile of charges made by providers of such service or supply in the geographic area as compiled in database selected by [Cigna]."[148] For MRC I Cigna relied upon MultiPlan/ Viant OPR for outpatient facility claims which is populated with Medicare Charge Data at a national level.[149]The MRC I methodology makes no mention that Cigna would use ██████████ ███████████████████████ bear no relationship to an R&C rate or the FAIR Health benchmark rate for SUD services, or to Plaintiffs' "normal charge for a similar service or supply" as represented in the MRC I SPDs and in Cigna's online legal disclaimer.

The MRC II methodology allows for the use of a Medicare-based reimbursement rate, but only when a Medicare rate is available and only if Cigna bases that rate "upon a methodology similar to a methodology utilized by Medicare for a similar service in the geographic market" as represented in the MRC II SPDs and in Cigna's online legal disclaimer. As Cigna recognizes, there are no Medicare rates for SUD treatment facilities, and I saw no evidence that Cigna's methodology is similar to Medicare's methodology.

Cigna and MultiPlan's repricing methodologies and reimbursement rates are premised upon Medicare data purchased by Cigna and MultiPlan that they use to produce arbitrary, unreliable and unjust reimbursement rates for Plaintiffs' SUD services that are a nominal percentage of the charges and far from Plaintiffs' usual, reasonable and customary charges. Cigna's experts contest that Plaintiffs charges were not "reasonable" in light of what other Plaintiffs were charging for the same service.[150] ████████████████████████████████ ████████████ The fact the Defendants were willing to enter into agreements at these rates indicates that they were in fact reasonable.

| Provider | Date | Global Agreement Percentage | Bates No. |
|---|---|---|---|
| TML Recovery | 10/5/2015 | ████████ | MPI_Cigna0007746 |
| DR Recovery Encinitas | 3/6/2015 | ████████ | MPI_Cigna0007745 |
| Pacific Palms Recovery | 5/26/2017 | ████████ | PPR_CIGNA00000074 |
| Woman's Recovery Center | 10/20/2017 | ████████ | WRC_CIGNA00000019 |
| Southern California Addiction Center | 6/5/2017 | ████████ | MPI_Cigna0007744 |

As a clinician who has been practicing for nearly 40 years and who has been intimately in an array of treatment programs located in a number of states including California Plaintiffs charged prices are reasonable and customary based on their geographic location and type of services they provide.

---

[148] Sample SPDs: Cigna_TML00019837; Cigna_TML00025225–6.
[149] Gompper Dep. at 54, 75, 80.
[150] Mr. O'Brien's Report at 11.

43

These reimbursement rates were arbitrary in that there is no evidence to indicate Cigna and
MultiPlan arrived at these purported R&C reimbursement rates by analyzing data of billed charges
made by healthcare professionals or facilities in the same geographic area for the same procedure
codes. In fact, the evidence demonstrates that Cigna and MultiPlan arrived at these rates by
analyzing claims data for different providers of different services in different geographic areas.[151]
As demonstrated by Cigna C-Suite emails which read ████████████████████████
███████████████████████████████ it appears more likely than not that Cigna and MultiPlan
arrived at these reimbursement rates not in an effort to fairly determine the R&C rates, but rather
to decrease their spend and increase their own profits.[152]

Cigna's ████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████.[153] The claims data for
the sample patients in this action demonstrates that Cigna and MultiPlan ████████████████
████████████████████ For example, Cigna's claims data indicates that for one of the sample
patient's claims, the provider billed $3,418.00 for its services.[155] The sum paid to the provider was
only $369.04.[156] ██████████████████████ The provider in this instance received ~10% of the
amount billed, ████████████████████████████████████████████████

████████████████████████████████████████████████████████████
████████████████████████████████ spending on SUD treatment at a time when a
million Americans have died from a drug poisoning. Cigna should have been implementing
initiatives and strategies to increase coverage and access to SUD treatment.

      2.      **There is no Medicare rate for inpatient or outpatient SUD services billed
by residential treatment facilities such as Plaintiffs, and** ████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████

████████████████████████████████████████ SUD providers are tasked with the responsibility of treating someone who can

---

[151] Cothron Dep. at 81–82.

[152] Cigna_TML0017624.

[153] Example ASO Cigna_TML00073419–00073420; Cothron Dep. at 103; Example ASO Cigna_TML00073419¬–
00073420

[154] Cigna_TML00195707.

[155] Cigna's Claim Report Vol. 18 for DR Recovery Patient Jacob Jones Cigna_TML00198472, beginning column
HR, row 15.

[156] *Id.*, also known as the allowed amount, column HT.

[157] *Id.*, columns HV and HW.

leave the treatment facility and gain access to alcohol, prescription drugs, and illegal substances, such as fentanyl analogs. We are responsible not only to the patients but feel an obligation to the public at large. Many people with SUDs are not only a danger to themselves but to others. For example, people with SUDs may commit crimes, such as drug dealing, as a consequence of their SUD. SUDs entail a plethora of risks that are less common at inpatient acute care hospitals and typically not encountered at SNFs.

With increased risks, come increased duties and associated costs, which are reflected in amounts SUD treatment facilities bill. SUD treatment facilities may provide inpatient services, which entail less patient exposure to the outside community, or outpatient services, which entail greater patient exposure to the outside community and related risks to the patient's SUD recovery. By definition, ███████████████ services are not outpatient services and do not entail as much exposure to the outside community and associated risks to recovery. SUD treatment facilities provide varying levels of services not provided by ███████████████ and medically specialized services not provided by ███████.

███████████████████████████████████████████████████████████████

If a patient with an SUD is not successful in an outpatient setting, SUD treatment providers may decide that another treatment setting or level of care is more appropriate, whether inpatient, residential, partial hospitalization, or maybe a more intensive outpatient. Each level of care requires a different type of service, investment of time, and resources.[160] Beyond levels of care, each patient at an SUD treatment facility often requires different specialized services, many of which are not provided at ███████████████. For example, a marital or family issue may be at the center of someone's substance use. In this scenario, I would connect the patient with a family therapist to assess this issue and to work with the treating physician to develop a treatment plan. These types of specialized services are not available at many ███████████████. Similarly, many ███████ may employ physical therapists or many ███████████████ may employ wound care physicians or a radiologist, which are rarely needed or present in SUD treatment facilities.

Cigna and MultiPlan's ███████████████████████████

[158]https://www.cms.gov/glossary?term=skilled+nursing+facility&items_per_pg.=10&viewmode=grid#:~:text=A%20facility%20(which%20meets%20specific.treatment%20available%20in%20a%20hospital.
[159] https://www.cms.gov/Research-Statistics-Data-and-Systems/Research/ResearchGenInfo/Downloads/DataNav_Glossary_Alpha.pdf
[160] For details in the details of the various levels of care see, https://www.medicaid.gov/state-resource-center/innovation-accelerator-program/iap-downloads/reducing-substance-use-disorders/asam-resource-guide.pdf

███████ is arbitrary and unreasonable considering the significant differences in treatment, care, risks, resources, and staffing. The services are not the same, and the Medicare rates for these differing facilities do not reflect what SUD providers in the same geographic area usually charge for SUD treatment. Indeed, Cigna and MultiPlan's █████████ of Plaintiffs' billing codes to Medicare rates resulted in reimbursement amounts that were generally between 7 and 20 percent of Plaintiffs' billed charges. These Medicare-based rates are not SUD R&C rates, such as those generated by FAIR Health.

   **3.    Despite Cigna's payment obligations under the sample patients' SPDs, Cigna and MultiPlan used biased data systems, administrative burdens, and deceptive practices to avoid paying, or to pay unreasonably low reimbursement rates for Plaintiffs' OON SUD services.**

As discussed above, MultiPlan's Master Services Agreement with Cigna provides for



MultiPlan may bestow upon a provider the perception of in-network status with its network agreements known as "Global Agreements," but MultiPlan will not guarantee reimbursement at the negotiated network rate, and ███████████████████████████████████ In negotiating single-claim agreements, MultiPlan employed questionable coercive tactics, offering Plaintiffs negotiated rates far below the R&C rate and a fraction of the billed charges with an indication that if not accepted, Plaintiffs could expect an even lower Medicare-based rate.[161] As part of this negotiation process, MultiPlan conditions payment on the OON provider's agreement to waive the balance bill.[162]

There are additional examples of Cigna and MultiPlan's use of flawed methodologies, biased data systems, burdensome requirements, and deceptive practices to avoid paying, or pay unreasonably low reimbursement rates for, OON SUD services. For example, ████████████████████████████████████████████████████████████████.[165]

   **4.    ████████████████████████████████████**

---

[161] Sample SCA Letter from MultiPlan MPI_Cigna0002011 (states: "if you do not wish to sign the agreement, this claim is subject to a payment as low as 110% of Medicare rate."); TML Recovery Dep. of Nate Izzo at 111–113.
[162] Viant SCA MPI_Cigna0005592 ("Provider agrees not to balance bill…"); Vangeli Decl. ¶ 21.
[163] Cigna_TML00171786.
[164] Cigna_TML00171774 at slide 26.
[165] Cigna_TML00171797 at slide 13; Cigna_TML00171786.



The claim charts I reviewed reflect a number of claims where Cigna determined the allowed amount to be $0. When cross-referencing those patients' line item claims to the patients' charts, it is apparent that Cigna denied definitive drug testing claims pursuant to its Medical Coverage Policy for Drug Testing, which provides for presumptive drug testing not to exceed one test per date of service up to 32 tests per year, and definitive drug testing not to exceed one test per date of service up to 16 tests per year, subject to limiting factors.[166]

Another group of claim denials were for services Cigna deemed not medically necessary. However, the vast majority of these claims were "administrative" denials for an alleged lack of documentation of the medical necessity, without any clinical review of the claim. The patient charts reflect the providers' compliance with Cigna's repeated requests for records, yet no acknowledgment by Cigna that it had received the requested records.[167] There were some claim denials for lack of medical necessity where the claim was reviewed by a medical director. However, the medical director's opinion conflicted with the records in the patient's chart. Furthermore, it has been well-documented that Cigna's medical directors have a custom and practice of denying claims without ever reviewing the medical records.

According to investigative reporting conducted by the independent, not-for-profit ProPublica news publication and published on March 25, 2023, Cigna "has built a system that allows its doctors to instantly reject a claim on medical grounds without opening the patient file, leaving people with unexpected bills, according to corporate documents and interviews with former Cigna officials. Over a period of two months last year, Cigna doctors denied over 300,000 requests for payments using this method, spending an average of 1.2 seconds on each case"[168]

The denials in this case are consistent with the initiatives described in the 

One such email message read, 

[69] The new one-size-fits all rule denying coverage of quantitative (definitive) testing after a negative qualitative (presumptive) test is inconsistent with medical standards. Presumptive drug testing does not reliably identify many

---

[166] Cigna's Drug Testing Policy Ex. 5 of Nemecek Dep. not bates labeled.

[167] See above proof of transmission of patient records to Cigna.

[168] https://www.propublica.org/article/cigna-pxdx-medical-health-insurance-rejection-claims#:~:text=The%20company%20has%20built%20a,interviews%20with%20former%20Cigna%20officials.

[169] Cigna_TML00171620.

substances, including fentanyl, methadone, Ambien, Ritalin, ketamine, MDA, kratom, pregabalin, and tapentadol.[170] The presumptive methodology often yields false negatives and lacks specificity, meaning that it does not distinguish between discrete analytes, such as oxycodone and oxymorphone within the opiate class.[171] At a time when more than 101,750 Americans are dying of drug poisonings, and more than 68 percent of those poisonings involve synthetic opioids like illegal fentanyl analogs, it is often medically necessary to conduct frequent definitive drug testing for many patients in the active treatment phase of SUD management.

## VII.   Compensation

I am being compensated at $1,250.00 per hour for my review of materials and preparation of this report.

## VIII.  Exhibits
- Curriculum Vitae
- List of cases in which expert testimony was provided

Dated:  July 9, 2023

By:   *Andrea G. Barthwell*
Andrea G. Barthwell, MD, DFASAM

---

[170] American Society of Addiction Medicine Consensus Statement on Appropriate Use of Drug Testing in Clinical Addiction Medicine:
https://journals.lww.com/journaladdictionmedicine/Fulltext/2017/06001/Appropriate_Use_of_Drug_Testing_in_Clinical.1.aspx; Gunja. The clinical and forensic toxicology of Z-drugs: https://pubmed.ncbi nlm.nih.gov/23404347/;
Urine Drug Testing LCD. CMS On-Line Manual, Publication 100-02, Medicare Benefit Policy Manual, Chapter 15, §§80.0, 80.1.1, 80.2. Clinical Laboratory services: https://www.cms.gov/medicare-coverage-database/view/lcd.aspx?LCDId=36037&DocID=L36037.
[171] American Society of Addiction Medicine Consensus Statement on Appropriate Use of Drug Testing in Clinical Addiction Medicine:
https://journals.lww.com/journaladdictionmedicine/Fulltext/2017/06001/Appropriate_Use_of_Drug_Testing_in_Clinical.1.aspx.

# EXHIBIT E-5

REDACTED VERSION OF DOCUMENT PROPOSED TO BE

FILED UNDER SEAL L.R. 79-5.2.2(c)

Supplemental Report of Andrea G. Barthwell, MD, DFASAM

Submitted March 30July 9, 2023
in the case of
*TML RECOVERY, LCC, et al. v. Cigna Corporation, et al.*
Case No.: 8:20-cv-0269-DOC-JDE
in the
United States District Court for the Central District of California

## I.      Introduction

Upon the request of Richard T. Collins, Esq., of Arnall Golden Gregory LLP, counsel for the Plaintiffs,[1] I have provided in this report a broad description of the substance use disorder (SUD), commonly referred to as addiction, treatment delivery systems in the United States. Additionally, I have reviewed numerous documents pertinent to the civil action described above and provided my opinion on the clinical and related practices the Plaintiffs follow in providing SUD treatment services and Defendants reimbursement of the resulting claims.

## II.      Qualifications

I have practiced Addiction Medicine since 1985, am certified by the American Board of Addiction Medicine, and am a Distinguished Fellow in the American Society of Addiction Medicine (ASAM). I have employed and overseen many forms of care used to treat alcoholism and other addictions. I have conducted research on the treatment of individuals in the office-based setting and on aggressive case management and its effect on treatment retention and outcomes.

I am a co-author of a chapter on the different modalities of SUD treatment in *Principles of Addiction Medicine*, ASAM's textbook. I was a reviewer of the first edition of *Principles of Effective Treatment*, the research-based guide on addiction treatment by the National Institute on Drug Abuse (NIDA). I have served on the Department of Health and Human Services' National Institute of Health (NIH) National Advisory Committees of the National Institute on Alcoholism and Alcohol Abuse (NIAAA), NIDA, and the Substance Abuse and Mental Health Administration (SAMHSA) Center for Substance Abuse Treatment (CSAT). Additionally, as a consultant I trained state employees to use ASAM's PPC in annual compliance visits and post-treatment reviews.

In Illinois, I was the Medical Director of an organization contracting with the State of Illinois during the shift from grant-in-aid funding to fee-for-service funding using the adoption of ASAM's Patient Placement Criteria (PPC)[2] as the impetus for the shift. In that position I helped develop a number of services our organization developed and sold to third party payers in publicly-funded centers that were created and funded by CSAT's then forerunner, "the Office of Treatment Improvement (OTI), a

---

[1] By "Plaintiffs," I refer to those in Band 1 who I understand include: 12 South, LLC, Addiction Health Alliance, LLC, DR Recovery Encinitas, LLC, MMR Services, LLC, TML Recovery, LLC, Woman's Recovery Center, LLC, Pacific Palms Recovery, LLC, Southern California Recovery Centers Oceanside, LCC, and Southern California Addiction Center, Inc.

[2] The PPC is a system that provides separate placement criteria for adolescents and adults to create comprehensive and individualized treatment plans.

~~Treatment Improvement (OTI), a~~ non-regulatory agency of the Federal Government intended to improve the quality of drug addiction treatment[3] Substance Abuse Prevention and Treatment Block Grant (SABG). The SABG program provides funds to all 50 states, the District of Columbia, Puerto Rico, the U.S. Virgin Islands, 6 Pacific jurisdictions, and 1 tribal entity to prevent and treat substance abuse.

The demand for space in programs that was intended to provide SUD services and care to the indigent rose sharply during the early 1980s, along with a proliferation of programs in hospitals and free-standing residential centers developed by not-for-profit, compassionate organizations, such as the Betty Ford Center, as the recognition of SUD and its treatment grew in the public eye. The publicly-funded and subsidized system of care across the country has long been recognized as a safety net for all individuals, even those with employee provided insurance benefits. The services developed for third-party payers within the "indigent and entitlement public sector" were highly sought after by insured individuals for a number of reasons. The third-party payer practice of denying coverage or requiring failure at a lower level of care than prescribed (step-coverage) encouraged individuals who might seek care at a private philanthropic, not-for-profit free-standing program or hospital intended for the insured to seek the assistance of the public programs. Deductibles and co-pays at the more expensive private facilities left individuals to make the choice to deny themselves the burden of future

 indebtedness against their own interests. Failure to ensure adequate numbers and types of providers and services accessible in the private sector forced individuals into the public sector for care, lest they face long waits, costly travel to "so-called" nationally recognized centers, or no access and potential loss of life due to the long waiting lists and delays in ability to start treatment. In the early 1980s, waiting lists of up to 15% of those actively seeking treatment were common.

While the U.S. government doubled funding for the SABG programs, private payers induced public programs to develop time-limited services for the insured rather than develop more private services to meet the increasing demand for treatment as individuals responded to public encouragement to stop drinking and the fear of AIDS to stop using drugs. These pressures expanded due to increased awareness driven by the proliferation of programs such as Mothers Against Drunk Driving (MADD); Students Against Drunk driving (SADD); the National Youth Anti-Drug Campaign and its frying pan commercials; private advertising campaigns supported by programs such as the hospital based "Care Centers;" high profile celebrity open acknowledgments of treatment, recovery, and relapse- including the travails of a First Lady of the United States who went on to open a private facility, the Betty Ford Center; and even a monthly themed show on "Oprah," on which I appeared. ~~treatment Additionally, as a consultant I trained state employees to use ASAM's PPC in annual compliance visits and post-treatment reviews.~~

From 2002 to 2004, I served as the Deputy Director of Demand Reduction in the White House Office of National Drug Control Policy (ONDCP). In this U.S. Senate-confirmed position, I traveled extensively, visiting programs in almost every state. I reviewed and certified the budget of the Center for Substance Abuse Treatment (CSAT), a federal agency within the Substance Abuse and Mental Health Service Administration (SAMHSA). In addition to the SABG

~~https://www.tandfonline.com/doi/abs/10.1080/02791072.1991.10472229?journalCode=ujpd20~~

program, I gained knowledge of a number of state financing models. At ONDCP, I also wrote the plan for President George W. Bush's national expansion of addiction treatment, known as, *Access to Recovery*. This initiative sought to provide an additional $1.5 billion of treatment support to states through the SABG program. The rationale for this expansion was to close the "treatment gap,"

---

[1] https://www.tandfonline.com/doi/abs/10.1080/02791072.1991.10472229?journalCode=ujpd20.

consisting of those individuals who recognized that they had an SUD and sought treatment but were unable to access it. The Bush Administration also proposed doubling the number of Drug Courts, a program that helped individuals access treatment under the supervision of a Judge and a treatment team in the Administrative Offices of the Court, using funds provided by the Department of Justice, and foregoing treatment covered by their individual or family insurance plan.

In addition to providing assistance to individuals who work for self-insured employers access treatment for all chronic and severe mental health problems, including SUD, I serve as an expert and consultant for the Department of Labor (DOL) and help their employees understand and identify variance between behavioral health and medical/surgical care that violates the Mental Health Parity and Addiction Equity Act (MHPAEA). The MHPAEA's purpose is to promote equal access to Mental Health(MH)/ SUD treatment by prohibiting disparate coverage limitations and practices that deny coverage for or access to these services. In the DOL's 2022 Mental Health Parity and Addiction Equity Act (MHPAEA) Report to Congress,[4] the DOL emphasized that its enforcement efforts will focus on two issues that are essential to this case: (1) prior authorization requirements for in-network and out-of-network inpatient services; and (2) out-of-network reimbursement rates (plan methods for determining usual, customary, and reasonable charges).[5] The report highlights instances when insurers failed to comply with MHPAEA's requirements by reimbursing SUD claims at a disproportionately low rate.[6] President Biden, the DOL, and the Department of Health and Human Services continue to make MHPAEA enforcement a top priority because of widespread noncompliance and to protect individuals seeking SUD treatment, as need is at an all-time high.[7]

The Senate Finance Committee's report[8] pointed to another issue relevant to this case – network inadequacy. Finding behavioral healthcare providers who are in-network (INN) with commercial insurers is a challenge and often a barrier for those trying to access care. [9] Studies of individual market plans and Medicare Advantage have found that networks cover a smaller proportion of behavioral health providers than of primary care providers, making it more likely patients will go out-of-network (OON) for behavioral health services. [10] Numerous commenters point to low commercial health plan reimbursement rates as one reason for limited network participation.[11]

---

[4] Dep't of Labor, 2022 MHPAEA Report to Congress, (2022) https://www.dol.gov/sites/dolgov/files/EBSA/laws-and-regulations/laws/mental-health-parity/report-to-congress-2022-2022-realizing-parity-reducing-stigma-and-raising-awareness.pdf.

[5] *Id*. at 50.

[6] *Id*. at 38.

[7] *Id*. at 3.

[8] See, U.S. Senate Finance Committee Report on Mental Health care in the United States: The Case for Federal Action, (2022) https://www.finance.senate.gov/imo/media/doc/SFC%20Mental%20Health%20Report%20March%202022.pdf.

[9] *Id*. at 22.

[10] U.S. Department of Health and Human Services, Office of the Assistant Secretary for Planning and Evaluation, New HHS Study Shows 63-Fold Increase in Medicare Telehealth Utilization During the Pandemic, December 2021 https://www.hhs.gov/about/news/2021/12/03/new-hhs-study-shows-63-fold-increase-in-medicare-telehealthutilization-during-pandemic.html; Mehrotra A et al., The Impact of COVID-19 on Outpatient Visits in 2020: Visits Remained Stable, Despite a Late Surge in Cases, Commonwealth Fund, Feb. 2021 https://doi.org/10.26099/bvhf-e411.

[11] Au-Yeung CM, Blewett LA, Winkelman TN, Increasing Access to Medications for Opioid Use Disorder: Policy Strategies During and After COVID-19 Pandemic, October 2021 https://www.milbank.org/wpcontent/uploads/2021/10/Au-Yeung Brief 5.pdf.

*[Link-to-previous setting changed from off in original to on in modified.].*

commercial health plan reimbursement rates as one reason for limited network participation.[11] Today, I continue to practice addiction medicine and provide consultative services to an array of treatment programs located in Illinois, Washington, Alaska, California, Pennsylvania, and New York. My full *curriculum vitae* is attached to this report.

## III.    Materials Reviewed

In preparing this report, I reviewed and analyzed the following items, which I use regularly in the practice of medicine, some of which I co-authored:

- A.G. Barthwell & L.S. Brown, The Treatment of Drug Addiction: An Overview Ch. 24, Principles of Addiction Medicine
- American Psychiatric Association, DSM IVR and DSM V
- The American Society of Addiction Medicine, Definition of Addiction [12]
- The American Society of Addiction Medicine, Patient Placement Criteria for the Treatment of Substance-Related Disorder, Second Edition- Revised (ASAM PPC-2R), Mee-Lee D, ed. Chevy Chase, MD: American Society of Addiction Medicine, 2001. Adult Placement Criteria Levels I- IV (pp. 25-127) and Dimensional Criteria for Adult Detoxification (pp 145-176)
- American Society of Addiction Medicine, ASAM Public Policy Statement on the Relationship between Treatment and Self Help: A Joint Statement of the American Society of Addiction Medicine, the American Academy of Addiction Psychiatry, and the American Psychiatric Association
- A.T. McLellan et al., Drug Dependence, a Chronic Medical Illness: Implications for Treatment, Insurance, and Outcomes Evaluation
- Center for Behavioral Health Statistics and Quality, Results from the 2010 National Survey on Drug Use and Health: Summary of National Findings
- Harold Pollack, 4.8 Million People Uninsured with Drug or Alcohol Problems
- L. Siqueland L & P. Crits-Christoph, Current Developments in Psychosocial Treatments of Alcohol and Substance Abuse
- Nady el-Guebaly, The Meanings of Recovery from Addiction, Evolution and Promises, Addiction Medicine
- National Institute on Drug Abuse, The Principles of Drug Addiction Treatment: A Research-Based Guide
- Scott J. Rein, Executive Brief: Dispelling the Myths of Out-of-Network Billing
- Substance Abuse and Mental Health Services Administration, The ADSS Cost Study: Costs of Substance Abuse Treatment in the Specialty Sector

https://www.hhs.gov/about/news/2021/12/03/new-hhs-study-shows-63-fold-increase-in-medicare-telehealthutilization-during-pandemic.html; Mehrotra A et al., The Impact of COVID-19 on Outpatient Visits in 2020: Visits Remained Stable, Despite a Late Surge in Cases, Commonwealth Fund, Feb. 2021 https://doi.org/10.26099/bvhf-e411.

[12] Au Yeung CM, Blewett LA, Winkelman TN, Increasing Access to Medications for Opioid Use Disorder: Policy Strategies During and After COVID-19 Pandemic, October 2021 https://www.milbank.org/wpcontent/uploads/2021/10/Au_Yeung_Brief_5.pdf.

- Substance Abuse and Mental Health Service Administration, Medication-Assisted Treatment for Opioid Addiction in Opioid Treatment Programs, TIP 43
- Substance Abuse and Mental Health Service Administration, Medications for Opioid Use Disorder, TIP 63

*[Link-to-previous setting changed from off in original to on in modified.]*

- • [Substance Abuse and Mental Health Services Administration, National Expenditures for Mental Health Services & Substance Abuse Treatment 1986-2009](#)

[12] The American Society of Addiction Medicine. "What Is the Definition of Addiction?" https://www.asam.org/quality-care/definition-of-addiction. (Accessed: January 26, 2023).

*[Link-to-previous setting changed from off in original to on in modified.]*.

- ~~Substance Abuse and Mental Health Service Administration, Medication-Assisted Treatment for Opioid Addiction in Opioid Treatment Programs, TIP 43~~
- ~~Substance Abuse and Mental Health Services Administration, National Expenditures for Mental Health Services & Substance Abuse Treatment 1986-2009~~
- Substance Abuse and Mental Health Services Administration, National Household Survey on Drug Use and Health (NSDUH)
- Substance Abuse and Mental Health Services Administration, Analyses of Substance Abuse and Treatment Need Issues
- Substance Abuse and Mental Health Services Administration, The Need for and Receipt of Specialty Treatment
- Substance Abuse and Mental Health Services Administration, Predictors of Substance Abuse Treatment Completion or Transfer to Further Treatment by Service Type, The TEDS Report
- Suzanne Gelber Rinaldo & David W. Rinaldo, Availability Without Accessibility? State Medicaid Coverage and Authorization Requirements for Opioid Dependence Medications
- Thomas J. Force, How to Obtain Increased Reimbursement on Your Out-of-Network Claims
- Websites of the following treatment providers: Betty Ford Center, Caron, Hazelden, Passages Malibu, and Promises
- W.M. Burdon, et al., Differential Effectiveness of Residential Versus Outpatient Aftercare for Parolees from Prison-based Therapeutic Community Treatment Programs
- U.S. Department of Labor's 2022 Mental Parity and Addiction Equity Act Report to Congress
- U.S. Senate Finance Committee Report on Mental Health care in the United States: The Case for Federal Action, (2022)
- U.S. Department of Health and Human Services, Office of the Assistant Secretary for Planning and Evaluation, New HHS Study Shows 63-Fold Increase in Medicare Telehealth Utilization During the Pandemic, December 2021
- Mehrotra A et al., The Impact of COVID-19 on Outpatient Visits in 2020: Visits Remained Stable, Despite a Late Surge in Cases, Commonwealth Fund, Feb. 2021
- Au-Yeung CM, Blewett LA, Winkelman TN, Increasing Access to Medications for Opioid Use Disorder: Policy Strategies During and After COVID-19 Pandemic, October 2021

In addition to the general resource material listed above used in preparation of this report, I reviewed and/or analyzed the following items provided by Arnall Golden Gregory LLP:

***TML Recovery, LLC v. Cigna Corporation et al.*, United States District Court, Central District of California, Case No. 8:20-cv-00269-DOC-JDE**

- Stipulated Protective Order, ECF No. 19
- Consolidated Second Amended Complaint, ECF No. 79

- myCigna - Legal Disclaimer (September 29, 2020)
- Cigna AEO Documents, Cigna_TML00171620, Cigna_TML00171630, Cigna_TML00171649, Cigna_TML00171650, Cigna_TML00171717, Cigna_TML00171719, Cigna_TML00171752, Cigna_TML00171753, Cigna_TML00171756, Cigna_TML00171757, Cigna_TML00171773, Cigna_TML00171774, Cigna_TML00171781, Cigna_TML00171782,

Cigna_TML00171784, Cigna_TML00171786, Cigna_TML00172045, Cigna_TML00172046

- Cigna's Claim Report, Volume 12, Cigna_TML00195700-8
  - 2015-2016 Standards and Guidelines - Medical Necessity Criteria,
  - 2017-01 Standards and Guidelines Medical Necessity Criteria, Cigna_TML00065470
  - 2018-01 Standards and Guidelines Medical Necessity Criteria, Cigna_TML00065347
  - 2019-01 Standards and Guidelines Medical Necessity Criteria, Cigna_TML00065848
  - 2020-01 Standards and Guidelines Medical Necessity Criteria, Cigna_TML00065604
  - 2020-04 Standards and Guidelines Medical Necessity Criteria, Cigna_TML00065261
- 2015-2016 Standards and Guidelines - Medical Necessity Criteria, Cigna_TML00065727
- 2017-01 Standards and Guidelines - Medical Necessity Criteria, Cigna_TML00065470
- 2018-01 Standards and Guidelines - Medical Necessity Criteria, Cigna_TML00065347
- 2019-01 Standards and Guidelines - Medical Necessity Criteria, Cigna_TML00065848
- 2020-01 Standards and Guidelines - Medical Necessity Criteria, Cigna_TML00065604
- 2020-04 Standards and Guidelines - Medical Necessity Criteria, Cigna_TML00065261
- Intro to ASAM Criteria for Patients and Families, Cigna_TML00065718

- Synopses of patient treatment records and claims administration documents, including Summary Plan Documents, Administrative Service Agreements, Global Agreements, Verification of benefits, claims reports, Patient, Plan and Claims Spreadsheets, Explanation of Benefits, Assignment of Benefits, and other patient specific documents and summaries for the following providers and patients:

  - Addiction Health Alliance patients JJ, SK, HS, PS, CC, JG, JG, MS
  - DR Recovery Encinitas patients CB, SK, CL, YP, CC, JJ, WP, CS
  - MMR Services patients MB, BF, MH, SW, CC, IE, AF, CG
  - Pacific Palms Recovery patients NAG, AF, LM, MS, CC, MH, ML, GSB
  - Southern California Addiction Center patients BG, AK, RM, MY, TB, CC, MC, RM
  - Southern California Recovery Center Oceanside patients JG, JJ, JL, PK, JP, PS, BD
  - TML Recovery patients BB, MC, ML, DM, KA, MC, AF, AM
  - Woman's Recovery Center patients DH, ET, MT, LA, AB, LE, ML

*[Link-to-previous setting changed from off in original to on in modified.].*

- myCigna - Legal Disclaimer (February 21, 2023)
- Skilled Nursing Facility Glossary
- Index of FAIR Health benchmark rates
- Insurance Companies Make Commitment To Address Opioid Crisis, November 9, 2017
- Cigna_TML00171630; Cigna_TML00094763; Cigna_TML00094767.
- Expert Reports of Dr. Kelly Clark and Mr. Kevin O'Brien.

**Deposition Materials**

- Deposition Transcript for Plaintiffs Witness Addiction Health Alliance, Nathaniel Izzo, Dated March 23, 2023

*[Link-to-previous setting changed from off in original to on in modified.]*

- ~~Skilled Nursing Facility Glossary~~

- [Deposition Transcript for Plaintiffs Witness DR Recovery, Nathaniel Izzo, Dated March 20, 2023](#)
- [Deposition Transcript for Plaintiffs Witness MMR Services, Nathaniel Izzo, Dated March 15, 2023](#)
- [Deposition Transcript for Plaintiffs Witness Pacific Palms Recovery, Ryan Schrier, Dated March 16, 2023](#)
- [Deposition Transcript for Plaintiffs Witness Southern California Addiction Center, Aaron Brower, Dated March 13, 2023](#)
- [Deposition Transcript for Plaintiffs Witness Southern California Recovery Centers Oceanside, Nathaniel Izzo, Dated March 9, 2023](#)
- [Deposition Transcript for Plaintiffs Witness TML Recovery, Nathaniel Izzo, Dated March 7, 2023](#)
- [Deposition Transcript for Plaintiffs Witness Woman's Recovery Center, Ryan Schrier, Dated March 8, 2023](#)
- [Deposition Transcript for MultiPlan Witness Monica Armstrong, Dated March 9, 2023](#)
- [Deposition Transcript for Cigna Witness Michael Callahan, Dated March 1, 2023](#)
- [Deposition Transcript for Cigna Witness Terri Cothron, Dated March 31, 2023](#)
- [Deposition Transcript for MultiPlan Witness Sean Crandell, Dated March 22, 2023](#)
- [Deposition Transcript for Cigna Witness Wendy Gompper, Dated March 28, 2023](#)
- [Deposition Transcript for Cigna Witness Dr. Doug Nemecek, Dated February 24, 2023](#)
- [Deposition Transcript for Cigna Witness Lauren Neu, Dated March 15, 2023](#)
- [Deposition Transcript for MultiPlan Witness Kathy Praxmarer, Dated March 14, 2023](#)
- [Deposition Transcript for Cigna Witness Emily Russell, Dated February 16, 2023](#)
- [Deposition Transcript for Cigna Witness Sean Petree, Dated March 30, 2023](#)
- [Deposition Transcript for Cigna Witness Mario Vangeli, Dated March 10, 2023](#)

***RJ v. Cigna Behavioral Health, Inc., et al.***, **United States District Court, Northern District of California, Case No. 20-cv-02255-NC**

- Stipulated Protective Order, ECF No. 22
- First Amended Complaint, ECF No. 63
- Plaintiff's Motion for Class Certification and Memorandum in Support of Motion, ECF No. 148
- Deposition transcript and exhibits for Cigna witness JoAnne Forrest, dated October 14, 2022
- Deposition transcript and exhibits for MultiPlan witness Sean Crandell, dated October 20, 2022
- Deposition transcript and exhibits for Cigna witness Michael Battistoni, dated October 25, 2022

- Deposition transcript and exhibits for Cigna witness Mario N. Vangeli, dated November 4, 2022
- Deposition transcript and exhibits for Cigna witness Terri Cothron, dated November 8, 2022
- Deposition transcript and exhibits for Cigna witness Jo-Ann Lebel, dated November 29, 2022
- Plaintiffs' Motion for Partial Summary Judgment regarding United's Counterclaim, Addiction Health's Declaration, ECF 145
- Plaintiffs' Motion for Partial Summary Judgment regarding United's Counterclaim, MMR Declaration, ECF 145-4
- Plaintiffs' Motion for Partial Summary Judgment regarding United's Counterclaim, Pacific Palm Recovery's Declaration, ECF 145-5
- Plaintiffs' Motion for Partial Summary Judgment regarding United's Counterclaim, Southern California Addiction Center's Declaration, ECF 145-6
- Plaintiffs' Motion for Partial Summary Judgment regarding United's Counterclaim, TML Recovery's Declaration, ECF 145-7
- Plaintiffs' Motion for Partial Summary Judgment regarding United's Counterclaim, Woman's Recovery Declaration, ECF 145-8
- Plaintiffs' Motion for Partial Summary Judgment regarding United's Counterclaim, DR Recovery's Declaration, ECF 147

***In the Matter of the Certificate of Authority of: Health Net Life Insurance Company*, Insurance Commissioner of the State of California, CDI File No. UPA-2016-00005**

- Order to Show Cause, CDI
- Order to Show Cause Health Net, State of California Insurance Commission

***In the Matter of UnitedHealth Group Incorporated*, State New York Office of the Attorney General, Investigation No. 2008-161**

- Assurance of Discontinuance Under Executive Law § 63(15)

**Articles**

- *"What Is the Definition of Addiction?"* The American Society of Addiction Medicine
- Availability Without Accessibility? State Medicaid Coverage and Authorization Requirements for Opioid Dependence Medications, Suzanne Gelber Rinaldo & David W. Rinaldo, American Society of Addiction Medicine (2013)
- "Drug overdoses are costing the U.S. economy $1 trillion a year, government report estimates," CNBC, February 8, 2022
- Michael C. Barnes, et al., Potential Impact of Texas et al v United States on Persons with Substance Use Disorder, ABA Health eSource (Oct. 2018)

**Congressional Reports and Studies**

- Department of Labor, 2022 MHPAEA Report to Congress, (2022)
- U.S. Senate Finance Committee Report on Mental Health Care in the United States: The Case for Federal Action, March 2022
- U.S. Department of Health and Human Services, Office of the Assistant Secretary for Planning and Evaluation, New HHS Study Shows 63-Fold Increase in Medicare Telehealth Utilization During the Pandemic, December 2021
- Increasing Access to Medications for Opioid Use Disorder: Policy Strategies During and After COVID-19 Pandemic, Au-Yeung CM, Blewett LA, Winkelman TN, October 2021
- H.R.-7780-SAP
- Overview of SUD Care Clinical Guidelines, A Resource for States Developing SUD Delivery System Reforms, medicaid.gov
- Medicare Coverage of Substance Abuse Services, CMS MLN Matters SE1604, April 28, 2016 (links in article updated on May 10, 2019)

**Research and Survey Materials**

- The Principles of Drug Addiction Treatment: A Research-Based Guide, National Institute on Drug Abuse
- Results from the 2010 National Survey on Drug Use and Health: Summary of National Findings, Center for Behavioral Health Statistics and Quality
- Status of Federal Funding for Addiction Services, National Association of State Alcohol and Drug Abuse Directors, March 3, 2014
- National Expenditures for Mental Health Services & Substance Abuse Treatment 1986-2009, Substance Abuse and Mental Health Services Administration
- 2020 NSDUH Detailed Tables, Substance Abuse and Mental Health Services Administration
- Principles of Drug Addiction Treatment: A Research-Based Guide 13-14, National Institute on Drug Abuse (3rd ed. 2012)
- "Status of State Medicaid Expansion Decisions: Interactive Map," KFF, published Jan. 31, 2022

**Other Materials Utilized in Supplemental Report**
- Bertha Coombs, *As Obamacare twists in political winds, top insurers made $6 billion (not that there is anything wrong with that)*, CNBC, Published, August 5, 2017, Updated, August 6, 2017.
- Joseph Burns, *The pandemic One Year In: Despite Large Profits in 2020, Health Insurers See Volatility Ahead*, MHE Publication, MHE March 11, 2021, Volume 31, Issue 3.
- Paige Minemyer, *UnitedHealth was 2021's most profitable payer. Here's a look at what its competitors earned*, Payers, February 11, 2022
- *Big payers ranked by 2022 profit*, Viewed July 6, 2023, https://www.beckerspayer.com/payer/big-payers-ranked-by-2022-profit.html
- Paige Minemyer, *Health insurers' profits topped $35B last year. Medicare Advantage is the common thread*, Payers, February 24, 2020

- Eric Lopez, Tricia Neuman, Gretchen Jacobson, and Larry Levitt, *How Much More Than Medicare Do Private Insurers Pay? A Review of the Literature*, KFF, April 15, 2020
- *Cigna Reports 2016 Results, Expects Attractive Earnings Growth in 2017*, Business Wire, February 2, 2017
- Cigna Annual Report, 2015
- Cigna Annual Report, 2016
- Cigna Annual Report, 2017
- Cigna Annual Report, 2018
- Cigna Annual Report, 2019
- Cigna Annual Report, 2020
- Cigna Annual Report, 2021
- Cigna Corporation, Schedule 14A, United States Securities And Exchange Commission, Fiscal Year 2022
- Amy Marschall, PsyD, Reviewed by David Susman, PhD, *How Psychoeducation Is Used In Therapy*, Verywell Mind, Updated May 22, 2023
- *The Global 2000*, Forbes, Andrea Murphy and Hank Tucker, Editors, June 8, 2023
- *Cal. Code Regs. Tit. 9, § 13005 - Definitions*, Cornell Law School, Legal Information Institute
- *Cal. Code Regs. Tit. 9, § 13010 - Requirement for Certification*, Cornell Law School, Legal Information Institute
- *Cal. Code Regs. Tit. 9, § 13015 - Requirements for Certification of Licensed Professionals*, Cornell Law School, Legal Information Institute
- *Cal. Code Regs. Tit. 9, § 13035 - Certifying Organizations*, Cornell Law School, Legal Information Institute
- *Alcohol and/or Other Drug Program Certification Standards*, Department of Health Care Services, Health and Human Services Agency, State of California, February 2020
- *Counselor Certification*, Department of Health Care Services, State of California, Last Modified, March 23, 2021

## IV.    Background

The following facts support the findings in my opinion.

### A.    Addiction Defined

Addiction is a treatable, chronic medical disease involving complex interactions among brain circuits, genetics, the environment, and an individual's life experiences. People with addiction use substances or engage in behaviors that become compulsive and often continue despite harmful consequences. [13] This is reflected in an individual's pathological pursuit of ~~reward[14]~~ reward [14] or relief

---

[13] The American Society of Addiction Medicine. "What Is the Definition of Addiction?" https://www.asam.org/quality-care/definition-of-addiction. (Accessed: January 26, 2023).

[14] Pathologically pursuing reward has multiple components. It is not necessarily the amount of exposure to the reward (e.g., the dosage of a drug) or the frequency or duration of the exposure that is pathological. In the disease of addiction, pursuit of rewards persists, despite life problems that accumulate due to addictive behaviors, even when

through substance use and other behaviors. Addiction is characterized by:

- Inability to consistently abstain;
- Impairment in behavioral control;
- Craving, or increased "hunger" for drugs or rewarding experiences;
- Diminished recognition of significant problems with one's behaviors and interpersonal relationships; and
- A dysfunctional emotional response.[15]

### B. Principles of Addiction Treatment

Like other chronic diseases, addiction often involves cycles of relapse and remission, meaning periods of relapse may interrupt spans of remission.[16] Without treatment or engagement in recovery activities, addiction is progressive and can result in disability or premature death.

Extensive data shows that addiction treatment is as effective as most well-accepted treatments for other chronic medical conditions.[17] Three decades of scientific research and clinical practice have yielded a variety of approaches to addiction treatment; the most effective approaches pair the patient's needs with scientifically researched services anticipated to have the highest impact. Treatment programs typically incorporate many components of care, each aimed to address a particular aspect of the illness and its consequences. For instance, specific pharmacologic and psychosocial treatments are frequently combined, which often leads to better treatment retention and outcomes.[18]

[15] The American Society of Addiction Medicine. "What Is the Definition of Addiction?" https://www.asam.org/quality-care/definition-of-addiction. (Accessed: January 26, 2023).

Below are summaries of some of NIDA's Principles of Effective Treatment:[19]

- Addiction is a complex but treatable disease that affects brain function and behavior.
- No single treatment is appropriate for everyone. Matching treatment settings to an individual's particular problems and needs is critical to his or her ultimate success in returning to productive functioning.
- Treatment must be readily available.

[15] Pathologically pursuing reward has multiple components. It is not necessarily the amount of exposure to the reward (e.g., the dosage of a drug) or the frequency or duration of the exposure that is pathological. In the disease of addiction, pursuit of rewards persists, despite life problems that accumulate due to addictive behaviors, even when engagement in the behaviors ceases to be pleasurable. Similarly, in earlier stages of addiction, or even before the outward manifestations of addiction have become apparent, substance use or engagement in addictive behaviors can be an attempt to pursue relief from dysphoria; while in later stages of the disease, engagement in addictive behaviors can persist even though the behavior no longer provides relief.

[15] These five features are not intended to be used as "diagnostic criteria" for determining if addiction is present or not. Although these characteristic features are widely present in most cases of addiction, regardless of the pharmacology of the substance use seen in addiction or the reward that is pathologically pursued, each feature may not be equally prominent in every case. The diagnosis of addiction requires a comprehensive biological, psychological, social and spiritual assessment by a trained and certified professional.

[16] It is also important to recognize that return to drug use or pathological pursuit of rewards is not inevitable.

[17] A.T. McLellan et al., *Drug Dependence, a Chronic Medical Illness: Implications for Treatment, Insurance, and Outcomes Evaluation*, 284 J. OF AM. MED. ASS'N.1689–1695 (2000).

[18] L. Siqueland L & P. Crits-Christoph, *Current Developments in Psychosocial Treatments of Alcohol and Substance Abuse*, 1 CURRENT PSYCHIATRY REP. 179–184 (1999).

[13] *The Principles of Drug Addiction Treatment: A Research-Based Guide*, NATIONAL INSTITUTE ON DRUG ABUSE, *available at* http://www.drugabuse.gov/publications/principles-drug-addiction-treatment-research-based-guide-third-edition/drug-addiction-treatment-in-united-states.

and outcomes.[18]

Below are summaries of some of NIDA's Principles of Effective Treatment:[19]

- Addiction is a complex but treatable disease that affects brain function and behavior.
- No single treatment is appropriate for everyone. Matching treatment settings to an individual's particular problems and needs is critical to his or her ultimate success in returning to productive functioning.
- Treatment must be readily available.
- Effective treatment attends to multiple needs of the individual, not just his or her substance use.
- Remaining in treatment for an adequate period of time is critical. The appropriate duration for an individual depends on the type and degree of the patient's problems and needs. Research indicates that most addicted individuals need at least **three months**[20] in treatment to significantly reduce or stop their drug use and that the best outcomes occur with longer durations of treatment.
- Programs should include strategies to engage and keep patients in treatment because individuals often leave treatment prematurely.
- An individual's treatment and service plan must be assessed continually and modified as necessary to ensure that it meets the individual's changing needs.
- Recovery from drug addiction is a long-term process and frequently requires multiple episodes of treatment. As with other chronic illnesses, relapses to drug abuse can occur and should signal a need for treatment to be reinstated or adjusted.

Treatment works best when it is driven by assessment, buttressed with case management, and completed with follow up care in the community. The treatment plan should address how the patient will achieve and maintain abstinence and improve his or her ability to function

physically, socially, and psychologically.[21]

## C.    Treatment Setting

Treatment for substance use and addiction is delivered in many different settings using a variety of behavioral and pharmacological approaches. For instance, treatment may be delivered in outpatient, inpatient, and residential settings. It is important to have outpatient services in every community, intensive outpatient services serving geographic clusters, and geographically dispersed regional and national residential services. Options in various locations are important because people with the severity of problems that require residential treatment may have a

[18] L. Siqueland L & P. Crits-Christoph, *Current Developments in Psychosocial Treatments of Alcohol and Substance Abuse*, 1 CURRENT PSYCHIATRY REP. 179–184 (1999).

[19] *The Principles of Drug Addiction Treatment: A Research-Based Guide*, NATIONAL INSTITUTE ON DRUG ABUSE, *available at* http://www.drugabuse.gov/publications/principles-drug-addiction-treatment-research-based-guide-third-edition/drug-addiction-treatment-in-united-states.

[20] Emphasis added.

[21] A.G. Barthwell & L.S. Brown, *The Treatment of Drug Addiction: An Overview* ch. 24, PRINCIPLES OF ADDICTION MEDICINE (Richard K Ries et al. eds., 4th Ed. 2009).

greater tendency to seek treatment away from the complex psychosocial environment in which their problems first developed. Benefits of residential treatment can include a greater sense of safety and security, all-day programming and uninterrupted focus on recovery, fewer hassles of daily living, fewer environmental temptations or triggers to relapse, and the opportunity to build supportive relationships with other people in treatment.

Treatment centers using a 28-day model of care increased during the late 1970s and early 1980s in response to increasing demand, public recognition of treatment's usefulness, and a model of reimbursement for care that supported the growth. Programs with national reputations developed in the late 1990s in response to a need to provide specialty care and a full continuum of care as defined by ASAM. These programs with national reputations attract patients from all over the country, partially because they provide detoxification on-site and have the capacity to manage all patients who arrive for care. Many of these programs have added other regional facilities to their stable of programs[22] to provide alternatives to their flagship programs to meet the needs of

[20] Emphasis added.

[21] A.G. Barthwell & L.S. Brown, *The Treatment of Drug Addiction: An Overview* ch. 24, PRINCIPLES OF ADDICTION MEDICINE (Richard K Ries et al. eds., 4th Ed. 2009).

[22] Examples include Caron with programs in Pennsylvania, Texas and Florida; Hazelden with a full continuum of care in Minnesota; and Springbrook in the Northwest.

geographic regions where many of their patients and former patients reside.

Nationally recognized programs rely on their reputations, referrals from former patients, referrals from interventionists who are familiar with their services, and marketing efforts from national outreach staff. Many target areas that are not served by regional residential centers.

Currently, in the United States, more than 14,500 specialized drug treatment facilities provide counseling, behavioral therapy, medication, case management, and other types of services to persons with SUDs. Some national programs provide niche markets with specific, highly developed services around a master clinician or school of thought. Niche markets include women's services (*e.g.*, Operation PAR in Florida), trauma (*e.g.*, The Refuge in Florida), eating disorders comorbid with SUDs (*e.g.*, Timberline Knolls in Illinois), professionals (*e.g.*, Talbott Recovery in Georgia), hospital extensions (*e.g.*, Pine Grove in Alabama), pain and addictions (*e.g.,* Las Vegas Recovery Center) and luxury programs (*e.g.*, Promises in California). Although specific treatment approaches often are associated with particular treatment settings, a variety of therapeutic interventions or services can be included in any given setting.

Drug abuse and addiction are also treated in physicians' offices and mental health clinics. Regardless of the setting, a variety of professionals, including counselors, physicians, psychiatrists, psychologists, nurses, and social workers, can contribute to effective addiction treatment.

### D.     The ASAM Criteria

*The ASAM Criteria* is the most widely used and comprehensive set of guidelines for placement, continued stay, transfer, or discharge of patients with addiction and co-occurring conditions. Formerly known as the ASAM patient placement criteria, *The ASAM Criteria* is the result of a collaboration that began in the 1980s to define one national set of criteria for providing outcome-oriented and results-based care in the treatment of addiction, originally called the Patient Placement Criteria (PPC).

~~²⁶ Examples include Caron with programs in Pennsylvania, Texas and Florida; Hazelden with a full continuum of care in Minnesota; and Springbrook in the Northwest.~~

In 1996, the second edition of the PPC was published (PPC-2). The PPC-2 defined six areas or dimensions of assessment. In 2001, ASAM further revised and again published the criteria as the PPC-2R. Among other things, the PPC-2R provides guidance on specific services (*e.g.*, drug screening, medication compliance, punctuality training, motivational interviewing, etc.), treatment plan reviews, and assessing the patient's response to treatment. It defines the criteria necessary for admission and continued stay in a certain level of care, including the acceptable sources of data (direct interviews and collateral interviews with family, employers, etc.).

Today, many states across the country are using *The ASAM Criteria* as the foundation of their efforts to improve the addiction treatment system. Adolescent and adult treatment plans are developed through a multidimensional patient assessment over five broad levels of treatment that are based on the degree of direct medical management provided, the structure, safety and security provided, and the intensity of treatment services provided. Some payers have looked to the *The ASAM Criteria* and revised them, without the peer review provided the original Criteria and the multiple revisions, to support denial of services or limitation of services. ███████████
██████



| Cigna 2015-2016 Residential SUD[29] | ASAM Level 3.1 Residential[30] |
|---|---|
| ███████████████████████ | Allied health professionals (e.g., counselor aides, group living workers) who are |
| ███████████████████████ ███████████████████████ ███████████████████████ ███████████████████████ | Physicians, NPs, and PAs are not involved in direct service provision as staff; a physician should review admission decisions |
| ███████████████████ | Support systems include telephone or in-person consultation with a physician; appropriately trained and credentialed medical, addiction, and |
| ███████████████████████ ███████████████ | |

[23] Despite the fact that *The ASAM Criteria* were first published in 1991.
[24] ████████████████████████████████████████████████████████ ██████████████████████

[25] Nemecek Dep. at 66–68.
[26] Report of Dr. Clark at 13.
[27] Original Complaint Filed December 31, 2019.
[28] Nemecek Dep. at 66–68; Cigna Standards and Guidelines/Medical Necessity Criteria For Treatment of Mental Health and Substance Use Disorders, Revised 2015–2016, CignaTML0065727–65847.
[29] Cigna Standards and Guidelines/Medical Necessity Criteria for Treatment of Behavioral Health and Substance Use Disorders Revised Edition: 2015-2016. Beginning Cigna_TML0065827.
[30] *ASAM Criteria*, pgs. 224-225.

Providers may apply a rule that a patient fail at a certain level of care before being matched to one where success may be achieved at the intensity and for the time needed to bring about substantive change in the patient's life to support recovery. Given the risk attendant to the use of illicit substances and the drug poisoning crisis, commonly referred to as the opioid epidemic, the practice of failure at a too low level of care is all too often, sadly, associated with death or permanent disability. In this situation, providers will request payer authorization to move the patient to a higher level of care.

The current *ASAM Criteria* assess:

- **Dimension 1** - Acute Intoxication and/or Withdrawal Potential: Exploring an individual's past and current experiences of substance use and withdrawal. It helps to predict the need for medication to manage withdrawal and conditions under which medical care is provided.
- **Dimension 2** - Biomedical Conditions and Complications: Exploring and individual's health history and current physical health needs. It helps predict the need for admission into medical-surgical beds prior to or concurrent with the onset of addiction care. Additionally, it suggests the level of difficulty in managing medical care while engaged in addiction care.
- **Dimension 3** - Emotional, Behavioral, or Cognitive Conditions and Complications: Exploring an individual's mental health history and current cognitive and mental health needs. It helps to predict the need for locked psychiatric units if there is imminent threat to self or others. If a psychiatric unit is not required, it addresses co-occurring emotional and behavior disorders that can complicate an individual's ability to engage in addiction care (*e.g.*, anxiety disorders making group participation difficult, depressive states that interfere with motivation to travel to treatment, etc.).
- **Dimension 4** - Readiness to Change: Exploring ~~and~~an individual's readiness for and interest in changing and reviews patient insight and compliance with directions.
- **Dimension 5** - Relapse, Continued Use, or Continued Problem Potential: Exploring and individual's unique needs that influence their risk for relapse or continued use. It reviews skills acquisition and symptomology that interferes with intentions.

- **Dimension 6** – Recovering/Living Environment: Exploring ~~and~~an individual's recovery or living situation, and the people and places that can support or hinder their recovery. It reviews the structure or safety available to the individual to support the intention to resist use.

*The ASAM Criteria* also ~~introduced more specific detail in the levels of care. The major~~defines the elements necessary for admission and continued stay in a certain level of care. Adolescent and adult treatment plans are developed using the multidimensional patient assessment over several broad levels of care that are based on the degree of direct medical management provided; the structure, safety and security provided; and the intensity of treatment services provided. The levels of care ~~are as follows~~include:

- Level 0.5, Early Intervention
- Level 1, Outpatient Services
- Level 2.1, Intensive Outpatient Services

- Level 2.5, Partial Hospitalization
- Level 3.1 Clinical Managed Low-Intensity Residential Services
- Level 3.3, Clinically Managed Population-Specific High-Intensity Residential Services
- Level 3.5, Clinically Managed High-Intensity Residential Services
- Level 3.7, Medically Monitored Intensive Inpatient Services
- Level 4, Medically Managed Intensive Inpatient Services.

~~These Levels are similar when discussing adolescent care.~~

*The ASAM Criteria* uses precise terminology to convey discrete concepts relating to physician assessments and medical decision making. The term "managed" entails the physician seeing the patient every 24 hours, and changes to the treatment plan may be made only upon the direction of the physician. The term "monitored" entails physician decision making upon assessments that may be conducted by other personnel, such as nurses. The term "supervised" means that the physician leads the treatment staff, approves patient admissions, and might not see patients more than once weekly; other members of the treatment team, such as licensed therapists, may adjust the treatment plan and report back to the physician.

A summary of services and staffing described by *The ASAM Criteria* for Level 1 outpatient services, Level 2 intensive outpatient/partial hospitalization services, Level 3 residential/inpatient services, Level 4 medically managed intensive inpatient services, Level 3.2-WM clinically managed residential WM, Level 3.7-WM medically monitored inpatient WM, and Level 4-WM medically managed intensive inpatient WM, is provided below.

## 1.   Level 1 Outpatient and Level 2 IOP/PHP Services

Level 1 covers organized outpatient services that are provided in regularly scheduled sessions that typically total fewer than nine contact hours per week for adults. Such services can be delivered in a wide variety of settings, are tailored to each patient's clinical needs, and are designed to help patients achieve changes in drug use or addictive behaviors.[31]

Level 2 has two variations: Level 2.1 IOP and Level 2.5 PHP services. Such services can be delivered in a variety of settings and can provide SUD education and treatment while allowing patients to apply new skills in real world environments. At Level 2.1, a minimum of nine hours of programming is provided per week for adults. At Level 2.5, a minimum of 20 hours of programming is provided per week for adults. For patients who do not need 24-hour supervision at Level 3.3 or greater, outpatient clinical services can be combined with Level 3.1, clinically managed low-intensity residential treatment.[32]

*The ASAM Criteria* describes several different characteristics of these levels, including examples of service delivery, staff, and support systems. The chart below highlights some of this information. Greater detail is available in the source document.

---

[31] *The ASAM Criteria*: Treatment Criteria for Addictive, Substance-Related, and Co-Occurring Conditions, Third Edition (2013). American Society of Addiction Medicine, Pg. 184.
[32] *The ASAM Criteria*, pgs. 196-197.

| Level | Examples of Service Delivery (Adult Programs) | Staff and Support Systems (Adult Programs) |
|---|---|---|
| 1 | Office practices, health clinics, school-based clinics, primary care, MH/SUD clinics, child and adolescent behavioral clinics | Appropriately credentialed/licensed treatment professionals (e.g., addiction-credentialed physicians, counselors, psychologists, social workers). Staff able to obtain and interpret information about biopsychosocial needs and are knowledgeable about the biopsychosocial dimensions of SUDs. Certified/licensed addiction counselors offer much of the counseling services. Physicians and appropriately licensed advanced registered nurse practitioners (NPs) and physician assistants (PAs) provide medication management services. Generalists may be involved in providing general medical evaluations. Support services include emergency services available by phone 24/7 and medical, psychiatric, psychological, laboratory, and toxicology service either on-site or through consultation/referral. Medical/psychiatric |
| 2.1 | After school, day or evening, weekend IOP programs | Interdisciplinary teams of appropriately credentialed addiction treatment professionals (e.g., addiction-credentialed physicians, counselors, psychologists, social workers). Physicians at this level should have specialty training or experience in addiction medicine/psychiatry. Staff able to obtain and interpret information about the patient's biopsychosocial needs. Generalists may be involved in providing general medical evaluations. Support services include emergency services available by phone 24/7 and medical, psychiatric, psychological, laboratory, and toxicology services, either on-site or through consultation/referral. Medical/psychiatric consultation available by phone within 24 hours and in |
| 2.5 | Day treatment or partial hospital programs | Interdisciplinary teams of appropriately credentialed addiction treatment professionals (e.g., addiction-credentialed physicians, counselors, psychologists, social workers). Physicians at this level should have specialty training or experience in addiction medicine/psychiatry. Staff able to obtain and interpret |

---

[33] *ASAM Criteria*, pgs. 187-188.
[34] *ASAM Criteria*, pgs. 198-199.

| | |
|---|---|
| | |

patient's biopsychosocial needs. Generalists may
be involved in providing general medical
evaluations.

Support services include emergency services available
by phone 24/7 and medical, psychiatric, psychological,
laboratory, and toxicology services, either on-site or
through consultation/referral. Medical/psychiatric
consultation available by phone within 8 hours and in

## 2.    Level 3 Residential/Inpatient Services

Level 3 is characterized by "a planned and structured regimen of care in a 24-hour residential
setting . . . All Level 3 programs serve individuals who, because of specific functional
limitations, need safe and stable living environments . . ."[36] Level 3's four sublevels exist on a
continuum ranging from the least to the most intensive services. They are briefly described
below[37]:

- *3.1 Clinically Managed Low-Intensity Residential Services*
  - 24-hour structure with available trained personnel; at least five hours per week of
    low-intensity clinical services.
- *3.3 Clinically Managed Population-Specific High-Intensity Residential Services*
  - 24-hour care with trained counselors to stabilize multidimensional imminent
    danger. Services are provided to meet patients' functional limitations to support
    recovery from substance use disorders (SUDs).
- *3.5 Clinically Managed High-Intensity Residential Services*
  - 24-hour care with trained counselors to stabilize multidimensional imminent
    danger and prepare for outpatient treatment. Patients' multidimensional needs are
    severe enough that they cannot be safely treated at a less intense level.
- *3.7 Medically Monitored Intensive Inpatient Services*
  - 24-hour nursing care and daily physician availability for significant problems in
    dimension 1 (acute intoxication/withdrawal potential), 2 (biomedical conditions
    and complications), or 3 (emotional, behavioral, or cognitive conditions and
    complications). Counselors are available 16 hours per day. Patients at this level
    typically have subacute problems in dimensions 2 or 3 that are severe enough for
    inpatient treatment, but not severe enough to warrant the resources of an acute
    general hospital or medically managed inpatient treatment program.

*The ASAM Criteria* defines "clinically managed services" as services that:

. . . are directed by non-physician addiction specialists rather than medical and nursing personnel. They are appropriate for individuals who primary problems involve emotional, behavioral, or cognitive concerns, readiness to change, relapse,

[35] *ASAM Criteria*, pgs. 208-209.
[36] *ASAM Criteria*, pg. 219.
[37] *ASAM Criteria*, pg. 106.

or recovery environment, and whose problems in [Dimension 1 and Dimension 2], if any, are minimal or can be managed through separate arrangements for medical services.[38]

"Medically monitored treatment" is defined as:

Services that are provided by an interdisciplinary staff of nurses, counselors, social workers, addiction specialists, and other health care professionals and technical personnel, under the direction of a licensed physician. Medical monitoring is provided through an appropriate mix of direct patient contact, review of records, team meetings, 24-hour coverage by a physician, and quality assurance programs.[39]

*The ASAM Criteria* describes several different characteristics of each sublevel, including examples of service delivery, staff, and support systems. The chart below highlights some of this information.

| Level | Examples of Service Delivery (Adult Programs) | Staff and Support Systems (Adult Programs) |
|---|---|---|
| 3.1 | Recovery residences, group homes, and other supportive living environments with 24-hour staff and close integration with clinical services | Allied health professionals (e.g., counselor aides, group living workers) who are available on-site 24 hours per day (or as required by state licensing requirements). Clinical staff who are knowledgeable about biological and psychosocial dimensions of SUDs and their treatment, and able to identify the signs and symptoms of acute psychiatric conditions. Appropriately trained and credentialed medical, addiction, and mental health professionals. Physicians, NPs, and PAs are not involved in direct service provision as staff. A physician should review admission decisions. Support systems include telephone or in-person consultation with a physician; and emergency |
| 3.3 | Therapeutic rehabilitation facility | Allied health professionals who are available on-site 24 hours per day (or as required by state licensing requirements). |

[38] *ASAM Criteria*, pg. 415.
[39] *ASAM Criteria*, pg. 422.
[40] *ASAM Criteria*, pgs. 224-225.

| | | At least one clinician with competence in the treatment of SUDs is available on-site or by telephone 24 hours per day.<br><br>Clinical staff who are knowledgeable about biological and psychosocial dimensions of SUDs and their treatment, and able to identify the signs and symptoms of acute psychiatric conditions. Staff have specialized training in behavior management techniques.<br><br>Support systems include telephone or in-person consultation with a physician, or a PA or NP in states where licensed as physician extenders (i.e., authorized to perform certain duties designated for a physician); and emergency services available 24/7.[41] |
| --- | --- | --- |
| 3.5 | Therapeutic community of variable length of stay with appropriately clinically trained staff; or a residential treatment center | Licensed or credentialed clinical staff (e.g., addiction counselors, social workers, licensed professional counselors) who work with allied professional staff in an interdisciplinary team approach.<br><br>Allied health professionals who are available on-site 24 hours per day (or as required by state licensing requirements).<br><br>At least one clinician with competence in the treatment of SUDs is available on-site or by telephone 24 hours per day.<br><br>Clinical staff who are knowledgeable about biological and psychosocial dimensions of SUDs and their treatment, and able to identify the signs and symptoms of acute psychiatric conditions. Staff have specialized training in behavior management techniques.<br><br>Support systems include telephone or in-person consultation with a physician, or a PA or NP in states where licensed as physician extenders; and |
| 3.7 | Inpatient treatment center within the context of an acute care hospital or acute psychiatric unit, or a | Interdisciplinary staff (physicians, nurses, addiction counselors, behavioral health specialists). |

[41] *ASAM Criteria*, pg. 236.
[42] *ASAM Criteria*, pgs. 249-251.

| | separate, more intensive unit of a freestanding Level 3.5 residential facility | Clinical staff who are knowledgeable about biological and psychosocial dimensions of addiction and other behavioral health disorders, and with specialized training in behavior management techniques and evidence-based practices.<br><br>A licensed physician to oversee the treatment process and assure the quality of care.<br><br>Support systems include available physician monitoring, nursing care, and observation. A physician is available to assess the patient in person within 24 hours of admission and thereafter as medically necessary. A nurse is responsible for monitoring patients' progress and medication administration.[43] |
|---|---|---|

Health insurers often refuse to approve medically necessary residential SUD treatment services. If they do authorize such services, the authorization is typically for a duration of services significantly less than what is medically necessary. Health insurers' denials of residential SUD treatment and, more specifically, Level 3.1 (supportive living environments with 24-hour staff and close integration with clinical services), is inconsistent with the trend in policy and practice to ensure that patients' needs for housing safety and stability are satisfied as an essential element of the SUD treatment plan. The Centers for Medicare and Medicaid Services has approved Medicaid programs that address participants' housing stability needs in Arkansas, Arizona, California, Massachusetts, and Oregon.

Domiciliary supportive services in medical/surgical areas are recognized and often covered by health insurance. Examples include in-home aid, nursing homes, skilled nursing facilities, and 23-hour hospital observation units (which can eliminate the necessity to admit a patient to the hospital).

### 3. Level 4 Medically Managed Intensive Inpatient Services

*The ASAM Criteria* defines "medically managed" as:

> Services that involve daily medical care, where diagnostic and treatment services are directly provided and/or managed by an appropriately trained and licensed physician. Such services are provided in an acute care hospital or psychiatric hospital or treatment unit.[44]

Level 4 services are delivered 24-hours per day in acute care settings with inpatient beds for patients whose acute biomedical, emotional, behavioral, and cognitive problems are severe enough to require primary medical and nursing care. These programs are staffed by interdisciplinary teams

[43] *ASAM Criteria*, pgs. 266-268.
[44] *ASAM Criteria*, pg. 422.

of credentialed clinical staff (e.g., addiction-credentialed physicians, NPs, PAs, nurses, counselors, psychologists, and social workers) who are knowledgeable about the biopsychosocial dimensions of addiction as well as biomedical, emotional, behavioral, and cognitive disorders. These care teams provide primary nursing care and observation 24 hours per day, medical management by physicians 24 hours per day, and professional counseling services 16 hours per day.[45]

### E.    Recovery

Addiction professionals and persons in recovery find hope in recovery. Recovery is available even to persons who may not at first be able to perceive this hope. Recovery is recognized when the individual with SUD acknowledges the disease, commits to recovery in a heart-felt way, and reduces or eliminates inducements to use. Some individuals, during and after an episode of treatment, my remain abstinent to convince others around them of their commitment to recover, while never actually making the commitment. When use resumes following this self-imposed, or sometimes coerced, period of abstinence, it is continued use and NOT a relapse.

As in other health conditions, recovery from addiction is best achieved through a combination of self-management, mutual support, and professional care provided by trained and certified professionals. Peer support, such as that found in various "self-help" activities, is beneficial in optimizing health status and functional outcomes in recovery.[2346]

Participation in alumni programs can encourage support and connection to prevent post-treatment substance use. Most national programs have such programs and facilitate connection with others who have had a similar treatment experience. The professionals who develop such programs are often seen as a part of a provider's marketing efforts in that they seek to have satisfied consumers remember them for referrals of family members and friends.

[*] *See ASAM Public Policy Statement on the Relationship between Treatment and Self Help: A Joint Statement of the American Society of Addiction Medicine, the American Academy of Addiction Psychiatry, and the American Psychiatric Association,* AMERICAN SOCIETY OF ADDICTION MEDICINE*, available at* http://www.asam.org/docs/publicy-policy-statements/1treatment-and-self-help---joint-12-971.pdf.

### F.    Access to Care/Funding

Drug abuse and addiction are major public health problems, and it has long been recognized that the public system needs to act as a safety net for addiction treatment services. A large portion of drug treatment is funded by local, state, and federal governmental entities, though these public addiction treatment services remain significantly underfunded and can have long waiting lists which vary by state and geographic region. To use these services, patients also must qualify for this assistance on a means test.

As indicated by the passage of the MHPAEA, health insurance is an essential element in accessing addiction treatment services for most individuals in need. In some states, the public sector programs serve individuals under first-, second-, or third-party pay arrangements, and the state sees itself as the payer of last resort. While the state may be the payer of last resort, individuals with third-party insurance coverage who present themselves to programs in the public sector are often prioritized over the truly indigent, as the reimbursement helps the public program diversify

---

<sup>65</sup> *ASAM Criteria*, pg. 282.
<sup>66</sup> *See ASAM Public Policy Statement on the Relationship between Treatment and Self Help: A Joint Statement of the American Society of Addiction Medicine, the American Academy of Addiction Psychiatry, and the American Psychiatric Association*, AMERICAN SOCIETY OF ADDICTION MEDICINE, *available at* http://www.asam.org/docs/publicy-policy-statements/1treatment-and-self-help---joint-12-971.pdf.

its sources of revenue and often, though meager, may receive more for the hour/slot/bed that the insured individual with an SUD occupies. Because these services are subsidized by the public funding, the cost to the third-party is generally lower than in the private sector, resulting in a perverse incentive to drive the insured into the already strained public sector. Persons suffering from addiction often face significant financial hardship as a result of their disease, which greatly impacts the ability to pay for treatment. These hardships are due to loss of employment or failure to secure employment due to positive pre-employment drug screens, estrangement from family who may have resources or coverage, and loss of financial stability due to large expenditures on drugs or legal defense services due to arrests from substance caused or related crimes (*e.g.*, drug sales, home invasions, public inebriation, issuing and uttering, etc.)

A large population of individuals neither qualifies for government assistance nor has access to insurance benefits. For instance, in 2010, an estimated 4.8 million individuals with SUDs lacked insurance, and among persons who received substance use treatment at a specialty facility, 41.5 percent reported using their "own savings or earnings" as a source of payment for such treatment.[2447] Moreover, research has shown that many individuals who have SUDs have low income, and even among those who are employed or have substantial income, as the addiction progresses, those incomes may decrease, and subsequently, once-covered or wealthy patients may have to rely on public funding in order to access addiction treatment.[2548] In some cases, family members are forced to refer their loved ones to the criminal justice system to ensure that they can get treatment. Alternatively, access to insurance can allow individuals to obtain the treatment that they need.

[*Results from the 2010 National Survey on Drug Use and Health: Summary of National Findings*, CENTER FOR BEHAVIORAL HEALTH STATISTICS AND QUALITY, *available at* http://www.samhsa.gov/data/nsduh/2k10nsduh/2k10results.htm; Harold Pollack, *4.8 Million People Uninsured with Drug or Alcohol Problems*, THE INCIDENTAL ECONOMIST, Aug. 17, 2013, *available at* http://theincidentaleconomist.com/wordpress/4-8-million-people-uninsured-with-drug-or-alcohol-problems/. Suzanne Gelber Rinaldo & David W. Rinaldo, *Availability Without Accessibility? State Medicaid Coverage and Authorization Requirements for Opioid Dependence Medications*, AMERICAN SOCIETY OF ADDICTION MEDICINE (2013).]

Although private and employer-subsidized health plans may provide coverage for treatment of addiction and its medical consequences, private insurers as payers for addiction benefits have steadily declined since 1986. Between 1986 and 2009, the share of substance abuse spending increased for Medicaid (from 9 percent to 21 percent) and for other state and local governments (from 27 percent to 31 percent) and decreased for private insurance (from 32 percent to 16 percent).[2649]

From 1986 to 2009, nominal substance abuse spending growth (4.4 percent annually, on average) was slower than the growth for all-health (7.5 percent) and mental health (6.8 percent).[2750]

Unfortunately, managed care also has resulted in shorter average stays, while a historical lack of or insufficient coverage for substance abuse treatment has curtailed the number of operational

[48] *Results from the 2010 National Survey on Drug Use and Health: Summary of National Findings*, CENTER FOR BEHAVIORAL HEALTH STATISTICS AND QUALITY, *available at* http://www.samhsa.gov/data/nsduh/2k10nsduh/2k10results.htm; Harold Pollack, *4.8 Million People Uninsured with Drug or Alcohol Problems*, THE INCIDENTAL ECONOMIST, Aug. 17, 2013, *available at* http://theincidentaleconomist.com/wordpress/4-8-million-people-uninsured-with-drug-or-alcohol-problems/. [49] Suzanne Gelber Rinaldo & David W. Rinaldo, *Availability Without Accessibility? State Medicaid Coverage and Authorization Requirements for Opioid Dependence Medications*, AMERICAN SOCIETY OF ADDICTION MEDICINE (2013).
[49] *Status of Federal Funding for Addiction Services,* NAT'L ASS'N OF STATE ALCOHOL AND DRUG ABUSE DIRECTORS, March 3, 2014, *available at* https://www.naadac.org/assets/2416/2014aina_morrison_rob_nasadad.pdf. [50] *National Expenditures for Mental Health Services & Substance Abuse Treatment 1986-2009*, SUBSTANCE ABUSE AND MENTAL HEALTH SERVICES ADMINISTRATION, *available at* http://store.samhsa.gov/shin/content//SMA13-4740/SMA13-4740.pdf.

programs. The National Survey on Drug Use and Health (NSDUH)[2851] illustrates this point.

The NSDUH provides national and state-level data on the use of tobacco, alcohol, and illicit drugs (including non-medical use of prescription drugs) in the United States. The survey includes a series of questions to assess the prevalence of substance use, including alcohol and illicit drugs, over the past 12 months. Questions are structured to classify persons as dependent on or abusing specific substances based on criteria specified in the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV and DSM-5).

In addition to questions about substance use employed to classify respondents' need for treatment, NSDUH includes questions about respondents' perceived need for treatment (*i.e.*, whether they felt they needed treatment or counseling for alcohol or illicit drug use). The survey found that in 2020, 41.1 million persons aged 12 or older needed treatment for substance use (14.9 percent of persons aged 12 or older). Some and 2.7 million persons (1.0 percent of persons aged 12 or older and 6.5 percent of those who needed treatment) received treatment at a specialty facility.

Among persons who received treatment at a specialty facility, 31.6 percent reported using their "own savings or earnings" as a source of payment, 48.1 percent reported using private health insurance, 30.0 percent reported using public assistance other than Medicaid, 48.8 percent reported using Medicaid, 20.0 percent reported using funds from family members, and 40.0 percent reported using Medicare.

Of the 27.6 million who were classified as needing but not receiving treatment, 559,000 persons (2.0 percent) reported that they perceived a need for treatment for their alcohol or illicit drug use problem. Of these 559,000 persons who felt they needed treatment but did not receive it in 2020, 115,000 (20.6 percent) reported that they made an effort to get treatment, and 444,000 (79.4 percent) reported making no effort to get treatment.

---

~ *Status of Federal Funding for Addiction Services,* N~AT'L~ A~SS'N OF~ S~TATE~ A~LCOHOL AND~ D~RUG~ A~BUSE~ D~IRECTORS,~ March 3, 2014, *available at* https://www.naadac.org/assets/2416/2014aina_morrison_rob_nasadad.pdf.
~ *National Expenditures for Mental Health Services & Substance Abuse Treatment 1986-2009,* S~UBSTANCE~ A~BUSE~ A~ND~ M~ENTAL~ H~EALTH~ S~ERVICES~ A~DMINISTRATION,~ *available at* http://store.samhsa.gov/shin/content//SMA13-4740/SMA13-4740.pdf.
~ *2020 NSDUH Detailed Tables,* S~UBSTANCE~ A~BUSE AND~ M~ENTAL~ H~EALTH~ S~ERVICES~ A~DMINISTRATION,~ *available at https://www.samhsa.gov/data/report/2020-nsduh-detailed-tables*

Among those who needed and perceived the need for treatment yet made no effort to receive treatment, the reasons for not seeking treatment included:

- No health coverage and could not afford cost (19.1 percent),
- Did not find program that offered type of treatment that was wanted (14.4 percent)
- Concern that receiving treatment might cause neighbors/community to have a negative opinion (11.9 percent),
- Could handle the problem without treatment (9.0 percent),
- Did not want others to find out (6.5 percent),
- Did not have time (5.2 percent), and
- No openings in a program (1.7 percent).

Among people aged 12 or older in 2020 who needed substance use treatment but did not receive it, 97.5 percent did not feel that they needed treatment. These statistics highlight the need to provide greater consumer access to quality, affordable health care that includes routine screenings for substance use, therapeutic interventions, evidence-based treatment, and recovery support.

[55] *2020 NSDUH Detailed Tables*, SUBSTANCE ABUSE AND MENTAL HEALTH SERVICES ADMINISTRATION, *available at https://www.samhsa.gov/data/report/2020-nsduh-detailed-tables*

It is important to have addiction treatment providers willing to take health insurance to provide access to care that would be otherwise unavailable. Addiction treatment providers, recognizing the need to allow patients to use their health insurance benefits, will typically accept insurance; however, these providers often prefer to work outside of commercial insurer networks. Not only is the amount of reimbursement often set lower than the cost of care within network, but treatment planning, including length of stay, is no longer clinically driven when an insurance company limits services without regard for the patient's medical needs. Other than the unrealistically low reimbursement, the most frustrating aspect of negotiated care within network is when inappropriate limits are applied or length-of-stay decisions are determined by an individual not working clinically with the patient (and often without clinical experience).

People with SUDs often face greater financial hardships than other patients, despite the availability of insurance, due to the nature of the disease and its consequences. Patients with SUDs may be insured by a working relative but underemployed or unemployed themselves due to their disorder. It is sometimes difficult to get family members to use their policy for treatment. The family member may not want his or her employer to know about the covered relative having a problem, or the family member may be skeptical of treatment. A lack of family support may exist before and after treatment, so individuals with SUDs may be homeless or may not have housing options after treatment. The lack of family support, housing, and employment often make post-treatment collection of fees virtually impossible.

Addiction treatment providers recognize financial difficulties facing patients – even those with health insurance that covers treatment for SUDs. Addiction treatment providers also have significant experience in dealing with the problems associated with the collection of fees. Many providers use a model of insurance, advance out-of-pocket payments, and financial aid to enable patients to access treatment. Some providers use promissory notes. Attempts to collect the portion of the medical bill for which the patient is responsible must account for the impacts that financial stress and aggressive collection tactics can have on a person's fragile recovery.

Addiction treatment providers accepting insurance incur additional costs and have entire departments dedicated to working with insurance companies to meet their requirements and attempt to collect payment. The Hazelden program is one example.

A small number of providers who service a limited group of individuals who are very wealthy can and do require full payment in advance; sometimes these individuals want to use their insurance benefits. To help the patient access insurance benefits, the provider will either manage the insurance policy with pre-certification and utilization review while in treatment or provide a comprehensive bill at the conclusion of care (which usually is not eligible for reimbursement ~~without~~because it lacks concurrent reviews).

Providers often must use an estimate of benefits for patients with insurance as the patient's clinical needs and length of stay are not known at the beginning of treatment. Providers also are affected by the insurer's limitations on care, as described above, which are often applied after treatment has concluded and the bill has been submitted. These treatment programs face the risk of receiving payments from insurers lower than those used in calculating the patient's up-front payment obligation.

Insurers' denials of care create a difficult dilemma for the treatment professional, whose last note in the chart documents the patient's clinical need and who knows, if she discharges the patient and the patient experiences an untoward event, the provider could be deemed liable for damages. Very few, if any, providers terminate care when insurance companies' interference becomes financially problematic. In fact, the provider's clinical relationship with the patient is at stake, and a sense of rejection could exacerbate the already grave risks associated with early termination of treatment ~~Ethical~~ethical SUD treatment providers are aware of the fragility of recovery and are generally reticent to terminate treatment before it is clinically appropriate to do so.

## G.    Substance Use Disorder and Drug Poisoning Crisis

On February 8, 2022, the U.S. Commission on Combating Synthetic Opioid Trafficking published its final report. The Commission cited statistics indicating that drug poisonings have been responsible for more than 1 million deaths in the U.S. since 1999. The Commission estimated that drug poisonings are now costing the U.S. around $1 trillion every year.[29][52]

More than 101,750 people died of drug poisonings in the 12 months ending in October ~~2022.[30]~~2022.[53] More than 76,900 of these deaths involved prescription or illicit opioids, such as illegal fentanyl and fentanyl analogs.[31][54] In fact, roughly 68 percent of all drug poisoning deaths and 86 percent of opioid poisoning deaths involved synthetic opioids (other than methadone), predominantly illicit fentanyl and its analogs.

~~[a] CNBC, "Drug overdoses are costing the U.S. economy $1 trillion a year, government report estimates," February 8, 2022, *available at* https://www.cnbc.com/2022/02/08/drug-overdoses-cost-the-us-around-1-trillion-a-year-report-says.html.~~
~~[30] https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm~~
~~[31] https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm~~

Millennium Health, a national drug testing laboratory, published a report in February 2023 entitled, "Fentanyl in Focus: Perspectives on Polysubstance Use in 2022."[3255]

A key finding from the Millennium report was the increasing detection of fentanyl alongside cocaine, methamphetamine, heroin, and prescription opioids. Nationally, fentanyl is the most-detected drug, but the Western United States has seen the most significant rate of growth.

The Millennium data revealed that over 60 percent of fentanyl-positive specimens were also positive for one or more fentanyl analogs. This finding could indicate that the use of multiple fentanyl analogs may be a form of intentional polysubstance use. Geographical analysis also showed regional differences in the prevalence of certain fentanyl analogs.

Furthermore, the Millennium data indicated that individuals with fentanyl-positive specimens were more likely to engage in polysubstance use in comparison with those who had fentanyl-negative specimens. Researchers also found that, given the regional differences, state and local data might be more significant to health care providers than national data alone. An understanding of local trends is essential for the development of effective SUD treatment plans.[3256]

Treatment for SUD has shown to be effective in reducing the impact of the disease as well as the

---

[52] CNBC, "Drug overdoses are costing the U.S. economy $1 trillion a year, government report estimates," February 8, 2022, *available at* https://www.cnbc.com/2022/02/08/drug-overdoses-cost-the-us-around-1-trillion-a-year-report-says.html.
[53] https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm
[54] https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm
[55] http://resource.millenniumhealth.com/signalsreportvol5
[56] http://resource.millenniumhealth.com/signalsreportvol5

public health burden. Appropriate treatment can reduce the number of poisonings and deaths and can increase productivity. Every dollar invested in SUD treatment programs yields a return of between $4 and $7 in increased earnings and decreased drug-related crime, criminal justice costs, and theft.[3457] Providing coverage of SUD treatment can not only save lives but also generate significant cost savings.

### H.    Steps Toward Reform

Prior to the enactment of the Patient Protection and Affordable Care Act of 2010 (ACA), health insurers in both public and private plans routinely denied coverage to individuals with SUDs. Health plans discriminated against individuals with SUDs on the basis of preexisting condition by either excluding them from coverage or limiting access to treatment through the use of higher copayments, annual visit limits, and burdensome prior authorization requirements.[3558]

The ACA and its implementing regulations significantly expanded insurance coverage and access for individuals with SUDs. For example, the law requires small group plans, individual plans, and Medicaid alternative benefit packages (ABPs) to cover SUD services as one of ten essential health benefits. The ACA also requires health insurers to accept people who apply for coverage regardless of preexisting conditions. The ACA prohibits insurers from charging higher premiums based on health condition, meaning insurers may not exclude individuals with SUDs from coverage or

charge them more based on their conditions. The ACA also caps annual out-of-pocket costs for health plan enrollees and prohibits individual plans, small group plans, and

[20] http://resource.millenniumhealth.com/signalsreportvol5

[21] http://resource.millenniumhealth.com/signalsreportvol5

[22] Nat'l Inst. On Drug Abuse, Principles of Drug Addiction Treatment: A Research-Based Guide 13-14 (3rd ed. 2012), *available at* https://d14rmgtrwzf5a.cloudfront.net/sites/default/files/675-principles-of-drug-addiction-treatment-a-research-based-guide-third-edition.pdf.

[23] Michael C. Barnes, et al., Potential Impact of Texas et al v United States on Persons with Substance Use Disorder, ABA Health eSource (Oct. 2018).

ABPs from putting yearly or lifetime dollar limits on the coverage of SUD services.[3659] The ACA additionally allows states to expand Medicaid coverage to all uninsured adults under the age of 65 with incomes up to 138 percent of the federal poverty level. As of January 2022, 39 states (including Washington, DC) have expanded Medicaid in line with the ACA, and 12 states have not.[3760]

Finally, the ACA and its implementing regulations expanded federal parity protections. In 2008, Congress passed the MHPAEA, which mandated parity in insurance coverage between mental health/substance use disorder and medical/surgical services, including both treatment limitations and financial requirements. The MHPAEA only applied to privately insured large group plans that voluntarily offered coverage of MH/SUD benefits. The ACA expanded the MH/SUD parity protections in the MHPAEA to individual and small group plans. In 2016, the Centers for Medicare & Medicaid Services expanded parity protections to Medicaid managed care organizations, Medicaid ABPs, and the Children's Health Insurance Program.[3861]

Just as the SUD and drug poisoning crisis was increasing the demand for SUD treatment, federal

[57] Nat'l Inst. On Drug Abuse, *Principles of Drug Addiction Treatment: A Research-Based Guide* 13-14 (3rd ed. 2012), *available at* https://d14rmgtrwzf5a.cloudfront.net/sites/default/files/675-principles-of-drug-addiction-treatment-a-research-based-guide-third-edition.pdf.
[58] Michael C. Barnes, et al., *Potential Impact of Texas et al v United States on Persons with Substance Use Disorder*, ABA Health eSource (Oct. 2018).
[59] Michael C. Barnes, et al., *Potential Impact of Texas et al v United States on Persons with Substance Use Disorder*, ABA Health eSource (Oct. 2018).
[60] KFF, "Status of State Medicaid Expansion Decisions: Interactive Map," published Jan. 31, 2022, *available at* https://www.kff.org/medicaid/issue-brief/status-of-state-medicaid-expansion-decisions-interactive-map/.
[61] Michael C. Barnes, et al., *Potential Impact of Texas et al v United States on Persons with Substance Use Disorder*, ABA Health eSource (Oct. 2018).

regulations requiring most health insurance plans to provide coverage of SUD treatment took effect. As of 2014, many Americans had access to SUD treatment for the first time. Naturally, the number of health insurance claims for SUD treatment services increased.

The expansion of the MHPAEA required that many more health insurers' treatment limitations and financial requirements for people being treated for SUD be in parity with those applied to people receiving medical or surgical care. As a result, the dollar value of insurance claims for SUD treatment services also increased.

Congressional efforts to reduce SUD and drug poisonings by providing accessible and affordable treatment remain ongoing. In September of 2022, the House passed H.R. 7780, the Mental Health Matters Act, which will expand access to mental health and SUD services by preventing Americans from being improperly denied mental health and substance use benefits, ensuring a fair standard of review by the courts and banning forced arbitration agreements.[3962]

As demonstrated by the Department of Labor's report,[40 63] health insurance companies are recalcitrant in adjusting to and complying with the requirements of the ACA and MHPAEA that are rapidly evolving to provide access and coverage for SUD treatment.

[63] Michael C. Barnes, et al., *Potential Impact of Texas et al v United States on Persons with Substance Use Disorder*, ABA Health eSource (Oct. 2018).

~~⁵⁹ KFF, "Status of State Medicaid Expansion Decisions: Interactive Map," published Jan. 31, 2022, *available at https://www.kff.org/medicaid/issue-brief/status-of-state-medicaid-expansion-decisions-interactive-map/.*~~
~~⁶⁰ Michael C. Barnes, et al., Potential Impact of Texas et al v United States on Persons with Substance Use Disorder, ABA Health eSource (Oct. 2018).~~

## I.    The Cigna Alarm

The year 2014 entailed a great deal of flux for consumers, providers, and insurers alike given the implementation of the ACA and its implementing regulations, which deemed behavioral health care an essential benefit and expanded mental health and SUD parity to new insurance markets. This change gave rise to some confusion and chaos, as is demonstrated by Cigna's ignorance in 2015 of the changes in the insurance industry surrounding billing and payment for testing for substance use.

Fortunately, many consumers were finally able to access insurance-covered SUD treatment. A lot of these people chose to obtain services from OON providers offering quality, convenience, or other value beyond that offered by lower-cost INN providers. This consumer preference for OON providers surely contributed to the fact that ███████████████ ⁶⁴

Cigna administrators became aware of the changes in selection of their product, use of the benefit, and attendant increase in costs. ████████████████████



⬜ ██████████████████

⁶²  https://www.whitehouse.gov/wp-content/uploads/2022/09/H.R.-7780-SAP.pdf
⁶³  Dᴇᴘ'ᴛ ᴏғ Lᴀʙᴏʀ, 2022 MHPAEA Rᴇᴘᴏʀᴛ ᴛᴏ Cᴏɴɢʀᴇss, (2022)
https://www.dol.gov/sites/dolgov/files/EBSA/laws-and-regulations/laws/mental-health-parity/report-to-congress ~~2022~~ 2022-realizing-parity-reducing-stigma-and-raising-awareness.pdf.
⁶⁴  Cigna_TML00171620.
⁶⁵  Cigna_TML00171630.



The emails state:

**(only 5 responses from providers)."** Emphasis added.

Ingenix was a subsidiary of UnitedHealth that created reimbursement schedules for UnitedHealth. The New York Attorney General found that Ingenix had a conflict of interest in creating reimbursement schedules used by UnitedHealth.[67]

---

[64] Cigna_TML0017624.
[65] UnitedHealth Group, NY State Invest - Assurance of Discontinuance Under Executive Law § 63(15).
[66] *See generally,* Nemecek Deposition Exhibits.
[67] Report of Dr. Clark, p. 17



I have been provided no evidence to suggest that Cigna took a collaborative approach to informing OON SUD providers of Cigna's expectations for prior or future SUD-related service provision and billing.

**J.      Onerous Documentation Requests**

I reviewed a documentation request Cigna sent to Plaintiff Addiction Health Alliance.[70] Cigna requested that the Plaintiff send the following information for 21 patients within 30 days:

- Complete medical and laboratory records
- Copies of patient billing and collection ledgers
- A copy of your billing and collection practices
- Signed Assignment of Benefit form for each patient
- List of all licensed employees, including credentials
- Proof of licensure and Clinical Laboratory Improvement Amendment certification or waiver
- The name of the manufacturer for the equipment and type of tests used for the urine drug testing performed at your facility
- Client handbook

In some instances, Cigna asked that responses be transmitted by fax, a mode of electronic communication that became largely obsolete some 25 years ago, or costly and slow physical mail.[71]

Nevertheless, I saw evidence that Plaintiff TML Recovery attempted in good faith to satisfy Cigna's requests of this nature and provided substantially all of the information Cigna requested.[72]

Cigna SIU Investigator Sharon Dennis stated in an email discussing Plaintiff TML, "I just deny everything for medical records and they do not respond."[73]

**K.      Cigna's Practices Drive Profit**

These measures were so effective, that Cigna experienced dramatic increase in profits between 2015–2022. Dr. Nemecek stated in his deposition that Cigna's "goal is to provide an overall, most

---

[70] CignaTML00061826. [71] Cigna_TML00061847. [72] February 15, 2018 - TML's submission of requested medical records to Cigna for patient MC, 320 pgs., Cigna_TML00057128-57447; February 15, 2018 - TML's submission of requested medical records to Cigna for patient BB, 355 pgs., Cigna_TML00056773-57127; February 15, 2018 - TML's submission of requested medical records to Cigna for patient ML, 580 pgs., Cigna_TML00058780-59359; February 15, 2018 - TML's submission of requested medical records to Cigna for patient DM, 84 pgs., Cigna_TML00059360-59443.
[73] Cigna_TML00095850.

affordable health plan" to meet the needs of its members, customers, and clients.[74] The "smoking gun" emails among Cigna's employees expose the company's primary emphasis on profitability, not consumer affordability. [75] This extreme focus on profits is reflected in the company's shareholders' net profits from 2015 through 2022:

- 2015: $2.1 billion[76]
- 2016: $1.9 billion[77]
- 2017: $2.2 billion[78]
- 2018: $2.6 billion[79]
- 2019: $5.1 billion[80]
- 2020: $8.5 billion[81]
- 2021: $5.4 billion[82]
- 2022: $6.7 billion[83]

Cigna is among the top 100 (#68) on the "Forbes Global 2000" ranking based on sales, profits, assets, and market value.[84] A company that is focused on providing a "most affordable health plan" would pass some of these impressive profits along to its members, customers, and clients in the form of premium reductions. I am not aware of any evidence that Cigna reduced its premiums and enhanced consumer affordability in any significant way during this time period.

Despite Cigna's efforts to reduce its costs and increase profitability, some claims were paid. If a claim was not paid at all it would trigger an adverse benefit determination,[85] so I observed that claims were gutted rather than zero-paid through the use of these new processes.

Cigna's expert stated:

> [I] only reference[d] one claim where two days of IOP services were billed [and grossly underpaid] for a single patient, JJ. (Barthwell page 26). As with her other assertions, Dr. Barthwell provides no information to support her opinion that this or any other specific claim was a covered service, why it would meet medical necessity criteria, or the amount of remuneration she believes would be appropriate.

[74] Nemecek Dep. at 131.
[75] Cigna_TML00171630.
[76] https://www.annualreports.com/HostedData/AnnualReportArchive/c/NYSE_CI_2015.pdf, pg. 5. [77] https://www.annualreports.com/HostedData/AnnualReportArchive/c/NYSE_CI_2016.pdf, pg. 6. [78] https://www.annualreports.com/HostedData/AnnualReportArchive/c/NYSE_CI_2017.pdf, pg. 40. [79] https://www.annualreports.com/HostedData/AnnualReportArchive/c/NYSE_CI_2018.pdf, pg. 29. [80] https://www.annualreports.com/HostedData/AnnualReportArchive/c/NYSE_CI_2019.pdf, pg. 81. [81] https://www.annualreports.com/HostedData/AnnualReportArchive/c/NYSE_CI_2020.pdf, pg. 72. [82] https://www.annualreports.com/HostedData/AnnualReportArchive/c/NYSE_CI_2021.pdf, pg. 183. [83] https://www.sec.gov/Archives/edgar/data/1739940/000114036122010160/ny20002777x1_def14a.htm, at schedule I.
[84] https://www.forbes.com/lists/global2000/?sh=327568135ac0
[85] Callahan Dep. at 87–90.

My findings support that ███████████████████████████████ [86] Despite the extreme scrutiny that the Plaintiffs underwent, many of their claims were paid (albeit often grossly underpaid). Each of these payments was a tacit Cigna *concession* that the Plaintiffs documented and proved the following:

- The patient's diagnosis;
- The service was covered;
- The service was appropriate;
- The provider was qualified;
- The service was provided.

The fact that Plaintiffs' claims were negotiated demonstrates that Cigna recognized, acknowledged, and accepted the amount of the claim since a negotiation is only required after the initial billed amount is accepted.

### L.    Cigna's Expert's Errors

#### 1.    Counseling Services in California

Cigna's expert contends that "psychotherapy is a procedure which can only be provided by a masters or doctorate level licensed professional who documents the provision of psychotherapy."[87]  This contention is inconsistent with California regulations. Specifically, California regulations provide:

"Counseling services" means any of the following activities:
(A) Evaluating participants', patients', or residents' AOD [Alcohol/Other Drug] treatment or recovery needs, including screening prior to admission, intake, and assessment of need for services at the time of admission;
(B) Developing and updating of a treatment or recovery plan;
(C) Implementing the treatment or recovery plan;
(D) Continuing assessment and treatment planning;
(E) Conducting individual counseling sessions, group counseling sessions, face-to-face interviews, or counseling for families, couples, and other individuals significant in the life of the participants, patients, or residents; and
(F) Documenting counseling activities, assessment, treatment and recovery planning, clinical reports related to treatment provided, progress notes, discharge summaries, and all other client related data.[88]

Counseling services may only be provided by the following individuals: [89]

---

[86] Cigna_TML00171630; Cigna_TML00094763.
[87] Report of Dr. Clark, p. 14.
[88] https://www.law.cornell.edu/regulations/california/9-CCR-13005
[89] https://www.dhcs.ca.gov/Documents/DHCS-AOD-Certification-Standards-2.7.2020.pdf

1. Licensed professionals acting within their scope of practice, i.e., "a physician licensed by the Medical Board of California; or a psychologist licensed by the Board of Psychology; or a clinical social worker or marriage and family therapist licensed by the California Board of Behavioral Sciences, or an intern registered with the California Board of Psychology or the California Board of Behavioral Sciences;[90] or
2. Individuals registered or certified pursuant to California Code of Regulations, Title 9, Division 4, Chapter 8.[91]

To obtain certification, non-licensed or non-certified individuals providing counseling services in a California SUD treatment program must register with a state-approved certifying organization within six months of hire.[92] From the date of registry, counselors have five years to become certified. If a counselor fails to become certified after being registered for five years, the counselor will not be permitted to provide counseling services to clients.[93]

Finally, California regulations state as follows:

> [A]t least thirty percent (30%) of staff providing counseling services in all AOD programs shall be licensed or certified pursuant to the requirements of this Chapter. All other counseling staff shall be registered pursuant to Section 13035(f).[94]

In other words, in California SUD treatment programs, counseling staff must be apportioned as follows:

- 70 percent or less:
  - o New hires within their first six months (in general, these individuals are often persons in recovery who wish to share their experiences with peers), or
  - o A person who is registered with a certifying organization but is not yet certified;
- 30 percent or more:
  - o California-licensed physicians, psychologists, clinical social workers, marriage and family therapists, and interns registered with the California Board of Psychology or Board of Behavioral Sciences; or
  - o Certified AOD counselors.

Cigna's expert also states that "Psychotherapy is a billable procedure by licensed clinician, while the other types of group experiences are not billable as medical codes, unless they are subsumed into a day rate of Intensive Outpatient Program/Partial Hospital Program/Residential Treatment Programs." This statement is inconsistent with California regulations.

As explained above, the definition of "counseling services" includes "implementing the treatment or recovery plan."[95] Individuals who understand their health condition and treatment methodology are often better equipped to cope and motivated to succeed in treatment and recovery. Therefore,

---

[90] https://www.law.cornell.edu/regulations/california/9-CCR-13015
[91] https://www.dhcs.ca.gov/Documents/DHCS-AOD-Certification-Standards-2.7.2020.pdf
[92] https://www.law.cornell.edu/regulations/california/9-CCR-13035
[93] https://www.dhcs.ca.gov/provgovpart/Pgs./CounselorCertification.aspx
[94] https://www.law.cornell.edu/regulations/california/9-CCR-13010
[95] https://www.law.cornell.edu/regulations/california/9-CCR-13005

SUD treatment plans often include informing the patient about his or her disorder, symptoms, and treatment methods. [96] These informational activities are the foundation "psychoeducation." [97] Given that counseling services include implementing the treatment plan, and the treatment plan often incorporates psychoeducation, psychoeducation is a counseling service. It is billable as such, and it may be provided by any of the individuals authorized by California regulation.

As a result of Cigna's expert's misunderstanding of how counseling services are conducted and billed in California, the expert's analyses and conclusions regarding the Plaintiffs' counseling services and billing are flawed and erroneous.

Cigna's expert also appears to have misinterpreted the charge and payment spreadsheets in the case record. For example, Cigna's expert reported, "My examination of these records reflect that Cigna did pay a portion of some of these claims for group psychotherapy sessions (90852) billed by DRR for patient WP (over $700 per claimed group psychotherapy session)...." Assuming the expert intended to refer to services for WP coded 90853, my reading of the relevant spreadsheet is that the maximum amount paid for services for WP coded 90853 was $183.[98] This amount was barely 10 percent of the billed amount of $1,709.

Neither Cigna nor its expert has provided a comprehensible explanation of how the rate reductions Cigna and its contractors applied to the Plaintiffs' claims were justified and calculated. I maintain that Cigna's approach to the computation of payment of the Plaintiffs' claims is irrational and haphazard, and intended to retain assets of Cigna despite claims that Cigna concedes are valid and payable.

## 2. Evidence-Based Treatment

Cigna's expert asserts that "the evidence-based treatment used to treat opioid addiction occurs in outpatient levels of care at Opioid Treatment Programs ("methadone clinics"), Office Based Opioid Treatment ("Suboxone clinics"), and Telemedicine Based Opioid Treatment programs ("telehealth Suboxone clinics")."[99] This assertion suggests that treatment without medication for opioid use disorder (OUD) is not evidence-based and does not occur in residential, PHP, IOP, and other settings.

SAMHSA's TIP 63 (which the Cigna's expert includes on her resume under "Policy and Standards Experience") states as follows:

> The science demonstrating the effectiveness of medication for OUD is strong ... This doesn't mean that remission and recovery occur only through medication. Some people achieve remission without OUD medication, just as some people can manage type 2 diabetes with exercise and diet alone....

---

[96] Amy Marshall, Psy.D. "How Psychoeducation Is Used in Therapy." https://www.verywellmind.com/what-is-psychoeducation-5323831#citation-1
[97] Amy Marshall, Psy.D. "How Psychoeducation Is Used in Therapy." https://www.verywellmind.com/what-is-psychoeducation-5323831#citation-1
[98] Cigna_TML00094767.
[99] Report of Dr. Clark, p. 5.

> Medication for OUD should be successfully integrated with outpatient and residential treatment. Some patients may benefit from different levels of care during the course of their lives. These different levels include outpatient counseling, intensive outpatient treatment, inpatient treatment, or long-term therapeutic communities....[100]

Furthermore, Cigna's expert declares that SUD treatment premised upon the Minnesota Model is not evidence-based. The Minnesota Model has a sturdy base of evidence documented in credible literature and has provided a foundation for SUD treatment in the U.S. for roughly 50 years. This model has evolved to incorporate all levels of care recognized by *The ASAM Criteria*, requires that the duration of treatment be individualized, and includes individual and group therapies, family engagement, mutual aid, and peer recovery support. There are no FDA-approved medications to treat SUDs other than OUD, alcohol use disorder, and nicotine use disorder. As such, multimodal treatment methods drawing upon the Minnesota Model are standard for patients with SUDs for which there are no medications.

### 3.   In-Network vs. Out-of-Network Providers

Health insurers maintain a network of providers to better predict and control costs. Providers who agree to go INN are marketed by the insurer and obtain access to a pool of insured individuals in exchange for less control over treatment decisions and lower fees that are established by the insurer. OON providers typically elect not to go INN due to the level of insurer control and lower compensation rates.

Deductibles, copays, and annual limits on out-of-pocket costs are typically lower for services provided by INN providers than the deductibles, copays, and annual limits applied to services provided by OON providers. Insured consumers who obtain health care services from INN providers typically pay less out of pocket than those consumers who obtain services from OON providers. Insured consumers who obtain services from OON providers are often willing and prepared to pay more out of pocket than consumers who obtain services from INN providers in exchange for the quality, convenience, or other distinctive value OON providers offer.

### 4.   False Negative Urine Drug Testing Results

In Dr. Nemecek's deposition, he explained his belief that the criteria in which a definitive drug test is medically necessary is when a presumptive test result is inconsistent or not available for the analyte being tested.[101] This position disregards the risks of false negative results associated with the less reliable presumptive methodology. A false negative result may give a treatment provider inappropriate confidence that substance use is not occurring. A false negative may cause the provider to miss a patient's return to use, lead to misdiagnosis or diagnostic delay, misinform the treatment plan, and reinforce extremely risky drug-related patient behaviors. This risk is especially grave when polysubstance use is common, fentanyl is frequently present in counterfeit medications

---

[100] SAMHSA TIP 63. https://store.samhsa.gov/sites/default/files/pep21-02-01-002.pdf
[101] Nemecek Dep. at 112–113.

and illicit substances, and some 90 percent of drug poisonings involve synthetic opioids like fentanyl.

### M.   Cigna's Reactions to Increased Costs and Coverage

Cigna and its experts seem to point to fraud as its reasons for changing the way it covered SUD treatment. For example, Cigna's experts seem to suggest that young adults seeking treatment is a perverse way for providers to bill their relatives' insurance.[102] However, Cigna's experts do not reference a single piece of evidence that the Plaintiffs in this action recruited dependents for this reason, nor does my review of the records indicate this.

As it relates to Cigna's coverage guidelines, I see no evidence that ███████████ ████████████████████████████ were offset by above-market-rate or supplemental compensation.[103] Rather, Cigna's requirements created complications and expenses that likely impeded SUD treatment providers' ability and willingness to serve Cigna-insured patients.

## V.   Factual Summary

Since completing my initial report Plaintiffs' counsel ~~had not~~has supplied me with ~~any~~the depositions taken in this action ~~as of the time~~which I ~~prepared this~~rely upon to supplement my report~~, though~~. Although I have had access to deposition transcripts taken in the related action – *RJ, et al. v. Cigna Behavioral Health et al.* (*RJ*) – for which I have also been retained as a consultant~~, I expect to receive transcripts of depositions taken in this action as they are completed, and I intend to supplement this report with any relevant testimony.~~did not rely on any materials from the *RJ* matter to form my initial report or supplemental report.

The following facts are drawn from Plaintiffs' Consolidated Second Amended Complaint (SAC) [ECF No. 79]. Plaintiffs are OON SUD treatment providers and clinical laboratories. ~~SAC ¶ 23.~~[104] Plaintiffs are in the profession of helping individuals recover from substance use disorders and return to their families and communities as healthy and productive members of society. ~~Id.~~[105] Plaintiffs are certified to provide these services by the California Department of Health Care Services. ~~Id. ¶ 1.~~[106]

~~Cigna~~[41]Cigna[107] is an insurance company licensed to do business in the state of California as providers of health insurance benefits. ~~Id. ¶¶ 10-16. MultiPlan~~[42][108] MultiPlan[109] is a provider of healthcare cost management solutions, specializing in providing claim cost management solutions, health care payment solutions, auditing and reimbursement of behavioral health and substance use disorder claims and costs, as well as prepayment services such as treatment facility and professional bill review and negotiations for controlling the financial risks associated with health care bills on plans insured, managed, or ~~administered by Cigna and its subsidiaries and affiliates. Id. ¶¶ 17-18.~~

---

[102] Dr. Kelly Clark Report at 9.
[103] Cigna Standards and Guidelines/Medical Necessity Criteria for Treatment of Behavioral Health and Substance Use Disorders Revised Edition: 2015-2016. Beginning Cigna_TML0065827.
[104] SAC ¶ 23.
[105] *Id.*
[106] *Id.* at ¶ 1.
[107] By "Cigna," I refer to Cigna Corporation, Cigna Health and Life Insurance Company, Connecticut General Life Insurance Company, Cigna Behavioral Health, Inc., Cigna Behavioral Health of California, Inc., Cigna Health

Management, Inc., and Cigna Healthcare of California, Inc.

[108] SAC at ¶¶ 10–16.

[109] By "MultiPlan," I refer to MultiPlan, Inc. and Viant, Inc.

administered by Cigna and its subsidiaries and affiliates.[110]

Plaintiffs provided medically necessary, preauthorized, and covered SUD treatment and laboratory services to 508 of Cigna's insured members (the patients), including residential withdrawal management and residential treatment (RTC), partial hospitalization/day treatment (PHP), intensive outpatient (IOP), outpatient (OP), treatment planning, counseling and behavioral therapies, family and group therapy, medication management, case management services, and laboratory services to, among other things, determine, measure, or otherwise describe the presence or absence of various substances in the body. *Id.* ¶ 22.[111] The health insurance plans provide coverage for OON SUD treatment and laboratory services. *Id.* ¶ 23.[112]

Before rendering treatment to the patients, Plaintiffs obtained written assignments of benefits from each of the patients. *Id.* ¶ 25.[113] Cigna confirmed, represented, promised, and warranted Plaintiffs through the required verification of benefits process that each of the insureds and their respective OON SUD treatments and services were covered by health insurance plans issued, managed, or administered by Cigna and MultiPlan. *Id.* ¶ 28.[114] In reliance on these assignments of benefits and Cigna representations, Plaintiffs rendered treatment to the patients. *Id.*[115] Cigna knew that Plaintiffs were treating and providing services and were advised and fully aware of Plaintiffs' charges for the treatment and services rendered. *Id.*[116] After providing treatment and services to the patients, Plaintiffs submitted their claims to Cigna for payment. *Id.* ¶ 29.[117]

I have been advised that Plaintiffs and Defendants selected a sample set of the patients for

---

[*] By "Cigna," I refer to Cigna Corporation, Cigna Health and Life Insurance Company, Connecticut General Life Insurance Company, Cigna Behavioral Health, Inc., Cigna Behavioral Health of California, Inc., Cigna Health Management, Inc., and Cigna Healthcare of California, Inc. [*] By "MultiPlan," I refer to MultiPlan, Inc. and Viant, Inc.

purposes of discovery. I have reviewed the claims charts and synopses of patient admission and treatment records, including Verification of Benefits (VOB), Assignment of Benefits (AOB), Explanation of Benefits (EOB) and Explanation of Payments (EOP), and other patient specific documents and summaries for the sample patients. I also reviewed documents produced by Defendants in this action, including internal document and communications, and claims administration documents, including Summary Plan Descriptions (SPDs), Administrative Services Only Agreements (ASOs), Cigna's Standards and Guidelines, SIU investigation files, emails, memoranda, spreadsheets, and slide decks. The following facts are drawn from these documents and the Defendants' witness testimony in ~~the RJ~~this action.

After Plaintiffs submitted their claims to Cigna for payment, Cigna paid Plaintiffs a nominal percentage of the charges for the claims that are at issue. Cigna accomplished this by, among other things, reimbursing the claims with an artificial "reasonable and customary" (R&C) rate,[~~43~~118] and funneling claims to MultiPlan through its █████████████████████████████████████████████████████████████████, [~~44~~ 119]

[110] *Id.* at ¶¶ 17–18.
[111] *Id.* at ¶ 22.
[112] *Id.* at ¶ 23.
[113] *Id.* at ¶ 25.
[114] *Id.* at ¶ 28.
[115] *Id.*
[116] *Id.*
[117] *Id.* at ¶ 29.
[118] Also known as "Usual and Customary" (U&C).
[119] Gompper Dep. at 117–118. Order to Show Cause *In the Matter of the Certificate of Authority of Health Net Life Insurance Company* (CDI File No. UPA-2016-00005).

████████████████████████████████████████████

████████████████████████████████████████████

██████ The Plaintiffs are not Medicare providers, and there is no Medicare rate for SUD treatment facilities such as Plaintiffs'; ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████ Cigna and MultiPlan's repricing methodologies are premised upon Medicare charge and reimbursement data, skewing the reimbursement rates lower.

According to Cigna's website, when calculating reimbursement for OON claims, the plans utilize any of the following three methodologies to calculate what Cigna defines as the "Maximum Reimbursable Charge" ("MRC").[45][121]

    a.    MRC I:

    Under this option, a data base compiled by FAIR Health, Inc. (an independent non-profit company) is used to determine the charges billed by health care professionals or facilities in the same geographic area for the same procedure codes using data. The maximum reimbursable amount is then determined by applying a percentile (typically the 70th or 80th percentile) of billed charges, based upon the FAIR Health, Inc. data. For example, if the plan sponsor has selected the 80th percentile, then any portion of a

---

~~[*] Also known as "Usual and Customary" (U&C).~~
~~[*] Order to Show Cause *In the Matter of the Certificate of Authority of Health Net Life Insurance Company* (CDI File No. UPA 2016-00005).~~
~~[*] myCigna - Legal Disclaimer: https://my.cigna.com/public/legal_disclaimer.html;~~
~~https://static.cigna.com/assets/chcp/resourceLibrary/clinicalReimbursementPayment/medicalClinicalReimburseOutOfNetwork.html.~~

charge that is in excess of the 80th percentile of charges billed for the particular service in the same relative geographic area (as determined using the FAIR Health, Inc. data) will not be covered and reimbursed, and the patient will be fully responsible for such excess.

b.     MRC II:

This option uses a schedule of charges established using a methodology claimed to be similar to that used by Medicare to determine allowable fees for services within a geographic market or at a particular facility. The schedule amount is then multiplied by a percentage (110%, 150% or 200%) selected by the plan sponsor to produce the MRC.

In the limited situations where a Medicare-based amount is not available (e.g., a certain type of health care professional or

[120] Cothron Dep. at 103. Cigna receives as much as 29% of the 'savings' and MultiPlan receives 7–11% of the savings
[121] myCigna - Legal Disclaimer; https://my.cigna.com/public/legal_disclaimer.html; https://static.cigna.com/assets/chcp/resourceLibrary/clinicalReimbursementPayment/medicalClinicalReimburseOut OfNetwork.html.

procedure is not covered by Medicare or charges relate to covered services for which Medicare has not established a reimbursement rate), the MRC is determined based on the lesser of:

1.     the health care professional or facility's normal charge for a similar service or supply; or

2. the MRC Option I methodology based on the 80th percentile of billed charges.

c.     Average Contracted Rate ("ACR"):

Under this option, the MRC is determined based on the lesser of:

1.     the health care professional or facility's normal charge for a similar service or supply; or

2. the Average Contracted Rate - i.e., the average percentage discount applied to all claims in a geographic area paid by Cigna during a recent 6-month period for the same or similar service provided by health care professionals or facilities participating in the Cigna network. The ACR is updated by Cigna on a semiannual basis. The geographic area used by Cigna is either a Metropolitan Statistical Area (MSA) or an area within governmental boundaries (e.g., state, county, zip code).

In some cases, the ACR amount will not be used and the MRC is determined based on the lesser of:

> 1. the health care professional or facilities' normal charge for a similar service or supply; or
>
> 2. the MRC I methodology based on the 80th percentile of billed charges."

The sample patients' SPDs that I reviewed contained either an MRC I reimbursement methodology that obligated Cigna to reimburse Plaintiffs' claims with an R&C rate such as those determined by using FAIR Health, or an MRC II reimbursement methodology that obligated Cigna to reimburse Plaintiffs' claims at either Plaintiffs' "normal charge for a similar service or supply; or the MRC Option I methodology [i.e., R&C] based on the 80th percentile of billed charges," for "situations [like here] where a Medicare-based amount is not available (e.g., a certain type of health care professional or procedure is not covered by Medicare or charges relate to covered services for which Medicare has not established a reimbursement rate)."[46]

[122]~~The~~ ~~The~~ Centers for Medicare and Medicaid Services ("CMS") defines R&C as, "[t]he amount paid for a medical service in a geographic area based on what providers in the area usually charge for the same or similar medical

[122] *Id.*

service." As evidenced by the plan language below, this verbiage is commonly used by insurers and referred to as R&C and U&C. For example, one of the MRC I SPDs I reviewed states:[47][123]

> Maximum Reimbursable Charge is determined based on the lesser of the providers normal charge for a similar service or supply; or
>
> A percentile of charges made by providers of such service or supply in the geographic area where the service is received. These charges are compiled in a database we have selected [e.g., FAIR Health].

An MRC II SPD I reviewed states that the reimbursement methodology for OON claims is:[48][124]

> 70% of the Maximum Reimbursable Charge [MRC]... [MRC] is determined based on the lesser of the provider's normal charge for a similar service or supply; or... [110%] of a schedule that [Cigna] developed based upon a methodology similar to a methodology utilized by Medicare for similar service in geographic market; In some cases, a Medicare based schedule will not be used and the [MRC] for covered services is determined based on the lesser of:
>
> □ the provider's normal charge for a similar service or supply; or

~~*Id.*~~

~~Cigna_TML00019837.~~

~Cigna_TML00025225_6.

☐ the 80th percentile of charges made by providers of such service or supply in the geographic area as compiled in database selected by [Cigna].

Cigna's experts seem to be critical of my reliance of Cigna's plan language on its website as opposed to the sample SPDs. As evidenced by the language above, that distinction is immaterial, as the language in the sample SPDs is nearly identical to the language online and leads to the same conclusion, and furthermore, my initial report did, in fact, include references to sample SPDs.

Ms. Gompper testified that, ███████████████████████████████████
████████████████████████████████████████████████████████████████
██████████████████████████ [125] The crux of this case is whether the methodologies were permissible pursuant to the plans. Ms. Gompper testified that MRC I professional claims are priced using FAIR Health.[126] However, for MRC I outpatient facility claims, Cigna does not use FAIR Health and instead uses MultiPlan/ Viant OPR, which is populated with Medicare Charge Data at a national level.[127] The plans provide that, under MRC I and II, the reimbursement must be calculated based on data relevant to the geographic area where the service is received.[128] ██████
████████████████████████████████████████████████████████████████

[123] Cigna_TML00019837.
[124] Cigna_TML00025225–6.
[125] Gompper Dep. at 43–45.
[126] Gompper Dep. *Id.* at 52.
[127] Gompper Dep. at 54, 75, 80.
[128] Cigna_TML00019837; Cigna_TML00025225–6.



[129] Using FAIR Health, on the other hand, would have allowed Cigna to price claims based on Geozips and in accordance with the plan language. [130]

As Cigna internal emails indicate and Ms. Gompper admits, Cigna and MultiPlan

[129] Gompper Dep. at 80–82.
[130] Gompper Dep. at 71.
[131] Gompper Dep. at 43–52.
[132] Cigna_TML00171624.
[133] Cigna_TML00171631.
[134] Id.
[135] Cigna_TML00171786.
[136] Cigna_TML00171752.
[137] Cigna_TML00171774.
[138] Cigna_TML00171756

[139] Crandell Dep. at 85.
[140] Cothron Dep. at 81–82.
[141] Gompper Dep. at 54, 75, 80.



Cigna derives revenue in two ways under the ASOs when providing claims administrative services for self-insured employers that sponsor health benefit plans for their employees that are relevant to this action:

## VI.     Opinions

1.     **Cigna implemented policies and systematic practices that emphasized profits over patients and resulted in the under-reimbursement of Plaintiffs' claims, with Cigna instead paying Plaintiffs an arbitrary, nominal percentage of the charges, far below a reasonable and customary rate.**

Plaintiffs are not Medicare providers and there is no Medicare rate for SUD treatment facilities such as Plaintiffs'; ██████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
██████████ Cigna disregarded the language it drafted into the SPDs that obligated Cigna to reimburse Plaintiffs' OON SUD claims with an R&C rate or the Plaintiffs' normal billed charges under either the MRC I or MRC II methodology given the absence of a Medicare rate, which is how Cigna historically had been reimbursing OON SUD claims prior to the 2015 changes to its reimbursement policies.  Instead, ████████████████████████████████████████████
██████████

[142] Example ASO Cigna_TML0073412.
[143] Example ASO Cigna_TML00073419–00073420.
[144] Cothron Dep. at 103.
[145] Example ASO Cigna_TML00073419–~00073420.
[146] Vangeli Dep. at 59–61; Cothron Dep. at 109.
[147] Cigna's Vol. 18 Claims Charts: Cigna_TML00198466–72.

███████████████████████████████████████████

The plans require that Cigna reimburse Plaintiffs claims based on "[a]percentile of charges made by providers of such service or supply in the geographic area where the service is received" for MRC I or for MRC II "the provider's normal charge for a similar service or supply; or the 80th percentile of charges made by providers of such service or supply in the geographic area as compiled in database selected by [Cigna]."[148] For MRC I Cigna relied upon MultiPlan/ Viant OPR for outpatient facility claims which is populated with Medicare Charge Data at a national level.[149]The MRC I methodology makes no mention that Cigna would use a ████████████ ████████ bear no relationship to an R&C rate or the FAIR Health benchmark rate for SUD services, or to Plaintiffs' "normal charge for a similar service or supply" as represented in the MRC I SPDs and in Cigna's online legal disclaimer.

The MRC II methodology allows for the use of a Medicare-based reimbursement rate, but only when a Medicare rate is available and only if Cigna bases that rate "upon a methodology similar to a methodology utilized by Medicare for a similar service in the geographic market" as represented in the MRC II SPDs and in Cigna's online legal disclaimer. There isAs Cigna recognizes, there are no Medicare raterates for SUD treatment facilities, and I saw no evidence that Cigna's methodology is similar to Medicare's methodology.

Cigna and MultiPlan's repricing methodologies and reimbursement rates are premised upon Medicare data purchased by Cigna and MultiPlan that they use to produce arbitrary, unreliable and unjust reimbursement rates for Plaintiffs' SUD services that are a nominal percentage of the charges and far from Plaintiffs' usual, reasonable and customary charges. Cigna's experts contest that Plaintiffs charges were not "reasonable" in light of what other Plaintiffs were charging for the same service.[150] Unfortunately they fail to recognize that Cigna and MultiPlan entered into Global Agreements and Single-Claim Agreements paying much higher percentages of billed charges than Cigna ultimately did. The fact the Defendants were willing to enter into agreements at these rates indicates that they were in fact reasonable.

| Provider | Date | Global Agreement Percentage | Bates No. |
|---|---|---|---|
| TML Recovery | 10/5/2015 | ████████████ | MPL_Cigna0007746 |
| DR Recovery Encinitas | 3/6/2015 | ████████████ | MPL_Cigna0007745 |
| Pacific Palms Recovery | 5/26/2017 | ████████████ | PPR_CIGNA00000074 |
| Woman's Recovery Center | 10/20/2017 | ████████████ | WRC_CIGNA00000019 |
| Southern California Addiction Center | 6/5/2017 | ████████████ | MPL_Cigna0007744 |

As a clinician who has been practicing for nearly 40 years and who has been intimately in an array of treatment programs located in a number of states including California Plaintiffs charged prices are reasonable and customary based on their geographic location and type of services they provide.

---

[148] Sample SPDs: Cigna_TML00019837; Cigna_TML00025225–6.
[149] Gompper Dep. at 54, 75, 80.
[150] Mr. O'Brien's Report at 11.

These reimbursement rates were arbitrary in that there is no evidence to indicate Cigna and MultiPlan arrived at these purported R&C reimbursement rates by analyzing data of billed charges made by healthcare professionals or facilities in the same geographic area for the same procedure codes. In fact, the evidence demonstrates that Cigna and MultiPlan arrived at these rates by analyzing claims data for different providers of different services in different geographic areas. ~~It~~[151] As demonstrated by Cigna C-Suite emails which read ██████████ ███████████████████████ it appears more likely than not that Cigna and MultiPlan arrived at these reimbursement rates not in an effort to fairly determine the R&C rates, but rather to decrease their spend and increase their own profits.[152]

████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████

───────────────



███████████████████████████████████████████████ [153] The claims data for the sample patients in this action demonstrates that Cigna and MultiPlan ████████████████████████████████████████████████ [154] For example, Cigna's claims data indicates that for one of the sample patient's claims, the provider billed $3,418.00 for its services. ~~50~~[155] The sum paid to the provider was only $~~369.04.~~[51]369.04.[156] ██████████████████████████████ The provider in this instance received ~10% of the amount billed, ████████████████████████████████ ██████████████████████

████████████████████████████████████████████████ spending on SUD treatment at a time when a million Americans have died from a drug poisoning. Cigna should have been implementing initiatives and strategies to increase coverage and access to SUD treatment.

    **2.** **There is no Medicare rate for inpatient or outpatient SUD services billed by residential treatment facilities such as Plaintiffs, and** ████████████ ████████████████████████████████████████████████ ████████████████████████████████

████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████

████████████████████████████████████████████████ SUD providers are tasked with the responsibility of treating someone who can

[151] Cothron Dep. at 81–82.
[152] Cigna_TML0017624.
[153] Example ASO Cigna_TML00073419–00073420; Cothron Dep. at 103; Example ASO Cigna_TML00073419¬–00073420
[154] Cigna_TML00195707.
[155] Cigna's Claim Report Vol. 18 for DR Recovery Patient Jacob Jones Cigna_TML00198472, beginning column HR, row 15.
[156] *Id.*, also known as the allowed amount, column HT.
[157] *Id.*, columns HV and HW.

leave the treatment facility and gain access to alcohol, prescription drugs, and illegal substances, such as fentanyl analogs. We are responsible not only to the patients but feel an obligation to the public at large. Many people with SUDs are not only a danger to themselves but to others. For example, people with SUDs may commit crimes, such as drug dealing, as a consequence of their SUD. SUDs entail a plethora of risks that are less common at inpatient ~~psychiatric~~<u>acute care</u> hospitals and typically not encountered at SNFs.

With increased risks, come increased duties and associated costs, which are reflected in amounts SUD treatment facilities bill. SUD treatment facilities may provide inpatient services, which entail less patient exposure to the outside community, or outpatient services, which entail greater patient exposure to the outside community and related risks to the patient's SUD recovery. By definition, ████████████████████████ services are not outpatient services and do not entail as much exposure to the outside community and associated risks to recovery. SUD treatment facilities provide varying levels of services not provided by ████████ ████████████████████████████████████████████████

~~⁵  Cigna_TML00195707~~
~~⁶  Cigna's Claim Report Vol. 12 for DR Recovery Patient Jacob Jones Cigna_TML00195703, column DJ.~~
~~⁷  *Id.*, also known as the allowed amount, column DL.~~
~~⁸  *Id.*, columns DM and DO.~~



If a patient with an SUD is not successful in an outpatient setting, SUD treatment providers may decide that another treatment setting or level of care is more appropriate, whether inpatient, residential, partial hospitalization, or maybe a more intensive outpatient. Each level of care requires a different type of service, investment of time, and resources.[159][160] Beyond levels of care, each patient at an SUD treatment facility often requires different specialized services, many of which are not provided at ██████████████████████████████████████ ██████████████████████████████████████████████ For example, a marital or family issue may be at the center of someone's substance use. In this scenario, I would connect the patient with a family therapist to assess this issue and to work with the treating physician to develop a treatment plan. These types of specialized services are not available at many ██████████████████████████ Similarly, many ████████ may employ physical therapists or many ██████████████████ may employ wound care physicians or a radiologist, which are rarely needed or present in SUD treatment facilities.

Cigna and MultiPlan's ██████████████████████████████████████████ ██████████

[159] https://www.cms.gov/glossary?term=skilled+nursing+facility&items_per_pg.=10&viewmode=grid#:~:text=A%20facility%20(which%20meets%20specific,treatment%20available%20in%20a%20hospital.
[159] https://www.cms.gov/Research-Statistics-Data-and-Systems/Research/ResearchGenInfo/Downloads/DataNav_Glossary_Alpha.pdf
[160] For details in the details of the various levels of care see, https://www.medicaid.gov/state-resource-center/innovation-accelerator-program/iap-downloads/reducing-substance-use-disorders/asam-resource-guide.pdf

███████ is arbitrary and unreasonable considering the significant differences in treatment, care, risks, resources, and staffing. The services are not the same, and the Medicare rates for these differing facilities do not reflect what SUD providers in the same geographic area usually charge for SUD treatment. Indeed, Cigna and MultiPlan's ███████ of Plaintiffs' billing codes to Medicare rates resulted in reimbursement amounts that were generally between ~~seven~~7 and 20 percent of Plaintiffs' billed charges. These Medicare-based rates are not SUD R&C rates, such as those generated by FAIR Health.

>    3.    Despite Cigna's payment obligations under the sample patients' SPDs, Cigna and MultiPlan used biased data systems, administrative burdens, and deceptive practices to avoid paying, or to pay unreasonably low reimbursement rates for Plaintiffs' OON SUD services.

As discussed above, MultiPlan's Master Services Agreement with Cigna provides for ███████



---

[x] ~~https://www.cms.gov/glossary?term=skilled+nursing+facility&items_per_page=10&viewmode=grid#:~:text=A%20facility%20(which%20meets%20specific,treatment%20available%20in%20a%20hospital.~~

[xi] ~~For details in the details of the various levels of care see, https://www.medicaid.gov/state-resource-center/innovation-accelerator-program/iap-downloads/reducing-substance-use-disorders/asam-resource-guide.pdf~~

MultiPlan may bestow upon a provider the perception of in-network status with its network agreements known as "Global Agreements," but MultiPlan will not guarantee reimbursement at the negotiated network rate, and ███████████████████████████████████████ ████████████████████████████████████ In negotiating single-claim agreements, MultiPlan employed questionable coercive tactics, offering Plaintiffs negotiated rates far below the R&C rate and a fraction of the billed charges with an indication that if not accepted, Plaintiffs could expect an even lower Medicare-based rate.[161] As part of this negotiation process, MultiPlan conditions payment on the OON provider's agreement to waive the balance bill.[162]

There are additional examples of Cigna and MultiPlan's use of flawed methodologies, biased data systems, burdensome requirements, and deceptive practices to avoid paying, or pay unreasonably low reimbursement rates for, OON SUD services. ████████████████████



**4.**

---

[161] Sample SCA Letter from MultiPlan MPI_Cigna0002011 (states: "if you do not wish to sign the agreement, this claim is subject to a payment as low as 110% of Medicare rate."); TML Recovery Dep. of Nate Izzo at 111–113.

[162] Viant SCA MPI_Cigna0005592 ("Provider agrees not to balance bill..."); Vangeli Decl. ¶ 21.

[163] Cigna_TML00171786.

[164] Cigna_TML00171774 at slide 26.

[165] Cigna_TML00171797 at slide 13; Cigna_TML00171786.

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████

The claim charts I reviewed reflect a number of claims where Cigna determined the allowed amount to be $0. When cross-referencing those patients' line item claims to the patients' charts, it is apparent that Cigna denied definitive drug testing claims pursuant to its Medical Coverage Policy for Drug Testing, which provides for presumptive drug testing not to exceed one test per date of service up to 32 tests per year, and definitive drug testing not to exceed one test per date of service up to 16 tests per year, subject to limiting factors.[166]

Another group of claim denials were for services Cigna deemed not medically necessary. However, the vast majority of these claims were "administrative" denials for an alleged lack of documentation of the medical necessity, without any clinical review of the claim. The patient charts reflect the providers' compliance with Cigna's repeated requests for records, yet no acknowledgment by Cigna that it had received the requested records.[167] There were some claim denials for lack of medical necessity where the claim was reviewed by a medical director. However, the medical director's opinion conflicted with the records in the patient's chart. Furthermore, it has been well-documented that Cigna's medical directors have a custom and practice of denying claims without ever reviewing the medical records.

According to investigative reporting conducted by the independent, not-for-profit ProPublica news publication and published on March 25, 2023, Cigna "has built a system that allows its doctors to instantly reject a claim on medical grounds without opening the patient file, leaving people with unexpected bills, according to corporate documents and interviews with former Cigna officials. Over a period of two months last year, Cigna doctors denied over 300,000 requests for payments using this method, spending an average of 1.2 seconds on each case"[168]

The denials in this case are consistent with the initiatives described in the ██████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████

One such email message read, ████████████████████████████████████

████████████████████████████████ Cigna_TML00171620,[169] The new one-size-fits all rule denying coverage of quantitative (definitive) testing after a negative qualitative (presumptive) test is inconsistent with medical standards. Presumptive drug testing does not reliably identify many

[166] Cigna's Drug Testing Policy Ex. 5 of Nemecek Dep. not bates labeled.

[167] See above proof of transmission of patient records to Cigna.

[168] https://www.propublica.org/article/cigna-pxdx-medical-health-insurance-rejection-claims#:~:text=The%20company%20has%20built%20a,interviews%20with%20former%20Cigna%20officials.

[169] Cigna_TML00171620.

substances, including fentanyl, methadone, Ambien, Ritalin, ketamine, MDA, kratom, pregabalin, and tapentadol.[170] The presumptive methodology often yields false negatives and lacks specificity, meaning that it does not distinguish between discrete analytes, such as oxycodone and oxymorphone within the opiate class.[171] At a time when more than 101,750 Americans are dying of drug poisonings, and more than 68 percent of those poisonings involve synthetic opioids like illegal fentanyl analogs, it is often medically necessary to conduct frequent definitive drug testing for many patients in the active treatment phase of SUD management.

## VII. Compensation

I am being compensated at $1,250.00 per hour for my review of materials and preparation of this report.

## VIII. Exhibits
  • Curriculum Vitae
  • List of cases in which expert testimony was provided

Dated: ~~March 30~~July 9, 2023

By:  *Andrea G. Barthwell*
     Andrea G. Barthwell, MD, DFASAM

---

[170] American Society of Addiction Medicine Consensus Statement on Appropriate Use of Drug Testing in Clinical Addiction Medicine: https://journals.lww.com/journaladdictionmedicine/Fulltext/2017/06001/Appropriate_Use_of_Drug_Testing_in_Clinical.1.aspx; Gunja. The clinical and forensic toxicology of Z-drugs: https://pubmed.ncbi.nlm.nih.gov/23404347/; Urine Drug Testing LCD. CMS On-Line Manual, Publication 100-02, Medicare Benefit Policy Manual, Chapter 15, §§80.0, 80.1.1, 80.2. Clinical Laboratory services: https://www.cms.gov/medicare-coverage-database/view/lcd.aspx?LCDId=36037&DocID=L36037.

[171] American Society of Addiction Medicine Consensus Statement on Appropriate Use of Drug Testing in Clinical Addiction Medicine: https://journals.lww.com/journaladdictionmedicine/Fulltext/2017/06001/Appropriate_Use_of_Drug_Testing_in_Clinical.1.aspx.

| Summary report: Litera Compare for Word 11.4.0.111 Document comparison done on 7/10/2023 9:29:35 AM | |
|---|---|
| **Style name:** Default Style | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** CIGNA Expert Report- Dr. Andrea Barthwell  2023.03.30 4869-5096-0974 v.2.pdf | |
| **Modified filename:** Supp. CIGNA Expert Report- Dr. Andrea Barthwell.pdf | |
| **Changes:** | |
| Add | 567 |
| Delete | 203 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 8 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 778 |

# EXHIBIT E-6

REDACTED VERSION OF DOCUMENT PROPOSED TO BE

FILED UNDER SEAL L.R. 79-5.2.2(c)

CONFIDENTIAL, ATTORNEYS' EYES ONLY

```
 1              UNITED STATES DISTRICT COURT
 2        CENTRAL DISTRICT OF CALIFORNIA, CENTRAL DIVISION
 3
 4   TML RECOVERY, LLC, et al.,
 5              Plaintiffs,
 6        vs.                        No.
                                     8:20-cv-00269-DOC-JDE
 7   CIGNA CORPORATION, et al.,
 8              Defendants.
     _____/
 9
     CIGNA HEALTH AND LIFE
10   INSURANCE COMPANY, et al.,
11        Counterclaim Plaintiffs,
             vs.
12
     TML RECOVERY, LLC, et al.,
13
          Counterclaim Defendants.
14   _____/
15
16           -- CONFIDENTIAL, ATTORNEYS' EYES ONLY --
17
18   VIDEO-RECORDED DEPOSITION OF ANDREA G. BARTHWELL, M.D.
19                 Remote Zoom Proceedings
20                   Chicago, Illinois
21                 Tuesday, July 11, 2023
22
23   REPORTED BY:
24   LESLIE ROCKWOOD ROSAS, RPR, CSR 3462
25   Pages 1 - 188                    Job No. 6005372

                                        Page 1
```

CONFIDENTIAL, ATTORNEYS' EYES ONLY

```
1                   UNITED STATES DISTRICT COURT
2          CENTRAL DISTRICT OF CALIFORNIA, CENTRAL DIVISION
3
4      TML RECOVERY, LLC, et al.,
5                   Plaintiffs,
6            vs.                        No.
                                        8:20-cv-00269-DOC-JDE
7      CIGNA CORPORATION, et al.,
8                   Defendants.
       _____/
9
       CIGNA HEALTH AND LIFE
10     INSURANCE COMPANY, et al.,
11         Counterclaim Plaintiffs,
                vs.
12
       TML RECOVERY, LLC, et al.,
13
           Counterclaim Defendants.
14     _____/
15
16            -- CONFIDENTIAL, ATTORNEYS' EYES ONLY --
17
18            Video-recorded deposition of ANDREA G.
19     BARTHWELL, M.D., taken on behalf of Defendants, Remote
20     Zoom Proceedings from Chicago, Illinois, beginning at
21     2:17 p.m. Central Daylight Time and ending at 7:12 p.m.
22     Central Daylight Time, on Tuesday, July 11, 2023, before
23     Leslie Rockwood Rosas, RPR, Certified Shorthand Reporter
24     No. 3462.
25
```

                                                      Page 2

CONFIDENTIAL-ATTORNEYS' EYES ONLY

```
1    APPEARANCES:

2    FOR THE PLAINTIFFS:

3         ARNALL GOLDEN GREGORY

4         BY: RICHARD T. COLLINS, ESQ.

5              LANDEN BENSON, ESQ.

6              THOMAS E. KELLY, ESQ.

7         2100 Pennsylvania Avenue NW, Suite 350S

8         Washington, D.C. 20037

9         (202) 677-4917 (Mr. Collins)

10        (404) 873-5623 (Mr. Benson)

11        (404) 873-8133 (Mr. Thomas)

12        rich.collins@agg.com

13        landen.benson@agg.com

14        tom.kelly@agg.com

15

16   FOR THE DEFENDANTS and COUNTERCLAIM PLAINTIFFS:

17        COOLEY LLP

18        BY: MATTHEW CAPLAN, ESQ.

19              CLAIRE OLIN, ESQ.

20        3 Embarcadero Center, 20th Floor

21        San Francisco, California 94111

22        (415) 693-2164 (Mr. Caplan)

23        (858) 550-6102 (Ms. Olin)

24        mcaplan@cooley.com

25        colin@cooley.com
```

                                             Page  3

CONFIDENTIAL ATTORNEYS' EYES ONLY

```
1    APPEARANCES (Continued):

2

3    FOR THE DEFENDANTS MULTIPLAN and VIANT:

4         PHELPS DUNBAR LLP

5         BY: TAYLOR J. CROUSILLAC, ESQ.

6         400 Convention Street, Suite 1100

7         Baton Rouge, Louisiana 70802-5618

8         (225) 376-0219

9         taylor.crousillac@phelps.com

10

11

12   Also Present:

13        Maddie Ahlers

14        Brandon Rackowski, Videographer

15

16

17

18

19

20

21

22

23

24

25
```

Page 4

CONFIDENTIAL ATTORNEYS' EYES ONLY

5

1                              I N D E X

2

3

4        Tuesday, July 11, 2023

5

6        WITNESS                                    EXAMINATION

7

8        ANDREA G. BARTHWELL, M.D.

9

10          BY MR. CAPLAN                               9

11          BY MR. CROUSILLAC                         136

12

13

14             QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:

15                          PAGE      LINE

16                           16         1

17

18

19

20

21

22

23

24

25

                                                    Page 5

CONFIDENTIAL - ATTORNEYS' EYES ONLY

6

```
 1                    DEPOSITION EXHIBITS

 2                  ANDREA G. BARTHWELL, M.D.

 3      NUMBER              DESCRIPTION              IDENTIFIED

 4    Exhibit 1   Report of Andrea G. Barthwell,          7

 5                M.D., DFASAM, 03/30/23

 6    Exhibit 2   Supplemental Report of Andrea G.        7

 7                Barthwell, M.D., DFASAM, 07/09/23

 8    Exhibit 3   DDR Patient, Plan and Claims           52

 9                spreadsheet

10    Exhibit 4   Email from Thomas Despard to           87

11                Thomas Despard and Kayla

12                Maciejewski, 12/11/19,

13                Cigna_TML00095850

14    Exhibit 5   Viant Facility U&C Review,            148

15                Oupatient Review (OPR) Model, June

16                2016, MPI_Cigna0007113 - 120

17    Exhibit 6   MultiPlan Negotiation Services        175

18                Global Agreement, 06/05/17,

19                MPI_Cigna0007744

20

21

22

23

24

25
```

Page 6

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1                Chicago, Illinois; Tuesday, July 11, 2023

 2                     2:17 p.m. Central Daylight Time

 3

 4                          PROCEEDINGS

 5                          --oOo--

 6           (Exhibit 1, Report of Andrea G. Barthwell, M.D.,

 7           DFASAM, 03/30/23, was marked for identification

 8           by counsel electronically.)

 9           (Exhibit 2, Supplemental Report of Andrea G.

10           Barthwell, M.D., DFASAM, 07/09/23, was marked

11           for identification by counsel electronically.)

12           THE VIDEOGRAPHER:  Good afternoon.  We are going

13   on the record at 2:17 p.m. Central on Tuesday, July 11th,

14   2023.

15           This is Media Unit 1 of the video-recorded        14:18:09

16   deposition of Dr. Andrea Barthwell, taken by counsel for

17   Defendant, in the matter of TML Recovery, LLC versus

18   Cigna Corporation, filed in the United States District

19   Court for the Central District of California, Case Number

20   8:20-cv-0269-DOC-JDE.                                     14:18:37

21           The location of the deposition is Veritext,

22   located at One North Franklin, Suite 3000, Chicago,

23   Illinois 60606.

24           My name is Brandon Rackowski representing

25   Veritext Legal Solutions, and I am the videographer.  The  14:19:07
```

Page 7

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    court reporter is Leslie Rosas from the firm Veritext

 2    Legal Solutions.

 3            Counsel and all present, including remotely,

 4    will now state their appearances and affiliations for the

 5    record, beginning with the noticing attorney.          14:19:25

 6            MR. CAPLAN:  Good afternoon.  My name's Matt

 7    Caplan.  I represent the Cigna defendants and

 8    counterclaim plaintiffs, and with me today is Claire

 9    Olin.

10            MR. CROUSILLAC:  This is Taylor Crousillac.  I    14:19:39

11    represent Defendants Viant, Inc., and MultiPlan, Inc.

12            MR. COLLINS:  And this is Rich Collins of Arnall

13    Golden Gregory on behalf of the plaintiffs and the

14    witness today.

15            MR. BENSON:  Landen Benson here on behalf of      14:19:55

16    plaintiffs as well with the firm Arnall Golden Gregory.

17            MR. KELLY:  This is Tom Kelly, also here on

18    behalf of plaintiffs, with Arnall Golden Gregory.

19            THE VIDEOGRAPHER:  Will the court reporter

20    please swear in the witness, and then counsel may        14:20:14

21    proceed.

22            THE REPORTER:  Yes.  Thank you.

23            Dr. Barthwell, if you would raise your right

24    hand, please.  Thank you.

25            You so solemnly state that the evidence you       14:20:22
```

Page 8

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    shall give in this matter shall be the truth, the whole

 2    truth, and nothing but the truth, so help you God?

 3            THE WITNESS:  I do.

 4            THE REPORTER:  Thank you.

 5            You may proceed, Counsel.                    14:20:34

 6

 7                       EXAMINATION

 8    BY MR. CAPLAN:

 9        Q.  Good afternoon, Dr. Barthwell.  You're appearing

10    as an expert witness today; is that correct?          14:20:39

11        A.  Yes.

12        Q.  And in these cases, who were you retained by as

13    an expert?

14        A.  Rich Collins of Arnall Golden & Gregory.

15        Q.  Who are you providing testimony on behalf of    14:20:51

16    today?

17        A.  TML Recovery and the other plaintiffs in the

18    case.

19        Q.  Do you know the names of the other plaintiffs?

20        A.  I do.  12 South LLC; Addiction Health Alliance  14:21:02

21    LLC; DR Recovery Encin- --

22        Q.  Encinitas.

23        A.  Encinitas, yes.  I recognize that, yes.

24            MMR Services; Women's Recovery Center; Pacific

25    Palms Recovery; Southern California Recovery Centers   14:21:25
```

Page 9

1    Oceanside; and Southern California Addiction Center,

2    Incorporated.

3        Q.  Have you been retained as an expert witness

4    before these cases?

5        A.  Yes, I have.                                    14:21:36

6        Q.  How many times?

7        A.  About a dozen.

8        Q.  Have you also been retained by these same

9    plaintiffs in other cases?

10       A.  I have.                                          14:21:48

11       Q.  What other cases?

12       A.  With United Healthcare.

13       Q.  Have you been retained by Mr. Collins or either

14   his current firm, Arnall Golden Gregory, or his prior

15   firm, Callahan & Blaine, in others matters?           14:22:04

16       A.  Only one other matter.

17       Q.  And what is that?

18       A.  That's with United Healthcare.

19       Q.  Have you been retained as an expert in a case

20   called RJ v. Cigna?                                     14:22:17

21       A.  Oh, yes.  Sorry.

22       Q.  And that case also involved the Arnall Golden

23   Gregory firm; is that right?

24       A.  It involves Richard Collins, yes, but he was not

25   with Golden Gregory at the time.                        14:22:34

                                              Page 10

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        Q.  And aside from the plaintiffs in these cases,

2    who has hired you as an expert witness?

3        A.  I beg your pardon.

4        Q.  Other than the plaintiffs in these cases and RJ,

5    since we've mentioned that, who else has retained you as        14:22:53

6    an expert witness?

7        A.  Oh, I would have to refer to my list of other

8    cases.  I really didn't prepare and commit them to memory

9    for this.  If you would like me to, I can pull up a

10   document from my phone.                                         14:23:14

11       Q.  No.  We can just confirm that the list of cases

12   you provided to us is complete, accurate, that's good

13   enough for today.

14       A.  It -- it is.  The list of cases that I've

15   provided to you is complete and accurate.                       14:23:27

16       Q.  Do you understand that I'm going to be asking

17   you questions today and you're answering them under oath?

18       A.  I do understand that.

19       Q.  And do you understand that means you have an

20   obligation to tell the truth today?                             14:23:41

21       A.  I do understand that.

22       Q.  Do you understand that the court reporter is

23   creating a written transcript of your testimony today?

24       A.  I do.

25       Q.  Do you understand that your deposition is being        14:23:52

                                                        Page 11

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   videotaped today?

2        A.  I do.

3        Q.  Do you understand that your testimony today,

4   either the written transcript or the video, may be played

5   in court in this matter?                                14:24:04

6        A.  I understand, yes.

7        Q.  Is there anything that's preventing you from

8   giving your best, most truthful testimony today?

9        A.  That's a two-part question.  You said my best

10  and most truthful.  There's nothing preventing me from   14:24:19

11  giving my most truthful, but I am very tired today, as I

12  had prepared to be deposed yesterday, and as a result of

13  not being able to be deposed, I was not able to sleep

14  well last night, and I'm extremely tired.

15          And I had to conduct a full day of business and   14:24:38

16  get it done by 2:00 to join you here.  So I've put in

17  eight hours already before coming here.  So I'm quite

18  tired.

19       Q.  Is there anything that would prevent you from

20  being deposed today?                                     14:24:50

21       A.  Nothing.

22       Q.  Can we agree that if you don't understand any of

23  my questions during the deposition, you'll let me know?

24       A.  I will let you know.

25       Q.  And I want to be mindful of the time today, but  14:25:01

                                                      Page 12

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    if you need a break at any time, you'll let us know.  And

 2    I'm happy to accommodate that as long as there's not a

 3    question pending.

 4          Is that all right?

 5      A.  Thank you.  That is all right.                    14:25:13

 6      Q.  Do you have an understanding as to why the

 7    plaintiffs in these matters are suing Cigna and

 8    MultiPlan?

 9      A.  I do.

10      Q.  And what is that understanding?                   14:25:23

11      A.  My understanding is that they would like to be

12    paid for the services that they provided the individuals

13    covered by Cigna, who had a diagnosis, sought treatment,

14    received services, and for which they billed Cigna.

15      Q.  Do you know what plaintiffs' legal claims are in  14:25:42

16    these cases?

17      A.  I don't understand what you mean by their legal

18    claims.  Are you asking me if I read the pleading?

19      Q.  Not necessarily that you read the pleading, but

20    do you know what the plaintiffs are suing Cigna and      14:25:59

21    MultiPlan for?

22      A.  Yes.

23      Q.  All right.  And I know you just gave me the

24    description, but do you know what the actual legal cause

25    of action the plaintiffs are suing for?                 14:26:14
```

Page 13

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        A.  Yes.  It -- in lay terms or legal terms?

 2        Q.  Your best answer based on the question.

 3        A.  Yeah, my best answer is that they would like to

 4   be paid for services that they provided, that Cigna took

 5   actions to either reduce the lay or gut the claims, and      14:26:35

 6   that they relied on the contract between them and Cigna

 7   to -- in order to understand that they would be paid for

 8   the services that they delivered.

 9        And that Cigna did not meet the terms of the

10   contract and did not pay them in -- in the instances that    14:27:02

11   they billed -- or pay them in the way in which they

12   billed.

13        Q.  And what is the contract that you were

14   referencing in that last answer?

15        A.  Well, again, I'm using "contract" in a lay way,     14:27:14

16   and I'm certain that there's a legal definition of the

17   contract.  But in lay terms, they had an understanding

18   that they were given an authorization to provide services

19   to individuals who had a diagnosis for which they would

20   need services, individuals whose diagnosis would dictate     14:27:33

21   what services were provided.

22        They then, in fact, in turn provided those

23   services, and when they put together a record of the

24   services that they provided and submitted it to Cigna,

25   Cigna did not pay them according to their understanding.     14:27:52
```

Page 14

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        Q.  I understand that you have copies of the two

 2   reports you issued in this case in front of you; is that

 3   right?

 4        A.  That's correct.

 5            MR. CAPLAN:  Because I was using Exhibit Share,    14:28:12

 6   I've marked the March 30th report as Exhibit 1, and the

 7   report dated July 9th and received yesterday, July 10th,

 8   as Exhibit 2.

 9            If everyone on Exhibit Share, you can just let

10   me know, confirm that you've got access to those.          14:28:28

11        Q.  And Dr. Barthwell, does that make sense, the

12   first report, Exhibit 1, the second report, Exhibit 2?

13        A.  Yes, it does.

14            MR. CROUSILLAC:  Yeah.  And Matt, they're on

15   Exhibit Share.                                             14:28:41

16            MR. CAPLAN:  Rich, did you get them, too?

17            MR. COLLINS:  Yes.

18        Q.  BY MR. CAPLAN:  All right.  Are all of the

19   opinions and conclusions you intend to testify to in this

20   case included in Exhibits 1 and 2, your two reports?       14:28:54

21        A.  Yes, they are.

22        Q.  There's a lot of references to a case called RJ

23   v. Cigna Behavioral Health in both of your reports.  What

24   is the RJ case?

25        A.  I'm sorry, you broke up.                          14:29:12
```

Page 15

CONFIDENTIAL ATTORNEYS' EYES ONLY

```
 1        Q.  I was asking what's your understanding of the RJ

 2   case that's referenced in your reports in these cases?

 3        MR. COLLINS:  I'm going to object at this point

 4   and on the grounds of attorney work product to the extent

 5   that Dr. Barthwell has not been disclosed as an expert,      14:29:31

 6   officially disclosed as an expert in the RJ matter,

 7   though we have disclosed to Cigna's counsel and

 8   MultiPlan's counsel in the RJ matter that she was

 9   retained as a consultant and potential expert for the

10   merits phase of that case.                                   14:29:55

11        And it's my understanding that we have not

12   gotten to a point of making disclosures for the merits

13   phase of that case at this point.

14        MR. CAPLAN:  Okay.  I'm not asking about

15   anything to do with her separate work on RJ.  I'm only       14:30:11

16   asking questions based on what's included in her report.

17   And it's referenced throughout both of the reports, and I

18   think it's a fair question to ask, one, what her

19   understanding is, and then I'll have some followups.

20        MR. COLLINS:  Well, I disagree because I think        14:30:33

21   it's clear in the RJ -- I mean in the report that

22   Dr. Barthwell makes clear she's not relying on any

23   information or materials from that RJ matter to support

24   any of the opinions or the factual statements in her

25   report.  So it's -- it's irrelevant in addition to being     14:30:51
```

Page 16

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    work product to the extent she hasn't been disclosed yet.

2            MR. CAPLAN:  Rich, it's in both reports.

3            MR. COLLINS:  I understand.

4            MR. CAPLAN:  Are you -- are you literally

5    instructing her not to answer a question based on what's        14:31:06

6    included in two reports you served in this case?

7            MR. COLLINS:  I'm instructing her to not answer

8    the question that was posed, which is -- on the grounds

9    of work product, which is my privilege, to the extent

10   that her understanding of that case.  Beyond just what's       14:31:19

11   disclosed in her report in terms of what she's reviewed,

12   but her understanding in that case would be our work

13   product at this point until she's disclosed as an expert.

14           The fact she is an expert or a consultant that

15   was retained, again, we -- we disclosed that, and all the      14:31:36

16   lawyers on this Zoom call understand why.  But she has

17   not been disclosed as an expert in that case, and

18   therefore, anything she has to say about the nature of

19   that case, in addition to her opinions, is our work

20   product.                                                        14:31:53

21           So, yeah, I'm going to have to instruct her on

22   that -- on that question.

23       Q.  BY MR. CAPLAN:  Why is the RJ v. Cigna

24   Behavioral Health case mentioned so often in the two

25   reports you issued in these cases?                              14:32:08

                                                       Page 17

CONFIDENTIAL ATTORNEYS' EYES ONLY

```
1            MR. COLLINS:  That's still going to have -- I'm

2    going to have to object as attorney work product.

3            MR. CAPLAN:  Rich, it's not attorney work

4    product.  It's the report you served in this case.  I can

5    start reading the quotes from those, which I'll get to,        14:32:26

6    but it's absolutely ridiculous that you're instructing

7    her not to answer a question based on why she included

8    material in the reports you served in this case.

9            MR. COLLINS:  I understand what you're saying,

10   and the fact that there's references to it in the report       14:32:39

11   is one thing, but to ask her --

12           MR. CAPLAN:  And I'm asking why she -- Rich, the

13   question was why she included those references.  There is

14   no basis to object to a question about why she included

15   things in her reports.                                         14:32:54

16           MR. COLLINS:  Except to the extent -- all right.

17   Let me put it this way, then.

18           MR. CAPLAN:  It's not work product.  Rich, it's

19   not work product in this case.  It's in her report that

20   you served, two reports that you served.                       14:33:04

21           MR. COLLINS:  Okay.  Give me one second, and

22   I'll explain my objections.

23           She can explain the fact that there's these

24   references in the report and that she was retained in RJ,

25   but to the extent that you want to find out why would          14:33:17
```

Page 18

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    there be a comparison between the two cases and why there

2    would be a reference to it, again, that -- that gets into

3    our work product --

4          MR. CAPLAN:  Rich, I'm literally asking why she

5    included words in her report.  That's not your work          14:33:32

6    product.  That's her work product.  Or are you telling me

7    you wrote the report?

8          Q.  Dr. Barthwell, did you write Exhibit 1?

9          A.  Yes, I did.

10         Q.  Dr. Barthwell, did you write Exhibit 2?          14:33:46

11         A.  Yes, I did.

12         Q.  Why do you reference RJ v. Cigna Behavioral

13   Health in Exhibits 1 and 2?

14         MR. COLLINS:  And let me object again as

15   attorney work product.  I will let her answer the          14:33:57

16   question.  Again --

17         MR. CAPLAN:  Rich, she just said it was her work

18   product.  Which one is it?  Did you write the reports or

19   did she?

20         MR. COLLINS:  Matt, I didn't even finish my          14:34:06

21   objection.  I said attorney work product to the extent --

22   and I'm asking -- I'm letting the witness answer the

23   question, but I want to caution the witness to not

24   disclose anything we discussed about the RJ case in terms

25   of what that case is about.          14:34:22

Page 19

```
 1          MR. CAPLAN:  I'm not asking for your

 2   discussions.  I'm asking why she included references to

 3   the RJ litigation in her reports.

 4          MR. COLLINS:  And that's why I limited my

 5   objection.                                            14:34:34

 6      Q.  BY MR. CAPLAN:  Dr. Barthwell, why in the

 7   reports you issued in this case, did you repeatedly

 8   reference the RJ v. Cigna Behavioral Health litigation?

 9          MR. COLLINS:  And I'll object to the insertion

10   of the term "repeatedly," but otherwise, you can answer  14:34:49

11   the question with the limited instruction about not

12   disclosing our communications about that case.

13          THE WITNESS:  I did not prepare today to discuss

14   RJ at all.  I'm going to answer this question to the best

15   of my ability.  In the preparation of Exhibit 1 and      14:35:09

16   Exhibit 2, I relied on things that I have reviewed, cases

17   of this nature in the past, cases in which there have

18   been findings, literature that refers to these kinds of

19   issues.

20          I don't recall more than one reference to the RJ  14:35:35

21   in here, and if there are more than that, I'd be happy to

22   look at that in context and respond to that question.

23          But under the factual summary, I was reporting

24   in this report that I had access to that material.  And

25   this may violate what Rich has advised me because I was   14:35:59
```

Page 20

CONFIDENTIAL ATTORNEYS' EYES ONLY

1    of the understanding that there was a concern that I was

2    using the findings in the depositions from RJ to inform

3    my opinions here.

4           And when Rich brought that concern to me, I

5    assured him that my initial report was developed before I      14:36:17

6    even got any of the materials related to the RJ case.

7    But I did disclose that I had those materials to try to

8    make clear in Exhibit 2 that those materials were

9    reviewed after the report was drafted.

10          If you can direct me to any other references to      14:36:36

11   RJ other than that clarifying reference, I'm happy to

12   look at it in context.

13          But I lost my preparation for the deposition,

14   and I didn't at all prepare to discuss RJ because I

15   wasn't here to do RJ today.  But I'm happy to look at any      14:36:53

16   reference in context and explain why it's there.

17       Q.  BY MR. CAPLAN:  Okay.  And just to clarify one

18   thing from your prior answer, you drafted the report that

19   was Exhibit 1 before you received access to the materials

20   from the RJ case?      14:37:10

21       A.  Either received access to or reviewed them.  And

22   I would have to review my records in detail to make sure

23   I hadn't received some of the materials, but I clearly

24   drafted it before I had reviewed those materials.

25       Q.  When did you finish drafting Exhibit 2?      14:37:31

Page 21

CONFIDENTIAL ATTORNEYS' EYES ONLY

1        A.   11 p.m. Sunday, July 9th.

2        Q.   And 11 p.m. Central Time?

3        A.   Yes.

4        Q.   When did you provide a copy of Exhibit 2 to

5   Mr. Collins and his colleagues?                          14:37:58

6        A.   About 11:15.

7        Q.   Also on Sunday, July 9th?

8        A.   Yes.

9        Q.   Why did you prepare a supplemental report in

10  these cases?                                             14:38:11

11       A.   I prepared the initial report based upon the

12  material that I had that didn't contain any of the facts

13  of the case.  It didn't contain the medical records that

14  I was provided.  It didn't take -- contain the analyses

15  of the billing, nor did it contain any of the            14:38:30

16  depositions.

17            The initial report was based on a general

18  understanding of what I was going to be reviewing and the

19  nature of the case, but as more material was provided to

20  me, it was clear that the report needed to be both        14:38:51

21  supplemented and revised and certain references taken

22  out, other references added to, because of the materials

23  that I had provided to me after finishing the first

24  report sometime in the month of March.

25       Q.   Do you recall when you were hired to work on the  14:39:15

                                                    Page 22

CONFIDENTIAL ATTORNEYS' EYES ONLY

```
 1    cases you're testifying about today?

 2         A.  I'm -- I believe it was in the winter or late

 3    winter of '22, if not the fall.  But none of the

 4    materials that were added to this report two became

 5    available until in the last couple months as the          14:39:43

 6    depositions were being completed.

 7              And as the depositions were completed and the

 8    facts of the matter as reported by those deposed became

 9    clear, it allowed me to go back and review again other

10    material, including the medical records and -- for more    14:40:00

11    clarification.

12         Q.  Okay.  Were you hired in these cases before or

13    after the United case with these same plaintiffs?

14         A.  After the United case.

15         Q.  Were you hired in this case before or after the   14:40:16

16    RJ case?

17         A.  I don't remember which one I was hired for

18    first, but this one began to move forward.

19         Q.  What were you asked to do to issue your report

20    in these cases?                                            14:40:35

21         A.  I was asked to review the material provided to

22    me and formulate my opinions.

23         Q.  Nothing more specific than that?

24         A.  No.  I generally don't get any more specific

25    instruction on any of these cases than that.              14:40:53
```

Page 23

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        Q.  Did you make any assumptions in rendering your

 2    opinions in these cases?

 3        A.  My opinions are based on my training,

 4    experience, the facts, the review of the facts, and

 5    analysis of the materials provided to me.              14:41:08

 6        Q.  Did you make any assumptions in rendering your

 7    opinions?

 8        A.  No.

 9        Q.  With respect to the opinions you've issued on

10    these cases, how would you describe your expertise?     14:41:25

11        A.  Thorough, complete, impeccably matched to the

12    task.

13        Q.  I was asking more about the subject matter.

14        A.  I beg your pardon.

15        Q.  I was asking more about the subject matter.  How   14:41:46

16    would you describe your expertise related to these cases?

17        A.  Well, I've had -- as these cases, does that

18    include the United case or just this case and the RJ

19    case, which I'm not prepared to discuss today?

20        Q.  I'm talking about the -- so when I say "these   14:42:04

21    cases," there's eight separate lawsuits that we're

22    talking about today.  Each one of the separate plaintiffs

23    has a separate lawsuit.

24        A.  Okay.

25        Q.  So that's why I'm referring to it in the plural.   14:42:17
```

Page 24

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          But if we all agree and it's easier for you

2     today and, you know, it's more understandable, I can say

3     "this case," if that will help you understand.

4          MR. COLLINS:  Yeah, I think given the fact that

5     it was consolidated for at least discovery in all          14:42:31

6     pretrial purposes, we can call it the -- "the case."

7          Q.  BY MR. CAPLAN:  Is that okay with you,

8     Dr. Barthwell?

9          A.  Well --

10          MR. COLLINS:  The TML Recovery case.          14:42:43

11          THE WITNESS:  I just want to say in

12     clarification for why I asked you to clarify what you

13     meant by "these cases," you have been referring to

14     United, RJ, and this.  I wondered if you meant these

15     cases, or if the case that I'm here to be deposed on          14:42:57

16     today.

17          If we agree that I am talking about these cases,

18     this case, then the facts -- I'm -- I'm prepared to

19     discuss the facts of these -- of this matter.

20          Q.  BY MR. CAPLAN:  Yeah, that's a good point of          14:43:15

21     clarification.

22          When I said "these cases," I'm not referring to

23     the United case.  I'm not referring to RJ.  I'm just

24     talking about the eight plaintiffs we've got here today.

25          A.  Yes.  Thank you.  Because we did shift gear and          14:43:27

                                                        Page 25

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    you went from broad to narrow.  And in the -- in the

2    narrow matter here with these plaintiffs, as it relates

3    to the facts, I am prepared to -- as it relates to the

4    facts, I'm prepared to review them, analyze them, subject

5    them to my experience and training, and have my --       14:43:51

6    support my opinions.

7        Q.   Okay.  Do you consider yourself an expert in

8    insurance regulations?

9        A.   I'm not an expert in insurance regulation, no.

10       Q.   You're also not a lawyer; is that correct?       14:44:07

11       A.   That's correct.

12       Q.   Do you consider yourself an expert in contract

13   interpretation?

14       A.   I'm not an expert in contracts.

15       Q.   Do you consider yourself an expert on insurance  14:44:18

16   payments?

17            MR. COLLINS:  Objection.  Vague and ambiguous.

18            THE WITNESS:  I have a lot of experience with

19   insurance payments.  And as it relates to the nature,

20   scope, and form of my opinions, I consider myself expert  14:44:37

21   enough to have rendered these opinions.

22       Q.   BY MR. CAPLAN:  Do you consider yourself an

23   expert in terms of how insurance companies calculate

24   payments under their plans and policies?

25       A.   I have had to become expert in understanding     14:44:52

Page 26

CONFIDENTIAL ATTORNEYS' EYES ONLY

1    that as I have worked more and more of these cases.  So,

2    yes, I would consider myself an expert as it relates to

3    the form and structure and extent of my opinions.

4        Q.  And that's based on your experience serving as

5    an expert witness in this and other cases?                14:45:16

6        A.  Well, not only that, but serving as a director

7    of facilities that have had to advocate over time for

8    payment, the contract with payors for payment, who have

9    had to defend bills that have been presented, who've

10   watched bills negotiated with payors.  So it's not just   14:45:41

11   based upon the expert work; it's based upon my actual

12   work.

13       Q.  How many hours did you spend on your initial

14   report in this case?

15       A.  I have not done a total of my hours, but as I     14:45:59

16   prepare each of my expert reports, I generally spend a

17   full-time, if not more, effort for around three weeks

18   getting the report finalized, and all of the time that

19   goes into reviewing the documents that have been provided

20   to me prior to that.                                       14:46:27

21       Q.  Do you have an estimate as to how much time you

22   spent on your initial report?

23       A.  Okay, I need to be clear as to what you're

24   asking.  Are you talking about when I first put pen to

25   paper to develop the report, or are you talking about the 14:46:44

Page 27

CONFIDENTIAL ATTORNEYS' EYES ONLY

```
 1   time that I spent reviewing the documents, which
 2   constituted tens of thousands of pages, before I sat down
 3   writing the report.  Which part of it are you asking
 4   about?
 5       Q.  All of the work that you put into drafting your      14:46:58
 6   initial report.
 7       A.  You used the term again there "drafting."  So do
 8   you mean the time when I began to write, or do you mean
 9   for me to include the time that I spent reading the
10   documents as I was formulating my opinion?                    14:47:15
11       Q.  How much have you billed the plaintiffs for your
12   work in this case?
13       A.  I've billed nothing.
14       Q.  Do you ever plan on billing them?
15       A.  I do.                                                 14:47:26
16       Q.  How much are you going to charge them for your
17   work in this case?
18       A.  I'm going to charge them $1,250 an hour.
19       Q.  For how many hours of work to date?
20       A.  I have no idea.                                       14:47:38
21       Q.  Are you keeping track of it anywhere?
22       A.  I am.
23       Q.  All right.  Where are you keeping track of the
24   amount of time you've spent working on this case?
25       A.  I keep track of it in my calendar.                   14:47:47
```

Page 28

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        Q.  When are you planning on billing the plaintiffs

 2   for your work in this case?

 3        A.  Now that this revised report is completed, I

 4   will probably set down to put together a bill for the

 5   work done to date.                                   14:48:01

 6        Q.  And to date, you haven't been paid anything?

 7        A.  I have not asked for any payment.

 8            THE REPORTER:  Excuse me.  To date, what,

 9   Counsel?  To date?

10        Q.  BY MR. CAPLAN:  You haven't been paid anything?   14:48:13

11        A.  I have not been paid anything to date.

12        Q.  Does your compensation depend --

13        A.  I'm sorry.  I'm sorry.  I did ask for a retainer

14   of $40,000.

15        Q.  Thank you.  And that's been paid?            14:48:29

16        A.  Yes.

17        Q.  Does your compensation at all depend on the

18   outcome of the case?

19        A.  Not at all.

20        Q.  Did anyone help you draft your reports?      14:48:40

21        A.  No.

22        Q.  Did you start your report in this case from

23   scratch?

24        A.  Yes.

25        Q.  Did you use your report from the United case in   14:48:54
```

Page 29

1     any way to help you develop your report in this case?

2          A.  Yes.

3          Q.  And can you describe that, please.

4          A.  Well, there is some elements in this report that

5     are common to the United report that have to do with        14:49:11

6     background.  There is a section -- you asked about the

7     United report so --

8          Q.  Correct.

9          A.  -- they're primarily background material, and

10    this was material that was added to the supplemental        14:49:27

11    report because the Cigna expert noted that I had not

12    provided detail as to the ASAM patient placement

13    criteria, nor described other kinds of material that's in

14    the public domain in my report.

15              Assuming that it being in the public domain and    14:49:49

16    a part of the insurance industry, I assumed I didn't have

17    to put it in my report, but I did want to respond to that

18    criticism that the expert made that my report was not

19    complete and thorough because I had not provided a

20    complete and thorough description of ASAM patient           14:50:11

21    placement criteria.

22         Q.  Did you talk to anyone, other than the

23    plaintiffs' lawyers, to help you prepare your report in

24    this case?

25         A.  No.                                                14:50:23

                                                        Page 30

CONFIDENTIAL ATTORNEYS' EYES ONLY

```
 1        Q.  Did you talk to any employees of any of the

 2   plaintiffs to help you come to your opinions and

 3   conclusions?

 4        A.  I'm sorry, did I talk to?

 5        Q.  Any of the plaintiffs' employees to help you      14:50:36

 6   come to your opinions and conclusions?

 7        A.  I did not.

 8        Q.  Has there ever been any sort of disciplinary

 9   proceeding initiated against you professionally or

10   otherwise?                                                 14:50:55

11        A.  No.

12        Q.  So I'm going to ask you some questions about

13   your reports.  I think we can rely on Exhibit 2, which is

14   your supplemental report, unless I ask you to look at

15   Exhibit 1, the initial report.                            14:51:11

16            Is that okay?

17        A.  Yes.

18        Q.  So in the first sentence of the first paragraph

19   on Exhibit 2 under "Introduction," you write, "I have

20   provided in this report a broad description of the         14:51:26

21   substance use disorder" -- "substance use disorder (SUD),

22   commonly referred to as addiction, treatment delivery

23   system in the United States."

24            Do you see that?

25        A.  I do.                                             14:51:42
```

                                                        Page 31

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        Q.  How does that relate to this case?

 2        A.  This is where the treatment that was provided to

 3   these individuals who were covered occurred, and I

 4   thought it would be pertinent to understand what

 5   constituted care for this disorder for which these people    14:52:07

 6   sought care.

 7        Q.  Do you see footnote 1 at the bottom of page 1 of

 8   Exhibit 2, where it says, "By 'Plaintiffs,' I refer to

 9   those in Band 1"?

10        A.  Yes.                                                 14:52:32

11        Q.  What's "Band 1"?

12        A.  I think that must be a typo.

13        Q.  Do you know where that came from?

14        A.  No.

15        Q.  Did it come from your report in the United case?    14:52:44

16        A.  I don't know.

17        Q.  Did it come from another report?

18        A.  I don't know.

19        Q.  Do you know if there's a Band 1 in this case?

20        A.  I don't.                                            14:52:58

21        Q.  Do you know why that's in your report?

22        A.  I don't know.

23        Q.  Did you review this report before you sent it to

24   plaintiffs' counsel on Sunday night?

25        A.  Yes, I did.                                         14:53:10
```

Page 32

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        Q.  And you don't have any recollection as to why

 2   that would be included in here?

 3        A.  No, but as I told you earlier, when I -- you

 4   asked me when I set down to draft my report, did I rely

 5   on prior reports, and I said "no."  You then asked me did      14:53:26

 6   I rely on materials from prior reports, and I said "yes."

 7            So this may have been picked up from material

 8   from a prior report for ease of typing.

 9        Q.  And was that something you would have cut and

10   pasted from another document into this one?                    14:53:45

11        A.  It could have been, yes.  As -- as I told you

12   previously, there are large swatches of the background

13   material which I added for clarification that was cut and

14   pasted from prior reports after I set down to lay out the

15   draft of the format of this report.                           14:54:03

16        Q.  Or you could have been looking at one document

17   and typing it into another if you didn't cut and paste

18   it; right?

19        A.  Correct.

20        Q.  In your reports, you make an assumption that the      14:54:14

21   plaintiffs are entitled to payment from Cigna for the

22   claims they submitted; is that correct?

23        A.  In my report, you're asking me did I what?  You

24   broke up again.

25        Q.  I was asking if you assumed that the plaintiffs       14:54:28
```

Page 33

CONFIDENTIAL-ATTORNEYS' EYES ONLY

1    are entitled to payments for the insurance claims they

2    submitted to Cigna.

3         A.  I don't think that anyone can make a blanket

4    assumption.  That's why there are claims reviews.  So no,

5    I don't make an assumption that they're entitled to          14:54:45

6    everything that they -- they filed.

7         Q.  Did you do any analysis as to whether or not the

8    plaintiffs complied with the plan terms in this case?

9         A.  Yes.

10        Q.  What was that analysis that you did?                 14:55:01

11        A.  I looked at the services that were provided.  I

12   looked at analysis of the claims and what was paid.  I

13   looked at medical records to see that the services that

14   were provided were, in fact, represented on those claims.

15        Q.  Anything else?                                       14:55:26

16        A.  No.

17        Q.  Did you do any analysis as to whether the

18   plaintiffs complied with the laws related to the services

19   they were providing in this case?

20        A.  I did some analysis of the laws in the state of     14:55:40

21   California and how -- whether these plaintiffs complied

22   with that and how they constituted their programs and

23   what would have been the prevailing laws under which they

24   operated.

25            And I'm quite familiar with the -- the laws as       14:55:56

                                                      Page 34

CONFIDENTIAL ATTORNEYS' EYES ONLY

1    it relates to these kinds of programs in California, as I

2    have run programs in California.

3        Q.  Did you do analysis as to whether or not the

4    plaintiffs complied with those laws?

5        A.  Not -- to some extent, but not a legal analysis        14:56:11

6    as to whether they complied, and that would not have been

7    necessary because that would have been determined on the

8    claims review.  If there was a provider that didn't

9    comply with the laws and was operating outside of the

10   law, then Cigna would have been handling that as the        14:56:33

11   basis for refusal to make a claim.

12            So I'm looking at claims that Cigna reviewed

13   with a number of administrative types of reviews and

14   clinical and medical reviews that they then determined

15   that they would pay, and one would -- recognizing that it        14:56:55

16   was Cigna's job to determine that the provider was

17   legitimately operating and offering services to the

18   individuals who had the coverage, when they made a

19   determination to pay a claim, all of those determinations

20   would have been done by Cigna.        14:57:17

21       Q.  Just so I understand that correctly, are you

22   saying that your opinions are limited to claims in which

23   Cigna decided to pay something?

24       A.  No, I'm not saying that.  But I'm trying to give

25   you an example of how applying a reasonable standard of        14:57:33

Page 35

CONFIDENTIAL-ATTORNEYS' EYES ONLY

```
 1   what was going on by -- with these providers, what Cigna

 2   was doing, how people were receiving services and what

 3   Cigna did with the claims, trying to provide you a

 4   reasonable view of that without having to open a medical

 5   record and trace all of that back to the standards under      14:57:55

 6   which they operated.

 7           If that's what you're prepared to do this

 8   afternoon, I'm prepared to do that with you.

 9       Q.  So but you would have to look at a plan, look at

10   the medical records, look at all the information            14:58:08

11   plaintiffs provided to Cigna in order to determine

12   whether a claim should be paid, and if so, how much;

13   right?

14       A.  I have to look at a reasonable set of records to

15   make those kinds of determinations.  And I have to -- and   14:58:25

16   you're right.  I have to look at a variety of records to

17   come to that determination.  And I'm telling you that's

18   what I did.

19       Q.  Do you know how Cigna's relationship with

20   MultiPlan worked?                                            14:58:38

21       A.  I have a general working knowledge of that, yes.

22       Q.  Okay.  Could you explain it to me, please?

23       ██  ████████████████████████████████████████████████

██  ██████████████████████████████████████████████████████████

██  ████████████████████████████████████████████████           14:59:02
```

Page 36

CONFIDENTIAL - ATTORNEYS' EYES ONLY



```
12        Q.  And as it relates to your opinions in this case,

13   do you have anything else to say about your understanding

14   of the relationship between MultiPlan and Cigna?

15             MR. COLLINS:  Objection.  Vague and ambiguous.    15:00:05

16             MR. CAPLAN:  I just wanted to make sure we

17   covered everything in that prior answer.

18             THE WITNESS:  Well, there are other things that

19   MultiPlan does, and there are other ways in which,

20   according to the testimony of MultiPlan employees, how     15:00:15

21   MultiPlan operates on behalf of Cigna in negotiating

22   these rates, in trying to protect the assets of Cigna, in

23   trying to enroll into an agreement with MultiPlan

24   providers who are providing out-of-network services

25   repeatedly so that there can be some regularity or        15:00:44
```

Page 37

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   normality to what that provider would, in fact, be

2   reimbursed for services.

3          So there's a lot more detail to go into, all

4   provided to me through the testimony of individuals who

5   worked for MultiPlan and for Cigna.                    15:01:00

6          I have no reason not to believe the veracity of

7   those depositions.

8      Q.  BY MR. CAPLAN:  Do you have anything else to say

9   about the relationship between Cigna and MultiPlan as it

10  relates to your opinions in this case?                 15:01:14

11     A.  Well, as it relates to my opinions.

12     Q.  Yeah.  My question is:  Have you told me

13  everything that you understand about the relationship

14  between MultiPlan and Cigna that impacted the opinions

15  you rendered in this case?                             15:01:29

16     A.  No, I haven't told you everything that I know.

17  I mean, we -- we wouldn't finish today if I were to tell

18  you all of it, but I'm telling you the things that are

19  material.

20  ███████████████████████████████████████████  ███████████

█   ██████████████████████████████  ████████████████

█   ██████████████████████████████████████████████████

█   ███████████████████████

24         There are other sign points and facts, but as it

25  relates to a working knowledge of how MultiPlan         15:02:03

Page 38

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    represented the interest of Cigna in negotiating claims

2    down with providers, I've given you a general view of

3    the -- a working knowledge of that based upon the

4    testimony and my experiences in working with MultiPlan

5    representatives.                                          15:02:24

6        Q.  Do you agree that reducing opioid use in the

7    population is a good thing?

8            THE REPORTER:  Repeat that, please.  Do you

9    agree that?

10       Q.  BY MR. CAPLAN:  Reducing opioid use in the       15:02:36

11   population is a good thing?

12       A.  Yes.

13       Q.  And do you agree that companies that try to

14   reduce opioid use in the population is a helpful step in

15   combating the opioid crisis?                             15:02:51

16       A.  Yes.

17       Q.  Have you done any research on any efforts that

18   Cigna has taken to combat the opioid crisis?

19       A.  I actually am aware of claims that Cigna has

20   made in their work with Shadow Box about how they're     15:03:06

21   going to help address the opioid crisis, but I've seen no

22   evidence that any of their claims have come to fruition.

23       Q.  You haven't -- you haven't researched that,

24   though.  You weren't asked to in this case; correct?

25       A.  I didn't understand the question.               15:03:24

                                                    Page 39

CONFIDENTIAL-ATTORNEYS' EYES ONLY

```
1        Q.  You haven't done any -- you haven't done any

2   research as to whether or not that happened, and you

3   weren't asked to in this case; correct?

4        A.  I was not asked to for the case, but I do have

5   knowledge because I run -- chair a foundation that is        15:03:33

6   focused on reducing the opioid epidemic.  And as a matter

7   of course, we track very closely the efforts of all kinds

8   of individuals, entities, government and non-governmental

9   agencies, at trying to address the opioid crisis.

10  Because we spend money to support those individuals in       15:03:57

11  their efforts.

12       Q.  Do you know --

13       A.  So it is -- it is unfair of you to say that I

14  don't have a general working knowledge of what Cigna has

15  said it was going to do and what it has not done.            15:04:08

16       Q.  All right.  I've let you go on, but now you're

17  not even listening to my question.  You're not answering

18  the question, and you aren't even using the same words I

19  asked.

20           All I asked is were you asked to research           15:04:18

21  whether or not Cigna has taken actions to address the

22  opioid crisis as part of your work in this case.

23       A.  The answer to the question is yes.

24       Q.  You were asked to do that in this case?

25       A.  Not in this case, no.                               15:04:31
```

Page 40

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        Q.  Yeah.  So my question is:  In this case, were

 2   you asked to do any research into whether or not Cigna

 3   has tried to combat the opioid crisis?

 4        MR. COLLINS:  Objection.  Asked and answered.

 5   And there's -- there's no need to get hostile.         15:04:45

 6        MR. CAPLAN:  Well, you're the one who's trying

 7   to put time limits on this.  You're the one who served

 8   20-odd pages of new reports yesterday morning 90 minutes

 9   before the deposition, and I'm trying to get through

10   this, and she is rambling and not answering the         15:04:57

11   questions.

12        MR. COLLINS:  I don't think that's true, Matt.

13   But we'll keep going and -- and -- and I -- I hope you'll

14   recognize that Dr. Barthwell is trying to comply with

15   your questions.                                         15:05:09

16        THE WITNESS:  Mr. Caplan, when you asked me had

17   I done research, the answer is yes.  Because as a -- in

18   the -- in my role for a matter other than this, I'm

19   responsible for knowing what people are doing to reduce

20   the opioid crisis.  And my opinion of what Cigna has done  15:05:25

21   is not very favorable versus what it said it was going to

22   do.

23        Q.  BY MR. CAPLAN:  All right.  Where is that --

24   where is that in your report?  Is that in your report?

25        A.  It's not.                                      15:05:33
```

Page 41

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.  Okay.

2      A.  It's not.

3      Q.  Thank you.  It's not in your report.  That's the

4  question.  It's not in your report, is it?

5      A.  No, but nor is it in my report that Cigna has      15:05:38

6  done something to reduce the opioid crisis.  And you

7  introduced the subject.  I am trying to respond to you in

8  a way that gets to the answer because I feel that you're

9  trying to make it seem as if I don't know what I'm

10  talking about because I haven't done research on          15:05:58

11  something that I have done research on.

12         Whether I was asked to do it by Mr. Collins or

13  not is not -- is not material to that.  I have done

14  research on that.

15      Q.  That research is not part of your work on this    15:06:09

16  case; is that correct?

17      A.  That's correct.  So you asked my opinion --

18      Q.  Okay.  That's my question.  That's my question.

19      A.  I'm sorry.  You asked me my opinion --

20      Q.  If I want to know something else, I will ask you   15:06:20

21  a follow-up question.  You are wasting time.

22      A.  Mr. --

23         MR. COLLINS:  Please, there's no need.  Let's --

24         MR. CAPLAN:  I've never had a witness waste this

25  much time, Rich.  And you're the one putting us on an     15:06:33

                                                    Page  42

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    artificial clock.  You're the one who's sandbagging us,

 2    doubling the size of her report 90 minutes before we were

 3    supposed to depose her, after it was due under the

 4    Federal Rules, doing more --

 5           MR. COLLINS:  I know.                        15:06:45

 6           MR. CAPLAN:  -- than we agreed to let you do.

 7    And I'm trying to address that the best way I can, Rich.

 8           MR. COLLINS:  Mr. Caplan, you're doing a --

 9    you're doing a fine job.  I understand that.

10           I think there may have been just a disconnect   15:06:54

11    between your question and how the witness perceived what

12    you were asking.  I think that's all that happened there.

13    But, please, let's just keeping moving on.  I don't think

14    we need to get into a shouting match over it.

15           MR. CAPLAN:  My point is if I want to ask her a   15:07:10

16    follow-up question, I will.  And she needs to answer the

17    question that's being asked, not going on and continuing

18    to talk about things that are unrelated to the question

19    that I'm asking.

20           MR. COLLINS:  I haven't --                   15:07:23

21           MR. CAPLAN:  You know, I'm usually pretty good

22    at giving people leeway, but we're trying to get this

23    done today because you've put a cap on the time we have

24    today.

25           MR. COLLINS:  Okay.                          15:07:48
```

Page 43

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.  BY MR. CAPLAN:  Would you look at Exhibit 2 to

2  your report on the top of page 4.

3          Are you with me?

4      A.  I am.

5      Q.  And on the top it says, "Today, I continue to      15:08:00

6  practice addiction medicine, provide consultative

7  services to an array of treatment programs located in

8  Illinois, Washington, Alaska, California, Pennsylvania,

9  and New York.  My full curriculum vitae is attached to

10  this report."                                              15:08:16

11          Is there a reason why your consultative services

12  aren't listed in your CV?

13      A.  The programs that I consult with is through

14  Encounter Medical Group, and it doesn't provide the

15  detail as to where those programs are physically located.   15:08:35

16      Q.  What do you charge for your consulting services?

17      A.  My usual and customary fee is $1,250 an hour.

18      Q.  So the same fee you charge for working on this

19  case?

20      A.  Yes.  But sometimes I charge much less and      15:08:53

21  sometimes I consult for nothing at all.

22      Q.  How do you make those decisions?

23      A.  It depends on whether the entity is a

24  governmental organization or a not-for-profit that is

25  struggling and receiving grant funds to do the work.   15:09:11

Page  44

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1     Q.  Are you currently president of the board of

2   directors of ASAM?

3     A.  I am not.

4     Q.  Why does your CV say you are?

5     A.  It should have a date when it ended, and it          15:09:32

6   should say 2002.  Since 2002, my CV has had an ASAM

7   president, comma, 2002 as the date that it ended.

8     Q.  Would it be an error if that wasn't in your CV?

9     A.  I'd be surprised if that's not in my CV.

10    Q.  And you haven't been the president of the board       15:09:55

11  of directors since 2002; is that right?

12    A.  That's correct.

13    Q.  So if it's not in there, it's been an error for

14  21 years at this point?

15    A.  No, it would be that in this particular version,      15:10:07

16  it was cut out for some reason.  It has been in there.  I

17  personally put it in there in 2002 when I was forced to

18  step down from that -- that duty.

19    Q.  Why were you forced to step down as the

20  president of the board of directors at ASAM?               15:10:24

21    A.  I took a cynic and firm position with the

22  Government that didn't allow me to have any outside

23  interest, and everything that I was doing at the time

24  showed in my CV a comma 2002 ending date.

25    Q.  And are you certified by the American Board of        15:10:43

Page 45

1     Addiction Medicine?

2          A.  Yes.

3          Q.  Do you have any other certifications pertaining

4     to substance use disorder treatment?

5          A.  No.                                              15:10:54

6          Q.  Do you hold any certificates related to health

7     insurance administration?

8          A.  I do not.

9          Q.  And this might be helpful to compare the two

10    reports, Exhibit 1 and 2, and I have some questions about  15:11:24

11    the "Materials Reviewed" section.  So I think that starts

12    on page 4 of both reports.

13         A.  I'm there.

14         Q.  At the time you issued your initial report on

15    March 30th, you hadn't reviewed any deposition testimony    15:11:48

16    from this case; is that correct?

17         A.  That's correct.

18         Q.  Okay.  Do you know when the depositions were

19    taken in this case?

20         A.  Not offhand.                                      15:12:01

21         Q.  The dates are listed in your -- your

22    supplemental report, Exhibit 2, of the deposition

23    testimony you reviewed, starting at the bottom of page 6.

24         A.  Okay.

25         Q.  And you will see the deposition dates listed in    15:12:30

                                                       Page 46

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    your "Materials Reviewed" in Exhibit 2 beginning on

2    page 6; right?

3         A.  Yes.

4         Q.  Are you able to tell me if depositions in this

5    case were taken before March 30th of 2023?              15:12:44

6         A.  Yes, looking at the first report and the second.

7         Q.  Why didn't you review any deposition testimony

8    from this case before you issued your report on

9    March 30th?

10        A.  Well, I'm going to need to amend my response.    15:13:02

11   Because most of the defendants had been deposed, and I

12   reviewed those, but I hadn't seen the depositions of some

13   of the -- most of the plaintiffs had been done, and I saw

14   them, but I didn't see some of the defendants.

15        Q.  If you can turn to page 20 of Exhibit 1, please.  15:13:26

16            Are you there?

17        A.  Yes.

18        Q.  On page 20 of Exhibit 1, you wrote, "Plaintiffs'

19   counsel had not supplied me with any depositions taken in

20   this action at the time I prepared this report."          15:13:49

21            Is that true?

22        A.  Where are you reading?

23        Q.  The first sentence on page 20 of Exhibit 1 under

24   "Factual Summary."

25        A.  Correct.  Yes, that's true.                      15:14:05
```

Page 47

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1       Q.   Okay.  And if we can go back to the "Materials

2   Reviewed" section.  You can look at page 6 of Exhibit 2.

3   And if you could let me know when you're there.

4       A.   I'm there.  Oh, six of Exhibit 2.  Okay, uh-huh.

5       Q.   Are you there?                                    15:14:32

6       A.   I'm there.

7       Q.   About halfway down the page, there's a bullet

8   point that begins with:  "Synopses of patient treatment

9   records and claims administration documents."

10          Do you see that?                                   15:14:42

11      A.   Yes.

12      Q.   What are the synopses that you're referring to

13   there?

14      A.   Each of these patients had records, and there

15   were extractions of those records that were provided to    15:15:03

16   me.

17      Q.   Wait.  Who provided those extractions?

18      A.   The attorneys in this case.

19      Q.   Do you know who created the synopses that you

20   reviewed?                                                  15:15:19

21      A.   I do not.

22      Q.   Do you think it was the plaintiffs' attorneys

23   that created them if they provided them to you?

24      A.   Yes.

25      Q.   Do you know how they were created?                15:15:28

Page 48

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          A.  I do not.

2          Q.  Did you do anything to confirm the accuracy of

3     the information included in the synopses you relied on?

4          A.  Yes, because I looked at the actual records.

5          Q.  Do you recall what information the synopses        15:15:43

6     contained?

7          A.  Highlighted -- highlighted material.

8          Q.  And then going back to page 6 of Exhibit 2, the

9     second bullet above the "Deposition Materials" heading,

10    there's three documents listed.                            15:16:08

11         Do you see that?

12         A.  I do.

13         Q.  The first one was already listed above, but the

14    second two are new, supplemental --

15         THE REPORTER:  Excuse me.  Excuse me, sir.            15:16:17

16    Supplemental?

17         MR. CAPLAN:  Report.

18         Q.  Do you know why you added these two documents to

19    your supplemental report?

20         A.  Yes, because I pulled those documents, and there  15:16:31

21    are quotes contained in this report that came directly

22    from those Bates-labeled documents.

23         In my haste under the time crunch to complete

24    this report, one of the ways in which I added to the

25    section called the Materials Reviewed was that I pulled    15:16:55

                                                    Page  49

CONFIDENTIAL ATTORNEYS' EYES ONLY

1    my footnotes from the report to make sure that I didn't

2    misrepresent materials that I had used in putting

3    together the report so that this could be as complete a

4    record of materials reviewed as possible.

5         Q.  BY MR. CAPLAN:  Okay.  Can you turn to page 9 of      15:17:17

6    Exhibit 2, please.

7         A.  Page 5 of Exhibit 2?

8         Q.  Nine.

9         A.  Nine.  I'm there.

10        Q.  All right.  And do you see at the bottom, the       15:17:31

11   "Other Materials Utilized in Supplemental Report"

12   heading?

13        A.  Yes.

14        Q.  So the first bullet point is an article by

15   Bertha Coombs.  Was that article available by March 30th     15:17:45

16   of 2023 to you?

17        A.  I did not review it in March of 2023.

18        Q.  The published date, according to your report, is

19   August 5th, 2017, and it was updated August 6, 2017.

20        Do you believe those are the dates that article        15:18:10

21   was published and updated?

22        A.  Yes.  Yes.  But your question was were these

23   materials available to me, and in trying to give you an

24   accurate response to your question, I didn't use them for

25   the first report.  I used them because they were useful      15:18:22

Page 50

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    to me in responding to one of the criticisms from one of

2    the experts that was deposed in the intervening period.

3           So, yes, the material was available but was not

4    used by me in the preparation of the first report.

5         Q.  All right.  And is that true for every document        15:18:38

6    listed under this "Other Materials Utilized" section?

7         A.  To the best of my ability, yes.

8         Q.  They all existed before March 30th of 2023?

9         A.  Yes.

10          MR. CAPLAN:  I'm going to -- Rich, do you have         15:19:05

11   Exhibit Share working?

12          MR. COLLINS:  I do.

13          MR. CAPLAN:  So I'm going to mark as Exhibit 3

14   what was provided to us as one of the materials reviewed

15   as the DRR Patient, Plan and Claims spreadsheet.            15:19:27

16          If you give me a moment, I'll get that up in

17   Exhibit Share.  Is that fair for everyone?

18          MR. COLLINS:  Okay.

19          THE REPORTER:  Excuse me, Counsel.  This is the

20   reporter.  Can we go off the record for just two minutes,    15:19:47

21   please.

22          MR. CAPLAN:  Yes, of course.

23          MR. COLLINS:  Yes.

24          THE VIDEOGRAPHER:  This is the end of Media 1.

25   We are going off the record.  The time is 3:19 p.m.         15:19:56

                                                         Page 51

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              (Recess.)

 2              (Exhibit 3, DDR Patient, Plan and Claims

 3              spreadsheet, was marked for identification by

 4              counsel electronically.)

 5              THE VIDEOGRAPHER:  This is the start of Media 2.    15:29:27

 6   We are going on the record.  The time is 3:29 p.m.

 7         Q.  BY MR. CAPLAN:  Dr. Barthwell, do you have

 8   Exhibit 3 in front of you?

 9         A.  I do.

10         Q.  Is Exhibit 3 one of the synopses you reviewed in    15:30:22

11   preparation of your reports?

12         A.  Yes, it is.

13         Q.  And then if we can start with column -- I just

14   want to walk through some of the columns and get your

15   understanding of what they -- they represent.             15:30:41

16              So column A is probably pretty self-explanatory.

17   That's the name of the member; is that right?

18         A.  Well -- oh, okay.  I've got to go back over to

19   A.  I'm sorry.

20         Q.  No problem.                                      15:30:54

21         A.  Yes.  Date of services.

22              MR. COLLINS:  And by the way, my laptop is not

23   touch screen so...

24              THE WITNESS:  Okay.

25              MR. COLLINS:  So if you try and swipe, it won't    15:31:07
```

Page 52

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    work.

 2         Q.  BY MR. CAPLAN:  And then column B, are the dates

 3    of service that the plaintiffs allegedly provided

 4    services; right?

 5         A.  Yes.                                        15:31:18

 6         Q.  What's shown in column C?

 7         A.  The level of care.  And it's broader than that

 8    because it would have a service like a breathalyzer, too.

 9    But services provided.

10         Q.  So the level of care the plaintiffs billed for  15:31:35

11    and the services the plaintiffs billed for; right?

12         A.  Yes.

13         Q.  Do you know what is in column D, "VOB"?

14         A.  It's the Verification of Benefits synopsis.  So

15    what part would be Cigna, what would be the member's, how  15:31:52

16    it related to percentage of the Medicare rate, and

17    whether the member's allowance had been met, their

18    deductible had been met.

19              And then I --

20         Q.  Are you aware -- sorry.                     15:32:08

21         A.  I'm assuming that the operator who signed the

22    Verification of Benefits is the other name that's there.

23         Q.  Do you know where the information reflected in

24    column D came from?

25         A.  From Verifications of Benefits.  There -- there  15:32:25
```

Page 53

CONFIDENTIAL-ATTORNEYS' EYES ONLY

1    are two different terms that are used depending upon the

2    plan.  One's a Verification of Benefits; the other's the

3    Verification of Payment, I think, of VOP.  Same thing in

4    actuality.

5         Q.  Do you know -- and again, Exhibit 3 was prepared        15:32:50

6    by the plaintiffs' attorneys, to your knowledge; is that

7    right?

8         A.  Yes.

9         Q.  Do you know what's reflected in column E?

10        A.  If there had been an authorization for those           15:33:01

11   services, the number on that authorization for the

12   different levels of care.  And they would typically --

13   they match what's in C if someone starts at a higher

14   level of care or gets an extension in that level of care.

15        Q.  And I think F, G, and H are pretty                      15:33:22

16   self-explanatory for the most part, I hope.  F is the

17   plaintiffs' billed charges; right?

18        A.  Yes.

19        Q.  G is amounts paid; correct?

20        A.  Yes.                                                    15:33:35

21        Q.  And H, the dollar figure balance is the

22   difference between the billed charges and the amount

23   paid; right?

24        A.  Right.  Allegedly.

25        Q.  Sorry.  Go ahead.                                       15:33:45

                                                              Page 54

1        A.   Allegedly; right?

2        Q.   Do you know what the percentages are that are

3    shown in column H?

4        A.   So I'm not sure exactly how that percentage

5    relates, but -- so I don't want to speculate as to what        15:34:10

6    that is.  If you add G and H together, you get F.

7        Q.   Do you know what column I is?

8        A.   The Global MultiPlan agreement, whether there is

9    one in place or not.

10        Q.   What's shown in column J?                            15:34:35

11        A.   The MultiPlan -- that's one that "yes" or "no,"

12    whether it exists or not.

13        Q.   Whether what exists?

14        A.   The agreement under the S -- under the

15    MultiPlan.  I'm actually not sure about that one.  I'm        15:34:52

16    not sure about J.

17        Q.   K is the plan that was in effect; right?

18        A.   Yes.

19        Q.   Do you know what's in column L labeled "ASA"?

20        A.   Those would -- I'd have to cross-reference them      15:35:07

21    to those Bates Numbers.

22        Q.   Do you know what column M, "ASA, cost

23    containment fees, Cigna's Excel Volume 12" shows?

24        A.   So when all this gets cross-referenced and I

25    open the chart and those -- with those Bates Numbers and      15:35:31

                                                        Page 55

CONFIDENTIAL-ATTORNEYS' EYES ONLY

1    look at the way these claims are adjudicated, what

2    they -- what -- what I'm able to ascertain from putting

3    all of this together is what was actually paid, what kind

4    of communications there were around it.  So I'd have to

5    go to those Bates Numbers to be precise about what it          15:35:58

6    was.

7            Inadequate network protection relates to whether

8    there can be exceptions made because the network is not

9    adequate to service the members, and typically when the

10   network has been deemed to be inadequate, it is easier to     15:36:22

11   rationalize an out-of-network provider providing services

12   to a patient.

13       Q.  And I don't think I actually caught the answer

14   on column M, which just has those "yeses" or "no's."  Do

15   you know what those "yeses" and "no's" mean in column M?      15:36:40

16       A.  No, I'd have to look at that Excel sheet in

17   order to know that to refresh my memory at this point.

18       Q.  And then if you look at column Q, it says,

19   "Notes:  Cigna's Excel Volume 3."  Do you know what's

20   shown in column Q?                                            15:37:03

21       A.  Yes.  In column Q, what we get is what was

22   actually paid against the claims that started out on the

23   far end of this against what was billed.

24       Q.  And column R says "Low Pay Codes."  Do you know

25   what's shown in column R?                                     15:37:27

                                                    Page 56

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        A.  No, I don't know what that -- what that means.

 2        Q.  And column S says "Denial Codes" and there's

 3   some number codes.  Do you know what's shown in column S?

 4        A.  No.  Again, not without cross-referencing it.

 5   Not all of this was useful to me as it would be to the        15:37:46

 6   attorneys who were working on this, but this is a --

 7   their work product that could help me in -- in many

 8   instances to cross-reference the record with how a claim

 9   was finally adjusted or adjudicated.

10        Q.  Do you know how many patients in total are at        15:38:04

11   issue in this case?

12        A.  I'm sorry, I didn't hear that.

13        Q.  Do you know the total number of patients that

14   are at issue in this case across the different

15   plaintiffs?                                                   15:38:18

16        A.  Oh, I have forgotten that number.

17        Q.  And I think you might know -- you know, tell me

18   if this doesn't sound familiar, but I think the parties

19   selected a subset which we call the discovery pool so

20   there was a more limited number that we provided           15:38:33

21   documentation for.

22            Does that sound familiar?

23        A.  That is typical in cases such as this, yes.

24        Q.  Okay.  Do you know how many patients you

25   reviewed records for in this case?                           15:38:48
```

Page 57

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.  Under each provider, there were eight records,

2   except for one, there was seven.

3      Q.  And for each of those patients, do you recall

4   what you reviewed?

5      A.  The -- their medical records.  The synopsis        15:39:06

6   information.  The actual bills.  Some of the records were

7   more complete than others.

8      Q.  Do you know what treatment records for any

9   particular patient that the plaintiff actually provided

10  to Cigna?                                                 15:39:33

11     A.  According to the testimony of the Cigna

12  employees, treatment records were requested on a number

13  of cases, and the response from the providers was

14  dismally low.

15         And when this program really started being         15:39:54

16  activated in response to the desire to contain cost and

17  increase profit.  But if the records in their totality

18  was -- if a record was sent -- and you know, I've had to

19  do this with my revenue cycle management people in

20  programs that I've run -- often you're trying to fax to   15:40:16

21  the reviewer records that contain up to 1500 pages of

22  documents.

23     Q.  How was Cigna supposed to know what's in records

24  that the plaintiff doesn't actually provide them?

25         MR. COLLINS:  Objection.  Calls for speculation.   15:40:39

Page 58

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1            MR. CAPLAN:  You can answer.

 2            THE WITNESS:  They can't know.

 3       Q.  BY MR. CAPLAN:  We can go back to Exhibit 2,

 4   which is a copy of your supplemental report, and you can

 5   turn to page 36, please.                          15:41:04

 6       A.  Okay.

 7       Q.  And do you see the Roman V:  "Factual Summary"?

 8       A.  I do.

 9       Q.  And in here it looks like you reviewed

10   Plaintiffs' Consolidated Second Amended Complaint; right?   15:41:25

11       A.  Yes.

12       Q.  And in this section "Factual Summary," you

13   summarized the allegations from the Second Amended

14   Complaint; is that right?

15       A.  Yes.                                       15:41:40

16       Q.  Did you assume that any of these allegations

17   were true in rendering your opinions in this case?

18       A.  No.  That's why these cases go to trial.

19       Q.  You're getting ahead of me.

20       A.  I'm sorry.                                 15:42:01

21       Q.  Did you -- did you take any steps to check

22   whether any of the allegations summarized in your

23   "Factual Summary" were supported by evidence?

24       A.  I took as much care as I could to determine that

25   those issues were, in fact, factual.  And I looked to see   15:42:25
```

Page 59

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    whether there was evidence in the records provided to me

2    in the depositions and summaries and medical records that

3    would support those facts.

4        Q.  And in that first paragraph, the "Factual

5    Summary," do you see where you refer to RJ as a related        15:42:47

6    action?

7        A.  Yes.

8        Q.  Why did you call RJ a related action here?

9            MR. COLLINS:  Well, I'll object attorney work

10   product and allow the witness to answer, but again, I          15:43:02

11   just want to make sure that we don't disclose our

12   communications about our interpretation of the claims in

13   RJ.

14           But you can answer the question.

15           THE WITNESS:  It is a term of art and that legal        15:43:17

16   science because in my situation, I was introduced to them

17   together, and then I was advised that I needed to set RJ

18   aside because it would be dealt with as a separate

19   matter.

20       Q.  BY MR. CAPLAN:  And the last paragraph or last         15:43:44

21   clause in the first sentence of the "Factual Summary" in

22   Exhibit 2 says, "I did not rely on any materials from the

23   RJ matter to form my initial report or supplemental

24   report."

25           Do you see that?                                        15:43:57

                                                       Page 60

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1          A.  I do.

 2          Q.  And is that a true statement?

 3          A.  Yes.

 4          Q.  Can we do a little comparison with Exhibit 1,

 5     your initial report.  There the "Factual Summary" is on     15:44:08

 6     page 20, which you can let me know when you're there.

 7          A.  Okay, I'm there.

 8          Q.  And if you could actually turn to page 21, and

 9     at the end of the first paragraph there, it says, "The

10     following facts are drawn from these documents and the      15:44:52

11     defendants' witness testimony in the RJ action."

12              Do you see that?

13          A.  I do.

14          Q.  All right.  How do you square those two

15     statements?                                                  15:45:02

16          A.  At the time of the first report, this was

17     included.  This amended report X's out any of the

18     material that I was exposed to from RJ because I was

19     advised I could not use it in any material way to

20     formulate my opinions in this matter.                       15:45:28

21          Q.  And we can go back to Exhibit 2 and page 37,

22     please.

23          A.  Okay.

24          Q.  And in the first full paragraph on page 37

25     begins:  "Plaintiffs provided medically necessary          15:45:52
```

                                            Page 61

1    pre-authorized and covered SUD treatment and laboratory

2    services."

3            Do you see that?

4        A.  Yes.

5        Q.  Okay.  Are you offering any opinions as to the        15:46:03

6    medical necessity for any of the treatment at issue?

7        A.  Repeat the question to make sure I get it right.

8        Q.  Are you offering any opinions as to the medical

9    necessity for any of the treatment at issue?

10       A.  I am.                                                 15:46:29

11       Q.  And what are those opinions?

12       A.  The opinion is when Cigna took a claim and

13   determined that it was, in fact, valid and should be

14   paid, that's evidence that they conceded to the fact that

15   the services provided there were medically necessary.     15:46:50

16       Q.  Okay.  And anything other than that?

17       A.  Well, a whole host of things related to reviews

18   of the records and understanding of the diagnoses and

19   what services would be provided in response to that,

20   which is probably beyond the scope of this meeting, but   15:47:10

21   I'm happy to go into if we meet again.

22       Q.  Towards the bottom of page 37 of Exhibit 2, you

23   talked about reasonable and customary, R&C, rates.

24            Do you see that?

25       A.  Yes.                                               15:47:29

                                                    Page 62

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          Q.   How does that relate to this case?

2          A.   It's central to this case.

3          Q.   Does Cigna use the term "reasonable and

4     customary" in adjudicating claims?

5          A.   I don't know if Cigna has "reasonable and          15:47:55

6     customary" anywhere in their -- their documents, but in

7     the footnote, you note I refer to it also as usual and

8     customary.

9               So while it may not be Cigna, it could be

10    MultiPlan, and it could be a term of art.  And I'm not       15:48:14

11    quite understanding your objection to "reasonable and

12    customary."

13         Q.   It's not an objection.  I'm just trying to

14    understand why you use "reasonable and customary, usual

15    and customary," if those aren't terms used by Cigna for      15:48:33

16    the claims in this case.

17         A.   Okay.

18         Q.   Why are you using the terms "reasonable and

19    customary" and "usual and customary"?

20         A.   Because it's my understanding that that is what     15:48:45

21    all concern was trying to drive to, but rarely got to.

22         Q.   Do you know if that --

23         A.   If there were not -- I'm sorry.

24         Q.   I said do you know if the "usual and customary

25    reasonable and customary" type language was used in any      15:49:07

Page 63

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    of the Cigna plans at issue?

 2         A.  Well, that's a very, very discrete question, and

 3    I don't know that I have seen it in anything that Cigna

 4    has written, but it is represented in the work of Cigna

 5    and MultiPlan.                                        15:49:27

 6         Q.  Turn to the next page, page 38 of Exhibit 2.

 7         A.  I'm there.

 8         Q.  Do you see the block quote in the page and

 9    there's footnote 121.  And footnote 121 refers to a Cigna

10    website; is that right?                               15:49:52

11         A.  Yes.

12         Q.  And the language quoted there on page 38 and

13    onto 39 is from the Cigna website you cite?

14         A.  Yes.

15         Q.  That language was not copied from any of the   15:50:04

16    plans at issue in this case; is that correct?

17         A.  That's correct.

18         Q.  You can move forward to page 41 of Exhibit 2,

19    please.

20             And about five lines down, you'll see in       15:50:25

21    parentheses, you know, "On average 50 to 70 percent of

22    plaintiffs' billed charges."

23             Do you see that?

24         A.  I do.

25         Q.  And that's discussing Cigna previously paying --  15:50:34
```

Page 64

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    paying that, if I'm reading this correctly; is that

2    right?

3         A.  That's correct.

4         Q.  What's that statement based on?  There's no cite

5    there.                                              15:50:45

6         A.  Oh, I'd have to go back to the -- to the records

7    to pull that.  But there is -- there was a document

8    provided me, I believe it was attached to the Gompper

9    testimony that showed each of these providers and what

10   their negotiated rate was using the FAIR Health.  And   15:51:07

11   there was a range from 50 to 70 percent for each of them.

12        Q.  And your recollection is that that's for the

13   plaintiffs in this case?

14        A.  Yes.

15        Q.  Okay.  We'll go backwards in the report a bit to  15:51:25

16   page 28, and it's the section you have titled "The Cigna

17   Alarm."  If you'll just let me know when you're there.

18        A.  I'm there.

19        Q.  Towards the end of the first paragraph of that

20   section, you wrote that:  "Cigna demonstrated its         15:51:56

21   ignorance in 2015 of the changes in the insurance

22   industry."

23            What did you mean by that?

24        A.  I mean that Cigna had not made the adjustments

25   that many of the other payors had made by 2015 in         15:52:15
```

Page 65

1    response to the acts of the Affordable Care Act and the

2    Parity Act.  And while other payors had made adjustments

3    in the way in which they were paying claims, Cigna hadn't

4    and suddenly found itself at a disadvantage when compared

5    to its peers.                                           15:52:38

6        Q.  Well, that doesn't necessarily mean they were

7    ignorant, does it?

8        A.  Well, now you're splitting hairs.

9        Q.  I'm --

10       A.  Ignorance --                                    15:52:50

11       Q.  It's your choice -- it's your choice of words.

12       A.  Right.

13       Q.  I mean, what you just conveyed to me was that

14   they acted more slowly than their competitors.

15       A.  They were ignorant to what was going on, and    15:52:59

16   when they became aware of it -- ignorance is a lack of

17   knowledge.  When they became aware of it, the alarm was

18   sounded.

19       Q.  That's my question.  What are you basing the

20   fact that you think there was a lack of knowledge on?    15:53:13

21   Because it's not in here.  There's no cite.  I'm just

22   trying to understand why you think there wasn't

23   knowledge.

24       A.  They -- it was the lack of knowledge of the

25   implication of this change and what would happen, and    15:53:24

Page 66

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    they suddenly woke up and had 5 percent of new enrollees

 2    coming to them, when others had much less.  They suddenly

 3    woke up and were paying very large claims when others

 4    were not and had taken actions to mitigate that.

 5          I'm not saying that the others were right.  I'm      15:53:43

 6    just saying that Cigna was very late in making those

 7    adjustments, and I believe that they -- they all acted in

 8    a way that really wasn't in good faith with what the

 9    Affordable Care Act and the Parity Act was intended to

10    accomplish.                                               15:54:04

11          But when they discovered it, they took these

12    actions, and others had taken action sooner.  They became

13    aware that providers would advise patients seeking

14    treatment to go to the marketplace and find a payor.  And

15    patients would wait a month in sometimes protected        15:54:25

16    environments trying to get into treatment until their

17    policy went into effect.

18          And it had the effect of driving people who

19    hadn't previously had coverage to coverage, which is what

20    the Affordable Care Act intended to do.                   15:54:42

21       Q.  All right.  So the question --

22       A.  And many -- I'm sorry.

23       Q.  It's not at all related to anything you just

24    said.  The question I asked you was:  What facts are you

25    basing the statement that you've made, that Cigna had     15:54:59
```

Page 67

CONFIDENTIAL ATTORNEYS' EYES ONLY

```
 1    lack of knowledge about what was going on in the industry
 2    at the time.  And you've told me that they were slower to
 3    act than other insurers, than other people in the market.
 4         My question is:  Why to you does that imply a
 5    lack of knowledge and ignorance, as you put it?          15:55:21
 6         A.  Because when they became aware of it, they first
 7    begin to note the effect that these changes were having
 8    on them, and they hadn't before that.  They were ignorant
 9    to the effect this was having on them until July.
10         Q.  The next paragraph you write that there's a       15:55:44
11    consumer preference for out-of-network providers.  What's
12    that based on?
13         A.  Quality, choice, geographic preference,
14    sometimes weather.  People are making these decisions not
15    necessarily because they're being -- if they're making    15:56:05
16    these decisions and not being driven by ASAM-certified
17    physicians or other professionals, they may make a
18    decision based upon where they know a program to be.
19    They may do an internet search and find something on the
20    CSAT website, the ASAM website, and go there.              15:56:24
21         Q.  Have you conducted an analysis of consumers to
22    determine whether they prefer in-network or
23    out-of-network providers?
24         A.  I provided out-of-network services and had
25    intimate knowledge of what people discussed when trying    15:56:44
```

Page 68

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    to make that decision and helped people try to find

2    services that were in-network so that they could use

3    their coverage to get services.  And some even in the

4    face of that, didn't want their employer to know, or they

5    didn't want to use a benefit, and they still made a          15:57:03

6    choice to get an out-of-network service.

7         Q.  In connection with your work on this case, did

8    you conduct an analysis as to whether or not the Cigna

9    members preferred out-of-network or in-network providers?

10        A.  In -- in this instance, Cigna is saying that       15:57:25

11   they are concerned about the preference that they are --

12        Q.  Okay.  I'm going to cut you off because you keep

13   doing this.  That's not the question I asked.  I asked

14   you about your work on this case.

15            And my question is:  In your work on this case,     15:57:39

16   did you do any analysis of Cigna members to determine

17   whether or not they preferred in-network or

18   out-of-network SUD providers?

19        A.  I relied on the analysis of Cigna employees.

20        Q.  Not the question I'm asking.                        15:57:54

21            Did you conduct any independent analysis of

22   Cigna members in connection with your work on this case?

23        A.  I did not.

24        Q.  Thank you.

25        A.  But I would really like to ask at this point if     15:58:10

Page 69

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    you were going to ask me to come and do another day with

 2    you that you treat me with a certain level of civility

 3    that I'm showing you.

 4         Q.  I respectfully disagree with that.  If you were

 5    treating me with civility, you would listen to my          15:58:25

 6    questions and answer them and not make me repeat myself.

 7    I am treating you -- I am treating you --

 8              MR. COLLINS:  That's not fair.  That's not fair.

 9         Q.  BY MR. CAPLAN:  -- Dr. Barthwell --

10              MR. COLLINS:  Please, let's just move on, and we  15:58:37

11    don't need to have this kind of animosity.  I truly

12    believe sometimes it's just a disconnect in the question

13    and -- and how it's perceived, and I believe

14    Dr. Barthwell is -- is trying her best to answer your

15    questions.                                                  15:58:54

16              MR. CAPLAN:  No, she's not answering my

17    questions because she doesn't want to, Rich.  Rich, how

18    many depositions have we taken together?  20?  More than

19    that over the years?

20              MR. COLLINS:  Probably.                           15:59:05

21              MR. CAPLAN:  Yeah.  I mean, this is not how they

22    typically go, and it's not because of anything that I'm

23    doing, Rich.

24              MR. COLLINS:  Well, let's -- let's keep going.

25    I -- I disagree.  I -- I believe everything is going        15:59:16
```

Page 70

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   smoothly here.  There's always questions that are

2   misperceived by a witness and -- and if it doesn't

3   respond to the question, you ask it again or you strike

4   the prior answer.  And you've been doing that.

5          And so let's just keep continuing.  And again,          15:59:34

6   if you need more time, you've got it.

7          MR. CAPLAN:  Thank you.

8      Q.  Did you do any analysis to determine what was

9   causing insurers to have increased out-of-network SUD

10  treatment spending around 2015?                                15:59:58

11     A.  Did I do the analysis now or did I do the

12  analysis around 2015?  Because I did the analysis around

13  2015.

14     Q.  In connection with your work?

15     A.  Which question are you asking?                          16:00:12

16     Q.  In connection with your work on this case.

17     A.  No.  But I am using my experience in the

18  formulation of my opinions, which I am obligated to do

19  and allowed to do.

20     Q.  Are you aware of any fraud, waste, and abuse in        16:00:32

21  the out-of-network substance use disorder treatment

22  industry beginning around 2015?

23     A.  That came later.

24     Q.  When -- when did that happen?

25     A.  2022, in the Department of Labor report to             16:01:02

Page 71

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    Congress.
 2         Q.  So you don't have any knowledge of any fraud,
 3    waste, or abuse in the out-of-network substance use
 4    disorder treatment industry from 2015 to 2022?
 5         A.  No.                                          16:01:18
 6         Q.  Are you aware of any governmental investigations
 7    into the out-of-network substance use disorder treatment
 8    industry between 2015 and 2022?
 9         A.  Yes.
10         Q.  What's your knowledge of that?              16:01:35
11         A.  The National Household Survey on Drug Use and
12    Health cataloged the use of third-party payor coverage in
13    seeking treatment or out-of-network treatment or
14    in-network treatment or treatment at all.  And they have
15    done that survey annually before 2002 when it was a part  16:01:52
16    of my work product, when I was in the Office of National
17    Drug Control Policy.  It's been done repeatedly for many
18    decades.
19         Q.  Are you aware of any Federal criminal
20    indictments for out-of-network substance use disorder    16:02:12
21    treatment providers from 2015 to 2022?
22         A.  Federal indictments for what?  I'm aware of
23    Federal indictments, but for what?
24         Q.  Of out-of-network substance use disorder
25    treatment providers in that time period.  Are you aware   16:02:34
```

Page 72

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    that any of them have been charged criminally between

2    2015 and 2022?

3            MR. COLLINS:  For -- again, for fraud, waste, or

4    abuse?

5            MR. CAPLAN:  The question was more general than    16:02:48

6    that.

7            MR. COLLINS:  Okay.

8            MR. CAPLAN:  Go ahead.

9            THE WITNESS:  Well, providers aren't

10   out-of-network, necessarily.  Again, the form of your    16:02:56

11   question is one that can't be answered with an honest

12   answer.

13       Q.  BY MR. CAPLAN:  Yes, it can.

14           Do you -- do you know whether or not any

15   out-of-network substance use disorder treatment providers  16:03:08

16   were criminally indicted by the United States Government

17   between 2015 to 2022?  That's a "yes" or "no" question.

18   Do you know any of those instances or not?

19           MR. COLLINS:  I have to object at this point

20   because that -- that is harassment.  It's not called for,  16:03:22

21   Mr. Caplan.  Because the witness was trying to explain

22   that your question specifically asked about

23   out-of-network providers.  And to understand whether or

24   not a provider who's been indicted is in-network,

25   out-of-network, with whom, multiple insurers or not, I    16:03:40
```

Page 73

CONFIDENTIAL ATTORNEYS' EYES ONLY

1    mean, that's the problem with the question.  The question

2    is vague, it's ambiguous, and your treatment of the

3    witness is unprofessional.

4            MR. CAPLAN:  Object to the question.  Say

5    objection, vague and ambiguous.                          16:03:52

6            MR. COLLINS:  I did.  I'm also asking you to

7    please be more civil.

8            THE WITNESS:  And I'm saying that the question

9    cannot be answered in that form.

10       Q.  BY MR. CAPLAN:  Why not?  It's asking you       16:04:06

11   whether or not you know something.

12       A.  Because someone who might be out-of-network with

13   Cigna may be in-network with United.  And if they were

14   federally indicted, are you asking me if they were

15   federally indicted for something that they did with an   16:04:25

16   out-of-network client or if you are asking if they were

17   federally indicted for something that they did.

18           There have been a lot of people who have been

19   federally indicted since 2015.  It didn't necessarily

20   have anything to do with whether they were acting in or  16:04:37

21   out of network.

22       Q.  And there's a lot of out-of-network substance

23   use disorder treatment providers that have been indicted

24   for fraud, waste, and abuse over the last eight years;

25   right?                                                   16:04:48

                                                   Page 74

CONFIDENTIAL ATTORNEYS' EYES ONLY

```
 1          A.  That's not correct.  Given the amount of
 2     treatment that there is, that is -- that is an inaccurate
 3     statement.  I cannot stipulate to that.
 4          Q.  Do you know what -- it's not that I'm asking you
 5     to stipulate to anything.  I'm asking if you know            16:05:02
 6     something.
 7              Do you know what the Sober Homes Initiative is?
 8          A.  The what?
 9          Q.  The Sober Homes Initiative?
10          A.  Yes.                                                 16:05:09
11          Q.  All right.  What is that?
12          A.  In Florida, they were looking at sober homes and
13     whether sober homes were facilitating drug use to get
14     readmission into treatment for people who were living in
15     them and getting kickbacks from IOP or outpatient           16:05:25
16     programs to provide the clinical services to people who
17     were living in the sober homes.  That's one aspect of it.
18          Q.  And that's a Department of Justice
19     investigation; correct?
20          A.  Right.  But that's not an out-of-network or        16:05:40
21     in-network issue.
22          Q.  That was not my question.  My question was
23     specifically just about the Sober Homes Initiative.  This
24     is why I have to keep asking you to listen to my
25     questions and answer them.  That question was limited to    16:05:53
```

Page 75

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    the Sober Homes Initiative.  That question --

 2              MR. COLLINS:  That -- she answered your

 3    question, and then you started following up on it, and

 4    she said, yeah, but it doesn't relate to inpatient or

 5    outpatient, referring back to your prior question.        16:06:08

 6              She has answered your questions.  If you don't

 7    like the answer, move to strike and ask it again in a

 8    better format.

 9              I'm tell you, this is just not professional.  I

10    don't understand what's going on.                         16:06:24

11              MR. CAPLAN:  Rich, my question was:  Was the

12    Sober Homes initiative a Department of Justice

13    investigation?  And she start going it was

14    out-of-network, in-network, this and that.

15         Q.  Dr. Barthwell, the question is:  Do you know    16:06:37

16    whether or not the Sober Homes initiative is a United

17    States Department of Justice investigation?

18         A.  It is.

19         Q.  Do you know whether or not it's limited to

20    Florida?                                                  16:06:45

21         A.  It is not.

22         Q.  All right.  Is it national?

23         A.  Yes.

24         Q.  Does it include investigation into substance use

25    disorder treatment providers in Southern California?      16:06:55
```

                                                        Page 76

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1        A.  It can, yes.

2        Q.  Do you know who Raymond Yeats is?

3        A.  Beg your pardon?

4        Q.  Do you know who Raymond Yeats is?

5        A.  I don't know Raymond Yeats.              16:07:10

6        Q.  You've offered opinions that the Mental Health

7    Parity Act and the Affordable Care Act created certain

8    conditions in the industry related to how people have

9    access to SUD treatment and how it's paid for; is that

10   right?                                           16:07:30

11       A.  Yes.

12       Q.  Did it also create new ways for providers to

13   take advantage of the laws?

14           MR. COLLINS:  Objection.  Vague and ambiguous.

15   Calls for speculation.                           16:07:41

16           THE WITNESS:  Yes.

17       Q.  BY MR. CAPLAN:  Can you explain that, please.

18       A.  I'm trying to be helpful here to get through

19   this.  Now you want me to explain something you want me

20   to speculate and stipulate to.                   16:08:02

21       Q.  No.  You just answered a question "yes," and I'm

22   asking why you answered the question "yes."

23       A.  Because it gave individuals an opportunity to

24   bill for individuals receiving services in one location

25   while being domiciled in another location.  It also gave  16:08:25
```

Page 77

CONFIDENTIAL ATTORNEYS' EYES ONLY

1    individuals an opportunity to bill repeated urine drug

2    testing on the domiciliary side.  But it does not prove

3    that the individuals that were conducting the urine drug

4    tests were doing them to engage in fraudulent behavior.

5    It speculates that it does.                          16:08:51

6           And the indictments and the investigation as an

7    attorney -- and I'm out of my depth here; I'm not an

8    attorney -- I don't think approve that fraud, waste, and

9    abuse is actually going on until a case has been closed.

10          I was an expert witness on the Operation Golden   16:09:07

11   Urine in Kentucky, where plaintiffs -- defendants were

12   actually -- received jail time for fraud, waste, and

13   abuse in urine drug testing.  But all the other cases did

14   not necessarily end up that way.

15          So I can't deny that some of it's happened, but   16:09:30

16   I also can't wholesale endorse that that was the

17   motivation behind every drug -- urine drug test that was

18   run.

19      Q.  You mentioned the conviction.  That's not the

20   only conviction for this type of claim that you're aware  16:09:47

21   of; right?

22      A.  It's not.

23      Q.  Are you familiar with the term "body brokers"?

24      A.  Yes.

25      Q.  What does that mean?                          16:09:55

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1            MR. COLLINS:  It's vague and ambiguous.  Calls

 2      for speculation depending on who you ask.

 3            But you can answer.

 4            THE WITNESS:  Right.

 5            In this context, it generally refers to someone      16:10:06

 6      who gets paid for sending a patient to treatment to

 7      someone who can bill for those services.

 8        Q.  BY MR. CAPLAN:  Would you agree that an insurer

 9      wouldn't want to pay for claims that it wasn't legally

10      required to pay?                                            16:10:23

11            MR. COLLINS:  Calls for speculation.

12            THE WITNESS:  Well, you also broke up.  Would I

13      agree --

14        Q.  BY MR. CAPLAN:  I could reask the question if

15      you didn't hear it.                                         16:10:31

16        A.  I didn't.

17        Q.  So the question is:  Do you agree that an

18      insurer wouldn't want to pay for claims that it wasn't

19      legally required to pay?

20        A.  I agree that it would not.                            16:10:42

21        Q.  Do you agree that insurers generally want to

22      eliminate fraud, waste, and abuse in the treatment that's

23      provided to their members?

24        A.  I agree.

25        Q.  Was Cigna the only insurer to implement              16:10:57
```

Page 79

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    practices and policies to address out-of-network

 2    substance use disorder of treatment providers around

 3    2015?

 4         A.  They were not.

 5         Q.  Almost all the insurers did; right?              16:11:09

 6         A.  They did.

 7         Q.  To your knowledge, has it been industry standard

 8    practice for an insurer to require that all billed claims

 9    comply with administrative requirements, like records

10    that require signatures have signatures?                 16:11:24

11         A.  Yes.

12         Q.  To your knowledge, is it an industry --

13    insurance industry standard practice to implement claim

14    edits, including, for example, that some claims require

15    medical director approval before they can be paid?       16:11:41

16         A.  Yes.

17         Q.  To your knowledge, is it an industry standard

18    practice for insurers to pend a payment of claims until a

19    medical record review is complete?

20         A.  Yes.                                             16:11:56

21         Q.  To your knowledge, is it an industry history

22    practice for insurers to require that providers submit

23    documents evidencing that they have the appropriate

24    licenses?

25              MR. COLLINS:  Objection.  Overbroad.           16:12:12
```

Page 80

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1          THE WITNESS:  And are you talking about specific
 2    to substance abuse treatment --
 3          Q.  BY MR. CAPLAN:  Sure.
 4          A.  -- or would you be talking about all kinds of
 5    medical/surgical care?                              16:12:24
 6          Q.  We could limit this to SUD treatment.
 7          A.  Because when you begin to limit it to SUD
 8    treatment, then we start to be at odds with the Parity
 9    Act.
10          To my knowledge, I don't know of a payor who's    16:12:35
11    asked, other than through credentialing to join the
12    network, in out-of-network surgeon, to submit evidence of
13    credentialing to perform an appendectomy.
14          Q.  All right.  Well, so I'll ask the question a
15    little differently, then.  I appreciate that.         16:12:58
16          To your knowledge, is it industry standard
17    practice for insurers to ensure that providers have their
18    state level-of-care credentials before paying claims?
19          A.  It is an industry practice.
20          Q.  Did Medicare institute limits on the number of    16:13:18
21    drug test codes for which it would pay per day in 2015?
22          A.  No.
23          Q.  Has Medicare ever instituted limits on the
24    number of drug test payments for which it would pay per
25    day?                                               16:13:40
```

Page 81

CONFIDENTIAL ATTORNEYS' EYES ONLY

1        A.   No.

2        Q.   Has Medicare ever instituted limits on the

3   number of drug tests for which it would pay per week?

4        A.   Yes.

5        Q.   What are those limits?                          16:13:52

6        A.   I have to refer to the article that I wrote upon

7   which those limits are based, and I didn't review that.

8        Q.   Was that around 2015?

9        A.   It was.

10        Q.   And in the same time frame, did Medicare         16:14:10

11   institute any limits on the number of drug tests for

12   which it would pay per month?

13        A.   No.  Because --

14        Q.   So it's just --

15        A.   -- Medicare leaves in an exception for medical    16:14:19

16   necessity any urine drug test beyond the limits, and it

17   also allows a drug test to be done in the emergency

18   department even if the limit has been met.  So it's not a

19   blanket limit.

20        Q.   And so for the limits you mentioned, I think you   16:14:38

21   said they were in part based on the article you wrote; is

22   that right?

23        A.   That's correct.

24        Q.   Do you know why Medicare instituted these limits

25   on drug testing around 2015?                             16:14:50

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        A.   They wanted to element the amount of money that

2    was spent paying for these tests.

3        Q.   Do you think the limits on drug testing coverage

4    that Medicare implemented around 2015 were inappropriate?

5        A.   That's a difficult question for me to answer          16:15:12

6    because it was a strawman that was intended to be put out

7    there and then challenged over time with real tests of

8    medical necessity.  It was a consensus statement which

9    led to the adoption of those standards by

10   Medicare/Medicaid.                                              16:15:29

11        So the use of the term "appropriate" is very

12   difficult to endorse because it was only intended to be a

13   place to start to limit expenditures, and it wasn't

14   totally focused on fraud and abuse.  It was overall

15   expenditures.                                                   16:15:45

16        Q.   Have those limits changed at all since they were

17   implemented around 2015?

18        A.   The significant change to that is that the

19   number of tests that could be done together on a given

20   day were clustered.  So, you know, zero to 5, 6 to 10, 11       16:16:02

21   to 15, just as examples.  I'm not being completely

22   accurate there.

23        And one of the ways to do a quick test to see

24   whether a provider is doing routine and standard testing,

25   and not testing that's driven by medical necessity was to       16:16:22

Page 83

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    see whether all of their tests included the same number

2    for any given patient on any given day or any group of

3    patients on any given day.

4         So the significant change was we were looking

5    that there would be a standard distribution of the number    16:16:40

6    of analytes and metabolites that would be done on a

7    patient on any given test day.

8         Q.  And we can turn back to your report and

9    Exhibit 2 and ask about some language that's at the top

10   of page 30, but the section begins at the bottom of page    16:17:06

11   29, if you want to look at that first.

12        A.  I'm there.

13   ███   ████   ███████████████████████████████████

██   ████████████████████████████   ██████████████████

██   ████████████████████████████████████   ████████████

██   ████████████████████

██   ████   ████

██   ████   ████████████████████████████████████

██   ████████████████████████████

██   ████   ████                                       16:17:38

21        Q.  What's wrong with requesting documentation from

22   providers?

23        A.  Nothing is wrong with requesting it.  When it

24   becomes an administrative burden, it becomes wrong in the

25   sense of what's right and what's wrong.  What's a barrier    16:17:55

Page 84

CONFIDENTIAL ATTORNEYS' EYES ONLY

1    and what's not a barrier.  What's an impediment to a

2    reasonable action and what's not.

3           And I included it here because it was -- if it

4    was used over and over and over again for the same

5    provider for different cases, it became an administrative     16:18:13

6    burden.  And it acted in that way.

7       Q.  What do you mean by "administrative burden"?

8       A.  Many of these programs are responding to a need

9    for care, trying to keep people alive.  They're putting

10   together an array of providers to -- to cover the 24-hour     16:18:41

11   shifts if it's in a residential facility or monitoring

12   patients and keeping them safe, patients who are highly

13   vulnerable to overdose and death.

14          And when they had to start shifting resources to

15   back-office staff to respond to repeated requests for the     16:19:02

16   credentials on the same staff over and over again, they

17   weren't able to devote the same amount of time, money, or

18   service to patients who had the disorder.  And then it

19   becomes an administrative burden.

20          So I agreed to your question earlier that it was       16:19:24

21   an industry standard that developed.  I think that it was

22   an industry standard that when it got over used became a

23   burden that drove people out of care -- out of business,

24   made it impossible to do their business, and put the

25   lives of many Americans in jeopardy.                          16:19:43

Page 85

CONFIDENTIAL ATTORNEYS' EYES ONLY

1     Q.  And the next subject on the top of page 30 you

2     said," I have been provided no evidence to suggest that

3     Cigna took a collaborative approach to informing OON" --

4     that's out-of-network -- "SUD providers of Cigna's

5     expectation for prior or future SUD-related service       16:20:02

6     provision and billing."

7          Do you see that?

8     A.  I do.

9     Q.  All right.  And out-of-network providers are

10    again providers who chose to not have a contractual       16:20:12

11    relationship with Cigna; is that right?

12    A.  That's correct.

13    Q.  Is Cigna required to collaborate with

14    out-of-network providers?

15    A.  No, not at all.  Nor are providers required to        16:20:25

16    collaborate with Cigna.

17    Q.  And --

18    A.  But if the -- to the benefit of all if they did,

19    in the same way it benefits us that you're treating me

20    better than you were an hour ago.                         16:20:44

21        MR. COLLINS:  Sorry.

22    Q.  BY MR. CAPLAN:  And especially with PPO plans,

23    you understand that the member-patient gets to pick their

24    provider; is that right?

25    A.  Yes, I do.                                            16:20:58

Page 86

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.  If a patient can pick an out-of-network provider

2   or an in-network provider; right?

3      A.  They do.

4      Q.  And when they do, it's the plan, their insurance

5   plan, that dictates how much the insurer is going to pay          16:21:13

6   the provider; is that right?

7      A.  That's correct.  The plan also decides how much

8   of a burden is left in the patient's hands.

9      Q.  And if you look a little bit further down on

10  page 30 of Exhibit 2, the last paragraph before                  16:21:32

11  Section K, there's a name Sharon Dennis.  Who's Sharon

12  Dennis?

13     A.  It was a Cigna SIU investigator whose testimony

14  I reviewed.

15     Q.  And then do you see footnote 73 at the end                 16:21:54

16  there, and if you look at footnote 73 there's a document

17  Cigna_TML00095850; right?

18     A.  Yes.

19        MR. CAPLAN:  So I'll go ahead and mark that

20  document as Exhibit 4.  That will be up on Exhibit Share          16:22:13

21  in a second.

22        (Exhibit 4, Email from Thomas Despard to Thomas

23        Despard and Kayla Maciejewski, 12/11/19,

24        Cigna_TML00095850, was marked for identification

25        by counsel electronically.)                                 16:22:46

                                                        Page 87

1      Q.  BY MR. CAPLAN:  It should be available, if you

2  can let me know when you have it.

3      A.  Are we going to break the suspense?

4      Q.  All right.  Can you let me know when you've had

5  a chance to review Exhibit 4?                              16:23:24

6      A.  Yes.

7      Q.  Is there anyone named Sharon Dennis referenced

8  in Exhibit 4?

9      A.  I'm trying to remember if the case was -- if the

10 patient was Sharon Dennis.  I'm -- hold on.  Again,        16:23:55

11 there's volumes and volumes of material, and I'm sorry to

12 slow this down, but I'm just -- I just want to make sure

13 that it wasn't Sharon Dennis, the patient.

14          MR. COLLINS:  If that is the case, we'll make

15 sure that we redact that name.  That's been mentioned now  16:24:21

16 a couple -- a few times.

17          MR. CAPLAN:  Yeah, and I'd just like to point

18 out I think any -- you know, of the patient-specific

19 information, any of the information that Cigna has

20 designated as AEO previously in the testimony should be    16:24:38

21 designated as AEO the remaining testimony is

22 confidential, as long as we do that on the record.

23          MR. COLLINS:  Yeah.

24          THE WITNESS:  I -- I am so very sorry, but I am

25 typically impeccable in that regard.  But again, things    16:24:54

Page 88

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1     came down to the final hour.

2            So on TML there is no SD.  So I don't know where

3     I got that -- why I have that as the reference and not TD

4     or KM, but I'd be happy to -- I would be happy to -- and

5     it may have been -- is there -- is there testimony --        16:25:28

6     hold on.

7            MR. COLLINS:  By Sharon Dennis, not that I

8     recall.

9            THE WITNESS:  I tend to be -- I tend to be -- I

10    tend to be fairly decent, more than fairly decent in that    16:25:39

11    regard, but let me just see.

12           I -- I don't have a good answer for that.

13       Q.  BY MR. CAPLAN:  And if you look at your report

14    again, Exhibit 2, back on page 30, in that same sentence

15    just above Section K, you have a quote.  It says, "I just    16:26:03

16    deny everything for medical records and they do not

17    respond."

18           Do you see that?

19       A.  Yes.

20       Q.  And if you go and look at Exhibit 4, towards the      16:26:14

21    end, that same language, again it in quotes appears.

22           Do you see that?

23       A.  Yes.

24       Q.  At the beginning of Exhibit 4, it's a message

25    from Thomas Despard that says, "Hey, I just got an email     16:26:29
```

Page 89

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    from an investigator at Blue Cross."

2           Do you see that?

3       A.  Yes.

4       Q.  And Mr. Despard also sent the message with the

5    quoted "I just deny language" at the bottom; right?        16:26:41

6       A.  Yes.

7       Q.  Isn't it likely that that is a quote that

8    Mr. Despard has taken from the Blue Cross email that he

9    received?

10          MR. COLLINS:  Objection.  Calls for speculation.   16:26:54

11          THE WITNESS:  It's possible.

12      Q.  BY MR. CAPLAN:  Yeah.  Isn't that the better

13   reading of Exhibit 4, is that Mr. Despard is quoting from

14   a source if he put the -- the words in quotes?

15          MR. COLLINS:  Objection.  Argumentative and        16:27:10

16   calls for speculation.

17          THE WITNESS:  It does.  It's a better

18   explanation.

19      Q.  BY MR. CAPLAN:  If you can please turn to

20   page 31 of your report, Exhibit 2.                         16:27:18

21      A.  I'm there.

22      Q.  And do you see that the series of bullet points

23   where you list Cigna's profits for its SEC filings?

24      A.  Yes.

25      Q.  Do you know Cigna's profit margins?               16:27:41

                                                    Page 90

CONFIDENTIAL ATTORNEYS' EYES ONLY

1      A.   What do you mean by that?

2           MR. COLLINS:   Objection.   Vague and ambiguous.

3      Q.   BY MR. CAPLAN:   Do you have an understanding of

4   what the term "profit margin" means?

5      A.   Yes.                                    16:27:58

6      Q.   So do you know what Cigna's profit margins were

7   to earn the profits reflected in your report?

8      A.   No.

9      Q.   Do you know how many medical customers Cigna has

10  each year to earn the profits listed in your report?   16:28:11

11     A.   No.

12     Q.   Do you know how much money the plaintiffs make?

13     A.   It varies.

14     Q.   Do you know how profitable the plaintiffs are?

15     A.   It varies.                              16:28:28

16     Q.   Could you give me an explanation of the

17  profitability for plaintiffs in this case?

18     A.   Well, it -- I don't even know how to begin to

19  answer that question in a reasonable way because it would

20  vary depending upon whether they are able to bill and get   16:28:50

21  paid for the services that they provide.

22          When -- when -- when they have a complete and

23  total shutdown of their being paid for services that they

24  have provided, they no longer are profitable.

25     Q.   Do you know if the plaintiffs ever earned more   16:29:09

                                                    Page 91

1    than $600 a year for profit per patient?

2         A.  I don't know why they wouldn't have.

3         Q.  So you would expect that the plaintiffs have

4    made at least $600 of profit per year per patient; right?

5         A.  Sure.                                    16:29:34

6         Q.  Okay.  If the plaintiffs were earning less than

7    $600 a year in profit per patient, would you say that

8    they'd be putting profit over their patients?

9              MR. COLLINS:  Objection.  Calls for speculation.

10             THE WITNESS:  That -- that can't be a straight   16:29:50

11   direct relationship in that way.

12        Q.  BY MR. CAPLAN:  Why not?

13        A.  Because a lot of things go into what they are

14   paying for.

15        Q.  What does that mean?                      16:30:11

16        A.  It means that no two providers are alike, no two

17   patients are alike.

18        Q.  Would you be surprised if Cigna made less than

19   that per patient?

20             MR. COLLINS:  Calls for speculation.     16:30:31

21             THE WITNESS:  No, I wouldn't.  We are -- we are

22   not -- it would be as if you were asking me does the guy

23   who's washing your car make a certain amount of money on

24   the car versus the guy that's selling you an apple making

25   a certain amount of money on the apple.           16:30:50

Page 92

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          The guy that's washing the car is engaged in

2     labor.  The guy that's selling you the apple is selling

3     you a product.  You're comparing apples to car washes

4     here.

5          Q.  BY MR. CAPLAN:  How so?                        16:31:04

6          A.  Cigna is not running a treatment program.

7     ███████████████████████████████████████████████████

      ████████████████████████████████████████████████

      ██████████████████████████████████████  I don't

10    know what -- what the standard is for the industry, but  16:31:24

11    it's not comparable to what someone should be able to

12    earn on a year of service for a bed in a treatment

13    program.  They're not -- you can't equate them.

14         Q.  So the provider should make more money is what

15    you're saying?                                          16:31:46

16         A.  That's not what I'm saying.  I'm saying you

17    can't ask me to compare those two.

18         Q.  Are the providers supposed to consider their --

19    their profits in running their business?

20         MR. COLLINS:  Objection.  Vague and ambiguous      16:32:03

21    and calls for speculation.

22         Q.  BY MR. CAPLAN:  Would you expect that the

23    plaintiffs in this case consider how much money they make

24    in operating their businesses?

25         A.  I was going to answer that "yes" before the     16:32:16

                                                  Page 93

1    objection.

2         Q.  And going back to the report, Exhibit 2, and you

3    can turn to page 32.  At the bottom of page 32 and 33,

4    you'll see several links to websites that have citations

5    for laws.                                        16:32:42

6         Do you see that?

7         A.  Yes.

8         Q.  Did you do that legal research yourself?

9         A.  Yes.

10        Q.  Are you familiar with how the plaintiffs in this   16:32:49

11   case established their billed charges?

12        A.  Not each and every one of them, but I understand

13   how people establish billed charges for these programs.

14        Q.  You didn't speak with any individual plaintiff

15   to understand how they established their billed charges   16:33:12

16   in this case; right?

17        A.  No.

18        Q.  And you'll agree that out-of-network providers

19   can unilaterally set their billed charges?  They can

20   choose how much they charge for their services?   16:33:28

21        A.  I know that to be true, except in instances

22   where there's been a cap put on a particular state, for

23   example, of out-of-network charges.  And then any

24   provider acting in that state as an out-of-network

25   provider has their charge capped.                16:33:48

Page 94

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        Q.  Do you know if any of the plaintiffs have ever

 2   been in-network with Cigna?

 3        A.  I don't.

 4        Q.  Do you know if any of them are currently

 5   in-network with Cigna?                               16:34:00

 6        A.  I don't.

 7        Q.  If any of the plaintiffs were in-network with

 8   Cigna, would that change any of your opinions?

 9        A.  No.

10        Q.  Why not?                                     16:34:11

11        A.  Because the decision to go in-network or

12   contract with MultiPlan are very complicated business

13   decisions that these owners and operators of these

14   programs come to in order to continue to be in business

15   and to be profitable.  So it doesn't surprise me when   16:34:27

16   someone says, well, I'm not making it this way so I'm

17   going to go in-network.  There are some benefits to being

18   in-network.  Or they say, I would rather know through my

19   MultiPlan contract what I can generally expect I'm going

20   to be paid for these services, and it will allow me to be  16:34:45

21   paid faster and more reliably.

22           Lots of decisions get made so that people can

23   stay in business and provide these critical services to

24   people.

25        Q.  Did you do any analysis to compare each of the  16:35:03
```

Page 95

```
 1    plaintiffs' charges for the same service?

 2        A.  Yes.

 3        Q.  Are you aware that each plaintiff often charge

 4    very different amounts for the same services they did

 5    before?                                           16:35:23

 6            MR. COLLINS:  I'm sorry, Matt, was that "varied"

 7    or "very"?

 8            MR. CAPLAN:  Very.  It works either way.

 9            MR. COLLINS:  Yeah, I'll object vague and

10    ambiguous.                                        16:35:33

11            THE WITNESS:  I'm aware that a provider may

12    charge a different amount from one bill to the next, and

13    providers may charge different amounts from each other.

14    So yes.

15        Q.  BY MR. CAPLAN:  Do you think that an          16:35:47

16    out-of-network provider should price a particular service

17    or treatment consistently across the different patients

18    they see?

19            MR. COLLINS:  Objection.  Overbroad.  Calls for

20    speculation.                                      16:36:00

21            THE WITNESS:  It might make things simpler, but

22    it's not necessarily the way it has to be.

23        Q.  BY MR. CAPLAN:  Because the out-of-network

24    provider has the freedom to set its prices?

25        A.  Yes.                                        16:36:18
```

Page 96

CONFIDENTIAL ATTORNEYS' EYES ONLY

1      Q.  Do you agree that out-of-network providers

2  typically do not receive 100 percent of their billed

3  charges for health insurance companies?

4          MR. COLLINS:  Objection.  Calls for speculation.

5  Overbroad.                                            16:36:32

6          THE WITNESS:  We are talking about what happened

7  over a long period of time, too.  And that has changed,

8  and it's changed for providers.  And there are things

9  that I'm aware of that even offsite billing companies do

10 with collections that the provider might not be aware of  16:36:52

11 to settle claims.

12         So there is no one real straight answer to that

13 because it's over a long period of time, a long period of

14 operation, and some -- different kinds of providers doing

15 different things over time in a different environment.   16:37:15

16     Q.  BY MR. CAPLAN:  Do you know if Medicare

17 determines reimbursement for any services based on a

18 provider's billed charges?

19     A.  When Medicare sets a rate, it doesn't base it on

20 the provider's billed charges.  It bases it on an        16:37:39

21 analysis of what should go into that rate.

22     Q.  Going back to your report, Exhibit 2, on

23 page 38.

24     A.  I'm there.

25     Q.  And about halfway through the first paragraph on  16:38:13

Page 97

CONFIDENTIAL-ATTORNEYS' EYES ONLY

```
1     the page, do you see there's a discussion about the

2     ████████████████████████████████████████████████████

      ████████████

4             MR. COLLINS:  I'm sorry, what page are we on?

5             MR. CAPLAN:  38 of Exhibit 2.              16:38:34

6             THE WITNESS:  And what sentence am I looking at,

7     the first -- first full paragraph or the first paragraph?

8        Q.  BY MR. CAPLAN:  The -- just the first paragraph,

9     and about halfway down, the sentence that begins with

10    "further."                                         16:38:50

11       A.  Okay.  Yes.

12            MR. CAPLAN:  Are you there, Rich, too?  I just

13    want to make sure we're all on the same page?

14            MR. COLLINS:  All on the same page.  Thank you.

15       Q.  BY MR. CAPLAN:  All right.  And so the question 16:39:03

16    I had is:  ████████████████████████████████████████

      ███████████████████████████████████████████████

      ████████████████████████████████████████████

19       A.  Yes.

20       Q.  ██████████████████████████████       ███████████

      █████████████████████████████████████████████████

      █████████████████████████████████████████████

      ████████████████

24       A.  I understand that denial of coverage is a -- is

25    a catastrophic event for everyone.                 16:39:54
```

Page 98

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        Q.   That's not my question.   My question is: ████

██   ████████████████████████████████████████████████

██   ████████████████████████████████████████████

██   ████████

5        A.   That wasn't your last question.   If we could          16:40:13

6    have it read back, but that wasn't the form of your last

7    question, really.

8        Q.   My question is: ████████████████████████████

██   ████████████████████████████████████████████████████

██                                                               16:40:27
     ██████████████████████████

11       A.   They do not.

12       Q.   Do you know how much money patients have saved

13   as a result of Cigna's Cost Containment Program?

14       A.   I don't.

15       Q.   Do you understand that Cigna's Cost Containment          16:40:48

16   Programs are meant to protect patients from large

17   out-of-network bills?

18       A.   I don't.

19       Q.   ████████████████████████████████████████

██   ████████████████████████████████████████████        ████████████

██   ██   ████████████

22       Q.   If you can please turn to page 41 of your

23   report, Exhibit 2.

24       A.   I'm there.

25       Q.   And in the first full paragraph, the second              16:41:35

Page 99

CONFIDENTIAL - ATTORNEYS' EYES ONLY



```
1    paragraph on the page that begins "as Cigna internal

2    emails indicate."

3           Are you with me?

4    A.   I am.

5    Q.   And further down in that paragraph, it says,        16:41:52

6

13   A.   That's correct.

14   Q.   What's your basis here for the statement here

15   that Cigna's using                              in        16:42:30

16   these calculations?

17   A.   Cothron's deposition.

18   Q.   Who's deposition?

19   A.   Cothron deposition.

20   Q.   Nothing else, just the deposition testimony         16:42:45

21   cited from Terri Cothron in footnote 140?

22   A.   Right.

23   Q.   Further down in that paragraph -- and this one,

24   it might be helpful to compare the language in your

25   initial report, which is Exhibit 1, and this language is  16:43:08
```

Page 100

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    on page 24 of your initial report.

2         A.  Okay.

3         Q.  It's the second full paragraph in Exhibit 1,

4    towards the end of the -- the paragraph, looking on

5    Exhibit 1 on page 24 says, "███████████████████        ██████████

     ████████████████████████████████████████████████████

     ██████████

8         A.  I see where you are.

9         Q.  And if you go back to Exhibit 2 in Exhibit 41,

10   you changed that language, and it doesn't have the ██████        ███████████

     ████████████ ████████████████████████████████████████

     ████████████████████████████████████████████████████

     ██████████         ████████████████████████████████████████████████

14        A.  Again, the first report was done before I had

15   sufficient information and data to review.  And on closer    16:44:11

16   review of the data and the depositions, ████████████████

     ██████████████████████████████████████    It's not used.

18        Q.  And if you turn to page 42 of Exhibit 2 and

19   we've got your first opinion heading.  Just let me know

20   when you're there.                                            16:44:45

21        A.  I'm there.

22        Q.  And what is Cigna's payments to out-of-network

23   providers impact patients?

24        A.  I'm sorry.  You broke up.

25        Q.  All right.  So my question is:  How do Cigna's       16:45:02

                                                     Page 101

1    payments to out-of-network providers impact patients?

2         A.  In a myriad of ways.  It drives out-of-network

3    providers out of the business.  It reduces the

4    out-of-network providers' interest in working with Cigna

5    patients.  It deprives the out-of-network provider of the      16:45:21

6    payment for the services that they provided in good faith

7    to Cigna's covered lives.  Just a myriad of ways.

8         Q.  In Opinion 1, what do you mean pay under

9    reimbursement plaintiff's claims?

10        A.  That they get less than they claim they should      16:45:51

11   be reimbursed.  The claim was gutted.

12        Q.  You used the word "arbitrary" in the opinion.

13   Do you see that?

14        A.  Yes.

15        Q.  How do you fine "arbitrary" in this context?      16:46:05

16        A.  Well, as not based upon a rule or a system.

17        Q.  And then towards the end of Opinion 1, you have

18   "an arbitrary nominal percentage of the charges."

19             What does the percentage of plaintiffs' billed

20   charges that are being paid matter?      16:46:34

21        A.  Well, it's one way of describing what was paid.

22   I could have said a nominal amount of the charge.

23        Q.  Turning to the next page, page 43 of Exhibit 2.

24        A.  Okay.

25        Q.  In the second full paragraph, at the --      16:47:07

Page 102

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    beginning at the end of the first line, it says, "But

 2    only when a Medicare rate is available and only if Cigna

 3    bases that rate upon a methodology similar to a

 4    methodology utilized by Medicare."

 5            Do you see that?                              16:47:23

 6        A.  Yes.

 7        Q.  All right.  And so the question I have is the

 8    first part of that, "only when a Medicare rate is

 9    available."  What are you basing that statement on?

10        A.  Again, it's my reading.  I currently serve --   16:47:41

11    and I can't help what I do -- I currently serve as a

12    consultant to the Department of Labor, and their

13    investigations of violations of parity.  And in my work

14    with them, I read volumes of material.  I can't tell you

15    how I have come to know this, but I know this.           16:48:05

16        Q.  This is a question specifically about language

17    in Cigna's plan documents.

18        A.  Right.

19        Q.  How do you know this about Cigna's plan

20    documents?                                               16:48:19

21        A.  Oh.  I didn't cite that?

22        Q.  There is no citation in that paragraph.  There

23    is only three on this entire page.

24        A.  Yeah, it's probably from the same web page where

25    I saw other Cigna plan documents.                        16:48:33
```

Page 103

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1        Q.  Yeah.  So there's a quote at the second -- at

2    the end of that sentence; right?  So that's where you

3    get, quote, "Upon a methodology," and it goes on; right?

4        A.  Yeah.

5        Q.  There's no -- when a Medicare rate is available.    16:48:48

6    And that language does not come from the Cigna plan.  And

7    that's my question?

8            Where did you cull that language from to render

9    an opinion that a Medicare rate had to be available in

10   order to utilize the MRC II methodology?                   16:49:04

11       A.  Because I believe that I know that to be the

12   case for all payors, not just Cigna.

13       Q.  It's not based on anything you reviewed in this

14   case?

15       A.  Yeah.  It's -- yep.  But again, you know, I        16:49:17

16   apologize for the work that I do that gives me access to

17   this stuff.  This is a -- if -- if you want me to, I can

18   go and find the source documents that refer to that.

19   It's part of my work with the Department of Labor.

20       Q.  I would appreciate if you could provide a          16:49:44

21   citation or the source for that.

22       A.  Okay.

23       Q.  Even if we don't do it today.

24       A.  I will get that today.

25       Q.  Thank you.                                         16:49:59
```

                                                      Page 104

CONFIDENTIAL ATTORNEYS' EYES ONLY

```
 1              Further down on page 43, just before the chart,
 2      you start discussing MultiPlan Global Agreements.
 3              Do you see that?
 4      A.  Yes.
 5      Q.  Do you have an understanding of how these        16:50:10
 6      agreements between a provider and MultiPlan would work?
 7      A.  Again, because we were in a situation with the
 8      provider where I was the corporate medical director to --
 9      to enter into a MultiPlan agreement, yes, to the extent
10      that I was involved in that, and then yes, to the extent  16:50:35
11      that I know this -- this is the process that's used.
12      Q.  Did you review the Global Agreements that were
13      identified in this case?
14      A.  No.
15      Q.  Do you have an understanding as to whether or     16:50:57
16      not the Global Agreements in this case are mandatory for
17      claims to be reimbursed?
18      A.  To the extent that you have to -- yes, in order
19      to know how they're going to be reimbursed, but either
20      party can decide not to refer to it.  And there may be an  16:51:18
21      agreement that then doesn't get applied to a subsequent
22      claim.
23      Q.  And the last paragraph on 43 says, "As a
24      clinician who has been practicing for nearly 40 years and
25      who has been intimately in an array of treatment programs  16:51:40
```

Page 105

1    located in a number of states, including California,

2    plaintiffs charged prices are reasonable and customary

3    based on their geographic location and type of services

4    they provide."

5         Did you do any analysis to confirm that, or is      16:51:55

6    this just based on your 40 years' experience?

7         A.  I did analysis.

8         Q.  And what analysis did you do to determine that

9    plaintiffs' charged prices are reasonable and customary

10   based on their geographic location and type of services   16:52:11

11   they provide?

12        A.  So I have intimate knowledge of their peer

13   programs in the area, both those with national

14   reputations and those that are local.

15        I did an analysis of the staff that worked in        16:52:26

16   each of those programs to get a sense of what their costs

17   should be.  I looked at a variety of medical records to

18   see what services were being provided that would

19   constitute a day of care or an episode of care, if it was

20   a PHP, or a unit of care if it was an IOP, and then I      16:52:44

21   looked at the -- the bills.

22        Q.  Where is that in your report in this case?

23        A.  I had to stipulate to my experience, training,

24   and the work that I did to get this report together

25   without making it a hundred-page report.                  16:53:14

                                                Page 106

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.  All right.  It's just this -- well, it should --

2   it's only one sentence.  I think it should be two

3   sentences.  It's just those two sentences on the bottom

4   of page 43, where you talk about plaintiffs' charged

5   prices being reasonable and customary?                    16:53:30

6      A.  Uh-huh.  That's -- that's my opinion.

7      Q.  It's just that one run-on sentence; right?

8      A.  That's my opinion is what?  I'm sorry.

9      Q.  It's just that one run-on sentence at the bottom

10  of page 43?                                                16:53:48

11         MR. COLLINS:  Objection.  Argumentative.

12         MR. CAPLAN:  I think there should be a period

13  before California and plaintiffs, or maybe a comma.

14  So...

15         THE WITNESS:  I'm sorry.                            16:53:57

16         MR. CAPLAN:  We could move on to page 46 --

17         THE WITNESS:  I found a typo on page 3, too,

18  that I can go back and correct for you, while we were

19  going through it.

20         MR. CAPLAN:  I'll say admittedly, I did not         16:54:15

21  notice this line until I was asking you the question.

22         THE WITNESS:  Now you want me to laugh with you?

23  After you said I write run-on sentences, you want me to

24  be -- okay.  Okay.

25         Where are we on page 44, please?                   16:54:30

                                                           Page 107

CONFIDENTIAL-ATTORNEYS' EYES ONLY



```
 1        Q.  BY MR. CAPLAN:  46, please.

 2        A.  Thank you.

 3        Q.  Do you see the heading number three on page 46?

 4        A.  I do.

 5        ████  ████████████████████████████████      ███████

 ██  ██    ████  ███████████████████████████████

 ██  ██████████████████

 ██  ████  ████████████████████████████████

 ██  ██████████████████████████  the same way

10   here that we discussed earlier in the deposition?    16:55:08

11        A.  Yes.

12        Q.  All right.  And then what do you mean by

13   ██████████████████████

 ██    ████  ██████████████████████████████

 ██  ████████████████████████████████████        ███████

 ██  ██████████████████████████████████

 ██  ████████    █████████████████████

 ██    ████  ████████████████████████████

 ██  ████████████████████████████████

 ██  ████████████████                          16:55:47

21        Do you see that?

22        A.  Yes.

23        Q.  All right.  What do you mean by "flawed

24   methodologies"?

25        A.  Since the requirement is if it follows the   16:55:52

                                           Page 108
```

```
 1    Medicare methodology, if you're going to use the Medicare

 2    methodology to set your rates, you have to use the

 3    Medicare methodology.  But if the Medicare methodology

 4    doesn't exist or isn't known, any methodology used is

 5    flawed because it doesn't comport with the law.        16:56:10

 6        Q.  Okay.  Anything else?

 7        A.  Isn't that enough?

 8        Q.  I just want to make sure I'm understanding.

 9            And then the beginning of that next sentence --

10        A.  I'm sorry.  We're talking over one another.      16:56:33

11            I think that that is the major crux of the flaw.

12    There might be, you know, minor ways of looking at it,

13    but if it doesn't exist or it's unknown, you can't employ

14    it.  And anything that you do that doesn't follow it, if

15    it's unknown or doesn't exist, is flawed.              16:56:52

16        Q.  And in that same paragraph, the beginning, you

17    write, ███████████████████████████████

██    ████████████████████████████

19            Can you tell me what those additional examples

20    are?                                                   16:57:08

21        A.  ████████████████████████████

██    ████████████████████████████████████

██    ███████████████████████████████████

██    ████████████████████████████

██    ████████████████████████████████    16:57:30
```

Page 109

CONFIDENTIAL ATTORNEYS' EYES ONLY

1   ████████████████████████████████████

2   ████████████████████████████████████

3   █████████████████████████████████████████

4   █████████████████████████████████████████

5   ██████████████████████████████████████   16:57:44

6       Q.  That's what's written here; right?

7       A.  Those are the examples.

8       Q.  Yeah.  Okay.  So that was the question.  Were

9   there examples that aren't listed in the report here?

10      A.  I thought the question were what are the          16:57:59

11  additional examples.

12      Q.  Yeah.  Because I read this to mean that there

13  are additional examples you weren't including in the

14  paragraph.

15      A.  You read it in a flawed way.                      16:58:09

16      Q.  All right.  Well, so it's all -- it's all in

17  there?

18      A.  It's all on you.

19      Q.  Okay.  Do you agree that insurers can deny

20  claims that are submitted with inaccurate procedure       16:58:30

21  codes?

22          MR. COLLINS:  Objection.  Vague and ambiguous.

23          THE WITNESS:  They can.  Probably should.  But

24  also your payors paid claims that had flawed codes.

25      Q.  BY MR. CAPLAN:  And an example of a flawed        16:58:56

Page 110

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    procedure code might be if the procedure code doesn't

2    align with the actual treatment that was provided?

3         A.  Correct.

4         Q.  Do you know whether or not psychotherapy can

5    only be provided by a Master's or Doctorate level        16:59:17

6    licensed professional, a psychotherapist?

7         A.  Not according to California law.  And under this

8    form of treatment, psychotherapy is not what is

9    described.  I -- I -- I put in several paragraphs about

10   that if we want to look at it.                           16:59:41

11        Q.  Do you understand that there is a difference

12   between psychotherapy and intensive outpatient programs

13   in the SUD space?

14        A.  I do.

15        Q.  All right.  And what are the differences?       16:59:56

16        A.  So psychotherapy can be a component of an

17   outpatient program, the service is provided in an

18   outpatient program.  And psychotherapy alone is never

19   enough to treat a substance use disorder.

20             And your expert misread the California law, and 17:00:29

21   so I put a number of pieces of information in here to try

22   to help people come back to a common understanding of

23   what constitutes substance use treatment.

24        Q.  And that's all included in your supplemental

25   report that was provided yesterday?                      17:00:47
```

Page 111



1        A.  Yes, sir.

2        Q.  We can go back to page 14 of Exhibit 2.

3        A.  I'm there.

4        Q.  And at the top of page 14, you mention that

5        ████████████████████████████████████████   ██████████

         ██████  right?

7        A.  Yes.

8        Q.  ███████████████████████████████████

         ███████████████████████████████████████████

         ██████████████████████████   ██████████

         ████   ████

         ████   ██████████████████████████████

         █████████████████████████████████████

         ████████████████████████████

         ████   ████                             ██████████

         ████   ███████████████████████████████████

         ████████████████████████████████████████

         ██████████████████████████

19       A.  No.  None that were peer reviewed.

20       Q.  Turn to page 16 of Exhibit 2.  You'll see the        17:02:14

21       one -- "Level 1 Outpatient and Level 2 IOP/PHP Services."

22       And then running all the way to page 22, up until the

23       section that begins "Recovery"?

24       A.  Yes.

25       Q.  I think those were all new additions in this        17:02:36

                                                          Page 112

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   supplemental report.  They weren't in your initial report
 2   from March; right?
 3       A.  That's correct.
 4       Q.  All right.  And the citations here for almost
 5   that section were from the ASAM criteria from 2013; is        17:02:52
 6   that right?
 7       A.  That's correct.
 8       Q.  So the materials that you needed to rely on to
 9   write these sections from page 16 to 22 all existed when
10   you submitted your initial report; right?                     17:03:10
11       A.  They did.
12       Q.  And this could have been in your initial report;
13   right?
14       A.  I deemed it unnecessary.  This is in response to
15   Kelly's testimony.                                            17:03:20
16       Q.  Do you know Dr. Kelly Clark?
17       A.  Yes.
18       Q.  How do you know Dr. Clark?
19       A.  I know her through ASAM, the American Society of
20   Addiction Medicine.                                           17:03:35
21       Q.  Have you worked together at ASAM?
22       A.  Yes.
23       Q.  What are your impressions of Dr. Clark?
24           MR. COLLINS:  Objection.  Overbroad.
25           THE WITNESS:  Right.  This -- I have a personal       17:03:51
```

Page 113

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   relationship with her, and I think it has nothing to do

 2   with this case.

 3       Q.  BY MR. CAPLAN:  Do you find Dr. Clark to be

 4   credible?

 5           MR. COLLINS:  Objection.  Vague and ambiguous.    17:04:03

 6   In this case?

 7           THE WITNESS:  In this matter, I think she was

 8   probably the worst witness you could have hired.

 9       Q.  BY MR. CAPLAN:  Why is that?

10       A.  Because she has been a very strong advocate for    17:04:17

11   MOUD treatment, medication assisted treatment for opioid

12   use disorder.  But opioid use disorder is a very small

13   percentage of substance use disorder, and she has gone on

14   record saying that there is no evidence-based residential

15   treatment and fails to recognize that without other forms   17:04:38

16   of care that don't include medicine, in effect, the

17   Government recommends that you inform a patient that MOUD

18   should be used, not that it's required, but fails to

19   recognize that most people don't recover using MOUD.

20   They recover using these other forms of therapy for which   17:04:59

21   these determinations are being made as to what the

22   reimbursement rate should be.

23       Q.  What does that have to do with the

24   interpretation of Cigna's claim language?

25       A.  Is Cigna only paying for MOUD?  I don't           17:05:13
```

Page 114

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    understand how she could be qualified to speak to

2    anything that you would pay for other than MOUD.

3        Q.  Why are you qualified to speak to anything,

4    Dr. Barthwell?

5            MR. COLLINS:  Whew.  Whew.  Objection.          17:05:33

6    Argumentative.  And should we go back over the

7    qualifications you covered and the report?

8            But I'll leave that up to you.

9            THE WITNESS:  Actually, I put my qualifications

10   in the report, and I noticed that you chose not to      17:05:47

11   address them.  So I assumed that you were going to

12   stipulate to them.  But if you would like to go over them

13   in detail, we can do that in the time we have left.

14       Q.  BY MR. CAPLAN:  Is everything -- are your

15   qualifications accurate?                                17:06:05

16       A.  Yes.

17       Q.  All right.  Then why do I need to ask you about

18   them if you accurately wrote them down in your report?

19       A.  Then why did you ask me about them?

20       Q.  Because you want to talk about them because you  17:06:16

21   like talking about yourself?

22       A.  No.  You just --

23           MR. COLLINS:  Objection.  Argumentative.

24           THE WITNESS:  You just asked me what were my

25   qualifications.  I'm asking you:  Why do you need to ask  17:06:23
```

Page 115

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    me what my qualifications are?  If -- are they not

2    adequately represented in my report?

3             MR. CAPLAN:  That wasn't my question.

4             THE WITNESS:  It wasn't a question?

5             MR. COLLINS:  You asked --                      17:06:33

6             MR. CAPLAN:  That was not a question.

7             MR. COLLINS:  -- why she considers herself an

8    expert.  It goes -- that was exactly what you asked.  I'm

9    sorry.

10            THE WITNESS:  You -- you maybe didn't catch the   17:06:44

11   edge to the question.  You may have intended to ask me

12   what makes me an expert, but what you asked me was:  What

13   makes you qualified.

14       Q.  BY MR. CAPLAN:  Yeah, I did ask you.  What makes

15   you qualified to speak to anything in this case?          17:06:57

16       A.  It's in my report.  My qualifications are laid

17   out in the report.

18       Q.  Okay.  Do you generally find Dr. Clark to be

19   reliable?

20       A.  I haven't had to interact with her in that way.   17:07:19

21       Q.  What do you mean?

22       A.  I haven't had to interact with her in a way to

23   determine whether she's reliable or not reliable.

24       Q.  Do you find her to be credible?

25       A.  I haven't had to interact with her in that way.   17:07:32
```

Page 116

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1          Q.  Do you find her to be an honest person?

 2          A.  I haven't had to interact with her in that way.

 3          Q.  You said you had a personal relationship with

 4     her.  Do you have no sense of whether or not she's

 5     honest?                                            17:07:47

 6          A.  I didn't understand the question.

 7          Q.  You said you have a personal relationship with

 8     her.  So my question is:  In the course of that

 9     relationship, you haven't had a chance to decide whether

10     or not you think she's an honest person?           17:07:58

11          A.  I haven't had to interact with her in that way.

12          Q.  Do you think she's trustworthy?

13          A.  I haven't had to interact with her in that way.

14          Q.  Do you think she's believable?

15          A.  I haven't had to interact with her in that way.  17:08:10

16          Q.  How long have you known Dr. Clark?

17          A.  Since about 2014.

18          Q.  How much time have you spent with Dr. Clark over

19     those nine years?

20          A.  Maybe three hours a year in each of those years.  17:08:28

21          Q.  Do you agree that intensive outpatient treatment

22     is a lower level of care than partial hospitalization

23     treatment?

24          A.  I do.

25          Q.  All right.  What does it mean to be a lower    17:08:43
```

                                                    Page 117

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    level of care?

 2        A.  It means that as it is generally defined, you

 3    are participating in fewer hours per day, fewer days per

 4    week in the IOP level of care.

 5            PHP generally is four or five days a week, four     17:09:00

 6    or five hours per day.  And IOP is nine hours or more a

 7    week in three-hour blocks, three days a week, generally

 8    offered to people who are employed, in an evening

 9    program.

10        Q.  Is it your opinion that substance use disorder     17:09:23

11    treatment providers render a higher level of care than

12    inpatient in psychiatric hospitals?

13        A.  You broke up again.  I'm sorry.

14        Q.  Is it your opinion that substance use disorder

15    treatment providers render a higher level of care than     17:09:39

16    inpatient in psychiatric hospitals?

17        A.  No, it is not my opinion.

18        Q.  Is it your opinion that inpatient care provided

19    psychiatric hospitals is less resource intensive than

20    care provided by the plaintiffs in this case, where        17:09:59

21    patients can leave the facility?

22            MR. COLLINS:  Objection.  Vague and ambiguous.

23            THE WITNESS:  That is not my opinion.

24        Q.  BY MR. CAPLAN:  Do you know whether or not there

25    are generally more medical staff employed at hospitals as  17:10:11
```

Page 118

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    compared to the plaintiffs' facilities in this case?

2         A.  I know there are generally more medical staff

3    employed in hospitals, and many of those positions are --

4    employ nurses or physician extenders because of the

5    requirement of having medical care 24/7, and some of          17:10:30

6    those positions, since that wouldn't be required in these

7    residential or community-based settings of care, would

8    not have that kind of staff person but somebody with more

9    of a clinical training.

10        Q.  Do you have an opinion as to whether it's more       17:10:47

11   costly to construct a psychiatric hospital or a

12   residential treatment facility?

13        MR. COLLINS:  Objection.  Vague and ambiguous.

14   Calls for speculation.

15        THE WITNESS:  To construct a hospital, are you          17:11:02

16   talking about creating the building or creating the

17   program that is within a building and then managing the

18   building 24/7?

19        Q.  BY MR. CAPLAN:  Physically building.

20        A.  Oh, it costs more to build a hospital than a        17:11:16

21   residential treatment facility.

22        Q.  If you could turn back to page --

23        THE WITNESS:  I'm sorry, if we are between

24   questions, could I take a break?

25        MR. COLLINS:  Yeah, that sounds like a good             17:11:31

Page 119

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    idea.

2            MR. CAPLAN:  Absolutely.

3            THE WITNESS:  Thank you.

4            THE VIDEOGRAPHER:  This is the end of Media 2.

5    We are going off the record the time is 5:11 p.m.          17:11:39

6            (Recess.)

7            THE VIDEOGRAPHER:  This is the start of Media 3.

8    We are going on the record.  The time is 5:25 p.m.

9        Q.  BY MR. CAPLAN:  And if we can go back to your

10   Exhibit 2 --                                               17:25:43

11           I think someone's got to mute themselves.  I was

12   getting some feedback from you, Rich.  It sounds better

13   now.  All right.  We'll start again.

14           All right.  Can you please go back to Exhibit 2,

15   your report, and go to page 47.                            17:26:00

16       A.  I'm there.

17       Q.  In the second full paragraph at the end, do you

18   see the "furthermore" sentence?

19       A.  Yes.

20       Q.  And is the basis for that sentence the           17:26:16

21   ProPublica article that you cite in footnote 168, or is

22   there something else that goes into that?

23       A.  So, again, we have experience with Cigna as an

24   industry and as a field, and I can't separate my

25   experience from both my -- from the literature, but I     17:26:51

                                                     Page 120

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    would stipulate to the literature in this example.  And

2    we would refer it to the ProPublica.

3        Q.  Do you think insurers should pay for services

4    that aren't medically necessary?

5        A.  I don't think they should.                    17:27:22

6        Q.  Do you have an opinion as to how an insurer

7    should determine whether a service is medically

8    necessary?

9        A.  Well, the process that I describe herein and

10   that is generally accepted is that -- and it -- and it   17:27:45

11   can be described, a medical necessity can be described.

12   And I -- for the sake of the hour, I'm not even going to

13   get into how medical necessity is a tool of the payors

14   and -- and -- and not really a tool of physicians.

15          But in this instance, the patient has an          17:28:10

16   authorizing diagnosis that you can quantify that there

17   are specific services that can be applied to that

18   authorizing diagnosis that you've set that out in a

19   treatment plan and then conduct the services as described

20   in that plan and document repeatedly over time that the   17:28:29

21   patient is responding in the direction and to the extent

22   predicted by that plan.

23          And so -- and the services are provided by

24   people who are qualified to deliver those services.  So

25   there is both the experience of setting out that you're   17:28:53

Page 121

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    working with people that are, you know, qualified, who
 2    comport themselves under a set of rules and standards
 3    that you can agree to and can live with, and then over
 4    time, that's why I relate to -- refer to developing a
 5    relationship.  You know what you're getting, why services     17:29:14
 6    are provided, how people view the use of tools such as
 7    acupuncture or urine drug testing in the treatment of
 8    care of people, and when those -- those tools and
 9    services would be applied to get the outcomes that they
10    then document for the individual so that individual's        17:29:34
11    life is improved at the end of that episode of care.
12        Q.  And if you're the insurer, what documents would
13    you need to review to make the medical necessity
14    determination?
15        A.  Assuming that I could do it over time by              17:29:54
16    developing a relationship and knowing someone, I mean, I
17    might put them on a kind of utilization management review
18    during the case so I'm not presented with a bill at the
19    end of the episode of care that didn't tell me that the
20    person was getting what they needed, that I'm working        17:30:17
21    collaboratively with that provider to make sure that the
22    person who's life is covered with me is getting what
23    they're needing and they're getting better.
24            And that's -- that's -- you know, that's been
25    something that adoption of the ASAM placement criteria       17:30:30
```

Page 122

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    which, you know, really isn't a level of care -- it's not

2    a treatment planner.  It's a level-of-care determination

3    tool.  It tells you where somewhere should start based

4    upon the intensity of the services and the severity of

5    the disease.                                    17:30:48

6            And then with monitoring of the case, it tells

7    you when the person is ready to step down to a lower

8    level of care.  And that, generally, is received by the

9    provider, but it could even be more collaboration in

10   coming to that decision.                        17:31:04

11           Certainly, when the -- when the payor says you

12   need to step down, providers know that they can appeal

13   that and say, here's more information that you should

14   consider that would allow me to service them here longer.

15           But the utilization management is telling you  17:31:18

16   whether those services are, in fact, adequate, whether

17   the person's qualified to give them, and whether they're

18   doing what -- what -- what they're supposed to do.

19       Q.  And that process that you just described would

20   be played out by an insurer or payor reviewing documents  17:31:32

21   and materials provided to them by the provider; right?

22       A.  Yes.  And it gets --

23       Q.  And if we go back to --

24       A.  I'm sorry.

25           It gets played out every day all over the  17:31:45

                                                    Page 123

CONFIDENTIAL ATTORNEYS' EYES ONLY

```
 1    country, and generally in most instances, it works.

 2         Q.  And going back to your report, Exhibit 2 again.

 3    We're still on page 47.

 4         A.  Yes.

 5         Q.  And in the second full paragraph, in the middle,    17:32:03

 6    there's two sentences that there were some claim denials

 7    for lack of medical necessity where the claim was

 8    reviewed by a medical director.  However, the medical

 9    director's opinion conflicted with the records in the

10    patient's chart.  And there's no citation there.           17:32:19

11         So the question I have is:  Can you give me an

12    example from this case of where that had happened?

13         A.  I would have to go back to the records, and I'm

14    happy to provide them to you after this so that we can

15    get through this.                                          17:32:52

16         Q.  Yeah.  I will ask you to do that, and I will

17    reserve all of my rights and remedies for reviewing that

18    later.

19         A.  Okay.

20         Q.  But if there are specific examples that you are   17:33:02

21    referring to in this case, I think you should identify

22    them.

23         A.  I will.

24         Q.  Okay.  Do you agree that there are reasons other

25    than medical necessity that an insurer or payor can        17:33:14
```

Page 124

CONFIDENTIAL ATTORNEYS' EYES ONLY

1    properly deny a claim?

2       A.  Yes.

3       Q.  What are they?

4       A.  A host of administrative causes.

5       Q.  For example, if a provider fails to provide    17:33:29

6    required information to be submitted with the claim;

7    right?

8       A.  Yes.  Submits the wrong billing codes.  There's

9    no evidence that ties back to that in the record.  Bad

10    fingering.    17:33:47

11       Q.  Or if it's a claim that's not covered by the

12    health plan; right?

13       A.  Right.  Yeah.  All of my medical necessity

14    starts with you have a person who is covered, who has a

15    diagnosis that's covered, and those services are    17:33:59

16    described for that diagnosis, and that the provider

17    doesn't provide services that aren't described by that

18    coverage.

19       Because those policies, you have to be very

20    careful in reviewing those policies to make sure that the    17:34:13

21    services that you're going to provide are, in fact,

22    covered.  And you should not expect to be paid for

23    something you do that isn't offered to that person.

24    That's on you.

25       Q.  Are you familiar with the term "fee forgiving"?    17:34:28

Page 125

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        A.  Not really, no.  Because I don't want to define

 2    it for you.

 3            THE REPORTER:  Excuse me.  Can you repeat the

 4    term?

 5            MR. CAPLAN:  Sorry.  I think my paper was          17:34:40

 6    probably covering my mic.  I said:  Are you familiar with

 7    the term fee forgiving, was the question.

 8        Q.  Do you have an understanding that certain plans

 9    do not provide coverage for services that a patient isn't

10    actually charged for or obligated to pay for?           17:34:56

11        A.  Yes.

12        Q.  And would that be another reason that a payor or

13    insurer could deny a claim, if the patient wasn't

14    actually charged for the services?

15        A.  If the -- yes, absolutely.  If they were charged   17:35:17

16    for something -- that was my last example.  You need to

17    know what the plan is going to cover, and you can't give

18    them something that the plan doesn't cover.

19            And sometimes that falls under this fraud,

20    waste, and abuse thing, and it's not even intended to be  17:35:36

21    so, where a provider gives the patient something that

22    isn't covered.  And then they have the very messy thing

23    to clean up where they need to figure out how that gets

24    paid for because you can't give services away.

25        Q.  What's your understanding of Cigna's coverage     17:35:56
```

                                            Page 126

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    policy for drug tests?

 2        A.  Well, I think it's kind of, again, a moving

 3    target, and I'd have to review the latest, but I believe

 4    that Cigna has a limit on tests that they will pay for

 5    per year, and they have a limit on -- they will only          17:36:17

 6    cover definitive tests in the face of a presumptive test

 7    that needs confirmation, but they don't allow the

 8    automatic referral for confirmation.  So somewhat

 9    complicated.

10        Q.  And you understand that's all included in a           17:36:41

11    written policy that's publicly available?

12        A.  I understand that, yes.

13        Q.  What is your understanding of how lab testing

14    should be used in connection with substance use disorder

15    treatment?                                                    17:36:59

16        A.  So I'm certain that you're referring to when a

17    diagnosis has been made because, you know, I've written

18    to the fact that it should be employed in general medical

19    care as a screening tool to identify the problem.  But

20    let's say we're only talking about someone who has a         17:37:20

21    substance use disorder who's in treatment.

22            My beliefs are well laid out in the document

23    which became the Palmetto policy.  It was a consensus

24    document.  I was a scientific chair of the consensus

25    document.  Wrote it up, presented it to Palmetto as a        17:37:37
```

Page 127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   consensus document across medical societies.  Wrote up a

 2   version of it for a peer-review journal in which it was

 3   reviewed and published, and I am cited to in the Palmetto

 4   policy, which lays out that the longer a patient is

 5   without using drugs, the longer the interval between         17:37:57

 6   tests should be.  Because not using predicts not using.

 7           You should not test more frequently than the

 8   window of detection.  And there are eight instances when

 9   you can go direct to definitive and not have to do a

10   presumptive test because we are using the test clinically   17:38:18

11   and not forensically.

12           And the whole purpose of the consensus paper was

13   to get us to move beyond the ASAM white paper, which

14   talked about and described urine drug testing but didn't

15   move us away from a forensic application of urine drug      17:38:31

16   testing to a clinical application.

17      Q.  I take it from your answer that, you know, urine

18   drug testing is a common way to test SUD treatment

19   patients?

20      A.  It's a common way to detect substance use and        17:38:48

21   non-use.

22      Q.  Okay.

23      A.  Adherence to the plan and response to the

24   treatment.

25      Q.  How often would a urine drug test be ordered for     17:39:01
```

Page 128

CONFIDENTIAL ATTORNEYS' EYES ONLY

1    a particular -- particular patient who's receiving SUD

2    treatment?

3        A.  Well, in the methadone setting, it is mandated

4    eight per year.  And in that setting where the resource

5    was very scarce and you only get eight labels per year          17:39:17

6    for urine for patients, those tests were applied only

7    when you believed you were going to find a positive test.

8            So a large percentage of tests were positive

9    because you used it to play "gotcha" with a patient and

10   say demonstrate that you're not adhering to your               17:39:39

11   abstinence plan.

12           I'm of the opinion that it is adhered to in the

13   highly restrictive residential settings, that you

14   document the use, historical use, current use, community

15   use, and circumstantial use on the way in, but if you          17:39:55

16   have a very tightly controlled residential setting, you

17   don't really need to test again until the patient is

18   ready to leave to demonstrate that their urines are, in

19   fact, still negative for use.

20           There are not tightly controlled residential           17:40:13

21   settings that want to test much more frequently than

22   that, and there is great debate as to whether there's

23   usefulness for all the findings.

24           If it is being used in a truly clinical way, it

25   will be used to confirm adherence to the plan or confirm       17:40:32

                                                        Page 129

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    nonadherence to the plan, and the clinical information

 2    about the patient will inform when it will be most

 3    usefully applied.  It's never done by schedule.

 4        Q.  Do you have an understanding as to what the

 5    general cost for a urine drug test is in the SUD          17:40:56

 6    treatment industry?

 7        A.  I've seen costs that range from very low to

 8    very, very high.  And I -- when we first write -- wrote

 9    the paper, the consensus document, we were concerned that

10    every single analyte and metabolite was being billed as a 17:41:15

11    standalone, and the cost of a urine could run well up

12    into the 3, 4, 5, $6,000 for a single test.  And if we

13    didn't get our arms around it, we were going to use --

14    lose a resource that was essential for trying to manage

15    patients, particularly as more pain patients entered      17:41:44

16    opioid use disorders and more people were dying from

17    opioids.

18            So, yeah, I've seen some really outrageous

19    bills, and I, for one, recommended to CMS that they

20    should have a rate for one test, and two or more, and     17:42:00

21    that they would pay a single amount for two or more, and

22    that the market drive how many tests you would be

23    offered.

24            So you could go to -- the University of Colorado

25    at the time offered 150 analytes and metabolites in a     17:42:15
```

Page 130

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    run, and they could do it for $500.  And if that was what

2    you wanted to take care of your patients, you could go

3    there and -- to try to get all of the lab -- laboratories

4    in the country to say what a multifaceted run would cost

5    them and set a rate somewhere above that, that would          17:42:38

6    allow a reasonable profit to keep those businesses in

7    business to support us.

8            But instead they did those staggered clusters,

9    and it allowed the fraud and abuse to continue.

10   Q.   Okay.  What do you think is a reasonable amount          17:42:54

11   to charge for a urine drug test?

12           MR. COLLINS:  Objection.  Lacks foundation and

13   incomplete hypothetical.

14           THE WITNESS:  Yeah, I really don't know what is

15   a reasonable cost because I don't know what it costs to       17:43:11

16   satisfy the requirements to run a lab.

17           I do know that when labs were offering the quasi

18   science of radio immunoassay and doing a quasi

19   definitives using it, and using an RIA to confirm an RIA,

20   that there were labs that didn't want to invest in the        17:43:38

21   equipment that would allow them to do GC mass spec.

22           So there's a lot of cost to set up of all this

23   stuff.  And I don't know what -- what is reasonable

24   because I'm not in the lab business, although I have run

25   a lot of labs, but I've run labs in the Government            17:43:54

Page 131

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    sector.

2        Q.  BY MR. CAPLAN:  Do you think that a single urine

3    drug test costing $2,000 is unreasonably expensive?

4            MR. COLLINS:  Let me object that it is an

5    incomplete hypothetical, lacks facts, and lacks          17:44:08

6    foundation.

7            THE WITNESS:  I would say it would depend upon

8    what's on the test.

9        Q.  BY MR. CAPLAN:  One -- one test, one metabolite.

10       A.  You mean one metabolite?                          17:44:21

11       Q.  Yeah.

12       A.  I don't -- it would depend upon -- because,

13   again, these labs that were reference labs, they had to

14   develop the test for fentanyl back when nobody knew how

15   to test for fentanyl.  There is a cost of doing that.  I  17:44:36

16   mean, in this country, there is cost that the innovators

17   have to bear in order to bring everybody else along.

18           So you can't answer that question.  I'm trying

19   to be reasonable here.  You can't answer that question

20   with a single response.                                  17:44:51

21       Q.  Do you think it's reasonable for a proprietor to

22   charge $3,000 for a single urine drug test?

23           MR. COLLINS:  I'll object again as incomplete

24   hypothetical, lacks foundation, and calls for

25   speculation.                                             17:45:10

                                             Page 132

CONFIDENTIAL-ATTORNEYS' EYES ONLY

```
1              THE WITNESS:  And I'd say you asked that and I

2     answered it.  It depends.

3         Q.  BY MR. CAPLAN:  How about $4,000?

4         A.  It depends.

5         Q.  How about 5,000?                            17:45:18

6              MR. COLLINS:  Same objection.

7              THE WITNESS:  It depends.

8         Q.  BY MR. CAPLAN:  6,000?

9              MR. COLLINS:  Same objection.

10             THE WITNESS:  Now we're haggling.  I don't know.   17:45:27

11        Q.  BY MR. CAPLAN:  7,000?

12             MR. COLLINS:  Same objection.

13        Q.  BY MR. CAPLAN:  8,000?

14             MR. COLLINS:  Same objection.

15        Q.  BY MR. CAPLAN:  9,000 for a single drug test; is   17:45:39

16    that unreasonable, Dr. Barthwell?

17        A.  I don't set these rates, and I don't have to

18    develop these tests.  There -- you know, there's IP that

19    goes into being able to test for things that show up.

20        Q.  Would it be reasonable for a provider to charge   17:45:56

21    $10,000 for a single urine drug test?

22             MR. COLLINS:  Same objection.

23             THE WITNESS:  I don't know.

24        Q.  BY MR. CAPLAN:  Do you think that somebody

25    charging more than $1,500 for a presumptive drug test      17:46:11
```

Page 133

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1   panel is unreasonably expensive?

2          MR. COLLINS:  Let me object that it's an

3   incomplete hypothetical, lacks foundation, calls for

4   speculation.

5          THE WITNESS:  I also am not an expert in rate    17:46:23

6   setting in the laboratory space.  I just don't have

7   opinions here.

8      Q.  BY MR. CAPLAN:  Do you think that drug testing

9   patients in substance use disorder treatment every other

10  day is medically necessary for substance use disorder    17:46:41

11  treatment?

12         MR. COLLINS:  Let me object.  Overbroad,

13  incomplete hypothetical, lacks foundation, calls for

14  speculation.

15         THE WITNESS:  In general, if the test that    17:46:53

16  you're using is a definitive test that has a broader

17  window of detection than one day, it is an

18  overutilization of the tool unless there is something

19  inciting the new test, which is what the Department --

20  the CMS recognized in saying, if you can prove medical    17:47:09

21  necessity for the test, then the test could be allowed.

22         But blanketly every other day, there -- it's

23  usually within the window of detection and would not be

24  necessary.

25         But if a patient is released to go to his    17:47:25
```

Page 134

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    grandmother's funeral and all of his cousins are

2    providers of, you know, methamphetamine, cocaine, and

3    heroin to the community where the funeral occurred, and

4    the patient came back appearing to be intoxicated, you

5    might want to do a test even if he had had his random          17:47:48

6    test the day, before you allow him back into a bed in the

7    facility.

8            That you could then -- you're establishing on

9    the grounds of medical necessity.  But that's not testing

10   every day, just a test every day.                              17:48:01

11       Q.  BY MR. CAPLAN:  Are you generally familiar how

12   Special Investigations Unit or SIU departments work?

13       A.  Not within the insurance industry, but in the

14   Department of Justice, I've worked with them on a number

15   of these cases.                                                17:48:18

16       Q.  And so specific to the insurance industry, an

17   internal SIU at Cigna, you are not necessarily familiar

18   with how that works; right?

19       A.  No.

20           MR. CAPLAN:  All right.  So I think I'm done.          17:48:28

21   Why don't we take a short break, just a couple minutes, I

22   can confirm, and if I am, I can hand it off to

23   Mr. Crousillac.

24           MR. COLLINS:  Sounds like a good plan.

25           THE VIDEOGRAPHER:  This is the end of Media 3.         17:48:44

Page 135

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    We are going off the record.  The time is 5:48 p.m.

 2            (Recess.)

 3            THE VIDEOGRAPHER:  This is the start of Media 4.

 4    We are going on the record.  The time is 5:54 p.m.

 5            MR. CAPLAN:  So thank you for your time today,      17:55:18

 6    Dr. Barthwell.  At this time, I don't have any further

 7    questions, but I'll note we did have a few areas for

 8    followup throughout the questioning so I'd appreciate it

 9    if you and Mr. Collins could get back to us on those.

10            And with that, I'll hand it off to              17:55:34

11    Mr. Crousillac.

12            THE WITNESS:  Thank you.

13

14                        EXAMINATION

15    BY MR. CROUSILLAC:                                     17:55:39

16       Q.  All right.  Good evening, Dr. Barthwell.  Can

17    you hear me okay?

18       A.  I can.  Thank you.

19       Q.  Okay.  We've met off the record, and actually,

20    we met in a related case about 18 months ago, if you    17:55:48

21    remember that.

22       A.  Oh, I do.  Nice to see you again.

23       Q.  Good to see you again as well.

24            So I represent Viant and MultiPlan, who are also

25    defendants in this case, okay?                          17:56:01
```

Page 136

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1        A.  Yes.

2        Q.  I will just, for sake of efficiency because I

3   know it's getting late, I'll just refer to them

4   collectively as MultiPlan.

5           Is that okay with you?                         17:56:10

6        A.  That's okay with me.

7        Q.  Okay.  And if I need to distinguish between

8   MultiPlan or Viant individually for any reason, I'll let

9   you know, okay?

10       A.  Thank you.                                     17:56:22

11       Q.  Okay.  We went through some of your background

12  earlier with Mr. Caplan.  I just -- just to kind ask a

13  question:  When you provide your consulting or expert

14  services, it's generally on the provider's side; right?

15       A.  No, not generally.  It's both.                 17:56:38

16       Q.  Okay.  So you do provide consulting or expert

17  services on the payor's side sometimes?

18       A.  Yes.  For the Federal Government.  Never

19  private.

20       Q.  For the Federal Government?                     17:56:51

21       A.  Yes.

22       Q.  Okay.  So have you ever provided expert services

23  or consulting services on behalf of a private commercial

24  payor?

25       A.  Not in matters of insurance reimbursement, no.  17:57:08
```

Page 137

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1     Q.  How about on behalf of a cost containment

2   company like MultiPlan; have you ever provided any

3   consulting or expert services?

4     A.  No.

5     Q.  When you were talking with Mr. Caplan earlier,     17:57:32

6   there was a brief discussion about your understanding of

7   MultiPlan's relationship with Cigna.

8         Do you recall that?

9     A.  I do.

10    Q.  Okay.  And then you provided some testimony just     17:57:44

11  kind of high level of what you understand it is that

12  MultiPlan does.

13        Do you recall that as well?

14    A.  I do.

15    Q.  Okay.  So it's fair to say you're at least     17:57:53

16  somewhat familiar with MultiPlan as a company?

17    A.  Somewhat familiar, yes, fair to say.

18    Q.  Okay.  Do you know if MultiPlan operates a PPO

19  network?

20    A.  What's a CPO stand for?     17:58:09

21    Q.  A PPO network.

22    A.  Oh, PPO.  PPO.  MultiPlan offer a PPO.  I'm not

23  familiar if they do.  They -- they might administer a

24  PPO, but I'm not familiar with them offering one.

25    Q.  You are familiar, though, with a PPO network?     17:58:34

                                                  Page 138

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        A.  Yes.  In fact, wasn't that the origin of

 2   MultiPlan?  I'm sorry, now that I think about it.  Wasn't

 3   that the origin of MultiPlan?  They had a network of

 4   physicians and providers which they provided as sort of a

 5   network extension to -- yeah.  It's coming back to me.     17:58:52

 6        I remember meeting you the last time, and I did

 7   a little bit more research after meeting you, and I was

 8   afraid this time that I would -- that high-level

 9   definition that I gave to your colleague, Mr. Caplan,

10   wouldn't satisfy you very much.                           17:59:13

11        Q.  Oh, no, that's fine.

12        A.  Yeah.  Yeah.  So.

13             MR. COLLINS:  You're the reason she didn't sleep

14   well last night, Taylor.  That's the truth.

15             THE WITNESS:  I do recall that, that you offer a  17:59:30

16   PPO, Taylor.  I'm sorry.

17        Q.  BY MR. CROUSILLAC:  Okay, great.

18        Do you know -- so you used the word, I think,

19   "extension" or "extender," I think you were about to say.

20   What do you mean by that?                                 17:59:44

21        A.  Just that when a network is not adequate, there

22   can be groups or individuals that the payor will go to to

23   make sure that there is adequacy in the network to meet

24   the needs of people who are insured.

25        Q.  Okay.  And is it your understanding that        18:00:06
```

Page 139

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    MultiPlan offers a service along those lines?

2         A.  Yes.

3         Q.  Do you know if that's a complementary PPO

4    network or an insured PPO network?

5         A.  I think you've just hit a wall on my knowledge    18:00:23

6    base.

7         Q.  Okay.  Yeah, that's fine.

8              All right.  So this time I will distinguish

9    between MultiPlan and Viant.  Do you know or do you have

10   any understanding of if there is a difference between the    18:00:41

11   services provided by MultiPlan or Viant?

12        A.  So in a general way, I believe that Viant is a

13   good source of data collection about claims that can be

14   used in terms of determining -- determining what's usual

15   and customary is by diagnoses, disease states, and/or    18:01:09

16   geographic areas, or the types of providers in a more

17   rich way than MultiPlan and could be a source of

18   determining what really a claim should be paid in a

19   particular geographic or treatment area.

20        Q.  Okay.  And what is that understanding based    18:01:43

21   upon?

22        A.  Reading, study, association with people in the

23   insurance industry.  I'm actually working right now with

24   a group that provides services to severely mentally ill

25   individuals who work for self-insured employers, and all    18:02:04

Page 140

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    of my colleagues are, you know, trained out of the

2    University of Pennsylvania School of Insurance and, you

3    know, I've had to have things rub off on me by being

4    around them.

5         But again, you know, I have not taken any          18:02:23

6    specific courses in it.  It's just through association

7    and trying to understand the industry.

8         Q.  Okay.  Is it based on anything specific that you

9    reviewed in preparation for your support -- for your

10   report in this case?                                    18:02:39

11        A.  Well, I do have to acknowledge that I reviewed

12   the last time I was deposed by you, also.

13        Q.  Okay.  So there were things you reviewed in

14   preparation for, I guess, the prior case and the one

15   we're here for today that were specific to those cases  18:02:59

16   that have helped you form your knowledge of that?

17        A.  To help me prepare for the deposition, but not

18   necessarily perform my -- prepare my opinions for my

19   written report.  Does that make sense to you?

20        I wanted to recall the way your deposition of       18:03:15

21   me, you're deposing me went in preparation for my

22   deposition yesterday, but I didn't review that prior to

23   developing my report.

24        Q.  Okay.  No, that's -- that's kind of what I was

25   getting at.  Thank you.                                 18:03:34

Page 141

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        A.  Yes.  Rich wasn't kidding when he said you

 2    scared me.

 3        Q.  I don't know about all that.  Okay.

 4            Okay.  To your knowledge, does MultiPlan pay

 5    claims?                                            18:04:00

 6        A.  No.

 7        Q.  Okay.  And who is the party that's ultimately

 8    responsible for paying the claim?

 9            MR. COLLINS:  Well, objection.  Overbroad.

10    Calls for speculation.                             18:04:18

11            But you can answer.

12            THE WITNESS:  Yeah, because I have an opinion

13    that goes a little bit beyond the -- Cigna would be.  If

14    MultiPlan is acting on behalf of Cigna, it would -- it

15    would be, although MultiPlan is central to setting the   18:04:30

16    amount that should be paid and determining, you know,

17    what a provider would get for a service delivered.  But

18    the check gets written by Cigna.

19            And so if -- if you're asking in a very discrete

20    way, Cigna pays the -- the amount.                 18:04:58

21        Q.  BY MR. CROUSILLAC:  To your knowledge, does

22    MultiPlan or Viant issue insurance coverage to members?

23            MR. COLLINS:  Objection.  Vague and ambiguous.

24    Calls for speculation.

25            THE WITNESS:  Not to my knowledge, no.      18:05:20
```

Page 142

CONFIDENTIAL-ATTORNEYS' EYES ONLY

1      Q.  BY MR. CROUSILLAC:  To your knowledge, do you

2  know if MultiPlan or Viant collect premiums from members?

3      A.  Not to my knowledge, no.

4      Q.  To your knowledge, do you know if MultiPlan --

5  strike that.                                      18:05:36

6          To your knowledge, does MultiPlan or Viant issue

7  Explanation of Benefit forms?

8      A.  Well, to my knowledge, they work very closely

9  with Cigna to determine what goes in that, but it would

10 be Cigna's printer that printed it based upon the          18:05:56

11 information provided to them by MultiPlan and in

12 collaboration with MultiPlan.

13         So that is a little grayer than some of my other

14 responses because of the relationship in determining what

15 that Explanation of Payment or Benefit should say, and    18:06:17

16 also because of interactions that are with patients about

17 what patients would do when there's been a payment that

18 leaves an additional collection on the table after --

19     Q.  When you say that -- sorry, I didn't mean to cut

20 you off, Doctor.                                   18:06:44

21         So when you say they work -- sorry.

22         When you say "work closely with Cigna in this

23 process," can you kind of -- what specifically do you

24 mean by that?

25     A.  I mean it is my understanding that Cigna         18:06:54

                                              Page 143

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    wouldn't know what to put in an EOP if it didn't hear

2    from MultiPlan as to how that claim was going to be

3    adjusted.  So -- so the, you know, who was issuing that.

4    I think Cigna and MultiPlan.

5         Q.  Okay.  And what is that understanding based          18:07:24

6    upon?

7         A.  Discussions with people in the industry and

8    experience with, you know, MultiPlan, trying to get

9    companies enrolled with MultiPlan, thinking that it might

10   be the solution to this nonpayment, slow payment,            18:07:44

11   low-payment situation that they found themselves in, in

12   the mid-teens, and general knowledge.

13        Q.  Okay.  Is that based upon any specific documents

14   you reviewed in preparation for your report or any

15   deposition testimony that you reviewed?                      18:08:05

16        A.  No.

17        Q.  To your knowledge, does MultiPlan or Viant

18   handle appeals under ERISA?

19        A.  Not to my knowledge, no.

20            MR. COLLINS:  I'm going to -- Mr. Crousillac, I      18:08:26

21   just wanted to interpose an objection, vague and

22   ambiguous, to your prior question.

23            MR. CROUSILLAC:  Rich, I think that's a little

24   late now.

25            MR. COLLINS:  It is.  It was way late.  It was       18:08:37

                                                        Page 144

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  really late.  And I'm going to have to beg the Judge if

2  you ask that question at trial to please give me another

3  shot.

4          MR. CROUSILLAC:  We'll see how that goes.

5      Q.  All right.  Dr. Barthwell, I want to ask some          18:09:02

6  questions now about Exhibit 2, which has been previously

7  introduced, which is your supplemental expert report.

8      A.  Yes.

9      Q.  Specifically, I want to start on page 42 of the

10  supplemental report under your first opinion.  You can          18:09:17

11  let me know when you get there.

12      A.  I'm there.

13      Q.  Okay.  About the third line down of that first

14  paragraph of Opinion 1, there's a sentence that starts

15  with, "for the reasons outlined below," and it says,          18:09:38

16  "Cigna and MultiPlan's use of Medicare rates for other

17  types of providers and Medicare charge data at a national

18  level to reimburse SUD treatment claims is

19  inappropriate."

20          You see that sentence?          18:09:53

21      A.  Yes.

22      Q.  Okay.  What do you specifically mean by

23  "Medicare rates"?

24      A.  A rate that Medicare would pay for a certain

25  type of provider or charge.          18:10:06

Page 145

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        Q.   Okay.  So a rate that Medicare would pay?

2        A.   Uh-huh.

3        Q.   How would you go about determining a rate that

4    Medicare would pay on any particular claim?

5        A.   I would go to Medicare and see if they have a       18:10:31

6    rate.

7        Q.   And when you say "go to Medicare," what

8    specifically do you mean by that?

9        A.   Well, the -- the rates that are Medicare

10   reimbursable are available through the Medicare           18:10:48

11   documents.  So if a rate exists, you can find it on the

12   CMS website.

13       Q.   Okay.  So you'd find it on the CMS website?

14       A.   Yes.

15       Q.   Have you ever done that before?                   18:11:04

16       A.   Yes.

17       Q.   So why is MultiPlan's alleged utilization of

18   Medicare data to come up with recommended pricing amounts

19   inappropriate?

20       A.   Because other than urine drug testing, Medicare    18:11:22

21   doesn't have rates for these types of facilities.

22       Q.   Okay.  So it's solely based on the fact that

23   there are no Medicare rates?

24       A.   If the rate doesn't exist, you can't use it as

25   an exemplar.                                               18:11:44

Page 146

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1        Q.  Do you know if MultiPlan utilizes Medicare

2   charge data or reimbursement data in its pricing

3   methodologies?

4        A.  I don't have that intimate knowledge about what

5   MultiPlan does in terms of whether it's charge or         18:12:03

6   reimbursement.  I don't know.

7        Q.  But you do understand the distinction between

8   the charge and reimbursement data; correct?

9        A.  Yes.

10       Q.  Is there any meaningful distinction between       18:12:20

11  those two?

12            MR. COLLINS:  Objection.  Overbroad.

13       Q.  BY MR. CROUSILLAC:  To the extent that you know.

14       A.  I always get them upside down.  You know,

15  whether it's paid or authorized, I'm -- I'm just not --    18:12:45

16  not sure.  I'm not conversant enough.

17       Q.  Okay.  Do you know if certain providers are

18  required to submit annual charges to CMS for services

19  that may not actually be ultimately reimbursable by

20  Medicare?                                                  18:13:08

21       A.  No, but that sounds like a reasonable practice.

22       Q.  So just a second ago, I think when we were

23  talking about the rates, you said you weren't -- I

24  guess -- I don't want to put words in your mouth.  These

25  are my words.  You're not necessarily intimately familiar 18:13:27
```

Page 147

CONFIDENTIAL ATTORNEYS' EYES ONLY

```
1    with MultiPlan's pricing methodology?

2         A.   That's correct.

3         Q.   Did you review any of what we've been calling in

4    these cases the MultiPlan white papers for any specific

5    methodology in preparation for issuing your report?        18:13:43

6         A.   Are you talking about the MR 1 and the MRC II?

7         Q.   No.  I'll go ahead and introduce one just so we

8    can -- as an example -- as an example.  This will be

9    exhibit -- it will pop up in Exhibit Share, and it will

10   be --                                                       18:14:03

11        A.   Uh-huh.

12        Q.   I believe we're on Exhibit Number 5.  Let's see.

13             MR. COLLINS:  That's what I've got.

14             MR. CROUSILLAC:  Hold on one second.

15             (Exhibit 5, Viant Facility U&C Review, Oupatient   18:14:17

16             Review (OPR) Model, June 2016, MPI_Cigna0007113

17             - 120, was marked for identification by counsel

18             electronically.)

19             MR. CROUSILLAC:  Okay.  And let me know when you

20   see it.  It should be on the way.                           18:14:24

21             MR. COLLINS:  Exhibit 5.

22             THE WITNESS:  Thank you.  Okay.  I have it.

23        Q.   BY MR. CROUSILLAC:  Okay.  So Exhibit 5 is a

24   document that's entitled "Viant Facility U&C Review,

25   Outpatient Review (OPR) Module."                            18:14:50
```

Page 148

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              Is that what you're looking at?

 2        A.  Yes.

 3        Q.  Did you review this specific document or similar

 4   documents when you were preparing to issue your report in

 5   this case?                                          18:15:02

 6        A.  Yes.

 7        Q.  Okay.  When you reviewed this document, which

 8   this -- at a high level, it kind of walks through the

 9   Viant OPR pricing methodology, at least as of June 2016,

10   did you see anything in this document that you took issue  18:15:26

11   with?

12        A.  I -- no.  I -- I can't say that I was bright

13   enough to take an issue with anything there.  Understood

14   it well enough.

15        Q.  Okay.                                      18:15:45

16        A.  More than superficial.

17        Q.  Okay.  Did you review -- okay.

18              Do you remember if you reviewed -- because these

19   were probably exhibits to depositions.  Because I know it

20   shows in the material you reviewed, it says exhibit, but  18:16:00

21   it doesn't go through detail which ones.

22              Did you review -- so I think you said you

23   reviewed this specific one with a Viant letterhead.  Do

24   you remember reviewing any other ones?

25        A.  Yeah, I think so.  Either FAIR Health or I --  18:16:17
```

                                                    Page 149

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1         Q.  DataiSight?

 2         A.  DataiSight, yes.

 3         Q.  Okay.  So you reviewed a similar kind of white

 4    paper for the DataiSight methodology?

 5         A.  Yeah.  I'm sorry, it's a little bit late in the     18:16:42

 6    day, and I'm not good with names.

 7         Q.  Oh, no, that's -- that's understandable.

 8             So when you reviewed these white papers, was

 9    it -- was it just to kind of get some more background on

10    how these things work, or are you specifically opining on    18:16:58

11    the methodologies in your report?

12         A.  I'm doing it to understand the testimony to get

13    a sense of how it works.  But you know from my testimony

14    that my opinions are not that deep into this.

15         Q.  All right.  Let's turn back to Exhibit 2, which     18:17:29

16    is the supplemental report, and let's look at page 43.

17         A.  Okay I'm there.

18         Q.  Okay.  And that paragraph, the full paragraph

19    above the charts, do you see that paragraph?

20         A.  Yes.                                                18:17:50

21         Q.  Right after the cite to footnote 150, there's a

22    sentence that says, "Unfortunately, they fail" -- which

23    I'm assuming is the plaintiff.  "Unfortunately, they" --

24    let me restart.

25             "Unfortunately, they fail to recognize that        18:18:07
```

Page 150

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Cigna and MultiPlan entered into Global Agreements and

2    Single-Claim Agreements paying much higher percentages of

3    billed charges than Cigna ultimately did."

4         Do you see that sentence?

5         A.  Yes.                                      18:18:19

6         Q.  Okay.  And I believe when you were speaking with

7    Mr. Caplan earlier, you said that you did not review the

8    specific Global Agreements that are at issue in this

9    case; is that correct?

10        A.  Right.                                     18:18:31

11        Q.  Okay.  But you are generally aware of Global

12   Agreements due to the prior work that you've done?

13        A.  Yes.  And, you know, say the last -- the last

14   piece of evidence that you showed me, the last Bates,

15   five.  Having read that, but having read that at a very   18:18:56

16   deep understanding are two different things.

17        So this chart was constructed from the knowledge

18   of the Global rates that were produced, but I'm not a

19   lawyer so I didn't read the sources of these data to

20   understand the contracting.                          18:19:20

21        Q.  Okay.

22        A.  Yeah.

23        Q.  If you look at the chart --

24        A.  Yes.

25        Q.  -- directly below that sentence, there's a    18:19:30

                                                    Page 151

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    column there that says "Date," and there's various dates

2    in there.  I assume those are the dates that the

3    contracts were executed on?

4        A.  Yes.

5        Q.  Do you know or did you review anything to inform      18:19:44

6    your knowledge on when any of these individual contracts

7    might have terminated or ended?

8        A.  No, although if I recall, these agreements are

9    renewable annually.

10       Q.  Do you know if any of these agreements are still      18:20:10

11   in effect today?

12       A.  I don't know.

13       Q.  So turning back to that sentence we read, which

14   is the one that immediately comes after the cite to

15   footnote 150, the sentence says, "Cigna and MultiPlan      18:20:30

16   entered into Global Agreements."

17           Is it your understanding that Cigna's a party to

18   those Global Agreements as well?

19       A.  That MultiPlan does it on behalf of Cigna.  So

20   yes, they are a party to.                                  18:20:48

21       Q.  Is that based upon the language of the Global

22   Agreement itself or just your understanding of how a

23   claim is priced when it flows through a Global Agreement?

24       A.  I'm -- again, I'm -- I am not qualified to speak

25   to the language of the agreement but more the spirit or    18:21:19

Page 152

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    intent.  So it is not based on a reading of the language

 2    of the agreement but an understanding of how those claims

 3    are priced when they flow through it.

 4          I also understand that they don't always have to

 5    meet that number even if they have an agreement, and that      18:21:39

 6    is, you know, an exception to the agreement.

 7          Q.  Do you know if there are claims that are at

 8    issue in this case that were priced pursuant to any

 9    Global Agreement?

10          A.  Oh.  I'm at a disadvantage to really -- to know      18:21:58

11    that level of detail at this hour of the day.  I don't

12    know.

13          Q.  Are you -- Dr. Barthwell, are you okay to

14    continue with the deposition?  I don't want to -- I don't

15    want you to, you know, give me testimony that -- I know      18:22:26

16    it's getting late in the day, and I surely don't want us

17    to come back here again, but I don't want your testimony

18    to be affected, and I understand if you're getting tired.

19          Are you able to continue?

20          A.  I'm able to continue.  I've been tired, but, you      18:22:42

21    know, I'm -- I prepared for yesterday, and then I didn't

22    do anything to keep that top of mind.  So, you know,

23    it -- my -- my -- my ability to have command of the facts

24    would have been better yesterday.

25          And if you want to allow me just a little      18:23:06
```

Page 153

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    latitude to acknowledge, you know, erosion of some of the

 2    facts.  If they're material, I can go find them when

 3    we're done, or you can say this is just not working for

 4    me.  If you can't say "yes" or "no," we need to stop.

 5         But if you just allow me a little latitude, I        18:23:25

 6    think we can get through this, and let me have

 7    responsibility for having erosion of the facts.

 8         You know, I don't want to do it to hurt your

 9    case at all.  I just don't know if there are any claims

10    that would have been subjected to these agreements.        18:23:39

11    Q.   Okay.  So you're okay to continue?  I mean, that

12    gives me a little concern that you're saying your

13    testimony may be eroded some.

14         But let's continue for now, and if you feel like

15    your testimony isn't what it should be -- because I want   18:24:00

16    to have a clear record and I want you to, you know, kind

17    of give me everything you know.  If you feel like your

18    testimony's becoming impacted, then let me know, okay?

19    And we'll continue for now.

20    A.   I will.  I will.                                      18:24:16

21         And so far you haven't asked me anything that I

22    think I should have a more stronger command of than I do.

23    You know, I'm being honest with you that I have a general

24    sense of -- of these contracts.  I know how very much

25    some of my clients in the past wanted to enter into        18:24:29
```

Page 154

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    MultiPlan agreements, how they thought that was going to
2    solve all their problems and -- and, you know.
3           And so I can speak to some generalities, but I'm
4    not missing any specific facts because I'm tired.  I will
5    let you know --                                    18:24:48
6        Q.  Okay.  Great.
7        A.  -- if I feel that I'm not going to be able to
8    stand by my testimony.  I will not do that to you or me.
9        Q.  Okay.  That's perfect.  That sounds great.
10          So let's turn now to the next page, which is   18:25:02
11   page 44.  I want to look at the top paragraph there, and
12   it's the second sentence that starts with "in fact."  And
13   I'll just go ahead and read it.
14          It says, "In fact, the evidence demonstrates
15   that Cigna and MultiPlan arrived at these rates by       18:25:20
16   analyzing claims data for different providers of
17   different services in different geographic areas."
18          Do you see that?
19       A.  Yes.
20       Q.  Okay.  When you say, "In fact, the evidence    18:25:29
21   demonstrates," what specific evidence are you referring
22   to?
23       A.  Provided by the deposition testimony.
24       Q.  The deposition testimony that's cited to in
25   footnote 151?                                          18:25:46
```

Page 155

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        A.  Yes, sir.

 2        Q.  Okay.  Is there any other evidence that supports

 3    that sentence?

 4        A.  No.  I think that's strong enough.

 5        Q.  And when that sentence says "analyzing claims      18:26:03

 6    data," do you know what "claims data" is referring to?

 7        A.  Claims that were submitted to Cigna, MultiPlan,

 8    or other national databases.  Because it is my

 9    understanding that MultiPlan also uses data that is

10    collected by other national databases that do a similar    18:26:31

11    thing with either Government payors or private insurance.

12        Q.  Okay.  So that reference to claims data is --

13    it's not specific to Cigna's claims data or MultiPlan's

14    claims data.  You're using that term broadly as claims

15    data as a whole?                                            18:26:57

16        A.  Yes.

17        Q.  Have you ever personally seen or reviewed any

18    underlying claims data?

19            MR. COLLINS:  Objection.  Vague and ambiguous.

20            THE WITNESS:  If -- if the -- if the question is    18:27:20

21    have I looked at a set of raw claims that a provider has

22    put together that they're trying to collect against, I

23    would say yes, a lot.  But if you're saying have I done

24    it to do an analysis, and I've had enough cases to have

25    geographic breakdowns or a particular type of service,     18:27:45
```

Page 156

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    and I'm analyzing it to come to a -- a rate setting?  No.

 2        Q.  BY MR. CROUSILLAC:  Have you ever personally

 3    reviewed any claims data for other providers in the same

 4    geographic area as the plaintiffs in this case?

 5        A.  Yes.                                          18:28:14

 6        Q.  Okay.  Can you tell me about that?

 7        A.  I was the corporate medical director for

 8    Treatment Management Company, and we had a program in

 9    Elsinore, California, with multiple levels of care.  And

10    one of the big issues for that particular company was     18:28:38

11    that they were put on 100 percent review of their claims,

12    and they were trying to work their way out of a situation

13    with a variety of payors so they could get reimbursed for

14    services that they had provided over a period of time.

15            And as is the case with many of these situations  18:29:04

16    that age, there is erosion away of the integrity of the

17    claim.  There is, you know, loss of integrity of the

18    chart.  The chart may get separated from the claim.

19    Maybe there was fat fingering when the claim was

20    originally put together or somebody was using the wrong    18:29:33

21    codes.

22            There are lots of programs that put -- put a

23    program in a situation where they're being reviewed.  In

24    addition to fraud, waste, and abuse, there are a number

25    of other problems that have nothing to do with them       18:29:47
```

Page 157

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    trying to act in fraudulent ways that put them in a

2    situation of being on a review.

3        Q.   Okay.  So you have reviewed claims data for that

4    facility?

5        A.   Yes.                                      18:29:58

6        Q.   Have you reviewed claims data for any other

7    facilities in the same geographic area as the plaintiff?

8        A.   No.

9        Q.   And when we say -- or I guess I'm using the term

10   "geographic area of the plaintiffs," and there is some    18:30:15

11   references in your report to geographic areas.

12            What is your understanding of the geographic

13   area of the plaintiffs in this case?

14       A.   A variety of places in and across California,

15   and they're not all comparable.                      18:30:33

16       Q.   When you say they are not all comparable, you're

17   saying the plaintiffs in this case are not all

18   comparable?

19       A.   That's correct.  Because they -- you know, an

20   Orange County location is different from a Sacramento   18:30:49

21   location is different from a Northern California

22   location.  And I'm not speaking to where these programs

23   are, but I'm just saying it's my understanding that they

24   are at various locations in California, and California is

25   a big geographic area with a lot of planning areas,    18:31:04

                                          Page 158

CONFIDENTIAL ATTORNEYS' EYES ONLY

```
1    geographical areas, different kinds of locales where the

2    cost of doing business would be different.

3        Q.  Okay.  When you're analyzing the geographic area

4    of a specific provider, when you say that, you know,

5    there might be differences depending on the geographic       18:31:28

6    area, what type of geographic area are you looking at?

7    Are you looking at a municipality?  Are you looking at a

8    county?  Are you looking at a ZIP code?

9        A.  Well, what -- again, my analysis have not been

10   that extensive.  So I haven't done a lot of geographic       18:31:47

11   dispersion or understanding, but if you're talking about

12   what my expectation would be in terms of trying to find

13   peer programs, it would be by statistical metropolitan

14   areas or at a county level.  Or -- you know -- you know,

15   Texas is not like California.  Arizona is not like           18:32:12

16   California.  The -- the rules and regulations of

17   employment law in California make running a program there

18   decidedly different than running one in Phoenix, although

19   both of those areas can be, as was referred to by some of

20   the testimony, geographically appealing to patients who      18:32:31

21   are looking for a national program, where they want to

22   travel out of the cold northern Rust Belt in the winter

23   to get treatment where it's warm.  They might -- Arizona

24   and California might appeal to them.

25        But trying to run a program in California in            18:32:48
```

Page 159

CONFIDENTIAL ATTORNEYS' EYES ONLY

1    terms of the HR cost is greatly -- vastly different than

2    running a program in Arizona.

3            So I would look to the state and the rules and

4    regulations that affect licensure in the state.  And then

5    I would look at, you know, the other factors that affect        18:33:01

6    real estate, acquisition of employees and stuff, which

7    might create variances in -- in what it would cost to do

8    a similar service, provide a similar service.

9            And then you have to look at the professionals

10   that you have to have onsite.  At one point, Florida           18:33:20

11   passed a law that if you worked in a substance abuse

12   treatment facility, you couldn't just be a physician or

13   an addictionist; you had to be a Board-certified

14   psychiatrist.

15           They couldn't satisfy the requirements for all         18:33:35

16   their programs that were licensed in the state if they

17   were going to require Board-certified psychiatrists.  So

18   that ran the cost of doing business up there greatly.

19       Q.  Do you know when CMS is defining a geographic

20   area for its reimbursement, how it defines that area?          18:33:54

21       A.  I don't.

22       Q.  Do you know when Viant provides, let's say in

23   this case, Cigna a pricing recommendation, how its

24   methodology defines the geographic area of the provider?

25       A.  I don't.  And so I owe you apology.  I probably        18:34:14

Page 160

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    shouldn't have given you so much geographic information

 2    since when I started out was saying is I don't know

 3    enough about it and haven't done enough analysis; I just

 4    know that geographic areas vary.  And I don't know what

 5    the requirement at the planning level is.              18:34:33

 6         Q.  All right.  And let's go look to the next

 7    paragraph on page 44.  I want to look at the sentence

 8    starting after the cite to footnote 153.

 9         A.  Okay.

10         Q.  And that sentence says, "The claims data for the   18:34:50

11    sample patient in this action demonstrates that Cigna and

12    MultiPlan routinely ███████████████████████████████

      ███████████████████████████████████████████████████████

      ██████████████████████████████████████

15             Do you see that sentence?                     18:35:04

16         A.  I do.

17         Q.  Okay.  And you used the word "routinely."  What

18    were you -- what's your definition of "routinely" in that

19    sentence?

20         A.  More than half of the time.                  18:35:16

21         Q.  Okay.  So more than half of the time?

22         A.  Yeah.

23         Q.  And that -- that statement is based on the

24    documents cited in footnote 154?

25         A.  I have to make sure I get the right one because  18:35:33
```

Page 161

CONFIDENTIAL ATTORNEYS' EYES ONLY

1    it is a 155.  154.   154 was the broader spreadsheet.

2        Q.  So it's your understanding that the documents

3    referred to in footnote 154 and 155 evidenced that

4    ███████████████████████████████████████████████

        ███████████████████████████████                    18:36:04

6        A.  At least half of the time.

7        Q.  Did you specifically request to review the

8    documents referenced there or were those provided to you

9    by plaintiffs' counsel?

10       A.  I was provided documents by plaintiffs' counsel.   18:36:23

11   I did not ask for any specific document.  If I have a

12   document that I reviewed that was other than one they

13   gave me, it was one I went and found.

14       Q.  What's your understanding of how these savings

15   fees work?  █████████████████████████████████    ██████████

     ██████████████████████████████████████

     ████████████    ███████████████████████████

     █████████████████

        ██    ███████████████████████████

     ███████████████████████████████████    ██████████

     ███████████    ████████████████████

     ████████████████████████████████████████

     ██████████████████

          ███████████████████████████

     ██████████████████████████████████        18:37:20

                                              Page 162

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    ███████████████████████████████████████

   ████████████████████████████████████

   ████████████████████████████████████████

   ████████████████████████████████████████

   ████████                   18:37:45

6      Q.  Okay.  And what -- what have you reviewed that

7   forms of basis of that understanding specific to this

8   case?

9      A.  Well, there is an example in the 156 that

10   demonstrates that.  There was an example in 157 that     18:38:03

11   demonstrates that.  ████████████████████████

   █████████████████████████████████

   ███████████████████████████████

   ████████████████████████████████████████

   ████████████████████████████████████████    ████████

   ████████████████

17       That I -- I have just a general knowledge of

18   that.  It's not demonstrated in these.

19      Q.  Okay.  And when you say you have a general

20   knowledge of that, I guess is that from your experience    18:38:45

21   as a provider or just from over the years of being in

22   these fields, you picked this up?

23      A.  No.  This is stuff that I had to pick up after I

24   was deposed by you the last time.  You know, I had to

25   make myself knowledgeable because you clearly pointed to    18:39:10

                                          Page 163

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    my deficiencies in understanding this the last time, and
 2    if I was to get into another case like this, I felt I had
 3    to be better prepared than I was.  So reading,
 4    discussion, review.
 5         Q.  Okay.  And the other case we're referring to was      18:39:33
 6    the case that involved United Healthcare; correct?
 7         A.  That's correct.
 8    ████████  ████████████████████████████████████████████
      █  ███████████████████████████████████████████████████
      █  ████████████████████████████████████              ████████████
      █  ████████  ████████████████  ███████████████
12         Q.  Okay.
13         A.  But I will meet you -- but I will if I ever meet
14    you again.  You just asked me another question I don't
15    know the answer to.                                            18:40:09
16         Q.  Well, we're on pace to probably do this again at
17    some point, it seems like.
18         A.  Yeah, there's another case probably out there.
19         Q.  Let's turn now -- I want to talk about your
20    second opinion and -- which starts on page 44 of the          18:40:23
21    supplemental report.  I want to talk about the very last
22    sentence on page 45 that spills into page 46.  And you
23    can let me know when you're there.
24         A.  I'm there.
25         Q.  Okay.  That sentence reads, "Cigna and             18:40:45
```

                                                        Page 164

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    MultiPlan's ████████████████████████████████

 █    ████████████████████████████████████████

 3    arbitrary and unreasonable considering the significant

 4    differences in treatment, care, risk, resources, and

 5    staffing."                                      18:41:01

 6         In that sentence what did you mean by the word

 7    ████████████████

 8         A.  So using a rate that is -- exists for one

 9    facility as a basis for determining the rate for

10    something else.                                 18:41:20

11         Q.  Okay.  And that definition, or your

12    understanding of ████████████ is that based off of any

13    documents or deposition testimony you reviewed

14    specifically in this case?

15         A.  You know, there was a lot of information in   18:41:38

16    that.  I'm sorry, I'm going to pull the reference for

17    you, in that the document out of Washington.  Let's see.

18         Some testimony, and why Cigna doesn't do it,

19    because that was focused on the patient.  So, you know.

20    But again, it was other than the -- other than the      18:42:40

21    references that I've listed, I get really hung up on the

22    issue of a ████████ versus a ████ analysis, when you

23    last deposed me.  So I spent some time trying to make

24    sure I understand that the ████ -- what the ████████

25    dealt -- referred to in contrast to the ████ analysis,   18:43:05
```

Page 165

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL – ATTORNEYS' EYES ONLY

1    and it's a working knowledge, not an intimate knowledge.

2          Q.  Do you know if the utilization of ███████

3    is common in the industry?

4          A.  Yes.  It's common in medicine.

5          Q.  Have you ever been asked to opine on any          18:43:36

6    specific ███████ before?

7          A.  Not as it related to fees, but as it related to

8    criteria.

9          Q.  Okay.  And what do you mean by that?

10         A.  So we ███████ in ASAM patient placement          18:43:54

11   criteria to a level of care.  There are instruments that

12   can be used to take the information you get from an

13   analysis or an evaluation of the patient to determine a

14   level of care that they should be treated in.

15         So I'm familiar with the use of the term          18:44:13

16   ███████ in that regard.  And I accept that ███████

17   is a term of art in the insurance industry because it is

18   a -- it is a useful way around which these rates are set

19   using the Medicare rates, looking at a rate that's set, a

20   rate reimbursement that's set by Medicare, and then          18:44:43

21   applying it to a different provider.

22         Q.  Okay.  Let's look again at page 46.  After what

23   we just looked at is a sentence that starts "indeed."  It

24   says, "Indeed, Cigna and MultiPlan's ███████

██   ████████████████████████████████████          18:45:17

Page 166

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   ████████████████████████████████████████████

2   ██████████████████████████████████

3        Do you see that?

4        A.  Yes.

5        Q.  Okay.  And that sentence does not have a          18:45:30

6   citation to it.  So can you tell me what -- what you

7   based that sentence off of?

8        A.  The chart that we referenced earlier that gave

9   the details on what was billed versus what was paid.

10       Q.  Are you referring to the citation at footnote     18:45:55

11  154 or 155?

12       A.  Let me see.  154.

13       Q.  Do you know if a ████████ was used for every

14  claim at issue in this case or a certain subset of

15  claims?                                                    18:46:23

16       A.  I would certainly agree that it could not have

17  been used for every claim at issue.  One, claims were

18  adjusted, decided, determined in a variety of different

19  ways for a variety of different reasons.  And there can

20  never be an instance where something happens every time.  18:46:42

21  There's always going to be an exception hidden somewhere

22  in there.

23        So I don't think that the ████████ was used in

24  every instance.

25       Q.  Do you think it was used for a specific subset    18:46:54

Page 167

CONFIDENTIAL ATTORNEYS' EYES ONLY

1    or type of claims over other claims or do you have any

2    knowledge of that?

3         A.  I didn't do that analysis.

4         Q.  All right.  In the very next sentence on page

5    46, it says, "These Medicare-based rates are not SUD R&C        18:47:18

6    rates, such as those generated by FAIR Health."

7             Why did you reference FAIR Health?

8         A.  So again, I've got this general knowledge that

9    comes from being quasi in the insurance industry through

10   this service that we provide that is a network extension    18:47:48

11   and through the self-insured employers, and our

12   executives talked a lot about what we would do to recruit

13   adequacy and adequate network and what we would offer to

14   people to get them to enroll with us to be in our network

15   to provide services.                                          18:48:18

16           And they talked about what tools are used, and

17   they've spent a lot of time talking about how they're

18   going to monitor services and reimbursement rates over

19   time.

20           So it's, again, a general knowledge that FAIR       18:48:32

21   Health is a database that has good geographic dispersion

22   and good collection of modalities or services

23   represented.

24        Q.  Okay.  When you said "good geographic

25   dispersion" --                                                18:48:59

                                                      Page 168

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          A.   Coverage.

2          Q.   -- do you know how FAIR -- coverage.   Okay.

3               Do you know if FAIR Health has a specific

4     geographic component to it?

5          A.   I can't speak to that.                    18:49:09

6          Q.   Do you know what underlying claims data FAIR

7     Health utilizes when determining, I guess, recommended

8     pricing amounts?

9          A.   I can't speak to that.

10         Q.   Do you know if FAIR Health utilizes any      18:49:31

11    █████████?

12         A.   I can't say for sure.

13         Q.   Is it your opinion that Cigna was obligated to

14    use FAIR Health in this case?

15         A.   No.                                        18:49:51

16         Q.   All right.   Let's go to the third opinion of the

17    supplemental report, which is right below that on page

18    46.  The first paragraph, the second sentence, it reads,

19    ██████████████████████████████████████████████████

██    ██████████████████████████████████████████          18:50:09

21              Do you see that sentence?

22         A.   Yes.

23         Q.   Was that what we were -- is this sentence, I

24    guess, referring to the same time topic that we discussed

25    probably 10 or 15 minutes ago?                      18:50:23

                                                    Page 169

CONFIDENTIAL ATTORNEYS' EYES ONLY

1        A.  The ████████ yes.

2        Q.  The word ███████████ is in quotes in

3    that sentence.  Why is that the case?

4        A.  Because it is not a specific term.  It's a

5    descriptive term.  I could have just as well put ██████        ████████

6    ████████████

7        Q.  Okay.  So ███████████████████████████,

8    the general concept is interchangeable to you?

9        A.  Yes.

10       Q.  But you weren't using quotes because you're        18:51:12

11   pulling that from any specific document?

12       A.  Absolutely not.

13       Q.  Do you have any understanding of how Cigna might

14   determine a ████████?

15       A.  So my general answer is the ████████ would        18:51:35

16   be established to preserve as much of their assets as

17   possible and to reimburse as little as possible or to

18   pay.  Because your expert argues you're not being

19   reimbursed for anything.  They're providing a service and

20   they're asking to be paid for it.  So it's not really a        18:52:03

21   reimbursement.

22           So I have in my testimony said that their

23   determination appears to be arbitrary and in favor to

24   them.

25           So I have to support my opinion by saying that        18:52:17

                                              Page 170

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    they determine that amount because they want to preserve

 2    assets, reduce costs, and increase profit.

 3        Q.  Do you have any understanding of whether Cigna

 4    refers to its members' plan documents when it sets a

 5    ██████████?                                          18:52:44

 6        A.  I'd have to say of course they would because

 7    they have to determine that that plan document allows a

 8    service for that patient, for that diagnosis, in the way

 9    in which it was delivered in order to be deemed or

10    concede that that -- that charge should be paid.     18:53:08

11        Q.  Do you -- do you contend that MultiPlan or Viant

12    plays a role in setting the ██████████?

13        A.  I concede that they play a role in delivering on

14    that ██████████ and trying to beat it and that their

15    activities are aimed at preserving assets and maximizing  18:53:37

16    profit just as much as Cigna's are.

17        Q.  Okay.  But you'd -- you would agree, though,

18    that MultiPlan does not set the ██████████?

19            MR. COLLINS:  Objection.  Misstates testimony.

20        Q.  BY MR. CROUSILLAC:  I think you didn't quite    18:53:58

21    answer my question, and it could have been a bad

22    question.

23            But I -- I'm asking as far as we want to call it

24    a ██████████ is it                                    

25    Cigna or the insurance carrier that sets that price, or  18:54:10
```

Page 171

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    is it MultiPlan, to your knowledge?

2         A.   The way I have a described it in my written

3    testimony, my expert report, that Cigna gives that to

4    MultiPlan.  So Cigna sets it.  So -- but I appreciate

5    you're taking ownership of the bad question.  I think my     18:54:31

6    response was bad that time.

7         Q.   All right.  Moving along, crossing off some

8    stuff so that's always good.

9         A.   Thank you.  We're going to make it through this

10   without another break, I think.                             18:54:59

11        Q.   I think so.  I think so.

12        A.   Okay.  All right.

13             MR. CROUSILLAC:  Yeah, we're getting -- I don't

14   want to commit to time, but we're getting close.  We're

15   getting close.                                              18:55:11

16             THE WITNESS:  I don't want you to lose your

17   rhythm, put you off.

18        Q.   BY MR. CROUSILLAC:  Okay.  Right there, we're

19   also -- so page 46 still.  Opinion 3, second paragraph,

20   it's the first sentence says, "MultiPlan may bestow upon     18:55:25

21   a provider the perception of in-network status with its

22   network agreements known as Global Agreements."

23             Do you see that?

24        A.   Yes.

25        Q.   When you say "MultiPlan may bestow upon a          18:55:43

                                                    Page 172

CONFIDENTIAL ATTORNEYS' EYES ONLY

1   provider the perception of in-network status," what do

2   you mean by that?

3        A.  That means that when MultiPlan contracts with a

4   provider through this Global Agreement, the provider gets

5   to act more like an in-network provider than an                 18:56:02

6   out-of-network provider.  It knows what it will be paid

7   for services delivered.  It understands that it is seen

8   as a desirable and/or necessary area part of the network

9   that, you know, has met whatever qualifying review is

10   required to be a part of that network, and it will be          18:56:28

11   able to provide services to patients covered by Cigna

12   through that Global Agreement, probably experiencing less

13   administrative burden than someone who didn't have a

14   Global Agreement in place.

15          Having everyone know what's going to be paid at         18:56:53

16   the outset is a better position than having no one know

17   what's -- what you're going to get.

18        Q.  All right.  If MultiPlan has a contract or --

19   strike that.  Let's restart.

20          If MultiPlan has a Global Agreement with a               18:57:07

21   provider, is the provider considered to be in-network

22   with Cigna?

23        A.  No.

24        Q.  Now the way that sentence -- the way I'm

25   interpreting it, you say MultiPlan may bestow upon the         18:57:30

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    provider the perception of in-network status.  Is it your

2    position that MultiPlan is, for a lack of a better word,

3    deceiving the providers when they sign a Global

4    Agreement?

5        A.  No.  Not defeating.  No, not at all.  I think        18:57:48

6    that this is a -- it's a marriage with caution.

7        Q.  And I know you didn't review the specific Global

8    Agreements in this case, but you're familiar with them

9    generally.

10        Do you know if those Global Agreements have any        18:58:10

11    statements in them that payment is guaranteed at this

12    Global Agreement rate?

13        A.  There are no guarantees in them.  That is what

14    I'm trying to point out in this paragraph, that the

15    perception is bestowed.  You can act as if, but it is        18:58:28

16    a -- it's a marriage of caution because it could fall

17    apart and you don't have to show cause if it does.

18    Everybody hopes the other's going to act in good faith,

19    and often then do.

20        Q.  Based on your experience, does MultiPlan explain        18:58:58

21    these caveats about, you know, payment's not guaranteed

22    as part of the, I guess, pitch to the provider to get

23    them to sign a Global Agreement?

24        A.  I don't think MultiPlan is obligated to explain

25    that.  MultiPlan is obligated to allow the provider to        18:59:18

Page 174

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    have the contract reviewed by their attorneys so that

 2    they are fully cognizant of what the contract calls for.

 3    But MultiPlan does not have to, you know, inform the

 4    provider of the contract.  It's what that duty calls

 5    fluffing.                                          18:59:39

 6          And often when people are coming to the point

 7    where they're signing these things, there's a bit of dire

 8    straits that the providers are in.  They're really happy

 9    to be able to move things to this point because it opens

10    the flow again.                                    18:59:58

11          MR. CROUSILLAC:  Okay.  I'm going to introduce

12    just very quickly here what will be marked as Exhibit 6.

13    And please let me know when you have it.  It will be

14    through Exhibit Share.

15          THE WITNESS:  Okay.                          19:00:17

16          (Exhibit 6, MultiPlan Negotiation Services

17          Global Agreement, 06/05/17, MPI_Cigna0007744,

18          was marked for identification by counsel

19          electronically.)

20          THE WITNESS:  I have it.                     19:00:36

21      Q.  BY MR. CROUSILLAC:  Okay.  So this is one of the

22    documents that was referenced in the chart early in your

23    report.  It's titled "MultiPlan Negotiation Services

24    Global Agreement," and it was to the plaintiff Southern

25    California -- it says So. Cal, but Southern California    19:00:52
```

Page 175

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    Addiction Centers.

 2            Do you see that?

 3        A.  Yes, I do.

 4        Q.  And I want to look just real quickly at the

 5    third bullet point.  You see there are several bullet        19:01:06

 6    points in the middle of it, but it's the third.  It says,

 7    "Provider understands and acknowledges that payment of

 8    benefits any" -- "if any, is subject to the terms and

 9    conditions of patient's benefit plan, including Kentucky

10    no-fault benefits, and that this Global Agreement does       19:01:25

11    not constitute a guarantee of benefit payment by the

12    payor."

13            Do you see that?

14        A.  I do.

15        Q.  Is it fair to say, then, that MultiPlan makes it     19:01:34

16    clear in the Global Agreements that the payment of

17    benefits, if any, is not guaranteed?

18        A.  They do.

19        Q.  All right.  Turning now to same paragraph on

20    page 46.  You can put Exhibit 6 away.                        19:01:59

21            It's the second sentence.  It says, "In

22    negotiating Single-Claim Agreements, MultiPlan employed

23    questionable coercive tactics offering plaintiffs

24    negotiated rates far below the R&C rate and a fraction of

25    the billed charges with an indication that if not           19:02:22
```

Page 176

1    accepted, plaintiffs could not expect an even" -- "or

2    plaintiff could expect an even lower Medicare-based

3    rate."

4            Do you see that?

5        A.  Which paragraph are you reading from?                19:02:30

6        Q.  Under Opinion Number 3, the second paragraph,

7    the middle.

8        A.  I have it.  Thank you.  I'm sorry.  I talked

9    over you.  Yes.

10       Q.  Okay.  That sentence you cite to footnote 161.        19:02:44

11   Is that the extent of the evidence that you reviewed that

12   supports that sentence?

13       A.  I don't think it is, but it is an adequate

14   support to the evidence.  You know, there I'm thinking

15   that I saw other MultiPlan agreements which would have     19:03:12

16   contained the same material, but that this one is good

17   enough.  It's complete and thorough.

18       Q.  Okay.  When you say "questionable coercive

19   tactics," does the rest of that sentence kind of

20   encapsulate what you're referring to as the questionable  19:03:32

21   coercive tactics?

22       A.  No.  The coercive tactics occur when your back

23   is against the wall, you've not received payment for a

24   long time, and MultiPlan comes in and says, let's get

25   this moving again.                                          19:03:48

                                                      Page 177

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1           Do you want to stay under the circumstances that

2     you're operating under and not get anything or do you

3     want to get something moving?  That's somewhat coercive.

4     You know that you've got them over a barrel.

5           The others are separated by commas and stand on          19:04:06

6     their own.  Offering plaintiffs negotiated rates far

7     below the R&C rate and a fraction of the billed charges

8     with an indication that if not accepted, maybe you'll get

9     an even lower rate, because we don't guarantee anything.

10         Q.  Okay.  You understand that the plaintiffs in          19:04:29

11    these cases are out-of-network providers; correct?

12         A.  I do.

13         Q.  So just, I guess, by definition, there's no

14    agreement between the providers and the payors on what --

15    what the charge should be paid at; correct?                    19:04:39

16         A.  Not in advance, no.  Except to the extent that

17    they might have reviewed -- they might have historical

18    payments.  Again, payment doesn't guarantee -- historical

19    payments don't guarantee future payments, but people rely

20    on that, or they might have approval on a particular           19:05:06

21    claim, continued stay reviews, and are believing that

22    this is going to be paid when the episode carries over.

23         Q.  Do you know if there's any prohibition under the

24    law against negotiating with a provider for the provider

25    to accept a lower amount than the provider's billed           19:05:32

Page 178

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    charges on an out-of-network claim?

2        A.   There is no prohibition against negotiation, but

3    it's my understanding that if there is no rate otherwise,

4    you have to pay 100 percent of that which is billed,

5    unless you find administrative or medical reasons not to      19:05:55

6    pay that which is billed.

7            And by creating a number of administrative

8    burdens, you can put a provider in a position of having

9    to negotiate, whereas they might not have thought that

10   they had to negotiate on the way in.  And that's the        19:06:13

11   coercion.

12       Q.   Okay.  When you say your understanding about

13   there's some instances where it's your belief that

14   there's an obligation to pay full billed charges, what is

15   that understanding based off of?                             19:06:29

16       A.   The law.  And I can get you the cite, but I

17   can't pull it up right now.

18       Q.   Okay.  So it's your understanding that there's a

19   specific law that requires payment at full billed charges

20   in certain circumstances?                                    19:06:50

21       A.   Yes.

22           MR. CROUSILLAC:  Well, I would like to request

23   that.  If you could send it to me after the deposition or

24   get your counsel to do that, that would be great.

25           MR. COLLINS:  We can do that.                        19:07:03

Page 179

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1           THE WITNESS:  Okay.

2           MR. CROUSILLAC:  Thank you.  Almost done.

3      Q.  Here the next sentence, it says --

4      A.  Well, before you go on.

5      Q.  Yes.                                    19:07:17

6      A.  That is also, it assumes that it is a bill that

7  would pass scrutiny; right?  You're not obligated to pay

8  something that is an incorrect bill.  So if it -- if it

9  would be disallowed, you don't have to pay something that

10 would be disallowed.                            19:07:35

11     Q.  Okay.

12     A.  Yeah.  Okay.

13     Q.  Make sense.

14          The next sentence says, "As part of this

15 negotiation process, MultiPlan conditions payment on the  19:07:42

16 out-of-network provider's agreement to waive the balance

17 bill."

18          Are you just kind of recapping how this works or

19 are you saying there's a problem with getting the

20 provider to agree to waive the balance bill?      19:07:57

21     A.  Well, if -- part of this is presented as if it's

22 done to spare the covered person these additional costs

23 for making an out-of-network decision, where it's set up

24 that the out-of-network decision is going to cost them

25 more.  And when one makes that decision and you agree to   19:08:36

                                           Page 180

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    take somebody out of the network, you're expecting to get

2    their part and the part that would be paid by the payor.

3          So this is another way of taking someone who's

4    back is against the wall and further reducing what

5    they're going to be able to get for services provided.        19:08:54

6          Q.  Would you agree that that is a benefit to the

7    patient to have someone getting the provider to agree to

8    not send them an out-of-network bill?

9          A.  Yeah, I do agree that -- that it is a benefit to

10   the patient.  But it hurts the system and -- and the flaw    19:09:18

11   in the system is by making the out-of-network choice so

12   unpalatable to begin with, so...

13         Q.  And just to clarify again, that sentence says

14   MultiPlan conditions payment, but we're in agreement that

15   MultiPlan is not actually, you know, writing the checks       19:09:48

16   here; right?

17         A.  You made that point, yes.  They don't write the

18   check.

19         Q.  Okay.  The remainder of this opinion talks about

20   the flawed methodologies, biased data system, burdensome      19:10:08

21   requirements, and deceptive practice, et cetera, and I

22   believe you covered all of that with Mr. Caplan; correct?

23         A.  I did, yes.

24         Q.  So we've referred to it a couple of times this

25   evening, but you gave a -- I guess a similar expert           19:10:40

Page 181

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    report in a case that also involved Viant and MultiPlan

 2    and United Healthcare; right?

 3         A.  Yes.

 4         Q.  Do you know if any portion of your opinions in

 5    that case were excluded by the Court?              19:10:55

 6         A.  I don't know.  I don't know.

 7         Q.  Did you -- okay.  So you don't know.

 8             So assuming, let's say that some portion of it

 9    could have been excluded.  Did that -- did you take that

10    into account when you drafted this report, and I guess   19:11:22

11    the answer to that is "no."

12         A.  The answer to that is definitely "no" because

13    different judges, different judges.  Different cases are

14    different cases.

15             MR. CROUSILLAC:  Okay.  And that was a terrible   19:11:34

16    run-on question.  I'm glad Rich didn't object to that.

17             MR. COLLINS:  No.  I decided to let you have

18    your fun.

19             MR. CROUSILLAC:  We know it's getting late.

20             THE WITNESS:  We understood what you asked.   19:11:49

21             MR. CROUSILLAC:  I actually believe that's all I

22    have, Dr. Barthwell.  I appreciate your time, and I'm

23    glad we could get this done this evening.

24             THE WITNESS:  Thank you for getting us through

25    it, and it certainly is a pleasure to see you again.   19:12:03
```

Page 182

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1              MR. COLLINS:  And -- and Counsel -- I'm sorry.

2      I don't know if you want to give me a list of what you

3      understand to be the deliverables, but maybe if you did

4      and we take a break, we see if any of those are still

5      needed or if we have the information, but that might be          19:12:25

6      helpful before we conclude.

7              MR. CAPLAN:  Yeah, I don't have time for that

8      tonight, but I'll look at the transcript and let you

9      know.

10             MR. COLLINS:  Okay.  We'll do that, then.              19:12:42

11             THE WITNESS:  We can pull it together in the

12     next day or so.

13             MR. COLLINS:  Yeah.

14             THE WITNESS:  Be happy to.

15             MR. CAPLAN:  Thank you.                               19:12:49

16             MR. COLLINS:  Thank you.

17             THE VIDEOGRAPHER:  Ready to go off?

18             MR. COLLINS:  I believe so.

19             THE VIDEOGRAPHER:  We are off the record at

20     7:12 p.m., and this concludes today's testimony given by      19:12:58

21     Dr. Andrea --

22             THE WITNESS:  Barthwell.

23             THE VIDEOGRAPHER:  -- Barthwell.  Thank you.

24             (Time noted: 7:12 p.m. Central Daylight Time.)

25                           --oOo--

                                                  Page 183

CONFIDENTIAL ATTORNEYS' EYES ONLY

```
1              I declare under the penalty of perjury under the

2     laws of the State of California that the foregoing is

3     true and correct.

4              Executed on _____, 2023, at

5     _____, _____.

6

7

8

9

10

11                          _____

12                          SIGNATURE OF THE WITNESS

13

14

15

16

17

18

19

20

21

22

23

24

25

                                              Page 184
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    STATE OF CALIFORNIA     ) ss:

 2    COUNTY OF MARIN         )

 3

 4          I, LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3452, do

 5    hereby certify:

 6          That the foregoing deposition testimony was

 7    taken before me at the time and place therein set forth

 8    and at which time the witness was administered the oath;

 9          That testimony of the witness and all objections

10    made by counsel at the time of the examination were

11    recorded stenographically by me, and were thereafter

12    transcribed under my direction and supervision, and that

13    the foregoing pages contain a full, true and accurate

14    record of all proceedings and testimony to the best of my

15    skill and ability.

16          I further certify that I am neither counsel for

17    any party to said action, nor am I related to any party

18    to said action, nor am I in any way interested in the

19    outcome thereof.

20          IN WITNESS WHEREOF, I have subscribed my name

21    this 13th day of July, 2023.

22

23

24          LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462

25
```

Page 185

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    RICHARD T. COLLINS, ESQ.

2    rich.collins@agg.com

3                                        July 13, 2023

4    RE: TML RECOVERY, LLC vs. CIGNA CORPORATION

5    July 11, 2023, ANDREA G. BARTHWELL, M.D., JOB NO. 6005372

6    The above-referenced transcript has been

7    completed by Veritext Legal Solutions and

8    review of the transcript is being handled as follows:

9    __ Per CA State Code (CCP 2025.520 (a)-(e)) - Contact Veritext

10      to schedule a time to review the original transcript at

11      a Veritext office.

12   __ Per CA State Code (CCP 2025.520 (a)-(e)) - Locked .PDF

13      Transcript - The witness should review the transcript and

14      make any necessary corrections on the errata pages included

15      below, noting the page and line number of the corrections.

16      The witness should then sign and date the errata and penalty

17      of perjury pages and return the completed pages to all

18      appearing counsel within the period of time determined at

19      the deposition or provided by the Code of Civil Procedure.

20   __ Waiving the CA Code of Civil Procedure per Stipulation of

21      Counsel - Original transcript to be released for signature

22      as determined at the deposition.

23   __ Signature Waived - Reading & Signature was waived at the

24      time of the deposition.

25

                                              Page 186

CONFIDENTIAL ATTORNEYS' EYES ONLY

1    _x_ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF

2        Transcript – The witness should review the transcript and

3        make any necessary corrections on the errata pages included

4        below, notating the page and line number of the corrections.

5        The witness should then sign and date the errata and penalty

6        of perjury pages and return the completed pages to all

7        appearing counsel within the period of time determined at

8        the deposition or provided by the Federal Rules.

9    __ Federal R&S Not Requested – Reading & Signature was not

10        requested before the completion of the deposition.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 187

CONFIDENTIAL-ATTORNEYS' EYES ONLY

```
 1   TML RECOVERY, LLC vs. CIGNA CORPORATION

 2   ANDREA G. BARTHWELL, M.D. (#6005372)

 3                E R R A T A   S H E E T

 4   PAGE_____ LINE_____ CHANGE_____

 5   _____

 6   REASON_____

 7   PAGE_____ LINE_____ CHANGE_____

 8   _____

 9   REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____    _____

24   WITNESS                                Date

25
```

Page 188

CONFIDENTIAL - ATTORNEYS' EYES ONLY

**[& - 24]**

| & |
|---|
| **&**   9:14 10:15 186:23 187:9 |

| 0 |
|---|
| **00269**   1:6 2:6 |
| **0269**   7:20 |
| **03/30/23**   6:5 7:7 |
| **06/05/17**   6:18 175:17 |
| **07/09/23**   6:7 7:10 |

| 1 |
|---|
| **1**   1:25 5:16 6:4 7:6,15 15:6,12 15:20 19:8,13 20:15 21:19 31:15 32:7,7,9 32:11,19 46:10 47:15,18,23 51:24 61:4 100:25 101:3,5 102:8,17 112:21 145:14 148:6 187:1 |
| **1,250**   28:18 44:17 |
| **1,500**   133:25 |
| **10**   83:20 169:25 |
| **10,000**   133:21 |
| **100**   97:2 157:11 179:4 |

**10th**   15:7
**11**   1:21 2:22 5:4 7:1 22:1,2 83:20 186:5
**1100**   4:6
**11:15**   22:6
**11th**   7:13
**12**   9:20 55:23
**12/11/19**   6:12 87:23
**120**   6:16 148:17
**121**   64:9,9
**13**   186:3
**136**   5:11
**13th**   185:21
**14**   112:2,4
**140**   100:21
**148**   6:14
**15**   83:21 169:25
**150**   130:25 150:21 152:15
**1500**   58:21
**151**   155:25
**153**   161:8
**154**   161:24 162:1,1,3 167:11,12
**155**   162:1,3 167:11
**156**   163:9
**157**   163:10
**16**   5:16 112:20 113:9

**161**   177:10
**168**   120:21
**175**   6:17
**18**   136:20
**188**   1:25

| 2 |
|---|
| **2**   6:6 7:9 15:8 15:12,20 19:10 19:13 20:16 21:8,25 22:4 31:13,19 32:8 44:1 46:10,22 47:1 48:2,4 49:8 50:6,7 52:5 59:3 60:22 61:21 62:22 64:6,18 84:9 87:10 89:14 90:20 94:2 97:22 98:5 99:23 101:9,18 102:23 112:2 112:20,21 120:4,10,14 124:2 145:6 150:15 |
| **2,000**   132:3 |
| **20**   41:8 47:15 47:18,23 61:6 70:18 167:2 |
| **2002**   45:6,6,7 45:11,17,24 72:15 |

**20037**   3:8
**2013**   113:5
**2014**   117:17
**2015**   65:21,25 71:10,12,13,22 72:4,8,21 73:2 73:17 74:19 80:3 81:21 82:8,25 83:4 83:17 112:18
**2016**   6:16 148:16 149:9
**2017**   50:19,19
**202**   3:9
**2020**   112:6,10 112:14
**2022**   71:25 72:4,8,21 73:2 73:17
**2023**   1:21 2:22 5:4 7:1,14 47:5 50:16,17 51:8 184:4 185:21 186:3,5
**2025.520**   186:9 186:12
**20th**   3:20
**21**   45:14 61:8
**2100**   3:7
**22**   23:3 112:22 113:9
**225**   4:8
**24**   85:10 101:1 101:5

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

**[24/7 - above]**

**24/7**  119:5,18
**28**  65:16
**29**  84:11
**2:00**  12:16
**2:17**  2:21 7:2
 7:13

**3**

**3**  3:20 6:8
 51:13 52:2,8
 52:10 54:5
 56:19 107:17
 108:18 120:7
 130:12 135:25
 172:19 177:6
**3,000**  132:22
**30**  84:10,13
 86:1 87:10
 89:14 187:1
**3000**  7:22
**30th**  15:6 46:15
 47:5,9 50:15
 51:8
**31**  90:20
**32**  94:3,3
**33**  94:3
**3452**  185:4
**3462**  1:24 2:24
 185:24
**350s**  3:7
**36**  59:5
**37**  61:21,24
 62:22
**376-0219**  4:8
**38**  64:6,12
 97:23 98:5

**39**  64:13
**3:19**  51:25
**3:29**  52:6

**4**

**4**  6:10 44:2
 46:12 87:20,22
 88:5,8 89:20
 89:24 90:13
 130:12 136:3
**4,000**  133:3
**40**  105:24
 106:6
**40,000**  29:14
**400**  4:6
**404**  3:10,11
**41**  64:18 99:22
 101:9
**415**  3:22
**42**  101:18
 145:9
**43**  102:23
 105:1,23 107:4
 107:10 150:16
**44**  107:25
 155:11 161:7
 164:20
**45**  164:22
**46**  107:16
 108:1,3 164:22
 166:22 168:5
 169:18 172:19
 176:20
**47**  120:15
 124:3

**5**

**5**  5:1 6:14 50:7
 67:1 83:20
 130:12 148:12
 148:15,21,23
**5,000**  133:5
**50**  64:21 65:11
**500**  131:1
**52**  6:8
**5411**  185:23
**550-6102**  3:23
**5:11**  120:5
**5:25**  120:8
**5:48**  136:1
**5:54**  136:4
**5th**  50:19

**6**

**6**  6:1,17 46:23
 47:2 48:2 49:8
 50:19 83:20
 175:12,16
 176:20
**6,000**  130:12
 133:8
**600**  92:1,4,7
 93:8
**6005372**  1:25
 186:5 188:2
**60606**  7:23
**677-4917**  3:9
**693-2164**  3:22

**7**

**7**  6:4,6 167:1

**7,000**  133:11
**70**  64:21 65:11
**70802-5618**  4:7
**73**  87:15,16
**7:12**  2:21
 183:20,24

**8**

**8,000**  133:13
**858**  3:23
**87**  6:10
**873-5623**  3:10
**873-8133**  3:11
**8:20**  1:6 2:6
 7:20

**9**

**9**  5:10 50:5
**9,000**  133:15
**90**  41:8 43:2
**94111**  3:21
**9th**  15:7 22:1,7

**a**

**ability**  20:15
 51:7 108:16
 153:23 185:15
**able**  12:13,13
 36:25 38:20,21
 47:4 56:2
 85:17 91:20
 93:11 133:19
 153:19,20
 155:7 173:11
 175:9 181:5
**above**  49:9,13
 89:15 131:5

Page 2

**[above - adoption]**

| | | | |
|---|---|---|---|
| 150:19 186:6 | **acknowledge** | 126:14 136:19 | **adequately** |
| **absolutely**  18:6 | 141:11 154:1 | 140:23 147:19 | 116:2 |
| 120:2 126:15 | **acknowledges** | 161:13 163:16 | **adhered**  129:12 |
| 170:12 | 176:7 | 181:15 182:21 | **adherence** |
| **abstinence** | **acquisition** | **acupuncture** | 128:23 129:25 |
| 129:11 | 160:6 | 122:7 | **adhering** |
| **abuse**  71:20 | **act**  66:1,2 67:9 | **acute**  100:7 | 129:10 |
| 72:3 73:4 | 67:9,20 68:3 | 165:2 | **adjudicated** |
| 74:24 78:9,13 | 77:7,7 81:9 | **add**  55:6 | 56:1 57:9 |
| 79:22 81:2 | 158:1 173:5 | **added**  22:22 | **adjudicating** |
| 83:14 126:20 | 174:15,18 | 23:4 30:10 | 63:4 |
| 131:9 157:24 | **acted**  66:14 | 33:13 49:18,24 | **adjusted**  38:21 |
| 160:11 | 67:7 85:6 | **addiction**  9:20 | 57:9 144:3 |
| **accept**  37:6 | **acting**  74:20 | 10:1 31:22 | 167:18 |
| 166:16 178:25 | 94:24 142:14 | 44:6 46:1 | **adjustments** |
| **accepted** | **action**  13:25 | 113:20 176:1 | 65:24 66:2 |
| 112:17 121:10 | 47:20 60:6,8 | **addictionist** | 67:7 |
| 177:1 178:8 | 61:11 67:12 | 160:13 | **administer** |
| **access**  15:10 | 85:2 161:11 | **addition**  16:25 | 138:23 |
| 20:24 21:19,21 | 185:17,18 | 17:19 101:5,11 | **administered** |
| 77:9 104:16 | **actions**  14:5 | 157:24 | 185:8 |
| **accommodate** | 40:21 67:4,12 | **additional** | **administration** |
| 13:2 | **activated**  58:16 | 109:17,19 | 46:7 48:9 |
| **accomplish** | **activities** | 110:11,13 | **administrative** |
| 67:10 | 171:15 | 143:18 180:22 | 35:13 80:9 |
| **account**  182:10 | **acts**  66:1 | **additions** | 84:24 85:5,7 |
| **accrues**  162:25 | **actual**  13:24 | 112:25 | 85:19 108:8,9 |
| **accuracy**  49:2 | 27:11 49:4 | **address**  39:21 | 109:24 125:4 |
| **accurate**  11:12 | 58:6 111:2 | 40:9,21 43:7 | 173:13 179:5,7 |
| 11:15 50:24 | **actuality**  54:4 | 80:1 115:11 | **admittedly** |
| 83:22 115:15 | **actually**  39:19 | **adequacy** | 107:20 |
| 185:13 | 55:15 56:3,13 | 139:23 168:13 | **adopt**  112:5 |
| **accurately** | 56:22 58:9,24 | **adequate**  56:9 | **adoption**  83:9 |
| 115:18 | 61:8 78:9,12 | 123:16 139:21 | 122:25 |
| | 115:9 126:10 | 168:13 177:13 | |

Page 3

CONFIDENTIAL - ATTORNEYS' EYES ONLY

**[advance - analysis]**

advance  178:16
advantage
  77:13
advise  67:13
advised  20:25
  60:17 61:19
advocate  27:7
  114:10
aeo  88:20,21
affect  160:4,5
affected  153:18
affiliations  8:4
affordable  66:1
  67:9,20 77:7
afraid  139:8
afternoon  7:12
  8:6 9:9 36:8
age  157:16
agencies  40:9
agg.com  3:12
  3:13,14 186:2
ago  86:20
  136:20 147:22
  169:25
agree  12:22
  25:1,17 39:6,9
  39:13 79:8,13
  79:17,20,21,24
  94:18 97:1
  110:19 112:16
  117:21 122:3
  124:24 167:16
  171:17 180:20
  180:25 181:6,7
  181:9

agreed  43:6
  85:20
agreement  6:18
  37:23 55:8,14
  105:9,21
  152:22,23,25
  153:2,5,6,9
  173:4,12,14,20
  174:4,12,23
  175:17,24
  176:10 178:14
  180:16 181:14
agreements
  105:2,6,12,16
  151:1,2,8,12
  152:8,10,16,18
  154:10 155:1
  172:22,22
  174:8,10
  176:16,22
  177:15
ahead  54:25
  59:19 73:8
  87:19 148:7
  155:13
ahlers  4:13
aimed  171:15
al  1:4,7,10,12
  2:4,7,10,12
alarm  65:17
  66:17
alaska  44:8
algorithms
  170:7

align  111:2
alike  92:16,17
alive  85:9
allegations
  59:13,16,22
alleged  146:17
allegedly  53:3
  54:24 55:1
alliance  9:20
allow  45:22
  60:10 95:20
  123:14 127:7
  131:6,21 135:6
  153:25 154:5
  174:25
allowable
  169:19 170:2,7
  171:24
allowance
  53:17
allowed  23:9
  71:19 131:9
  134:21
allows  82:17
  171:7
ambiguous
  26:17 37:15
  74:2,5 77:14
  79:1 91:2
  93:20 96:10
  110:22 114:5
  118:22 119:13
  142:23 144:22
  156:19

amend  47:10
amended  59:10
  59:13 61:17
american  45:25
  113:19
americans
  85:25
amount  28:24
  38:22 54:22
  75:1 83:1
  85:17 92:23,25
  96:12 102:22
  130:21 131:10
  142:16,20
  169:19 170:6,7
  170:14,15
  171:1,5,12,14
  171:18,24
  178:25
amounts  54:19
  96:4,13 146:18
  167:1 169:8
  170:2
analyses  22:14
analysis  24:5
  34:7,10,12,17
  34:20 35:3,5
  68:21 69:8,16
  69:19,21 71:8
  71:11,12,12
  95:25 97:21
  106:5,7,8,15
  156:24 159:9
  161:3 165:22
  165:25 166:13

CONFIDENTIAL - ATTORNEYS' EYES ONLY

[analysis - asked]

168:3
**analyte** 130:10
**analytes** 84:6
168:25 130:25
**analyze** 26:4
**analyzing**
155:16 156:5
157:1 159:3
**andrea** 1:18
2:18 5:8 6:2,4
6:6 7:6,9,16
183:21 186:5
188:2
**animosity**
70:11
**annual** 147:18
**annually** 72:15
152:9
**answer** 5:14
14:2,3,14 17:5
17:7 18:7
19:15,22 20:10
20:14 21:18
37:17 40:23
41:17 42:8
43:16 56:13
59:1 60:10,14
70:6,14 71:4
73:12 75:25
76:7 79:3 83:5
89:12 91:19
93:25 97:12
128:17 132:18
132:19 142:11
164:15 170:15

171:21 182:11
182:12
**answered** 41:4
73:11 74:9
76:2,6 77:21
77:22 133:2
**answering**
11:17 40:17
41:10 70:16
**apart** 174:17
**apc** 100:7
**apologize**
104:16 162:16
**apology** 160:25
**appeal** 123:12
159:24
**appealing**
159:20
**appeals** 144:18
**appearances**
3:1 4:1 8:4
**appearing** 9:9
135:4 186:18
187:7
**appears** 89:21
170:23
**appendectomy**
81:13
**apple** 92:24,25
93:2
**apples** 93:3
**application**
128:15,16
**applied** 105:21
121:17 122:9

129:6 130:3
**applying** 35:25
166:21
**appreciate**
81:15 104:20
136:8 172:4
182:22
**approach** 86:3
**appropriate**
80:23 83:11
**approval** 80:15
178:20
**approve** 78:8
**april** 112:5,10
112:14
**arbitrary**
102:12,15,18
165:3 170:23
**area** 106:13
140:19 157:4
158:7,10,13,25
159:3,6,6
160:20,20,24
173:8
**areas** 136:7
140:16 155:17
158:11,25
159:1,14,19
161:4
**argues** 170:18
**argumentative**
90:15 107:11
115:6,23
**arizona** 159:15
159:23 160:2

**arms** 130:13
**arnall** 3:3 8:12
8:16,18 9:14
10:14,22
**array** 44:7
85:10 105:25
**arrived** 155:15
**art** 60:15 63:10
166:17
**article** 50:14,15
50:20 82:6,21
120:21
**artificial** 43:1
**asa** 55:19,22
**asam** 30:12,20
45:2,6,20
68:16,20 112:5
112:9,13,16
113:5,19,21
122:25 128:13
166:10
**ascertain** 56:2
**aside** 11:1
60:18
**asked** 23:19,21
25:12 29:7
30:6 33:4,5
39:24 40:3,4
40:19,20,20,24
41:2,4,16
42:12,17,19
43:17 67:24
69:13,13 73:22
81:11 115:24
116:5,8,12

CONFIDENTIAL - ATTORNEYS' EYES ONLY

**[asked - based]**

133:1 154:21
164:14 166:5
182:20
**asking**  11:16
13:18 16:1,14
16:16 18:12
19:4,22 20:1,2
24:13,15 27:24
28:3 33:23,25
43:12,19 69:20
71:15 74:6,10
74:14,16 75:4
75:5,24 77:22
92:22 107:21
115:25 142:19
170:20 171:23
**aspect**  75:17
**assess**  84:19
**assessment**
37:10
**assets**  37:22
163:1 170:16
171:2,15
**assisted**  114:11
**association**
140:22 141:6
**assume**  59:16
152:2
**assumed**  30:16
33:25 115:11
**assumes**  180:6
**assuming**  30:15
53:21 122:15
150:23 182:8

**assumption**
33:20 34:4,5
**assumptions**
24:1,6
**assured**  21:5
**attached**  44:9
65:8
**attorney**  8:5
16:4 18:2,3
19:15,21 60:9
78:7,8
**attorneys**  1:16
2:16 48:18,22
54:6 57:6
175:1
**august**  50:19
50:19
**authorization**
14:18 54:10,11
**authorized**
62:1 147:15
**authorizing**
121:16,18
**automatic**
127:8
**available**  23:5
50:15,23 51:3
88:1 103:2,9
104:5,9 127:11
146:10
**avenue**  3:7
**average**  64:21
**aware**  39:19
53:20 66:16,17
67:13 68:6

71:20 72:6,19
72:22,25 78:20
96:3,11 97:9
97:10 98:16
151:11

**b**

**b**  53:2 187:1
**back**  23:9 36:5
48:1 49:8
52:18 59:3
61:21 65:6
76:5 84:8
85:15 89:14
94:2 97:22
99:6 101:9
107:18 111:22
112:2 115:6
119:22 120:9
120:14 123:23
124:2,13 125:9
132:14 135:4,6
136:9 139:5
150:15 152:13
153:17 177:22
181:4
**background**
30:6,9 33:12
137:11 150:9
**backwards**
65:15
**bad**  125:9
171:21 172:5,6
**balance**  54:21
180:16,20

**band**  32:9,11
32:19
**barrel**  178:4
**barrier**  84:25
85:1
**barthwell**  1:18
2:19 5:8 6:2,4
6:7 7:6,10,16
8:23 9:9 15:11
16:5,22 19:8
19:10 20:6
25:8 41:14
52:7 70:9,14
76:15 115:4
133:16 136:6
136:16 145:5
153:13 182:22
183:22,23
186:5 188:2
**base**  97:19
140:6
**based**  14:2
16:16 17:5
18:7 22:11,17
24:3 27:4,11
27:11 39:3
65:4 68:12,18
82:7,21 97:17
98:2 100:9
102:16 104:13
106:3,6,10
109:22 114:14
119:7 123:3
140:20 141:8
143:10 144:5

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

**[based - board]**

144:13 146:22
152:21 153:1
161:23 165:12
167:7 168:5
179:15
**bases**  97:20
103:3
**basing**  66:19
67:25 103:9
**basis**  18:14
35:11 100:14
120:20 163:7
165:9
**bates**  49:22
55:21,25 56:5
151:14
**baton**  4:7
**bear**  132:17
**beat**  169:20
171:14
**becoming**
154:18
**bed**  93:12
135:6
**beg**  11:3 24:14
77:3 145:1
**began**  23:18
28:8
**beginning**  2:20
8:5 47:1 71:22
89:24 103:1
109:9,16
**begins**  48:8
61:25 84:10

98:9 100:1
112:23 162:22
**behalf**  2:19
8:13,15,18
9:15 37:21
137:23 138:1
142:14 152:19
**behavior**  78:4
**behavioral**
15:23 17:24
19:12 20:8
100:10
**behaviors**
108:16
**belief**  179:13
**beliefs**  127:22
**believable**
117:14
**believe**  23:2
37:1 38:6
50:20 65:8
67:7 70:12,13
70:25 104:11
127:3 140:12
148:12 151:6
181:22 182:21
183:18
**believed**  129:7
**believing**
178:21
**belt**  159:22
**benefit**  38:20
38:22 69:5
86:18 143:7,15
176:9,11 181:6

181:9
**benefits**  53:14
53:22,25 54:2
86:19 95:17
176:8,10,17
**benson**  3:5,10
8:15,15
**bertha**  50:15
**best**  12:8,9 14:2
14:3 20:14
43:7 51:7
70:14 185:14
**bestow**  172:20
172:25 173:25
**bestowed**
174:15
**better**  76:8
86:20 90:12,17
120:12 122:23
153:24 164:3
173:16 174:2
**beyond**  17:10
62:20 82:16
128:13 142:13
**biased**  108:5
181:20
**big**  157:10
158:25
**bill**  29:4 77:24
78:1 79:7
91:20 96:12
122:18 180:6,8
180:17,20
181:8

**billed**  13:14
14:11,12 28:11
28:13 37:4
53:10,11 54:17
54:22 56:23
64:22 80:8
94:11,13,15,19
97:2,18,20
102:19 130:10
151:3 162:24
167:2,9 176:25
178:7,25 179:4
179:6,14,19
**billing**  22:15
28:14 29:1
86:6 97:9
125:8 165:1
166:25
**bills**  27:9,10
58:6 99:17
106:21 130:19
**bit**  65:15 87:9
139:7 142:13
150:5 175:7
**blaine**  10:15
**blanket**  34:3
82:19
**blanketly**
134:22
**block**  64:8
**blocks**  118:7
**blue**  90:1,8
**board**  45:1,10
45:20,25
160:13,17

CONFIDENTIAL - ATTORNEYS' EYES ONLY

**[bodies - car]**

**bodies** 110:3
**body** 78:23
**bottom** 32:7
  46:23 50:10
  62:22 84:10
  90:5 94:3
  107:3,9
**box** 39:20
**brandon** 4:14
  7:24
**break** 13:1 88:3
  119:24 135:21
  172:10 183:4
**breakdowns**
  156:25
**breathalyzer**
  53:8
**brief** 138:6
**bright** 149:12
**bring** 132:17
**broad** 26:1
  31:20
**broader** 53:7
  134:16 162:1
**broadly** 156:14
**broke** 15:25
  33:24 79:12
  101:24 118:13
**brokers** 78:23
**brought** 21:4
**build** 119:20
**building**
  119:16,17,18
  119:19

**bullet** 48:7 49:9
  50:14 84:13
  90:22 176:5,5
**burden** 84:24
  85:6,7,19,23
  87:8 173:13
**burdens** 108:8
  108:9 179:8
**burdensome**
  181:20
**business** 12:15
  85:23,24 93:19
  95:12,14,23
  102:3 131:7,24
  159:2 160:18
**businesses**
  93:24 131:6

---

**c**

**c** 53:6 54:13
**ca** 186:9,12,20
**cal** 175:25
**calculate** 26:23
**calculations**
  100:16
**calendar** 28:25
**california** 1:2
  2:2 3:21 7:19
  9:25 10:1
  34:21 35:1,2
  44:8 76:25
  106:1 107:13
  111:7,20 157:9
  158:14,21,24
  158:24 159:15
  159:16,17,24

159:25 175:25
  175:25 184:2
  185:1
**call** 17:16 25:6
  57:19 60:8
  171:23
**callahan** 10:15
**called** 10:20
  15:22 49:25
  73:20
**calling** 148:3
**calls** 58:25
  77:15 79:1,11
  90:10,16 92:9
  92:20 93:21
  96:19 97:4
  119:14 132:24
  134:3,13
  142:10,24
  175:2,4
**cap** 43:23
  94:22
**caplan** 3:18,22
  5:10 8:6,7 9:8
  15:5,16,18
  16:14 17:2,4
  17:23 18:3,12
  18:18 19:4,17
  20:1,6 21:17
  25:7,20 26:22
  29:10 37:16
  38:8 39:10
  41:6,16,23
  42:24 43:6,8
  43:15,21 44:1

49:17 50:5
  51:10,13,22
  52:7 53:2 59:1
  59:3 60:20
  70:9,16,21
  71:7 73:5,8,13
  73:21 74:4,10
  76:11 77:17
  79:8,14 81:3
  86:22 87:19
  88:1,17 89:13
  90:12,19 91:3
  92:12 93:5,22
  96:8,15,23
  97:16 98:5,8
  98:12,15
  107:12,16,20
  108:1 110:25
  114:3,9 115:14
  116:3,6,14
  118:24 119:19
  120:2,9 126:5
  132:2,9 133:3
  133:8,11,13,15
  133:24 134:8
  135:11,20
  136:5 137:12
  138:5 139:9
  151:7 162:16
  181:22 183:7
  183:15
**capped** 94:25
**car** 92:23,24
  93:1,3

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

**[care - challenged]**

| | | | |
|---|---|---|---|
| **care**  32:5,6 | 25:23 27:14 | 174:8 182:1,5 | **center**  3:20 |
| 37:8 53:7,10 | 28:12,17,24 | **cases**  9:12 10:4 | 9:24 10:1 |
| 54:12,14,14 | 29:2,18,22,25 | 10:9,11 11:1,4 | **centers**  9:25 |
| 59:24 66:1 | 30:1,24 32:1 | 11:8,11,14 | 176:1 |
| 67:9,20 77:7 | 32:15,19 34:8 | 13:16 16:2 | **central**  1:2,2 |
| 81:5,18 84:15 | 34:19 37:12 | 17:25 19:1 | 2:2,2,21,22 7:2 |
| 85:9,23 100:7 | 38:10,15 39:24 | 20:16,17 22:10 | 7:13,19 22:2 |
| 100:7,8 106:19 | 40:3,4,22,24,25 | 23:1,12,20,25 | 63:2 142:15 |
| 106:19,20 | 41:1 42:16 | 24:2,10,16,17 | 183:24 |
| 112:9,17 | 44:19 46:16,19 | 24:21 25:13,15 | **certain**  14:16 |
| 114:16 117:22 | 47:5,8 48:18 | 25:17,22 27:1 | 22:21 70:2 |
| 118:1,4,11,15 | 57:11,14,25 | 27:5 57:23 | 77:7 92:23,25 |
| 118:18,20 | 59:17 63:1,2 | 58:13 59:18 | 126:8 127:16 |
| 119:5,7 122:8 | 63:16 64:16 | 78:13 85:5 | 145:24 147:17 |
| 122:11,19 | 65:13 69:7,14 | 135:15 141:15 | 163:4 167:14 |
| 123:1,2,8 | 69:15,22 71:16 | 148:4 156:24 | 179:20 |
| 127:19 131:2 | 78:9 88:9,14 | 178:11 182:13 | **certainly** |
| 157:9 165:2,4 | 91:17 93:23 | 182:14 | 123:11 167:16 |
| 166:11,14 | 94:11,16 | **cataloged** | 182:25 |
| **careful**  125:20 | 104:12,14 | 72:12 | **certificates** |
| **carrier**  171:25 | 105:13,16 | **catastrophic** | 46:6 |
| **carries**  178:22 | 106:22 114:2,6 | 98:25 | **certification** |
| **case**  7:19 9:18 | 116:15 118:20 | **catch**  116:10 | 109:25 |
| 10:19,22 15:2 | 119:1 122:18 | **caught**  56:13 | **certifications** |
| 15:20,22,24 | 123:6 124:12 | **cause**  13:24 | 46:3 110:2 |
| 16:2,10,13 | 124:21 136:20 | 174:17 | **certified**  2:23 |
| 17:6,10,12,17 | 136:25 141:10 | **causes**  125:4 | 45:25 68:16 |
| 17:19,24 18:4 | 141:14 149:5 | **causing**  71:9 | 160:13,17 |
| 18:8,19 19:24 | 151:9 153:8 | **caution**  19:23 | **certify**  185:5,16 |
| 19:25 20:7,12 | 154:9 157:4,15 | 174:6,16 | **cetera**  181:21 |
| 21:6,20 22:13 | 158:13,17 | **caveats**  163:4 | **chair**  40:5 |
| 22:19 23:13,14 | 160:23 163:8 | 174:21 | 127:24 |
| 23:15,16 24:18 | 164:2,5,6,18 | **ccp**  186:9,12 | **challenged** |
| 24:18,19 25:3 | 165:14 167:14 | **ceilings**  163:4 | 83:7 |
| 25:6,10,15,18 | 169:14 170:3 | | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[chance - cited]**

| | | | |
|---|---|---|---|
| **chance** 88:5 | **chart** 55:25 | 63:15 64:1,3,4 | 173:11,22 |
| 117:9 | 105:1 124:10 | 64:9,13,25 | 186:4 188:1 |
| **change** 66:25 | 151:17,23 | 65:16,20,24 | **cigna's** 16:7 |
| 83:18 84:4 | 157:18,18 | 66:3 67:6,25 | 35:16 36:19 |
| 95:8 188:4,7 | 167:8 175:22 | 69:8,10,16,19 | 55:23 56:19 |
| 188:10,13,16 | **charts** 150:19 | 69:22 74:13 | 86:4 90:23,25 |
| 188:19 | **check** 59:21 | 79:25 84:19 | 91:6 99:13,15 |
| **changed** 83:16 | 142:18 181:18 | 86:3,11,13,16 | 100:15 101:22 |
| 97:7,8 101:10 | **checks** 181:15 | 87:13,17,24 | 101:25 102:7 |
| **changes** 65:21 | **chicago** 1:20 | 88:19 91:9 | 103:17,19 |
| 68:7 | 2:20 7:1,22 | 92:18 93:6 | 114:24 126:25 |
| **charge** 28:16 | **choice** 66:11,11 | 95:2,5,8 98:2 | 143:10 152:17 |
| 28:18 44:16,18 | 68:13 69:6 | 98:17,18,22 | 156:13 171:16 |
| 44:20 94:20,25 | 181:11 | 99:3,9,19 | **cigna0007113** |
| 96:3,12,13 | **choose** 94:20 | 100:1,6 102:4 | 6:16 148:16 |
| 102:22 131:11 | **chose** 86:10 | 103:2,25 104:6 | **cigna0007744** |
| 132:22 133:20 | 115:10 | 104:12 109:17 | 6:19 175:17 |
| 145:17,25 | **cigna** 1:7,9 2:7 | 109:21 112:5,9 | **circumstances** |
| 147:2,5,8 | 2:9 6:13 7:18 | 112:13 114:25 | 178:1 179:20 |
| 171:10 178:15 | 8:7 10:20 13:7 | 120:23 127:4 | **circumstantial** |
| **charged** 73:1 | 13:13,14,20 | 135:17 138:7 | 129:15 |
| 106:2,9 107:4 | 14:4,6,9,24,25 | 142:13,14,18 | **citation** 103:22 |
| 126:10,14,15 | 15:23 17:23 | 142:20 143:9 | 104:21 124:10 |
| **charges** 36:23 | 19:12 20:8 | 143:22,25 | 167:6,10 |
| 54:17,22 64:22 | 30:11 33:21 | 144:4 145:16 | **citations** 94:4 |
| 94:11,13,15,19 | 34:2 35:10,12 | 151:1,3 152:15 | 113:4 |
| 94:23 96:1 | 35:20,23 36:1 | 152:19 155:15 | **cite** 64:13 65:4 |
| 97:3,18,20 | 36:3,11,25 | 156:7 160:23 | 66:21 103:21 |
| 102:18,20 | 37:14,21,22 | 161:11 162:4 | 120:21 150:21 |
| 147:18 151:3 | 38:5,9,14 39:1 | 163:1,4,14 | 152:14 161:8 |
| 167:2 176:25 | 39:18,19 40:14 | 164:10,25 | 177:10 179:16 |
| 178:7 179:1,14 | 40:21 41:2,20 | 165:18 166:24 | **cited** 100:21 |
| 179:19 | 42:5 53:15 | 169:13,19 | 128:3 155:24 |
| **charging** | 58:10,11,23 | 170:13 171:3 | 161:24 |
| 133:25 | 62:12 63:3,5,9 | 171:25 172:3,4 | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[civil - collins]

civil 74:7
186:19,20
civility 70:2,5
claim 35:11,19
36:12 37:4,6
38:21,23 57:8
62:12 78:20
80:13 99:4,10
99:20 102:10
102:11 105:22
114:24 124:6,7
125:1,6,11
126:13 140:18
142:8 144:2
146:4 151:2
152:23 157:17
157:18,19
162:19 167:14
167:17 176:22
178:21 179:1
claims 6:8
13:15,18 14:5
33:22 34:1,4
34:12,14 35:8
35:12,22 36:3
39:1,19,22
48:9 51:15
52:2 56:1,22
60:12 63:4,16
66:3 67:3 79:9
79:18 80:8,14
80:18 81:18
84:19 97:11
101:7 102:9
105:17 109:21

109:22,23
110:20,24
140:13 142:5
145:18 153:2,7
154:9 155:16
156:5,6,7,12,13
156:14,14,18
156:21 157:3
157:11 158:3,6
161:10,13
167:15,17
168:1,1 169:6
claire 3:19 8:8
clarification
23:11 25:12,21
33:13
clarify 21:17
25:12 181:13
clarifying
21:11
clark 113:16,18
113:23 114:3
116:18 117:16
117:18
clause 60:21
clean 126:23
clear 16:21,22
21:8 22:20
23:9 27:23
154:16 176:16
clearly 21:23
163:25
client 74:16
clients 154:25

clinical 35:14
75:16 119:9
128:16 129:24
130:1
clinically
128:10
clinician
105:24
clock 43:1
close 172:14,15
closed 78:9
closely 40:7
143:8,22
closer 101:15
clustered 83:20
clusters 131:8
cms 130:19
134:20 146:12
146:13 147:18
160:19
cocaine 135:2
code 111:1,1
159:8 165:1
186:9,12,19,20
codes 56:24
57:2,3 81:21
100:7,9 110:21
110:24 125:8
157:21 166:25
coercion
179:11
coercive 176:23
177:18,21,22
178:3

cognizant
175:2
cold 159:22
colin 3:25
collaborate
86:13,16
collaboration
123:9 143:12
collaborative
86:3
collaboratively
122:21
colleague 139:9
colleagues 22:5
141:1
collect 143:2
156:22
collected
156:10
collection
140:13 143:18
168:22
collections
97:10
collectively
137:4
collects 36:23
collins 3:4,9
8:12,12 9:14
10:13,24 15:17
16:3,20 17:3,7
18:1,9,16,21
19:14,20 20:4
20:9 22:5 25:4
25:10 26:17

Page 11

**[collins - concern]**

37:15 41:4,12
42:12,23 43:5
43:8,20,25
51:12,18,23
52:22,25 58:25
60:9 70:8,10
70:20,24 73:3
73:7,19 74:6
76:2 77:14
79:1,11 80:25
86:21 88:14,23
89:7 90:10,15
91:2 92:9,20
93:20 96:6,9
96:19 97:4
98:4,14 107:11
110:22 113:24
114:5 115:5,23
116:5,7 118:22
119:13,25
131:12 132:4
132:23 133:6,9
133:12,14,22
134:2,12
135:24 136:9
139:13 142:9
142:23 144:20
144:25 147:12
148:13,21
156:19 171:19
179:25 182:17
183:1,10,13,16
183:18 186:1
**colorado**
130:24

**column** 52:13
52:16 53:2,6
53:13,24 54:9
55:3,7,10,19,22
56:14,15,18,20
56:21,24,25
57:2,3 152:1
**columns** 52:14
**combat** 39:18
41:3
**combating**
39:15
**come** 31:2,6
32:15,17 36:17
39:22 70:1
95:14 103:15
104:6 111:22
146:18 153:17
157:1
**comes** 152:14
163:14 168:9
177:24
**coming** 12:17
67:2 123:10
139:5 175:6
**comma** 45:7,24
107:13
**command**
153:23 154:22
**commas** 178:5
**commercial**
137:23
**commit** 11:8
172:14

**common** 30:5
111:22 128:18
128:20 166:3,4
**commonly**
31:22
**communicati...**
20:12 56:4
60:12
**community**
119:7 129:14
135:3
**companies**
26:23 39:13
97:3,9 144:9
**company** 1:10
2:10 138:2,16
157:8,10
**comparable**
93:11 158:15
158:16,18
**comparator**
101:17
**compare** 46:9
93:17 95:25
100:24
**compared** 66:4
119:1
**comparing**
93:3
**comparison**
19:1 61:4
**compensation**
29:12,17 98:2
**competitors**
66:14

**complaint**
59:10,14
**complementary**
140:3
**complete** 11:12
11:15 24:11
30:19,20 49:23
50:3 58:7
80:19 91:22
177:17
**completed** 23:6
23:7 29:3
186:7,17 187:6
**completely**
83:21
**completion**
187:10
**complicated**
95:12 127:9
**complied** 34:8
34:18,21 35:4
35:6
**comply** 35:9
41:14 80:9
**component**
111:16 169:4
**comport** 109:5
122:2
**concede** 171:10
171:13
**conceded** 62:14
**concept** 170:8
**concern** 21:1,4
63:21 154:12

Page 12

CONFIDENTIAL - ATTORNEYS' EYES ONLY

**[concerned - correct]**

concerned
  69:11 130:9
conclude   183:6
concludes
  183:20
conclusions
  15:19 31:3,6
conditions   77:8
  176:9 180:15
  181:14
conduct   12:15
  69:8,21 121:19
conducted
  68:21 109:23
conducting
  78:3
confidential
  1:16 2:16
  88:22
confirm   11:11
  15:10 49:2
  106:5 129:25
  129:25 131:19
  135:22
confirmation
  127:7,8
conflicted
  124:9
congress   72:1
connection
  69:7,22 71:14
  71:16 127:14
consensus   83:8
  127:23,24
  128:1,12 130:9

consider   26:7
  26:12,15,20,22
  27:2 93:18,23
  123:14
considered
  173:21
considering
  165:3
considers   116:7
consistently
  96:17
consolidated
  25:5 59:10
constitute
  106:19 176:11
constituted
  28:2 32:5
  34:22
constitutes
  111:23
construct
  119:11,15
constructed
  151:17
consult   44:13
  44:21
consultant   16:9
  17:14 103:12
consultative
  44:6,11
consulting
  44:16 137:13
  137:16,23
  138:3

consumer
  68:11
consumers
  68:21
contact   186:9
contain   22:12
  22:13,14,15
  58:16,21
  185:13
contained   49:6
  49:21 177:16
containment
  55:23 98:18,22
  99:2,9,13,15
  138:1
contend   171:11
context   20:22
  21:12,16 79:5
  100:11 102:15
continue   44:5
  95:14 131:9
  153:14,19,20
  154:11,14,19
continued   4:1
  178:21
continuing
  43:17 71:5
contract   14:6
  14:10,13,15,17
  26:12 27:8
  95:12,19
  173:18 175:1,2
  175:4
contracting
  151:20

contracts   26:14
  152:3,6 154:24
  173:3
contractual
  86:10
contrast   165:25
control   72:17
controlled
  129:16,20
convention   4:6
conversant
  147:16
conveyed   66:13
conviction
  78:19,20
cooley   3:17
cooley.com
  3:24,25
coombs   50:15
copied   64:15
copies   15:1
copy   22:4 59:4
corporate
  105:8 157:7
corporation
  1:7 2:7 7:18
  186:4 188:1
correct   9:10
  15:4 26:10,11
  30:8 33:19,22
  39:24 40:3
  42:16,17 45:12
  46:16,17 47:25
  54:19 64:16,17
  65:3 75:1,19

Page 13

CONFIDENTIAL - ATTORNEYS' EYES ONLY

[correct - crousillac]

| | | | |
|---|---|---|---|
| 82:23 86:12 | counsel  7:8,11 | coverage  35:18 | crisis  39:15,18 |
| 87:7 100:13 | 7:16 8:3,20 9:5 | 37:8 67:19,19 | 39:21 40:9,22 |
| 107:18 111:3 | 16:7,8 29:9 | 69:3 72:12 | 41:3,20 42:6 |
| 113:3,7 147:8 | 32:24 47:19 | 83:3 98:21,24 | criteria  30:13 |
| 148:2 151:9 | 51:19 52:4 | 99:3 125:18 | 30:21 113:5 |
| 158:19 164:6,7 | 87:25 148:17 | 126:9,25 | 122:25 166:8 |
| 178:11,15 | 162:9,10 | 142:22 169:1,2 | 166:11 |
| 181:22 184:3 | 175:18 179:24 | covered  13:13 | critical  95:23 |
| corrections | 183:1 185:10 | 32:3 37:17 | criticism  30:18 |
| 186:14,15 | 185:16 186:18 | 62:1 93:7,9 | criticisms  51:1 |
| 187:3,4 | 186:21 187:7 | 102:7 115:7 | cross  55:20,24 |
| correctly  35:21 | counselors | 122:22 125:11 | 57:4,8 90:1,8 |
| 65:1 | 100:10 | 125:14,15,22 | 165:24 |
| corrupted | counterclaim | 126:22 173:11 | crossing  172:7 |
| 108:6 | 1:11,13 2:11 | 180:22 181:22 | ▮▮▮▮▮▮ |
| cost  55:22 | 2:13 3:16 8:8 | covering  126:6 | 165:22,24 |
| 58:16 98:18,22 | country  124:1 | cpo  138:20 | 166:6,10,16,16 |
| 99:2,9,13,15 | 131:4 132:16 | create  77:12 | 167:13,23 |
| 130:5,11 131:4 | county  158:20 | 160:7 | 169:11 |
| 131:15,22 | 159:8,14 185:2 | created  48:19 | ▮▮▮▮▮▮ |
| 132:15,16 | couple  23:5 | 48:23,25 77:7 | 100:6 |
| 138:1 159:2 | 88:16 135:21 | creating  11:23 | ▮▮▮▮▮▮ |
| 160:1,7,18 | 181:24 | 119:16,16 | 165:1,7,12 |
| 180:24 | course  40:7 | 179:7 | 166:2,24 |
| costing  132:3 | 51:22 117:8 | credentialing | crousillac  4:5 |
| costly  119:11 | 171:6 | 81:11,13 | 5:11 8:10,10 |
| costs  106:16 | courses  141:6 | credentials | 15:14 135:23 |
| 119:20 130:7 | court  1:1 2:1 | 81:18 84:15 | 136:11,15 |
| 131:15 171:2 | 7:19 8:1,19 | 85:16 | 139:17 142:21 |
| 180:22 | 11:22 12:5 | credible  114:4 | 143:1 144:20 |
| cothron  100:19 | 182:5 | 116:24 | 144:23 145:4 |
| 100:21 | cousins  135:1 | criminal  72:19 | 147:13 148:14 |
| cothron's | cover  85:10 | criminally  73:1 | 148:19,23 |
| 100:17 | 126:17,18 | 73:16 | 157:2 171:20 |
| | 127:6 | | 172:13,18 |

Page 14

CONFIDENTIAL - ATTORNEYS' EYES ONLY

**[crousillac - delivered]**

175:11,21
179:22 180:2
182:15,19,21
**crunch** 49:23
**crux** 109:11
**csat** 68:20
**csr** 1:24 185:4
185:24
**cull** 104:8
**current** 10:14
129:14
**currently** 45:1
95:4 103:10,11
**curriculum**
44:9
**customary**
36:23 37:1
44:17 62:23
63:4,6,8,12,14
63:15,19,19,24
63:25 106:2,9
107:5 140:15
**customers** 91:9
**cut** 33:9,13,17
45:16 69:12
143:19
**cv** 1:6 2:6 7:20
44:12 45:4,6,8
45:9,24
**cycle** 58:19
**cynic** 45:21

**d**

**d** 5:1 53:13,24
**d.c.** 3:8

**data** 36:23,25
101:15,16
108:5,6 109:25
140:13 145:17
146:18 147:2,2
147:8 151:19
155:16 156:6,6
156:9,12,13,14
156:15,18
157:3 158:3,6
161:10 169:6
181:20
**database**
168:21
**databases**
156:8,10
**dataisight**
150:1,2,4
**date** 28:19 29:5
29:6,8,9,11
45:5,7,24
50:18 52:21
152:1 186:16
187:5 188:24
**dated** 15:7
**dates** 46:21,25
50:20 53:2
152:1,2
**day** 12:15 70:1
81:21,25 83:20
84:2,3,7
106:19 109:23
118:3,6 123:25
134:10,17,22
135:6,10,10

150:6 153:11
153:16 183:12
185:21
**daylight** 2:21
2:22 7:2
183:24
**days** 118:3,5,7
**ddr** 6:8 52:2
**dealt** 60:18
165:25
**death** 85:13
**debate** 129:22
**decades** 72:18
**deceiving** 174:3
**decent** 89:10,10
**deceptive**
108:13,17
181:21
**decide** 105:20
117:9
**decided** 35:23
167:18 182:17
**decidedly**
159:18
**decides** 87:7
**decision** 68:18
69:1 95:11
123:10 180:23
180:24,25
**decisions** 44:22
68:14,16 95:13
95:22
**declare** 184:1
**deductible**
53:18

**deemed** 56:10
113:14 171:9
**deep** 150:14
151:16
**defeating** 174:5
**defend** 27:9
**defendant** 7:17
**defendants** 1:8
1:13 2:8,13,19
3:16 4:3 8:7,11
47:11,14 61:11
78:11 136:25
**deficiencies**
164:1
**define** 126:1
**defined** 118:2
**defines** 160:20
160:24
**defining** 160:19
**definitely**
182:12
**definition**
14:16 139:9
161:18 165:11
178:13
**definitive** 127:6
128:9 134:16
**definitives**
131:19
**deliver** 121:24
**deliverables**
183:3
**delivered** 14:8
142:17 171:9
173:7

Page 15

CONFIDENTIAL - ATTORNEYS' EYES ONLY

**[delivering - developing]**

delivering
171:13
delivery   31:22
demanded
109:24
demonstrate
129:10,18
163:12
demonstrated
65:20 163:18
demonstrates
155:14,21
161:11 163:10
163:11
denial   57:2
98:24
denials   124:6
denied   98:21
99:3,10
dennis   87:11
87:12 88:7,10
88:13 89:7
deny   78:15
89:16 90:5
110:19 125:1
126:13
department
71:25 75:18
76:12,17 82:18
103:12 104:19
134:19 135:14
departments
135:12
depend   29:12
29:17 132:7,12

depending   54:1
79:2 91:20
159:5
depends   44:23
133:2,4,7
deployed   110:5
depose   43:3
deposed   12:12
12:13,20 23:8
25:15 47:11
51:2 141:12
163:24 165:23
deposing
141:21
deposition   1:18
2:18 6:1 7:16
7:21 11:25
12:23 21:13
41:9 46:15,22
46:25 47:7
49:9 100:17,18
100:19,20
108:10 141:17
141:20,22
144:15 153:14
155:23,24
165:13 179:23
185:6 186:19
186:22,24
187:8,10
depositions
21:2 22:16
23:6,7 38:7
46:18 47:4,12
47:19 60:2

70:18 101:16
149:19
deprives   102:5
depth   78:7
describe   24:10
24:16 30:3
121:9
described
30:13 111:9
121:11,11,19
123:19 125:16
125:17 128:14
172:2
describing
102:21
description   6:3
13:24 30:20
31:20
descriptive
170:5
designated
88:20,21
desirable   173:8
desire   58:16
despard   6:10
6:11 87:22,23
89:25 90:4,8
90:13
detail   21:22
30:12 38:3
44:15 115:13
149:21 153:11
details   167:9
detect   128:20

detection   128:8
134:17,23
determination
35:19 36:17
122:14 123:2
170:23
determinations
35:19 36:15
114:21
determine
35:16 36:11,25
59:24 68:22
69:16 71:8
106:8 116:23
121:7 143:9
166:13 170:14
171:1,7
determined
35:7,14 62:13
167:18 186:18
186:22 187:7
determines
97:17
determining
140:14,14,18
142:16 143:14
146:3 165:9
169:7
develop   27:25
30:1 132:14
133:18
developed   21:5
85:21
developing
122:4,16

CONFIDENTIAL - ATTORNEYS' EYES ONLY

**[developing - document]**

141:23
**devote** 85:17
**dfasam** 6:5,7
  7:7,10
**diagnoses**
  62:18 140:15
**diagnosis** 13:13
  14:19,20 37:8
  37:9 121:16,18
  125:15,16
  127:17 171:8
**dictate** 14:20
**dictates** 37:9
  87:5
**difference**
  54:22 111:11
  140:10 162:24
  163:15
**differences**
  111:15 159:5
  165:4
**different** 54:1
  54:12 57:14
  85:5 96:4,12
  96:13,17 97:14
  97:15,15
  151:16 155:16
  155:17,17
  158:20,21
  159:1,2,18
  160:1 166:21
  167:18,19
  182:13,13,13
  182:14

**differently**
  81:15
**differs** 164:9
**difficult** 83:5
  83:12
**dire** 175:7
**direct** 21:10
  92:11 128:9
**direction**
  121:21 185:12
**directly** 49:21
  151:25
**director** 27:6
  80:15 105:8
  124:8 157:7
**director's**
  124:9
**directors** 45:2
  45:11,20
**disadvantage**
  66:4 153:10
**disagree** 16:20
  70:4,25
**disallowed**
  180:9,10
**disciplinary**
  31:8
**disclose** 19:24
  21:7 60:11
**disclosed** 16:5
  16:6,7 17:1,11
  17:13,15,17
**disclosing**
  20:12

**disclosures**
  16:12
**disconnect**
  43:10 70:12
**discovered**
  67:11
**discovery** 25:5
  57:19
**discrete** 64:2
  142:19
**discuss** 20:13
  21:14 24:19
  25:19
**discussed** 19:24
  68:25 108:8,10
  169:24
**discussing**
  64:25 105:2
  164:9
**discussion** 98:1
  138:6 164:4
**discussions**
  20:2 144:7
**disease** 123:5
  140:15
**dismally** 58:14
**disorder** 31:21
  31:21 32:5
  46:4 71:21
  72:4,7,20,24
  73:15 74:23
  76:25 80:2
  85:18 111:19
  114:12,12,13
  118:10,14

**disclosures**
127:14,21
  134:9,10
**disorders**
  130:16
**dispersion**
  159:11 168:21
  168:25
**distinction**
  147:7,10
**distinguish**
  137:7 140:8
**distributed**
  163:3
**distribution**
  84:5
**district** 1:1,2
  2:1,2 7:18,19
**division** 1:2 2:2
**doc** 1:6 2:6
  7:20
**doctor** 143:20
**doctorate**
  111:5
**document**
  11:10 33:10,16
  51:5 65:7
  87:16,20
  121:20 122:10
  127:22,24,25
  128:1 129:14
  130:9 148:24
  149:3,7,10
  162:11,12
  165:17 170:11
  171:7

Page 17

**[documentation - emergency]**

documentation
57:21 84:14,21
documents
27:19 28:1,10
48:9 49:10,18
49:20,22 58:22
61:10 63:6
80:23 103:17
103:20,25
104:18 122:12
123:20 144:13
146:11 149:4
161:24 162:2,8
162:10 165:13
171:4 175:22
doing  36:2
41:19 43:4,8,9
45:23 69:13
70:23 71:4
78:4 83:24
97:14 123:18
131:18 132:15
150:12 159:2
160:18
dollar  54:21
domain  30:14
30:15
domiciled
77:25
domiciliary
78:2
doubling  43:2
downward
38:21

dozen  10:7
dr  7:16 8:23
9:9,21 15:11
16:5,22 19:8
19:10 20:6
25:8 41:14
52:7 70:9,14
76:15 113:16
113:18,23
114:3 115:4
116:18 117:16
117:18 133:16
136:6,16 145:5
153:13 182:22
183:21
draft  29:20
33:4,15
drafted  21:9,18
21:24 182:10
drafting  21:25
28:5,7
drawn  61:10
drive  63:21
130:22
driven  68:16
83:25
drives  102:2
driving  67:18
drove  85:23
drr  51:15
drug  72:11,17
75:13 78:1,3
78:13,17,17
81:21,24 82:3
82:11,16,17,25

83:3 122:7
127:1 128:14
128:15,18,25
130:5 131:11
132:3,22
133:15,21,25
134:8 146:20
drugs  128:5
due  43:3
151:12
dunbar  4:4
duty  45:18
175:4
dying  130:16

**e**

e  3:6 5:1 54:9
186:9,12 187:1
188:3,3,3
earlier  33:3
85:20 108:8,10
137:12 138:5
151:7 167:8
early  175:22
earn  91:7,10
93:12
earned  91:25
earning  92:6
93:8
ease  33:8
easier  25:1
56:10
edge  116:11
edits  80:14
effect  55:17
67:17,18 68:7

68:9 114:16
152:11
effectively
162:21
efficiency
137:2
effort  27:17
efforts  39:17
40:7,11
eight  12:17
24:21 25:24
58:1 74:24
128:8 129:4,5
either  10:13
12:4 14:5
21:21 96:8
105:19 149:25
156:11
electronically
7:8,11 52:4
87:25 148:18
175:19
element  83:1
elements  30:4
eliminate  79:22
elsinore  157:9
email  6:10
87:22 89:25
90:8
emails  100:2
embarcadero
3:20
emergency
82:17

Page 18

CONFIDENTIAL - ATTORNEYS' EYES ONLY

**[employ - exhibit]**

| | | | |
|---|---|---|---|
| **employ** 109:13 119:4 | **entered** 130:15 151:1 152:16 | 170:16 | **example** 35:25 80:14 94:23 |
| **employed** 118:8,25 119:3 127:18 176:22 | **entire** 103:23 | **establishing** 135:8 | 109:21 110:25 121:1 124:12 |
| **employees** 31:1 31:5 37:20 58:12 69:19 109:25 160:6 | **entities** 40:8 | **estate** 160:6 | 125:5 126:16 |
| | **entitled** 33:21 34:1,5 148:24 | **estimate** 27:21 | 148:8,8 163:9 163:10 |
| | **entity** 44:23 | **et** 1:4,7,10,12 2:4,7,10,12 181:21 | **examples** 83:21 109:17,19 |
| **employer** 69:4 | **environment** 97:15 | **evaluation** 166:13 | 110:7,9,11,13 124:20 163:11 |
| **employers** 140:25 168:11 | **environments** 67:16 | **evening** 118:8 136:16 181:25 182:23 | **excel** 55:23 56:16,19 |
| **employment** 159:17 | **eop** 144:1 | **event** 98:25 | **except** 18:16 58:2 94:21 178:16 |
| **encapsulate** 177:20 | **epidemic** 40:6 | **everybody** 132:17 174:18 | **exception** 82:15 153:6 167:21 |
| **encin** 9:21 | **episode** 106:19 122:11,19 178:22 | **evidence** 8:25 39:22 59:23 | |
| **encinitas** 9:22 9:23 | **equate** 93:13 | 60:1 62:14 81:12 86:2 | **exceptions** 56:8 |
| **encounter** 44:14 | **equipment** 131:21 | 114:14 125:9 151:14 155:14 | **excluded** 182:5 182:9 |
| **ended** 45:5,7 152:7 | **erisa** 144:18 | 155:20,21 156:2 177:11 | **excuse** 29:8 49:15,15 51:19 126:3 |
| **endorse** 78:16 83:12 | **eroded** 154:13 | 177:14 | |
| | **erosion** 154:1,7 157:16 | **evidenced** 162:3 | **executed** 152:3 184:4 |
| **engage** 78:4 108:15 | **errata** 186:14 186:16 187:3,5 | **evidencing** 80:23 | **executives** 168:12 |
| **engaged** 93:1 | **error** 45:8,13 | **exactly** 55:4 116:8 | **exemplar** 146:25 |
| **enroll** 37:23 168:14 | **especially** 86:22 | **examination** 5:6 9:7 136:14 185:10 | **exhibit** 6:4,6,8 6:10,14,17 7:6 |
| **enrolled** 144:9 | **esq** 3:4,5,6,18 3:19 4:5 186:1 | | 7:9 15:5,6,8,9 |
| **enrollees** 67:1 | **essential** 130:14 | | 15:12,12,15 |
| **ensure** 81:17 | **establish** 94:13 | | |
| **enter** 105:9 154:25 | **established** 94:11,15 | | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

**[exhibit - facts]**

19:8,10 20:15
20:16 21:8,19
21:25 22:4
31:13,15,19
32:8 44:1
46:10,22 47:1
47:15,18,23
48:2,4 49:8
50:6,7 51:11
51:13,17 52:2
52:8,10 54:5
59:3 60:22
61:4,21 62:22
64:6,18 84:9
87:10,20,20,22
88:5,8 89:14
89:20,24 90:13
90:20 94:2
97:22 98:5
99:23 100:25
101:3,5,9,9,18
102:23 112:2
112:20 120:10
120:14 124:2
145:6 148:9,9
148:12,15,21
148:23 149:20
150:15 175:12
175:14,16
176:20
**exhibits**   6:1
15:20 19:13
149:19
**exist**   109:4,13
109:15 146:24

**existed**   51:8
113:9
**exists**   55:12,13
146:11 165:8
**expect**   92:3
93:22 95:19
125:22 177:1,2
**expectation**
86:5 159:12
**expecting**
181:1
**expenditures**
83:13,15
**expensive**
132:3 134:1
**experience**   24:4
26:5,18 27:4
71:17 106:6,23
120:23,25
121:25 144:8
163:20 174:20
**experiences**
39:4
**experiencing**
173:12
**expert**   9:10,13
10:3,19 11:2,6
16:5,6,9 17:13
17:14,17 26:7
26:9,12,14,15
26:20,23,25
27:2,5,11,16
30:11,18 78:10
111:20 116:8
116:12 134:5

137:13,16,22
138:3 145:7
170:18 172:3
181:25
**expertise**   24:10
24:16
**experts**   51:2
**explain**   18:22
18:23 21:16
36:22 73:21
77:17,19
174:20,24
**explanation**
90:18 91:16
143:7,15
**explanatory**
52:16 54:16
**exposed**   61:18
**extender**
139:19
**extenders**
119:4
**extension**   54:14
139:5,19
168:10
**extensive**
159:10
**extent**   16:4
17:1,9 18:16
18:25 19:21
27:3 35:5
105:9,10,18
121:21 147:13
177:11 178:16

**extractions**
48:15,17
**extremely**
12:14
**eyes**   1:16 2:16

**f**

**f**   54:15,16 55:6
**face**   69:4 127:6
**facilitating**
75:13
**facilities**   27:7
119:1 146:21
158:7
**facility**   6:14
85:11 100:12
100:15 109:22
118:21 119:12
119:21 135:7
148:15,24
158:4 160:12
165:9
**fact**   14:22
17:14 18:10,23
25:4 34:14
38:1 59:25
62:13,14 66:20
123:16 125:21
127:18 129:19
139:1 146:22
155:12,14,20
**factors**   160:5
**facts**   22:12
23:8 24:4,4
25:18,19 26:3
26:4 38:24

Page 20

CONFIDENTIAL - ATTORNEYS' EYES ONLY

[facts - footnote]

60:3 61:10
67:24 132:5
153:23 154:2,7
155:4
**factual** 16:24
20:23 47:24
59:7,12,23,25
60:4,21 61:5
**fail** 150:22,25
**fails** 114:15,18
125:5
**fair** 16:18
51:17 65:10
70:8,8 138:15
138:17 149:25
168:6,7,20
169:2,3,6,10,14
176:15
**fairly** 89:10,10
**faith** 67:8
102:6 174:18
**fall** 23:3 174:16
**falls** 126:19
**familiar** 34:25
57:18,22 78:23
94:10 125:25
126:6 135:11
135:17 138:16
138:17,23,24
138:25 147:25
166:15 174:8
**far** 56:23
154:21 171:23
176:24 178:6

**faster** 95:21
**fat** 157:19
**fault** 176:10
**favor** 108:6
170:23
**favorable**
41:21
**fax** 58:20
**federal** 43:4
72:19,22,23
137:18,20
187:1,8,9
**federally** 74:14
74:15,17,19
**fee** 44:17,18
93:7 98:16,22
99:20 125:25
126:7 169:20
**feedback**
120:12
**feel** 42:8 154:14
154:17 155:7
**fees** 55:23 99:2
99:9 161:12
162:4,15 166:7
**felt** 164:2
**fentanyl** 132:14
132:15
**fewer** 118:3,3
**field** 120:24
**fields** 163:22
**figure** 54:21
126:23
**filed** 7:18 34:6

**filings** 90:23
**final** 89:1
**finalized** 27:18
**finally** 57:9
**find** 18:25
67:14 68:19
69:1 104:18
114:3 116:18
116:24 117:1
129:7 146:11
146:13 154:2
159:12 179:5
**findings** 20:18
21:2 129:23
**fine** 43:9
102:15 139:11
140:7
**fingering**
125:10 157:19
**finish** 19:20
21:25 38:17
**finishing** 22:23
**firm** 8:1,16
10:14,15,23
45:21
**first** 15:12
22:23 23:18
27:24 31:18,18
47:6,23 49:13
50:14,25 51:4
60:4,21 61:9
61:16,24 65:19
68:6 84:11
97:25 98:7,7,7
98:8 99:25

101:14,19
103:1,8 108:19
130:8 145:10
145:13 169:18
172:20
**five** 64:20
118:5,6 151:15
**flaw** 109:11
181:10
**flawed** 108:19
108:23 109:5
109:15,18
110:15,24,25
181:20
**floor** 3:20
**florida** 75:12
76:20 160:10
**flow** 153:3
175:10
**flows** 152:23
**fluffing** 175:5
**focused** 40:6
83:14 165:19
**follow** 42:21
43:16 109:14
**following** 37:9
61:10 76:3
**follows** 108:25
186:8
**followup** 136:8
**followups**
16:19
**footnote** 32:7
63:7 64:9,9
87:15,16

CONFIDENTIAL - ATTORNEYS' EYES ONLY

**[footnote - give]**

100:21 120:21
150:21 152:15
155:25 161:8
161:24 162:3
167:10 177:10
**footnotes** 50:1
**forced** 45:17,19
**foregoing**
184:2 185:6,13
**forensic** 128:15
**forensically**
128:11
**forgiving**
125:25 126:7
**forgotten** 57:16
**form** 26:20
27:3 60:23
73:10 74:9
99:6 111:8
141:16
**format** 33:15
76:8
**forms** 114:15
114:20 143:7
163:7
**formulate**
23:22 61:20
**formulating**
28:10
**formulation**
71:18
**forth** 185:7
**forward** 23:18
64:18

**found** 66:4
107:17 144:11
162:13
**foundation**
40:5 131:12
132:6,24 134:3
134:13
**four** 118:5,5
**fraction** 176:24
178:7
**frame** 82:10
**francisco** 3:21
**franklin** 7:22
**fraud** 71:20
72:2 73:3
74:24 78:8,12
79:22 83:14
126:19 131:9
157:24
**fraudulent**
78:4 158:1
**frcp** 187:1
**freedom** 96:24
**frequently**
128:7 129:21
**front** 15:2 52:8
**fruition** 39:22
**full** 12:15 27:17
44:9 61:24
98:7 99:25
101:3 102:25
120:17 124:5
150:18 179:14
179:19 185:13

**fully** 175:2
**fun** 182:18
**funds** 44:25
**funeral** 135:1,3
**further** 87:9
98:10 100:5,23
105:1 136:6
181:4 185:16
**furthermore**
120:18
**future** 86:5
178:19

**g**

**g** 1:18 2:18 5:8
6:2,4,6 7:6,9
54:15,19 55:6
186:5 188:2
**gaap** 165:22,25
**gc** 131:21
**gear** 25:25
**general** 22:17
36:21 39:2
40:14 73:5
100:9 127:18
130:5 134:15
140:12 144:12
154:23 163:12
163:17,19
168:8,20 170:8
170:15
**generalities**
155:3
**generally** 23:24
27:16 79:5,21
95:19 112:17

116:18 118:2,5
118:7,25 119:2
121:10 123:8
124:1 135:11
137:14,15
151:11 167:1
174:9
**generated**
168:6
**geographic**
36:24 68:13
106:3,10
140:16,19
155:17 156:25
157:4 158:7,10
158:11,12,25
159:3,5,6,10
160:19,24
161:1,4 168:21
168:24 169:4
**geographical**
159:1
**geographically**
159:20
**getting** 27:18
59:19 75:15
120:12 122:5
122:20,22,23
137:3 141:25
153:16,18
172:13,14,15
180:19 181:7
182:19,24
**give** 9:1 18:21
35:24 50:23

Page 22

CONFIDENTIAL - ATTORNEYS' EYES ONLY

**[give - guaranteed]**

| | | | |
|---|---|---|---|
| 51:16 91:16 | 70:22 73:8 | 78:9 87:5 88:3 | **gotcha** 129:9 |
| 123:17 124:11 | 87:19 89:20 | 93:25 94:2 | **gotten** 16:12 |
| 126:17,24 | 92:13 95:11,17 | 95:17,19 97:22 | **government** |
| 145:2 153:15 | 97:21 101:9 | 105:19 107:19 | 40:8 45:22 |
| 154:17 183:2 | 104:18 107:18 | 108:14 109:1 | 73:16 114:17 |
| **given** 14:18 | 112:2 115:6,12 | 115:11 120:5,8 | 131:25 137:18 |
| 25:4 39:2 75:1 | 120:9,14,15 | 121:12 124:2 | 137:20 156:11 |
| 83:19 84:2,2,3 | 123:23 124:13 | 125:21 126:17 | **governmental** |
| 84:7 161:1 | 128:9 130:24 | 129:7 130:13 | 40:8 44:24 |
| 183:20 | 131:2 134:25 | 136:1,4 144:2 | 72:6 |
| **gives** 104:16 | 139:22 146:3,5 | 144:20 145:1 | **grandmother's** |
| 126:21 154:12 | 146:7 148:7 | 155:1,7 160:17 | 135:1 |
| 172:3 | 149:21 154:2 | 165:16 167:21 | **grant** 44:25 |
| **giving** 12:8,11 | 155:13 161:6 | 168:18 172:9 | **grayer** 143:13 |
| 43:22 | 169:16 180:4 | 173:15,17 | **great** 129:22 |
| **glad** 182:16,23 | 183:17 | 174:18 175:11 | 139:17 155:6,9 |
| **global** 6:18 | **god** 9:2 | 178:22 180:24 | 179:24 |
| 55:8 105:2,12 | **goes** 27:19 | 181:5 | **greatly** 160:1 |
| 105:16 151:1,8 | 104:3 116:8 | **golden** 3:3 8:13 | 160:18 |
| 151:11,18 | 120:22 133:19 | 8:16,18 9:14 | **gregory** 3:3 |
| 152:16,18,21 | 142:13 143:9 | 10:14,22,25 | 8:13,16,18 |
| 152:23 153:9 | 145:4 | 78:10 | 9:14 10:14,23 |
| 172:22 173:4 | **going** 7:12 | **gompper** 65:8 | 10:25 |
| 173:12,14,20 | 11:16 16:3 | **good** 7:12 8:6 | **ground** 162:17 |
| 174:3,7,10,12 | 17:21 18:1,2 | 9:9 11:12 | **grounds** 16:4 |
| 174:23 175:17 | 20:14 22:18 | 25:20 39:7,11 | 17:8 135:9 |
| 175:24 176:10 | 28:16,18 31:12 | 43:21 67:8 | **group** 44:14 |
| 176:16 | 36:1 39:21 | 89:12 102:6 | 84:2 140:24 |
| **go** 23:9 38:3 | 40:15 41:13,21 | 119:25 135:24 | **groups** 139:22 |
| 40:16 48:1 | 43:17 47:10 | 136:16,23 | **guarantee** |
| 51:20 52:18 | 49:8 51:10,13 | 140:13 150:6 | 176:11 178:9 |
| 54:25 56:5 | 51:25 52:6 | 168:21,22,24 | 178:18,19 |
| 59:3,18 61:21 | 66:15 68:1 | 172:8 174:18 | **guaranteed** |
| 62:21 65:6,15 | 69:12 70:1,24 | 177:16 | 174:11,21 |
| 67:14 68:20 | 70:25 76:10,13 | | 176:17 |

Page 23

CONFIDENTIAL - ATTORNEYS' EYES ONLY

**[guarantees - hypothetical]**

| | | | |
|---|---|---|---|
| **guarantees** 174:13 | **happens** 167:20 | **helped** 69:1 141:16 | **hope** 41:13 54:16 |
| **guess** 141:14 147:24 158:9 163:20 169:7 169:24 174:22 178:13 181:25 182:10 | **happy** 13:2 20:21 21:11,15 62:21 89:4,4 124:14 175:8 183:14 | **helpful** 39:14 46:9 77:18 100:24 183:6 | **hopes** 174:18 |
| **guidelines** 112:5,9,13 | **harassment** 73:20 | **heroin** 135:3 | **hospital** 100:9 119:11,15,20 |
| **gut** 14:5 | **haste** 49:23 | **hey** 89:25 | **hospitalization** 117:22 |
| **gutted** 102:11 | **heading** 49:9 50:12 101:19 108:3 | **hidden** 167:21 | **hospitals** 100:8 118:12,16,19 118:25 119:3 165:2 |
| **guy** 92:22,24 93:1,2 | **health** 1:9 2:9 9:20 15:23 17:24 19:13 20:8 46:6 65:10 72:12 77:6 97:3 100:10 125:12 149:25 168:6,7 168:21 169:3,7 169:10,14 | **high** 130:8 138:11 139:8 149:8 | **host** 62:17 125:4 |
| **h** | | **higher** 54:13 100:6 118:11 118:15 151:2 | **hostile** 41:5 |
| **h** 54:15,21 55:3 55:6 188:3 | | **highlighted** 49:7,7 | **hour** 28:18 44:17 85:10 86:20 89:1 118:7 121:12 153:11 |
| **haggling** 133:10 | | **highly** 85:12 129:13 | **hours** 12:17 27:13,15 28:19 117:20 118:3,6 118:6 |
| **hairs** 66:8 | | **hired** 11:2 22:25 23:12,15 23:17 114:8 | **household** 72:11 |
| **half** 161:20,21 162:5,6 | **healthcare** 10:12,18 164:6 164:10 182:2 | **historical** 129:14 178:17 178:18 | **hr** 160:1 |
| **halfway** 48:7 97:25 98:9 | **hear** 57:12 79:15 136:17 144:1 | **history** 80:21 | **huh** 48:4 107:6 146:2 148:11 |
| **hand** 8:24 135:22 136:10 | **help** 9:2 25:3 29:20 30:1,23 31:2,5 39:21 57:7 103:11 111:22 141:17 | **hit** 140:5 | **hundred** 106:25 |
| **handle** 144:18 | | **hold** 46:6 88:10 89:6 148:14 | **hung** 165:21 |
| **handled** 186:8 | | **homes** 75:7,9 75:12,13,17,23 76:1,12,16 | **hurt** 154:8 |
| **handling** 35:10 | | **honest** 73:11 117:1,5,10 154:23 | **hurts** 181:10 |
| **hands** 87:8 | | | **hypothetical** 131:13 132:5 |
| **happen** 66:25 71:24 | | | |
| **happened** 40:2 43:12 78:15 97:6 124:12 | | | |

Page 24

[hypothetical - initial]

132:24 134:3
134:13

**i**

**idea**   28:20
120:1
**identification**
7:7,11 52:3
87:24 148:17
175:18
**identified**   6:3
105:13
**identify**   124:21
127:19
**ignorance**
65:21 66:10,16
68:5
**ignorant**   66:7
66:15 68:8
**ii**   104:10 148:6
**illinois**   1:20
2:20 7:1,23
44:8
**immediately**
152:14
**immunoassay**
131:18
**impact**   101:23
102:1
**impacted**   38:14
154:18
**impeccable**
88:25
**impeccably**
24:11

**impediment**
85:1
**implement**
79:25 80:13
**implemented**
83:4,17 109:21
**implication**
66:25
**imply**   68:4
108:14
**impossible**
85:24
**impressions**
113:23
**improved**
122:11
**inaccurate**   75:2
110:20
**inadequate**
56:7,10
**inapplicable**
101:6,12
**inappropriate**
83:4 145:19
146:19
**inciting**   134:19
**include**   24:18
28:9 76:24
114:16
**included**   15:20
16:16 17:6
18:7,13,14
19:5 20:2 33:2
49:3 61:17
84:1 85:3

111:24 127:10
186:14 187:3
**including**   8:3
23:10 80:14
106:1 110:13
176:9
**incomplete**
131:13 132:5
132:23 134:3
134:13
**incorporated**
10:2
**incorrect**   180:8
**increase**   58:17
171:2
**increased**   71:9
**independent**
69:21
**indicate**   100:2
**indication**
176:25 178:8
**indicted**   73:16
73:24 74:14,15
74:17,19,23
**indictments**
72:20,22,23
78:6
**individual**
94:14 122:10
152:6
**individual's**
122:10
**individually**
137:8

**individuals**
13:12 14:19,20
32:3 35:18
38:4 40:8,10
77:23,24 78:1
78:3 139:22
140:25
**industry**   30:16
65:22 68:1
71:22 72:4,8
77:8 80:7,12
80:13,17,21
81:16,19 85:21
85:22 93:10
120:24 130:6
135:13,16
140:23 141:7
144:7 166:3,17
168:9
**inform**   21:2
114:17 130:2
152:5 175:3
**information**
16:23 36:10
49:3,5 53:23
58:6 88:19,19
101:15 111:21
123:13 125:6
130:1 143:11
161:1 165:15
166:12 183:5
**informing**   86:3
**initial**   21:5
22:11,17 27:13
27:22 28:6

Page 25

**[initial - issuing]**

31:15 46:14
60:23 61:5
100:25 101:1
113:1,10,12
**initiated** 31:9
**initiative** 75:7
75:9,23 76:1
76:12,16
**innovators**
132:16
**inpatient** 76:4
118:12,16,18
**insertion** 20:9
**instance** 69:10
121:15 167:20
167:24
**instances** 14:10
57:8 73:18
94:21 124:1
128:8 179:13
**institute** 81:20
82:11
**instituted**
81:23 82:2,24
**instruct** 17:21
**instructed** 5:14
**instructing**
17:5,7 18:6
**instruction**
20:11 23:25
**instruments**
166:11
**insurance** 1:10
2:10 26:8,9,15
26:19,23 30:16

34:1 46:7
65:21 80:13
87:4 97:3
135:13,16
137:25 140:23
141:2 142:22
156:11 166:17
168:9 171:25
**insured** 139:24
140:4,25
168:11
**insurer** 79:8,18
79:25 80:8
87:5 121:6
122:12 123:20
124:25 126:13
**insurers** 68:3
71:9 73:25
79:21 80:5,18
80:22 81:17
110:19 121:3
**integrity**
157:16,17
**intend** 15:19
**intended** 67:9
67:20 83:6,12
116:11 126:20
**intensity** 123:4
**intensive**
111:12 117:21
118:19
**intent** 153:1
**interact** 116:20
116:22,25
117:2,11,13,15

**interactions**
143:16
**interchangea...**
170:8
**interest** 39:1
45:23 102:4
**interested**
185:18
**internal** 100:1
135:17
**internet** 68:19
**interpose**
144:21
**interpretation**
26:13 60:12
114:24
**interpreting**
173:25
**interval** 128:5
**intervening**
51:2
**intimate** 68:25
106:12 147:4
166:1
**intimately**
105:25 147:25
**intoxicated**
135:4
**introduce**
148:7 175:11
**introduced**
42:7 60:16
145:7
**introduction**
31:19

**invest** 131:20
**investigation**
75:19 76:13,17
76:24 78:6
**investigations**
72:6 103:13
135:12
**investigator**
87:13 90:1
**involved** 10:22
105:10 164:6
182:1
**involves** 10:24
**iop** 75:15 100:8
106:20 112:21
118:4,6
**ip** 133:18
**irrelevant**
16:25
**issue** 23:19
57:11,14 62:6
62:9 64:1,16
75:21 142:22
143:6 149:4,10
149:13 151:8
153:8 165:22
167:14,17
**issued** 15:2
17:25 20:7
24:9 46:14
47:8
**issues** 20:19
59:25 157:10
**issuing** 144:3
148:5

Page 26

[j - knowledge]

| **j** | 85:12 | 55:19,22 56:15 | 140:3,9 141:1 |
|---|---|---|---|
| **j**  4:5 55:10,16 | **kelly**  3:6 8:17 | 56:17,19,24 | 141:3,5 142:3 |
| **jail**  78:12 | 8:17 113:16 | 57:1,3,10,13,17 | 142:16 143:2,4 |
| **jde**  1:6 2:6 7:20 | **kelly's**  113:15 | 57:17,24 58:8 | 144:1,3,8 |
| **jeopardy**  85:25 | **kentucky**  78:11 | 58:18,23 59:2 | 145:11 147:1,6 |
| **job**  1:25 35:16 | 176:9 | 61:6 63:5,22 | 147:13,14,17 |
| 43:9 186:5 | **kickbacks** | 63:24 64:3,21 | 148:19 149:19 |
| **join**  12:16 | 75:15 | 65:17 68:18 | 150:13 151:13 |
| 81:11 | **kidding**  142:1 | 69:4 73:14,18 | 152:5,10,12 |
| **journal**  128:2 | **kind**  56:3 70:11 | 74:11 75:4,5,7 | 153:6,7,10,12 |
| **judge**  145:1 | 119:8 122:17 | 76:15,19 77:2 | 153:15,15,21 |
| **judges**  182:13 | 127:2 137:12 | 77:4,5 81:10 | 153:22 154:1,8 |
| 182:13 | 138:11 141:24 | 82:24 83:20 | 154:9,16,17,18 |
| **july**  1:21 2:22 | 143:23 149:8 | 88:2,4,18 89:2 | 154:23,24 |
| 5:4 7:1,13 15:7 | 150:3,9 154:16 | 90:25 91:6,9 | 155:2,5 156:6 |
| 15:7 22:1,7 | 177:19 180:18 | 91:12,14,18,25 | 157:17 158:19 |
| 68:9 185:21 | **kinds**  20:18 | 92:2 93:10 | 159:4,14,14 |
| 186:3,5 | 30:13 35:1 | 94:21 95:1,4 | 160:5,19,22 |
| **june**  6:15 | 36:15 40:7 | 95:18 97:16 | 161:2,4,4 |
| 148:16 149:9 | 81:4 97:14 | 99:2,8,12,19 | 163:24 164:11 |
| **justice**  75:18 | 159:1 | 101:19 103:15 | 164:11,15,23 |
| 76:12,17 | **km**  89:4 | 103:15,19 | 165:15,19 |
| 135:14 | **knew**  132:14 | 104:11,15 | 166:2 167:13 |
| **k** | **know**  9:19 | 105:11,19 | 169:2,3,6,10 |
| **k**  55:17 87:11 | 12:23,24 13:1 | 109:12 111:4 | 173:9,15,16 |
| 89:15 | 13:15,20,23,24 | 113:16,18,19 | 174:7,10,21 |
| **kayla**  6:11 | 15:10 25:2 | 118:24 119:2 | 175:3,13 |
| 87:23 | 32:13,16,18,19 | 122:1,5,24 | 177:14 178:4 |
| **keep**  28:25 | 32:21,22 36:19 | 123:1,12 | 178:23 181:15 |
| 41:13 69:12 | 38:16 40:12 | 126:17 127:17 | 182:4,6,6,7,19 |
| 70:24 71:5 | 42:9,20 43:5 | 128:17 131:14 | 183:2,9 |
| 75:24 85:9 | 43:21 46:18 | 131:15,17,23 | **knowing**  41:19 |
| 131:6 153:22 | 48:3,19,25 | 133:10,18,23 | 122:16 |
| **keeping**  28:21 | 49:18 53:13,23 | 135:2 137:3,9 | **knowledge** |
| 28:23 43:13 | 54:5,9 55:2,7 | 138:18 139:18 | 36:21 38:25 |

Page 27

**[knowledge - limit]**

| | | | |
|---|---|---|---|
| 39:3 40:5,14 | **labs** 131:17,20 | **laugh** 107:22 | **leslie** 1:24 2:23 |
| 54:6 66:17,20 | 131:25,25 | **law** 35:10 | 8:1 185:4,24 |
| 66:23,24 68:1 | 132:13,13 | 109:5 111:7,20 | **letterhead** |
| 68:5,25 72:2 | **lack** 66:16,20 | 159:17 160:11 | 149:23 |
| 72:10 80:7,12 | 66:24 68:1,5 | 178:24 179:16 | **letting** 19:22 |
| 80:17,21 81:10 | 124:7 174:2 | 179:19 | **level** 53:7,10 |
| 81:16 106:12 | **lacks** 131:12 | **laws** 34:18,20 | 54:14,14 70:2 |
| 140:5 141:16 | 132:5,5,24 | 34:23,25 35:4 | 81:18 84:15 |
| 142:4,21,25 | 134:3,13 | 35:9 77:13 | 111:5 112:9,21 |
| 143:1,3,4,6,8 | **laid** 116:16 | 94:5 184:2 | 112:21 117:22 |
| 144:12,17,19 | 127:22 | **lawsuit** 24:23 | 118:1,4,11,15 |
| 147:4 151:17 | **landen** 3:5 8:15 | **lawsuits** 24:21 | 123:1,2,8 |
| 152:6 163:12 | **landen.benson** | **lawyer** 26:10 | 138:11 139:8 |
| 163:17,20 | 3:13 | 151:19 | 145:18 149:8 |
| 166:1,1 168:2 | **language** 63:25 | **lawyers** 17:16 | 153:11 159:14 |
| 168:8,20 172:1 | 64:12,15 84:9 | 30:23 | 161:5 166:11 |
| **knowledgeable** | 89:21 90:5 | **lay** 14:1,5,15 | 166:14 |
| 163:25 | 100:24,25 | 14:17 33:14 | **levels** 54:12 |
| **known** 109:4 | 101:10 103:16 | **lays** 128:4 | 100:6,8 157:9 |
| 117:16 172:22 | 104:6,8 114:24 | **leave** 115:8 | **licensed** 111:6 |
| **knows** 173:6 | 152:21,25 | 118:21 129:18 | 160:16 |
| | 153:1 | **leaves** 82:15 | **licenses** 80:24 |
| **l** | **laptop** 52:22 | 143:18 | **licensing** |
| | **large** 33:12 | **led** 83:9 | 109:24 |
| **l** 55:19 | 67:3 99:16 | **leeway** 43:22 | **licensure** 84:14 |
| **lab** 127:13 | 129:8 | **left** 87:8 115:13 | 110:1 160:4 |
| 131:3,16,24 | **late** 23:2 67:6 | **legal** 7:25 8:2 | **life** 1:9 2:9 |
| **labeled** 49:22 | 137:3 144:24 | 13:15,17,24 | 122:11,22 |
| 55:19 | 144:25 145:1 | 14:1,16 35:5 | **lifesaving** |
| **labels** 129:5 | 150:5 153:16 | 60:15 94:8 | 161:14 |
| **labor** 71:25 | 182:19 | 186:7 | **likely** 90:7 |
| 93:2 103:12 | **latest** 127:3 | **legally** 79:9,19 | **limit** 81:6,7 |
| 104:19 | **latitude** 154:1 | **legitimately** | 82:18,19 83:13 |
| **laboratories** | 154:5 | 35:17 | 127:4,5 |
| 131:3 | | | |
| **laboratory** | | | |
| 62:1 134:6 | | | |

Page 28

**[limited - make]**

**limited**  20:4,11
35:22 57:20
75:25 76:19
109:22
**limits**  41:7
81:20,23 82:2
82:5,7,11,16,20
82:24 83:3,16
**line**  5:15 103:1
107:21 108:19
145:13 186:15
187:4 188:4,7
188:10,13,16
188:19
**lines**  64:20
140:1
**links**  94:4
**list**  11:7,11,14
90:23 183:2
**listed**  44:12
46:21,25 49:10
49:13 51:6
91:10 110:9
165:21
**listen**  70:5
75:24
**listening**  40:17
**literally**  17:4
19:4
**literature**
20:18 120:25
121:1
**litigation**  20:3
20:8

**little**  61:4 81:15
87:9 139:7
142:13 143:13
144:23 150:5
153:25 154:5
154:12 170:17
**live**  122:3
**lives**  85:25
102:7
**living**  75:14,17
**llc**  1:4,12 2:4,12
7:17 9:20,21
186:4 188:1
**llp**  3:17 4:4
**local**  106:14
**locales**  159:1
**located**  7:22
44:7,15 106:1
**location**  7:21
77:24,25 106:3
106:10 158:20
158:21,22
**locations**
158:24
**locked**  186:12
187:1
**long**  13:2 88:22
97:7,13,13
117:16 177:24
**longer**  91:24
123:14 128:4,5
**look**  20:22
21:12,15 31:14
36:9,9,10,14,16
44:1 48:2 56:1

56:16,18 84:11
87:9,16 89:13
89:20 111:10
150:16 151:23
155:11 160:3,5
160:9 161:6,7
166:22 176:4
183:8
**looked**  34:11
34:12,13 49:4
59:25 106:17
106:21 156:21
166:23
**looking**  33:16
35:12 47:6
75:12 84:4
98:6 101:4
109:12 149:1
159:6,7,7,8,21
166:19
**looks**  36:25
59:9
**lose**  130:14
172:16
**loss**  157:17
**lost**  21:13
**lot**  15:22 26:18
38:3 74:18,22
92:13 131:22
131:25 156:23
158:25 159:10
165:15 168:12
168:17
**lots**  95:22
157:22

**louisiana**  4:7
**low**  56:24
58:14 130:7
144:11
**lower**  100:8
117:22,25
123:7 177:2
178:9,25

**m**

**m**  55:22 56:14
56:15
**m.d.**  1:18 2:19
5:8 6:2,5,7 7:6
7:10 186:5
188:2
**maciejewski**
6:12 87:23
**maddie**  4:13
**made**  30:18
35:18 39:20
56:8 65:24,25
66:2 67:25
69:5 85:24
92:4,18 95:22
98:21 114:21
127:17 161:12
162:4 181:17
185:10
**major**  109:11
**make**  15:11
21:8,22 24:1,6
33:20 34:3,5
35:11 36:15
37:16 42:9
44:22 50:1

Page 29

CONFIDENTIAL - ATTORNEYS' EYES ONLY

**[make - medical]**

| | | | |
|---|---|---|---|
| 60:11 62:7 | 113:2 | 21:24 22:22 | 132:10,16 |
| 68:17 69:1 | **margin**   91:4 | 23:4 24:5 33:6 | 139:20 143:19 |
| 70:6 88:12,14 | 93:9 | 46:11 47:1 | 143:24,25 |
| 91:12 92:23 | **margins**   90:25 | 48:1 49:9,25 | 145:22 146:8 |
| 93:14,23 96:21 | 91:6 | 50:2,4,11,23 | 154:11 165:6 |
| 98:13 109:8 | **marin**   185:2 | 51:6,14 60:22 | 166:9 173:2 |
| 122:13,21 | **mark**   51:13 | 113:8 123:21 | **meaningful** |
| 125:20 139:23 | 87:19 | **matt**   8:6 15:14 | 147:10 |
| 141:19 159:17 | **marked**   7:7,10 | 19:20 41:12 | **means**   11:19 |
| 161:25 163:25 | 15:6 52:3 | 96:6 | 57:1 91:4 |
| 165:23 172:9 | 87:24 148:17 | **matter**   7:17 9:1 | 92:16 98:20 |
| 180:13 186:14 | 175:12,18 | 10:16 12:5 | 118:2 173:3 |
| 187:3 | **market**   68:3 | 16:6,8,23 23:8 | **meant**   25:13,14 |
| **makes**   16:22 | 130:22 | 24:13,15 25:19 | 99:16 |
| 116:12,13,14 | **marketplace** | 26:2 40:6 | **media**   7:15 |
| 176:15 180:25 | 67:14 | 41:18 60:19,23 | 51:24 52:5 |
| **making**   16:12 | **marriage**   174:6 | 61:20 102:20 | 120:4,7 135:25 |
| 67:6 68:14,15 | 174:16 | 114:7 | 136:3 |
| 92:24 95:16 | **mass**   131:21 | **matters**   10:15 | **medicaid**   83:10 |
| 106:25 180:23 | **master's**   111:5 | 13:7 137:25 | **medical**   22:13 |
| 181:11 | **match**   43:14 | **matthew**   3:18 | 23:10 34:13 |
| **manage**   130:14 | 54:13 | **maximizing** | 35:14 36:4,10 |
| **management** | **matched**   24:11 | 171:15 | 44:14 58:5 |
| 58:19 122:17 | **material**   18:8 | **mcaplan**   3:24 | 60:2 62:6,8 |
| 123:15 157:8 | 20:24 22:12,19 | **mean**   13:17 | 80:15,19 81:5 |
| **managing** | 23:10,21 30:9 | 16:21 28:8,8 | 82:15 83:8,25 |
| 119:17 | 30:10,13 33:7 | 38:17 56:15 | 89:16 91:9 |
| **mandated** | 33:13 38:19 | 65:23,24 66:6 | 105:8 106:17 |
| 129:3 | 42:13 49:7 | 66:13 70:21 | 112:13 118:25 |
| **mandatory** | 51:3 61:18,19 | 74:1 78:25 | 119:2,5 121:11 |
| 105:16 | 88:11 103:14 | 85:7 91:1 | 121:13 122:13 |
| **march**   15:6 | 149:20 154:2 | 92:15 102:8 | 124:7,8,8,25 |
| 22:24 46:15 | 177:16 | 108:5,12,23 | 125:13 127:18 |
| 47:5,9 50:15 | **materials**   16:23 | 110:12 116:21 | 128:1 134:20 |
| 50:17 51:8 | 21:6,7,8,19,23 | 117:25 122:16 | 135:9 157:7 |

**[medical - multifaceted]**

| | | | |
|---|---|---|---|
| 179:5 | **members**  56:9 | 104:10 109:1,2 | 85:17 91:12 |
| **medically** | 69:9,16,22 | 109:3,3,4 | 92:23,25 93:14 |
| 61:25 62:15 | 79:23 142:22 | 148:1,5 149:9 | 93:23 99:12 |
| 121:4,7 134:10 | 143:2 171:4 | 150:4 160:24 | 161:12 162:4 |
| **medicare**  53:16 | **memory**  11:8 | **methods**  110:5 | **monitor**  168:18 |
| 81:20,23 82:2 | 56:17 | **metropolitan** | **monitored** |
| 82:10,15,24 | **mental**  77:6 | 159:13 | 110:3 |
| 83:4,10 97:16 | **mentally** | **mic**  126:6 | **monitoring** |
| 97:19 101:6,12 | 140:24 | **mid**  144:12 | 85:11 123:6 |
| 103:2,4,8 | **mention**  112:4 | **middle**  124:5 | **month**  22:24 |
| 104:5,9 109:1 | **mentioned**  11:5 | 176:6 177:7 | 67:15 82:12 |
| 109:1,3,3 | 17:24 78:19 | **mind**  153:22 | **months**  23:5 |
| 145:16,17,23 | 82:20 88:15 | **mindful**  12:25 | 136:20 |
| 145:24 146:1,4 | **merits**  16:10,12 | **minor**  109:12 | **morning**  41:8 |
| 146:5,7,9,10,18 | **message**  89:24 | **minutes**  41:8 | **motivation** |
| 146:20,23 | 90:4 | 43:2 51:20 | 78:17 |
| 147:1,20 | **messy**  126:22 | 135:21 169:25 | **moud**  114:11 |
| 166:19,20,25 | **met**  53:17,18 | **misperceived** | 114:17,19,25 |
| 168:5 177:2 | 82:18 136:19 | 71:2 | 115:2 |
| **medication** | 136:20 173:9 | **misread**  111:20 | **mouth**  147:24 |
| 114:11 | **metabolite** | **misrepresent** | **move**  23:18 |
| **medicine**  44:6 | 130:10 132:9 | 50:2 | 64:18 70:10 |
| 46:1 113:20 | 132:10 | **missing**  155:4 | 76:7 107:16 |
| 114:16 166:4 | **metabolites** | **misstates** | 128:13,15 |
| **meet**  14:9 | 84:6 130:25 | 171:19 | 175:9 |
| 62:21 110:4 | **methadone** | **mitigate**  67:4 | **moving**  43:13 |
| 139:23 153:5 | 129:3 | **mmr**  9:24 | 127:2 172:7 |
| 164:13,13 | **methampheta...** | **modalities** | 177:25 178:3 |
| **meeting**  62:20 | 135:2 | 168:22 | **mpi**  6:16,19 |
| 139:6,7 | **methodologies** | **model**  6:15 | 148:16 175:17 |
| **member**  52:17 | 108:20,24 | 148:16 | **mrc**  99:20 |
| 86:23 | 109:18 147:3 | **module**  148:25 | 104:10 148:6 |
| **member's** | 150:11 181:20 | **moment**  51:16 | **multifaceted** |
| 53:15,17 | **methodology** | **money**  38:22 | 131:4 |
| | 103:3,4 104:3 | 40:10 83:1 | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[multiplan - network]**

**multiplan** 4:3
6:17 8:11 13:8
13:21 36:20,23
37:3,14,19,20
37:21,23 38:5
38:9,14,20,21
38:25 39:4
55:8,11,15
63:10 64:5
95:12,19 98:2
98:17,23 99:3
99:9,19 100:6
101:5,11 105:2
105:6,9 136:24
137:4,8 138:2
138:12,16,18
138:22 139:2,3
140:1,9,11,17
142:4,14,15,22
143:2,4,6,11,12
144:2,4,8,9,17
147:1,5 148:4
151:1 152:15
152:19 155:1
155:15 156:7,9
161:12 162:4
163:5,14
169:19,20
171:11,18
172:1,4,20,25
173:3,18,20,25
174:2,20,24,25
175:3,16,23
176:15,22
177:15,24

180:15 181:14
181:15 182:1
**multiplan's**
16:8 109:18
138:7 145:16
146:17 148:1
156:13 165:1
166:24
**multiple** 73:25
157:9
**municipality**
159:7
**mute** 120:11
**myriad** 102:2,7

**n**

**n** 5:1
**name** 7:24
52:17 53:22
87:11 88:15
185:20
**name's** 8:6
**named** 88:7
**names** 9:19
150:6
**narrow** 26:1,2
**national** 72:11
72:16 76:22
106:13 145:17
156:8,10
159:21
**nature** 17:18
20:17 22:19
26:19
**nearly** 105:24

**necessarily**
13:19 66:6
68:15 73:10
74:19 78:14
96:22 135:17
141:18 147:25
162:25
**necessary** 35:7
61:25 62:15
121:4,8 134:10
134:24 173:8
186:14 187:3
**necessity** 62:6,9
82:16 83:8,25
112:14 121:11
121:13 122:13
124:7,25
125:13 134:21
135:9
**need** 13:1 14:20
27:23 41:5
42:23 43:14
47:10 70:11
71:6 85:8
115:17,25
122:13 123:12
126:16,23
129:17 137:7
154:4
**needed** 22:20
60:17 113:8
122:20 183:5
**needing** 122:23
**needs** 43:16
127:7 139:24

**negative**
129:19
**negotiate** 37:5
162:22 163:2
179:9,10
**negotiated**
27:10 65:10
176:24 178:6
**negotiating**
37:21 39:1
176:22 178:24
**negotiation**
6:17 175:16,23
179:2 180:15
**neither** 185:16
**network** 37:24
56:7,8,10,11
68:11,22,23,24
69:2,6,9,9,17
69:18 71:9,21
72:3,7,13,14,20
72:24 73:10,15
73:23,24,25
74:12,13,16,21
74:22 75:20,21
76:14,14 80:1
81:12,12 86:4
86:9,14 87:1,2
94:18,23,24
95:2,5,7,11,17
95:18 96:16,23
97:1 99:17
101:22 102:1,2
102:4,5 138:19
138:21,25

Page 32

CONFIDENTIAL - ATTORNEYS' EYES ONLY

**[network - okay]**

139:3,5,21,23
140:4,4 168:10
168:13,14
172:21,22
173:1,5,6,8,10
173:21 174:1
178:11 179:1
180:16,23,24
181:1,8,11
**never**  42:24
111:18 130:3
137:18 167:20
**new**  41:8 44:9
49:14 67:1
77:12 109:22
112:25 134:19
**nice**  136:22
**night**  12:14
32:24 139:14
**nine**  50:8,9
117:19 118:6
**no's**  56:14,15
**nominal**  102:18
102:22
**non**  40:8
128:21
**nonadherence**
130:1
**nonpayment**
144:10
**normality**  38:1
**north**  7:22
**northern**
158:21 159:22

**notating**
186:15 187:4
**note**  63:7 68:7
136:7
**noted**  30:11
183:24
**notes**  56:19
**notice**  107:21
**noticed**  115:10
**noticing**  8:5
**number**  6:3
7:19 35:13
54:11 57:3,13
57:16,20 58:12
81:20,24 82:3
82:11 83:19
84:1,5 106:1
108:3,16
111:21 135:14
148:12 153:5
157:24 177:6
179:7 186:15
187:4
**numbers**  55:21
55:25 56:5
**nurses**  119:4
**nursing**  100:11
100:15
**nw**  3:7

**o**

**oath**  11:17
185:8
**object**  16:3
18:2,14 19:14
20:9 60:9

73:19 74:4
96:9 132:4,23
134:2,12
182:16
**objection**  19:21
20:5 26:17
37:15 41:4
58:25 63:11,13
74:5 77:14
80:25 90:10,15
91:2 92:9
93:20 94:1
96:19 97:4
107:11 110:22
113:24 114:5
115:5,23
118:22 119:13
131:12 133:6,9
133:12,14,22
142:9,23
144:21 147:12
156:19 171:19
**objections**
18:22 185:9
**obligated**  71:18
126:10 169:13
174:24,25
180:7
**obligation**
11:20 179:14
**occur**  177:22
**occurred**  32:3
135:3
**oceanside**  10:1

**odd**  41:8
**odds**  81:8
**offer**  138:22
139:15 168:13
**offered**  77:6
118:8 125:23
130:23,25
**offering**  35:17
62:5,8 131:17
138:24 176:23
178:6
**offers**  140:1
**offhand**  46:20
**office**  72:16
85:15 186:11
**officially**  16:6
**offsite**  97:9
**oh**  10:21 11:7
48:4 52:18
57:16 65:6
103:21 119:20
136:22 138:22
139:11 150:7
153:10
**okay**  16:14
18:21 21:17
23:12 24:24
25:7 26:7
27:23 31:16
36:22 42:1,18
43:25 46:18,24
48:1,4 50:5
51:18 52:18,24
57:24 59:6
61:7,23 62:5

Page 33

**[okay - outset]**

| | | | |
|---|---|---|---|
| 62:16 63:17 | 165:11 166:9 | **opine** 166:5 | **opioids** 130:17 |
| 65:15 69:12 | 166:22 167:5 | **opining** 150:10 | **opportunity** |
| 73:7 84:13 | 168:24 169:2 | **opinion** 28:10 | 77:23 78:1 |
| 92:6 98:11 | 170:7 171:17 | 41:20 42:17,19 | **opr** 6:15 |
| 101:2 102:24 | 172:12,18 | 62:12 101:19 | 148:16,25 |
| 104:22 107:24 | 175:11,15,21 | 102:8,12,17 | 149:9 |
| 107:24 109:6 | 177:10,18 | 104:9 107:6,8 | **orange** 158:20 |
| 110:8,19 | 178:10 179:12 | 118:10,14,17 | **order** 14:7 |
| 116:18 124:19 | 179:18 180:1 | 118:18,23 | 36:11 56:17 |
| 124:24 128:22 | 180:11,12 | 119:10 121:6 | 95:14 104:10 |
| 131:10 136:17 | 181:19 182:7 | 124:9 129:12 | 105:18 132:17 |
| 136:19,25 | 182:15 183:10 | 142:12 145:10 | 169:20 171:9 |
| 137:5,6,7,9,11 | **old** 162:17 | 145:14 164:20 | **ordered** 128:25 |
| 137:16,22 | **olin** 3:19,23 8:9 | 169:13,16 | **organization** |
| 138:10,15,18 | **one's** 54:2 | 170:25 172:19 | 44:24 |
| 139:17,25 | **ones** 149:21,24 | 177:6 181:19 | **origin** 139:1,3 |
| 140:7,20 141:8 | **onsite** 160:10 | **opinions** 15:19 | **original** 186:10 |
| 141:13,24 | **oon** 86:3 | 16:24 17:19 | 186:21 |
| 142:3,4,7 | **ooo** 7:5 183:25 | 21:3 23:22 | **originally** |
| 144:5,13 | **op** 100:8 | 24:2,3,7,9 26:6 | 157:20 |
| 145:13,22 | **open** 36:4 | 26:20,21 27:3 | **oupatient** 6:15 |
| 146:1,13,22 | 55:25 | 31:2,6 35:22 | 148:15 |
| 147:17 148:19 | **opens** 175:9 | 37:12 38:10,11 | **outcome** 29:18 |
| 148:22,23 | **operated** 34:24 | 38:14 59:17 | 37:11 185:19 |
| 149:7,15,17,17 | 36:6 | 61:20 62:5,8 | **outcomes** 122:9 |
| 150:3,17,18 | **operates** 37:21 | 62:11 71:18 | **outlined** 145:15 |
| 151:6,11,21 | 138:18 | 77:6 95:8 | **outpatient** |
| 153:13 154:11 | **operating** 35:9 | 134:7 141:18 | 75:15 76:5 |
| 154:11,18 | 35:17 93:24 | 150:14 182:4 | 111:12,17,18 |
| 155:6,9,20 | 110:1,4 178:2 | **opioid** 39:6,10 | 112:21 117:21 |
| 156:2,12 157:6 | **operation** | 39:14,15,18,21 | 148:25 |
| 158:3 159:3 | 78:10 97:14 | 40:6,9,22 41:3 | **outrageous** |
| 161:9,17,21 | **operator** 53:21 | 41:20 42:6 | 130:18 |
| 163:6,19 164:5 | **operators** | 114:11,12 | **outset** 173:16 |
| 164:12,25 | 95:13 | 130:16 | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

**[outside - particular]**

| | | | |
|---|---|---|---|
| **outside** 35:9 45:22 | 89:14 90:20 94:3,3 97:23 | 95:20,21 98:16 98:18,22 99:3 | 145:14 150:18 150:18,19 |
| **overall** 83:14 | 98:1,4,13,14 | 99:9,20 102:20 | 155:11 161:7 |
| **overbroad** 80:25 96:19 97:5 113:24 134:12 142:9 147:12 | 99:22 100:1 101:1,5,18 102:23,23 103:23,24 105:1 106:25 | 102:21 110:24 125:22 126:24 140:18 142:16 147:15 161:13 163:3,16 167:9 | 169:18 172:19 174:14 176:19 177:5,6 **paragraphs** 111:9 |
| **overdose** 85:13 | 107:4,10,16,17 | 170:20 171:10 | **pardon** 11:3 |
| **overutilization** 134:18 | 107:25 108:3 112:2,4,20,22 | 173:6,15 178:15,22 | 24:14 77:3 **parentheses** |
| **owe** 160:25 | 113:9 119:22 | 181:2 | 64:21 |
| **own** 178:6 | 120:15 124:3 | **pain** 130:15 | **parity** 66:2 |
| **owners** 95:13 | 145:9 150:16 | **palmetto** | 67:9 77:7 81:8 |
| **ownership** 172:5 | 155:10,11 161:7 164:20 | 127:23,25 128:3 | 103:13 **part** 12:9 28:3 |
| | 164:22,22 | **palms** 9:25 | 30:16 40:22 |
| **p** | 166:22 168:4 | **panel** 134:1 | 42:15 53:15 |
| **p.m.** 2:21,21 | 169:17 172:19 | **paper** 27:25 | 54:16 72:15 |
| 7:2,13 22:1,2 | 176:20 186:15 | 126:5 128:12 | 82:21 103:8 |
| 51:25 52:6 | 187:4 188:4,7 | 128:13 130:9 | 104:19 173:8 |
| 120:5,8 136:1 | 188:10,13,16 | 150:4 | 173:10 174:22 |
| 136:4 183:20 | 188:19 | **papers** 148:4 | 180:14,21 |
| 183:24 | **pages** 1:25 28:2 | 150:8 | 181:2,2 |
| **pace** 164:16 | 41:8 58:21 | **paragraph** | **partial** 117:22 |
| **pacific** 9:24 | 185:13 186:14 | 31:18 60:4,20 | **participating** |
| **page** 5:15 32:7 | 186:17,17 | 61:9,24 65:19 | 118:3 |
| 44:2 46:12,23 | 187:3,6,6 | 68:10 87:10 | **particular** |
| 47:2,15,18,23 | **paid** 13:12 14:4 | 97:25 98:7,7,8 | 36:24 45:15 |
| 48:2,7 49:8 | 14:7 29:6,10 | 99:25 100:1,5 | 58:9 94:22 |
| 50:5,7 59:5 | 29:11,15 34:12 | 100:23 101:3,4 | 96:16 129:1,1 |
| 61:6,8,21,24 | 36:12 54:19,23 | 102:25 103:22 | 140:19 146:4 |
| 62:22 64:6,6,8 | 56:3,22 62:14 | 105:23 108:18 | 156:25 157:10 |
| 64:12,18 65:16 | 77:9 79:6 | 109:16 110:14 | 178:20 |
| 84:10,10,13 | 80:15 91:21,23 | 120:17 124:5 | |
| 86:1 87:10 | | | |

Page 35

**[particularly - percentage]**

| | | | |
|---|---|---|---|
| **particularly** 130:15 | **patients** 48:14 57:10,13,24 58:3 67:13,15 84:3 85:12,12 85:18 92:8,17 96:17 99:12,16 101:23 102:1,5 118:21 128:19 129:6 130:15 130:15 131:2 134:9 143:16 143:17 159:20 173:11 | 98:21 102:6 108:17 143:15 143:17 144:10 144:11 162:22 174:11 176:7 176:11,16 177:23 178:18 179:19 180:15 181:14 | **peers** 66:5 **pen** 27:24 **penalty** 184:1 186:16 187:5 **pend** 80:18 **pended** 109:21 **pending** 13:3 **pennsylvania** 3:7 44:8 141:2 **people** 32:5 36:2 41:19 43:22 58:19 67:18 68:3,14 68:25 69:1 74:18 75:14,16 77:8 85:9,23 94:13 95:22,24 111:22 114:19 118:8 121:24 122:1,6,8 130:16 139:24 140:22 144:7 168:14 175:6 178:19 **perceived** 43:11 70:13 **percent** 64:21 65:11 67:1 97:2 157:11 167:2 179:4 **percentage** 53:16 55:4 102:18,19 114:13 129:8 |
| **parties** 57:18 **party** 72:12 105:20 142:7 152:17,20 185:17,17 **pass** 180:7 **passed** 160:11 **past** 20:17 154:25 **paste** 33:17 **pasted** 33:10 33:14 **patient** 6:8 30:12,20 48:8 51:15 52:2 56:12 58:9 79:6 84:2,7 86:23 87:1 88:10,13,18 92:1,4,7,19 114:17 121:15 121:21 126:9 126:13,21 128:4 129:1,9 129:17 130:2 134:25 135:4 161:11 165:2 165:19 166:10 166:13 171:8 181:7,10 **patient's** 87:8 124:10 176:9 | **pay** 14:10,11 14:25 35:15,19 35:23 56:24 79:9,10,18,19 81:21,24 82:3 82:12 87:5 102:8 115:2 121:3 126:10 127:4 130:21 142:4 145:24 146:1,4 162:21 170:18 179:4,6 179:14 180:7,9 **paying** 64:25 65:1 66:3 67:3 81:18 83:2 92:14 114:25 142:8 151:2 **payment** 27:8,8 29:7 33:21 37:6 38:23 54:3 80:18 | **payment's** 174:21 **payments** 26:16,19,24 34:1 81:24 101:22 102:1 178:18,19,19 **payor** 67:14 72:12 81:10 123:11,20 124:25 126:12 137:24 139:22 176:12 181:2 **payor's** 137:17 **payors** 27:8,10 65:25 66:2 104:12 110:24 121:13 156:11 157:13 178:14 **pays** 142:20 **pdf** 186:12 187:1 **peer** 106:12 112:19 128:2 159:13 | |

CONFIDENTIAL - ATTORNEYS' EYES ONLY

**[percentages - pleasure]**

| | | | |
|---|---|---|---|
| **percentages** 55:2 151:2 | **phone** 11:10 | 3:16 8:8,13,16 | 103:17,19,25 |
| **perception** 172:21 173:1 174:1,15 | **php** 100:7 106:20 112:21 118:5 | 8:18 9:17,19 10:9 11:1,4 13:7,15,20,25 | 104:6 121:19 121:20,22 125:12 126:17 |
| **perfect** 155:9 | **phps** 100:9 | 23:13 24:22 | 126:18 128:23 |
| **perform** 81:13 141:18 | **physically** 44:15 119:19 | 25:24 26:2 28:11 29:1 | 129:11,25 130:1 135:24 |
| **period** 51:2 72:25 97:7,13 97:13 107:12 157:14 186:18 187:7 | **physician** 119:4 160:12 | 30:23 31:2,5 32:8,24 33:21 33:25 34:8,18 | 171:4,7 176:9 **planner** 123:2 **planning** 29:1 158:25 161:5 |
| **perjury** 184:1 186:17 187:6 | **physicians** 68:17 121:14 139:4 | 34:21 35:4 36:11 47:13,18 48:22 53:3,10 | **plans** 26:24 64:1,16 86:22 |
| **person** 93:7,8 108:7 117:1,10 119:8 122:20 122:22 123:7 125:14,23 180:22 | **pick** 86:23 87:1 163:23 | 53:11 54:6,17 57:15 59:10 | 101:12 126:8 |
| | **picked** 33:7 163:22 | 61:25 64:22 | **play** 129:9 171:13 |
| | **piece** 151:14 | 65:13 78:11 | **played** 12:4 |
| | **pieces** 111:21 | 91:12,14,17,25 | 123:20,25 |
| **person's** 123:17 | **pitch** 174:22 | 92:3,6 93:23 94:10 95:1,7 | **plays** 171:12 **pleading** 13:18 13:19 |
| **personal** 113:25 117:3,7 | **place** 55:9 83:13 173:14 185:7 | 96:1 102:19 106:2,9 107:4 | **please** 8:20,24 30:3 36:22 |
| **personally** 45:17 156:17 157:2 | **placement** 30:12,21 122:25 166:10 | 107:13 118:20 119:1 157:4 158:10,13,17 | 39:8 42:23 43:13 47:15 50:6 51:21 |
| **pertaining** 46:3 | **places** 158:14 | 161:13,13 | 59:5 61:22 |
| **pertinent** 32:4 | **plaintiff** 58:9 58:24 94:14 96:3 150:23 158:7 175:24 177:2 | 162:5,9,10 165:1 166:25 167:2 176:23 177:1 178:6,10 | 64:19 70:10 74:7 77:17 90:19 99:22 107:25 108:1 |
| **phase** 16:10,13 | **plaintiff's** 102:9 | **plan** 6:8 28:14 | 120:14 145:2 |
| **phelps** 4:4 | **plaintiffs** 1:5 1:11 2:5,11 3:2 | 34:8 36:9 37:9 51:15 52:2 | 175:13 |
| **phelps.com** 4:9 | | 54:2 55:17 | **pleasure** 182:25 |
| **phoenix** 159:18 | | 87:4,5,7 | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

**[plural - probably]**

| | | | |
|---|---|---|---|
| **plural**  24:25 | 170:17 | 30:23 141:17 | 67:19 88:20 |
| **point**  16:3,12 | **potential**  16:9 | 141:18 | 145:6 |
| 16:13 17:13 | **ppo**  86:22 | **prepared**  12:12 | **price**  96:16 |
| 25:20 43:15 | 138:18,21,22 | 22:11 24:19 | 164:9 171:24 |
| 45:14 48:8 | 138:22,22,24 | 25:18 26:3,4 | 171:25 |
| 50:14 56:17 | 138:25 139:16 | 36:7,8 47:20 | **priced**  98:17 |
| 69:25 73:19 | 140:3,4 | 54:5 153:21 | 152:23 153:3,8 |
| 84:13 88:17 | **practice**  44:6 | 164:3 | **prices**  96:24 |
| 160:10 164:17 | 80:8,13,18,22 | **preparing** | 106:2,9 107:5 |
| 174:14 175:6,9 | 81:17,19 | 149:4 | **pricing**  146:18 |
| 176:5 181:17 | 147:21 181:21 | **present**  4:12 | 147:2 148:1 |
| **pointed**  163:25 | **practices**  80:1 | 8:3 | 149:9 160:23 |
| **points**  38:24 | 108:13 | **presented**  27:9 | 169:8 |
| 90:22 176:6 | **practicing** | 122:18 127:25 | **primarily**  30:9 |
| **policies**  26:24 | 105:24 | 180:21 | **printed**  143:10 |
| 80:1 109:22 | **pre**  62:1 | **preserve** | **printer**  143:10 |
| 125:19,20 | **precise**  56:5 | 170:16 171:1 | **prior**  10:14 |
| **policy**  67:17 | **predicted** | **preserving** | 21:18 27:20 |
| 72:17 127:1,11 | 121:22 | 171:15 | 33:5,6,8,14 |
| 127:23 128:4 | **predicts**  128:6 | **president**  45:1 | 37:17 71:4 |
| **pool**  57:19 | **prefer**  68:22 | 45:7,10,20 | 76:5 86:5 |
| **pop**  148:9 | **preference** | **presumptive** | 141:14,22 |
| **population** | 68:11,13 69:11 | 127:6 128:10 | 144:22 151:12 |
| 39:7,11,14 | **preferred**  69:9 | 133:25 | **private**  137:19 |
| **portion**  182:4,8 | 69:17 | **pretrial**  25:6 | 137:23 156:11 |
| **posed**  17:8 | **premiums** | **pretty**  43:21 | **privilege**  17:9 |
| **position**  45:21 | 143:2 | 52:16 54:15 | **probably**  29:4 |
| 173:16 174:2 | **preparation** | 108:17 | 52:16 62:20 |
| 179:8 | 20:15 21:13 | **prevailing** | 70:20 103:24 |
| **positions**  119:3 | 51:4 52:11 | 34:23 | 110:23 114:8 |
| 119:6 | 141:9,14,21 | **prevent**  12:19 | 126:6 149:19 |
| **positive**  129:7 | 144:14 148:5 | **preventing** | 160:25 164:16 |
| 129:8 | **prepare**  11:8 | 12:7,10 | 164:18 169:25 |
| **possible**  50:4 | 20:13 21:14 | **previously** | 173:12 |
| 90:11 170:17 | 22:9 27:16 | 33:12 64:25 | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[problem - provider]**

| | | | |
|---|---|---|---|
| **problem**  52:20 | **profit**  44:24 | **proprietor** | 51:14 53:3,9 |
| 74:1 127:19 | 58:17 90:25 | 132:21 | 57:20 58:9 |
| 180:19 | 91:4,6 92:1,4,7 | **propublica** | 60:1 61:25 |
| **problems**  155:2 | 92:8 93:9 | 120:21 121:2 | 62:15,19 65:8 |
| 157:25 | 131:6 171:2,16 | **protect**  37:22 | 68:24 79:23 |
| **procedure** | **profitability** | 99:16 | 86:2 91:24 |
| 110:20 111:1,1 | 91:17 | **protected** | 102:6 106:18 |
| 186:19,20 | **profitable** | 67:15 | 111:2,5,17,25 |
| **proceed**  8:21 | 91:14,24 95:15 | **protecting** | 118:18,20 |
| 9:5 | **profits**  90:23 | 163:1 | 121:23 122:6 |
| **proceeding** | 91:7,10 93:19 | **protection**  56:7 | 123:21 137:22 |
| 31:9 | **program**  58:15 | **prove**  78:2 | 138:2,10 139:4 |
| **proceedings** | 68:18 84:14 | 134:20 | 140:11 143:11 |
| 1:19 2:20 7:4 | 93:6,13 98:18 | **provide**  14:18 | 155:23 157:14 |
| 185:14 | 99:13 111:17 | 22:4 36:3 | 162:8,10 181:5 |
| **process**  105:11 | 111:18 118:9 | 37:10 44:6,14 | 186:19 187:8 |
| 121:9 123:19 | 119:17 157:8 | 58:24 75:16 | **provider**  35:8 |
| 143:23 162:18 | 157:23 159:17 | 91:21 95:23 | 35:16 37:5 |
| 164:9 180:15 | 159:21,25 | 104:20 106:4 | 38:1 56:11 |
| **produced** | 160:2 | 106:11 124:14 | 58:1 73:24 |
| 151:18 | **programs** | 125:5,17,21 | 83:24 85:5 |
| **product**  16:4 | 34:22 35:1,2 | 126:9 137:13 | 86:24 87:1,2,6 |
| 17:1,9,13,20 | 44:7,13,15 | 137:16 160:8 | 93:14 94:24,25 |
| 18:2,4,18,19 | 58:20 75:16 | 168:10,15 | 96:11,16,24 |
| 19:3,6,6,15,18 | 85:8 94:13 | 173:11 | 97:10 102:5 |
| 19:21 57:7 | 95:14 99:16 | **provided**  11:12 | 105:6,8 122:21 |
| 60:10 72:16 | 105:25 106:13 | 11:15 13:12 | 123:9,21 125:5 |
| 93:3 | 106:16 109:25 | 14:4,21,22,24 | 125:16 126:21 |
| **professional** | 110:3 111:12 | 22:14,19,23 | 133:20 142:17 |
| 76:9 111:6 | 157:22 158:22 | 23:21 24:5 | 145:25 156:21 |
| **professionally** | 159:13 160:16 | 27:19 30:12,19 | 159:4 160:24 |
| 31:9 | **prohibition** | 31:20 32:2 | 163:21 166:21 |
| **professionals** | 178:23 179:2 | 34:11,14 36:11 | 172:21 173:1,4 |
| 68:17 160:9 | **properly**  125:1 | 37:2,7,10 38:4 | 173:4,5,6,21,21 |
| | | 48:15,17,23 | 174:1,22,25 |

Page 39

CONFIDENTIAL - ATTORNEYS' EYES ONLY

**[provider - questionable]**

175:4 176:7
178:24,24
179:8 180:20
181:7
**provider's**
97:18,20
137:14 178:25
180:16
**providers** 36:1
37:24 39:2
58:13 65:9
67:13 68:11,23
69:9,18 72:21
72:25 73:9,15
73:23 74:23
76:25 77:12
80:2,22 81:17
84:22 85:10
86:4,9,10,14,15
92:16 93:18
94:18 96:13
97:1,8,14
101:23 102:1,3
102:4 118:11
118:15 123:12
135:2 139:4
140:16 145:17
147:17 155:16
157:3 174:3
175:8 178:11
178:14
**provides**
140:24 160:22
169:19

**providing** 9:15
34:19 37:24
56:11 108:15
161:14 170:19
**provision** 86:6
**psychiatric**
118:12,16,19
119:11
**psychiatrist**
160:14
**psychiatrists**
160:17
**psychotherap...**
111:6
**psychotherapy**
111:4,8,12,16
111:18
**public** 30:14,15
**publicly** 127:11
**published**
50:18,21 128:3
**pull** 11:9 65:7
165:16 179:17
183:11
**pulled** 49:20,25
**pulling** 170:11
**purpose** 128:12
**purposes** 25:6
**pursuant** 153:8
**put** 12:16 14:23
18:17 27:24
28:5 29:4
30:17 41:7
43:23 45:17
68:5 83:6

85:24 90:14
94:22 111:9,21
115:9 122:17
144:1 147:24
156:22 157:11
157:20,22,22
158:1 170:5
172:17 176:20
179:8
**putting** 42:25
50:2 56:2 85:9
92:8

**q**

**qualifications**
84:15 115:7,9
115:15,25
116:1,16
**qualified** 115:1
115:3 116:13
116:15 121:24
122:1 123:17
152:24
**qualifying**
173:9
**quality** 68:13
**quantify**
121:16
**quasi** 131:17
131:18 168:9
**question** 12:9
13:3 14:2
16:18 17:5,8
17:22 18:7,13
18:14 19:16,23
20:11,14,22

38:12 39:25
40:17,18,23
41:1 42:4,18
42:18,21 43:11
43:16,17,18
50:22,24 60:14
62:7 64:2
66:19 67:21,24
68:4 69:13,15
69:20 70:12
71:3,15 73:5
73:11,17,22
74:1,1,4,8
75:22,22,25
76:1,3,5,11,15
77:21,22 79:14
79:17 81:14
83:5 85:20
91:19 98:15
99:1,1,5,7,8
101:25 103:7
103:16 104:7
107:21 110:8
110:10 116:3,4
116:6,11 117:6
117:8 124:11
126:7 132:18
132:19 137:13
144:22 145:2
156:20 164:14
171:21,22
172:5 182:16
**questionable**
176:23 177:18
177:20

CONFIDENTIAL - ATTORNEYS' EYES ONLY

**[questioning - received]**

**questioning**
136:8
**questions** 5:14
11:17 12:23
16:16 31:12
41:11,15 46:10
70:6,15,17
71:1 75:25
76:6 119:24
136:7 145:6
**quick** 83:23
**quickly** 175:12
176:4
**quite** 12:17
34:25 63:11
171:20
**quote** 64:8
89:15 90:7
104:1,3
**quoted** 64:12
90:5
**quotes** 18:5
49:21 89:21
90:14 170:2,10
**quoting** 90:13

**r**

**r** 56:24,25
188:3,3
**r&c** 62:23
168:5 176:24
178:7
**r&s** 187:1,9
**rackowski** 4:14
7:24

**radio** 131:18
**raise** 8:23
**rambling** 41:10
**ran** 160:18
**random** 135:5
**range** 65:11
130:7
**rarely** 63:21
**rate** 37:4 53:16
65:10 97:19,21
99:20 101:16
103:2,3,8
104:5,9 114:22
130:20 131:5
134:5 145:24
146:1,3,6,11,24
157:1 163:2,3
163:13,15
165:8,9 166:19
166:20 170:1
171:24 174:12
176:24 177:3
178:7,9 179:3
**rates** 37:22
62:23 100:15
101:6,12 109:2
133:17 145:16
145:23 146:9
146:21,23
147:23 151:18
155:15 166:18
166:19,25
168:5,6,18
176:24 178:6

**rather** 95:18
**rationalize**
56:11
**raw** 156:21
**raymond** 77:2
77:4,5
**read** 13:18,19
99:6 103:14
110:12,15
151:15,15,19
152:13 155:13
**reading** 18:5
28:9 47:22
65:1 90:13
103:10 140:22
153:1 164:3
177:5 186:23
187:9
**readmission**
75:14
**reads** 164:25
169:18
**ready** 123:7
129:18 183:17
**real** 83:7 97:12
160:6 176:4
**really** 11:8
58:15 67:8
69:25 99:7
121:14 123:1
126:1 129:17
130:18 131:14
140:18 145:1
153:10 165:21
170:20 175:8

**reask** 79:14
**reason** 38:6
44:11 45:16
126:12 137:8
139:13 188:6,9
188:12,15,18
188:21
**reasonable**
35:25 36:4,14
62:23 63:3,5
63:11,14,18,25
85:2 91:19
106:2,9 107:5
131:6,10,15,23
132:19,21
133:20 147:21
**reasons** 124:24
145:15 167:19
179:5
**recall** 20:20
22:25 49:5
58:3 89:8
138:8,13
139:15 141:20
152:8
**recapping**
180:18
**receive** 97:2
99:19 169:20
**received** 13:14
15:7 21:19,21
21:23 78:12
90:9 98:2
123:8 177:23

Page 41

**[receives - related]**

receives   37:8
receiving   36:2
  44:25 77:24
  129:1
recess   52:1
  120:6 136:2
recognize   9:23
  41:14 114:15
  114:19 150:25
recognized
  134:20
recognizing
  35:15
recollection
  33:1 65:12
recommendat...
  160:23
recommended
  130:19 146:18
  169:7
recommends
  114:17
record   7:13 8:5
  14:23 36:5
  50:4 51:20,25
  52:6 57:8
  58:18 80:19
  88:22 114:14
  120:5,8 125:9
  136:1,4,19
  154:16 183:19
  185:14
recorded   1:18
  2:18 7:15
  185:11

records   21:22
  22:13 23:10
  34:13 36:10,14
  36:16 48:9,14
  48:15 49:4
  57:25 58:1,5,6
  58:8,12,17,21
  58:23 60:1,2
  62:18 65:6
  80:9 89:16
  106:17 124:9
  124:13
recover   114:19
  114:20
recovery   1:4,12
  2:4,12 7:17
  9:17,21,24,25
  9:25 25:10
  112:23 186:4
  188:1
recruit   168:12
redact   88:15
reduce   14:5
  39:14 41:19
  42:6 110:5
  171:2
reduces   102:3
reducing   39:6
  39:10 40:6
  181:4
refer   11:7 32:8
  60:5 63:7 82:6
  84:18 104:18
  105:20 121:2
  122:4 137:3

reference   19:2
  19:12 20:8,20
  21:11,16 55:20
  57:8 89:3
  132:13 156:12
  165:16 168:7
referenced   16:2
  16:17 55:24
  88:7 162:8
  167:8 175:22
  186:6
references
  15:22 18:10,13
  18:24 20:2
  21:10 22:21,22
  158:11 165:21
referencing
  14:14 57:4
referral   127:8
referred   31:22
  159:19 162:3
  165:25 181:24
referring   24:25
  25:13,22,23
  48:12 76:5
  124:21 127:16
  155:21 156:6
  164:5 167:10
  169:24 177:20
refers   20:18
  64:9 79:5
  171:4
reflected   53:23
  54:9 91:7

refresh   56:17
refusal   35:11
regard   88:25
  89:11 166:16
region   36:24
regoing   162:16
regularity
  37:25
regulation   26:9
regulations
  26:8 159:16
  160:4
regulatory
  110:3
reimbursable
  146:10 147:19
reimburse
  108:14 145:18
  170:17
reimbursed
  38:2 102:11
  105:17,19
  157:13 170:19
reimbursement
  37:1 97:17
  102:9 114:22
  137:25 147:2,6
  147:8 160:20
  166:20 167:1
  168:18 170:21
relate   32:1 63:1
  76:4 122:4
related   21:6
  24:16 34:18
  46:6 53:16

Page 42

**[related - reputations]**

60:5,8 62:17
67:23 77:8
86:5 112:13
136:20 166:7,7
185:17
**relates** 26:2,3
26:19 27:2
35:1 37:12
38:10,11,25
55:5 56:7
**relationship**
36:19 37:14
38:9,13 86:11
92:11 114:1
117:3,7,9
122:5,16 138:7
143:14
**released** 134:25
186:21
**reliable** 116:19
116:23,23
**reliably** 95:21
**relied** 14:6
20:16 49:3
69:19
**rely** 31:13 33:4
33:6 60:22
113:8 178:19
**relying** 16:22
**remainder**
181:19
**remaining**
88:21
**remedies**
124:17

**remember**
23:17 88:9
136:21 139:6
149:18,24
**remote** 1:19
2:19
**remotely** 8:3
**remove** 101:13
**render** 104:8
118:11,15
**rendered** 26:21
38:15
**rendering** 24:1
24:6 59:17
**renewable**
152:9
**repeat** 39:8
62:7 70:6
126:3
**repeated** 78:1
85:15
**repeatedly** 20:7
20:10 37:25
72:17 121:20
**report** 6:4,6 7:6
7:9 15:6,7,12
15:12 16:16,21
16:25 17:11
18:4,10,19,24
19:5,7 20:24
21:5,9,18 22:9
22:11,17,20,24
23:4,19 27:14
27:18,22,25
28:3,6 29:3,22

29:25 30:1,4,5
30:7,11,14,17
30:18,23 31:14
31:15,20 32:15
32:17,21,23
33:4,8,15,23
41:24,24 42:3
42:4,5 43:2
44:2,10 46:14
46:22 47:6,8
47:20 49:17,19
49:21,24 50:1
50:3,11,18,25
51:4 59:4
60:23,24 61:5
61:16,17 65:15
71:25 84:8
89:13 90:20
91:7,10 94:2
97:22 99:23
100:25 101:1
101:14 106:22
106:24,25
110:9 111:25
113:1,1,10,12
115:7,10,18
116:2,16,17
120:15 124:2
141:10,19,23
144:14 145:7
145:10 148:5
149:4 150:11
150:16 158:11
164:21 169:17
172:3 175:23

182:1,10
**reported** 1:23
23:8
**reporter** 2:23
8:1,19,22 9:4
11:22 29:8
39:8 49:15
51:19,20 126:3
**reporting**
20:23
**reports** 15:2,20
15:23 16:2,17
17:2,6,25 18:8
18:15,20 19:18
20:3,7 27:16
29:20 31:13
33:5,6,14,20
41:8 46:10,12
52:11
**represent** 8:7
8:11 52:15
136:24 162:23
**representatives**
39:5
**represented**
34:14 39:1
64:4 116:2
168:23
**representing**
7:24
**reprice** 101:6
101:12
**reputations**
106:14

CONFIDENTIAL - ATTORNEYS' EYES ONLY

**[request - ria]**

request   162:7
179:22
requested
58:12 187:1,9
187:10
requesting
84:21,23
requests   84:14
85:15
require   80:8,10
80:14,22
160:17
required   79:10
79:19 86:13,15
112:8,9,12
114:18 119:6
125:6 147:18
173:10
requirement
108:25 119:5
161:5
requirements
80:9 110:2
131:16 160:15
181:21
requires
179:19
research   39:17
40:2,20 41:2
41:17 42:10,11
42:14,15 94:8
139:7
researched
39:23

reserve   124:17
residential
85:11 114:14
119:7,12,21
129:13,16,20
resource
118:19 129:4
130:14
resources
85:14 165:4
respect   24:9
respectfully
70:4
respond   20:22
30:17 42:7
71:3 85:15
89:17
responding
51:1 85:8
121:21
response   47:10
50:24 58:13,16
62:19 66:1
113:14 128:23
132:20 172:6
responses
143:14
responsibility
154:7
responsible
41:19 142:8
rest   177:19
restart   150:24
173:19

restrictive
129:13
result   12:12
99:13
resulted   166:25
retained   9:12
10:3,8,13,19
11:5 16:9
17:15 18:24
retainer   29:13
retreading
162:16
return   186:17
187:6
revenue   58:19
review   6:14,15
21:22 23:9,21
24:4 26:4
32:23 35:8
47:7 50:17
80:19 82:7
88:5 101:15,16
105:12 122:13
122:17 127:3
128:2 141:22
148:3,15,16,24
148:25 149:3
149:17,22
151:7 152:5
157:11 158:2
162:7,20 164:4
173:9 174:7
186:8,10,13
187:2

reviewed   17:11
20:16 21:9,21
21:24 35:12
46:11,15,23
47:1,12 48:2
48:20 49:25
50:4 51:14
52:10 57:25
58:4 59:9
87:14 104:13
112:19 124:8
128:3 141:9,11
141:13 144:14
144:15 149:7
149:18,20,23
150:3,8 156:17
157:3,23 158:3
158:6 162:12
163:6 165:13
175:1 177:11
178:17
reviewer   58:21
reviewing
22:18 27:19
28:1 123:20
124:17 125:20
149:24
reviews   34:4
35:13,14 62:17
109:23 178:21
revised   22:21
29:3
rhythm   172:17
ria   131:19,19

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[rich - saying]**

| | | | |
|---|---|---|---|
| **rich** 8:12 9:14 15:16 17:2 18:3,12,18 19:4,17 20:25 21:4 42:25 43:7 51:10 70:17,17,23 76:11 98:12 120:12 140:17 142:1 144:23 182:16<br>**rich.collins** 3:12 186:2<br>**richard** 3:4 10:24 186:1<br>**ridiculous** 18:6<br>**right** 8:23 10:23 13:4,5 13:23 15:3,18 18:16 28:23 33:18 36:13,16 40:16 41:23 45:11 47:2 50:10 51:5 52:17 53:4,11 54:7,17,23,24 55:1,17 59:10 59:14 61:14 62:7 64:10 65:2 66:12 67:5,21 74:25 75:11,20 76:22 77:10 78:21 79:4 80:5 81:14 82:22 | 84:19,25 86:9 86:11,24 87:2 87:6,17 88:4 90:5 92:4 94:16 98:15 100:12,22 101:25 103:7 103:18 104:2,3 107:1,7 108:12 108:23 110:6 110:16 111:15 112:6 113:2,4 113:6,10,13,25 115:17 117:25 120:13,14 123:21 125:7 125:12,13 135:18,20 136:16 137:14 140:8,23 145:5 150:15,21 151:10 161:6 161:25 168:4 169:16,17 172:7,12,18 173:18 176:19 179:17 180:7 181:16 182:2<br>**rights** 124:17<br>**risk** 165:4<br>**rj** 10:20 11:4 15:22,24 16:1 16:6,8,15,21,23 17:23 18:24 19:12,24 20:3 | 20:8,14,20 21:2,6,11,14,15 21:20 23:16 24:18 25:14,23 60:5,8,13,17,23 61:11,18<br>**rockwood** 1:24 2:23 185:4,24<br>**role** 41:18 171:12,13<br>**roman** 59:7<br>**rosas** 1:24 2:23 8:1 185:4,24<br>**rouge** 4:7<br>**routine** 83:24<br>**routinely** 161:12,17,18<br>**rpr** 1:24 2:23 185:4,24<br>**rtc** 100:7<br>**rub** 141:3<br>**rule** 102:16<br>**rules** 43:4 122:2 159:16 160:3 187:8<br>**run** 35:2 40:5 58:20 78:18 107:7,9,23 130:11 131:1,4 131:16,24,25 159:25 182:16<br>**running** 93:6 93:19 112:22 159:17,18 160:2 | **rust** 159:22<br>**s**<br>**s** 55:14 57:2,3 188:3<br>**sacramento** 158:20<br>**safe** 85:12<br>**sake** 121:12 137:2<br>**sample** 161:11<br>**san** 3:21<br>**sandbagging** 43:1<br>**sat** 28:2<br>**satisfy** 131:16 139:10 160:15<br>**saved** 38:22 99:12 163:2<br>**savings** 98:3 99:20 161:12 162:14,23,25 163:14<br>**saw** 47:13 103:25 177:15<br>**saying** 18:9 35:22,24 67:5 67:6 69:10 74:8 93:8,15 93:16,16 114:14 134:20 154:12 156:23 158:17,23 161:2 170:25 180:19 |

Page 45

CONFIDENTIAL - ATTORNEYS' EYES ONLY

[says - served]

**says** 32:8 44:5
  56:18,24 57:2
  60:22 61:9
  84:14 89:15,25
  95:16 100:5
  101:5,11 103:1
  105:23 123:11
  145:15 149:20
  150:22 152:1
  152:15 155:14
  156:5 161:10
  166:24 168:5
  172:20 175:25
  176:6,21
  177:24 180:3
  180:14 181:13
**scarce** 129:5
**scared** 142:2
**schedule** 130:3
  186:10
**school** 141:2
**science** 60:16
  131:18
**scientific**
  127:24
**scope** 26:20
  62:20
**scratch** 29:23
**screen** 52:23
**screening**
  127:19
**scrutiny** 109:24
  180:7
**sd** 89:2

**search** 68:19
**sec** 90:23
**second** 15:12
  18:21 47:6
  49:9,14 59:10
  59:13 87:21
  99:25 101:3
  102:25 104:1
  120:17 124:5
  147:22 148:14
  155:12 164:20
  169:18 172:19
  176:21 177:6
**section** 30:6
  46:11 48:2
  49:25 51:6
  59:12 65:16,20
  84:10 87:11
  89:15 108:18
  112:23 113:5
**sections** 113:9
**sector** 132:1
**see** 31:24 32:7
  34:13 46:25
  47:14 48:10
  49:11 50:10
  59:7,25 60:5
  60:25 61:12
  62:3,24 64:8
  64:20,23 83:23
  84:1,16 86:7
  87:15 89:11,18
  89:22 90:2,22
  94:4,6 96:18
  98:1 101:8

102:13 103:5
  105:3 106:18
  108:3,21
  112:20 120:18
  136:22,23
  145:4,20 146:5
  148:12,20
  149:10 150:19
  151:4 155:18
  161:15 165:17
  167:3,12
  169:21 172:23
  176:2,5,13
  177:4 182:25
  183:4
**seeking** 67:13
  72:13
**seem** 42:9
**seems** 164:17
**seen** 39:21
  47:12 64:3
  130:7,18
  156:17 173:7
**selected** 57:19
**self** 52:16 54:16
  140:25 168:11
**selling** 92:24
  93:2,2
**send** 179:23
  181:8
**sending** 79:6
**sense** 15:11
  84:25 106:16
  117:4 141:19
  150:13 154:24

180:13
**sent** 32:23
  58:18 90:4
**sentence** 31:18
  47:23 60:21
  89:14 98:6,9
  101:13 104:2
  107:2,7,9
  109:9 120:18
  120:20 145:14
  145:20 150:22
  151:4,25
  152:13,15
  155:12 156:3,5
  161:7,10,15,19
  164:22,25
  165:6 166:23
  167:5,7 168:4
  169:18,21,23
  170:3 172:20
  173:24 176:21
  177:10,12,19
  180:3,14
  181:13
**sentences** 107:3
  107:3,23 124:6
**separate** 16:15
  24:21,22,23
  60:18 120:24
**separated**
  157:18 178:5
**series** 90:22
**serve** 103:10,11
**served** 17:6
  18:4,8,20,20

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[served - skilled]**

41:7
**service** 53:3,8
56:9 69:6
85:18 86:5
93:12 96:1,16
111:17 121:7
123:14 140:1
142:17 156:25
160:8,8 168:10
170:19 171:8
**services** 6:17
9:24 13:12,14
14:4,8,18,20,21
14:23,24 34:11
34:13,18 35:17
36:2,24 37:2,5
37:7,24 38:2
44:7,11,16
52:21 53:4,9
53:11 54:11
56:11 62:2,15
62:19 68:24
69:2,3 75:16
77:24 79:7
91:21,23 94:20
95:20,23 96:4
97:17 102:6
106:3,10,18
108:15 112:21
121:3,17,19,23
121:24 122:5,9
123:4,16
125:15,17,21
126:9,14,24
137:14,17,22

137:23 138:3
140:11,24
147:18 155:17
157:14 168:15
168:18,22
173:7,11
175:16,23
181:5
**serving** 27:4,6
**set** 29:4 33:4,14
36:14,24,25
60:17 94:19
96:24 109:2
110:2 121:18
122:2 131:5,22
133:17 156:21
162:20 163:13
166:18,19,20
171:18 180:23
185:7
**sets** 37:3 97:19
171:4,25 172:4
**setting** 121:25
129:3,4,16
134:6 142:15
157:1 171:12
**settings** 119:7
129:13,21
**settle** 97:11
**seven** 58:2
**several** 94:4
111:9 176:5
**severely** 140:24
**severity** 123:4

**shadow** 39:20
**share** 15:5,9,15
51:11,17 87:20
148:9 175:14
**shared** 163:14
**sharon** 87:11
87:11 88:7,10
88:13 89:7
**sheet** 56:16
**shift** 25:25
**shifting** 85:14
**shifts** 85:11
**short** 135:21
**shorthand** 2:23
**shot** 145:3
**shouting** 43:14
**show** 133:19
174:17
**showed** 45:24
65:9 151:14
**showing** 70:3
**shown** 53:6
55:3,10 56:20
56:25 57:3
**shows** 55:23
149:20
**shutdown**
91:23
**side** 78:2
137:14,17
**sign** 38:24
174:3,23
186:16 187:5
**signature**
184:12 185:23

186:21,23,23
187:9
**signatures**
80:10,10
**signed** 53:21
**significant**
83:18 84:4
165:3
**signing** 175:7
**similar** 103:3
149:3 150:3
156:10 160:8,8
181:25
**simpler** 96:21
**single** 130:10
130:12,21
132:2,20,22
133:15,21
151:2 176:22
**sir** 49:15 112:1
156:1
**situation** 60:16
105:7 144:11
157:12,23
158:2
**situations**
157:15
**siu** 87:13
135:12,17
**six** 48:4
**size** 43:2
**skill** 185:15
**skilled** 100:11
100:15

**[sleep - standard]**

| | | | |
|---|---|---|---|
| **sleep**  12:13 139:13 | 52:19 53:20 54:25 57:12 | **speak**  94:14 115:1,3 116:15 | 97:4 119:14 132:25 134:4 |
| **slow**  88:12 144:10 | 59:20 63:23 67:22 86:21 | 152:24 155:3 169:5,9 | 134:14 142:10 142:24 |
| **slower**  68:2 | 88:11,24 96:6 | **speaking**  151:6 | **spend**  27:13,16 |
| **slowly**  66:14 | 98:4 101:24 | 158:22 | 40:10 110:5 |
| **small**  114:12 | 107:8,15 | **spec**  131:21 | **spending**  71:10 |
| **smoothly**  71:1 | 109:10 116:9 | **special**  135:12 | **spent**  27:22 |
| **snf**  100:11 | 118:13 119:23 | **specific**  23:23 | 28:1,9,24 83:2 |
| 101:6,10,13,16 | 123:24 126:5 | 23:24 37:10 | 117:18 165:23 |
| 165:2,2 | 139:2,16 | 81:1 88:18 | 168:17 |
| **snfs**  100:9 | 143:19,21 | 121:17 124:20 | **spills**  164:22 |
| **sober**  75:7,9,12 | 150:5 165:16 | 135:16 141:6,8 | **spirit**  152:25 |
| 75:13,17,23 | 177:8 183:1 | 141:15 144:13 | **splitting**  66:8 |
| 76:1,12,16 | **sort**  31:8 37:3 | 148:4 149:3,23 | **spreadsheet** |
| **societies**  128:1 | 139:4 | 151:8 155:4,21 | 6:9 51:15 52:3 |
| **society**  113:19 | **sought**  13:13 | 156:13 159:4 | 162:1 |
| **solely**  146:22 | 32:6 | 162:11 163:7 | **square**  61:14 |
| **solemnly**  8:25 | **sound**  57:18,22 | 166:6 167:25 | **ss**  185:1 |
| **solution**  144:10 | **sounded**  66:18 | 169:3 170:4,11 | **staff**  84:15 |
| **solutions**  7:25 | **sounds**  119:25 | 174:7 179:19 | 85:15,16 |
| 8:2 186:7 | 120:12 135:24 | **specifically** | 106:15 118:25 |
| **solve**  155:2 | 147:21 155:9 | 73:22 75:23 | 119:2,8 |
| **somebody** | **source**  90:14 | 103:16 143:23 | **staffing**  165:5 |
| 119:8 133:24 | 104:18,21 | 145:9,22 146:8 | **staggered** |
| 157:20 181:1 | 140:13,17 | 150:10 162:7 | 131:8 |
| **someone's** | **sources**  151:19 | 165:14 | **stand**  138:20 |
| 120:11 | **south**  9:20 | **speculate**  55:5 | 155:8 178:5 |
| **somewhat** | **southern**  9:25 | 77:20 | **standalone** |
| 127:8 138:16 | 10:1 76:25 | **speculates**  78:5 | 130:11 |
| 138:17 178:3 | 175:24,25 | **speculation** | **standard**  35:25 |
| **sooner**  67:12 | **space**  111:13 | 58:25 77:15 | 80:7,13,17 |
| **sorry**  10:21 | 134:6 | 79:2,11 90:10 | 81:16 83:24 |
| 15:25 29:13,13 | **spare**  180:22 | 90:16 92:9,20 | 84:5 85:21,22 |
| 31:4 42:19 | | 93:21 96:20 | 93:10 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

**[standards - supervision]**

| | | | |
|---|---|---|---|
| **standards** 36:5 | 73:16 76:17 | **study** 140:22 | 160:11 |
| 83:9 110:5 | 106:1 110:1 | **stuff** 104:17 | **successfully** |
| 112:17 122:2 | 140:15 | 131:23 160:6 | 98:17 |
| **start** 18:5 | **statistical** | 163:23 172:8 | **sud** 31:21 62:1 |
| 29:22 52:5,13 | 159:13 | **subject** 24:13 | 69:18 71:9 |
| 76:13 81:8 | **status** 172:21 | 24:15 26:4 | 77:9 81:6,7 |
| 83:13 85:14 | 173:1 174:1 | 42:7 86:1 | 84:19 86:4,5 |
| 105:2 120:7,13 | **stay** 95:23 | 176:8 | 101:6,12 |
| 123:3 136:3 | 178:1,21 | **subjected** | 111:13 112:17 |
| 145:9 | **stenographic...** | 154:10 | 128:18 129:1 |
| **started** 56:22 | 185:11 | **submit** 80:22 | 130:5 145:18 |
| 58:15 76:3 | **step** 39:14 | 81:12 147:18 | 168:5 |
| 161:2 | 45:18,19 123:7 | **submits** 125:8 | **suddenly** 66:4 |
| **starting** 46:23 | 123:12 | **submitted** | 67:1,2 |
| 161:8 | **steps** 59:21 | 14:24 33:22 | **sufficient** |
| **starts** 46:11 | **stipulate** 75:3,5 | 34:2 37:7 | 101:15 |
| 54:13 125:14 | 77:20 106:23 | 110:20 113:10 | **suggest** 86:2 |
| 145:14 155:12 | 115:12 121:1 | 125:6 156:7 | **suing** 13:7,20 |
| 164:20 166:23 | **stipulation** | **subscribed** | 13:25 |
| **state** 8:4,25 | 186:20 | 185:20 | **suite** 3:7 4:6 |
| 34:20 81:18 | **stop** 154:4 | **subsequent** | 7:22 |
| 84:15 94:22,24 | **straight** 92:10 | 105:21 | **summaries** |
| 160:3,4,16 | 97:12 | **subset** 57:19 | 60:2 |
| 184:2 185:1 | **straits** 175:8 | 167:14,25 | **summarized** |
| 186:9,12 | **strawman** 83:6 | **substance** | 59:13,22 |
| **statement** 61:2 | **street** 4:6 | 31:21,21 46:4 | **summary** 20:23 |
| 65:4 67:25 | **strike** 71:3 76:7 | 71:21 72:3,7 | 47:24 59:7,12 |
| 75:3 83:8 | 143:5 173:19 | 72:20,24 73:15 | 59:23 60:5,21 |
| 100:14 103:9 | **strong** 114:10 | 74:22 76:24 | 61:5 |
| 161:23 | 156:4 | 80:2 81:2 | **sunday** 22:1,7 |
| **statements** | **stronger** | 111:19,23 | 32:24 |
| 16:24 61:15 | 154:22 | 114:13 118:10 | **superficial** |
| 174:11 | **structure** 27:3 | 118:14 127:14 | 149:16 |
| **states** 1:1 2:1 | **struggling** | 127:21 128:20 | **supervision** |
| 7:18 31:23 | 44:25 | 134:9,10 | 185:12 |

[supplemental - terms]

supplemental
6:6 7:9 22:9
30:10 31:14
46:22 49:14,16
49:19 50:11
59:4 60:23
111:24 113:1
145:7,10
150:16 164:21
169:17
supplemented
22:21
supplied 47:19
support 16:23
26:6 40:10
60:3 131:7
141:9 170:25
177:14
supported
59:23
supports 156:2
177:12
supposed 43:3
58:23 93:18
123:18
sure 21:22
37:16 50:1
55:4,15,16
60:11 62:7
81:3 88:12,15
92:5 98:13
109:8 122:21
125:20 139:23
147:16 161:25
165:24 169:12

surely 153:16
surgeon 81:12
surgical 81:5
surprise 95:15
surprised 45:9
92:18
survey 72:11
72:15
survive 101:17
survived
109:23
suspense 88:3
swatches 33:12
swear 8:20
swipe 52:25
synopses 48:8
48:12,19 49:3
49:5 52:10
synopsis 53:14
58:5
system 31:23
102:16 181:10
181:11,20
systems 108:5,6

t

t 3:4 186:1
188:3,3
table 143:18
tactics 84:18
176:23 177:19
177:21,22
take 22:14
59:21 77:13
119:24 128:17
131:2 135:21

149:13 166:12
181:1 182:9
183:4
taken 2:19 7:16
22:21 39:18
40:21 46:19
47:5,19 67:4
67:12 70:18
90:8 141:5
185:7
talk 30:22 31:1
31:4 43:18
107:4 115:20
164:19,21
talked 62:23
128:14 168:12
168:16 177:8
talking 24:20
24:22 25:17,24
27:24,25 42:10
81:1,4 97:6
109:10 115:21
119:16 127:20
138:5 147:23
148:6 159:11
168:17
talks 181:19
target 37:4
127:3 162:20
162:22,25
163:2,3,13,15
164:9 170:1,5
170:7,14,15
171:5,12,14,18
171:24,24

task 24:12
taylor 4:5 8:10
139:14,16
taylor.crousil...
4:9
td 89:3
teens 144:12
tell 11:20 38:17
47:4 57:17
76:9 103:14
109:19 122:19
157:6 167:6
telling 19:6
36:17 38:18
123:15
tells 123:3,6
tend 89:9,9,10
tens 28:2
term 20:10
28:7 60:15
63:3,10 78:23
83:11 91:4
125:25 126:4,7
156:14 158:9
166:15,17
170:4,5
terminated
152:7
terms 14:1,1,9
14:17 17:11
19:24 26:23
34:8 54:1
63:15,18
140:14 147:5
159:12 160:1

CONFIDENTIAL - ATTORNEYS' EYES ONLY

**[terms - time]**

|  |  |  |  |
|---|---|---|---|
| 176:8 | 165:18 170:22 | **thing**  18:11 | 147:22 149:22 |
| **terri**  100:21 | 171:19 172:3 | 21:18 39:7,11 | 149:25 154:6 |
| **terrible**  182:15 | 183:20 185:6,9 | 54:3 126:20,22 | 154:22 156:4 |
| **test**  78:17 | 185:14 | 156:11 | 162:15,21 |
| 81:21,24 82:16 | **testimony's** | **things**  18:15 | 167:23,25 |
| 82:17 83:23 | 154:18 | 20:16 37:18 | 171:20 172:5 |
| 84:7 127:6 | **testing**  78:2,13 | 38:18 43:18 | 172:10,11,11 |
| 128:7,10,10,18 | 82:25 83:3,24 | 62:17 88:25 | 174:5,24 |
| 128:25 129:7 | 83:25 122:7 | 92:13 96:21 | 177:13 |
| 129:17,21 | 127:13 128:14 | 97:8,15 133:19 | **thinking**  144:9 |
| 130:5,12,20 | 128:16,18 | 141:3,13 | 177:14 |
| 131:11 132:3,8 | 134:8 135:9 | 150:10 151:16 | **third**  72:12 |
| 132:9,14,15,22 | 146:20 | 175:7,9 | 145:13 169:16 |
| 133:15,19,21 | **tests**  78:4 82:3 | **think**  16:18,20 | 176:5,6 |
| 133:25 134:15 | 82:11 83:2,7 | 25:4 31:13 | **thomas**  3:6,11 |
| 134:16,19,21 | 83:19 84:1 | 32:12 34:3 | 6:10,11 87:22 |
| 134:21 135:5,6 | 127:1,4,6 | 41:12 43:10,12 | 87:22 89:25 |
| 135:10 | 128:6 129:6,8 | 43:13 46:11 | **thorough**  24:11 |
| **testify**  15:19 | 130:22 133:18 | 48:22 54:3,15 | 30:19,20 |
| **testifying**  23:1 | **texas**  159:15 | 56:13 57:17,18 | 177:17 |
| **testimony**  9:15 | **thank**  8:22,24 | 66:20,22 78:8 | **thought**  32:4 |
| 11:23 12:3,8 | 9:4 13:5 25:25 | 82:20 83:3 | 110:10 155:1 |
| 37:20 38:4 | 29:15 42:3 | 85:21 88:18 | 179:9 |
| 39:4 46:15,23 | 69:24 71:7 | 96:15 107:2,12 | **thousands**  28:2 |
| 47:7 58:11 | 98:14 104:25 | 109:11 112:25 | **three**  27:17 |
| 61:11 65:9 | 108:2 120:3 | 114:1,7 117:10 | 49:10 103:23 |
| 87:13 88:20,21 | 136:5,12,18 | 117:12,14 | 108:3 117:20 |
| 89:5 100:20 | 137:10 141:25 | 120:11 121:3,5 | 118:7,7 |
| 113:15 138:10 | 148:22 172:9 | 124:21 126:5 | **thwart**  108:16 |
| 144:15 150:12 | 177:8 180:2 | 127:2 131:10 | **ties**  125:9 |
| 150:13 153:15 | 182:24 183:15 | 132:2,21 | **tightly**  129:16 |
| 153:17 154:13 | 183:16,23 | 133:24 134:8 | 129:20 |
| 154:15 155:8 | **therapy**  114:20 | 135:20 139:2 | **time**  2:21,22 |
| 155:23,24 | **thereof**  185:19 | 139:18,19 | 7:2 10:25 |
| 159:20 165:13 |  | 140:5 144:4,23 | 12:25 13:1 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[time - treatment]**

| | | | |
|---|---|---|---|
| 22:2 27:7,17 | **titled** 65:16 | 67:11 86:3 | **travel** 159:22 |
| 27:18,21 28:1 | 175:23 | 149:10 | **treat** 70:2 |
| 28:8,9,24 41:7 | **tml** 1:4,12 2:4 | **tool** 121:13,14 | 111:19 |
| 42:21,25 43:23 | 2:12 7:17 9:17 | 123:3 127:19 | **treated** 166:14 |
| 45:23 46:14 | 25:10 89:2 | 134:18 | **treating** 70:5,7 |
| 47:20 49:23 | 186:4 188:1 | **tools** 122:6,8 | 70:7 86:19 |
| 51:25 52:6 | **tml00095850** | 168:16 | **treatment** |
| 61:16 68:2 | 6:13 87:17,24 | **top** 44:2,5 84:9 | 13:13 31:22 |
| 71:6 72:25 | **today** 8:8,14 | 84:14 86:1 | 32:2 37:9 44:7 |
| 78:12 82:10 | 9:10,16 11:13 | 112:4 153:22 | 46:4 48:8 58:8 |
| 83:7 85:17 | 11:17,20,23 | 155:11 | 58:12 62:1,6,9 |
| 97:7,13,15 | 12:1,3,8,11,20 | **topic** 169:24 | 67:14,16 71:10 |
| 115:13 117:18 | 12:25 20:13 | **total** 27:15 | 71:21 72:4,7 |
| 120:5,8 121:20 | 21:15 23:1 | 57:10,13 91:23 | 72:13,13,14,14 |
| 122:4,15 | 24:19,22 25:2 | **totality** 58:17 | 72:21,25 73:15 |
| 130:25 136:1,4 | 25:16,24 38:17 | **totally** 83:14 | 74:2,23 75:2 |
| 136:5,6 139:6 | 43:23,24 44:5 | **touch** 52:23 | 75:14 76:25 |
| 139:8 140:8 | 104:23,24 | **touched** 162:15 | 77:9 79:6,22 |
| 141:12 157:14 | 136:5 141:15 | **towards** 62:22 | 80:2 81:2,6,8 |
| 161:20,21 | 152:11 | 65:19 89:20 | 93:6,12 96:17 |
| 162:5,6 163:24 | **today's** 183:20 | 101:4 102:17 | 105:25 111:2,8 |
| 164:1 165:23 | **together** 14:23 | **trace** 36:5 | 111:23 112:18 |
| 167:20 168:17 | 29:4 50:3 55:6 | **track** 28:21,23 | 114:11,11,15 |
| 168:19 169:24 | 56:3 60:17 | 28:25 40:7 | 117:21,23 |
| 172:6,14 | 70:18 83:19 | **trained** 141:1 | 118:11,15 |
| 177:24 182:22 | 85:10 106:24 | **training** 24:3 | 119:12,21 |
| 183:7,24,24 | 113:21 156:22 | 26:5 106:23 | 121:19 122:7 |
| 185:7,8,10 | 157:20 183:11 | 119:9 | 123:2 127:15 |
| 186:10,18,24 | **told** 33:3,11 | **transcribed** | 127:21 128:18 |
| 187:7 | 38:12,16 68:2 | 185:12 | 128:24 129:2 |
| **times** 10:6 | **tom** 8:17 | **transcript** | 130:6 134:9,11 |
| 88:16 181:24 | **tom.kelly** 3:14 | 11:23 12:4 | 140:19 145:18 |
| **tired** 12:11,14 | **tonight** 183:8 | 183:8 186:6,8 | 157:8 159:23 |
| 12:18 153:18 | **took** 14:4 45:21 | 186:10,13,13 | 160:12 161:14 |
| 153:20 155:4 | 59:24 62:12 | 186:21 187:2,2 | 165:4 |

Page 52

CONFIDENTIAL - ATTORNEYS' EYES ONLY

**[trial - understanding]**

| | | | |
|---|---|---|---|
| **trial** 59:18 145:2 | 174:14 | **typing** 33:8,17 | 39:25 43:9 |
| **tried** 41:3 | **tuesday** 1:21 | **typo** 32:12 | 63:14 66:22 |
| **triggers** 162:20 | 2:22 5:4 7:1,13 | 107:17 | 73:23 76:10 |
| **true** 41:12 | **turn** 14:22 | **u** | 86:23 94:12,15 |

trial  59:18
145:2
tried  41:3
triggers  162:20
true  41:12
47:21,25 51:5
59:17 61:2
94:21 184:3
185:13
truly  70:11
129:24
trustworthy
117:12
truth  9:1,2,2
11:20 139:14
truthful  12:8
12:10,11
try  21:7 39:13
52:25 69:1
111:21 131:3
trying  35:24
36:3 37:22,23
40:9 41:6,9,14
42:7,9 43:7,22
50:23 58:20
63:13,21 66:22
67:16 68:25
70:14 73:21
77:18 85:9
88:9 130:14
132:18 141:7
144:8 156:22
157:12 158:1
159:12,25
165:23 171:14

174:14
tuesday  1:21
2:22 5:4 7:1,13
turn  14:22
47:15 50:5
59:5 61:8 64:6
84:8 90:19
94:3 99:22
101:18 112:20
119:22 150:15
155:10 164:19
turning  102:23
152:13 176:19
two  12:9 15:1
15:20 17:6,24
18:20 19:1
23:4 46:9
49:14,18 51:20
54:1 61:14
92:16,16 93:17
107:2,3 124:6
130:20,21
147:11 151:16
type  63:25
78:20 106:3,10
145:25 156:25
159:6 168:1
types  35:13
140:16 145:17
146:21
typical  57:23
typically  54:12
56:9 70:22
88:25 97:2

typing  33:8,17
typo  32:12
107:17

**u**

u&c  6:14
148:15,24
uh  48:4 107:6
146:2 148:11
ultimately
142:7 147:19
151:3
um  109:23
under  11:17
20:23 26:24
31:19 34:23
36:5 37:9 43:3
47:23 49:23
51:6 55:14,14
58:1 102:8
111:7 122:2
126:19 144:18
145:10 163:2
177:6 178:1,2
178:23 184:1,1
185:12
underlying
156:18 169:6
understand
11:16,18,19,21
11:22,25 12:3
12:6,22 13:17
14:7 15:1 17:3
17:16 18:9
25:3 32:4
35:21 38:13,20

39:25 43:9
63:14 66:22
73:23 76:10
86:23 94:12,15
98:20,24 99:15
111:11 115:1
117:6 127:10
127:12 138:11
141:7 147:7
150:12 151:20
153:4,18
165:24 178:10
183:3
understandable
25:2 150:7
understanding
13:6,10,11
14:17,25 16:1
16:11,19 17:10
17:12 21:1
22:18 26:25
37:13 52:15
62:18 63:11,20
91:3 105:5,15
109:8 111:22
126:8,25
127:13 130:4
138:6 139:25
140:10,20
143:25 144:5
151:16 152:17
152:22 153:2
156:9 158:12
158:23 159:11
162:2,14,17,19

CONFIDENTIAL - ATTORNEYS' EYES ONLY

**[understanding - varies]**

| | | | |
|---|---|---|---|
| 163:7,12 164:1 | **unreasonably** | 129:14,14,15 | 165:8 166:19 |
| 164:8 165:12 | 132:3 134:1 | 129:15,19 | 170:10 |
| 170:13 171:3 | **unrelated** | 130:13,16 | **usual**   37:1 |
| 179:3,12,15,18 | 43:18 | 134:9,10 | 44:17 63:7,14 |
| **understands** | **updated**   50:19 | 145:16 146:24 | 63:19,24 |
| 173:7 176:7 | 50:21 | 166:15 169:14 | 140:14 |
| **understood** | **upside**   147:14 | **used**   28:7 50:2 | **usually**   43:21 |
| 149:13 182:20 | **urine**   78:1,3,11 | 50:25 51:4 | 134:23 |
| **unfair**   40:13 | 78:13,17 82:16 | 54:1 63:15,25 | **utilization** |
| **unfortunately** | 122:7 128:14 | 84:19 85:4,22 | 122:17 123:15 |
| 150:22,23,25 | 128:15,17,25 | 101:17 102:12 | 146:17 166:2 |
| **unilaterally** | 129:6 130:5,11 | 105:11 109:4 | **utilize**   104:10 |
| 94:19 | 131:11 132:2 | 114:18 127:14 | **utilized**   50:11 |
| **unit**   7:15 | 132:22 133:21 | 129:9,24,25 | 51:6 100:7,9 |
| 106:20 135:12 | 146:20 | 139:18 140:14 | 103:4 |
| **united**   1:1 2:1 | **urines**   129:18 | 161:17 166:12 | **utilizes**   147:1 |
| 7:18 10:12,18 | **use**   29:25 31:21 | 167:13,17,23 | 169:7,10 |
| 23:13,14 24:18 | 31:21 39:6,10 | 167:25 168:16 | |
| 25:14,23 29:25 | 39:14 46:4 | **useful**   50:25 | **v** |
| 30:5,7 31:23 | 50:24 61:19 | 57:5 166:18 | **v**   10:20 15:23 |
| 32:15 73:16 | 63:3,14 69:2,5 | **usefully**   130:3 | 17:23 19:12 |
| 74:13 76:16 | 71:21 72:3,7 | **usefulness** | 20:8 59:7 |
| 164:6,10 182:2 | 72:11,12,20,24 | 129:23 | **vague**   26:17 |
| **university** | 73:15 74:23 | **uses**   156:9 | 37:15 74:2,5 |
| 130:24 141:2 | 75:13 76:24 | **using**   14:15 | 77:14 79:1 |
| **unknown** | 80:2 83:11 | 15:5 21:2 | 91:2 93:20 |
| 109:13,15 | 108:19 109:1,2 | 40:18 63:18 | 96:9 110:22 |
| **unnecessary** | 109:18 111:19 | 65:10 71:17 | 114:5 118:22 |
| 113:14 | 111:23 112:9 | 100:15 101:6 | 119:13 142:23 |
| **unpalatable** | 112:13 114:12 | 101:12 108:9 | 144:21 156:19 |
| 181:12 | 114:12,13 | 114:19,20 | **valid**   62:13 |
| **unprofessional** | 118:10,14 | 128:5,6,6,10 | **variances** |
| 74:3 | 122:6 127:14 | 131:19,19 | 160:7 |
| **unreasonable** | 127:21 128:20 | 134:16 156:14 | **varied**   96:6 |
| 133:16 165:3 | 128:21 129:14 | 157:20 158:9 | **varies**   91:13,15 |

Page 54

CONFIDENTIAL - ATTORNEYS' EYES ONLY

**[variety - ways]**

variety 36:16
106:17 157:13
158:14 167:18
167:19
various 152:1
158:24
vary 91:20
161:4
vastly 160:1
veracity 38:6
verification
53:14,22 54:2
54:3
verifications
53:25
veritext 7:21,25
8:1 186:7,9,11
version 45:15
128:2
versus 7:17
41:21 92:24
165:22 167:9
viant 4:3 6:14
8:11 136:24
137:8 140:9,11
140:12 142:22
143:2,6 144:17
148:15,24
149:9,23
160:22 171:11
182:1
video 1:18 2:18
7:15 12:4
videographer
4:14 7:12,25

8:19 51:24
52:5 120:4,7
135:25 136:3
183:17,19,23
videotaped
12:1
view 36:4 39:2
122:6
violate 20:25
violations
103:13
vitae 44:9
vob 53:13
volume 55:23
56:19
volumes 88:11
88:11 103:14
vop 54:3
vs 1:6,11 2:6,11
186:4 188:1
vulnerable
85:13

**w**

wait 48:17
67:15
waive 180:16
180:20
waived 186:23
186:23
waiving 186:20
walk 52:14
walks 149:8
wall 140:5
177:23 181:4

want 12:25
18:25 19:23
25:11 30:17
42:20 43:15
52:14 55:5
60:11 69:4,5
70:17 77:19,19
79:9,18,21
84:11 88:12
98:13 104:17
107:22,23
109:8 111:10
115:20 126:1
129:21 131:20
135:5 145:5,9
147:24 153:14
153:15,16,17
153:25 154:8
154:15,16
155:11 159:21
161:7 164:19
164:21 171:1
171:23 172:14
172:16 176:4
178:1,3 183:2
wanted 37:16
83:1 131:2
141:20 144:21
154:25
warm 159:23
washes 93:3
washing 92:23
93:1
washington 3:8
44:8 165:17

waste 42:24
71:20 72:3
73:3 74:24
78:8,12 79:22
126:20 157:24
wasting 42:21
watched 27:10
way 14:11,15
18:17 30:1
42:8 43:7
52:22 56:1
61:19 66:3
67:8 78:14
85:6 86:19
91:19 92:11
95:16 96:8,22
102:21 108:9
110:15 112:22
116:20,22,25
117:2,11,13,15
128:18,20
129:15,24
140:12,17
141:20 142:20
144:25 148:20
157:12 166:18
171:8 172:2
173:24,24
179:10 181:3
185:18
ways 37:19
49:24 77:12
83:23 102:2,7
109:12 158:1
167:19

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

**[we've - x's]**

| | | | |
|---|---|---|---|
| **we've** 11:5 | 59:2 60:10,15 | **word** 102:12 | 44:18 51:11 |
| 25:24 101:19 | 61:11 71:2 | 139:18 161:17 | 57:6 102:4 |
| 136:19 148:3 | 73:9,21 74:3,8 | 165:6 170:2 | 122:1,20 |
| 181:24 | 77:16 78:10 | 174:2 | 140:23 154:3 |
| **weather** 68:14 | 79:4,12 81:1 | **words** 19:5 | 166:1 |
| **web** 103:24 | 88:24 89:9 | 40:18 66:11 | **works** 37:3,5 |
| **website** 64:10 | 90:11,17 92:10 | 90:14 147:24 | 96:8 124:1 |
| 64:13 68:20,20 | 92:21 96:11,21 | 147:25 | 135:18 150:13 |
| 146:12,13 | 97:6 98:6 | **work** 16:4,15 | 162:18 180:18 |
| **websites** 94:4 | 107:15,17,22 | 17:1,9,12,19 | **worst** 114:8 |
| **week** 82:3 | 110:23 113:25 | 18:2,3,18,19 | **write** 19:8,10 |
| 118:4,5,7,7 | 114:7,8 115:9 | 19:3,5,6,15,17 | 19:18 28:8 |
| **weeks** 27:17 | 115:24 116:4 | 19:21 22:25 | 31:19 68:10 |
| **went** 26:1 | 116:10 118:23 | 27:11,12 28:5 | 107:23 108:19 |
| 67:17 137:11 | 119:15,23 | 28:12,17,19 | 109:17 113:9 |
| 141:21 162:13 | 120:3 131:14 | 29:2,5 39:20 | 130:8 181:17 |
| **whereof** 185:20 | 132:7 133:1,7 | 40:22 42:15 | **writing** 28:3 |
| **whew** 115:5,5 | 133:10,23 | 44:25 53:1 | 181:15 |
| **white** 128:13 | 134:5,15 | 57:7 60:9 64:4 | **written** 11:23 |
| 148:4 150:3,8 | 136:12 139:15 | 69:7,14,15,22 | 12:4 64:4 |
| **who've** 27:9 | 142:12,25 | 71:14,16 72:16 | 110:6 127:11 |
| **wholesale** | 148:22 156:20 | 103:13 104:16 | 127:17 141:19 |
| 78:16 | 172:16 175:15 | 104:19 105:6 | 142:18 172:2 |
| **window** 128:8 | 175:20 180:1 | 106:24 135:12 | **wrong** 84:21,23 |
| 134:17,23 | 182:20,24 | 140:25 143:8 | 84:24,25 125:8 |
| **winter** 23:2,3 | 183:11,14,22 | 143:21,22 | 157:20 |
| 159:22 | 184:12 185:8,9 | 150:10 151:12 | **wrote** 19:7 |
| **witness** 5:6,14 | 185:20 186:13 | 157:12 162:15 | 47:18 65:20 |
| 8:14,20 9:3,10 | 186:16 187:2,5 | **worked** 27:1 | 82:6,21 115:18 |
| 10:3 11:2,6 | 188:24 | 36:20 38:5 | 127:25 128:1 |
| 19:22,23 20:13 | **woke** 67:1,3 | 106:15 113:21 | 130:8 |
| 25:11 26:18 | **women's** 9:24 | 135:14 160:11 | |
| 27:5 37:18 | **wondered** | **working** 28:24 | **x** |
| 41:16 42:24 | 25:14 | 36:21 38:25 | **x** 5:1 187:1 |
| 43:11 52:24 | | 39:3,4 40:14 | **x's** 61:17 |

Page 56

CONFIDENTIAL - ATTORNEYS' EYES ONLY

**[yeah - zoom]**

| y |
|---|
| **yeah**   14:3 |
| 15:14 17:21 |
| 25:4,20 38:12 |
| 41:1 70:21 |
| 76:4 88:17,23 |
| 90:12 96:9 |
| 103:24 104:1,4 |
| 104:15 110:8 |
| 110:12 116:14 |
| 119:25 124:16 |
| 125:13 130:18 |
| 131:14 132:11 |
| 139:5,12,12 |
| 140:7 142:12 |
| 149:25 150:5 |
| 151:22 161:22 |
| 164:18 172:13 |
| 180:12 181:9 |
| 183:7,13 |
| **year**   91:10 92:1 |
| 92:4,7 93:12 |
| 117:20 127:5 |
| 129:4,5 |
| **years**   45:14 |
| 70:19 74:24 |
| 105:24 106:6 |
| 117:19,20 |
| 163:21 |
| **yeats**   77:2,4,5 |
| **yep**   104:15 |
| **yeses**   56:14,15 |
| **yesterday** |
| 12:12 15:7 |
| 41:8 111:25 |

| 141:22 153:21 |
|---|
| 153:24 |
| **york**   44:9 |

| z |
|---|
| **zero**   83:20 |
| **zip**   159:8 |
| **zoom**   1:19 2:20 |
| 17:16 |

Page 57

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# EXHIBIT E-7

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED CONDITIONALLY UNDER SEAL L.R. 79-5.2.2(c)

1   COOLEY LLP
    MAZDA K. ANTIA (214963)
2   (mantia@cooley.com)
    CLAIRE OLIN (302214)
3   (colin@cooley.com)
    JAMIE D. ROBERTSON (326003)
4   (jdrobertson@cooley.com)
    DYLAN K. SCOTT (332796)
5   (dscott@cooley.com)
    10265 Science Center Drive
6   San Diego, CA 92121
    Phone: (858) 550-6000
7   Fax: (858) 550-6420

8   MATTHEW D. CAPLAN (260388)
    (mcaplan@cooley.com)
9   SHARON SONG (313535)
    (ssong@cooley.com)
10  3 Embarcadero Center, 20th Floor
    San Francisco, CA  94111-4004
11  Phone: (415) 693-2000
    Fax: (415) 693-2222

12  *Attorneys for Defendants and Counterclaim Plaintiffs*
    *Cigna Corporation, Cigna Health and Life Insurance*
13  *Co., Connecticut General Life Insurance Co., Cigna*
    *Behavioral Health, Inc., Cigna Behavioral Health of*
14  *California, Inc., Cigna Health Management, Inc.,*
    *and Cigna Healthcare of California, Inc.*

15
                  UNITED STATES DISTRICT COURT
16
        CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION
17

18  TML RECOVERY, LLC, *et al.*,          Case No. 8:20-cv-0269-DOC-JDE

19                          Plaintiffs,    Consolidated with the following
                                           cases for pretrial proceedings:
20       v.
                                           8:20-cv-0271   8:20-cv-0274
    CIGNA CORPORATION, *et al.*,           8:20-cv-0272   8:20-cv-0787
21                                         8:20-cv-0273   8:20-cv-0788
                            Defendants.    [UNREDACTED VERSION OF DOCUMENT
22                                         PROPOSED TO BE FILED UNDER SEAL]

23  CIGNA HEALTH AND LIFE                  *MOTION IN LIMINE* NO. 1: CIGNA'S
    INSURANCE COMPANY, *et al.*,           MOTION TO EXCLUDE TESTIMONY OF
24                                         DR. ANDREA BARTHWELL
                     Counterclaim Plaintiffs,
25                                         This document relates to all actions
         v.                                Judge:              Hon. David O. Carter
26                                         Final Pretrial Conference:   July 24, 2023
    TML RECOVERY, LLC, *et al.*,           Time:               8:30 a.m.
27                                         Trial:              July 31, 2023
                 Counterclaim Defendants.  Time:               8:30 a.m.
28

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................... 1

II.   BARTHWELL'S OPINION ...................................................................... 3

III.  LEGAL STANDARD ............................................................................... 4

IV.   BARTHWELL'S TESTIMONY MUST BE EXCLUDED IN FULL ............ 6

      A.    Barthwell's Opinion Must Be Excluded As Unreliable ........................ 6

            1.    Barthwell's Opinions Are Not Supported By Documents
                  Produced In this Case .............................................................. 6

            2.    Barthwell's Opinion Is Not Based On *Any* Principles Or
                  Methods .................................................................................... 9

      B.    Barthwell's Opinion Must Also Be Excluded Because It Is
            Prejudicial And Confusing ................................................................. 14

      C.    Alternatively, Portions of Barthwell's Report Must Also Be
            Excluded ............................................................................................ 16

            1.    The Supplemental Portions of Barthwell's Report Must Be
                  Excluded As Untimely ............................................................ 16

            2.    Barthwell's Opinion Regarding Insurance-Related Issues
                  Must Be Excluded As Outside Of Her Expertise ................... 17

            3.    All Legal Opinion Must Be Stricken From Barthwell's
                  Report ..................................................................................... 18

            4.    Barthwell May Not Usurp The Role Of The Factfinder .......... 19

V.    CONCLUSION ...................................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apple, Inc. v. Samsung Elecs. Co.*,
   2013 U.S. Dist. LEXIS 160188 (N.D. Cal. Nov. 6, 2013) ................................17

*Avago Techs., Inc. v. IPtronics, Inc.*,
   2015 WL 3640626 (N.D. Cal. June 11, 2015) ....................................................8

*Avila v. Willits Env't. Remediation Tr.*,
   633 F.3d 828 839 (9th Cir. 2011) ....................................................................17

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
   509 U.S. 209 (1993) ...........................................................................................9

*Claar v. Burlington N.R.R. Co.*,
   29 F.3d 499 (9th Cir. 1994) ............................................................................13

*Colony Holdings, Inc. v. Texaco Ref. & Mktg.*,
   2001 U.S. Dist. LEXIS 26217 (C.D. Cal. Oct. 29, 2001) ..................................4

*Daubert v. Merrell Dow Pharms., Inc.*,
   43 F.3d 1311 (9th Cir. 1995) ....................................................................5, 6, 13

*Daubert v. Merrell Dow Pharms, Inc.*,
   509 U.S. 579 (1993) ...................................................................................passim

*GE v. Joiner*,
   522 U.S. 136 (1997)......................................................................................4, 14

*Grodzitsky v. Am. Honda Motor Co., Inc.*,
   957 F.3d 979 (9th Cir. 2020) ............................................................................5

*Guidroz-Brault v. Mo. Pac. R.R. Co.*,
   254 F.3d 825 (9th Cir. 2001) ............................................................................7

*In re Hanford Nuclear Rsrv. Litig.*,
   534 F.3d 986 (9th Cir. 2008) .......................................................................6, 14

*Hangarter v. Provident Life & Accident Ins. Co.*,
   373 F.3d 998 (9th Cir. 2004) ..........................................................................18

# TABLE OF AUTHORITIES
### continued

**Page(s)**

*Harner v. USAA Gen. Indem. Co.*,
  590 F. Supp. 3d 1217 (S.D. Cal. 2022) ................................................ 15

*Hoffman v. Constr. Protective Servs., Inc.*,
  541 F.3d 1175 (9th Cir. 2008) ........................................................... 16

*Humphreys v. Regents of the Univ. of Cal.*,
  2006 U.S. Dist. LEXIS 47822 (N.D. Cal., July 6, 2006) ..................... 19

*Jinro Am. Inc. v. Secure Invs., Inc.*,
  266 F.3d 993 (9th Cir. 2001) ............................................................. 19

*Jones v. U.S.*,
  933 F. Supp. 894 (N.D. Cal. 1996) ...................................................... 5

*Kearney v. Standard Ins. Co.*,
  175 F.3d 1084 (9th Cir. 1999) ........................................................... 10

*Kennedy v. Collagen Corp.*,
  161 F.3d 1226 (9th Cir. 1998) ............................................................. 5

*Knox v. Contra Costa Cnty.*,
  2022 WL 2290686 (N.D. Cal. June 24, 2022) ....................................... 5

*Kumho Tire Co., Ltd. v. Carmichael*,
  526 U.S. 137 (1999) ........................................................................... 5

*Lust ex. Rel. Lust v. Merrell Dow Pharms., Inc.*,
  89 F.3d 594 (9th Cir. 1996) ................................................................ 4

*Messick v. Novartis Pharms. Corp.*,
  747 F.3d 1193 (9th Cir. 2014) ............................................................. 5

*Mid-State Fertilizer Co. v. Exchange Nat. Bank of Chicago*,
  877 F.2d 1333 (7th Cir. 1989) ........................................................... 13

*Murray v. S. Route Maritime SA*,
  870 F.3d 915 (9th Cir. 2017) .......................................................... 5, 9

*Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*,
  523 F.3d 1051 (9th Cir. 2008) ........................................................... 18

1

**TABLE OF AUTHORITIES**
continued

2

**Page(s)**

3

*Obrey v. Johnson*,
  400 F.3d 691 (9th Cir. 2005) .................................................................. 5

4

5

*Ollier v. Sweetwater Union High School Dist.*,
  768 F.3d 843 (9th Cir. 2005) ................................................................ 16

6

7

*In re Out-of-Network Substance Use Disorder Claims Against UnitedHealthcare*,
  No. 8:19-cv-02075 JVS (C.D. Cal. 2019), ECF No. 307 .................. 11, 12, 13

8

9

*R.J. v. Cigna, et al.*,
  No. 4:20-cv-02255-EJD, Dkt. 22 (Protective Order) .......................... 7

10

*RJ v. Cigna Behavioral Health, Inc. et al.*,
  No. 20-cv-02255-NC (N.D. Cal.) .......................................... 7, 8, 11

11

12

*U. S. v. Flores*,
  2014 U.S. Dist. LEXIS 184440 (N.D. Cal. June 16, 2014) ................. 19

13

14

*U. S. v. Hermanek*,
  289 F.3d 1076 (9th Cir. 2002) ........................................................ 9, 13

15

16

*U. S. v. Pac. Gas & Elec. Co.*,
  2016 WL 1640462 (N.D. Cal. Apr. 26, 2016) .................................... 20

17

18

*U.S. v. Bolandian*,
  771 Fed. Appx. 762 (9th Cir. 2019) .................................................. 6

19

20

*U.S. v. Rincon*,
  28 F.3d 921 (9th Cir. 1994) ............................................................ 13

21

22

*U.S. v. Tamman*,
  782 F.3d 543 (9th Cir. 2015) ............................................................ 20

23

24

*United States v. Valentino*,
  2023 U.S. Dist. LEXIS 10756 (E.D. Pa. Jan. 23, 2023) .................... 15

25

26

*W. Parcel Express v. United Parcel Serv. Of Am., Inc.*,
  65 F. Supp. 2d 1052 (N.D. Cal. 1998) ............................................. 7

27

28

*Waymo LLC v. Uber Techs., Inc.*,
  2017 WL 5148390 (N.D. Cal. Nov. 6, 2017) ................................. 15, 20

# TABLE OF AUTHORITIES
**continued**

**Page(s)**

*Wendell v. GlaxoSmithKline LLC,*
   858 F.3d 1227 (9th Cir. 2017) ............................................................. 14

*Whitewater W. Indus. v. Pac. Surf Designs, Inc.,*
   2019 WL 4452986 (S.D. Cal. Sept. 16, 2019) .................................. 18

**Other Authorities**

Fed. R. Evid.
   401 .......................................................................................................... 5
   402 .......................................................................................................... 5
   403 ................................................................................................... *passim*
   702 ................................................................................................... *passim*

Rule
   26 ..................................................................................................... 3, 16

# I.      INTRODUCTION

The Court should exclude the testimony of Dr. Andrea Barthwell ("Barthwell"), Plaintiff's proffered expert, because (1) it is not reliable or relevant and therefore fails the requirements of Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579, 590, 592-93 (1993) and (2) the confusion and prejudice that would result from her testimony significantly outweighs any probative value and should therefore be excluded under Rule 403 of the Federal Rules of Evidence.  If the Court does not exclude her testimony in whole, the Court should exclude portions of Barthwell's opinions, which are improper legal opinion, opine on issues outside of her expertise, and offer factual assertions for issues upon which she is not a percipient witness.  Finally, the Court should exclude the supplemental portions of Barthwell's report submitted a week after the deadline to submit supplemental expert testimony passed as untimely.

***First***, Barthwell's testimony is unreliable because she reviewed **no documents from this case in preparing her report**.  Barthwell admits that her original report was based only on her ███████████ and the ███████████ not ███████████ all of which were available at the time she issued her initial report, save for two deposition transcripts (one of which she did not even rely on). Ex. A at 22:11-241.  Barthwell proffered a supplemental report—a week after the deadline to submit supplemental expert testimony passed—which, for the first time, added citations to documents and testimony from this case. Yet, somehow, none of the substantive opinions changed after she reviewed the facts of the case.  In other words, Barthwell first provided whatever conclusions would support Plaintiffs' case in her original report and then attempted to shoehorn in citations to the record in her supplemental report in order to give the appearance of credibility.  But that is not how reliable opinion is formed.  An expert must *first* review the evidence and *then* form her opinions.

MOTION TO EXCLUDE A. BARTHWELL
CASE NO. 8:20-CV-0269-DOC-JDE

1    Even if Barthwell had properly relied upon materials from this case in forming

2    her opinion, the evidence does not—and literally could not—support her broad,

3    sweeping conclusions.   For example, Barthwell opines that "Plaintiffs provided

4    medically necessary, preauthorized, and covered SUD treatment and laboratory services

5    to 508 of Cigna's insured members (the patients)[,]" but she admits that she only

6    reviewed records for 62 patients, not 508.  *Id.* at 57:24-58:2.  And her review of the

7    evidentiary record was incomplete at best, despite her representation in the report that

8    she considered certain records.  During her deposition, Barthwell admitted, for example,

9    that she did not review the Global Agreements between MultiPlan and Plaintiffs (Ex. A

10   at 105:12-14

11   ), yet her report states that she reviewed the Global Agreements (Ex. C at

12   6) and offers extensive opinion regarding those Agreements (*id.* at 43, 46).

13   **Second,** Barthwell's testimony is unreliable because it is not based on any

14   analysis, principles, or methods, but rather is copied and pasted from another report she

15   submitted on behalf of Plaintiffs in a different action against United Healthcare.

16   Barthwell admitted, and errors in her report plainly reflect, that she simply copied and

17   pasted portions of the report she submitted in the United case into the report provided

18   in this action, despite initially claiming she drafted it from scratch—until she was forced

19   to concede that she did, in fact, copy from her United report.  *See* Ex. A at 29:22-30:14,

20   32:7-33:19. Expert testimony must be tied to analysis of available facts and/or data, not

21   copied and pasted from reports submitted in another reimbursement case against a

22   *different and entirely unrelated insurer*.

23   **Third,** Barthwell's testimony should also be excluded under Rule 403 because

24   her lack of evidentiary support, failure to conduct any analysis, and extensive narrative

25   about irrelevant and prejudicial issues, like the opioid crisis, only serve to confuse the

26   issues and mislead the jury and are unfairly prejudicial to Cigna.  Its confusion and

27   prejudice significantly outweigh any minimal probative value to the relevant issues in

28   this case.

**Finally,** at the very least, certain portions of Barthwell's report must be stricken because her testimony goes outside her area of expertise – to, for example, insurance-related opinions – and because she makes improper legal opinions and factual assertions as to issues for which she was not a percipient witness and for which she has no evidentiary support, which she has already been chastised for by another Court in this District.  And the additional portions of her report, submitted well after the deadline to provide supplemental expert testimony, must be stricken as untimely.

For each of these reasons, the Court should exclude Barthwell's testimony in whole or, at a minimum, in part.

## II.     BARTHWELL'S OPINION

On March 30, 2023, Plaintiffs served Barthwell's first expert report.  *See* Ex. B. On July 10, 2023, one week after the Rule 26(a)(3)(B) deadline to supplement expert reports had passed, Plaintiffs served a "supplemental" expert report for Barthwell.  *See* Ex. C.  Barthwell's supplemental report added 19 new pages of material.  *See* Ex. D.

In both her original and supplemental reports, Barthwell purports to provide testimony as to "a broad description of the substance use disorder (SUD) . . . treatment delivery systems in the United States . . . and . . . the clinical and related practices the Plaintiffs follow in providing SUD treatment services." Ex. B at 1.  In reality, she draws sweeping conclusions regarding Cigna's reimbursement methodologies and her interpretation of its policy incentives for applying such reimbursement methods.  *See generally*, Exs. B & C.  Barthwell also spends the majority of her reports discussing the opioid crisis in the United States, though this dispute only pertains to reimbursement for SUD services, not policy issues related to the opioid crisis.  In the last few pages of the reports, Barthwell offers the following four "opinions":

> **Opinion 1**: "Cigna implemented policies and systematic practices that emphasized profits over patients and resulted in the under-reimbursement of Plaintiffs' claims, with Cigna instead paying Plaintiffs an arbitrary, nominal percentage of the charges, far below a reasonable and customary rate." Ex. B. at 25.
>
> **Opinion 2**: "There is no Medicare rate for inpatient or outpatient SU█ billed by residential treatment facilities such as Plaintiffs, and

████████████████████████████████████

**Opinion 3**: "Despite Cigna's payment obligations under the sample patients SPDs, Cigna and MultiPlan used biased data systems, administrative burdens, and deceptive practices to avoid paying, or to pay unreasonably low reimbursement rates for Plaintiffs' OON SUD services."

**Opinion 4**: "Cigna wrongfully determined that certain SUD services, levels of care, and laboratory testing lacked medical necessity based upon its own internal coverage and level of care guidelines, utilization review policies and procedures, reimbursement policies and claims editing functions that are inconsistent with generally accepted standards of care, and through its special investigations unit (SIU) policies and procedures that unjustifiably denied SUD claims without any clinical review by Cigna."

The Court should bar Dr. Barthwell's testimony in its entirety, including these specific opinions, and should strike the supplemental portions and certain, legal opinions and factual statements from her reports as described further below.

## III. LEGAL STANDARD

Federal Rule of Evidence 702 permits expert testimony only if: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. Plaintiffs bear the burden of showing that Barthwell's expert testimony is admissible. *Lust ex. Rel. Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996). The Court has the "gatekeeping" obligation to admit expert testimony only when it is both reliable and relevant. Plaintiffs cannot meet this burden.

To be reliable, expert testimony must be grounded in reasoning or methodology that is scientifically valid and not unsupported speculation. *Daubert*, 509 U.S. at 590. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Colony Holdings, Inc. v. Texaco Ref. & Mktg.*, 2001 U.S. Dist. LEXIS 26217, at *12 (C.D. Cal. Oct. 29, 2001) (internal quotations omitted) (quoting *GE v. Joiner*, 522 U.S. 136, 146 (1997). By measuring an expert opinion's reliability, this Court

"play[s] an active and important role . . . [in] preventing shoddy expert testimony and junk science from reaching the jury." *Murray v. S. Route Maritime SA*, 870 F.3d 915, 923 (9th Cir. 2017).

The Court does so by determining if the testimony "suffer[s] from serious methodological flaws." *Obrey v. Johnson*, 400 F.3d 691, 696 (9th Cir. 2005). The Court has "broad latitude" to determine both "whether particular expert testimony is reliable" and "how to determine reliability." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 138-39 (1999). Challenges to "faults" with a particular methodology "go to the weight, not the admissibility" of expert testimony. *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1231 (9th Cir. 1998). Nonetheless, courts unhesitatingly exclude expert reports that are overall unreliable. *See, e.g., Grodzitsky v. Am. Honda Motor Co., Inc.*, 957 F.3d 979, 985 (9th Cir. 2020) (affirming exclusion of expert report that was not based on industry standards or on peer-reviewed literature).

Expert testimony is irrelevant if it "does not relate to any issues in the case" and 'ergo, [is] non-helpful.'" *Daubert*, 509 U.S. at 591. Relevancy "depends on the particular law at issue." *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1196-97 (9th Cir. 2014). Relevancy under Rule 702 is "more stringent" than relevancy under Rule 402 because it "reflect[s] the special dangers inherent in the scientific expert testimony." *Knox v. Contra Costa Cnty.*, 2022 WL 2290686, at *32 (N.D. Cal. June 24, 2022) (quoting *Jones v. U.S.*, 933 F. Supp. 894, 900 (N.D. Cal. 1996)). Thus, this Court must be "convinced that it speaks clearly and directly to an issue in dispute in this case." *Jones*, 933 F. Supp. at 900 (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1321 n. 17 (9th Cir. 1995) ("*Daubert (II)*")). "Evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence and the fact is of consequence in determining the action." Fed. R. Evid. 401.

Separately, Rule 403 permits exclusion of "relevant evidence if its probative value is substantially outweighed by a danger of . . . confusing the issues [or] misleading the jury[.]" Fed. R. Evid. 403. This danger "is especially true with respect to expert

witnesses." *In re Hanford Nuclear Rsrv. Litig.*, 534 F.3d 986, 1016 (9th Cir. 2008); *see also U.S. v. Bolandian*, 771 Fed. Appx. 762, 764 (9th Cir. 2019).

Accordingly, courts must "exclude proffered [expert testimony] under Rules 702 and 403 unless they are convinced that [the testimony] speaks clearly and directly to an issue in dispute in the case, and that it will not mislead the jury." *Daubert II*, 43 F.3d at 1321 n. 17.

## IV.    BARTHWELL'S TESTIMONY MUST BE EXCLUDED IN FULL

Barthwell's opinion must be excluded as unreliable, prejudicial, and confusing under Federal Rules of Evidence 702 and 403 and binding Ninth Circuit precedent.

### A.    Barthwell's Opinion Must Be Excluded As Unreliable

Barthwell's Opinion is unreliable because it was not derived from evidence produced in this case and, even once she provided citations to the record, those citations do not support her opinion. Moreover, Barthwell's report is not based on *any* principles or methods, let alone reliable ones. Each of these issues, by themselves, is sufficient to warrant exclusion but, taken together, unquestionably requires that her testimony be barred.

#### 1.    Barthwell's Opinions Are Not Supported By Documents Produced In this Case

Barthwell admittedly did not rely on **any** evidence produced in this case in forming her opinion:



█████████████████████████████████ Ex. A at 22:11-24.

This testimony reveals the truth about her reports: Barthwell first crafted the conclusions that would support Plaintiffs' allegations and then later "supplemented" her original report by removing citations to irrelevant testimony and shoehorning in tenuous references to the evidentiary record. But that is not allowed. An expert must develop her opinion first based upon "sufficient facts." *W. Parcel Express v. United Parcel Serv. Of Am., Inc.*, 65 F. Supp. 2d 1052, 1060 (N.D. Cal. 1998) ("When expert opinions are not supported by sufficient facts, or when the indisputable record contradicts or otherwise renders the opinions unreasonable, they cannot be relied upon."). Barthwell's admitted failure to rely on any documents produced in this case and her conflicting testimony as to what she did actually review renders her reports unreliable and calls for exclusion of her testimony. *See* Fed. R. Evid. 702; *see also Guidroz-Brault v. Mo. Pac. R.R. Co.*, 254 F.3d 825, 830-31 (9th Cir. 2001) (finding it proper for court to exclude expert opinion that is "not sufficiently founded on facts.").

Barthwell's original report confirms that she did not rely upon witness testimony from this case because "Plaintiffs counsel had not supplied [her] with any depositions taken in th[e] action as of the time [she] prepared" the report, even though all but two had been completed at the time she issued her report. Ex. B at 20. Instead, Barthwell's original report represents that she relied upon "Defendants' witness testimony in the *RJ* action"[1] in forming her understanding of the facts underlying her original opinion. *Id.* Because *RJ* is entirely unrelated to this case – it involves different plaintiffs, providers, and includes RICO and class action allegations – and because her use of the confidential *RJ* deposition transcripts and exhibits violated the *RJ* Protective Order[2], Barthwell later

---

[1] *RJ v. Cigna Behavioral Health, Inc. et al.*, No. 20-cv-02255-NC (N.D. Cal.) ("*RJ*").
[2] *R.J. v. Cigna, et al.*, No. 4:20-cv-02255-EJD, Dkt. 22 (Protective Order) (mandating that confidential *RJ* information and documents produced in that case be used "only for prosecuting, defending, or attempting to settle [that] litigation"). Courts in the Ninth Circuit routinely exclude testimony of experts who violated Protective Orders.

1   amended her report to state that she did not rely on any *RJ* materials and has since
2   confirmed this position during her deposition. *See* Ex. C at 36; *see also* Ex. A at 21:4-
3   9.   While this is directly contradicted by her express statements in the original report
4   ("I reviewed and/or analyzed the following items provided by Arnall Golden Gregory
5   LLP" (listing *RJ* deposition transcripts) Ex. B at 4 and "The following facts are drawn
6   from these documents and the Defendants' witness testimony in the *RJ* action." *Id.* at
7   21), it reflects that Barthwell relied not on the evidentiary record, such as witness
8   deposition testimony, in forming her original opinions, but instead relied upon her
9   ████████████████       Ex. A at 22:17-18.

10      Yet, Barthwell's substantive opinions did not change when she purportedly did
11   review the records produced in this case. *See* Ex. D.  The supplemental report adds, for
12   the first time, citations to documents and testimony produced in this case, but these cites
13   are plainly meant to prop up her opinions, and could not have formed the factual basis
14   for them.   For example, in Barthwell's reports she states that ████████████████
15   ██████████████████████████████████████████████████████
16   ██████████████████████████████████████████████████████
17   ████████████████  *See, e.g.,* Ex. D at 65.  When asked what her evidentiary basis was
18   for ██████████████████████████████████████████  she
19   testified that she used ████████████████████████  Ex. A at 100:14-
20   22. But Barthwell made this representation in her original report *before* she purportedly
21   reviewed the deposition transcripts in this case.  And, even if she wanted to, she could
22   not have reviewed the deposition testimony of Terri Cothron in order to provide her
23   original opinion because Ms. Cothron was not deposed until March 31, 2023, the day
24   *after* Barthwell submitted her original report, and even reviewing the Cothron testimony
25   that Barthwell cites shows that it has nothing to do with SNFs.  Even worse, Barthwell
26   is wrong.  Cigna does not—and has never—cross-walked to SNFs.

27   _____

28   *See, e.g., Avago Techs., Inc. v. IPtronics, Inc.,* 2015 WL 3640626 (N.D. Cal. June 11, 2015).

Likewise, Barthwell draws conclusions as to all patients at issue in this case, including that "Plaintiffs provided medically necessary, preauthorized, and covered SUD treatment and laboratory services to 508 of Cigna's insured members" (Ex. B at 20), but she literally could not have reviewed the records for each of the patients at issue in this case.  By agreement, the discovery patient pool is only 106 patients, compared to the 508 patients at issue in this case, and she admits that she only purportedly reviewed records relating to a small subset of the discovery patient pool.  *See* Ex. A at 57:24-58:7.  Expert testimony must be supported by sufficient facts or data.  Fed. R. Evid. 702.  Barthwell clearly and admittedly did not rely on evidence produced in this case in forming her opinion, much less the "important, objective proof" required to support admissible testimony.  *See Murray*, 870 F.3d at 923.

### 2.    Barthwell's Opinion Is Not Based On *Any* Principles Or Methods

Barthwell's report does not refer to, let alone analyze or discuss, any studies, analysis, principles, or methods supporting her opinions.  By failing to provide the underlying methodology used to reach her findings, Barthwell's report does not satisfy even the bare minimum requirements for admissibility set forth by Federal Rule of Evidence 702.  *See Daubert*, 509 U.S. at 590; *see also U. S. v. Hermanek*, 289 F.3d 1076, 1094 (9th Cir. 2002) (before testimony can be admitted the expert must explain how their conclusion is supported by evidence or data); *see also Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993).  Such unsupported speculation must be excluded.  *Id.*

Barthwell makes broad, conclusory statements, that, for example, the "Medicare data purchased by Cigna and MultiPlan" produced "arbitrary, unreliable, and unjust reimbursement rates for Plaintiffs' SUD services that are a nominal percentage of the charges" and that Cigna "under-reimburse[d] . . . Plaintiffs' claims." Ex. B at 25.  But she produced no analysis reflecting how the reimbursement rates were arbitrary or unreliable.  *See* Exs. B & C.  She did not review Medicare data.  *Id.*  She did not review

9

reimbursement rates of other insurers for similar charges. *Id.* She did not review any claims data for providers of SUD services in the relevant geographic area. *Id.* at 106:8-107:6. Barthwell also necessarily concludes that Plaintiffs' billed charges were reasonable, such that they were entitled to more than a "nominal percentage of . . . charges." Ex. B at 25. But again, Barthwell's report contains no discernable analysis of Plaintiffs' claims data. She did not consider amounts billed by similar, SUD service providers in the geographic area except for a single example of a treatment management company for which she was the corporate medical director and admits that her ███████ ████████████████████████████████████████████████████████████ ████████████████████ Ex. A at 159:3-24.

Even if she had analyzed the "usual and customary" amounts paid to Plaintiffs or other providers in the geographic area, it would not matter. The only relevant question in this action is whether the amounts Cigna paid to Plaintiffs were consistent with the plan terms. *See Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1088 (9th Cir. 1999) (examining insurers' benefit determinations actions against plan terms). Again, while Barthwell claims she reviewed medical-related documents, she did not review the actual plan documents produced in this case, which would be required to analyze the plan terms. Ex. A at 34:7-16. Yet she alleges that ████████████████████████████ ██████████████████ Ex. B at 25. Barthwell does not explain which SPDs she reviewed or present any analysis of how the *specific* amounts charged by Plaintiffs and reflected in the claims data should have been reimbursed under the plan terms. Ex. A at 34:7-16; Exs. B & C.

Even where the reports suggest that Barthwell reviewed some claims data in order to assess Cigna's and MultiPlan's cost containment fees, she provides only one example of a single instance where Cigna's and MultiPlan's fees were higher than the amounts paid to the provider. Ex. B at 26. She does not describe any method or procedure used to assess all the fees at issue in this case, which would be required here because the fees earned vary from plan to plan and from claim to claim. Barthwell also did not analyze

the claims data, or any other information which would allow her to conclude that the fees earned by Cigna and MultiPlan █████████████████████████ ███████████████████ Ex B at 25. Indeed, as discussed below, this is unsupported legal conclusion, not evidence-based expert opinion.

Moreover, Barthwell clearly copied and pasted sections of a report she submitted in a *completely different case filed against UnitedHealthcare* into her supplemental report submitted in this case. Ex. A at 29:25-30:21 (admitting she used the United report to help develop her report submitted in this case); 33:9-19 (conceding she copied and pasted █████████████████████████████ Though Barthwell initially claimed that she wrote the report from scratch (Ex. A at 29:22-24), she later conceded that she copied and pasted portions of expert reports used in prior cases to put together the report submitted in this case (Ex. A at 30:4-21, 33:3-19). In addition to the fact that she admitted she did as much, there are numerous typos and factual errors in her report which point to the fact that she did not prepare the reports solely for this case. For example, footnote one at the bottom of page one in her supplemental report refers to "band 1" but there is no "band 1" in this case—this is how the United case referred to certain groups of Plaintiffs.[3] Likewise, in the "materials reviewed" section under the heading "*RJ v. Cigna*", Barthwell lists a number of *RJ* deposition transcripts and seven declarations filed by Plaintiffs in their action against United, which were presumably included in error.

But one only needs to compare the three opinions she proffered in United to the ones submitted in this case to see that Barthwell simply switched "Cigna" for "United" and provided essentially the same report.

---

[3] *In re Out-of-Network Substance Use Disorder Claims Against UnitedHealthcare*, No. 8:19-cv-02075 JVS (DFMx) (C.D. Cal. 2019), ECF No. 307 (Order Regarding Motion to Exclude Expert Opinion and Testimony) at 1 ("'Providers' refers to the Band 1 Plaintiffs, as designated in the Court's Case Management Order").

MOTION TO EXCLUDE A. BARTHWELL
CASE NO. 8:20-CV-0269-DOC-JDE

| Excerpts from Cigna Expert Report (Ex. B) | Excerpts from *In re OON SUD Claims Against United Healthcare*[4] |
|---|---|
| "Despite Cigna's payment obligations under the sample patients' SPDs, Cigna and MultiPlan used biased data systems, administrative burdens, and deceptive practices to avoid paying, or to pay unreasonably low reimbursement rates for Plaintiffs' OON SUD services." *Id.* at 27. | "Despite United's payment obligations under its plan documents, United and MultiPlan used biased data systems, administrative burdens, and deceptive practices to avoid paying, or pay unreasonably low reimbursement rates for out of network substance use disorder services." |
| "Cigna implemented policies and systematic practices that emphasized profits over patients and resulted in under-reimbursement of Plaintiffs' claims, with Cigna instead paying Plaintiffs an arbitrary, nominal percentage of the charges, far below a reasonable and customary rate." *Id.* at 24. | "United engaged in unfair, unreasonable, illegal, fraudulent, and systematic practices-with an emphasis on profits over patients-and paid Plaintiffs a nominal percentage of the covered charges." |
| "There is no Medicare rate for inpatient or outpatient SUD services billed by residential treatment facilities such as Plaintiffs, and ███████████████ ███████████████████████ ██████████ is arbitrary and unreasonable." *Id.* at 26. | "There is no Medicare rate for inpatient or outpatient substance use disorder services billed by residential treatment facilities such as Plaintiffs, and United's substitution of a bundled per diem Medicare rate for an entirely different service furnished by an entirely different type of facility is an unfair business practice that violates federal and state mental health parity laws." |

The only reason there is any difference between Barthwell's opinions in this case and United is because the United court excluded certain portions of her opinions as improper legal conclusion. *Id.* at 8. For example, referring to United opinion 1, the court said "[t]he first half of this opinion is rife with legal conclusions and will be excluded. Only the portion not containing a legal conclusion, namely that "an emphasis on profits over patients – and paid Plaintiffs a nominal percentage of the covered charges" will be

---

[4] *Id.*

admitted." *Id.* The remaining language is almost identical to what was submitted in this case.

Barthwell must explain her analysis in sufficient detail to allow the court to assess its validity and reliability, even if she just copied and pasted that analysis from another case.[5] *Daubert II*, 43 F.3d at 1319 (*citing U.S. v. Rincon*, 28 F.3d 921, 924 (9th Cir. 1994) (excluding expert evidence because none of the research was submitted to the court or described in sufficient detail that the court could determine the validity of the research under *Daubert*)). "[U]nadorned assertions" and broad conclusions, without sufficient explanation of the underlying methodology or analysis used to reach such conclusions will not be allowed. *Id*. Where, as here, the materials submitted by Barthwell "neither explain the methodology [she] followed to reach [her] conclusions nor point to any external source to validate that methodology. We've been presented with only the experts' qualifications, [her] conclusions and [her] assurances of reliability." *Id.* Under *Daubert*, and Federal Rule of Evidence 702, that is not enough. *See Claar v. Burlington N.R.R. Co.*, 29 F.3d 499, 502 (9th Cir. 1994) (affirming exclusion of expert opinions when experts failed to explain reasoning and methods underlying their conclusions).

Barthwell has not provided a shred of analysis that would support her testimony. "An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." *Mid-State Fertilizer Co. v. Exchange Nat. Bank of Chicago*, 877 F.2d 1333, 1339 (7th Cir. 1989). To be anything other than inadmissible, unsupported speculation, expert opinion must be underpinned by *some* principle, method, or analysis. *Hermanek*, 289 F.3d at 10094. Barthwell's testimony fails this threshold requirement.

---

[5] To the extent Barthwell conducted analysis but declined to include such analysis in her report, that is also improper. She is required to set forth all relevant analysis in her report so that it can be properly scrutinized. *Daubert II*, 43 F.3d at 1319.

## B.   Barthwell's Opinion Must Also Be Excluded Because It Is Prejudicial And Confusing

Rule 403 provides a second, independent reason to exclude Barthwell's testimony: it unfairly prejudices Cigna, confuses the issues, and misleads the jury. The Court has a duty to balance the overall prejudice and confusion an expert might cause against whatever probative value her testimony might provide. *In re Hanford*, 534 F.3d at 1016. The Court should not "look [] too narrowly at each individual consideration" about an expert's testimony, but should "tak[e] into account the broader picture of the expert's overall methodology." *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1233 (9th Cir. 2017).

*First,* as discussed above, Barthwell's failure to rely upon any documents produced in this case in developing her opinion and the lack of any discernable analysis means that her broad, sweeping conclusions are nothing more than speculation. *Supra*, VI.A.1-VI.A.2. She has reached the point where "there is simply too great an analytical gap between the data and the opinion offered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). "Conclusions and methodology are not entirely distinct from one another" (*id.*), her opinion must be grounded in fact. Such speculative, misleading, and confusing testimony must be excluded under Rule 403.

*Second*, Barthwell's testimony is confusing and prejudicial because it repeatedly references the "opioid epidemic" and "drug poisoning crisis" and implies that, by purportedly under-reimbursing Plaintiffs, *Cigna is contributing to this national crisis*. This case involves the amounts Cigna paid to Plaintiffs for SUD treatment services. Policy considerations related to the opioid crisis have no bearing on whether Cigna appropriately reimbursed Plaintiffs. And it goes without saying that Cigna is in no way responsible for the opioid crisis.

In addition to spending the first ten pages of her report recounting various policy issues related to opioid abuse, the actual "opinion" portion of her report also states, for example, that:

████████████████████████████████ at a time when a million Americans have died from drug poisoning. **Cigna should have been implementing initiatives and strategies to increase coverage and access to SUD treatment**." (Ex. B at 25).

Next Barthwell describes Cigna's drug testing policy, which caps the number of codes which may be billed per date of service, and then implies that such testing limits are contributing to deaths from drug poisonings:

> "At a time when more than 101,750 Americans are dying of drug poisonings, and more than 68 percent of those poisonings involve synthetic opioids like illegal fentanyl analogs, it is often medically necessary to conduct frequent definitive drug testing for many patients in the active treatment phase of SUD management." (Ex. B at 29).

There is no need to weigh whether this type of testimony is helpful – it is only prejudicial and serves no probative value whatsoever and courts routinely exclude this type of expert testimony. *See, e.g., United States v. Valentino*, 2023 U.S. Dist. LEXIS 10756, at 45 (E.D. Pa. Jan. 23, 2023) ("The Court properly precluded [expert's] testimony about chronic pain and the opioid crisis affecting millions of Americans because it was irrelevant to the case, would inflame the jurors' passions in discussing the opioid crisis, risked confusing the issues to the jury, and would create a side trial about issues immaterial to the case."). Barthwell's report is replete with these types of prejudicial statements.

Courts regularly exclude expert reports that fail Rule 403's balancing test. *See, e.g., Harner v. USAA Gen. Indem. Co.*, 590 F. Supp. 3d 1217, 1230 (S.D. Cal. 2022) (holding expert testimony would be "irrelevant and unduly prejudicial"); *see also Waymo LLC v. Uber Techs., Inc.*, 2017 WL 5148390, at *5 (N.D. Cal. Nov. 6, 2017) ("[I]ts danger of confusing the issues, misleading the jury, and causing unfair prejudice substantially outweighs the probative value[.]"). This Court should do the same with

MOTION TO EXCLUDE A. BARTHWELL
CASE NO. 8:20-CV-0269-DOC-JDE

1    Barthwell's testimony.

2        **C.    Alternatively, Portions of Barthwell's Report Must Also Be Excluded**

3        At a minimum, portions of Barthwell's report must be excluded as untimely,

4    outside of her area of expertise, legal opinion, and/or improper factual allegations.

5        **1.    The Supplemental Portions of Barthwell's Report Must Be Excluded As Untimely**

6

7        Plaintiffs served Barthwell's supplemental report on July 10, a week after the

8    deadline to serve supplemental expert testimony, and *less than two hours before her*

9    *deposition was scheduled to begin*.[6]   Barthwell's supplemental report adds **19 pages**

10   and nearly doubles her original report.  *See* Ex. D.  Rule 26(e)(2) requires that "[a]ny

11   additions or changes to [an expert's report] must be disclosed by the time the party's

12   pretrial disclosures . . . are due."  The parties' pretrial disclosures were due on July 3,

13   2023.  Failure to timely supplement warrants exclusion of the late additions under Rule

14   37.  Rule 37's exclusion sanction is "self-executing" and "automatic" because it is

15   meant to provide parties with "a strong inducement" for parties to comply with Rule

16   26.  *Hoffman v. Constr. Protective Servs., Inc.*, 541 F.3d 1175, 1180 (9th Cir. 2008) *as*

17   *amended* (Sept. 16, 2008); *see also Ollier*, 768 F.3d at 861 (This exclusion sanction is

18   "'intended to put teeth into the mandatory . . . disclosure requirements' of Rule 26(a)

19   and (e).") (internal citations omitted).

20       There is no justification for Plaintiffs' delay in disclosing Barthwell's

21   supplemental report.  All the material added to her report is based on documents and

22   evidence that has been available for months now, most of which was available when

23   she issued her original report.  Accordingly, the supplemental portions of Barthwell's

24

25   _____

[6] Plaintiffs' submission of an untimely supplemental report, produced less than two hours before Barthwell's deposition, is consistent with Plaintiffs' practice of not complying with this Court's rules.  Plaintiffs. Practice of not complying with this Court's rules is further reflected by Plaintiffs' supplementation of their Rule 26(a) disclosures well after the close of discovery, and which identified 30 new fact witnesses. *See* Cigna's Motion in Limine #2: to Exclude Plaintiffs' Untimely Disclosed Witnesses; *see also* ECF No. 266 (Report & Recommendation No. 12 finding Plaintiffs violated the Protective Order by disclosing Cigna's AEO information and documents).

report—identified by the redline attached as Exhibit D must be stricken as untimely.

### 2. Barthwell's Opinion Regarding Insurance-Related Issues Must Be Excluded As Outside Of Her Expertise

Barthwell does not have any qualifications which would allow her to offer testimony on insurance-related issues. *See* Ex. A at 46:6-8. An expert may only provide opinion as to issues for which she has sufficient qualifications ("knowledge, skill, experience, training, or education"). Fed. R. Evid. 702. Where, as here, an expert's opinion extends beyond their area of expertise, it must be excluded. *See Avila v. Willits Env't. Remediation Tr.*, 633 F.3d 828 839 (9th Cir. 2011); *see also Apple, Inc. v. Samsung Elecs. Co.*, 2013 U.S. Dist. LEXIS 160188, at *42-43 (N.D. Cal. Nov. 6, 2013) (excluding expert testimony where she "expressly admitted in her deposition" that she lacked relevant expertise).

Barthwell is a medical doctor with experience practicing Addiction Medicine, including SUD treatment and drug testing (Ex. B at 1-4), but she admits that she has no education, experience, or training in the business of insurance, including insurance claims administration, interpretation of insurance policies, or the processing and editing of claims for services. *See* Ex. A at 46:6-8. Nonetheless, Barthwell offers opinions related to Cigna's policies, insurance administration, and claims editing processes. For example, Barthwell opines that:

- Cigna "[I]mplemented policies and systemic practices that emphasized profits over patients" (Ex. B at 25),



*First,* these are not opinion, but rather generic unsubstantiated criticisms of Cigna's policies and practices. *Second,* even if they could be characterized as "opinions",

Barthwell admittedly lacks the requisite expertise to offer opinion on these issues. Any testimony as to issues of insurance policies, administration, and claims editing must be excluded.

### 3. All Legal Opinion Must Be Stricken From Barthwell's Report

Where, as here, an expert offers a legal opinion or conclusion on an ultimate issue, such testimony must be excluded because "offering legal conclusion testimony invades the province of the trial judge." *Whitewater W. Indus. v. Pac. Surf Designs, Inc.*, 2019 WL 4452986, at *2 (S.D. Cal. Sept. 16, 2019) (citation omitted); *see also Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1059 (9th Cir. 2008). "'As a corollary of this principle, expert conclusions which do not inform the jury about the facts but which merely function like jury instructions,' are impermissible." *Whitewater W. Indus.*, 2019 WL 4452986, at *3 (citation omitted); *see Hangarter v. Provident Life & Accident Ins. Co.,* 373 F.3d 998, 1016 (9th Cir. 2004). Barthwell offers numerous legal conclusions, including the following, which must be stricken as improper legal opinion (and, in some cases, as discussed below, improper factual conclusions):

- "*Cigna confirmed, represented, promised, and warranted* Plaintiffs through the required verification of benefits process that each of the insureds and their respective OON SUD treatments and services were covered by health insurance plans, issued, managed, or administered by Cigna and MultiPlan." Ex. B at 20. (emphasis added).
- "In *reliance on these assignments of benefits and Cigna's representations*, Plaintiffs rendered treatment to the patients." *Id.* (emphasis added)
- "Cigna and MultiPlan are compensated by the amount of money they save the employers (plan sponsors), which *provides a financial incentive* to deny coverage of treatment services and under-pay providers like the Plaintiffs." *Id.* at 21. (emphasis added).
- █████████████████████████████████████████████████
- "*It appears more likely than not that Cigna and MultiPlan arrived at these reimbursement rates not in an effort to fairly determine the R&C rate, but rather to increase their own profits.*" *Id.* (emphasis added).
- █████████████████████████████████████████████████

18

Expert testimony, like this, which amounts to legal conclusion, is inadmissible because it does not assist the trier of fact, and allowing it runs the risk that the jury will pay unwarranted deference to the witness's expertise. *See Humphreys v. Regents of the Univ. of Cal.*, 2006 U.S. Dist. LEXIS 47822, at *5-6 (N.D. Cal., July 6, 2006). Accordingly, all legal opinion must be stricken from Barthwell's report.

### 4. Barthwell May Not Usurp The Role Of The Factfinder

Barthwell's report also contains numerous assertions of fact for which she has no independent knowledge and which only serve to displace the role of the factfinder. Rule 702 allows an expert to assist the factfinder in understanding issues of fact, but it does not allow her to direct the trier of fact as to what conclusion to reach. Fed. R. Evid. 702. Moreover, expert testimony is improper to the extent it relies on an expert's interpretation of facts and where such testimony "would probably be elicited from percipient witnesses." *See U. S. v. Flores*, 2014 U.S. Dist. LEXIS 184440, at *3-4 (N.D. Cal. June 16, 2014); *see also Jinro Am. Inc. v. Secure Invs., Inc.*, 266 F.3d 993, 1004 (9th Cir. 2001) *opinion amended on denial of reh'g*, 272 F.3d 1289 (9th Cir. 2001). To do otherwise usurps the role of the factfinder.

Barthwell is not a percipient witness. She has no direct knowledge of the facts of this case other than what has been presented to her in Plaintiffs' pleadings or what she has gleaned from the limited patient records she reviewed. Plaintiffs may not use her testimony to add a veneer of credibility to unsupported factual allegations.

For example, Barthwell's report recites the allegations contained in Plaintiffs' Second Amended Complaint as if they are truth—including statements like, "Before rendering treatment to the patients, Plaintiffs obtained written assignments of benefits from each of the patients" (Ex. B at 20), "Cigna knew that Plaintiffs were treating and providing services were advised and fully aware of Plaintiffs' charges for the treatment and services rendered" (*id.*), and "Cigna changed its reimbursement policies in or around 2015 to discontinue reimbursing MRC I and MRC II OON SUD claims with an R&C rate (on average 50-70% of Plaintiffs' billed charges) . . ." (Ex. B at 24).

An expert's role is to assist the trier of fact by providing information, not to be a persuasive advocate for a particular set of unproven facts. Courts routinely exclude "recitations of fact" included in expert reports. *U.S. v. Tamman*, 782 F.3d 543, 552-53 (9th Cir. 2015) (upholding district court's finding that expert testimony which contained only a "recitation of facts and [a] legal conclusion" was improper).

Barthwell also provides her interpretation of Cigna's internal communications as if they are fact, not simply a subjective assessment of their meaning. For example, Barthwell states that



(Ex. B at 28-9).

This is not expert opinion, this is subjective interpretation of documents produced in this action and it is entirely inappropriate. The evidence produced in this action speaks for itself. Barthwell's subjective interpretation of these documents requires no "specialized knowledge" and therefore only serves to "muddy the uncomplicated facts with [her] façade of expertise. *Waymo LLC*, 2017 WL 5148390, at *6. Indeed, it is "improper for [an expert] to simply rehash otherwise admissible evidence about which [s]he has no personal knowledge." *U. S. v. Pac. Gas & Elec. Co.*, 2016 WL 1640462, at *2 (N.D. Cal. Apr. 26, 2016) (citations and quotations omitted). In reciting Plaintiffs'

1   allegations from the Second Amended Complaint and providing her subjective
2   interpretation of documents as if it was fact, Barthwell usurps the role of the fact finder
3   whose responsibility it is to interpret these documents and reach their own conclusions.
4   Accordingly, the Court must strike these portions of Barthwell's report.

5   **V.   CONCLUSION**

6   For each of the reasons explained above, Barthwell's report must be excluded in full
7   and in part.

8

9   Dated: July 13, 2023                    Respectfully submitted,

10                                          COOLEY LLP

11                                          */s/ Mazda K. Antia*
                                            Mazda K. Antia
12

13                                          *Attorneys for Defendants and Counterclaim*
                                            *Plaintiffs*
14                                          *Cigna Corporation, Cigna Health and Life*
                                            *Insurance Co., Connecticut General Life*
15                                          *Insurance Co., Cigna Behavioral Health,*
                                            *Inc., Cigna Behavioral Health of California,*
16                                          *Inc., Cigna Health Management, Inc., and*
                                            *Cigna Healthcare of California, Inc.*
17

18

19

20

21

22

23

24

25

26

27

28