# ECF 251-6

# EXHIBIT A-6

<u>Report of Andrea G. Barthwell, MD, DFASAM</u>

Submitted March 30, 2023
in the case of
*TML RECOVERY, LCC, et al. v. Cigna Corporation, et al.*
Case No.: 8:20-cv-0269-DOC-JDE
in the
United States District Court for the Central District of California

## I.      Introduction

Upon the request of Richard T. Collins, Esq., of Arnall Golden Gregory LLP, counsel for the Plaintiffs,[1] I have provided in this report a broad description of the substance use disorder (SUD), commonly referred to as addiction, treatment delivery systems in the United States. Additionally, I have reviewed numerous documents pertinent to the civil action described above and provided my opinion on the clinical and related practices the Plaintiffs follow in providing SUD treatment services.

## II.     Qualifications

I have practiced Addiction Medicine since 1985, am certified by the American Board of Addiction Medicine, and am a Distinguished Fellow in the American Society of Addiction Medicine (ASAM). I have employed and overseen many forms of care used to treat alcoholism and other addictions. I have conducted research on the treatment of individuals in the office-based setting and on aggressive case management and its effect on treatment retention and outcomes.

I am a co-author of a chapter on the different modalities of SUD treatment in *Principles of Addiction Medicine*, ASAM's textbook. I was a reviewer of the first edition of *Principles of Effective Treatment*, the research-based guide on addiction treatment by the National Institute on Drug Abuse (NIDA). I have served on the  Department of Health and Human Services' National Institute of Health (NIH) National Advisory Committees of the National Institute on Alcoholism and Alcohol Abuse (NIAAA), NIDA, and the Substance Abuse and Mental Health Administration (SAMHSA) Center for Substance Abuse Treatment (CSAT).

In Illinois, I was the Medical Director of an organization contracting with the State of Illinois during the shift from grant-in-aid funding to fee-for-service funding using the adoption of ASAM's Patient Placement Criteria (PPC)[2] as the impetus for the shift.  In that position I helped develop a number of services our organization developed and sold to third party payers in publicly-funded centers that were created and funded by CSAT's then forerunner, "the Office of

---

[1] By "Plaintiffs," I refer to those in Band 1 who I understand include:   12 South, LLC, Addiction Health Alliance, LLC, DR Recovery Encinitas, LLC, MMR Services, LLC, TML Recovery, LLC, Woman's Recovery Center, LLC, Pacific Palms Recovery, LLC, Southern California Recovery Centers Oceanside, LCC, and Southern California Addiction Center, Inc.

[2] The PPC is a system that provides separate placement criteria for adolescents and adults to create comprehensive and individualized treatment plans.

1

Treatment Improvement (OTI), a non-regulatory agency of the Federal Government intended to improve the quality of drug addiction treatment[3] Substance Abuse Prevention and Treatment Block Grant (SABG).  The SABG program provides funds to all 50 states, the District of Columbia, Puerto Rico, the U.S. Virgin Islands, 6 Pacific jurisdictions, and 1 tribal entity to prevent and treat substance abuse.

The demand for space in programs that was intended to provide SUD services and care to the indigent rose sharply during the early 1980s, along with a proliferation of programs in hospitals and free-standing residential centers developed by not-for-profit, compassionate  organizations, such as the Betty Ford Center, as the recognition of SUD and its treatment grew in the public eye.  The publicly-funded and subsidized system of care across the country has long been recognized as a safety net for all individuals, even those with employee provided insurance benefits.  The services developed for third-party payers within the "indigent and entitlement public sector" were highly sought after by insured individuals for a number of reasons.  The third-party payer practice of denying coverage or requiring failure at a lower level of care than prescribed (step-coverage) encouraged individuals who might seek care at a private philanthropic, not-for-profit free-standing program or hospital intended for the insured to seek the assistance of the public programs.  Deductibles and co-pays at the more expensive private facilities left individuals to make the choice to deny themselves the burden of future indebtedness against their own interests.  Failure to ensure adequate numbers and types of providers and services accessible in the private sector forced individuals into the public sector for care, lest they face long waits, costly travel to "so-called" nationally recognized centers, or no access and potential loss of life due to the long waiting lists and delays in ability to start treatment. In the early 1980s, waiting  lists of up to 15% of those actively seeking treatment were common.

While the U.S. government doubled funding for the SABG programs, private payers induced public programs to develop time-limited services for the insured rather than develop more private services to meet the increasing demand for treatment as individuals responded to public encouragement to stop drinking and the fear of AIDS to stop using drugs.  These pressures expanded due to increased awareness driven by the proliferation of programs such as Mothers Against Drunk Driving (MADD); Students Against Drunk driving (SADD); the National Youth Anti-Drug Campaign and its frying pan commercials; private advertising campaigns supported by programs such as the hospital based "Care Centers;" high profile celebrity open acknowledgments of treatment, recovery, and relapse- including the travails of a First Lady of the United States who went on to open a private facility, the Betty Ford Center; and even a monthly themed show on "Oprah," on which I appeared.  treatment    Additionally, as a consultant I trained state employees to use ASAM's PPC in annual compliance visits and post-treatment reviews.

From 2002 to 2004, I served as the Deputy Director of Demand Reduction in the White House Office of National Drug Control Policy (ONDCP). In this U.S. Senate-confirmed position, I traveled extensively, visiting programs in almost every state. I reviewed and certified the budget of the Center for Substance Abuse Treatment (CSAT), a federal agency within the Substance Abuse and Mental Health Service Administration (SAMHSA).  In addition to the SABG

---

[3] https://www.tandfonline.com/doi/abs/10.1080/02791072.1991.10472229?journalCode=ujpd20

2

program, I gained knowledge of a number of state financing models. At ONDCP, I also wrote the plan for President George W. Bush's national expansion of addiction treatment, known as, *Access to Recovery*. This initiative sought to provide an additional $1.5 billion of treatment support to states through the SABG program.  The rationale for this expansion was to close the "treatment gap," consisting of those individuals who recognized that they had an SUD and sought treatment but were unable to access it. The Bush Administration also proposed doubling the number of Drug Courts, a program that helped individuals access treatment under the supervision of a Judge and a treatment team in the Administrative Offices of the Court, using funds provided by the Department of Justice, and foregoing treatment covered by their individual or family insurance plan.

In addition to providing assistance to individuals who work for self-insured employers access treatment for all chronic and severe mental health problems, including SUD, I serve as an expert and consultant for the Department of Labor (DOL) and help their employees understand and identify variance between behavioral health and medical/surgical care that violates  the Mental Health Parity and Addiction Equity Act (MHPAEA).  The MHPAEA's purpose is to promote equal access to Mental Health(MH)/ SUD treatment by prohibiting disparate coverage limitations and practices that deny coverage for or access to these services. In the DOL's 2022 Mental Health Parity and Addiction Equity Act (MHPAEA) Report to Congress,[4]  the DOL emphasized that its enforcement efforts will focus on two issues that are essential to this case: (1) prior authorization requirements for in-network and out-of-network inpatient services; and (2) out-of-network reimbursement rates (plan methods for determining usual, customary, and reasonable charges).[5] The report highlights instances when insurers failed to comply with MHPAEA's requirements by reimbursing SUD claims at a disproportionately low rate.[6] President Biden, the DOL, and the Department of Health and Human Services continue to make MHPAEA enforcement a top priority because of widespread noncompliance and to protect individuals seeking SUD treatment, as need is at an all-time high.[7]

The Senate Finance Committee's report[8] pointed to another issue relevant to this case – network inadequacy. Finding behavioral healthcare providers who are in-network (INN) with commercial insurers is a challenge and often a barrier for those trying to access care.[9] Studies of individual market plans and Medicare Advantage have found that networks cover a smaller proportion of behavioral health providers than of primary care providers, making it more likely patients will go out-of-network (OON) for behavioral health services.[10] Numerous commenters point to low

---

[4] Dep't of Labor, 2022 MHPAEA Report to Congress, (2022)
https://www.dol.gov/sites/dolgov/files/EBSA/laws-and-regulations/laws/mental-health-parity/report-to-congress-2022-realizing-parity-reducing-stigma-and-raising-awareness.pdf.

[5] *Id.* at 50.

[6] *Id*. at 38.

[7] *Id.* at 3.

[8] See, U.S. Senate Finance Committee Report on Mental Health care in the United States: The Case for Federal Action, (2022)
https://www.finance.senate.gov/imo/media/doc/SFC%20Mental%20Health%20Report%20March%202022.pdf.

[9] *Id.* at 22.

[10] U.S. Department of Health and Human Services, Office of the Assistant Secretary for Planning and Evaluation, New HHS Study Shows 63-Fold Increase in Medicare Telehealth Utilization During the Pandemic, December 2021

commercial health plan reimbursement rates as one reason for limited network participation.[11]

Today, I continue to practice addiction medicine and provide consultative services to an array of treatment programs located in Illinois, Washington, Alaska, California, Pennsylvania, and New York.  My full *curriculum vitae* is attached to this report.

## III.    Materials Reviewed

In preparing this report, I reviewed and analyzed the following items, which I use regularly in the practice of medicine, some of which I co-authored:

- A.G. Barthwell & L.S. Brown, The Treatment of Drug Addiction: An Overview Ch. 24, Principles of Addiction Medicine
- American Psychiatric Association, DSM IVR and DSM V
- The American Society of Addiction Medicine, Definition of Addiction [12]
- The American Society of Addiction Medicine, Patient Placement Criteria for the Treatment of Substance-Related Disorder, Second Edition- Revised (ASAM PPC-2R), Mee-Lee D, ed. Chevy Chase, MD: American Society of Addiction Medicine, 2001. Adult Placement Criteria Levels I- IV (pp. 25-127) and Dimensional Criteria for Adult Detoxification (pp 145-176)
- American Society of Addiction Medicine, ASAM Public Policy Statement on the Relationship between Treatment and Self Help: A Joint Statement of the American Society of Addiction Medicine, the American Academy of Addiction Psychiatry, and the American Psychiatric Association
- A.T. McLellan et al., Drug Dependence, a Chronic Medical Illness: Implications for Treatment, Insurance, and Outcomes Evaluation
- Center for Behavioral Health Statistics and Quality, Results from the 2010 National Survey on Drug Use and Health: Summary of National Findings
- Harold Pollack, 4.8 Million People Uninsured with Drug or Alcohol Problems
- L. Siqueland L & P. Crits-Christoph, Current Developments in Psychosocial Treatments of Alcohol and Substance Abuse
- Nady el-Guebaly, The Meanings of Recovery from Addiction, Evolution and Promises, Addiction Medicine
- National Institute on Drug Abuse, The Principles of Drug Addiction Treatment: A Research-Based Guide
- Scott J. Rein, Executive Brief: Dispelling the Myths of Out-of-Network Billing
- Substance Abuse and Mental Health Services Administration, The ADSS Cost Study: Costs of Substance Abuse Treatment in the Specialty Sector

---

[11] https://www.hhs.gov/about/news/2021/12/03/new-hhs-study-shows-63-fold-increase-in-medicare-telehealthutilization-during-pandemic.html; Mehrotra A et al., The Impact of COVID-19 on Outpatient Visits in 2020: Visits Remained Stable, Despite a Late Surge in Cases, Commonwealth Fund, Feb. 2021 https://doi.org/10.26099/bvhf-e411.

[11] Au-Yeung CM, Blewett LA, Winkelman TN, Increasing Access to Medications for Opioid Use Disorder: Policy Strategies During and After COVID-19 Pandemic, October 2021 https://www.milbank.org/wpcontent/uploads/2021/10/Au-Yeung_Brief_5.pdf.

[12] The American Society of Addiction Medicine. "What Is the Definition of Addiction?" https://www.asam.org/quality-care/definition-of-addiction. (Accessed: January 26, 2023).

- Substance Abuse and Mental Health Service Administration, Medication-Assisted Treatment for Opioid Addiction in Opioid Treatment Programs, TIP 43
- Substance Abuse and Mental Health Services Administration, National Expenditures for Mental Health Services & Substance Abuse Treatment 1986-2009
- Substance Abuse and Mental Health Services Administration, National Household Survey on Drug Use and Health (NSDUH)
- Substance Abuse and Mental Health Services Administration, Analyses of Substance Abuse and Treatment Need Issues
- Substance Abuse and Mental Health Services Administration, The Need for and Receipt of Specialty Treatment
- Substance Abuse and Mental Health Services Administration, Predictors of Substance Abuse Treatment Completion or Transfer to Further Treatment by Service Type, The TEDS Report
- Suzanne Gelber Rinaldo & David W. Rinaldo, Availability Without Accessibility? State Medicaid Coverage and Authorization Requirements for Opioid Dependence Medications
- Thomas J. Force, How to Obtain Increased Reimbursement on Your Out-of-Network Claims
- Websites of the following treatment providers: Betty Ford Center, Caron, Hazelden, Passages Malibu, and Promises
- W.M. Burdon, et al., Differential Effectiveness of Residential Versus Outpatient Aftercare for Parolees from Prison-based Therapeutic Community Treatment Programs
- U.S. Department of Labor's 2022 Mental Parity and Addiction Equity Act Report to Congress
- U.S. Senate Finance Committee Report on Mental Health care in the United States: The Case for Federal Action, (2022)
- U.S. Department of Health and Human Services, Office of the Assistant Secretary for Planning and Evaluation, New HHS Study Shows 63-Fold Increase in Medicare Telehealth Utilization During the Pandemic, December 2021
- Mehrotra A et al., The Impact of COVID-19 on Outpatient Visits in 2020: Visits Remained Stable, Despite a Late Surge in Cases, Commonwealth Fund, Feb. 2021
- Au-Yeung CM, Blewett LA, Winkelman TN, Increasing Access to Medications for Opioid Use Disorder: Policy Strategies During and After COVID-19 Pandemic, October 2021

In addition to the general resource material listed above used in preparation of this report, I reviewed and/or analyzed the following items provided by Arnall Golden Gregory LLP:

**_TML Recovery, LLC v. Cigna Corporation et al._, United States District Court, Central District of California, Case No. 8:20-cv-00269-DOC-JDE**

- Stipulated Protective Order, ECF No. 19
- Consolidated Second Amended Complaint, ECF No. 79

- myCigna - Legal Disclaimer (September 29, 2020)
- Cigna AEO Documents, Cigna_TML00171620, Cigna_TML00171630, Cigna_TML00171649, Cigna_TML00171650, Cigna_TML00171717, Cigna_TML00171719, Cigna_TML00171752, Cigna_TML00171753, Cigna_TML00171756, Cigna_TML00171757, Cigna_TML00171773, Cigna_TML00171774, Cigna_TML00171781, Cigna_TML00171782, Cigna_TML00171784, Cigna_TML00171786, Cigna_TML00172045, Cigna_TML00172046
- Cigna's Claim Report, Volume 12, Cigna_TML00195700-8
- 2015-2016 Standards and Guidelines - Medical Necessity Criteria, Cigna_TML00065727
- 2017-01 Standards and Guidelines - Medical Necessity Criteria, Cigna_TML00065470
- 2018-01 Standards and Guidelines - Medical Necessity Criteria, Cigna_TML00065347
- 2019-01 Standards and Guidelines - Medical Necessity Criteria, Cigna_TML00065848
- 2020-01 Standards and Guidelines - Medical Necessity Criteria, Cigna_TML00065604
- 2020-04 Standards and Guidelines - Medical Necessity Criteria, Cigna_TML00065261
- Intro to ASAM Criteria for Patients and Families, Cigna_TML00065718

- Synopses of patient treatment records and claims administration documents, including Summary Plan Documents, Administrative Service Agreements, Global Agreements, Verification of benefits, claims reports, Patient, Plan and Claims Spreadsheets, Explanation of Benefits, Assignment of Benefits, and other patient specific documents and summaries for the following providers and patients:

  - Addiction Health Alliance patients ███████████████
  - DR Recovery Encinitas patients ████████████
  - MMR Services patients ██████████████████
  - Pacific Palms Recovery patients ██████████████
  - Southern California Addiction Center patients █████████████ ██████
  - Southern California Recovery Center Oceanside patients ██████████ █████
  - TML Recovery patients █████████████████
  - Woman's Recovery Center patients ████████████

- myCigna - Legal Disclaimer (February 21, 2023)
- Skilled Nursing Facility Glossary
- Index of FAIR Health benchmark rates
- Insurance Companies Make Commitment To Address Opioid Crisis, November 9, 2017

6

- Skilled Nursing Facility Glossary

***RJ v. Cigna Behavioral Health, Inc., et al.*, United States District Court, Northern District of California, Case No. 20-cv-02255-NC**

- Stipulated Protective Order, ECF No. 22
- First Amended Complaint, ECF No. 63
- Plaintiff's Motion for Class Certification and Memorandum in Support of Motion, ECF No. 148
- Deposition transcript and exhibits for Cigna witness JoAnne Forrest, dated October 14, 2022
- Deposition transcript and exhibits for MultiPlan witness Sean Crandell, dated October 20, 2022
- Deposition transcript and exhibits for Cigna witness Michael Battistoni, dated October 25, 2022
- Deposition transcript and exhibits for Cigna witness Mario N. Vangeli, dated November 4, 2022
- Deposition transcript and exhibits for Cigna witness Terri Cothron, dated November 8, 2022
- Deposition transcript and exhibits for Cigna witness Jo-Ann Lebel, dated November 29, 2022
- Plaintiffs' Motion for Partial Summary Judgment regarding United's Counterclaim, Addiction Health's Declaration, ECF 145
- Plaintiffs' Motion for Partial Summary Judgment regarding United's Counterclaim, MMR Declaration, ECF 145-4
- Plaintiffs' Motion for Partial Summary Judgment regarding United's Counterclaim, Pacific Palm Recovery's Declaration, ECF 145-5
- Plaintiffs' Motion for Partial Summary Judgment regarding United's Counterclaim, Southern California Addiction Center's Declaration, ECF 145-6
- Plaintiffs' Motion for Partial Summary Judgment regarding United's Counterclaim, TML Recovery's Declaration, ECF 145-7
- Plaintiffs' Motion for Partial Summary Judgment regarding United's Counterclaim, Woman's Recovery Declaration, ECF 145-8
- Plaintiffs' Motion for Partial Summary Judgment regarding United's Counterclaim, DR Recovery's Declaration, ECF 147

***In the Matter of the Certificate of Authority of: Health Net Life Insurance Company*, Insurance Commissioner of the State of California, CDI File No. UPA-2016-00005**

- Order to Show Cause, CDI
- Order to Show Cause Health Net, State of California Insurance Commission

***In the Matter of UnitedHealth Group Incorporated*, State New York Office of the Attorney General, Investigation No. 2008-161**

- Assurance of Discontinuance Under Executive Law § 63(15)

7

**Articles**

- *"What Is the Definition of Addiction?"* The American Society of Addiction Medicine
- Availability Without Accessibility? State Medicaid Coverage and Authorization Requirements for Opioid Dependence Medications, Suzanne Gelber Rinaldo & David W. Rinaldo, American Society of Addiction Medicine (2013)
- "Drug overdoses are costing the U.S. economy $1 trillion a year, government report estimates," CNBC, February 8, 2022
- Michael C. Barnes, et al., Potential Impact of Texas et al v United States on Persons with Substance Use Disorder, ABA Health eSource (Oct. 2018)

**Congressional Reports and Studies**

- Department of Labor, 2022 MHPAEA Report to Congress, (2022)
- U.S. Senate Finance Committee Report on Mental Health Care in the United States: The Case for Federal Action, March 2022
- U.S. Department of Health and Human Services, Office of the Assistant Secretary for Planning and Evaluation, New HHS Study Shows 63-Fold Increase in Medicare Telehealth Utilization During the Pandemic, December 2021
- Increasing Access to Medications for Opioid Use Disorder: Policy Strategies During and After COVID-19 Pandemic, Au-Yeung CM, Blewett LA, Winkelman TN, October 2021
- H.R.-7780-SAP
- Overview of SUD Care Clinical Guidelines, A Resource for States Developing SUD Delivery System Reforms, medicaid.gov
- Medicare Coverage of Substance Abuse Services, CMS MLN Matters SE1604, April 28, 2016 (links in article updated on May 10, 2019)

**Research and Survey Materials**

- The Principles of Drug Addiction Treatment: A Research-Based Guide, National Institute on Drug Abuse
- Results from the 2010 National Survey on Drug Use and Health: Summary of National Findings, Center for Behavioral Health Statistics and Quality
- Status of Federal Funding for Addiction Services, National Association of State Alcohol and Drug Abuse Directors, March 3, 2014
- National Expenditures for Mental Health Services & Substance Abuse Treatment 1986-2009, Substance Abuse and Mental Health Services Administration
- 2020 NSDUH Detailed Tables, Substance Abuse and Mental Health Services Administration
- Principles of Drug Addiction Treatment: A Research-Based Guide 13-14, National Institute on Drug Abuse (3rd ed. 2012)
- "Status of State Medicaid Expansion Decisions: Interactive Map," KFF, published Jan. 31, 2022

## IV.    Background

The following facts support the findings in my opinion.

### A.    Addiction Defined

Addiction is a treatable, chronic medical disease involving complex interactions among brain circuits, genetics, the environment, and an individual's life experiences. People with addiction use substances or engage in behaviors that become compulsive and often continue despite harmful consequences.[13] This is reflected in an individual's pathological pursuit of reward[14] or relief through substance use and other behaviors. Addiction is characterized by:

- Inability to consistently abstain;
- Impairment in behavioral control;
- Craving, or increased "hunger" for drugs or rewarding experiences;
- Diminished recognition of significant problems with one's behaviors and interpersonal relationships; and
- A dysfunctional emotional response.[15]

### B.    Principles of Addiction Treatment

Like other chronic diseases, addiction often involves cycles of relapse and remission, meaning periods of relapse may interrupt spans of remission.[16] Without treatment or engagement in recovery activities, addiction is progressive and can result in disability or premature death.

Extensive data shows that addiction treatment is as effective as most well-accepted treatments for other chronic medical conditions.[17] Three decades of scientific research and clinical practice have yielded a variety of approaches to addiction treatment; the most effective approaches pair the patient's needs with scientifically researched services anticipated to have the highest impact. Treatment programs typically incorporate many components of care, each aimed to address a particular aspect of the illness and its consequences. For instance, specific pharmacologic and psychosocial treatments are frequently combined, which often leads to better treatment retention

---

[13] The American Society of Addiction Medicine. "What Is the Definition of Addiction?" https://www.asam.org/quality-care/definition-of-addiction. (Accessed: January 26, 2023).

[14] Pathologically pursuing reward has multiple components. It is not necessarily the amount of exposure to the reward (e.g., the dosage of a drug) or the frequency or duration of the exposure that is pathological. In the disease of addiction, pursuit of rewards persists, despite life problems that accumulate due to addictive behaviors, even when engagement in the behaviors ceases to be pleasurable. Similarly, in earlier stages of addiction, or even before the outward manifestations of addiction have become apparent, substance use or engagement in addictive behaviors can be an attempt to pursue relief from dysphoria; while in later stages of the disease, engagement in addictive behaviors can persist even though the behavior no longer provides relief.

[15] These five features are not intended to be used as "diagnostic criteria" for determining if addiction is present or not. Although these characteristic features are widely present in most cases of addiction, regardless of the pharmacology of the substance use seen in addiction or the reward that is pathologically pursued, each feature may not be equally prominent in every case. The diagnosis of addiction requires a comprehensive biological, psychological, social and spiritual assessment by a trained and certified professional.

[16] It is also important to recognize that return to drug use or pathological pursuit of rewards is not inevitable.

[17] A.T. McLellan et al., *Drug Dependence, a Chronic Medical Illness: Implications for Treatment, Insurance, and Outcomes Evaluation*, 284 J. OF AM. MED. ASS'N.1689–1695 (2000).

and outcomes.[18]

Below are summaries of some of NIDA's Principles of Effective Treatment:[19]

- Addiction is a complex but treatable disease that affects brain function and behavior.
- No single treatment is appropriate for everyone. Matching treatment settings to an individual's particular problems and needs is critical to his or her ultimate success in returning to productive functioning.
- Treatment must be readily available.
- Effective treatment attends to multiple needs of the individual, not just his or her substance use.
- Remaining in treatment for an adequate period of time is critical. The appropriate duration for an individual depends on the type and degree of the patient's problems and needs. Research indicates that most addicted individuals need at least **three months**[20] in treatment to significantly reduce or stop their drug use and that the best outcomes occur with longer durations of treatment.
- Programs should include strategies to engage and keep patients in treatment because individuals often leave treatment prematurely.
- An individual's treatment and service plan must be assessed continually and modified as necessary to ensure that it meets the individual's changing needs.
- Recovery from drug addiction is a long-term process and frequently requires multiple episodes of treatment. As with other chronic illnesses, relapses to drug abuse can occur and should signal a need for treatment to be reinstated or adjusted.

Treatment works best when it is driven by assessment, buttressed with case management, and completed with follow up care in the community. The treatment plan should address how the patient will achieve and maintain abstinence and improve his or her ability to function physically, socially, and psychologically.[21]

### C.    Treatment Setting

Treatment for substance use and addiction is delivered in many different settings using a variety of behavioral and pharmacological approaches. For instance, treatment may be delivered in outpatient, inpatient, and residential settings. It is important to have outpatient services in every community, intensive outpatient services serving geographic clusters, and geographically dispersed regional and national residential services. Options in various locations are important because people with the severity of problems that require residential treatment may have a

---

[18] L. Siqueland L & P. Crits-Christoph, *Current Developments in Psychosocial Treatments of Alcohol and Substance Abuse*, 1 CURRENT PSYCHIATRY REP. 179–184 (1999).

[19] *The Principles of Drug Addiction Treatment: A Research-Based Guide*, NATIONAL INSTITUTE ON DRUG ABUSE, *available at* http://www.drugabuse.gov/publications/principles-drug-addiction-treatment-research-based-guide-third-edition/drug-addiction-treatment-in-united-states.

[20] Emphasis added.

[21] A.G. Barthwell & L.S. Brown, *The Treatment of Drug Addiction: An Overview* ch. 24, PRINCIPLES OF ADDICTION MEDICINE (Richard K Ries et al. eds., 4th Ed. 2009).

greater tendency to seek treatment away from the complex psychosocial environment in which their problems first developed. Benefits of residential treatment can include a greater sense of safety and security, all-day programming and uninterrupted focus on recovery, fewer hassles of daily living, fewer environmental temptations or triggers to relapse, and the opportunity to build supportive relationships with other people in treatment.

Treatment centers using a 28-day model of care increased during the late 1970s and early 1980s in response to increasing demand, public recognition of treatment's usefulness, and a model of reimbursement for care that supported the growth. Programs with national reputations developed in the late 1990s in response to a need to provide specialty care and a full continuum of care as defined by ASAM. These programs with national reputations attract patients from all over the country, partially because they provide detoxification on-site and have the capacity to manage all patients who arrive for care. Many of these programs have added other regional facilities to their stable of programs[22] to provide alternatives to their flagship programs to meet the needs of geographic regions where many of their patients and former patients reside.

Nationally recognized programs rely on their reputations, referrals from former patients, referrals from interventionists who are familiar with their services, and marketing efforts from national outreach staff. Many target areas that are not served by regional residential centers.

Currently, in the United States, more than 14,500 specialized drug treatment facilities provide counseling, behavioral therapy, medication, case management, and other types of services to persons with SUDs. Some national programs provide niche markets with specific, highly developed services around a master clinician or school of thought. Niche markets include women's services (*e.g.*, Operation PAR in Florida), trauma (*e.g.*, The Refuge in Florida), eating disorders comorbid with SUDs (*e.g.*, Timberline Knolls in Illinois), professionals (*e.g.*, Talbott Recovery in Georgia), hospital extensions (*e.g.*, Pine Grove in Alabama), pain and addictions (*e.g.,* Las Vegas Recovery Center) and luxury programs (*e.g.*, Promises in California). Although specific treatment approaches often are associated with particular treatment settings, a variety of therapeutic interventions or services can be included in any given setting.

Drug abuse and addiction are also treated in physicians' offices and mental health clinics. Regardless of the setting, a variety of professionals, including counselors, physicians, psychiatrists, psychologists, nurses, and social workers, can contribute to effective addiction treatment.

### D.    The ASAM Criteria

*The ASAM Criteria* is the most widely used and comprehensive set of guidelines for placement, continued stay, transfer, or discharge of patients with addiction and co-occurring conditions. Formerly known as the ASAM patient placement criteria, *The ASAM Criteria* is the result of a collaboration that began in the 1980s to define one national set of criteria for providing outcome-oriented and results-based care in the treatment of addiction, originally called the Patient Placement Criteria (PPC).

---

[22] Examples include Caron with programs in Pennsylvania, Texas and Florida; Hazelden with a full continuum of care in Minnesota; and Springbrook in the Northwest.

11

In 1996, the second edition of the PPC was published (PPC-2). The PPC-2 defined six areas or dimensions of assessment.  In 2001, ASAM further revised and again published the criteria as the PPC-2R. Among other things, the PPC-2R provides guidance on specific services (*e.g.*, drug screening, medication compliance, punctuality training, motivational interviewing, etc.), treatment plan reviews, and assessing the patient's response to treatment. It defines the criteria necessary for admission and continued stay in a certain level of care, including the acceptable sources of data (direct interviews and collateral interviews with family, employers, etc.).

Today, many states across the country are using *The ASAM Criteria* as the foundation of their efforts to improve the addiction treatment system. Adolescent and adult treatment plans are developed through a multidimensional patient assessment over five broad levels of treatment that are based on the degree of direct medical management provided, the structure, safety and security provided, and the intensity of treatment services provided.  Some payers have looked to the ASAM Criteria and revised them, without the peer review provided the original Criteria and the multiple revisions, to support denial of services or limitation of services.  Providers may apply a rule that a patient fail at a certain level of care before being matched to one where success may be achieved at the intensity and for the time needed to bring about substantive change in the patient's life to support recovery.  Given the risk attendant to the use of illicit substances and the drug poisoning crisis, commonly referred to as the opioid epidemic, the practice of failure at a too low level of care is all too often, sadly, associated with death or permanent disability.

The current ASAM Criteria assess:

- **Dimension 1** - Acute Intoxication and/or Withdrawal Potential: Exploring an individual's past and current experiences of substance use and withdrawal.  It helps to predict the need for medication to manage withdrawal and conditions under which medical care is provided.
- **Dimension 2** - Biomedical Conditions and Complications: Exploring and individual's health history and current physical health needs.  It helps predict the need for admission into medical-surgical beds prior to or concurrent with the onset of addiction care. Additionally, it suggests the level of difficulty in managing medical care while engaged in addiction care.
- **Dimension 3** - Emotional, Behavioral, or Cognitive Conditions and Complications:  Exploring an individual's mental health history and current cognitive and mental health needs.  It helps to predict the need for locked psychiatric units if there is imminent threat to self or others. If a psychiatric unit is not required, it addresses co-occurring emotional and behavior disorders that can complicate an individual's ability to engage in addiction care (*e.g.*, anxiety disorders making group participation difficult, depressive states that interfere with motivation to travel to treatment, etc.).
- **Dimension 4** - Readiness to Change: Exploring and individual's readiness for and interest in changing and reviews patient insight and compliance with directions.
- **Dimension 5** - Relapse, Continued Use, or Continued Problem Potential: Exploring and individual's unique needs that influence their risk for relapse or continued use.  It reviews skills acquisition and symptomology that interferes with intentions.

- **Dimension 6** – Recovering/ Living Environment: Exploring and individual's recovery or living situation, and the people and places that can support or hinder their recovery.  It reviews the structure or safety available to the individual to support the intention to resist use.

The ASAM Criteria also introduced more specific detail in the levels of care. The major levels of care are as follows:

- Level 0.5, Early Intervention
- Level 1, Outpatient Services
- Level 2.1, Intensive Outpatient Services
- Level 2.5, Partial Hospitalization
- Level 3.1 Clinical Managed Low-Intensity Residential Services
- Level 3.3, Clinically Managed Population-Specific High-Intensity Residential Services
- Level 3.5, Clinically Managed High-Intensity Residential Services
- Level 3.7, Medically Monitored Intensive Inpatient Services
- Level 4, Medically Managed Intensive Inpatient Services.

These Levels are similar when discussing adolescent care.

### E.    Recovery

Addiction professionals and persons in recovery find hope in recovery. Recovery is available even to persons who may not at first be able to perceive this hope. Recovery is recognized when the individual with SUD acknowledges the disease, commits to recovery in a heart-felt way, and reduces or eliminates inducements to use.  Some individuals, during and after an episode of treatment, my remain abstinent to convince others around them of their commitment to recover, while never actually making the commitment.  When use resumes following this self-imposed, or sometimes coerced, period of abstinence, it is continued use and NOT a relapse.

As in other health conditions, recovery from addiction is best achieved through a combination of self-management, mutual support, and professional care provided by trained and certified professionals. Peer support, such as that found in various "self-help" activities, is beneficial in optimizing health status and functional outcomes in recovery.[23]

Participation in alumni programs can encourage support and connection to prevent post-treatment substance use. Most national programs have such programs and facilitate connection with others who have had a similar treatment experience. The professionals who develop such programs are often seen as a part of a provider's marketing efforts in that they seek to have satisfied consumers remember them for referrals of family members and friends.

---

[23] *See ASAM Public Policy Statement on the Relationship between Treatment and Self Help: A Joint Statement of the American Society of Addiction Medicine, the American Academy of Addiction Psychiatry, and the American Psychiatric Association*, AMERICAN SOCIETY OF ADDICTION MEDICINE, *available at* http://www.asam.org/docs/publicy-policy-statements/1treatment-and-self-help---joint-12-971.pdf.

13

## F.        Access to Care/Funding

Drug abuse and addiction are major public health problems, and it has long been recognized that the public system needs to act as a safety net for addiction treatment services. A large portion of drug treatment is funded by local, state, and federal governmental entities, though these public addiction treatment services remain significantly underfunded and can have long waiting lists which vary by state and geographic region. To use these services, patients also must qualify for this assistance on a means test.

As indicated by the passage of the MHPAEA, health insurance is an essential element in accessing addiction treatment services for most individuals in need. In some states, the public sector programs serve individuals under first-, second-, or third-party pay arrangements, and the state sees itself as the payer of last resort. While the state may be the payer of last resort, individuals with third-party insurance coverage who present themselves to programs in the public sector are often prioritized over the truly indigent, as the reimbursement helps the public program diversify its sources of revenue and often, though meager, may receive more for the hour/slot/bed that the insured individual with an SUD occupies.  Because these services are subsidized by the public funding, the cost to the third-party is generally lower than in the private sector, resulting  in a perverse incentive to drive the insured into the already strained public sector.   Persons suffering from addiction often face significant financial hardship as a result of their disease, which greatly impacts the ability to pay for treatment. These hardships are due to loss of employment or failure to secure employment due to positive pre-employment drug screens, estrangement from family who may have resources or coverage, and loss of financial stability due to large expenditures on drugs or legal defense services due to arrests from substance caused or related crimes (*e.g.,* drug sales, home invasions, public inebriation, issuing and uttering, etc.)

A large population of individuals neither qualifies for government assistance nor has access to insurance benefits. For instance, in 2010, an estimated 4.8 million individuals with SUDs lacked insurance, and among persons who received substance use treatment at a specialty facility, 41.5 percent reported using their "own savings or earnings" as a source of payment for such treatment.[24] Moreover, research has shown that many individuals who have SUDs have low income, and even among those who are employed or have substantial income, as the addiction progresses, those incomes may decrease, and subsequently, once-covered or wealthy patients may have to rely on public funding in order to access addiction treatment.[25] In some cases, family members are forced to refer their loved ones to the criminal justice system to ensure that they can get treatment. Alternatively, access to insurance can allow individuals to obtain the treatment that they need.

---

[24] *Results from the 2010 National Survey on Drug Use and Health: Summary of National Findings*, CENTER FOR BEHAVIORAL HEALTH STATISTICS AND QUALITY, *available at* http://www.samhsa.gov/data/nsduh/2k10nsduh/2k10results.htm; Harold Pollack, *4.8 Million People Uninsured with Drug or Alcohol Problems*, THE INCIDENTAL ECONOMIST, Aug. 17, 2013, *available at* http://theincidentaleconomist.com/wordpress/4-8-million-people-uninsured-with-drug-or-alcohol-problems/.
[25] Suzanne Gelber Rinaldo & David W. Rinaldo, *Availability Without Accessibility? State Medicaid Coverage and Authorization Requirements for Opioid Dependence Medications*, AMERICAN SOCIETY OF ADDICTION MEDICINE (2013).

14

Although private and employer-subsidized health plans may provide coverage for treatment of addiction and its medical consequences, private insurers as payers for addiction benefits have steadily declined since 1986. Between 1986 and 2009, the share of substance abuse spending increased for Medicaid (from 9 percent to 21 percent) and for other state and local governments (from 27 percent to 31 percent) and decreased for private insurance (from 32 percent to 16 percent).[26]

From 1986 to 2009, nominal substance abuse spending growth (4.4 percent annually, on average) was slower than the growth for all-health (7.5 percent) and mental health (6.8 percent).[27]

Unfortunately, managed care also has resulted in shorter average stays, while a historical lack of or insufficient coverage for substance abuse treatment has curtailed the number of operational programs. The National Survey on Drug Use and Health (NSDUH)[28] illustrates this point.

The NSDUH provides national and state-level data on the use of tobacco, alcohol, and illicit drugs (including non-medical use of prescription drugs) in the United States. The survey includes a series of questions to assess the prevalence of substance use, including alcohol and illicit drugs, over the past 12 months. Questions are structured to classify persons as dependent on or abusing specific substances based on criteria specified in the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV and DSM-5).

In addition to questions about substance use employed to classify respondents' need for treatment, NSDUH includes questions about respondents' perceived need for treatment (*i.e.*, whether they felt they needed treatment or counseling for alcohol or illicit drug use). The survey found that in 2020, 41.1 million persons aged 12 or older needed treatment for substance use (14.9 percent of persons aged 12 or older). Some and 2.7 million persons (1.0 percent of persons aged 12 or older and 6.5 percent of those who needed treatment) received treatment at a specialty facility.

Among persons who received treatment at a specialty facility, 31.6 percent reported using their "own savings or earnings" as a source of payment, 48.1 percent reported using private health insurance, 30.0 percent reported using public assistance other than Medicaid, 48.8 percent reported using Medicaid, 20.0 percent reported using funds from family members, and 40.0 percent reported using Medicare.

Of the 27.6 million who were classified as needing but not receiving treatment, 559,000 persons (2.0 percent) reported that they perceived a need for treatment for their alcohol or illicit drug use problem. Of these 559,000 persons who felt they needed treatment but did not receive it in 2020, 115,000 (20.6 percent) reported that they made an effort to get treatment, and 444,000 (79.4 percent) reported making no effort to get treatment.

---

[26] *Status of Federal Funding for Addiction Services,* NAT'L ASS'N OF STATE ALCOHOL AND DRUG ABUSE DIRECTORS, March 3, 2014, *available at* https://www.naadac.org/assets/2416/2014aina_morrison_rob_nasadad.pdf.
[27] *National Expenditures for Mental Health Services & Substance Abuse Treatment 1986-2009*, SUBSTANCE ABUSE AND MENTAL HEALTH SERVICES ADMINISTRATION, *available at* http://store.samhsa.gov/shin/content//SMA13-4740/SMA13-4740.pdf.
[28] *2020 NSDUH Detailed Tables*, SUBSTANCE ABUSE AND MENTAL HEALTH SERVICES ADMINISTRATION, *available at* https://www.samhsa.gov/data/report/2020-nsduh-detailed-tables

Among those who needed and perceived the need for treatment yet made no effort to receive treatment, the reasons for not seeking treatment included:

- No health coverage and could not afford cost (19.1 percent),
- Did not find program that offered type of treatment that was wanted (14.4 percent)
- Concern that receiving treatment might cause neighbors/community to have a negative opinion (11.9 percent),
- Could handle the problem without treatment (9.0 percent),
- Did not want others to find out (6.5 percent),
- Did not have time (5.2 percent), and
- No openings in a program (1.7 percent).

Among people aged 12 or older in 2020 who needed substance use treatment but did not receive it, 97.5 percent did not feel that they needed treatment. These statistics highlight the need to provide greater consumer access to quality, affordable health care that includes routine screenings for substance use, therapeutic interventions, evidence-based treatment, and recovery support.

It is important to have addiction treatment providers willing to take health insurance to provide access to care that would be otherwise unavailable. Addiction treatment providers, recognizing the need to allow patients to use their health insurance benefits, will typically accept insurance; however, these providers often prefer to work outside of commercial insurer networks. Not only is the amount of reimbursement often set lower than the cost of care within network, but treatment planning, including length of stay, is no longer clinically driven when an insurance company limits services without regard for the patient's medical needs. Other than the unrealistically low reimbursement, the most frustrating aspect of negotiated care within network is when inappropriate limits are applied or length-of-stay decisions are determined by an individual not working clinically with the patient (and often without clinical experience).

People with SUDs often face greater financial hardships than other patients, despite the availability of insurance, due to the nature of the disease and its consequences. Patients with SUDs may be insured by a working relative but underemployed or unemployed themselves due to their disorder. It is sometimes difficult to get family members to use their policy for treatment. The family member may not want his or her employer to know about the covered relative having a problem, or the family member may be skeptical of treatment. A lack of family support may exist before and after treatment, so individuals with SUDs may be homeless or may not have housing options after treatment. The lack of family support, housing, and employment often make post-treatment collection of fees virtually impossible.

Addiction treatment providers recognize financial difficulties facing patients – even those with health insurance that covers treatment for SUDs. Addiction treatment providers also have significant experience in dealing with the problems associated with the collection of fees. Many providers use a model of insurance, advance out-of-pocket payments, and financial aid to enable patients to access treatment. Some providers use promissory notes. Attempts to collect the portion of the medical bill for which the patient is responsible must account for the impacts that financial stress and aggressive collection tactics can have on a person's fragile recovery.

16

Addiction treatment providers accepting insurance incur additional costs and have entire departments dedicated to working with insurance companies to meet their requirements and attempt to collect payment. The Hazelden program is one example.

A small number of providers who service a limited group of individuals who are very wealthy can and do require full payment in advance; sometimes these individuals want to use their insurance benefits. To help the patient access insurance benefits, the provider will either manage the insurance policy with pre-certification and utilization review while in treatment or provide a comprehensive bill at the conclusion of care (which usually is not eligible for reimbursement without concurrent reviews).

Providers often must use an estimate of benefits for patients with insurance as the patient's clinical needs and length of stay are not known at the beginning of treatment. Providers also are affected by the insurer's limitations on care, as described above, which are often applied after treatment has concluded and the bill has been submitted. These treatment programs face the risk of receiving payments from insurers lower than those used in calculating the patient's up-front payment obligation.

Insurers' denials of care create a difficult dilemma for the treatment professional, whose last note in the chart documents the patient's clinical need and who knows, if she discharges the patient and the patient experiences an untoward event, the provider could be deemed liable for damages. Very few, if any, providers terminate care when insurance companies' interference becomes financially problematic. In fact, the provider's clinical relationship with the patient is at stake, and a sense of rejection could exacerbate the already grave risks associated with early termination of treatment Ethical SUD treatment providers are aware of the fragility of recovery and are generally reticent to terminate treatment before it is clinically appropriate to do so.

### G.    Substance Use Disorder and Drug Poisoning Crisis

On February 8, 2022, the U.S. Commission on Combating Synthetic Opioid Trafficking published its final report. The Commission cited statistics indicating that drug poisonings have been responsible for more than 1 million deaths in the U.S. since 1999. The Commission estimated that drug poisonings are now costing the U.S. around $1 trillion every year.[29]

More than 101,750 people died of drug poisonings in the 12 months ending in October 2022.[30] More than 76,900 of these deaths involved prescription or illicit opioids, such as illegal fentanyl and fentanyl analogs.[31] In fact, roughly 68 percent of all drug poisoning deaths and 86 percent of opioid poisoning deaths involved synthetic opioids (other than methadone), predominantly illicit fentanyl and its analogs.

---

[29] CNBC, "Drug overdoses are costing the U.S. economy $1 trillion a year, government report estimates," February 8, 2022, *available at* https://www.cnbc.com/2022/02/08/drug-overdoses-cost-the-us-around-1-trillion-a-year-report-says.html.

[30] https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm

[31] https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm

Millennium Health, a national drug testing laboratory, published a report in February 2023 entitled, "Fentanyl in Focus: Perspectives on Polysubstance Use in 2022."[32]

A key finding from the Millennium report was the increasing detection of fentanyl alongside cocaine, methamphetamine, heroin, and prescription opioids. Nationally, fentanyl is the most-detected drug, but the Western United States has seen the most significant rate of growth.

The Millennium data revealed that over 60 percent of fentanyl-positive specimens were also positive for one or more fentanyl analogs. This finding could indicate that the use of multiple fentanyl analogs may be a form of intentional polysubstance use. Geographical analysis also showed regional differences in the prevalence of certain fentanyl analogs.

Furthermore, the Millennium data indicated that individuals with fentanyl-positive specimens were more likely to engage in polysubstance use in comparison with those who had fentanyl-negative specimens. Researchers also found that, given the regional differences, state and local data might be more significant to health care providers than national data alone. An understanding of local trends is essential for the development of effective SUD treatment plans.[33]

Treatment for SUD has shown to be effective in reducing the impact of the disease as well as the public health burden. Appropriate treatment can reduce the number of poisonings and deaths and can increase productivity. Every dollar invested in SUD treatment programs yields a return of between $4 and $7 in increased earnings and decreased drug-related crime, criminal justice costs, and theft.[34] Providing coverage of SUD treatment can not only save lives but also generate significant cost savings.

### H.    Steps Toward Reform

Prior to the enactment of the Patient Protection and Affordable Care Act of 2010 (ACA), health insurers in both public and private plans routinely denied coverage to individuals with SUDs. Health plans discriminated against individuals with SUDs on the basis of preexisting condition by either excluding them from coverage or limiting access to treatment through the use of higher copayments, annual visit limits, and burdensome prior authorization requirements.[35]

The ACA and its implementing regulations significantly expanded insurance coverage and access for individuals with SUDs. For example, the law requires small group plans, individual plans, and Medicaid alternative benefit packages (ABPs) to cover SUD services as one of ten essential health benefits. The ACA also requires health insurers to accept people who apply for coverage regardless of preexisting conditions. The ACA prohibits insurers from charging higher premiums based on health condition, meaning insurers may not exclude individuals with SUDs from coverage or charge them more based on their conditions. The ACA also caps annual out-of-pocket costs for health plan enrollees and prohibits individual plans, small group plans, and

---

[32] http://resource.millenniumhealth.com/signalsreportvol5

[33] http://resource.millenniumhealth.com/signalsreportvol5

[34] Nat'l Inst. On Drug Abuse, Principles of Drug Addiction Treatment: A Research-Based Guide 13-14 (3rd ed. 2012), *available at* https://d14rmgtrwzf5a.cloudfront.net/sites/default/files/675-principles-of-drug-addiction-treatment-a-research-based-guide-third-edition.pdf.

[35] Michael C. Barnes, et al., Potential Impact of Texas et al v United States on Persons with Substance Use Disorder, ABA Health eSource (Oct. 2018).

ABPs from putting yearly or lifetime dollar limits on the coverage of SUD services.[36] The ACA additionally allows states to expand Medicaid coverage to all uninsured adults under the age of 65 with incomes up to 138 percent of the federal poverty level. As of January 2022, 39 states (including Washington, DC) have expanded Medicaid in line with the ACA, and 12 states have not.[37]

Finally, the ACA and its implementing regulations expanded federal parity protections. In 2008, Congress passed the MHPAEA, which mandated parity in insurance coverage between mental health/substance use disorder and medical/surgical services, including both treatment limitations and financial requirements. The MHPAEA only applied to privately insured large group plans that voluntarily offered coverage of MH/SUD benefits. The ACA expanded the MH/SUD parity protections in the MHPAEA to individual and small group plans. In 2016, the Centers for Medicare & Medicaid Services expanded parity protections to Medicaid managed care organizations, Medicaid ABPs, and the Children's Health Insurance Program.[38]

Just as the SUD and drug poisoning crisis was increasing the demand for SUD treatment, federal regulations requiring most health insurance plans to provide coverage of SUD treatment took effect. As of 2014, many Americans had access to SUD treatment for the first time. Naturally, the number of health insurance claims for SUD treatment services increased.

The expansion of the MHPAEA required that many more health insurers' treatment limitations and financial requirements for people being treated for SUD be in parity with those applied to people receiving medical or surgical care. As a result, the dollar value of insurance claims for SUD treatment services also increased.

Congressional efforts to reduce SUD and drug poisonings by providing accessible and affordable treatment remain ongoing. In September of 2022, the House passed H.R. 7780, the Mental Health Matters Act, which will expand access to mental health and SUD services by preventing Americans from being improperly denied mental health and substance use benefits, ensuring a fair standard of review by the courts and banning forced arbitration agreements.[39]

As demonstrated by the Department of Labor's report,[40] health insurance companies are recalcitrant in adjusting to and complying with the requirements of the ACA and MHPAEA that are rapidly evolving to provide access and coverage for SUD treatment.

---

[36] Michael C. Barnes, et al., Potential Impact of Texas et al v United States on Persons with Substance Use Disorder, ABA Health eSource (Oct. 2018).

[37] KFF, "Status of State Medicaid Expansion Decisions: Interactive Map," published Jan. 31, 2022, *available at https://www.kff.org/medicaid/issue-brief/status-of-state-medicaid-expansion-decisions-interactive-map/.*

[38] Michael C. Barnes, et al., Potential Impact of Texas et al v United States on Persons with Substance Use Disorder, ABA Health eSource (Oct. 2018).

[39] https://www.whitehouse.gov/wp-content/uploads/2022/09/H.R.-7780-SAP.pdf

[40] DEP'T OF LABOR, 2022 MHPAEA REPORT TO CONGRESS, (2022) https://www.dol.gov/sites/dolgov/files/EBSA/laws-and-regulations/laws/mental-health-parity/report-to-congress-2022-realizing-parity-reducing-stigma-and-raising-awareness.pdf.

## V.    Factual Summary

Plaintiffs' counsel had not supplied me with any depositions taken in this action as of the time I prepared this report, though I have had access to deposition transcripts taken in the related action – *RJ, et al. v. Cigna Behavioral Health et al.* (*RJ*) – for which I have also been retained as a consultant. I expect to receive transcripts of depositions taken in this action as they are completed, and I intend to supplement this report with any relevant testimony.

The following facts are drawn from Plaintiffs' Consolidated Second Amended Complaint (SAC) [ECF No. 79]. Plaintiffs are OON SUD treatment providers and clinical laboratories. SAC ¶ 23. Plaintiffs are in the profession of helping individuals recover from substance use disorders and return to their families and communities as healthy and productive members of society. *Id.* Plaintiffs are certified to provide these services by the California Department of Health Care Services. *Id.* ¶ 1.

Cigna[41] is an insurance company licensed to do business in the state of California as providers of health insurance benefits. *Id.* ¶¶ 10-16. MultiPlan[42] is a provider of healthcare cost management solutions, specializing in providing claim cost management solutions, health care payment solutions, auditing and reimbursement of behavioral health and substance use disorder claims and costs, as well as prepayment services such as treatment facility and professional bill review and negotiations for controlling the financial risks associated with health care bills on plans insured, managed, or administered by Cigna and its subsidiaries and affiliates. *Id.* ¶¶ 17-18.

Plaintiffs provided medically necessary, preauthorized, and covered SUD treatment and laboratory services to 508 of Cigna's insured members (the patients), including residential withdrawal management and residential treatment (RTC), partial hospitalization/day treatment (PHP), intensive outpatient (IOP), outpatient (OP), treatment planning, counseling and behavioral therapies, family and group therapy, medication management, case management services, and laboratory services to, among other things, determine, measure, or otherwise describe the presence or absence of various substances in the body. *Id.* ¶ 22. The health insurance plans provide coverage for OON SUD treatment and laboratory services. *Id.* ¶ 23.

Before rendering treatment to the patients, Plaintiffs obtained written assignments of benefits from each of the patients. *Id.* ¶ 25. Cigna confirmed, represented, promised, and warranted Plaintiffs through the required verification of benefits process that each of the insureds and their respective OON SUD treatments and services were covered by health insurance plans issued, managed, or administered by Cigna and MultiPlan. *Id.* ¶ 28. In reliance on these assignments of benefits and Cigna representations, Plaintiffs rendered treatment to the patients. *Id.* Cigna knew that Plaintiffs were treating and providing services and were advised and fully aware of Plaintiffs' charges for the treatment and services rendered. *Id.* After providing treatment and services to the patients, Plaintiffs submitted their claims to Cigna for payment. *Id.* ¶ 29.

I have been advised that Plaintiffs and Defendants selected a sample set of the patients for

[41] By "Cigna," I refer to Cigna Corporation, Cigna Health and Life Insurance Company, Connecticut General Life Insurance Company, Cigna Behavioral Health, Inc., Cigna Behavioral Health of California, Inc., Cigna Health Management, Inc., and Cigna Healthcare of California, Inc.
[42] By "MultiPlan," I refer to MultiPlan, Inc. and Viant, Inc.

purposes of discovery. I have reviewed the claims charts and synopses of patient admission and treatment records, including Verification of Benefits (VOB), Assignment of Benefits (AOB), Explanation of Benefits (EOB) and Explanation of Payments (EOP), and other patient specific documents and summaries for the sample patients. I also reviewed documents produced by Defendants in this action, including internal document and communications, and claims administration documents, including Summary Plan Descriptions (SPDs), Administrative Services Only Agreements (ASOs), Cigna's Standards and Guidelines, SIU investigation files, emails, memoranda, spreadsheets, and slide decks. The following facts are drawn from these documents and the Defendants' witness testimony in the *RJ* action.

After Plaintiffs submitted their claims to Cigna for payment, Cigna paid Plaintiffs a nominal percentage of the charges for the claims that are at issue. Cigna accomplished this by, among other things, reimbursing the claims with an artificial "reasonable and customary" (R&C) rate,[43] and funneling claims to MultiPlan through its "cost-containment program," where SUD claims would be priced and reimbursed based on inapplicable Medicare rates for different types of facilities, [44] such as an inpatient psychiatric hospital or a skilled nursing facility (SNF, where an individual recovering from a car accident learning how to walk again may be treated), as developed and determined by MultiPlan's irrational repricing methodologies, including Viant OPR and Data iSight. The Plaintiffs are not Medicare providers, and there is no Medicare rate for SUD treatment facilities such as Plaintiffs'; nor are the services provided by Plaintiffs akin to those services provided by inpatient psychiatric hospitals or SNFs. Further, Cigna and Multiplan are compensated by the amount of money they save the employers (plan sponsors), which provides a financial incentive to deny coverage of treatment services and under-pay providers like the Plaintiffs. Cigna and MultiPlan's repricing methodologies are premised upon Medicare charge and reimbursement data, skewing the reimbursement rates lower.

According to Cigna's website, when calculating reimbursement for OON claims, the plans utilize any of the following three methodologies to calculate what Cigna defines as the "Maximum Reimbursable Charge" ("MRC").[45]

> a.    MRC I:
>
> Under this option, a data base compiled by FAIR Health, Inc. (an independent non-profit company) is used to determine the charges billed by health care professionals or facilities in the same geographic area for the same procedure codes using data. The maximum reimbursable amount is then determined by applying a percentile (typically the 70th or 80th percentile) of billed charges, based upon the FAIR Health, Inc. data. For example, if the plan sponsor has selected the 80th percentile, then any portion of a

---

[43] Also known as "Usual and Customary" (U&C).

[44]  Order to Show Cause *In the Matter of the Certificate of Authority of Health Net Life Insurance Company* (CDI File No. UPA-2016-00005).

[45] myCigna - Legal Disclaimer; https://my.cigna.com/public/legal_disclaimer.html; https://static.cigna.com/assets/chcp/resourceLibrary/clinicalReimbursementPayment/medicalClinicalReimburseOutOfNetwork.html.

charge that is in excess of the 80th percentile of charges billed for the particular service in the same relative geographic area (as determined using the FAIR Health, Inc. data) will not be covered and reimbursed, and the patient will be fully responsible for such excess.

b.      MRC II:

This option uses a schedule of charges established using a methodology similar to that used by Medicare to determine allowable fees for services within a geographic market or at a particular facility. The schedule amount is then multiplied by a percentage (110%, 150% or 200%) selected by the plan sponsor to produce the MRC.

In the limited situations where a Medicare-based amount is not available (e.g., a certain type of health care professional or procedure is not covered by Medicare or charges relate to covered services for which Medicare has not established a reimbursement rate), the MRC is determined based on the lesser of:

> 1.  the health care professional or facility's normal charge for a similar service or supply; or

> 2.  the MRC Option I methodology based on the 80th percentile of billed charges.

c.      Average Contracted Rate ("ACR"):

Under this option, the MRC is determined based on the lesser of:

> 1.  the health care professional or facility's normal charge for a similar service or supply; or

> 2.  the Average Contracted Rate - i.e., the average percentage discount applied to all claims in a geographic area paid by Cigna during a recent 6-month period for the same or similar service provided by health care professionals or facilities participating in the Cigna network. The ACR is updated by Cigna on a semiannual basis. The geographic area used by Cigna is either a Metropolitan Statistical Area (MSA) or an area within governmental boundaries (e.g., state, county, zip code).

In some cases, the ACR amount will not be used and the MRC is determined based on the lesser of:

22

> 1. the health care professional or facilities' normal charge for a similar service or supply; or
>
> 2. the MRC I methodology based on the 80th percentile of billed charges."

The sample patients' SPDs that I reviewed contained either an MRC I reimbursement methodology that obligated Cigna to reimburse Plaintiffs' claims with an R&C rate such as those determined by using FAIR Health, or an MRC II reimbursement methodology that obligated Cigna to reimburse Plaintiffs' claims at either Plaintiffs' "normal charge for a similar service or supply; or the MRC Option I methodology [i.e., R&C] based on the 80th percentile of billed charges," for "situations [like here] where a Medicare-based amount is not available (e.g., a certain type of health care professional or procedure is not covered by Medicare or charges relate to covered services for which Medicare has not established a reimbursement rate)."[46]

The Centers for Medicare and Medicaid Services ("CMS") defines R&C as, "[t]he amount paid for a medical service in a geographic area based on what providers in the area usually charge for the same or similar medical service." As evidenced by the plan language below, this verbiage is commonly used by insurers and referred to as R&C and U&C. For example, one of the MRC I SPDs I reviewed states:[47]

> Maximum Reimbursable Charge is determined based on the lesser of the providers normal charge for a similar service or supply; or
>
> A percentile of charges made by providers of such service or supply in the geographic area where the service is received. These charges are compiled in a database we have selected [e.g., FAIR Health].

An MRC II SPD I reviewed states that the reimbursement methodology for OON claims is:[48]

> 70% of the Maximum Reimbursable Charge [MRC]… [MRC] is determined based on the lesser of the provider's normal charge for a similar service or supply; or… [110%] of a schedule that [Cigna] developed based upon a methodology similar to a methodology utilized by Medicare for similar service in geographic market; In some cases, a Medicare based schedule will not be used and the [MRC] for covered services is determined based on the lesser of:
>
> - the provider's normal charge for a similar service or supply; or

---

[46] *Id*.
[47] Cigna_TML00019837.
[48] Cigna_TML00025225–6.

23

- the 80th percentile of charges made by providers of such service or supply in the geographic area as compiled in database selected by [Cigna].

Cigna changed its reimbursement policies in or around 2015 to discontinue reimbursing MRC I and MRC II OON SUD claims with an R&C rate (on average 50-70% of Plaintiffs' billed charges) due to the absence of a Medicare rate for SUD services, and to instead reimburse MRC I and MRC II claims with inapplicable Medicare-based rates arrived at by Cigna and MultiPlan cross-walking the healthcare billing codes used by Plaintiffs, to codes used by Medicare providers that Cigna and MultiPlan considered similar enough to Plaintiffs'.

Cigna and MultiPlan crosswalked the higher levels of care (RTC and PHP) to codes utilized by inpatient psychiatric hospitals, and the lower levels of care (PHP and OP) to codes utilized by SNFs and general behavioral health counselors. Cigna referred claims to MultiPlan for repricing with its Viant OPR that utilizes Medicare charge data to reprice OON SUD facility claims, and Data iSight that utilizes Medicare cost data to reprice OON SUD professional claims. In addition to MultiPlan using inapplicable SNF Medicare rates to reprice SUD claims, MultiPlan had insufficient data to arrive at an IOP R&C rate for the geographic area where Plaintiffs provided the service and instead used the percentile of charges by SNFs at a national level, which yielded an arbitrarily low Medicare SNF rate.

I have not yet had the opportunity to review deposition testimony explaining why Cigna changed its reimbursement policies in or around 2015 and began reimbursing OON SUD claims with Medicare rates. However, I have reviewed documents that reflect Cigna management's concern about the amount it was obligated to spend on OON SUD claims, the effect on Cigna's profits, and programs and initiatives that were implemented to reduce the amount Cigna would actually spend on OON SUD services. I also reviewed ASOs between Cigna and self-insured plan sponsors, Cigna's agreement with MultiPlan, and claims data that reflects Cigna and MultiPlan's compensation is tied to a percentage of "savings" – the difference between Plaintiffs' billed charges and the amount actually paid to Plaintiffs.

Cigna derives revenue in two ways under the ASOs when providing claims administrative services for self-insured employers that sponsor health benefit plans for their employees that are relevant to this action: (1) Cigna receives a per-member/per-month (PEPM) fee that is calculated based on historical claims data and intended to approximate the monthly average cost of administering the health benefits plan; and (2) Cigna receives an additional "cost containment" fee generally calculated as 27 or 29 percent of the "net savings." Net savings are the difference between the provider's billed charged and the amount actually paid to the provider, less MultiPlan's fee. The Master Services Agreement between Cigna and MultiPlan calls for calculation of MultiPlan's fees as 9-12 percent of the gross savings (depending on the year and amendment to the agreement).

## VI.    Opinions

1.    Cigna implemented policies and systematic practices that emphasized profits over patients and resulted in the under-reimbursement of Plaintiffs' claims, with Cigna instead paying Plaintiffs an arbitrary, nominal percentage of the charges, far below a reasonable and customary rate.

Plaintiffs are not Medicare providers and there is no Medicare rate for SUD treatment facilities such as Plaintiffs'; nor are the services provided by Plaintiffs the same as those services provided by psychiatric hospitals or SNFs. Cigna and MultiPlan's use of Medicare rates to reimburse SUD treatment claims is inappropriate. Further, Cigna and its third-party partners like Multiplan are compensated by the amount of money they save the employers (plan sponsors), which provides a financial incentive to under-pay providers like Plaintiffs. Cigna disregarded the language it drafted into the SPDs that obligated Cigna to reimburse Plaintiffs' OON SUD claims with an R&C rate or the Plaintiffs' normal billed charges under either the MRC I or MRC II methodology given the absence of a Medicare rate, which is how Cigna historically had been reimbursing OON SUD claims prior to the 2015 changes to its reimbursement policies. Instead, Cigna cross-walked Plaintiffs' billing codes and reimbursed their MRC I and MRC II claims with inapplicable Medicare-based rates.

The MRC I methodology makes no mention that Cigna would use a Medicare-based rate to reimburse OON SUD services, and Medicare rates for a different type of facility bear no relationship to an R&C rate or the FAIR Health benchmark rate for SUD services, or to Plaintiffs' "normal charge for a similar service or supply" as represented in the MRC I SPDs and in Cigna's online legal disclaimer.

The MRC II methodology allows for the use of a Medicare-based reimbursement rate, but only when a Medicare rate is available and only if Cigna bases that rate "upon a methodology similar to a methodology utilized by Medicare for a similar service in the geographic market" as represented in the MRC II SPDs and in Cigna's online legal disclaimer. There is no Medicare rate for SUD treatment facilities, and I saw no evidence that Cigna's methodology is similar to Medicare's methodology.

Cigna and MultiPlan's repricing methodologies and reimbursement rates are premised upon Medicare data purchased by Cigna and MultiPlan that they use to produce arbitrary, unreliable and unjust reimbursement rates for Plaintiffs' SUD services that are a nominal percentage of the charges and far from Plaintiffs' usual, reasonable and customary charges. These rates were arbitrary in that there is no evidence to indicate Cigna and MultiPlan arrived at these purported R&C reimbursement rates by analyzing data of billed charges made by healthcare professionals or facilities in the same geographic area for the same procedure codes. In fact, the evidence demonstrates that Cigna and MultiPlan arrived at these rates by analyzing claims data for different providers of different services in different geographic areas. It appears more likely than not that Cigna and MultiPlan arrived at these reimbursement rates not in an effort to fairly determine the R&C rates, but rather to increase their own profits.

Cigna's ASO cost-containment fees and MultiPlan's repricing fees, both of which are calculated as a percentage of the difference between what the providers charge and what Cigna ultimately is

willing to pay, financially incentivize Cigna and MultiPlan to under-pay Plaintiffs' claims – the lower the reimbursement rate, the higher are Cigna and MultiPlan's fees. The claims data for the sample patients in this action demonstrates that Cigna and MultiPlan routinely made more money in savings fees for Plaintiffs' claims than Plaintiffs were paid for actually providing the life-saving treatment.[49] For example, Cigna's claims data indicates that for one of the sample patient's claims, the provider billed $3,418.00 for its services.[50] The sum paid to the provider was only $369.04.[51] Cigna earned a savings fee of $1,079.34 (nearly three times as much as the provider), and MultiPlan made $274.40.[52] The provider in this instance received ~10% of the amount billed, while Cigna received ~35% of the net savings or over 30% of the amount billed.

The use of low Medicare rates to reimburse OON SUD claims is just one of the strategies and initiatives Cigna implemented in 2015 to reduce spending on SUD treatment at a time when a million Americans have died from a drug poisoning. Cigna should have been implementing initiatives and strategies to increase coverage and access to SUD treatment.

2.      There is no Medicare rate for inpatient or outpatient SUD services billed by residential treatment facilities such as Plaintiffs, and Cigna and MultiPlan's cross-walking of billing codes to arrive at a Medicare rate for an entirely different service furnished by an entirely different type of facility is arbitrary and unreasonable.

SUD treatment facilities are significantly different from inpatient psychiatric hospitals and SNFs in terms of the treatments and services provided, the patients who are treated, the risks of harm patients present to themselves and others, and the resources and staffing necessary to operate the different facilities.

Psychiatric hospitals and SNFs provide inpatient care, while the majority of the claims at issue were for outpatient services. SUD providers are tasked with the responsibility of treating someone who can leave the treatment facility and gain access to alcohol, prescription drugs, and illegal substances, such as fentanyl analogs. We are responsible not only to the patients but feel an obligation to the public at large. Many people with SUDs are not only a danger to themselves but to others. For example, people with SUDs may commit crimes, such as drug dealing, as a consequence of their SUD. SUDs entail a plethora of risks that are less common at inpatient psychiatric hospitals and typically not encountered at SNFs.

With increased risks, come increased duties and associated costs, which are reflected in amounts SUD treatment facilities bill. SUD treatment facilities may provide inpatient services, which entail less patient exposure to the outside community, or outpatient services, which entail greater patient exposure to the outside community and related risks to the patient's SUD recovery. By definition, inpatient psychiatric facilities' services are not outpatient services and do not entail as much exposure to the outside community and associated risks to recovery. SUD treatment facilities provide varying levels of services not provided by inpatient psychiatric hospitals and medically specialized services not provided by SNFs.

---

[49] Cigna_TML00195707

[50] Cigna's Claim Report Vol. 12 for DR Recovery Patient ▮▮▮▮▮ Cigna_TML00195703, column DJ.

[51] *Id.*, also known as the allowed amount, column DL.

[52] *Id.*, columns DM and DO.

26

The nature of the treatment SNFs provide differs significantly from SUD treatment. CMS defines a SNF as: "[a] facility (which meets specific regulatory certification requirements) which primarily provides inpatient skilled nursing care and related services to patients who require medical, nursing, or rehabilitative services but does not provide the level of care or treatment available in a hospital."[53] The treatment and care provided at a SNF does not compare to that provided at an SUD treatment facility, where level of care decisions and individualized treatment plans are vital to a patient's recovery.

If a patient with an SUD is not successful in an outpatient setting, SUD treatment providers may decide that another treatment setting or level of care is more appropriate, whether inpatient, residential, partial hospitalization, or maybe a more intensive outpatient. Each level of care requires a different type of service, investment of time, and resources.[54] Beyond levels of care, each patient at an SUD treatment facility often requires different specialized services, many of which are not provided at SNFs and, therefore, are not reflected in the blanket SNF reimbursement rates used by Cigna. For example, a marital or family issue may be at the center of someone's substance use. In this scenario, I would connect the patient with a family therapist to assess this issue and to work with the treating physician to develop a treatment plan. These types of specialized services are not available at many SNFs. Similarly, many SNFs may employ physical therapists, which are rarely needed or present in SUD treatment facilities.

Cigna and MultiPlan's cross-walking of Plaintiffs' billing codes to inpatient psychiatric hospitals and SNFs is arbitrary and unreasonable considering the significant differences in treatment, care, risks, resources, and staffing. The services are not the same, and the Medicare rates for these differing facilities do not reflect what SUD providers in the same geographic area usually charge for SUD treatment. Indeed, Cigna and MultiPlan's cross-walking of Plaintiffs' billing codes to Medicare rates resulted in reimbursement amounts that were generally between seven and 20 percent of Plaintiffs' billed charges. These Medicare-based rates are not SUD R&C rates, such as those generated by FAIR Health.

3.     Despite Cigna's payment obligations under the sample patients' SPDs, Cigna and MultiPlan used biased data systems, administrative burdens, and deceptive practices to avoid paying, or to pay unreasonably low reimbursement rates for Plaintiffs' OON SUD services.

As discussed above, MultiPlan's Master Services Agreement with Cigna provides for Cigna to pay MultiPlan a fee premised upon the savings MultiPlan achieves by repricing a claim. Cigna provides MultiPlan an "allowable amount" that MultiPlan must beat in order to receive a fee. MultiPlan provides Cigna with different services to achieve this savings, including network agreements with the providers that include reduced negotiated rates available to Cigna, MultiPlan's Viant and Data iSight databases (discussed above) that are used to reprice claims, and single-claim negotiation services.

---

[53]https://www.cms.gov/glossary?term=skilled+nursing+facility&items_per_page=10&viewmode=grid#:~:text=A%2 0facility%20(which%20meets%20specific,treatment%20available%20in%20a%20hospital.

[54] For details in the details of the various levels of care see, https://www.medicaid.gov/state-resource-center/innovation-accelerator-program/iap-downloads/reducing-substance-use-disorders/asam-resource-guide.pdf

MultiPlan may bestow upon a provider the perception of in-network status with its network agreements, but MultiPlan will not guarantee reimbursement at the negotiated network rate, and Cigna may choose to ignore the negotiated network rate, instead paying a cross-walked Medicare rate. In negotiating single-claim agreements, MultiPlan employed questionable coercive tactics, offering Plaintiffs negotiated rates far below the R&C rate and a fraction of the billed charges with an indication that if not accepted, Plaintiffs could expect an even lower Medicare-based rate. As part of this negotiation process, MultiPlan conditions payment on the OON provider's agreement to waive the balance bill.

There are additional examples of Cigna and MultiPlan's use of flawed methodologies, biased data systems, burdensome requirements, and deceptive practices to avoid paying, or pay unreasonably low reimbursement rates for, OON SUD services.

4. Cigna wrongfully determined that certain SUD services, levels of care, and laboratory testing lacked medical necessity based upon its own internal coverage and level of care guidelines, utilization review policies and procedures, reimbursement policies and claims editing functions that are inconsistent with generally accepted standards of care, and through its special investigations unit (SIU) policies and procedures that unjustifiably denied SUD claims without any clinical review by Cigna.

The claim charts I reviewed reflect a number of claims where Cigna determined the allowed amount to be $0. When cross-referencing those patients' line item claims to the patients' charts, it is apparent that Cigna denied definitive drug testing claims pursuant to its Medical Coverage Policy for Drug Testing, which provides for presumptive drug testing not to exceed one test per date of service up to 32 tests per year, and definitive drug testing not to exceed one test per date of service up to 16 tests per year, subject to limiting factors.

Another group of claim denials were for services Cigna deemed not medically necessary. However, the vast majority of these claims were "administrative" denials for an alleged lack of documentation of the medical necessity, without any clinical review of the claim. The patient charts reflect the providers' compliance with Cigna's repeated requests for records, yet no acknowledgment by Cigna that it had received the requested records. There were some claim denials for lack of medical necessity where the claim was reviewed by a medical director. However, the medical director's opinion conflicted with the records in the patient's chart. Furthermore, it has been well-documented that Cigna's medical directors have a custom and practice of denying claims without ever reviewing the medical records.

According to investigative reporting conducted by the independent, not-for-profit ProPublica news publication and published on March 25, 2023, Cigna "has built a system that allows its doctors to instantly reject a claim on medical grounds without opening the patient file, leaving people with unexpected bills, according to corporate documents and interviews with former Cigna officials. Over a period of two months last year, Cigna doctors denied over 300,000 requests for payments using this method, spending an average of 1.2 seconds on each case"

The denials in this case are consistent with the initiatives described in the 2015 emails between Cigna's management that prioritized drafting new drug testing policies to limit coverage for such testing. The initiatives entailed utilization management policies and guidelines and intensified

28

efforts to increase medical necessity documentation requirements and administratively deny claims. None of these initiatives was intended to expand coverage, enhance access to care, or improve care. Rather, the emails, memos, and slide decks made clear that Cigna's intent behind these initiatives was to reduce the amount it would have to spend on reimbursing SUD claims.

One such email message read, "When it comes to labs, the enterprise is working on a coverage policy change around the number of tests allowed per screening as well as denying quantitative test when a customer has a negative qualitative test." Cigna_TML00171620. The new one-size-fits all rule denying coverage of quantitative (definitive) testing after a negative qualitative (presumptive) test is inconsistent with medical standards. Presumptive drug testing does not identify many substances, including fentanyl. At a time when more than 101,750 Americans are dying of drug poisonings, and more than 68 percent of those poisonings involve synthetic opioids like illegal fentanyl analogs, it is often medically necessary to conduct frequent definitive drug testing for many patients in the active treatment phase of SUD management.

## VII.    Compensation

I am being compensated at $1,250.00 per hour for my review of materials and preparation of this report.

## VIII.   Exhibits
- Curriculum Vitae
- List of cases in which expert testimony was provided

Dated:  March 30, 2023

By:   *Andrea G. Barthwell*
      Andrea G. Barthwell, MD, DFASAM

29